1   THE TIDRICK LAW FIRM LLP
    STEVEN G. TIDRICK, SBN 224760
2   JOEL B. YOUNG, SBN 236662
    1300 Clay Street, Suite 600
3   Oakland, California  94612
    Telephone: (510) 788-5100
4   Facsimile:  (510) 291-3226
    E-mail:    sgt@tidricklaw.com
5   E-mail:    jby@tidricklaw.com

6   Attorneys for Individual and Representative
    Plaintiff MELANIE SPORTSMAN
7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11  MELANIE SPORTSMAN,                  Case No. 3:19-cv-03053-WHO

12              Plaintiff,              **NOTICE OF MOTION, MOTION, AND
                                        MEMORANDUM OF POINTS AND
13       v.                             AUTHORITIES IN SUPPORT OF
                                        PLAINTIFF'S MOTION FOR SUMMARY
14  A PLACE FOR ROVER, INC. d/b/a Rover JUDGMENT AND/OR PARTIAL
    *et al.*,                           SUMMARY JUDGMENT**

15              Defendants.             Date:      March 31, 2021
16                                      Time:      2:00 p.m.
                                        Location:  Courtroom 2 – 17th floor
17                                                 San Francisco Courthouse
                                                   450 Golden Gate Avenue
18                                                 San Francisco, California

19                                      Judge:     The Honorable William H. Orrick

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION .................................................................................... 1

MEMORANDUM OF POINTS & AUTHORITIES ............................................................ 1

I.      INTRODUCTION ............................................................................................ 1

II.     FACTS ................................................................................................................ 2

    A.  The Defendant ......................................................................................... 2

    B.  Defendant Brands Itself as a Pet Service Provider ......................... 4

    C.  Defendant Recruits People to Work for Rover as Pet Care Providers........... 7

    D.  Defendant Offers and Sells Pet Care Services and Related Products to Pet Owners ................................................................... 8

    E.  Defendant Exerts Significant Control Over the Pet Care Providers' Work .. 10

         1.  Defendant Dictates the Types of Pet Care Services That Are Offered .......................................................... 10

         2.  Defendant Sets the Terms and Conditions of Work ...................... 10

         3.  Defendant "Scores" the Performance of Pet Care Providers .......... 11

         4.  Defendant Requires That All Bookings, Payments, and Communications with Pet Owners Be Completed Through Its Website ............................................................ 12

         5.  Defendant Deducts 20% From the Earnings of Pet Care Providers and Characterizes the Deductions as "Service Fees" ..................... 13

         6.  Defendant Requires Rover Profiles ................................................. 14

         7.  Defendant Requires Detailed Reporting by Pet Care Providers ..... 15

    F.  Defendant's "Pet Care Provider" Position Does Not Require Special Skills ........................................................................ 17

    G.  Plaintiff Melanie Sportsman ............................................................ 17

III.    ARGUMENT .................................................................................................... 18

    A.  Legal Standards Governing Plaintiff's Claims ............................... 18

         1.  Rule 56(c) Standard ........................................................................ 18

         2.  The IWC Wage Orders Apply to Plaintiff's Work for Defendant.. 18

             a)  Wage Order #5 Applies to Plaintiff's Work ........................ 19

i

b)   In the Alternative, Wage Order # 4 Applies .......................... 19

c)   In the Alternative, Wage Order # 17 Applies ....................... 20

B.  The Court Should Apply the "ABC Test" of *Dynamex* to Determine Whether Plaintiff Was an Employee ............................................. 21

1.  Defendant Cannot Establish That "The Worker Performs Work That Is Outside The Usual Course of [Defendant's] Business" ("Prong B").................................................................................. 21

2.  Defendant Cannot Establish That Plaintiff "Is Customarily Engaged in an Independently Established Trade, Occupation, Or Business of The Same Nature As The Work Performed" ("Prong C").................................................................................. 23

3.  Defendant Has the Burden of Proving the Prongs of the ABC Test .............................................................................................. 25

IV.    CONCLUSION.................................................................................................. 25

1

**TABLE OF AUTHORITIES**

2

**CASES**                                                                                                    **PAGE(S)**

3

*Anderson v. Liberty Lobby, Inc.*,

4

477 U.S. 242 (1986). ............................................................................................ 18

*Arshakyan v. X17, Inc.*,

5

2019 WL 10097455 (C.D. Cal. June 21, 2019) ................................................... 25

6

*Bradley v. Networkers Internat., LLC*,
211 Cal. App. 4th 1129 (2012) ............................................................................ 19

7

*California Corr. Peace Officers' Assn. v. State of California*,

8

188 Cal. App. 4th 646 (2010) .............................................................................. 20

9

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................. 18

10

*Cotter v. Lyft, Inc.*,

11

60 F. Supp. 3d 1067 (N.D. Cal. 2015) ................................................................. 22

12

*Crawford v. Uber Technologies, Inc.*,
2018 WL 1116725 (N.D. Cal. 2018) .................................................................... 23

13

*Cunningham v. Lyft, Inc.*,

14

2020 WL 2616302 (D. Mass. 2020) ................................................................ 22, 23

15

*Dynamex Operations West Inc. v. Superior Court*,
4 Cal. 5th 903 (2018) ................................................................................... *passim*

16

*Galen v. County of Los Angeles*,

17

477 F.3d 652 (9th Cir. 2007) ............................................................................... 18

18

*Garcia v. Border Transportation Grp.*, LLC,
28 Cal. App. 5th 558 (2018) ........................................................................... 24, 25

19

*Huntington Mem'l Hosp. v. Superior Court*,

20

131 Cal. App. 4th 893 (2005) .............................................................................. 21

21

*James v. Uber Techs. Inc.*,
2021 WL 254303 (N.D. Cal. Jan. 26, 2021) ....................................................... 23

22

*Johnson v. Arvin-Edison Water Storage Dist.*,

23

174 Cal. App. 4th 729 (2009) .............................................................................. 20

24

*Lockhart v. Cty. of Los Angeles*,
2007 WL 9627609 (C.D. Cal. Oct. 16, 2007) ................................................. 20, 21

25

*Martinez v. Combs*,

26

49 Cal. 4th 35 (2010) ...................................................................................... 20, 21

27

*Namisnak v. Uber Technologies, Inc.*,
444 F. Supp. 3d 1136 (N.D. Cal. 2020) .............................................................. 23

28

iii

*O'Connor v. Uber Technologies, Inc.*,
82 F. Supp. 3d 1133 (N.D. Cal. 2015) .................................................................................... 23

*Olsen v. Idaho State Bd. of Med.*,
363 F.3d 916 (9th Cir. 2004) ................................................................................................. 18

*People v. Superior Court of Los Angeles Cty.*,
57 Cal. App. 5th 619 (2020) .................................................................................................. 21

*People v. Uber Techs., Inc.*,
56 Cal. App. 5th 266 (2020) ............................................................................................. 22, 23

*Rogers v. Lyft, Inc.*,
452 F. Supp. 3d 904 (N.D. Cal. 2020) ................................................................................... 22

*Tidewater Marine W., Inc. v. Bradshaw*,
14 Cal. 4th 557 (1996) ........................................................................................................... 19

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers
Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*,
2009 WL 734028 (C.D. Cal. Mar. 16, 2009) ......................................................................... 19

*Vazquez v. Jan-Pro Franchising Int'l, Inc.*,
10 Cal. 5th 944 (2021) ........................................................................................................... 21

STATUTES AND REGULATIONS

A.B. 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019) ......................................................... 1, 2, 21

Cal. Labor Code §§ 1171 *et seq.* ............................................................................................ 19

Cal. Labor Code § 1182.11 ..................................................................................................... 19

Cal. Labor Code § 2775 .......................................................................................................... 2

Cal. Code Regs., tit. 8, §§ 11000 *et seq.* ...................................................................... 19, 20, 21

RULES

Fed. R. Civ. P. 56(c) .............................................................................................................. 18

**NOTICE OF MOTION AND MOTION**

TO DEFENDANT AND ITS ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on March 31, 2021, at 2:00 p.m., or as soon thereafter as the matter may be heard by the Court, Plaintiff Melanie Sportsman ("Plaintiff") will and hereby does move the Court for an Order granting Summary Judgment and/or Partial Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure. There are no genuine disputes of material fact, and Plaintiff is entitled to judgment as a matter of law, as to whether Plaintiff is an employee of Defendant A Place For Rover, Inc. d/b/a Rover ("Defendant" or "Rover") under California law. The motion will be based on this Notice, the following Memorandum of Points and Authorities, the Declarations of Melanie Sportsman ("Sportsman Dec.") and Steven G. Tidrick ("Tidrick Dec.") filed herewith, the pleadings and other papers filed in this action, and any evidence or argument presented at the hearing.

DATED: February 24, 2021            Respectfully submitted,

THE TIDRICK LAW FIRM LLP

By:     /s/ Steven G. Tidrick
_____
STEVEN G. TIDRICK, SBN 224760
JOEL B. YOUNG, SBN 236662

Counsel for Plaintiff Melanie Sportsman

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION

Defendant classifies its workers who perform pet care services ("Pet Care Providers") as independent contractors. Plaintiff alleges that California law requires that Defendant classify the Pet Care Providers as employees, and has asserted numerous claims arising from the alleged misclassification. The first step in proving these claims is establishing that Plaintiff, a Pet Care Provider for Defendant, must be classified as an employee. In 2018, the California Supreme Court simplified the relevant test when it issued its decision in *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 955 (2018), reh'g denied (June 20, 2018) ("*Dynamex*"), which the California Legislature subsequently codified. *See* A.B. 5, Ch. 296,

1

2019–2020 Reg. Sess. (Cal. 2019); Cal. Lab. Code § 2775. Pursuant to this test, workers are presumed to be employees. *See Dynamex*, 4 Cal. 5th at 955. To overcome this presumption and lawfully classify a worker as an independent contractor, a company must, pursuant to the *Dynamex* three-prong "ABC" test, prove three (3) things: (a) that the worker is free from the control and direction of the hirer; (b) that the worker performs work that is outside the usual course of the hiring entity's business; and (c) that the worker is customarily engaged in an independently established trade, occupation, or business. *Id*. at 925. This motion seeks partial summary judgment based on the second factor ("Prong B") and third factor ("Prong C"). Because no genuine dispute of material fact exists, the Court should grant partial summary judgment on the issue of misclassification.

## II. FACTS

### A. The Defendant

Defendant, a for-profit business, was founded in 2011. *See* Transcript of Deposition of Defendant's Rule 30(b)(6) witness Derek Chang, Dec. 18, 2020 ("Rover Depo.") (Ex. 1 to Tidrick Dec.), at 23:7-21, 38:14-24, 173:8-13. Defendant sought to compete with kennels by providing pet owners with an alternative. *See* Tidrick Dec. Ex. 20 (press release entitled "Rover.com Introduces Mobile App For Dogs (And Owners) On The Go," which describes the business as an "alternative to traditional dog boarding that connects dog owners with local dog sitters and hosts, in real homes, in hundreds of cities across the United States."); Stipulation Regarding Authenticity of Documents, filed Dec. 8, 2020 (ECF No. 61) ("Stipulation Regarding Authenticity"), ¶ 27.

Through its website and mobile app, Defendant offers and sells services that are performed by workers whom it refers to as "service providers," "pet sitters," "sitters," or "dog walkers" (collectively, "Pet Care Providers"). *See* Rover Depo. at 14:1-5; 18:10-20:4 & Ex. 3. The services include "Dog Walking" (30-minute walks), "Doggy Day Care" (in the Pet Care Provider's home), "Dog Boarding" (in the Pet Care Provider's home), "House Sitting" (animal care in the pet owner's home on a per day basis), and "Drop-In Visit" (30-minute check-in at the pet owner's home) (collectively, "Pet Care Services"). *Id.* Rover refers to the

2

purchasers (and prospective purchasers) of the Pet Care Services as "pet owners" or "pet parents" (collectively, "Pet Owners"). *See* Rover Depo. at 15:18-24. The following is an image showing how Defendant offers to sell the Pet Care Services to pet owners:



*Id.* at 18:10-20:4 & Ex. 3

As of April 24, 2017, Defendant touted that it has "established itself as the largest network of dog sitters in the U.S. with more than 100,000 sitters" and "over the past year it has become the largest dog walking service in the country with more than 75,000 active dog walkers covering thousands of cities." *See* Tidrick Dec. Ex. 21 (press release entitled "Rover.com Introduces "The Dog People" in First Integrated National Brand Campaign"); Stipulation Regarding Authenticity ¶ 35.

Defendant recently disclosed that "[s]ince its inception through 2020, more than 2 million pet parents have booked services on Rover with more than 500,000 pet care providers across North America and Europe." *See* Tidrick Dec. Ex. 22 (press release). It also announced that it will become a public company via a merger with Nebula Caravel Acquisition Corp. ("Nebula Caravel"). *Id.* Nebula Caravel is a special purpose acquisition company, also known as an "SPAC" or "blank check company," a corporation formed for the sole purpose of raising investment capital through an initial public offering ("IPO"). *Id.* "The transaction values Rover at an enterprise value of approximately $1.350 billion." *Id.*

3

Defendant generates revenue exclusively from the services performed by the Pet Care Providers. Defendant charges the Pet Owner's credit card at the time when the Pet Owner books a service. *See* Tidrick Dec. Ex. 23 (website printout) ("When will I be charged for a service? Your card is charged at the time of booking, similar to reserving a flight."); Rover Depo. at 59:12-62:4 & Ex. 5 ("Terms of Service"), at page 7 (ROVER_000509), § 10.2. From the time when the Pet Owner books the service, Defendant retains Pet Owner's payment, and then, two days after the Pet Care Provider provides the service, Defendant pays the Pet Care Provider a portion of the funds. *See* Tidrick Dec. Ex. 23 ("Rover holds onto the funds and releases payment to your sitter or dog walker two days after the service is complete."). Defendant has testified that it "deducts twenty percent" and pays the Pet Care Provider 80% of the Pet Owner's payment. *See* Rover Depo. at 38:14-39:3; *see also* Sportsman Dec. ¶¶ 6-9 & Exs. A, B. Thus, Defendant recognizes as revenue the payments made by Pet Owners for the services provided by Pet Care Providers. *See* Rover Depo. at 38:4-24; *see also id.* at 42:7-43:3 (testifying that Rover does not sell software or technology). Defendant admits that without the Pet Care Providers, Defendant would not generate revenue. *See id.* at 38:4-40:1.

## B. Defendant Brands Itself as a Pet Service Provider

On April 24, 2017, Defendant announced a $4.5 million advertising campaign "declaring [Defendant's] brand as The Dog People™." *See* Tidrick Dec. Ex. 21; Stipulation Regarding Authenticity ¶ 35. The nationwide campaign "portrays a collection of moments illustrating why Rover and its community of pet sitters and dog walkers are The Dog People that pet parents prefer for dog care." *Id.* Defendant's "goal with this campaign is to show pet parents that Rover can help them find true dog people who will care for their dog the same way they would." *Id.* In the advertising campaign, Defendant marketed itself as a pet care service provider. For example, Defendant has stated:

- "At Rover.com we're the dog care—second only to you—dog people, ready to walk, love, or just play with your dog. Download the app and book today. Rover.com. The dog people." *See* Tidrick Dec. Ex. 41 (Rover commercial entitled "Find your perfect sitter on Rover") at 0:16-0:30; Stipulation Regarding Authenticity ¶ 4.

4

- "So whenever you're out of town or just stuck at work, you'll know your pup can still have all of the fun, like park fun, and stick fun, and even popsicle fun. For whatever dog thing your dog needs, find their perfect fit on Rover." *See* Tidrick Dec. Ex. 42 (Rover commercial entitled "How to find The Perfect Pet Sitter Rover.com") at 0:39-0:55; Stipulation Regarding Authenticity ¶ 5.

- "Get $20 off your first service. Rover.com. The dog people. We're the dog people. . . . At Rover.com we're the dog care—second only to you—dog people, ready to walk, love, or just play with your dog. Download the app and book today. Rover.com. The dog people." *See* Tidrick Dec. Ex. 43 (Rover commercial filename "Rover_000557") at 0:02-0:09, 0:24-0:37; Stipulation Regarding Authenticity ¶ 15.

- "When there's thunder, we've got cuddles. At Rover.com we're the dog people, ready to be there for your dog, rain or shine. Download the app and book today. Rover.com. The dog people." *See* Tidrick Dec. Ex. 44 (Rover commercial filename "Rover_000563") at 0:01-0:15; Stipulation Regarding Authenticity ¶ 17.

- "Amy has a girl's weekend. Luckily, she also has a Rover sitter for her dog. . . . The dog people are ready. Book a sitter today on Rover.com." *See* Tidrick Dec. Ex. 45 (Rover commercial entitled "The Dog People Are Ready – Boarding") at 0:00-0:05; 0:25-0:30; Stipulation Regarding Authenticity ¶ 19.

- "Janet has to work late. Luckily, she also has a Rover walker for her dog. . . . The dog people are ready. Book a walker today on Rover.com." *See* Tidrick Dec. Ex. 46 (Rover commercial entitled "The Dog People Are Ready – Walking") at 0:00-0:05; 0:26-0:30; Stipulation Regarding Authenticity ¶ 20.

- "Let's walk. . . . Find the perfect walker for your dog. Rover.com. The dog people." *See* Tidrick Dec. Ex. 47 (Rover commercial entitled "Walk It Out") at 0:00-0:02; 0:25-0:30; Stipulation Regarding Authenticity ¶ 21.

In its advertising, Defendant has prominently displayed Pet Care Providers wearing the company's distinctive green t-shirt and/or other paraphernalia showing the Rover.com logo, which suggests to prospective purchasers that Pet Care Providers are Rover.com employees and/or core to the Rover.com business. For example:

1
2
3
4
5
6
7
8
9



Ex. 45 at 00:23

10
11
12
13
14
15
16
17
18
19



Ex. 47 at 00:11

20
21
22
23
24
25
26
27
28



Ex. 43 at 00:18

6



Ex. 43 at 00:19

**C.    Defendant Recruits People to Work for Rover as Pet Care Providers**

In order to ensure that it has enough Pet Care Providers to provide its advertised services, Defendant recruits people to work as Pet Care Providers. It recruits prospective workers using "job search" websites such as Indeed.com as well as postings on its own website. *See* Rover Depo. at 197:9-18, 199:11-22 & Ex. 19; Tidrick Dec. Exs. 24, 25, 26, 27, 28. Defendant informs prospective recruits that working as a "Rover sitter" is a "job" and/or implies that the recruit will work for Rover. For example, Defendant states:

- "***A Part-Time Job For College Students: Make Money as a Pet Sitter***
  Whether you're preparing to start college or already in the thick of it, finding a part-time job that fits your student schedule can be a challenge. Pet sitting, however, is flexible, fun, and the perfect study break for students. You may already have experience taking care of the family dog or watching your neighbor's cat while she was out of town. Whether you're looking for a summer job or a side gig during the school year, Rover is an excellent choice for a part-time job for college students." *See* Tidrick Dec. Ex. 24 (Rover website page entitled "A Part-Time Job For College Students: Make Money as a Pet Sitter") (emphasis added); Stipulation Regarding Authenticity ¶ 42.

- "***Why Rover is a great job for retirees*** While all of the above jobs for retirees are great choices, we'd like to think Rover offers something special. Not only are you getting to hang out with dogs all day, but you're helping someone experience the unconditional love of a dog. With Rover, people who work full time can rest easy knowing someone like you is caring for their best friend. And you get to explore your community, get some exercise and make a little

7

money while you're at it. Wondering how the cash you make with Rover can enhance your retirement?" *See* Tidrick Dec. Ex. 25 (Rover website page entitled "Jobs for Retirees – Part-Time Jobs for Retirees") (emphasis added); Stipulation Regarding Authenticity ¶ 62.

- "As an on-demand dog walker, you play an important role in every owner's experience ***trusting Rover*** with their beloved pets. Currently, on-demand dog walking is Rover's only service that allows you, as a walker, to accept a request without any prior conversation with the owner." *See* Tidrick Dec. Ex. 26 (Rover website page entitled "Best Communication Practices as an On-demand Dog Walker") (emphasis added); Stipulation Regarding Authenticity ¶ 39.

- "'Dogs Bring Out the Best in Me:' ***Meet Rover Sitter Fabiana***." *See* Tidrick Dec. Ex. 27 (Rover website page) (emphasis added); Stipulation Regarding Authenticity ¶ 36.

- "Become a ***Rover sitter*** – Make up to $1,000/month watching dogs in your home. . . . ***Rover dog sitters*** come from a variety of backgrounds and industries, including customer service, sales, retail, the restaurant industry (including barista, bartender, server, and waiter/waitress, restaurant host, hostess, bus, bus boy), messenger, bike messenger, delivery driver, finance, marketing, data entry, food runner, account manager, contract worker, cleaner, baby sitter [sic], babysitter, caregiver, teacher, education, and intern. If you work from home or you're a student, recent grad, seasonal worker, contract worker, stay at home mom, stay at home dad--or ***you're just looking for flexible work, gig work, part-time work, seasonal work, a summer job*** or work to earn additional money on the side--***Rover could be a great fit for you***. . . . ***Rover sitters*** come from a variety of backgrounds, but successful sitters are dog lovers first." *See* Tidrick Dec. Ex. 19 (Rover Depo. Ex. 19) (Rover_000571) (emphasis added).

- "Love dogs? Pet sitters are in demand! ***Become a sitter with Rover*** and get paid to play with dogs." *See* Tidrick Dec. Ex. 28 (Rover_000577) (emphasis added).

*See also* Rover Depo. at 196:5-17 & Ex. 19 (testifying that Defendant has "put communications out" encouraging people to become Pet Care Providers).

### D.     Defendant Offers and Sells Pet Care Services and Related Products to Pet Owners

While Defendant's Rule 30(b)(6) witness asserted that Defendant is an "online marketplace," *see* Rover Depo. at 40:4-16, undisputable facts show that Defendant is in the business of providing Pet Owners with Pet Care Services and related products.

8

First, Pet Owners pay Defendant (not the Pet Care Providers) for pet care services. A Pet Owner who wants to purchase a service offered on Defendant's website or mobile app makes a booking through the website or mobile app, at which time the Pet Owner selects the service and a Pet Care Provider, and at the time of booking, *the Pet Owner pays Defendant*. *See* Tidrick Dec. Ex. 23; Rover Depo. at 59:12-62:4 & Ex. 5 ("Terms of Service"), at page 7 (ROVER_000509), § 10.2. If the selected Pet Care Provider turns out to be unavailable, Defendant will either "find a new Rover sitter or dog walker" or refund the Pet Owner. *See* Rover Depo. at 94:5-95:3 & Ex. 5 ("Terms of Service"), at page 7 (ROVER_000509), § 10.5 ("Reservation Guarantee"); Tidrick Dec. Ex. 29 (Rover web page entitled "Rover's Reservation Guarantee"); Tidrick Dec. Ex. 30 (Rover web page entitled "Rover's Booking Protection"); Sportsman Dec. ¶ 13. Only after the service is provided, specifically, two days later, Defendant pays the Pet Care Provider who provided the service. *See* Ex. 5 ("Terms of Service"), at page 7 (ROVER_000509), § 10.2; Tidrick Dec. Ex. 23.

Second, Defendant provides Pet Owners with the "Rover Guarantee." *See* Rover Depo. at 124:8-126:22 & Ex. 8. The Rover Guarantee "exists to fill the gap when the responsible party—usually the pet care provider—is unable or unwilling to pay for costs arising from damage or injury attributable to his or her negligence, and when insurance is not available. It is a contractual agreement from Rover to protect its users, enforceable in accordance with the Rover Guarantee Terms and Conditions." *See* Ex. 8 at page ROVER_000526. The "[r]eimbursement under the Rover Guarantee is generally paid out of Rover's own pocket—though [Rover] reserve[s] the right to refer a claim to [its] insurance carriers when necessary or appropriate." *Id*.

Third, Defendant offers refunds to Pet Owners for "substandard services." *See* Tidrick Dec. Ex. 5 ("Terms of Service"), at ROVER_000509, § 10.5 ("Refunds for Substandard Services"); Rover Depo. at 140:1-141:14. Rover promises: "If we determine in our reasonable discretion that a Service Provider has failed to provide Pet Care Services in accordance with our guidelines and policies on the Site or these terms then we may, in our reasonable discretion, cancel a Booking and issue a full or partial refund to a Pet Owner." *See* Ex. 5 at § 10.5.

Fourth, Defendant provides various "features" to ensure that Pet Owners are satisfied with

9

the Pet Care Services. *See* Rover Depo. at 22:7-22 (referring to Rover's "team of trust and safety"); Tidrick Dec. Ex. 31 (Rover web page entitled "Trust & Safety – Safety is at the heart of what we do") ("On top of offering round-the-clock support, we provide features that facilitate safe, informed, and positive experiences for the people and pets in our community.").

   **E.      Defendant Exerts Significant Control Over the Pet Care Providers' Work**

   **1.      Defendant Dictates the Types of Pet Care Services That Are Offered**

Defendant chose the five types of Pet Care Services that it offers to Pet Owners on its website and app; Pet Care Providers do not have the ability to offer other services. *See supra* Section II(A); Rover Depo. at 32:13-22; 34:13-25. Indeed, as Rover states on one of its web pages directed at Pet Care Providers, "here's *our* full list of services":

> - **Dog boarding:** Your client's dogs come to your home and stay overnight.
> - **House sitting:** You go to your client's home and stay overnight, taking care of their dogs and home.
> - **Drop-in visits:** You stop by your client's home while they're away a few times a day for 30 minutes each time to feed and play with their dogs.
> - **Dog walking:** You pick up your client's dogs at their home and provide a 30-minute walk.
> - **Doggy day care:** Your client's dogs come to your home during the day, dropping off around 7–9am, and picking up around 4–6pm.

Ex. 32 at page 1-2.

   **2.      Defendant Sets the Terms and Conditions of Work**

Defendant's agreement with its Pet Care Providers (including Plaintiff) dictates various terms and conditions of work. For example:

- Defendant "conduct[s] an initial review of" a prospective Pet Care Provider's "application" and requires that the prospective worker pass "background checks." *See* Tidrick Dec. Ex. 5 (Terms of Service), § 2.2.

- Defendant requires that each Pet Care Provider be "18 years of age or older." *See* Tidrick Dec. Ex. 5 (Terms of Service), § 3.

- Defendant requires that each Pet Care Provider have a "profile page" (also known as "Rover profile") on the Rover.com website and mobile app. *See* Tidrick Dec. Ex. 5 (Terms of Service), § 7.1; Rover Depo. at 44:12-45:20 & Ex. 4; Tidrick Ex. 33 (Rover's "tips [that] will make your Rover profile

10

shine"); Stipulation Regarding Authenticity"), ¶ 58; Sportsman Dec. ¶ 10.

- Defendant reserves the right to, and in fact does, terminate Pet Care Providers for "any" reason "or no reason at all." *See* Tidrick Dec. Ex. 5 (Terms of Service), § 4.2; Rover Depo. at 166:7-25; 168:12-20. When Defendant terminates a Pet Care Provider, Defendant "deactivates" the Rover profile for that person, and the individual is prohibited from creating a new profile. *See id.*

- Defendant prohibits a true business with multiple personnel from serving as a Pet Care Provider. A person working as a Pet Care Provider is not allowed "to authorize the use of [his/her] account . . . by any other person." Rather, there can be only "one caregiver for any given profile." *See* Tidrick Dec. Ex. 5 (Terms of Service), § 4.1; Rover Depo. at 89:18-22; *see also id.* at 89:23-94:3; Sportsman Dec. ¶ 13.

- Defendant prohibits Pet Care Providers from using Rover's website or app to "arrange for the provision and purchase of services" and "then complete a payment transaction for those services offline." *See* Tidrick Dec. Ex. 5 (Terms of Service), § 4.1.

### 3. Defendant "Scores" the Performance of Pet Care Providers

Defendant monitors the performance of Pet Care Providers and maintains a "scoring" system whereby it assigns numerical "performance scores" (between 50 and 100) that: (1) purports to provide the Pet Care Provider with a "sense of how [he or she is] performing compared to other" Pet Care Providers; and (2) impacts the Pet Care Provider's "profile ranking," *i.e.*, how "high" or "low" the Pet Care Provider's "Rover profile" appears in search results on Rover's website and mobile app when a Pet Owner is booking Pet Care Services. *See* Tidrick Dec. Ex. 34 (Rover web page entitled "What are sitter performance scores?") ("Sitter Performance Scores give you a sense of how you're performing compared to other sitters and walkers on the platform, and they influence your profile ranking in search. The higher your score, the better your placement in relevant search results on Rover."); Stipulation Regarding Authenticity, ¶ 71; Sportsman Dec. ¶ 11.

Thus, Pet Care Providers with higher performance scores are "reward[ed]" by Defendant with "a higher search rank – meaning [they] get more exposure" to prospective customers; conversely, Pet Care Providers with lower performance scores are penalized by Defendant with a lower search rank. *See* Rover Depo. at 169:24-170:15 & Ex. 13; *see also id.*

1    at 155:10-24; 157:16-163:2. For example, if the Pet Care Provider rejects a client or

2    prospective client during a time period when the Pet Care Provider's online calendar indicates

3    that he or she is "available," Rover penalizes the Pet Care Provider with a lower performance

4    score and thus a lower search rank. *See id.; see also* Ex. 34; Sportsman Dec. ¶ 11.

5         A Pet Care Provider's search rank has a financial impact on the Pet Care Provider. A

6    lower search rank means that he or she is less likely to receive booking requests and thus is

7    less likely to earn income. *See* Tidrick Dec. Ex. 35 (Rover web page stating that if "your

8    search rank" is "lower" then "you'll be less likely to receive requests"); Stipulation Regarding

9    Authenticity, ¶ 63; *see also* Sportsman Dec. ¶ 11. As Defendant has stated, "You could be the

10   best pet sitter in the biz, but if pet parents never see your profile, you won't get the stay

11   requests you deserve. So how can you make sure that pet parents who come to Rover see your

12   profile at the top of their search results?" Ex. 36; Stipulation Regarding Authenticity, ¶ 55.

13            **4.    Defendant Requires That All Bookings, Payments, and**

14                **Communications with Pet Owners Be Completed Through Its Website**

15        Defendant requires that all payments by Pet Owners, and all communications between Pet

16   Care Providers and Pet Owners, be done through its website and/or mobile app. Defendant states:

17   "Paying and communicating through Rover is essential to ensuring a safe and secure experience.

18   In fact, it's so important to everyone's security that we made it a requirement in our Terms of

19   Service." *See* Tidrick Dec. Ex. 14 (Rover web page entitled, "What if a client wants to pay me

20   directly, not through the Rover site?"); Stipulation Regarding Authenticity, ¶ 53; Rover Depo. at

21   169:1-17. Moreover, "[a]ccepting payments outside of Rover could also lead to account

22   suspensions for both the sitter and the owner." *See* Rover Depo. at 89:2-17 & Ex. 14. Therefore,

23   Defendant instructs the Pet Care Providers that "if someone asks to pay you directly—whether

24   that's via check, cash, wire transfer, or a payment website other than Rover—say no and remind

25   them that paying through Rover keeps everyone's information secure." *See* Ex. 14.

26        Defendant instructs its Pet Care Providers to "never" accept payments directly from

27   customers and "always" to use the Rover website or mobile app for booking job assignments. *See*

28   Rover Depo. at 169:24-170:13 & Ex. 13. Defendant's directive is clear: "Never accept cash or

12

NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT – *Sportsman v. A Place for Rover, Inc. et al.*, Case No. 3:19-cv-03053-WHO

checks—always book on Rover." Ex. 34 at page 3.

Defendant repeatedly issues that directive: "**Never accept cash or checks—always book on Rover.** Booking on Rover is required per Rover's Terms of Service. We reward sitters and dog walkers who have a great history on the site with a higher search rank—meaning you get more exposure to dog owners near you." *See* Rover Depo. at 170:4-13 & Ex. 13 (emphasis in original).

Defendant further instructs its Pet Care Providers: "If a Pet Parent Offers to Book Outside the Site, Say 'No Thanks'." *See* Tidrick Dec. Ex. 36 (Rover web page entitled "How Search Rank Works (and How to Work It)"), at page 3; Stipulation Regarding Authenticity, ¶ 55.

> **5.      Defendant Deducts 20% From the Earnings of Pet Care Providers and Characterizes the Deductions as "Service Fees"**

Defendant generates income by deducting 20% (or sometimes 15% or 25%) from payments made by Pet Owners each time they pay for Pet Care Services; Defendant pays the Pet Care Provider the remainder. *See* Rover Depo. at 38:14-39:3; Sportsman Dec. ¶¶ 6-9 & Exs. A, B. Defendant has characterized those percentage deductions as "service fees" taken from the earnings of the Pet Care Providers; the percentage is 15%, 20%, or 25%, depending on when the Pet Care Provider's profile was approved by Defendant. *See* Rover Depo. at 59:12-62:4 & Ex. 5 ("Terms of Service"), at page 7 (ROVER_000509), § 10.3 (section entitled "Service Fees"); Tidrick Decl. Ex. 37 (Rover web page entitled, "What are the service fees?") ("Service fees vary depending on when your Rover profile was approved. . . . If your sitter profile was originally created and approved before March 1, 2016, you'll take home 85% of earnings from each booking."); Stipulation Regarding Authenticity, ¶ 46. *See also* Tidrick Dec. Ex. 38 (Rover web page), at page 2 ("you keep 80% of your earnings"); Stipulation Regarding Authenticity, ¶ 51.

Defendant states that the service fees are necessary for the company to "provide ongoing support" and "educational opportunities" and for "facilitating Rover's customer support, 24/7 trust and safety coverage, and important site maintenance and product improvements." *See* Tidrick Decl. Ex. 37 at page 2. *See also* Tidrick Decl. Ex. 38 at page 2 (stating that the "20% [service fee] helps us cover benefits for sitters, including the costs of processing payments and

13

ongoing promotion of sitters on Rover—as well as Rover Support, 24/7 Trust & Safety coverage, and important site maintenance and product improvements").

Defendant sets the service fee rates, and asserts that it can change them from time to time at its sole discretion. *See id*.; Ex. 5 at page 1 (ROVER_000503), § 1 ("You understand and agree that we may change the Terms from time to time, and that any such changes will be effective immediately. . . .") and page 7 (ROVER_000509), § 10.3 (section entitled "Service Fees").

### 6.    Defendant Requires Rover Profiles

In order for someone to work for Rover as a Pet Care Provider, he or she is required to create a "Rover profile." *See* Rover Depo. at 45:3-12. The Pet Care Provider does not incur any cost for creating and having a Rover profile. *See* Tidrick Dec. Ex. 38 at page 2 (Rover web page) ("It's free to create your profile on Rover . . . . "); Stipulation Regarding Authenticity, ¶ 46.

Defendant has stated that the purpose of a Rover profile is "to allow Pet Owners to find, evaluate and contact" Pet Care Providers. *See* Tidrick Dec. Ex. 5 (Terms of Service), § 7.1. *See also* Rover Depo. 45:13-20.

Defendant strictly controls what appears, and what does not appear, on Rover profiles. *See* Tidrick Dec. Ex. 5 (Terms of Service), §§ 7.5, 7.6; Sportsman Dec. ¶ 10. Pet Care Providers provide a photograph and certain required information, and then Defendant creates and maintains the profiles. Sportsman Dec. ¶ 10. Defendant dictates that each Rover profile include a photograph of the Pet Care Provider and identify him or her only by their first name and last initial. *Id*.; *see also* Rover Depo. at 52:4-14 & Ex. 4. Defendant does not allow Pet Care Providers to include their last name or list a phone number or e-mail address. *See* Sportsman Dec. ¶ 10; *see also* Rover Depo. at 52:16-24. Defendant does not allow a Pet Care Provider to list a business name. *See* Sportsman Dec. ¶ 10; *see also* Rover Depo. at 51:18-52:14.

Defendant dictates that a Rover profile leads with a photograph of the Pet Care Provider, followed by their first name and last initial, their location, their "star" rating as calculated by Defendant, their "Response Rate" as calculated by Defendant, and their "Response Time" as calculated by Defendant. *See* Sportsman Dec. ¶ 10; *see also* Rover Depo.

14

1   at 52:4-14, 53:12-23 & Ex. 4. Below that section, the various categories that follow are all

2   dictated by Defendant. *See* Sportsman Dec. ¶ 10.

3       Defendant controls the order in which Rover profiles of various Pet Care Providers appear

4   when a Pet Owner is booking a service on the Rover website or mobile app; the ordering also

5   known as "search rank." *See* Rover Depo. at 57:19-23; Tidrick Dec. Ex. 36 (Rover web page

6   entitled "How Search Rank Works (and How to Work it)").

7       Defendant has an algorithm for search ranking that incorporates various factors, which

8   include the following and possibly other undisclosed factors: (1) the Pet Care Provider's history

9   of accepting or declining booking requests by Pet Owners, excluding any requests that were

10  outside the Pet Care Provider's specified time periods of availability, "specified service range," or

11  "stated dog preferences"; (2) whether the Pet Care Provider gets "great" reviews from Pet

12  Owners; and (3) how often the Pet Care Provider provides "repeat" services to a Pet Owner. *See*

13  Tidrick Dec. Ex. 36 at page 1 ("the order that sitters show up can seem random—but don't worry,

14  there's a science behind it. We can't give away the recipe to our secret sauce, but there are some

15  things you can do to show up at the top"); Rover Depo. at 57:19-23; 160:15-161:16 & Ex. 13.

16  Defendant provides guidance to Pet Care Providers for improving their search ranking, for

17  example: "Keep Your Calendar Updated"; "Get Testimonials and Reviews"; "Upload Great

18  Pictures"; "Respond Quickly and with Enthusiasm"; "Deliver Great Service to Earn Loyal

19  Clients"; and "If a Pet Parent Offers to Book Outside the Site, Say 'No Thanks'." Ex. 36 at 2-3.

20      If a Pet Care Provider has fewer than three completed bookings and does not respond to a

21  booking request, Defendant places the Pet Care Provider's Rover profile in "away mode," which

22  means that the Pet Care Provider cannot get booking requests, and if the Pet Care Provider

23  "reactivates" his or her profile, the search rank will be lower, and thus he or she will be less likely

24  to receive booking requests. *See* Tidrick Dec. Ex. 35 at pages 1-2 (Rover web page entitled,

25  "Keep your profile live and out of away mode"); Stipulation Regarding Authenticity, ¶ 63.

26      **7.    Defendant Requires Detailed Reporting by Pet Care Providers**

27      Defendant requires Pet Care Providers to "tap the appropriate icon [on the Rover

28  mobile app] each time they pee, poo, eat or drink" ("they" referring to the Pet Owner's pet),

15

so that this information will be reported to the Pet Owner on a "Rover Card" when the Pet Care Provider has completed his or her services. *See* Tidrick Dec. Ex. 39 (Rover web page entitled, "Rover Cards Are Here!"); Stipulation Regarding Authenticity, ¶ 66. The Rover Card is an electronic reporting mechanism designed by Rover whereby the Pet Care Provider provides the following to the Pet Owner: (1) "start and stop times"; (2) the exact times when the animal urinated, defecated, ate, and drank water; (3) "at least one photo" of the animal; and (4) an "optional short note." *See* Tidrick Dec. Ex. 39 (Rover web page entitled, "Rover Cards Are Here!"); Stipulation Regarding Authenticity, ¶ 66.

For the dog walking service, Rover has "dog walking map" technology that "works with the Rover Card . . . to track and share information about pee, poo, food, and water activity during the walk" and also "tracks the walker's route for the time between when the walk starts and stops." *See* Tidrick Dec. Ex. 40 (Rover web page entitled, "How does the dog walking map feature work?"), at page 1; Stipulation Regarding Authenticity, ¶ 41. Rover's technology also tracks the location of the Dog Care Provider. The company has described its location tracking as follows: "When a dog walker begins a walk, they'll tap Start in their Rover app. When they're done, they'll tap Stop to end the walk. During that time, their device will track and store their GPS location data, which is sent to Rover once they hit Stop. Rover then uses that info to create a Rover Card that is sent to the pet owner." Ex. 40 at page 2. The following is an example of a location tracking map that is sent to the Pet Owner:



NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – *Sportsman v. A Place for Rover, Inc. et al.*, Case No. 3:19-cv-03053-WHO

1   Ex. 40 at page 2.

2       Defendant communicates to Pet Care Providers that Rover Cards are required, as

3   follows: "You **must** use Rover Cards for Recurring Bookings **in order to get paid**." *See*

4   Tidrick Dec. Ex. 10 (emphasis added); Stipulation Regarding Authenticity, ¶ 40; Rover Depo.

5   at 133:18-134:1 (testifying "I don't have anything to believe that it's not accurate").

6       **F.    Defendant's "Pet Care Provider" Position Does Not Require Special Skills**

7       Defendant states: "What are the requirements to offer dog boarding? Number one:

8   have a genuine love of dogs! You also need to be at least 18 years old, be able to board dogs

9   in your home, and have the latest Rover app for iOS or Android. Beyond that—sitters come

10  from a variety of backgrounds, from office workers to people with less traditional career

11  paths. Note that your past work experience doesn't matter too much as long as you fit the

12  requirements above." *See* Tidrick Dec. Ex. 38 (Rover web page) at page 2; Stipulation

13  Regarding Authenticity, ¶ 51.

14      **G.    Plaintiff Melanie Sportsman**

15      Plaintiff Melanie Sportsman worked for Rover as a Pet Care Provider from May 2017

16  to December 2018. *See* Sportsman Dec. ¶ 2. In that capacity, she performed the following

17  services: (1) "drop-in visits" of approximately 30 minutes each, during which time she would

18  go into the pet owner's home to ensure that the dog has food, water, and an opportunity for a

19  "potty break," and to otherwise provide the dog with attention and "play" time; (2) "dog

20  walking" whereby she would take the dog on a thirty-minute walk starting and ending at the

21  pet owner's home; and (3) "dog boarding" whereby she would care for the dog while I hosted

22  the dog at her home overnight; and (4) "doggy day care" whereby she would care for the dog

23  while she hosted the dog at her home during the day, beginning in the morning (when the pet

24  owner would drop off their dog at her home) and ending around 4pm to 6pm (when the pet

25  owner would pick up the dog from her home). *Id.* ¶ 3. Every time she performed these

26  services, she acted as an attendant to the dog in that she would be present with the dog, wait

27  on the dog, and attend to the dog's needs (for food, water, potty breaks, and play time). *Id.*

28  She also cleaned up after the dog, and photographed the dog. The photos were provided to the

1    pet owner so that the pet owner would know that she was taking good care of the dog. *Id.*

2        During the time Sportsman worked for Defendant, she was taking classes at Clovis

3    Community College, and had no other employment. *Id*. ¶ 5.

4        Sportsman never worked in any kind of animal care capacity either before or after

5    working for Defendant. *Id*. ¶ 12. She never took any steps to establish and promote an

6    independent pet care services business, such as incorporating a business entity, obtaining a

7    business license, advertising to the general public, and/or making offerings to the public or to

8    potential customers to provide services of an independent business. *Id*. ¶ 5.

9    **III.    ARGUMENT**

10       **A.    Legal Standards Governing Plaintiff's Claims**

11           **1.    Rule 56(c) Standard**

12       Summary judgment may be granted only when, drawing all inferences and resolving all

13   doubts in favor of the non-moving party, there are no genuine issues of material fact and the

14   moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v.

15   Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing substantive law, it

16   could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

17   A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could

18   return a verdict for the nonmoving party." *Id*. Bald assertions that genuine issues of material fact

19   exist are insufficient. *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). The

20   moving party bears the burden of identifying those portions of the pleadings, discovery, and

21   affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at

22   323. Once the moving party meets its initial burden, the nonmoving party must go beyond the

23   pleadings and, by its own affidavits or discovery, set forth specific facts showing that a genuine

24   issue of fact exists for trial. Fed. R. Civ. P. 56(c). All reasonable inferences, however, must be

25   drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363

26   F.3d 916, 922 (9th Cir. 2004).

27           **2.    The IWC Wage Orders Apply to Plaintiff's Work for Defendant**

28       California labor law secures for employees the right to a minimum wage, the right to

18

1    overtime pay, and other benefits. *See, e.g.,* Cal. Labor Code §§ 1171-1194. Many of these

2    rights are further defined by "wage orders" issued by the State of California's Industrial

3    Welfare Commission ("IWC"). *See* Cal. Labor Code § 1182.11.

4           The "IWC is the state agency empowered to formulate regulations (known as wage

5    orders) governing employment in the State of California." *Tidewater Marine W., Inc. v.*

6    *Bradshaw*, 14 Cal. 4th 557, 561 (1996). "The IWC is a quasi-legislative body authorized by

7    statute to promulgate orders regulating wages, hours, and conditions of employment for

8    employees throughout California.  Pursuant to this authority, the IWC has promulgated

9    seventeen different "wage orders" that apply to various groups of employees. The Ninth

10   Circuit has stated that IWC wage orders are 'quasi-legislative regulations that are to be

11   interpreted in the same manner as statutes.'" *United Steel, Paper & Forestry, Rubber, Mfg.,*

12   *Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*,

13   2009 WL 734028, at *3 (C.D. Cal. Mar. 16, 2009) (quoting *Watkins v. Ameripride Servs.,* 375

14   F.3d 821, 825 (9th Cir. 2004) (citations omitted).

15          "The wage orders are codified in the California Code of Regulations (Cal.Code Regs.,

16   tit. 8, §§ 11010-11170.)" *Bradley v. Networkers Internat., LLC*, 211 Cal. App. 4th 1129, 1135

17   (2012). There is a general minimum wage order, 8 Cal. Code Reg. § 11000, and there are

18   wage orders specific to particular industries. *See* 8 Cal. Code Reg. §§ 11010-11170.

19                      **a)      Wage Order # 5 Applies to Plaintiff's Work**

20          Subject to certain limited exceptions not applicable here, Wage Order No. 5 applies to

21   "all persons employed in the public housekeeping industry," which is defined as "any

22   industry, business, or establishment which provides meals, housing, or maintenance services

23   . . . and includes, but is not limited to the following: . . . Establishments providing veterinary

24   or other ***animal care services***." Cal. Code Regs. tit. 8, § 11050, §§ 1, 2(P)(7) (emphasis

25   added). Plaintiff provided animal care services, and thus Wage Order No. 5 applies. *See supra*

26   Section II(G); Sportsman Dec. ¶ 3.

27                      **b)      In the Alternative, Wage Order # 4 Applies**

28          If the Court were to find that Wage Order No. 5 does not apply, then Wage Order No.

19

NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT – *Sportsman v. A Place for Rover, Inc. et al.*, Case No. 3:19-cv-03053-WHO

4 would apply. It covers "attendants," "hosts," "cleaners," and "photographers," among others. *See* Cal. Code Regs. tit. 8, § 11040, § 1, 2(O). Pet Care Providers act in all of those capacities. *See supra* Section II(G); Sportsman Dec. ¶ 3.

### c)    In the Alternative, Wage Order # 17 Applies

If the Court were to find that Wage Order Nos. 4 and/or 5 do not apply, nor any of the other wage orders numbered 1 through 3 or 6 through 16, then Wage Order No. 17 would apply. It covers "[a]ny industry or occupation not previously covered by, and all employees not specifically exempted in, the Commission's wage orders in effect in 1997, or otherwise exempted by law, are covered by this order." *See* Cal. Code Regs. tit. 8, § 11170, § 1(A).

"The IWC promulgated Wage Order No. 17, effective March 1, 2000, to implement wage order amendments required by Assembly Bill No. 60 (1999–2000 Reg. Sess.)." *California Corr. Peace Officers' Assn. v. State of California*, 188 Cal. App. 4th 646, 655 (2010) (citing *Johnson v. Arvin-Edison Water Storage Dist.*, 174 Cal. App. 4th 729, 739 (2009)).[1] "Wage Order No. 17 is a catch-all order, which subsumes 'Miscellaneous Employees' who are not otherwise covered specific wage orders." *Id.* at 655. "It applies to any industry or occupation not previously covered by, and *all employees not specifically exempted in, the Commission's wage orders in effect in 1997, or otherwise exempted by law.*" *Id.* at 655 (citing Cal. Code Regs., tit. 8, § 11170) (internal quotations and brackets omitted).

When Wage Order No. 17 was enacted, "one of the IWC commissioners explained that this wage order would apply to an industry that was 'something altogether new that couldn't be identified as belonging in any other wage order.'" *Johnson*, 174 Cal. App. 4th at 739; *California Corr. Peace Officers' Assn. v. State of California*, 188 Cal. App. at 655.

The California Supreme Court has stated that Wage Order No. 17 "cover[s] all employees not covered by an industry or occupation order." *Martinez v. Combs*, 49 Cal. 4th 35, 57 & n.24 (2010). A federal district court has held that Wage Order No. 17 "was intended to cover any occupations and industries not already covered <u>or</u> exempted." *Lockhart v. Cty. of*

---

[1] "At a public meeting held January 9, 2001, the IWC voted to change the name of 'Interim Wage Order—2000' to 'Wage Order 17—Regulating Miscellaneous Employees. *Johnson*, 174 Cal. App. 4th at 739.

20

NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – *Sportsman v. A Place for Rover, Inc. et al.*, Case No. 3:19-cv-03053-WHO

1     *Los Angeles*, 2007 WL 9627609, at *5 (C.D. Cal. Oct. 16, 2007). *See also Huntington Mem'l*

2     *Hosp. v. Superior Court*, 131 Cal. App. 4th 893, 902 (2005) (stating that Wage Order No. 17

3     "applies to industries and occupations not covered by, and all employees not specifically

4     exempted in, the wage orders in effect in 1997").

5        **B.**      **The Court Should Apply the "ABC Test" of *Dynamex* to Determine**

6             **Whether Plaintiff Was an Employee**

7        As used in the Wage Orders, "employ" means "to engage, suffer, or permit to work." *See*

8     *Martinez v. Combs*, 49 Cal. 4th 35, 64 (2010). *See, e.g.,* Cal. Code Regs. tit. 8, § 11050 (Wage

9     Order No. 5), § 2(E); Cal. Code Regs. tit. 8, § 11040 (Wage Order No. 4), § 2(E). The California

10    Supreme Court has interpreted the "suffer or permit to work" standard as: "(1) placing the burden

11    on the hiring entity to establish that the worker is an independent contractor who was not intended

12    to be included within the wage order's coverage; and (2) requiring the hiring entity, in order to

13    meet this burden, to establish *each* of the three factors embodied in the ABC test—namely (A)

14    that the worker is free from the control and direction of the hiring entity in connection with the

15    performance of the work, both under the contract for the performance of the work and in

16    fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's

17    business; *<u>and</u>* (C) that the worker is customarily engaged in an independently established trade,

18    occupation, or business of the same nature as the work performed. *Dynamex*, 4 Cal. 5th at 957.

19    The *Dynamex* ABC test applies to all claims based on the Wage Orders. *Id*. at 964. *See also*

20    *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 10 Cal. 5th 944 (2021) (holding that *Dynamex* applies

21    retroactively). The *Dynamex* ABC test also applies to all Labor Code claims arising on or after

22    January 1, 2020. *See People v. Superior Court of Los Angeles Cty.*, 57 Cal. App. 5th 619, 626

23    (2020) ("Effective January 1, 2020, AB 5 codified (as Labor Code section 2750.3) the ABC test

24    and expanded its reach to apply to all claims under the Labor Code and the Unemployment

25    Insurance Code. (Stats. 2019, ch. 296, § 2.)").

26        **1.**      **Defendant Cannot Establish That "The Worker Performs Work That**

27             **Is Outside The Usual Course of [Defendant's] Business" ("Prong B")**

28        To illustrate the 'line' between employees and independent contractors, the California

Supreme Court in *Dynamex* offered examples to show how prong B of the ABC test applies:

> [O]n the one hand, when a retail store hires an outside plumber to repair a leak in a bathroom on its premises or hires an outside electrician to install a new electrical line, the services of the plumber or electrician are not part of the store's usual course of business and the store would not reasonably be seen as having suffered or permitted the plumber or electrician to provide services to it as an employee. On the other hand, when a clothing manufacturing company hires work-at-home seamstresses to make dresses from cloth and patterns supplied by the company that will thereafter be sold by the company, or when a bakery hires cake decorators to work on a regular basis on its custom-designed cakes, the workers are part of the hiring entity's usual business operation and the hiring business can reasonably be viewed as having suffered or permitted the workers to provide services as employees.

*Dynamex*, 4 Cal. 5th at 959-60. These examples demonstrate that a business cannot establish prong B for workers who perform work that is fundamental to its operations.

Recently, with respect to the question whether Uber drivers are employees of Uber, the California Court of Appeal affirmed a trial court's finding that "there is more than a reasonable probability the People will prevail on the merits at trial." *People v. Uber Techs., Inc.*, 56 Cal. App. 5th 266, 301 (2020), *as modified on denial of reh'g* (Nov. 20, 2020), *review denied* (Feb. 10, 2021). Analyzing Prong B of *Dynamex*, the court reasoned that Uber's "usual course of business involves the day-to-day task of matching riders and drivers each time a user requests a ride, arranging for riders' payments to be processed, and retaining a portion of the proceeds from each ride." *Id.* at 297. The court noted that "the legislative history does appear to show an awareness that the misclassification issues AB 5 sought to address are prevalent not just in traditional "brick and mortar" businesses, but in modern technology-driven companies as well." *Id.* at 297 & n.18.

Plaintiff anticipates that Defendant will assert that it is in the business solely of creating a technological platform. That argument has no merit. The court in *People v. Uber* was presented with that contention and rejected it. The court stated: "A number of cases have considered contentions that ride-sharing companies such as Lyft and Uber are in the business solely of creating technological platforms, not of transporting passengers, and have dismissed them out of hand." *Id.* at 270 (citing *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067 (N.D. Cal. 2015), *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 911 (N.D. Cal. 2020), *Cunningham v. Lyft, Inc.*, 2020 WL 2616302 (D.

22

Mass. 2020), *O'Connor v. Uber Technologies, Inc.*, 82 F. Supp. 3d 1133 (N.D. Cal. 2015), *Crawford v. Uber Technologies, Inc.*, 2018 WL 1116725 (N.D. Cal. 2018), and *Namisnak v. Uber Technologies, Inc.*, 444 F. Supp. 3d 1136, 1143 (N.D. Cal. 2020)). *See also James v. Uber Techs. Inc.*, 2021 WL 254303, at *10 (N.D. Cal. Jan. 26, 2021) ("This Court has repeatedly held that Uber and Uber's drivers are both in the business of transportation.").

The court's reasoning in *People v. Uber* is compelling here. There is no need to go to trial to see if Rover can prove that Pet Care Services are outside the usual course of its business. Rover was founded to compete with kennels. *See supra* Section II(A). It has described itself as "the largest network of dog sitters in the U.S." *See id*. To showcase its success as a business, it has touted its number of Pet Care Providers. *See id*. Rover offers and sells the Pet Care Services and related products to Pet Owners. *See supra* Section II(D). Rover's advertising prominently features images of Pet Care Providers wearing Rover-branded apparel while caring for pets. *See supra* Section II(B). Rover cannot deny the obvious: Rover could not operate its business without its Pet Care Providers. *See supra* Section II(A). The Pet Care Providers perform Rover's services. *See id*. The company would not exist without them. *See id*. Rover's revenues do not depend on distribution of software, but on the performance of Pet Care Services by its Pet Care Providers. *See id*. These indisputable facts demonstrate that providing Pet Care Services is within the usual course of Rover's business. No reasonable trier of fact could conclude that workers who are essential to a company's survival, who are fundamental to its business, and who are the "*sine qua non*" for its generation of revenue, are—in spite of all that—merely incidental to that business.

### 2.    Defendant Cannot Establish That Plaintiff "Is Customarily Engaged in an Independently Established Trade, Occupation, Or Business of The Same Nature As The Work Performed" ("Prong C")

"[I]n order to satisfy part C of the ABC test, the hiring entity must prove that the worker is customarily engaged in an independently established trade, occupation, or business." *Dynamex*, 4 Cal. 5th at 963. "When a worker has not independently decided to engage in an independently established business but instead is simply designated an independent contractor by the unilateral action of a hiring entity, there is a substantial risk that the hiring business is attempting to evade

1   the demands of an applicable wage order through misclassification." *Id. at 962*.

2   In *Garcia v. Border Transportation Grp., LLC*, the court discussed what is required for a

3   business to meet its burden with respect to Prong C of the *Dynamex* ABC test:

> Key for our purposes, *Dynamex* makes clear that the question in part C is *not* whether
> BTG *prohibited* or *prevented* Garcia from engaging in an independently established
> business. (*Dynamex, supra,* 4 Cal.5th at p. 962, 232 Cal.Rptr.3d 1, 416 P.3d 1 ["[t]he fact
> that a company has not prohibited or prevented a worker from engaging in such a business
> is not sufficient"].) Instead, the inquiry is whether Garcia fits the common conception of
> an independent contractor—"an individual who *independently* has made the decision to go
> into business for himself or herself" and "generally takes the usual steps to establish and
> promote his or her independent business—for example, through incorporation, licensure,
> advertisements, routine offerings to provide services of the independent business to the
> public or to a number of potential customers, and the like." (*Ibid.*)
>
> *Dynamex* drives this point home in footnote 30. The court cites with approval a Utah case
> that explained, " 'the appropriate inquiry under part (C) is whether the person engaged in
> covered employment actually has such an independent business, occupation, or
> profession, not whether he or she could have one.' " (*Dynamex, supra,* 4 Cal.5th at p. 962,
> fn. 30, 232 Cal.Rptr.3d 1, 416 P.3d 1, citing *McGuire v. Dept. of Employment
> Security* (Utah Ct.App. 1989) 768 P.2d 985, 988.) It also references a Vermont decision
> construing language identical to that in part C as follows:
>
> " 'The adverb "independently" clearly modifies the word "established," and must carry
> the meaning that the trade, occupation, profession or business was established,
> independently of the employer or the rendering of the personal service forming the basis
> of the claim. The present tense 'is' indicates the individual must be engaged in such
> independent activity at the time of rendering the service involved. "Customarily" means
> usually, habitually, regularly.' " (*In re Bargain Busters, Inc.* (Vt. 1972) [130 Vt. 112] 287
> A.2d 554, 559 [cited by *Dynamex,* at p. 962, fn. 30 [232 Cal.Rptr.3d 1, 416 P.3d 1]].)
>
> A North Dakota case cited in footnote 30 likewise explains that "to meet the third prong, it
> is not enough to show that the individuals are free to engage in similar activities for others
> or work as employees for others." (*Midwest Property Recovery, Inc. v. Job Service of
> North Dakota* (N.D. 1991) 475 N.W.2d 918, 924.) Finally, footnote 30 cites a Connecticut
> decision that explains it is not enough for a hiring business to *permit* a worker to engage in
> activities for other businesses to satisfy part C. (*Dynamex,* at p. 962, fn. 30, 232
> Cal.Rptr.3d 1, 416 P.3d 1, citing *JSF Promotions, Inc. v. Administrator* (2003) 265 Conn.
> 413, 828 A.2d 609, 613 (*JSF Promotions* ).)

22   *Garcia v. Border Transportation Grp.*, LLC, 28 Cal. App. 5th 558, 572-73 (2018), as modified on

23   denial of reh'g (Nov. 13, 2018).

24   In light of the standards set forth in the above authorities, Defendant cannot establish that

25   Plaintiff is customarily engaged in an independently established trade, occupation, or business of

26   the same nature as the work performed. Plaintiff has not taken any steps to establish and promote

27   an independent pet care services business, such as incorporating a business entity, obtaining a

28   business license, advertising to the general public, and/or making offerings to the public or to

24

NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT – *Sportsman v. A Place for Rover, Inc. et al.*, Case No. 3:19-cv-03053-WHO

1   potential customers to provide services of an independent business. *See supra* at Section II(G).

2   **3.      Defendant Has the Burden of Proving the Prongs of the ABC Test**

3   Based on the facts and authorities above, Defendant cannot establish that Plaintiff is an

4   independent contractor who was not intended to be included within the wage order's coverage.

5   Plaintiff has proffered evidence that her work was within the usual course of Defendant's

6   business, and that she has not been customarily engaged in an independently established trade,

7   occupation, or business of the same nature as the work performed. Thus, she has gone beyond

8   what is required in a plaintiff's motion for summary judgment on the issue of misclassification.

9   Indeed, once Plaintiff has established that a wage order applies to her work, the burden shifts to

10  Defendant to prove that Plaintiff was properly classified. *See Garcia*, 28 Cal. App. 5th at 572-73;

11  *Arshakyan v. X17, Inc.*, 2019 WL 10097455, at *2 (C.D. Cal. June 21, 2019).

12  **IV.    CONCLUSION**

13  Plaintiff respectfully requests that the Court grant Plaintiff's Motion for Summary

14  Judgment and/or Partial Summary Judgment.

15  DATED: February 24, 2021                    Respectfully submitted,

16                                              THE TIDRICK LAW FIRM LLP

17                                              By:     /s/ Steven G. Tidrick

18                                              _____
                                                STEVEN G. TIDRICK, SBN 224760
                                                JOEL B. YOUNG, SBN 236662

19
                                                Counsel for Plaintiff Melanie Sportsman
20

21

22

23

24

25

26

27

28

NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT – *Sportsman v. A Place for Rover, Inc. et al.*, Case No. 3:19-cv-03053-WHO