1  THE TIDRICK LAW FIRM LLP
   STEVEN G. TIDRICK, SBN 224760
2  JOEL B. YOUNG, SBN 236662
   1300 Clay Street, Suite 600
3  Oakland, California  94612
   Telephone: (510) 788-5100
4  Facsimile:  (510) 291-3226
   E-mail:     sgt@tidricklaw.com
5  E-mail:     jby@tidricklaw.com

6  Attorneys for Individual and Representative
   Plaintiff MELANIE SPORTSMAN

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10  MELANIE SPORTSMAN,                    Case No. 3:19-cv-03053-WHO

11              Plaintiff,                **DECLARATION OF STEVEN TIDRICK,
                                          ESQ. IN SUPPORT OF PLAINTIFF'S
12        v.                              MOTION FOR SUMMARY JUDGMENT
                                          AND/OR PARTIAL SUMMARY
13  A PLACE FOR ROVER, INC. d/b/a Rover *et*  JUDGMENT**
    *al.*,
14                                        Date:      March 31, 2021
                Defendants.               Time:      2:00 p.m.
15                                        Location:  Courtroom 2 – 17th Floor
                                                     San Francisco Courthouse
16                                                   450 Golden Gate Avenue
                                                     San Francisco, California
17
                                          Judge:     The Honorable William H. Orrick
18

19

20

21

22

23

24

25

26

27

28

I, Steven G. Tidrick, do declare and state as follows:

1.      I am an attorney with The Tidrick Law Firm LLP, attorneys of record for Plaintiff in the above-entitled action. I am licensed to practice before all of the courts of the States of California and Massachusetts, and all U.S. District Courts in the State of California, including the Northern District of California, and the U.S. Court of Appeals for the First and Ninth Circuits. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the transcript of the deposition of the Rule 30(b)(6) witness of Defendant A Place For Rover, Inc. d/b/a Rover ("Rover" or "Defendant"), Derek Chang, taken on December 18, 2020.

3.      Attached hereto as **Exhibit 3** is a true and correct copy of exhibit 3 to the deposition of Defendant's Rule 30(b)(6) witness Derek Chang.

4.      Attached hereto as **Exhibit 4** is a true and correct copy of exhibit 4 to the deposition of Defendant's Rule 30(b)(6) witness Derek Chang.

5.      Attached hereto as **Exhibit 5** is a true and correct copy of exhibit 5 to the deposition of Defendant's Rule 30(b)(6) witness Derek Chang.

6.      Exhibit 7 to the deposition of Defendant's Rule 30(b)(6) witness Derek Chang is attached to the Declaration of Melanie Sportsman, filed herewith (as Exhibit B thereto).

7.      Attached hereto as **Exhibit 8** is a true and correct copy of exhibit 8 to the deposition of Defendant's Rule 30(b)(6) witness Derek Chang.

8.      Attached hereto as **Exhibit 10** is a true and correct copy of exhibit 10 to the deposition of Defendant's Rule 30(b)(6) witness Derek Chang.

9.      Attached hereto as **Exhibit 13** is a true and correct copy of exhibit 13 to the deposition of Defendant's Rule 30(b)(6) witness Derek Chang.

10.     Attached hereto as **Exhibit 14** is a true and correct copy of exhibit 14 to the deposition of Defendant's Rule 30(b)(6) witness Derek Chang.

11.     **Exhibit 16** is a video that is being submitted to the Court on a flash drive. It is a true and correct copy of exhibit 16 to the deposition of Defendant's Rule 30(b)(6) witness

Derek Chang.

12.     **Exhibit 17** is a video that is being submitted to the Court on a flash drive. It is a true and correct copy of exhibit 17 to the deposition of Defendant's Rule 30(b)(6) witness Derek Chang.

13.     Attached hereto as **Exhibit 19** is a true and correct copy of exhibit 19 to the deposition of Defendant's Rule 30(b)(6) witness Derek Chang.

14.     Attached hereto as **Exhibit 20** is a true and correct copy of Defendant's press release dated August 15, 2012, entitled "Rover.com Introduces Mobile App For Dogs (And Owners) On The Go," which describes the business as an "alternative to traditional dog boarding that connects dog owners with local dog sitters and hosts, in real homes, in hundreds of cities across the United States."). Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, filed Dec. 8, 2020 (ECF No. 61) ("Stipulation Regarding Authenticity"), ¶ 27.

15.     Attached hereto as **Exhibit 21** is a true and correct copy of Defendant's press release dated April 24, 2017, entitled "Rover.com Introduces 'The Dog People' in First Integrated National Brand Campaign." Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 35.

16.     Attached hereto as **Exhibit 22** is a true and correct copy of Defendant's recent press release issued earlier this month, on February 11, 2021, entitled "Rover, the World's Largest Network of Five-Star Pet Sitters and Dog Walkers, Announces Plans to Become a Public Company via a Merger with True Wind Capital's SPAC, Nebula Caravel Acquisition Corp." The press release is available online at https://www.prnewswire.com/news-releases/rover-the-worlds-largest-network-of-five-star-pet-sitters-and-dog-walkers-announces-plans-to-become-a-public-company-via-a-merger-with-true-wind-capitals-spac-nebula-caravel-acquisition-corp-301226679.html (printed on February 20, 2021 and bates numbered SPORTSMAN 085 through 093).

17.     Attached hereto as **Exhibit 23** is a true and correct copy of printouts from Defendant's website, specifically, Defendant's web page entitled "When will I be charged for

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

a service?" The first two pages of Exhibit 23 (bates numbered SPORTSMAN 094-095) show that web page as archived by the Internet Archive, a 501(c)(3) non-profit, on June 10, 2016. The next two pages (bates numbered SPORTSMAN 096-097) show that web page as archived by the Internet Archive on October 31, 2020. The next two pages (bates numbered SPORTSMAN 098-099) were printed directly from Defendant's website on February 20, 2021, specifically, Defendant's web page that is available online at

https://support.rover.com/hc/en-us/articles/205880556-When-will-I-be-charged-for-a-service-

18.     Attached hereto as **Exhibit 24** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "A Part-Time Job For College Students: Make Money as a Pet Sitter." Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 42.

19.     Attached hereto as **Exhibit 25** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "Jobs For Retirees – Part-Time Jobs for Retirees." Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 62.

20.     Attached hereto as **Exhibit 26** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "Best Communication Practices as an On-demand Dog Walker." Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 39.

21.     Attached hereto as **Exhibit 27** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "'Dogs Bring Out the Best in Me:' Meet Rover Sitter Fabiana." Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 36.

22.     Attached hereto as **Exhibit 28** is a true and correct copy of Defendant's job postings, which Defendant produced in this litigation identified with bates number Rover_000577.

23.     Attached hereto as **Exhibit 29** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "Rover's Reservation

4

Guarantee" << https://www.rover.com/reservation-guarantee/ >> as archived by the Internet Archive, a 501(c)(3) non-profit, on February 23, 2017 (bates numbered SPORTSMAN 105).

24.     Attached hereto as **Exhibit 30** is a true and correct copy of printouts from Defendant's website, specifically, Defendant's web page entitled "Rover's Booking Protection." The first three pages of Exhibit 30 (bates numbered SPORTSMAN 100-102) show that web page as archived by the Internet Archive, a 501(c)(3) non-profit, on August 11, 2019. The next two pages (bates numbered SPORTSMAN 103-104) were printed directly from Defendant's website on February 20, 2021, specifically, Defendant's web page that is available online at https://www.rover.com/terms/reservation-protection/

25.     Attached hereto as **Exhibit 31** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "Trust & Safety." It was printed from Defendant's website on February 16, 2021. Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 21.

26.     Attached hereto as **Exhibit 32** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "FAQs from Sitters and Dog Walkers New to Rover." It was printed from Defendant's website on August 22, 2018. *See* Stipulation Regarding Authenticity of Documents, ¶ 50.

27.     Attached hereto as **Exhibit 33** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "How to Make Your Profile Shine." It was printed from Defendant's website on August 22, 2018. Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 58.

28.     Attached hereto as **Exhibit 34** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "What are sitter performance scores?" It was printed from Defendant's website on June 30, 2019. Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 71.

29.     Attached hereto as **Exhibit 35** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "Keep your profile live and out of away mode." It was printed from Defendant's website on August 22, 2018. Defendant

5

has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 63.

30.     Attached hereto as **Exhibit 36** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "How Search Rank Works (and How to Work It)." It was printed from Defendant's website on August 22, 2018. Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 55.

31.     Attached hereto as **Exhibit 37** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "What are the service fees?" It was printed from Defendant's website on July 21, 2019. Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 46.

32.     Attached hereto as **Exhibit 38** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "Enjoy a flexible schedule, easy payments, and the joy of getting paid to pay with dogs." It was printed from Defendant's website on August 22, 2018. Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 51.

33.     Attached hereto as **Exhibit 39** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "Rover Cards Are Here!" It was printed from Defendant's website on August 22, 2018. Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 66.

34.     Attached hereto as **Exhibit 40** is a true and correct copy of a printout from Defendant's website, specifically, Defendant's web page entitled "How does the dog walking map feature work?" It was printed from Defendant's website on May 14, 2020. Defendant has authenticated this document. *See* Stipulation Regarding Authenticity of Documents, ¶ 41.

35.     **Exhibit 41** is a video that is being submitted to the Court on a flash drive. It is a true and correct copy of Defendant's commercial entitled "Find your perfect sitter on Rover." Defendant has authenticated this video. *See* Stipulation Regarding Authenticity of Documents, ¶ 4.

36.     **Exhibit 42** is a video that is being submitted to the Court on a flash drive. It is

a true and correct copy of Defendant's commercial entitled "How to find The Perfect Pet Sitter Rover.com." Defendant has authenticated this video. *See* Stipulation Regarding Authenticity of Documents, ¶ 5.

37.     **Exhibit 43** is a video that is being submitted to the Court on a flash drive. It is a true and correct copy of Defendant's commercial that Defendant produced in this litigation identified with bates number Rover_000557.mp4. Defendant has authenticated this video. *See* Stipulation Regarding Authenticity of Documents, ¶ 15.

38.     **Exhibit 44** is a video that is being submitted to the Court on a flash drive. It is a true and correct copy of Defendant's commercial that Defendant produced in this litigation identified with bates number Rover_000563.mp4. Defendant has authenticated this video. *See* Stipulation Regarding Authenticity of Documents, ¶ 17.

39.     **Exhibit 45** is a video that is being submitted to the Court on a flash drive. It is a true and correct copy of Defendant's commercial entitled "The Dog People Are Ready – Boarding." Defendant has authenticated this video. *See* Stipulation Regarding Authenticity of Documents, ¶ 19.

40.     **Exhibit 46** is a video that is being submitted to the Court on a flash drive. It is a true and correct copy of Defendant's commercial entitled "The Dog People Are Ready – Walking." Defendant has authenticated this video. *See* Stipulation Regarding Authenticity of Documents, ¶ 20.

41.     **Exhibit 47** is a video that is being submitted to the Court on a flash drive. It is a true and correct copy of Defendant's commercial entitled "Walk It Out." Defendant has authenticated this video. *See* Stipulation Regarding Authenticity of Documents, ¶ 21.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 24, 2021.

/s/ Steven G. Tidrick

_____

STEVEN G. TIDRICK, ESQ.

DECLARATION OF STEVEN TIDRICK, ESQ. IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
*Sportsman v. A Place for Rover, Inc. et al.*, Case No. 3:19-cv-03053-WHO

Exhibit 1

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

```
_____
                           )
MELANIE SPORTSMAN,         )
                           )
        Plaintiff,         )
                           )      Case No.
     vs.                   )      3:19-cv-03053-WHO
                           )
A PLACE FOR ROVER, Inc.    )
d/b/a Rover et al.,        )
                           )
        Defendants.        )
_____)
```

Rule 30(b)(6) Deposition of

DEREK CHANG

Friday, December 18, 2020

REPORTED BY:  JOHN WISSENBACH, RDR, CRR, CRC,
              CSR 6862

30(b)(6) — Derek Chang — December 18, 2020

## Page 2

INDEX OF EXAMINATIONS

EXAMINATION BY MR. TIDRICK    Page
      6

EXHIBITS MARKED FOR IDENTIFICATION

No.   Description       Page

Exhibit 1   Plaintiff's Amended Notice of Rule   9
      30(b)(6) Deposition of Defendant A
      Place for Rover, Inc. d/b/a Rover
      and Demand for Production at the
      Deposition

Exhibit 2   Plaintiff's Notice of Rule 30(b)(6)   12
      Deposition of Defendant A Place for
      River, Inc. d/b/a Rover and Demand
      for Production at the Deposition

Exhibit 3   "ROVER_000588.mp4, Rover.com, The   17
      Dog People," etc. (1 page)

Exhibit 4   "Melanie S., Hoover, Fresno, CA,"   43
      "Rover," etc. (ROVER_000001-
      ROVER_000017)

Exhibit 5   Rover, Terms of Service; Last   59
      Updated: January 31, 2017
      (ROVER_000503-ROVER000516)

Exhibit 6   Django administration, etc., and   98
      attachments (ROVER_000018-
      ROVER000224)

Exhibit 7   How do I review my payments from my 105
      Rover bookings? – Help Center
      (https://support.rover.com/hc/
      en-us/articles/115001821803-How-do-
      I-review-my-payments-from-my-Rover-
      bookings-) (5 pages)

Exhibit 8   Rover Guarantee (ROVER_000525-   126
      ROVER_000527).

Exhibit 9   Putting Together a Stellar Rover   128
      Card for your Clients | The Dog
      People by Rover.com (ROVER_000528-

## Page 3

      ROVER_000534)

Exhibit 10  What are Rover Cards and how do I   181
      send them? - Help Center (https://
      support.rover.com/hc/en-us/
      articles/21157324d-What-are-Rover-
      Cards-and-how-do-I-send-them)
      (3 pages)

Exhibit 11  Business Card V001, pack of 250,   144
      Rover Goods (MILLER 158)

Exhibit 12  "Rover; Hi $(First_Name), Now that   149
      you know a bit about how to get and
      book your first request, I want to
      give some background about how pet
      owners will find your profile,"
      etc. (ROVER_000499)

Exhibit 13  How to Improve Your Performance   157
      Scores and Succeed on Rover | The
      Dog People by Rover.com
      (MILLER 198 – MILLER 202)

Exhibit 14  Rover; What if a client wants to   168
      pay me directly, not through the
      Rover site? (MILLER 382 –
      MILLER 384)

Exhibit 15  Here's What You Need to Know About   175
      Meet and Greets | The Dog People by
      Rover.com (MILLER 174 – MILLER 181)

Exhibit 16  Ex. 16.mp4.com   178

Exhibit 17  Ex. 17.mp4.com   188

Exhibit 18  Ex. 18.mp4.com   190

Exhibit 19  "Core Services, Overnight Boarding, 191
      2018-2109, 1/1/18-2/1/19; Become a
      Rover sitter – Make up to
      $1,000/month watching dogs in your
      home, San Francisco (ROVER_000571)

MARKED QUESTION
PAGE LINE
117  9

## Page 4

1   BE IT REMEMBERED that, pursuant to the laws
2 governing the taking and use of depositions, on
3 Friday, December 18, 2020, commencing at 9:35 a.m.
4 PST, before me, JOHN WISSENBACH, CSR 6862, of San
5 Francisco, California, appeared through
6 videoconference DEREK CHANG, at Seattle, Washington,
7 called as a witness by Individual and Representative
8 Plaintiff Melanie Sportsman who, being by me first
9 duly sworn, was thereupon examined as a witness in
10 said action.

11   APPEARANCES OF COUNSEL VIA VIDEOCONFERENCE
12 For the Plaintiff:
13     THE TIDRICK LAW FIRM LLP
      BY:  STEVEN G. TIDRICK, Attorney at Law
14        JOEL B. YOUNG, Attorney at Law
      1300 Clay Street, Suite 600
15     Oakland, California 94612-1427
      (510) 788-5100  sgt@tidricklaw.com
16     (510) 788-5100  jby@tidricklaw.com
17 For the Defendant:
18     DAVIS WRIGHT TREMAINE LLP
      BY:  JOHN P. LeCRONE, Attorney at Law
19        VANDANA KAPUR, Attorney at Law
      865 South Figueroa Street, Suite 2400
20     Los Angeles, California 90017-2566
      (213) 633-6825  johnlecrone@dwt.com
21     (213) 633-6812  vandanakapur@dwt.com
22 ALSO PRESENT VIA VIDEOCONFERENCE:  MELISSA WEILAND
23 and JOSE RIVERA, Videographer

        ---o0o---

## Page 5

1   THE VIDEOGRAPHER:  This is the remote video
2 recorded deposition of Derek Chang.  Today is
3 Friday, December 18, 2020.  The time is now 12:35
4 p.m. in the Eastern time zone.  We are here in the
5 matter of Melanie Sportsman vs. A Place for Rover,
6 Inc. dba Rover, et al.  My name is Jose Rivera,
7 remote video technician, on behalf of Gregory
8 Edwards LLC.  Will counsel please introduce
9 themselves.

10   MR. TIDRICK:  This is Steve --
11   MR. LeCRONE:  John -- John LeCrone, on
12 behalf of --
13   MR. TIDRICK:  Sorry.
14   MR. LeCRONE:  Go ahead, Steve.
15   MR. TIDRICK:  No, you go ahead.  That's
16 fine.
17   MR. LeCRONE:  I'm sorry I jumped in so
18 quickly.
19   John LeCrone, counsel for defendant, A
20 Place Called Rover, also known as Rover.  And I'm
21 here with Melissa Weiland, the general counsel of
22 Rover, and the witness, who has been selected as the
23 person most knowledgeable on the topics set forth in
24 the notice, Derek Chang.  Also here, I should -- I
25 forgot to mention, my colleague, Vandana Kapur.

Page 6

1        MR. TIDRICK:  This is Steven Tidrick, on
2  behalf of plaintiff.  And my partner, Joel Young,
3  is —
4        THE VIDEOGRAPHER:  Steve, you there?
5        Looks like Steve froze.
6        Steve, are you there?
7        MR. TIDRICK:  Yes.  I couldn't hear any of
8  that.
9        THE VIDEOGRAPHER:  Okay.  Yeah.  You froze
10 for a second.  Are you with us now?
11       MR. TIDRICK:  Yes.
12       THE VIDEOGRAPHER:  Okay.  Okay.  I'll
13 continue.
14       At this time, will the reporter, John
15 Wissenbach, on behalf of GregoryEdwards LLC, please
16 swear in the witness.
17       THE COURT REPORTER:  Yes.  And I will note
18 that it is 9:37 a.m. West Coast time.
19       So if you would please right hand.
20            DEREK CHANG,
21 having been first duly sworn, testified as follows:
22        EXAMINATION BY MR. TIDRICK
23    Q.  Good morning.  Is it Mr. Chang?  Is that
24 correct?
25    A.  That's right.

Page 7

1    Q.  And just for the record, would you please
2  state your name for the record.
3    A.  Yeah.  Derek Chang.
4    Q.  Mr. Chang, have you ever testified before?
5    A.  Yes, I have.
6    Q.  Was that in court?
7    A.  It was not in court.  It was in an office.
8    Q.  You testified before at a deposition?
9    A.  Yes.
10   Q.  How many times have you done that?
11   A.  Maybe twice.
12   Q.  The two times you've testified before, was
13 that in connection with Rover?
14   A.  No, it was not.  It was at a different
15 company that I worked at.
16   Q.  Approximately how long ago was that?
17   A.  Maybe ten years ago.
18   Q.  Fair to say you understand generally what a
19 deposition is?
20   A.  Yes.
21   Q.  Just to go over some of the basics --
22 sounds like you may already know them -- I ask
23 questions; your responsibility is to answer them
24 truthfully.  You understand that?
25   A.  Yes.

Page 8

1    Q.  Do you understand that you're under oath,
2  just as you would be if you were testifying in
3  court?
4    A.  Yes.
5    Q.  There's no guessing when you answer
6  questions, but you understand there's a difference
7  between guessing and estimating?
8    A.  Yes.
9    Q.  And just to be clear, if I ask you a
10 question and you know the answer approximately, we
11 expect you to provide your best estimate.  Okay?
12   A.  Yeah.
13   Q.  The time period covered by today's
14 deposition is June 11th, 2017 to the present.  So
15 unless I ask a question that's specifying a
16 different time frame -- time frame, we will
17 understand that your answers are covering that time
18 frame.  Okay?
19   A.  Uh-huh.
20   Q.  Did you do anything to prepare for the
21 deposition?
22   A.  Yes, I did.
23   Q.  What did you do?
24   A.  I looked at some documents.
25   Q.  Approximately how many documents did you

Page 9

1  look at?
2    A.  Maybe a half dozen.
3    Q.  Do you recall what the documents were that
4  you looked at?
5    A.  There were some press release documents,
6  the profile that was created by Sportsman, and some
7  marketing material.
8    Q.  Anything else?
9    A.  No.
10       Oh, terms of service.
11   Q.  Anything else?
12   A.  No.
13   Q.  All right.  Because this deposition is
14 happening remotely, we're all using Zoom technology,
15 so if there are hiccups, please be patient.  One
16 thing I'm going to attempt to do right now is to
17 present you with an exhibit.
18       (Deposition Exhibit 1 was marked for
19 identification.)
20 BY MR. TIDRICK:
21   Q.  So in the chat box, a document identified
22 as Exhibit 1 should have popped up.  Are you able to
23 see that?
24   A.  Yeah.  I'm clicking on it right now.
25       Okay.  I see it.

Page 10

1    Q.   Have you seen that document before?
2         MR. LeCRONE:  Counsel, if you could just
3    hold one second.  What I'm -- it's asking me to
4    download something.  Is that -- I'm not seeing the
5    document that you've sent.
6         MR. TIDRICK:  So there should be a chat box
7    on your screen.
8         MR. LeCRONE:  I've got that --
9         MR. TIDRICK:  And --
10        MR. LeCRONE:  I've got that open.  It says
11   from Steve Tidrick -- I've got that -- to everyone.
12   And it's got a PDF.  Hold on.  And it's asking me to
13   download it, and it's not letting me download it.
14   So for some strange reason, I can't look at it.
15        MR. TIDRICK:  Let me give you a minute or
16   two, see if there's a technical issue that maybe we
17   could work through.  Sometimes I know that when
18   you're clicking on something, your computer has to
19   grant permission, or something, to download it.
20        MR. LeCRONE:  Yeah.  It's wanting me to
21   save it.  Hold on.  No.
22        We're going to have to figure this out.
23   Hold tight.
24        THE VIDEOGRAPHER:  Would you like to go off
25   record, Counsel?

Page 11

1         MR. LeCRONE:  Yes.  Let's do that.  I --
2         THE VIDEOGRAPHER:  The time is 12:43 p.m.,
3    and we're going off the record.
4         (Recess taken.)
5         THE VIDEOGRAPHER:  The time is 12:48 p.m.
6    Eastern, and we're back on record.
7    BY MR. TIDRICK:
8         Q.   Mr. Chang, I just want to give you a
9    heads-up that I'm planning at the very end of the
10   deposition today to just confirm that you haven't
11   been sending or receiving text messages with anyone
12   during the deposition, that you don't have any kind
13   of Instant Messenger app where you're communicating
14   with someone during the deposition, you're not
15   emailing with anyone during the deposition,
16   et cetera.  So I'm just giving you a heads-up about
17   that now so that you can anticipate that I'll be
18   asking that.  Our expectation is that you won't be
19   doing any of those things.
20        A.   Yeah.
21        Q.   All right.  So before we went off the
22   record, I presented an exhibit marked as Exhibit 1.
23   Mr. Chang, are you able to see that document?
24        A.   Yes.
25        Q.   Prior to this deposition, had you seen that

Page 12

1    document before?
2         A.   I have not.
3         MR. TIDRICK:  I'm going to present another
4    document.
5         (Deposition Exhibit 2 was marked for
6    identification.)
7    BY MR. TIDRICK:
8         Q.   This is Exhibit 2.  Are you able to see the
9    Exhibit 2 document?
10        A.   Yeah.  I'm looking at it right now.
11        Okay.
12        Q.   Have you seen Exhibit 2 prior to this
13   deposition?
14        A.   I have not.
15        Q.   Just for identification purposes, I'll
16   state for the record Exhibit 1 is the amended
17   deposition notice, dated December 14th, 2020.
18   Exhibit 2 is the original deposition notice, dated
19   November 22nd, 2020.  We might be coming back to
20   these later.
21        So Mr. Chang, I just want --
22        MR. LeCRONE:  And I'm sorry, Counsel.  If
23   we could just go off the record one more time.
24   Something's not working right for me.  I really,
25   really apologize, but let me --

Page 13

1         MR. TIDRICK:  No.  No, it's fine; no need
2    to apologize.
3         MR. LeCRONE:  I've got my IT guy right
4    here.  He's going to figure this whole bloody --
5    this -- this mess out.  Hold on one second.
6         MR. TIDRICK:  No, no need to apologize.
7         So let's go off the record while -- while
8    we figure that out.
9         THE VIDEOGRAPHER:  Okay.  Stand by.  The
10   time is 12:51 Eastern, and we're going off the
11   record.
12        (Discussion off the record.)
13        THE VIDEOGRAPHER:  The time is 12:52 p.m.
14   Eastern, and we're back on record.
15   BY MR. TIDRICK:
16        Q.   Mr. Chang, I just want to go over a few
17   terms to make sure that we're all on the same page
18   when we use those terms today.
19        You understand that when we say "Rover" in
20   this deposition, we're referring to the company you
21   work for, A Place for Rover, Inc.  Okay?
22        A.   Got it.
23        Q.   That company does business under the name
24   Rover, correct?
25        A.   Correct.

30(b)(6) - Derek Chang - December 18, 2020

5 (Pages 14 to 17)

## Page 14

1    Q.  I understand that Rover has various lingo
2  for referring to service providers.  The words
3  "sitters," "pet sitters," and "dog walkers," those
4  are all service providers, correct?
5    A.  Correct.
6    Q.  All of those terms refer to individuals who
7  provide pet care services on behalf of Rover,
8  correct?
9        MR. LeCRONE:  Objection.  I'm going to --
10  that lacks foundation.  I'm not sure that properly
11  states it, Counsel.  So I object to that question as
12  vague and ambiguous.
13  BY MR. TIDRICK:
14    Q.  And Mr. Chang, just -- just to be clear,
15  Mr. Chang, your counsel is able to state objections
16  for the record, but unless your counsel tells you to
17  not answer a question, the expectation is that after
18  he states his objection for the record -- that's for
19  the judge at some future point to evaluate -- you
20  still go ahead and answer the question.  Okay?
21    A.  Yeah.  Yeah, thanks.
22        Can -- can you restate that question,
23  please?
24    Q.  Yes.  The terms "sitters," "pet sitters,"
25  "dog walkers," "service providers," those terms all

## Page 15

1  refer to individuals who provide pet care services
2  on behalf of Rover, correct?
3    A.  No, they don't provide services on behalf
4  of Rover.  They provide them for their clients, the
5  owners.
6    Q.  Well, I'm not asking who they provide the
7  services to.
8        Let me state it this way:  The terms
9  "sitters," "pet sitters," "dog walkers," "service
10  providers," those terms all refer to individuals who
11  provide pet care services through the Rover
12  platform, correct?
13    A.  Yes.
14    Q.  In this deposition, if I say "service
15  providers" or "pet care providers," I'll be
16  referring to those individuals, okay?
17    A.  Yes.
18    Q.  Rover uses the terms "pet owners" and "pet
19  parents" to refer to individuals who purchase
20  services through the Rover platform, correct?
21    A.  That's correct.
22    Q.  In this deposition, if we say "customers,"
23  we'll be referring to those individuals, okay?
24    A.  Okay.
25        MR. LeCRONE:  Counsel, just to be clear, as

## Page 16

1  you framed your question there, as you use the word
2  "customers," you're referring to both the service
3  providers and the dog owners, or are you referring
4  just to the owners, the pet owners?
5  BY MR. TIDRICK:
6    Q.  The owners, that -- that I understand Rover
7  uses the terms "pet owners" and "pet parents" to
8  refer to.  All right?  So --
9        MR. LeCRONE:  Okay.  I'm not quite sure
10  that's all correct.  But you can ask the question as
11  you see fit.
12        THE WITNESS:  Did you want me to answer
13  your question?
14        MR. LeCRONE:  You can answer it if you
15  understand it, Mr. Chang.
16        THE WITNESS:  Got it.
17        So understood how you referred to it.  In
18  our marketplace, our customers are both the owners
19  and sitters.
20  BY MR. TIDRICK:
21    Q.  All right.  That may be confusing, so --
22  I'll try to avoid using the term "customers."
23        So with respect to the individuals that you
24  refer to, that Rover refers to as pet owners and pet
25  parents, is there some other term that you use to

## Page 17

1  describe those individuals?
2    A.  "Owners" is a good term for that.
3    Q.  All right.  So the terms "owners," "pet
4  owners," "pet parents" are interchangeable; is that
5  right?
6    A.  That's correct.
7    Q.  Those all refer to individuals who purchase
8  pet care services through the Rover platform,
9  correct?
10    A.  That's correct.
11    Q.  I also wanted to go over the terms that
12  Rover uses to describe the services that pet owners
13  can purchase.  For reference, I'll refer you to
14  another exhibit, which I will provide right now.
15        (Deposition Exhibit 3 was marked for
16  identification.)
17  BY MR. TIDRICK:
18    Q.  I've provided a document identified as
19  Exhibit 3.  Are you able to see that document?
20    A.  Yes.
21    Q.  I will represent that Exhibit 3 is a
22  printout from a video that Rover produced in this
23  case Bates numbered ROVER_000558.mp4 at time stamp 8
24  seconds.
25        And, actually, if you look at the top of

Page 18

1  the two images on that page, if you zoom in, you're
2  able to see it has the MP4 number at the top, and I
3  think you can also see the time stamp.
4          MR. LeCRONE:  And Counsel, this is John
5  LeCrone.  Just for clarity, this is what appears to
6  be a three-page document; is that right?
7          MR. TIDRICK:  Exhibit 3 is only one page.
8          MR. LeCRONE:  Hmm.  Okay.
9  BY MR. TIDRICK:
10         Q.  So Mr. Chang, you'll see Exhibit 3 shows an
11  image of a smartphone, correct?
12         A.  Yes.
13         Q.  You see where it says "Rover.com,
14  Services"?
15         A.  Yes.
16         Q.  Below that, you see various services
17  listed, correct?
18         A.  Yes.
19         Q.  Specifically, under "Rover.com, Services,"
20  it says, at least in large print, "Dog Walking,"
21  "Doggy Day Care," "Dog Boarding," "House Sitting,"
22  and "Drop-In Visit."  Those are all of the services
23  offered by Rover; is that correct?
24         MR. LeCRONE:  I'm going to object.  It
25  calls for speculation, lacks foundation, vague and

Page 19

1  ambiguous.
2          THE WITNESS:  Those are the services that
3  are offered by sitters who are on our platform.
4  BY MR. TIDRICK:
5          Q.  Understood.  Those are all of the services
6  that are offered through the Rover.com platform,
7  correct?
8          A.  Yes, they're available on the platform from
9  our sitters -- from the sitters who use our
10  platform.
11         Q.  Those are all of the services that are
12  offered through the platform, correct?
13         A.  Yes.
14         Q.  And just to be clear, where it says "House
15  Sitting," below that, in smaller print, it says "in
16  your home."  The house sitting "in your home" refers
17  to the pet owner's home, correct?
18         A.  Yes.
19         Q.  And just so the record is clear, I'll make
20  sure that we're on the same page as far as the small
21  print under each of those categories.  It says "Dog
22  Walking, 30 minute walks"; "Doggy Day Care, in the
23  sitter's home"; "Dog Boarding, in the sitter's
24  home," "House Sitting, in your home," and "Drop-In
25  Visit, 30 minute check-ins."

Page 20

1          And, again, those are all of the services
2  that are offered through the Rover.com platform,
3  correct?
4          A.  That's right.
5          Q.  You understand that Melanie Sportsman is a
6  pet care provider?
7          A.  I think she was.  I don't think she is
8  anymore.
9          Q.  Understood.  You understand that Melanie
10  Sportsman was a pet care provider; is that correct?
11         A.  Correct.
12         Q.  You understand that Melanie Sportsman is
13  suing Rover?
14         A.  Correct.
15         Q.  Now, occasionally I'll ask you a question
16  that -- I'm just going to give a heads-up.  I'm not
17  asking for you to disclose communications with any
18  of your lawyers.  Okay?
19         A.  Okay.
20         Q.  So if I ask you a question, I'm not -- I'm
21  not asking you to disclose that.
22          Are you able to tell me, without disclosing
23  the specifics of any conversations, how you became
24  aware of this lawsuit?
25          MR. LeCRONE:  I will just object for the

Page 21

1  record.  I do not want Mr. Chang to testify about
2  anything he learned through counsel or otherwise.
3          But if you can answer it without disclosing
4  that, Mr. Chang, you can -- you can do so.
5          THE WITNESS:  I'm sorry.  Can you please
6  repeat that again?
7  BY MR. TIDRICK:
8          Q.  How did you become aware of the lawsuit?
9          A.  I was asked to be deposed for this case.
10  And that's where I became aware of this.
11         Q.  Did someone at the company ask you?
12         A.  Yes.
13         Q.  Who at the company asked you?
14         A.  Our legal counsel.
15         Q.  Excluding conversations with any counsel,
16  have you ever spoken with anyone about the lawsuit?
17         A.  No.
18         Q.  During this deposition, you understand
19  you're testifying on behalf of Rover, correct?
20         A.  Yes.
21         Q.  Were you aware that the deposition notice
22  demands that you produce documents today?
23         A.  That I produce documents?
24          MR. LeCRONE:  Yeah, Counsel, I will just go
25  on the record to say to you that all of the

Page 22

1  documents that are referenced have already been
2  produced to you.  So there are no additional
3  documents to produce here today, and Mr. Chang will
4  not be producing any documents in connection with
5  this deposition.
6          MR. TIDRICK:  Understood.
7      Q.  Mr. Chang, when did you start working for
8  Rover?
9      A.  I started working in July 2018.
10      Q.  How many job titles have you held at Rover?
11      A.  One.
12      Q.  So that's the position that you're
13  presently in, right?
14      A.  Yes.
15      Q.  What is that position?
16      A.  VP of operations.
17      Q.  What are your responsibilities in that
18  role?
19      A.  I lead a team of trust and safety; our CX,
20  or customer experience; and a business operations
21  team.
22      Q.  Oh, and I just wanted to make sure you
23  know.  I didn't say this at the beginning, but at
24  any point that you want to take a break, please
25  speak up and just let us know.  The only thing I ask

Page 23

1  is that if I've asked you a question and there's a
2  question pending, you don't at that point ask for a
3  break.  Okay?
4      A.  Yeah, fair.  Thank you.
5      Q.  Do you need a break now?
6      A.  I do not.  Thank you.
7      Q.  Okay.  When was Rover founded?
8          MR. LeCRONE:  Objection; calls for
9  speculation, lacks foundation, goes outside the
10  scope of the PMK deposition, vague and ambiguous to
11  the word "founded."
12          Mr. Chang, if you have any -- any
13  reasonable idea when it might have been started, you
14  can answer that question.
15          THE WITNESS:  I do not know exactly.
16  Generally 2011.
17  BY MR. TIDRICK:
18      Q.  So I understand correctly, Rover was
19  founded in approximately 2011?
20      A.  Yeah.  It's -- I don't know exactly when.
21  That's my -- as you said earlier, on my estimation.
22      Q.  Understood.  Where is Rover located?
23          MR. LeCRONE:  Vague and ambiguous, lacks
24  foundation.
25          THE WITNESS:  Can you specify "located,"

Page 24

1  please?
2  BY MR. TIDRICK:
3      Q.  Where is Rover headquartered?
4      A.  In Seattle.
5      Q.  Does Rover have physical locations other
6  than Seattle?
7      A.  Yes, we do.
8      Q.  Where are those?
9      A.  In Spokane and in Barcelona.
10      Q.  Do you know when, approximately, Rover
11  started operating in California?
12          MR. LeCRONE:  Objection; outside the scope
13  of the PMK deposition, lacks foundation, vague and
14  ambiguous.
15          If you do have a reasonable estimate,
16  Mr. Chang, you can answer the question, but I don't
17  want you to guess at it.
18          THE WITNESS:  I do not know.
19  BY MR. TIDRICK:
20      Q.  Has Rover been operating in California
21  throughout the time that you've been with Rover?
22      A.  Yes, we have.
23      Q.  Do you have any understanding where in
24  California services are available through the Rover
25  platform?

Page 25

1          MR. LeCRONE:  Objection; vague and
2  ambiguous, lacks foundation.
3          THE WITNESS:  Are you referring to cities?
4  BY MR. TIDRICK:
5      Q.  Sure, cities, regions, or if it's
6  everywhere; whatever you're able to tell me about
7  the geographic areas where services are available --
8          MR. LeCRONE:  And --
9  BY MR. TIDRICK:
10      Q.  -- through the Rover --
11          MR. LeCRONE:  And, Counsel, you're not
12  asking about brick-and-mortar locations or
13  facilities, correct?  Is that right?
14  BY MR. TIDRICK:
15      Q.  So my understanding is from the prior
16  testimony, the only brick-and-mortar facilities that
17  the company has are in Seattle, Spokane, and
18  Barcelona.  Is that correct, Mr. Chang?
19      A.  That's right.
20      Q.  So my question is, where geographically in
21  California are services available through the
22  Rover.com platform?
23          MR. LeCRONE:  Again, that calls for
24  speculation, lacks foundation, goes beyond the scope
25  of the notice for this PMK.

30(b)(6) - Derek Chang - December 18, 2020

8 (Pages 26 to 29)

Page 26

1        But if you have a reasonable estimate or a
2  reasonable understanding of it, Mr. Chang, you can
3  answer the question.
4        THE WITNESS:  I do not know exactly
5  everywhere in California.  I think in general
6  we're -- our services are broadly available.  But I
7  don't know -- I wouldn't be able to tell you all the
8  exact cities, counties, and places.
9  BY MR. TIDRICK:
10       Q.  Do you have any understanding approximately
11  how many pet care providers have been listed on the
12  Rover.com platform?
13       MR. LeCRONE:  Again, goes beyond the scope
14  of this deposition and the topics contained within
15  the PMK notice, lacks foundation, calls for
16  speculation for this witness.
17       Again, Mr. Chang, I will say to you that if
18  you have a reasonable estimate and can answer the
19  question as such, you may do so, but I don't want
20  you to guess.
21       THE WITNESS:  I do not know how many we
22  have listed.
23  BY MR. TIDRICK:
24       Q.  And you're not able to tell me even
25  approximately; is that fair?

Page 27

1       A.  I think I'd be guessing at that.
2       Q.  I don't want a guess.  If you're able to
3  tell me an approximation or a range, I would like
4  that.
5       MR. LeCRONE:  Again, I don't want you to
6  guess, either, Mr. Chang.  So -- and this clearly
7  goes beyond the scope of this -- today's deposition.
8  It has to be a reasonable estimate based on your
9  understanding.  And I don't want you to guess
10  otherwise.
11       THE WITNESS:  I am not able to answer that,
12  because I would be guessing at what that is.
13  BY MR. TIDRICK:
14       Q.  Do you have any understanding with respect
15  to how many individuals have been listed on the
16  Rover platform for services in California at any
17  point in time?
18       MR. LeCRONE:  Same objection:  goes beyond
19  the scope of this deposition, today's deposition, as
20  person most knowledgeable, lacks foundation, calls
21  for speculation.
22       THE WITNESS:  I do not know that.
23  BY MR. TIDRICK:
24       Q.  Do you have any understanding why Rover was
25  founded?

Page 28

1       MR. LeCRONE:  Again, same objections:  goes
2  beyond the scope of this deposition today, beyond
3  the topics that have been set out by you, Counsel,
4  in the notice, calls for speculation, lacks
5  foundation.
6       THE WITNESS:  I don't know the specifics of
7  that.
8  BY MR. TIDRICK:
9       Q.  Do you have any understanding that Rover
10  was founded at least in part to provide an
11  alternative for pet owners who otherwise would have
12  put their pets in kennels?
13       MR. LeCRONE:  Same objections.
14       THE WITNESS:  Can you repeat that again?
15  Sorry.
16       MR. TIDRICK:  Could the court reporter read
17  that back, please.
18       (The record was read by the reporter.)
19       THE WITNESS:  I don't know if that's part
20  of the, as you -- I think you said earlier, the
21  reason for founding.  I don't know if that's true or
22  not.
23  BY MR. TIDRICK:
24       Q.  Understood.  And if we put aside the
25  founding, is it fair to say the following:  that

Page 29

1  part of Rover's purpose presently is to provide an
2  alternative to pet owners who otherwise would place
3  their pets in a kennel?
4       MR. LeCRONE:  Again, I hate to keep
5  objecting, but this goes well beyond the scope of
6  today's deposition, lacks foundation, calls for
7  speculation.
8       THE WITNESS:  Yeah, I'm not -- I understand
9  what you're asking.  And I'm not sure whether or not
10  that is true.  Our -- all I can tell you is, like,
11  our mission is to make sure everybody can have the
12  unconditional love of a pet.
13  BY MR. TIDRICK:
14       Q.  The dog boarding service that's available
15  through the Rover platform, what does that entail?
16       A.  That is where a sitter provides services
17  for an owner, and the owner is able to board their
18  pet with that sitter.
19       Q.  Has that service been available through the
20  Rover platform throughout the time that you've been
21  with the company?
22       A.  Yes, it has.
23       Q.  What does the house sitting service that's
24  available through the Rover platform entail?
25       A.  It is similar to that, but that would be

Page 30

1  done in the owner's home.
2       Q.   Has that service been available on the
3  platform throughout the time that you've been with
4  the company?
5       A.   Yes, it has.
6       Q.   The doggy day care service that's available
7  through the Rover platform, what does that entail?
8       A.   That is where a sitter would provide,
9  basically, day care services for an owner's pet.
10      Q.   Has that service been available on the
11  platform throughout the time that you've been with
12  the company?
13      A.   I think it has.
14      Q.   The dog walking service on the Rover
15  platform, what does that entail?
16      A.   That is where a sitter provides dog walking
17  services for an owner and takes that owner's dog for
18  a walk.
19      Q.   Has that service been available on the
20  platform throughout the time that you've been with
21  the company?
22      A.   Yes, it has.
23      Q.   The drop-in visits service on the Rover
24  platform, what does that entail?
25      A.   That would be where a sitter drops in on an

Page 31

1  owner's pet to be able to give them a potty break or
2  water for a small interval of time.
3       Q.   Has that service been available on the
4  Rover platform throughout the time that you've been
5  with the company?
6       A.   Yes.
7       Q.   Do you have any understanding which of
8  those services are used the most by pet owners?
9            MR. LeCRONE:  Vague and ambiguous.  Let me
10  just say, I'm going to object as vague and ambiguous
11  as to the phrase "used the most"; may call for
12  speculation.
13           THE WITNESS:  I believe dog boarding is the
14  one that is -- is the -- gets used the most.
15  BY MR. TIDRICK:
16      Q.   Does the company collect statistics on
17  usage of the various services?
18           MR. LeCRONE:  Vague and ambiguous as to
19  "statistics," lacks foundation, goes well beyond the
20  scope of today's deposition, may call for
21  speculation.
22           THE WITNESS:  Can you clarify?  Did you say
23  "statistics"?  I'm sorry.  Is that the word you
24  used?
25  BY MR. TIDRICK:

Page 32

1       Q.   Let me ask it a different way.
2            When you identified dog boarding in
3  response to my prior question, what's your basis for
4  that?
5       A.   That would be based upon the amount of
6  dollars that flow through the marketplace that are
7  paid from owners to sitters related to that service.
8  And that's the one that has the largest amount of
9  that.
10      Q.   The company keeps track of the amount of
11  dollars spent for each service; is that correct?
12      A.   Yes.
13      Q.   The various services that are available
14  through the Rover platform that we just went
15  through, specifically dog boarding, house sitting,
16  doggy day care, dog walking, drop-in visits, those
17  are the only services that pet care providers can
18  provide through the Rover platform; is that correct?
19           MR. LeCRONE:  Asked and answered, I
20  believe.
21           THE WITNESS:  Yes, those are the ones that
22  are available on our platform.
23  BY MR. TIDRICK:
24      Q.   Why did Rover choose those services as the
25  services to be provided on the platform?

Page 33

1            MR. LeCRONE:  Again, calls for speculation,
2  lacks foundation, goes well beyond the scope of
3  today's PMK deposition and the topics therein, may
4  call for a legal conclusion.
5            Mr. Chang, if you can answer that question
6  with a reasonable estimate or a reasonable answer,
7  you can -- I'll let you answer the question.  But it
8  certainly is -- it's got a lot of reasons why it's a
9  problematic question.
10           THE WITNESS:  I do not know the reason why
11  those ones were --
12           MR. YOUNG:  John, it would be great if you
13  could limit your speaking objections and stop
14  coaching the witness, please.
15           MR. LeCRONE:  Joel, are you taking the
16  deposition or is Mr. Tidrick?
17           MR. TIDRICK:  We're both -- we're both here
18  together.
19           MR. LeCRONE:  Yeah.  Well --
20           MR. TIDRICK:  It's --
21           MR. LeCRONE:  Yeah.
22           MR. TIDRICK:  It's a reasonable --
23           MR. LeCRONE:  But --
24           MR. TIDRICK:  It's a reasonable request.
25  I've -- I've refrained from --

Page 34

1      MR. LeCRONE:  I'm just -- I know we're
2  remote.  And I'm just making my objections.  And
3  I'll do them as I see fit.
4      MR. YOUNG:  Yeah, but you're coaching the
5  witness.  It would be great if you could stop that.
6      MR. LeCRONE:  Well, I appreciate your --
7  your instruction to me, Joel, but you're not taking
8  the deposition, number one.  And I -- you know, I'm
9  not going to hear -- I'm not going to sit here, from
10 you or Mr. Tidrick, and take your instructions.  So
11 we can move on and go to the next question.
12 BY MR. TIDRICK:
13     Q.  Mr. Chang, do you have any understanding
14 why the services that we've just discussed are the
15 services that are provided on the platform?
16     A.  I do not know why.
17     Q.  Is there a particular department or unit at
18 Rover that ultimately has control over which
19 services are offered on the platform?
20     MR. LeCRONE:  Again, goes outside the scope
21 of today's PMK deposition, may call for a legal
22 conclusion, lacks foundation.
23     THE WITNESS:  I don't know if there is one
24 or not.  These were services that existed when I got
25 here, and it's just -- they've just been here.

Page 35

1  BY MR. TIDRICK:
2      Q.  So you don't understand that to be part of
3  your area as far as being VP of operations; is that
4  fair?
5      A.  That's correct.
6      Q.  Who do you report to at Rover?
7      A.  I report to the chief operating officer.
8      Q.  What other positions report to the chief
9  operating officer?
10     A.  Our chief marketing officer; our chief
11 technology officer, or maybe he's the VP of
12 engineering, I can't remember; and our PR director.
13     Q.  And so those three, as well as yourself,
14 all report to whom?
15     A.  To the chief operating officer.
16     Q.  And who is that?
17     A.  His name?
18     Q.  Right.
19     A.  Brent Turner.
20     Q.  What's the chief marketing officer's name?
21     A.  Bill Kong.
22     Q.  What's the chief technology officer's name?
23     A.  And I'm not sure if I -- if he's CTO or VP,
24 but his name is Nassir Samatar, I think is his last
25 name.

Page 36

1      Q.  Can you spell that for the benefit of the
2  court reporter, please?
3      A.  Yeah, I don't know it.  I can look it up if
4  it's really that important.
5      Q.  No, it's fine.  The court reporter can ask
6  you later.
7      A.  Yeah.
8      Q.  The PR director's name?
9      A.  That is Susan Johnston.
10     Q.  I think you've already addressed this, but
11 just to be clear, pet care providers work in the
12 homes of pet owners, correct?
13     MR. LeCRONE:  Well, it's vague and
14 ambiguous as to "work."
15     But you could answer, Mr. Chang.
16     THE WITNESS:  They sometimes provide
17 services in those homes.
18 BY MR. TIDRICK:
19     Q.  Sportsman did, correct?
20     A.  I'd have to go back and look at her profile
21 again to be a hundred percent sure, but I think --
22 I'm pretty sure she did.
23     Q.  And what specifically in her profile would
24 you look to in order to know if she had done work in
25 the homes of pet owners?

Page 37

1      A.  Actually, I should say offered services.  I
2  would go and look to see what -- on her profile what
3  services that she offered.  And if she offered the
4  one that you're kind of pointing to on this, the dog
5  boarding, then that would tell me that she worked
6  in -- or, sorry, house sitting, that she would have
7  worked in somebody's home or if she had done -- or
8  gone -- performed services; or if she had done dog
9  walking, it would have been that she would have gone
10 to that house to -- to get the dog, to walk it.
11     Q.  Would "Drop-In Visit" also indicate that?
12     A.  Yes.
13     Q.  Do any of those services include cleaning
14 up after dogs?
15     MR. LeCRONE:  Vague and ambiguous.
16     THE WITNESS:  I don't know.  I think that's
17 whatever's decided between the -- the owner and the
18 sitter.
19 BY MR. TIDRICK:
20     Q.  Any of the services listed on Exhibit 3,
21 are any of those services where Rover has an
22 expectation that if the dog makes a mess, that the
23 dog care provider will clean it up?
24     MR. LeCRONE:  Again, vague and ambiguous
25 with respect to expectation, lacks foundation.

Page 38

1    THE WITNESS:  The expectations are set
2 between the owner and the sitter for that.
3 BY MR. TIDRICK:
4    Q.  How does Rover generate revenue?
5    MR. LeCRONE:  Again, I'll object; this goes
6 well beyond the scope of the topics listed in
7 today's PMK deposition, vague and ambiguous with
8 respect to generation of revenue, may call for
9 speculation or a legal conclusion.
10    THE WITNESS:  Can I ask you a clarifying
11 question on that?
12 BY MR. TIDRICK:
13    Q.  Certainly.
14    A.  Are you asking me about how Rover generates
15 revenue in the online marketplace?
16    Q.  Let's start there.  Yes.  How does it?
17    A.  So an owner receives pet services from a
18 sitter.  So that sitter provides pet services.  And
19 the owner electronically transmits payment of the
20 money that the -- they have agreed upon, the -- the
21 rates the sitters sat, and -- the agreed-upon rate.
22 And Rover deducts 20 percent from that and transmits
23 the money to the sitter.  And that's the revenue
24 that we generate.
25    Q.  So Rover deducts 20 percent and transmits

Page 39

1 the other 80 percent to the dog care provider; is
2 that correct?
3    A.  That's correct.
4    Q.  Now, you mentioned that this is how Rover
5 generates revenue in the online marketplace.  Are
6 there other ways in which Rover generates revenue?
7    A.  That's the one that I know of.  I -- I
8 asked because there might be some others that I'm
9 not aware of.  That's the one that I'm aware of.
10    Q.  Understood.  That's the only source of
11 revenue that you're aware of, correct?
12    A.  Yeah.
13    Q.  So as far as that revenue stream goes,
14 without pet care providers providing services, Rover
15 would not be generating revenue through that stream,
16 correct?
17    A.  Can you say that one more time, please?
18    MR. TIDRICK:  Could the court reporter read
19 it back, please.
20    (The record was read by the reporter.)
21    MR. LeCRONE:  Again, this goes beyond the
22 scope of the PMK deposition, may call for a legal
23 conclusion, lacks foundation, vague and ambiguous.
24    THE WITNESS:  If there were no transaction
25 between the sitter and the owner, there would be no

Page 40

1 revenue for Rover to collect.
2 BY MR. TIDRICK:
3    Q.  Understood.  Thank you.
4    Is Rover a technology business?
5    MR. LeCRONE:  Again, vague and ambiguous,
6 calls for speculation.  It goes outside the scope of
7 the PMK deposition notice.
8    THE WITNESS:  Rover is an online
9 marketplace, and our website is a part of that.  So
10 I'm not sure how you define "Technology," but that's
11 how I would characterize what our business is.
12 BY MR. TIDRICK:
13    Q.  Have you ever heard anyone at the company
14 refer to the company as a technology business or a
15 technology company?
16    A.  Not that I can recall.
17    Q.  I'm about to go to another exhibit.  It
18 would be a good time for a break if you're ready for
19 one.  If not, we can just --
20    MR. LeCRONE:  Sure.
21 BY MR. TIDRICK:
22    Q.  -- continue.
23    MR. LeCRONE:  Sure.  We could take a break
24 right now.  Is that good?
25    MR. TIDRICK:  Sure.  How long?

Page 41

1    MR. LeCRONE:  Why don't we say ten minutes.
2 How about that?
3    MR. TIDRICK:  Sounds good.
4    MR. LeCRONE:  10:40?
5    MR. TIDRICK:  All right.  I think that's --
6 I think that's seven minutes, but --
7    MR. LeCRONE:  Okay.
8    MR. TIDRICK:  Yeah, that sounds -- I'm
9 fine.  And let's -- let's --
10    MR. LeCRONE:  Fine.
11    MR. TIDRICK:  -- come back at 10:40.
12    THE VIDEOGRAPHER:  Okay.  Stand by.  The
13 time is 1:33 p.m. Eastern, and we're going off the
14 record.
15    (Recess taken.)
16    THE VIDEOGRAPHER:  The time is 1:47 p.m.
17 Eastern, and we're back on record.
18 BY MR. TIDRICK:
19    Q.  Does Rover license any technology to
20 anyone?
21    MR. LeCRONE:  Again, that's vague and
22 ambiguous, calls for speculation, lacks foundation.
23    THE WITNESS:  No.
24 BY MR. TIDRICK:
25    Q.  Does Rover make any revenue from selling

Page 42

1  any technology to the general public?
2          MR. LeCRONE:  Same objections, and I'll add
3  this goes beyond the scope of today's deposition and
4  what this witness was prepared to testify to.
5          THE WITNESS:  No.
6  BY MR. TIDRICK:
7      Q.  Does Rover sell any software to the general
8  public?
9      A.  No.
10     Q.  Does the company make any revenue from the
11 sale of technology?
12         MR. LeCRONE:  Same objections.
13         THE WITNESS:  We are -- we make revenue
14 from people using our online marketplace, which uses
15 a site that has technology.
16 BY MR. TIDRICK:
17     Q.  So presently you're just referring to the
18 revenue stream that you described before,
19 specifically pet owners paying for services that
20 they purchase on the Rover platform.  Is that what
21 you're referring to?
22     A.  Yeah, from before.
23     Q.  Putting that aside, there's no technology
24 that the company sells, correct?
25         MR. LeCRONE:  Again, lacks foundation,

Page 43

1  calls for speculation.  That goes beyond the scope
2  of today's deposition.
3          THE WITNESS:  Yeah.  Correct.
4  BY MR. TIDRICK:
5      Q.  I'm going to present another exhibit,
6  Exhibit 4.
7      A.  Good.
8          (Deposition Exhibit 4 was marked for
9  identification.)
10         THE WITNESS:  And I've got it.
11 BY MR. TIDRICK:
12     Q.  For identification purposes, Exhibit 4 is a
13 17-page document that is Bates numbered ROVER_000001
14 through 17.  You see that document?
15     A.  Yeah, I have a 17-page document here.
16     Q.  What is the Exhibit 4 document?
17     A.  This is Melanie S.'s profile.
18     Q.  This is Melanie Sportsman's Rover profile,
19 correct?
20     A.  Correct.  The profile that she has on
21 Rover, is that what you mean, or had on Rover?
22     Q.  Well, the company refers to documents like
23 this as Rover profiles, correct?
24     A.  I don't -- I think we usually say a sitter
25 profile.

Page 44

1      Q.  These profiles aren't just for sitters,
2  though, right?  It's for anyone who provides
3  services through the Rover platform?
4          MR. LeCRONE:  Objection; vague and
5  ambiguous.
6          THE WITNESS:  These -- I'm wondering if you
7  can clarify for me, because those -- as you stated
8  it, it sounded like those were the same thing in my
9  mind, like sitters and people who are providing
10 services on the Rover platform.
11 BY MR. TIDRICK:
12     Q.  Understood.  So we've also referred to them
13 generally as pet care providers.
14         Do I understand correctly this Exhibit 4
15 document is a profile of a pet care provider?
16 Correct?
17     A.  That is correct.
18     Q.  Pet care providers who provide services
19 through the Rover platform have a document known as
20 a profile, correct?
21     A.  That's right.
22     Q.  The pet care provider profiles are viewable
23 only on Rover's mobile app and website, correct?
24         MR. LeCRONE:  Calls for speculation, lacks
25 foundation.

Page 45

1          THE WITNESS:  Yes.
2  BY MR. TIDRICK:
3      Q.  Rover requires that each pet care provider
4  create a profile for the platform, correct?
5      A.  Yes.  For a provider who is -- wants to
6  provide services for owners, we require that they
7  create a profile.
8      Q.  And I think we're saying the same thing,
9  but just to be clear, if someone is to sell services
10 through the Rover platform, they are required by
11 Rover to have a profile on the platform, correct?
12     A.  That's right.
13     Q.  Why does Rover require that?
14     A.  We require that because we want our owners
15 to be able to see a picture of who the potential
16 service -- the sitter is.  We want them to share
17 their experience dog walking.  We want them to
18 see -- there's something in there called
19 testimonial.  We want them to see testimonial from a
20 family or a friend about that particular sitter.
21     Q.  How does Rover implement that requirement?
22         MR. LeCRONE:  Vague and ambiguous, goes
23 outside the scope of the notice.
24         THE WITNESS:  A sitter creates a profile,
25 and when creating that profile there are steps in

Page 46

1  that, and that's where those things would occur.
2  BY MR. TIDRICK:
3      Q.  Is that part of the application process?
4      MR. LeCRONE:  Objection; vague and
5  ambiguous with respect to the term "application."
6      THE WITNESS:  It's not an application.
7  It's literally a sitter creating a profile.
8  BY MR. TIDRICK:
9      Q.  Does that happen after the person is
10 accepted for the platform?
11     MR. LeCRONE:  Vague and ambiguous,
12 argumentative.
13     THE WITNESS:  The sitters can create their
14 profile at any time.  There's no acceptance of it.
15 BY MR. TIDRICK:
16     Q.  I'm asking something a bit different.  I
17 can't go ahead and just create a profile that will
18 appear on the Rover platform right now, right?
19     A.  Like you could go and create a profile.
20     Q.  But that wouldn't show up on the platform
21 until I was approved or accepted by Rover, right?
22     A.  All right.  Okay.  Yeah.
23     Q.  That's what I'm getting at, is essentially
24 the chronology of how this happens in the process of
25 someone who wants to provide services through the

Page 47

1  Rover platform.  If I understand correctly, someone
2  applies, and if they're accepted then it's just
3  through the normal course of what happens next that
4  the person provides information that is used to
5  generate a profile.  Is that right?
6      A.  Yeah.  That -- the -- can you say that
7  again?  I just want to make sure.  That first part
8  of your sentence I want to make sure I heard right.
9      MR. TIDRICK:  Could the court reporter read
10 it back, please.
11     (The record was read by the reporter.)
12     THE WITNESS:  The -- a sitter comes and
13 creates a profile, and then there is a chronology
14 of -- from when they create their profile and then
15 when it is, I think you're saying, like visible and
16 seen in the marketplace.
17 BY MR. TIDRICK:
18     Q.  Understood.  And that all happens after
19 someone's accepted by Rover to be on the platform,
20 right?
21     A.  Yes.  If you -- I'm not sure.  I'm trying
22 to understand the "accepted" word.  I'm not trying
23 to be difficult.  I'm just trying to understand
24 that.
25     The -- like the example that I used of

Page 48

1  where somebody -- we want to make sure that
2  somebody's face can be seen.  When somebody submits
3  a profile and they don't have a picture, then we --
4  we wouldn't put that profile on the site, and we
5  would want them to put a picture in their profile
6  before it goes on the site.  Does that make sense?
7      Q.  I think so.
8      Let me get at it this way:  Do I understand
9  correctly, approximately 15 to 20 percent of
10 individuals who want to provide services through the
11 Rover platform are accepted by Rover?  Is that
12 approximately right?
13     MR. LeCRONE:  Again, vague and ambiguous
14 with respect to the term "acceptance," lacks
15 foundation.
16     THE WITNESS:  No.  It's -- again, back to
17 what we talked about originally, around approximates
18 and estimates, it's around 20 percent of people who
19 come to create a profile actually finish the profile
20 and that profile ends up being on -- in our
21 marketplace.
22 BY MR. TIDRICK:
23     Q.  Understood.  All right.  Well, that
24 actually helps me understand the chronology better.
25 So it sounds like anyone who is interested in

Page 49

1  providing services through the Rover platform
2  provides various information, photograph, to Rover,
3  and then approximately 20 percent of those
4  individuals are accepted by Rover to be on the
5  platform.  Is that correct?
6      MR. LeCRONE:  That misstates the testimony.
7      THE WITNESS:  Yeah, they -- I didn't say
8  accepted.  I just said that 15 to 20 percent of them
9  actually finish and complete and their profiles end
10 up being in the marketplace.
11 BY MR. TIDRICK:
12     Q.  What happens to the other approximately
13 80 percent?
14     A.  Some people don't finish it.  So they start
15 it, and they don't finish it.  And so that's where
16 the -- that number comes from, where -- the people
17 who actually end up going through the entire
18 process.
19     Q.  What information does Rover require be
20 submitted to be part of the pet care provider's
21 profile?
22     MR. LeCRONE:  And asked and answered, I
23 believe, vague and ambiguous, calls for speculation.
24     THE WITNESS:  The -- when a sitter creates
25 a profile, the things I mentioned earlier, so a

Page 50

1  picture of the sitter, a description of their
2  experience with pets so that owners know that, and
3  then a testimonial for -- from somebody.
4  BY MR. TIDRICK:
5      Q.   A person who wants to provide services
6  through the Rover platform has to provide his or her
7  true name, correct?
8      A.   Yes.
9      Q.   And that always appears on the profiles as
10  the first name and the last initial, correct?
11         MR. LeCRONE:  Objection; vague and
12  ambiguous.
13         THE WITNESS:  I don't -- I don't know.
14         MR. LeCRONE:  Lacks foundation.
15         THE WITNESS:  I don't know.
16         MR. LeCRONE:  Go ahead.  I'm sorry.
17         THE WITNESS:  I was just saying, I don't
18  know if that's how that information flows to what
19  shows up on the profile.
20  BY MR. TIDRICK:
21      Q.   Have you ever seen any profiles on the
22  Rover platform that include the full first name and
23  the full last name?
24      A.   I think I've only seen it where it's like
25  the full name and then the last -- the first initial

Page 51

1  of the surname.
2      Q.   The first name and then the first initial
3  of the surname, correct?
4      A.   That's right.
5      Q.   Does a pet care provider have the option of
6  including his or her full first and last name on
7  their profile?
8      A.   I don't know.  I don't know if they do or
9  not.
10      Q.   Does Rover do anything to verify that the
11  pet care provider's name provided for the profile is
12  their actual, true name?
13         MR. LeCRONE:  Vague and ambiguous.
14         THE WITNESS:  The -- there's a background
15  check that occurs in the process, and identity is --
16  is there.
17  BY MR. TIDRICK:
18      Q.   Does a pet care provider have the option of
19  including a business name, for example a dba or a
20  corporate name, on their profile rather than their
21  personal name?
22      A.   I do not know if that's the case.
23      Q.   You've never seen a profile that appears
24  that way; is that correct?
25      A.   It's hard for me to say that, because all

Page 52

1  profiles also have free-form text boxes.  And so I
2  can't speak to whether or not one of those might
3  have that or not.
4      Q.   Looking at the Exhibit 4 document as an
5  example, on the first page, at the very top, there's
6  the Rover logo, and then there's this statement
7  about COVID-19, and then below that is the pet care
8  provider's photograph, and then below that is the
9  pet care provider's full first name and first
10  initial of their surname.  That information is
11  standardized for the Rover profiles, correct?
12         MR. LeCRONE:  Vague and ambiguous.
13         THE WITNESS:  To my knowledge, that's how
14  the profiles are displayed in our marketplace.
15  BY MR. TIDRICK:
16      Q.   Does a pet care provider have an option to
17  include their phone number on their profile?
18      A.   I don't believe the phone number is in the
19  profile.
20      Q.   Does a pet care provider have the option of
21  including their personal email address in their
22  profile?
23      A.   I don't believe email -- personal email
24  addresses are in there, either.
25      Q.   The Rover profile includes reviews posted

Page 53

1  by customers, correct?
2      A.   The sitter's profile has profile --
3  reviews?  Is that what you just asked me?
4      Q.   Yes.  Is that right?
5      A.   Yes.
6      Q.   Does a pet care provider have the ability
7  to post reviews to their own profile?
8      A.   I don't believe they can post to their own
9  profile.  They can respond to profiles, but I don't
10  believe they can post profile -- reviews about
11  themselves.
12      Q.   Does a pet care provider have the ability
13  to delete a review from their profile?
14      A.   No, they do not.
15      Q.   Can a pet care provider opt to not allow
16  reviews to appear in their profile?
17      A.   I do not believe that they can.
18      Q.   Can a pet care provider opt to not have
19  star ratings on their profile?
20      A.   No.
21      Q.   Can a pet care provider opt to not have a
22  response rate listed on their profile?
23      A.   No, response rates are on the profile.
24      Q.   And just so the written record is clear --
25      A.   I'm actually not sure whether response rate

Page 54

1    is overt on the profile.  I'd have to go back and
2    look at that and scan hers.
3        Q.   Do I understand right -- and just so we're
4    all clear, as an example, looking at the Exhibit 4
5    document, on the first page --
6        A.   Yeah.  Got it.
7        Q.   -- below -- below the photograph is the
8    person's full first name and first initial of their
9    surname.  Below that is the location where the pet
10   care provider is based; is that correct?
11       A.   Yeah.
12       Q.   And then below that is the star rating,
13   correct?
14       A.   Yeah.
15       Q.   And then below that, where it says
16   "Response Rate," does that appear on the profiles
17   that are viewable by the pet owners?
18       A.   Yes.  Thanks for showing that to me.
19       Q.   So that response rate is visible to pet
20   owners, correct?
21       A.   That's correct.
22       Q.   And the response time is visible to pet
23   owners, correct?
24       A.   Yeah.  Yes.
25       Q.   And just to be clear, I think you've

Page 55

1    already answered this, but the information about
2    response rate and response time, the pet care
3    provider doesn't have the option of excluding that
4    information from their profile, correct?
5        A.   Correct.
6        Q.   Was that "Correct"?
7        A.   Yes.
8             MR. LeCRONE:  Mr. Chang, it's hard to
9    listen to you, at least at my end, so if you could
10   make sure your voice is -- is up and you're close
11   enough to the -- to your --
12            THE WITNESS:  Yeah.
13            MR. LeCRONE:  -- microphone.  Then --
14            THE WITNESS:  I can put my headphones on,
15   too, if that helps.  I'll -- let me just speak up
16   for --
17            MR. LeCRONE:  No, that's -- it -- now --
18   now it's a lot better.  It just was hard, the last
19   couple answers, to hear.
20            THE WITNESS:  Okay.
21            MR. TIDRICK:  Was it clear enough that you
22   were able to get the answers down?
23            I'm not asking you, Mr. Chang.  I'm asking
24   the court reporter.
25            (Discussion off the record.)

Page 56

1    BY MR. TIDRICK:
2        Q.   Well, just to be ultracautious -- I don't
3    think this will take very long.  And please excuse
4    the "asked and answered" aspect of this, but I just
5    want to make sure that this is clear on the record.
6             The pet care provider does not have the
7    option of excluding the star rating from their
8    profile, correct?
9        A.   That's right.
10       Q.   The pet care provider does not have the
11   option of excluding the response rate from their
12   profile, correct?
13       A.   That's right.
14       Q.   The pet care provider does not have the
15   option of excluding the response time from their
16   profile, correct?
17            (Discussion off the record.)
18            THE WITNESS:  That's right.
19   BY MR. TIDRICK:
20       Q.   Do I understand correctly that certain pet
21   care providers' profiles are hidden from customers?
22            MR. LeCRONE:  Vague and ambiguous, lacks
23   foundation.
24            THE WITNESS:  No, I don't think any of our
25   profiles are hidden.

Page 57

1    BY MR. TIDRICK:
2        Q.   And I'm wondering if this is a terminology
3    issue.  I feel like I've seen something in Rover
4    documents referring to hiding of profiles under
5    certain circumstances.
6             Let's say that -- well, let me -- let me
7    ask it this way:  When a prospective pet owner wants
8    services through the Rover platform, they're
9    presented with various profiles to choose from,
10   correct?
11       A.   That's right.
12       Q.   How does Rover determine which profiles
13   will be shown to a prospective pet owner?
14            MR. LeCRONE:  Vague and ambiguous.
15            THE WITNESS:  I don't know all the workings
16   of how all those pieces determine which ones are
17   listed, and in what order.
18   BY MR. TIDRICK:
19       Q.   Rover has some kind of algorithm that
20   controls which pet care providers' profiles will
21   show up when a pet owner identifies a service that
22   they want, correct?
23       A.   That's correct.
24       Q.   Do pet care providers incur any cost for
25   setting up and maintaining a profile on the Rover

Page 58

```
 1  platform?
 2          MR. LeCRONE:  Could -- before you answer,
 3  could you repeat that question, Mr. Court Reporter.
 4          (The record was read by the reporter.)
 5          THE WITNESS:  I don't know whether they
 6  incur any costs in doing that.
 7  BY MR. TIDRICK:
 8      Q.  In order for a pet owner to see a pet care
 9  provider's profile, the pet owner has to log in to
10  the Rover website or the Rover mobile app; is that
11  correct?
12      A.  I cannot recall whether or not they have to
13  log in or whether they can look at it just by going
14  straight to Rover.com.  But they have to come to
15  Rover.com to be able to see the files.
16      Q.  Are you familiar with something called,
17  quote, "away mode"?
18      A.  I've heard the term before.
19      Q.  Is that something you're familiar with?
20      A.  Not deeply familiar.
21      Q.  And, again, I don't want you to guess, but
22  now that I've mentioned that term, does that refresh
23  your memory about, for example, an away mode
24  resulting in a pet care provider not having a
25  profile show up on a search made by a pet owner?
```

Page 59

```
 1          MR. LeCRONE:  Lacks foundation, calls for
 2  speculation, vague and ambiguous.
 3          THE WITNESS:  I'm not sure whether or not
 4  away mode, if I'm paraphrasing you, doesn't --
 5  prevents a profile from showing up.
 6  BY MR. TIDRICK:
 7      Q.  I'm going to present another exhibit.
 8          (Deposition Exhibit 5 was marked for
 9  identification.)
10          MR. LeCRONE:  This would be Exhibit 5,
11  Counsel?
12          MR. TIDRICK:  Yes.  This is Exhibit 5.  And
13  for identification purposes, Exhibit 5 is a 14-page
14  document Bates numbered ROVER_000503 through 516.
15  And I understand the document is entitled "Terms of
16  Service."
17          THE WITNESS:  I have it here.
18          MR. LeCRONE:  Mr. Chang, make sure you've
19  reviewed this document in full.
20  BY MR. TIDRICK:
21      Q.  And for what it's worth, I think this is
22  one of the documents that you mentioned that you'd
23  reviewed in preparation for the deposition.  I would
24  also note -- I'm scrolling to the last couple pages
25  of this.  I'm not sure that the last two pages,
```

Page 60

```
 1  Bates numbered ROVER_000515 and 516, are actually
 2  part of the terms of service.  So after you have a
 3  chance to look at this, let's -- let's get on the
 4  same page about what -- what pages constitute the
 5  terms of service.  Okay?
 6          And Mr. Chang, I'll just wait until you
 7  tell me you've had a chance to look at it.
 8      A.  Yeah.  I'm scanning.  And I'll give you the
 9  thumbs-up when I'm done.
10      Q.  Thank you.
11          MR. LeCRONE:  Mr. Court Reporter, I'm
12  curious.  Is that the Bay Bridge behind you in the
13  virtual background?
14          THE WITNESS:  Okay.
15  BY MR. TIDRICK:
16      Q.  Great.  Thank you.  So, first, just so that
17  we're on the same page, do I understand correctly
18  that the pages that are Bates numbered 503 through
19  514, that those 12 pages are Rover's terms of
20  service?
21          MR. LeCRONE:  Is the question whether they
22  are current terms of service or at some point in
23  time, Counsel?  Vague and ambiguous.
24  BY MR. TIDRICK:
25      Q.  You can answer.
```

Page 61

```
 1      A.  They are pages -- through to 514 I think is
 2  what you said.  Those are pages of a terms of
 3  service.
 4      Q.  Were those Rover's terms of service in
 5  effect for a certain time period?
 6      A.  They were.
 7      Q.  What time period were these terms of
 8  service in effect?
 9      A.  I don't know the exact range of them.  I
10  just see here "Last updated: January 31st, 2017."  I
11  don't know how long they were in effect until.
12      Q.  Do you know what date after January 31st,
13  2017 the terms of service were updated?
14      A.  I do not know the answer to that.
15      Q.  Do you know approximately?
16      A.  I don't.  And I'm not trying to be
17  difficult.  I actually don't.  But I can find it.
18      Q.  What steps would you go through to
19  determine that?
20      A.  I would probably go to our legal department
21  and check, and ask.
22      Q.  Do I understand correctly that at least for
23  some period of time, this Exhibit 5 document, pages
24  1 through 12, as identified at the bottom of the
25  pages, that that constituted the terms of service
```

Page 62

1  for some period of time for Rover?
2      A.  Yeah.
3      Q.  Yes?
4      A.  Yes.
5      Q.  Do you have any understanding who created
6  this document?
7      A.  I do not know who created this document.
8      Q.  Is it your understanding that Rover created
9  this document?
10     A.  I don't know that for sure.  It would have
11  been Rover or somebody affiliated with Rover.
12     Q.  And just to be clear, when you say someone
13  affiliated with Rover, you're not referring to the
14  pet care providers, correct?
15     A.  Correct.
16     Q.  The pet care providers did not participate
17  in drafting the terms of service, correct?
18     A.  That's correct.
19     Q.  Now, I know that there's some uncertainty
20  as to the exact period of time that these terms of
21  service were in effect, but understanding that, let
22  me ask you this:  For whatever period of time that
23  the terms of service represented in Exhibit 5 were
24  in effect, those terms of service applied to all pet
25  care providers, correct?

Page 63

1      A.  Yes, they would have provided -- they would
2  have applied to all pet care providers who used the
3  Rover service, or I should say provided services on
4  Rover.
5      Q.  And that was true for whatever period of
6  time that these terms of service were in effect,
7  correct?
8      A.  Right.
9      Q.  And is it fair to say your understanding,
10  at some point these terms of service may have been
11  modified, and whatever the modified terms of service
12  became, those modified terms of service again would
13  apply to all pet care providers, correct?
14         MR. LeCRONE:  Again, before you answer,
15  Mr. Chang, could you read that question back,
16  Mr. Reporter.
17         (The record was read by the reporter.)
18         MR. LeCRONE:  Thank you.
19         I would just object.  It calls -- may call
20  for a legal conclusion, vague and ambiguous, lacks
21  foundation.
22         THE WITNESS:  I believe that to be true.  I
23  do not know whether or not somebody has legacy terms
24  for when they started using the service.  I believe
25  terms of service apply to everybody as they get

Page 64

1  published.
2  BY MR. TIDRICK:
3      Q.  I think I understand you.  And just to be
4  clear, you've never seen an individualized contract
5  with a pet care provider that's different than the
6  terms of service for all other providers, correct?
7      A.  I've never seen an individualized terms of
8  service for a particular provider or owner.
9      Q.  Is it true that Rover requires that a pet
10  care provider be 18 years of age or older?
11     A.  Yes.
12     Q.  Why does Rover require that?
13         MR. LeCRONE:  Calls for speculation, may
14  call for a legal conclusion, beyond the scope of
15  this -- today's deposition and the topics in the
16  notice.
17         THE WITNESS:  I don't know exactly why 18
18  is the -- is the age for providing service.
19  BY MR. TIDRICK:
20     Q.  Are you specifically aware that the terms
21  of service presently in effect are different than
22  this Exhibit 5, or are you just not sure whether
23  it's been modified?
24     A.  I think that our current terms of
25  service -- this one is from 2017.  So I think we

Page 65

1  have updated terms of service since then.  I don't
2  know for sure, but I think so.
3      Q.  I'm just noticing at the top of the
4  document, there is a date in the top left corner
5  that says 7/17/2020.
6      A.  Uh-huh.
7      Q.  Does looking at that give you any refreshed
8  memory that these were the terms of service in
9  effect at least through July 2020 and that if there
10  were modifications, that those happened after July
11  17?
12     A.  Of 2020?
13     Q.  Yes.
14     A.  I think it's possible.  And the only reason
15  I say "possible," because, like, I don't know
16  whether or not this is when this was printed, on
17  that date, and that was like the date stamp of when
18  it was printed.
19     Q.  Rover requires that each pet care provider
20  pass a background check; is that correct?
21     A.  Yes, that's correct.
22     Q.  That's a background check by a third party,
23  correct?
24     A.  That's correct.
25     Q.  That third party is selected by Rover,

Page 66

1  correct?
2      A.  Yes.
3      Q.  Why does Rover require that each pet care
4  provider pass a background check?
5      A.  We do that so that our owners can have
6  peace of mind.  And we want owners to come to our
7  marketplace.  We have strangers that are meeting in
8  the marketplace and entering each other's homes and
9  looking after pets, which are important to owners.
10  And so we do that so that owners can have peace of
11  mind about using service — people that are pet
12  sitters on our — in our marketplace.
13      Q.  Have you ever heard this background check
14  requirement be described as a quality control
15  function?
16      A.  No.
17      Q.  How specifically does Rover implement the
18  background check requirement?
19      A.  Can you elaborate on "specifically,"
20  please?
21      Q.  So I understand that a background check is
22  required.  Can you tell me how that works?
23      A.  So how does the back — can — do you mean
24  how does the background check, like, occur or
25  happen?

Page 67

1      Q.  Right.
2          MR. LeCRONE:  Again, this may — lacks
3  foundation, and may call for speculation, also may
4  call for some form of a legal conclusion.  In his
5  answer, I don't think this — I think this witness
6  has already testified that this is done by a third
7  party.  So I want to just make that clear for the
8  record.
9          If you do have an understanding one way or
10  the other, Mr. Chang, you can answer the question,
11  but I don't want you to guess one way or the other.
12          THE WITNESS:  When somebody creates their
13  profile, there is a step where they would have a
14  background check.  And at that point — I'm not sure
15  of all the details of what happens or how all of
16  that gets done, but there's a step there where —
17  where a background check — a background check gets
18  conducted by the third party.
19  BY MR. TIDRICK:
20      Q.  Do you have any understanding what sort of
21  things can turn up in a background check that would
22  disqualify someone from providing services on the
23  Rover platform?
24          MR. LeCRONE:  Again, may call for a legal
25  conclusion, vague and ambiguous, lacks foundation

Page 68

1  with this witness, and goes beyond the scope of
2  today's deposition.
3          THE WITNESS:  I don't know all the
4  specifics.  I would only be able to speak very
5  generally or broadly, and not totally sure, but, for
6  example, like a criminal — actually, I don't know.
7  Some — I'd be guessing.
8  BY MR. TIDRICK:
9      Q.  I don't want you to guess.  Do you know
10  generally some categories of information that turns
11  up in background checks that disqualifies someone
12  from providing services on the platform?
13      A.  I don't, because I'm not an expert in it.
14  I would — like the — like if you asked me for a
15  category, I would say, like, crimes or criminal
16  history, but I wouldn't be able to say much more
17  than that around what's in that.
18      Q.  Is there anything besides crimes or
19  criminal history that would exclude someone from
20  providing services on the Rover platform?
21          MR. LeCRONE:  Asked and answered, calls for
22  speculation, lacks foundation, calls for a legal
23  conclusion.
24          THE WITNESS:  I don't know.
25  BY MR. TIDRICK:

Page 69

1      Q.  When someone wants to provide pet care
2  services through the Rover platform, they need to
3  apply and be accepted by Rover; is that correct?
4      A.  Can you restate that, please?
5          MR. TIDRICK:  Could you read back the
6  question, please.
7          (The record was read by the reporter.)
8          MR. LeCRONE:  I believe this was in some
9  fashion asked and answered earlier.  Misstates prior
10  testimony, vague and ambiguous.
11          THE WITNESS:  When somebody wants to
12  provide pet care services in the marketplace, they
13  complete a profile to perform services.
14  BY MR. TIDRICK:
15      Q.  Is there anything that occurs in the
16  process of signing up with the platform that Rover
17  describes as an application?
18          MR. LeCRONE:  Asked and answered.
19          THE WITNESS:  No.
20  BY MR. TIDRICK:
21      Q.  Does Rover ever do anything that it
22  describes as being a review of an application?
23          MR. LeCRONE:  Vague and ambiguous, calls
24  for speculation.
25          THE WITNESS:  No, nothing that we describe

Page 70

1 as review.
2 BY MR. TIDRICK:
3        Q.   So if I could please refer you to section
4 2.2 of the Exhibit 5 document.  It's on the first
5 page of the Exhibit 5 document.
6        A.   Uh-huh.
7        MR. LeCRONE:  And, again, Counsel, that's
8 2.2.  Do I have that right?
9 BY MR. TIDRICK:
10       Q.   Yes.   Section 2.2.
11       MR. LeCRONE:  Got it.
12 BY MR. TIDRICK:
13       Q.   Exhibit 5.  It's the page that is Bates
14 labeled ROVER —
15       MR. LeCRONE:  Got it.
16 BY MR. TIDRICK:
17       Q.   — 503.  And if you could, please, take a
18 look at that section 2.2.  And why don't you take —
19 I know you've already read this, but take a moment
20 to read that section, please.
21       A.   Yeah.
22       Q.   So there's a phrase in section 2.2 of
23 Exhibit 5 that says, "We conduct an initial review
24 of Service Provider applications."  Can you explain
25 to me what that refers to?

Page 71

1        A.   I — I don't know.  I think I understand
2 what you're asking me.  And when somebody signs up
3 and creates a profile, I think about that as we
4 process those.
5        Q.   So I'm just trying to understand better
6 what this is referring to.  Do I understand
7 correctly, when someone wants to provide services on
8 the Rover platform, they go through a process of
9 providing various information, some of which
10 ultimately can end up in a Rover profile.  And is
11 that process of providing information what is being
12 referred to here when it says, "We conduct an
13 initial review of Service Provider applications"?
14       MR. LeCRONE:  Mr. Court Reporter, can you
15 read that back for me, please.
16       (The record was read by the reporter.)
17       MR. LeCRONE:  Vague and ambiguous, lacks
18 foundation, compound, may call for a legal
19 conclusion.
20       THE WITNESS:  I'm not a lawyer and don't
21 write the terms of service.  So the — is what is
22 written here the same thing as what I describe as a
23 sitter who creates a profile and we process that?
24 I — I don't — can't say that that's the exact same
25 thing.

Page 72

1 BY MR. TIDRICK:
2        Q.   Have you ever heard anyone at the company
3 refer to people who want to provide services on the
4 Rover platform as applicants?
5        MR. LeCRONE:  Asked and answered.
6        THE WITNESS:  No.
7        While you're thinking about your next
8 question, can I ask one thing, too?
9 BY MR. TIDRICK:
10       Q.   Sure.  Yeah, please.
11       A.   I don't need it now, but maybe in the next
12 20 or 30 minutes, I wouldn't mind having a break so
13 I can eat something —
14       Q.   Sure.
15       A.   — if that's possible.  I — like I said, I
16 don't need it now, but in that window that would be
17 great.
18       Q.   Yeah, that timing is great.  That's —
19 that's lunchtime.  So — yeah, why don't we — why
20 don't we aim for sometime — sometime around 12:00,
21 12:15.  Does that work?
22       A.   That's great.  Thanks.
23       Q.   Okay.
24       MR. LeCRONE:  I would — I would prefer
25 12:00, Counsel, if that works for you.

Page 73

1        MR. TIDRICK:  Sure.  That's fine.  That's
2 fine.
3        Q.   So, Mr. Chang, the terms of service, the
4 reference to "an initial review of Service Provider
5 applications" in section 2.2, do you have any idea
6 what that refers to?
7        A.   Yeah, it's — my understanding or take on
8 this is that it's similar to what I mentioned
9 earlier, where a sitter creates a profile, and then
10 we process it.  But other than that, I don't really
11 know much more about how to describe that.
12       Q.   What is involved in that processing?
13       A.   That would be where we want to make sure
14 that — the things that I mentioned earlier, where
15 there's a photo of the sitter, where somebody can
16 see their face, and they provided information about
17 their experience sitting pets so that owners can
18 understand that, and then the testimonial.  So they
19 ask somebody that they know to provide a testimonial
20 for them.
21       Q.   Is that review conducted by humans at
22 Rover, or is that a machine-driven process?
23       MR. LeCRONE:  Calls for speculation, vague
24 and ambiguous.
25       THE WITNESS:  That process is by people.

Page 74

1  BY MR. TIDRICK:
2      Q.  What are the job titles of those people?
3      A.  I think they're referred to as agents.
4      Q.  Is there a department that the agents
5  you're referring to fall within?
6      A.  Yeah.  They're operations agents.
7      Q.  Is that under your purview?
8      A.  Yes.
9      Q.  How many agents are there who participate
10  in that process?
11      A.  It varies at any given time.  Five to ten.
12      Q.  Are there any written instructions that
13  those agents follow for their review of information
14  that's submitted by the prospective pet care
15  providers?
16      A.  Can you say that back or read that back
17  again, please.
18          MR. TIDRICK:  Could you read it, please.
19          (The record was read by the reporter.)
20          THE WITNESS:  I don't know if there is
21  something in writing that they are looking at or
22  referring to.  So I would say I don't know if
23  there's written instructions per se.
24  BY MR. TIDRICK:
25      Q.  Is there some training that they receive

Page 75

1  for that function?
2      A.  Yes.
3      Q.  Who gives that training?
4      A.  There would be a trainer that provides
5  that.
6      Q.  Is that an employee of Rover?
7      A.  Yes, the trainer would be an employee of
8  Rover.
9      Q.  Who specifically is that person?
10      A.  We don't have one right now.  That person
11  recently left Rover.
12      Q.  What was that person's -- well, what is
13  that person's name?
14      A.  It is Bethany Kline.
15      Q.  Is the last name spelled K-L-I-N-E?
16          Sorry.  What's the spelling of the last
17  name?
18      A.  How you spelled it is correct.
19      Q.  Okay.  During what time period was Bethany
20  Kline performing that training function?
21      A.  I don't know when she started.  And she
22  recently left, in the last, I'd say, couple months.
23      Q.  Do you have any understanding
24  geographically where she was based?
25      A.  She was in Seattle.

Page 76

1      Q.  Did you ever observe personally any of the
2  trainings that Bethany Kline gave to the agents?
3      A.  No.
4      Q.  Do you have any understanding whether she
5  used any written materials for those trainings?
6      A.  I haven't seen them.  There probably were,
7  but I haven't seen anything.
8      Q.  Do you have any understanding approximately
9  how much time an agent spends reviewing information
10  provided by a prospective pet care provider?
11      A.  Yes.
12      Q.  How much?
13      A.  The amount of time spent processing by one
14  of our agents is -- I'm going to estimate, just to
15  give order of magnitude.  It's 60 -- like a minute
16  or two.
17      Q.  So when you were saying 60, 60 seconds,
18  approximately?
19      A.  Yeah.
20      Q.  Per applicant?
21      A.  Per profile processed.
22      Q.  Per prospective pet care provider, correct:
23  60 seconds?
24      A.  60 -- yeah, in that neighborhood, 60 to 120
25  seconds to process one.

Page 77

1      Q.  And during that 60 to 120-second time
2  frame, does the agent make a decision as to whether
3  the prospective pet care provider will be listed on
4  the platform?
5      A.  They -- the agents make decisions about
6  whether or not those things that I mentioned are in
7  the profile or not, so a picture, have they included
8  written documentation -- or not documentation, but,
9  like, description of pet services that they provide,
10  or experience, and whether or not there's a
11  testimonial there.
12      Q.  Does the agent give an up or down decision
13  as to whether a prospective pet care provider will
14  be on the Rover platform?
15      A.  No, they do not.  The -- the -- it's
16  actually up to the -- the sitter.  The -- if one of
17  those pieces of information is missing, then they
18  send it back and ask that it's provided.
19      Q.  Are the prospective pet care providers
20  rated in any manner?
21      A.  No.
22          MR. LeCRONE:  Vague and ambiguous.
23          I'm sorry, Mr. Chang.  I kind of spoke over
24  you.
25          THE WITNESS:  It's okay.

Page 78

1        MR. LeCRONE:  You can answer the question.
2        THE WITNESS:  No, there are no grades.
3    BY MR. TIDRICK:
4        Q.  Do the agents or anyone else apply any
5    criteria in deciding whether a prospective pet care
6    provider will appear on the platform?
7        A.  No, there's no — other than the things
8    that I've mentioned, those are the — those are the
9    elements of a sitter's profile that we ask the
10   sitter to include in the profile.
11       Q.  Do you have any understanding how it is
12   that only — what was the percentage you said
13   earlier, 15 percent —
14       A.  I said —
15       Q.  — of the —
16       A.  — it was neighborhood 20 percent, kind of
17   as an estimate.
18       Q.  20 percent.  Do you have any understanding
19   what explanation there is, if any, for why only
20   20 percent of the individuals who start the process
21   of providing information to provide services on the
22   Rover platform ultimately are listed on the
23   platform?
24       MR. LeCRONE:  I think that's been asked and
25   answered.  He's explained where those percentages

Page 79

1    came from.
2        THE WITNESS:  The — that's the number of
3    people who have actually gone through and completed
4    the profile, that then end up on the marketplace.
5    BY MR. TIDRICK:
6        Q.  The process of completing the profile, do
7    you have any understanding what aspects of that
8    process are the parts that individuals fail to
9    complete?
10       MR. LeCRONE:  Lacks foundation, calls for
11   speculation, vague and ambiguous.
12       THE WITNESS:  Yeah, I don't know which
13   particular parts.
14   BY MR. TIDRICK:
15       Q.  At what point in the process does the
16   background check occur?
17       A.  I do not know what step it is in the
18   process.  I just know it's in the process.
19       Q.  Do you have any understanding, even
20   approximately, of the people who start the process
21   of submitting information to be listed as a pet care
22   provider on the Rover platform, what percent
23   ultimately go through a background check process?
24       A.  No, I do not.  No.
25       Q.  Do you have any understanding whether

Page 80

1    that's after the agent spends the approximately 60
2    to 120 seconds reviewing it?
3        A.  Is the background check after somebody
4    reviews it?
5        Q.  Right.
6        A.  I do not know that.
7        Q.  Does Rover tend to turn down prospective
8    pet care providers who appear to be doing it
9    primarily for the money and not for love of pets?
10       MR. LeCRONE:  Vague and ambiguous, lacks
11   foundation, calls for speculation, argumentative.
12       THE WITNESS:  Rover, you know, we allow
13   anybody to create a profile and go onto the
14   marketplace.  And owners can decide which sitters
15   that they want to have — which sitters they want to
16   sit their pets or walk their dogs.
17   BY MR. TIDRICK:
18       Q.  So would you disagree with the statement
19   that Rover tends to turn down individuals who are
20   doing it primarily for the money?
21       MR. LeCRONE:  Vague and ambiguous with
22   respect to the term "turn down," misstates prior
23   testimony.
24       THE WITNESS:  No, I — I would say that
25   that is inaccurate.  We don't turn down people.

Page 81

1        MR. TIDRICK:  I know we're close to 12:00.
2    This is a reasonable breaking point.  So why don't
3    we break.  How long do people want for lunch?
4        MR. LeCRONE:  Can we say till 12:45?  Is
5    that okay?
6        MR. TIDRICK:  It's fine with me.
7        MR. LeCRONE:  Okay.  Let's do that.
8        MR. TIDRICK:  All right.
9        THE VIDEOGRAPHER:  Please stand by.  The
10   time is 2:55 p.m. Eastern, and we're going off the
11   record.
12       (Whereupon, a lunch recess was taken.)
13
14            AFTERNOON PROCEEDINGS
15       THE VIDEOGRAPHER:  The time is 3:50 p.m.
16   Eastern, and we're back on record.
17   BY MR. TIDRICK:
18       Q.  Hi, Mr. Chang.  So we're back from lunch.
19   You understand you're still on the record and still
20   under oath, correct?
21       A.  Yes.
22       Q.  Still looking at the Exhibit 5 document, if
23   you could, please, turn to the second page of that,
24   and specifically the section that's numbered 2.6.
25       A.  Hey, Mr. Tidrick, can I clarify something

30(b)(6) - Derek Chang - December 18, 2020

22 (Pages 82 to 85)

Page 82

1  that you asked me to?
2     Q.  Sure.
3     A.  I was -- something was bugging me, and I
4  was thinking about it at lunch.  You asked me about
5  costs that sitters incur or what a sitter -- what
6  costs they might incur if they create a profile.
7  And I think I'd said I don't know if they incur a
8  cost.  I just want to clarify, I know they don't
9  incur a cost from a fee that Rover charges.  We
10 don't charge for that.  But what I was thinking
11 about was, like, I don't know if they incur costs
12 like if they bought a new T-shirt or got a photo
13 taken, or something like that.  So I want to make
14 sure I -- I clarified that.
15       The only -- the only cost they incur would
16 be when they have a booking, they pay Rover that
17 20 percent fee that they can see and they're aware
18 of.  So I just want to make sure I -- I made that
19 clear.  I want to clarify that there was no cost
20 from a Rover fee when they create a booking -- or
21 when they create a profile.
22    Q.  Thank you.  Well, I appreciate you
23 clarifying that.  And just so we have a clean
24 record, I'm going to ask you a question that's
25 essentially what you just said so that you can

Page 83

1  confirm it.  All right?
2       Is it correct to say that pet care
3  providers do not pay any fee to Rover to have a
4  profile on the -- on the Rover platform?
5     A.  That's correct.  There's no -- we don't
6  charge a fee for them to create a profile.
7     Q.  Thank you.  And there's no fee that's
8  charged to maintain that profile on the platform,
9  correct?
10    A.  Correct.  The only fee is if they're doing
11 a booking, and the 20 percent -- 20 percent fee that
12 Rover charges them.
13    Q.  And just to be clear, I think you're saying
14 that just to try to be careful, which I appreciate,
15 but the -- the 20 percent amount that Rover takes
16 out of payments for services, that's totally
17 separate from maintaining a profile, correct?
18    A.  Yes.  Correct.  And I just want to make
19 sure I clarify, based on what you just said to me,
20 too.  The -- so the sitter charges the owner a fee,
21 whatever they decide it to be.  And then Rover
22 charges a 20 percent fee on top that they see.
23 It's -- actually, I think I might have even said
24 deduction before.  It's not.  It's a fee that is
25 applied on top, and they can see what that is, and

Page 84

1  we're transparent about that when they're -- when
2  we're doing bookings, but not -- not associated with
3  creating the profile or having the profile.
4     Q.  So just as an example, an individual who
5  sets up a profile on the Rover platform to be a pet
6  care provider, if that person never performs any
7  services, then that person pays nothing to Rover,
8  correct?
9     A.  That's correct.
10    Q.  So I was directing you to Exhibit 5 again,
11 and the second page of that, which is Bates numbered
12 ROVER_000504, and specifically section 2.6.  Do you
13 want to take a moment just to reread that section.
14 It's about nine or ten lines long.
15    A.  Just the two, six?
16    Q.  Yes, 2.6.
17    A.  Okay.
18    Q.  There's a statement in the terms of
19 service, Exhibit 5, page 2, section 2.6.  And I'm
20 quoting a phrase out of a sentence.  It says
21 "Rover.com performs a limited review of applications
22 to become Service Providers."
23       Does that refer to the review by agents who
24 review information submitted by the prospective pet
25 care providers for 60 to 120 seconds on average?

Page 85

1     A.  Yeah, I think that refers to the -- the
2  process of those agents processing those in that
3  time you mentioned or the application -- or the --
4  the profile to become on our -- on our marketplace.
5     Q.  In addition to that review by the agents,
6  the human agents, does Rover also have any kind of
7  technology that reviews information submitted by the
8  prospective pet care providers?
9        MR. LeCRONE:  Asked and answered.
10       THE WITNESS:  Yeah, the -- the -- the
11 processing of the profiles is all done by people.
12 BY MR. TIDRICK:
13    Q.  Does Rover prohibit pet care providers from
14 obtaining payment from pet owners outside of the
15 Rover website or mobile app?
16    A.  Can you restate that, please?
17       MR. TIDRICK:  Could the court reporter read
18 it back, please.
19       (The record was read by the reporter.)
20       MR. LeCRONE:  And that's vague and
21 ambiguous the way it's phrased.
22       But Mr. -- Mr. Chang, if you understand the
23 question, you can answer it.
24       THE WITNESS:  A sitter or a provider can
25 engage with anybody they want to in their business

30(b)(6) - Derek Chang - December 18, 2020

23 (Pages 86 to 89)

Page 86

1   and transact and collect money from people.  If
2   somebody -- if a pet -- if a sitter meets and books
3   with an owner using our Rover site, we -- we want
4   the payment to be through the platform so that the
5   payments are safe and secure and that we can
6   continue to make sure we have a safe marketplace.
7   BY MR. TIDRICK:
8        Q.   In a scenario where a pet care provider
9   makes arrangement with a pet owner to provide pet
10  care services but makes those arrangements outside
11  the platform, is that prohibited?
12            MR. LeCRONE:  Vague and ambiguous.
13            THE WITNESS:  If a sitter makes
14  arrangements with a -- an owner or somebody who has
15  a pet to -- to provide services and that's not done
16  on our platform, then -- was your question can they
17  collect funds from them?  Was that what your
18  question was?
19  BY MR. TIDRICK:
20       Q.   Well, is it prohibited for -- for -- for
21  a -- let me state it this way:  Is it prohibited for
22  a pet care provider to provide services to a pet
23  owner and obtain payment from that pet owner outside
24  of the Rover platform?
25            MR. LeCRONE:  Again, it's vague and

Page 87

1   ambiguous, lacks foundation.
2             THE WITNESS:  The -- they're not prohibited
3   from providing services and collecting money outside
4   the platform.  Our terms of service is that if they
5   are actually booking that service through the -- on
6   the Rover -- in the Rover marketplace, that that's
7   where the payment is to be transmitted, through the
8   Rover platform.
9   BY MR. TIDRICK:
10       Q.   Is it fair to say a pet care provider is
11  prohibited by Rover from using the Rover platform to
12  arrange for pet care services with another Rover
13  user, a pet owner, and completing the payment
14  outside of the platform?  That's prohibited, right?
15            MR. LeCRONE:  That is -- again, maybe you
16  should read that question back, Mr. Court Reporter,
17  but it's -- it's vague and ambiguous as phrased.
18            Can you read that back, please.
19            (The record was read by the reporter.)
20            MR. LeCRONE:  Yeah, it's vague and
21  ambiguous.  I think it misstates the witness's prior
22  testimony, too.
23            THE WITNESS:  The -- so for -- where a
24  owner and sitter make a booking on the Rover
25  platform, that's where we want the payment to be on

Page 88

1   the platform.  If a sitter made an arrangement with
2   an owner outside of our marketplace to do that, they
3   have every right to do that.  We don't -- we don't
4   prohibit them from doing business in any other way
5   outside of our marketplace.
6   BY MR. TIDRICK:
7        Q.   Why does Rover require that if the
8   arrangement for the services is made through the
9   platform, that the payment has to be made through
10  the platform?
11            MR. LeCRONE:  Again, this goes beyond the
12  scope of today's PMK deposition on the topics that
13  were set forth on the notice.  It's vague and
14  ambiguous, may call for a legal conclusion, lacks
15  foundation for this witness.
16            THE WITNESS:  You know, we're a
17  marketplace, and we have two sets of customers.  We
18  have owners, and we have sitters.  And it's really
19  important that we have a safe and trustworthy
20  community, and having safe and secure payment and
21  transmittal of funds is part of that.  So that's why
22  we want to make sure that it's done on the platform.
23  BY MR. TIDRICK:
24       Q.   Is there anything that Rover does to
25  enforce that requirement?

Page 89

1             MR. LeCRONE:  Vague and ambiguous.
2             THE WITNESS:  If we are aware that somebody
3   has created a booking on our platform but then does
4   payment off platform, then that is where we would
5   enforce that.
6   BY MR. TIDRICK:
7        Q.   Has that ever happened?
8        A.   Yes.
9        Q.   What happens when that happens?
10       A.   We -- it depends.  It could be deactivating
11  somebody's profile.
12       Q.   In effect terminating the contract with the
13  pet care provider?
14       A.   We don't have a contract with them.  But it
15  would just deactivate their profile so they wouldn't
16  be able to offer their services on our -- in our
17  marketplace anymore.
18       Q.   Rover prohibits a pet care provider from
19  having more than one person provide services under
20  the same account; is that correct?
21       A.   Yes, where -- like we -- there is one
22  caregiver for any given profile.
23       Q.   In other words, Rover does not allow a pet
24  care provider to send someone else to provide the
25  services, correct?

30(b)(6) - Derek Chang - December 18, 2020

24 (Pages 90 to 93)

Page 90

1           MR. LeCRONE:  It's vague and ambiguous.
2           THE WITNESS:  I don't know the answer to
3    that.
4    BY MR. TIDRICK:
5       Q.  Let's turn to page 3 of the terms of
6    service, the page numbered 3/12, or ROVER_000505.
7       A.  Yeah, I'm there.
8       Q.  So near the top, section 4.1 has numerous
9    bullet points underneath it.  Near the top of 4.1,
10   there's a sentence that says, "When you use the
11   Rover.com Service, you agree," colon, several bullet
12   points.  One of them is -- and this is four from the
13   bottom -- "Not to transfer or authorize the use of
14   your account for the Rover.com Service by any other
15   person."  Do you see that?
16      A.  Yeah.
17      Q.  Do you have any understanding what that is
18   prohibiting?
19      A.  I do not, no.
20      Q.  Have you ever heard of a pet care provider
21   sending someone other than the pet care provider
22   themselves to provide the services that are agreed
23   to?
24      A.  I don't recall any.
25      Q.  Is that something that would be of concern

Page 91

1    to Rover?
2           MR. LeCRONE:  Objection; calls for
3    speculation.
4           THE WITNESS:  Yeah, I -- I don't know.
5    BY MR. TIDRICK:
6       Q.  Let me put it this way:  Is it acceptable
7    for a pet care provider to subcontract with another
8    person to provide services that are agreed to under
9    that pet care provider's account?
10          MR. LeCRONE:  Mr. Chang, before you answer,
11   can -- Mr. Reporter, can you read that back for me.
12          (The record was read by the reporter.)
13          MR. LeCRONE:  Okay.  It's vague and
14   ambiguous, calls for a legal conclusion, goes
15   outside the scope of the topics for this PMK
16   deposition.
17          That said, Mr. Chang, if you have an
18   understanding, a reasonable understanding, of what
19   this question is asking and have any knowledge in
20   order to answer it, you can.
21          THE WITNESS:  The -- as I stated earlier,
22   we don't have a contract with a care provider, so
23   there's no subcontracting to be had.  So -- yeah.
24   BY MR. TIDRICK:
25      Q.  Well, if I changed the word from

Page 92

1    "subcontract" to "contract," does that change your
2    answer?
3       A.  No, it doesn't, because there are no
4    contracts.
5       Q.  What I mean is, is it acceptable to Rover
6    for a pet care provider to have a contract with
7    someone else, another person, to provide services
8    that the pet care provider agrees to provide on the
9    platform?
10          MR. LeCRONE:  Again, it's vague and
11   ambiguous, it goes outside the scope of the topics
12   for this deposition, calls for a legal conclusion,
13   and it lacks foundation.
14          THE WITNESS:  Could you read that back,
15   please, court reporter.
16          (The record was read by the reporter.)
17          MR. LeCRONE:  Again, I will add it's an
18   incomplete hypothetical.
19          THE WITNESS:  I'm not sure if I completely
20   understand the question, so I'm not sure how I --
21   how I can answer it.  You know, I'll say this is
22   the -- you know, it's -- it's really, really
23   important that our -- our marketplace is safe.  And
24   if I don't know -- so maybe I'll just stop there
25   about -- because I don't want to speculate.  I was

Page 93

1    going to say if this is about something related to
2    safety, then probably.  But I just don't know.  And
3    I'm happy to try and answer your question.  I'm just
4    not sure I fully understand -- understand.
5    BY MR. TIDRICK:
6       Q.  I'll try to give a very specific scenario.
7          Would it have been acceptable to Rover for
8    Sportsman to reach an agreement through the Rover
9    platform to provide a service to a pet owner, but
10   rather than Sportsman going to provide that service,
11   she sends someone else to provide the service
12   instead?
13          MR. LeCRONE:  And, Counsel, are you
14   referring to Ms. Sportsman making that through the
15   platform, the -- the marketplace, or separately, on
16   her own?
17   BY MR. TIDRICK:
18      Q.  Through the marketplace.  Through the
19   platform.
20          MR. LeCRONE:  Again, it's incomplete
21   hypothetical, vague and ambiguous.
22          THE WITNESS:  The -- in that particular
23   situation, I'm not sure of all the parameters and
24   pieces.  I would just say that there might be some
25   issues with that, as I think you even mentioned

Page 94

1   earlier that we want, you know, people to be 18
2   years or older.  In that situation, maybe somebody
3   could be under 18.  So that would be problematic.
4   BY MR. TIDRICK:
5        Q.  Rover provides what it calls a reservation
6   guarantee to pet owners, correct?
7        A.  Yes.
8        Q.  What is that guarantee?
9        A.  It is -- I'll loosely define it -- is if
10  a -- if a sitter has a booking arrangement with an
11  owner and that needs to be canceled, then Rover will
12  try to find another sitter for them, and then where
13  there's a difference in the cost of that, that we
14  will help the owner with a portion of that.
15       Q.  I'll refer you to page 7 of the terms of
16  service.
17       A.  Okay.
18       Q.  And specifically, in section 10.5 the
19  second bullet point is headed "Reservation
20  Guarantee."  And you'll see, starting at the second
21  line of that paragraph -- I'm excerpting from the
22  sentence -- "Rover.com uses all reasonable efforts
23  to find replacement Service Providers when Service
24  Providers cancel Bookings near the start date of the
25  service period identified in the Booking."

Page 95

1              Does that accurately describe the process
2   that you were just referring to?
3        A.  Yeah.
4        Q.  Why does Rover provide that guarantee?
5            MR. LeCRONE:  Calls for a legal conclusion,
6   calls for speculation, lacks foundation, beyond the
7   scope of the topics in this deposition.
8            THE WITNESS:  The -- as a -- as an online
9   marketplace, where we have both customers who are
10  sitters and customers who are owners, it's -- you
11  know, we want it to be a flourishing marketplace.
12  And so if a sitter, for example, maybe gets sick and
13  isn't able to do that booking, has to cancel it, we
14  want to provide support for our customer in that
15  case.  And so that's an example of where we would
16  want to offer that, so that the sitter would want to
17  continue to offer their services in our marketplace.
18  And it would also characterize that as a dual
19  benefit, where, for an owner who has a booking with
20  that sitter, it's also a kind of support or customer
21  service for them, too, because they are able to
22  still have their pet looked after without having to
23  kind of start a process all over of trying to find
24  somebody else at the last minute.
25  BY MR. TIDRICK:

Page 96

1        Q.  The terms of service uses the phrase
2   "reasonable efforts."  What are the reasonable
3   efforts that Rover undertakes to find replacement
4   service providers in that scenario?
5            MR. LeCRONE:  Calls for a legal conclusion,
6   lacks foundation, vague and ambiguous, beyond the
7   scope.
8            THE WITNESS:  I'm not sure about a
9   definition of "reasonable" or all the steps,
10  frankly, in it.  I do know that we try and -- or we
11  contact sitters to see if anybody else can take that
12  stay.
13  BY MR. TIDRICK:
14       Q.  Who at Rover does that?
15       A.  I'm not sure specifically right now.
16  It's -- it's agents.  It's operations agents who at
17  one point in time did, but I'm not sure who does it
18  now.
19       Q.  So those were human beings, not some sort
20  of machine algorithm?
21       A.  That's correct.
22       Q.  Do you have any understanding how Rover
23  identifies potential replacement service providers?
24       A.  I don't know.
25       Q.  Does Rover allow the service provider

Page 97

1   themselves to find and send their own replacement?
2            MR. LeCRONE:  Lacks foundation and calls
3   for speculation, vague and ambiguous.
4            THE WITNESS:  I don't know whether or not,
5   in the process, a service provider can put forward
6   another sitter to do that.
7   BY MR. TIDRICK:
8        Q.  Rover provides insurance coverage to pet
9   owners for damages resulting from pet care provider
10  services, correct?
11           MR. LeCRONE:  Vague and ambiguous, lacks
12  foundation.
13           THE WITNESS:  Yeah, the insurance offers
14  owner property damage.
15  BY MR. TIDRICK:
16       Q.  I believe there's a description of this in
17  Section 8 of the terms of service.  If you could
18  scroll back.  It appears to start at page 4 of
19  Exhibit 5.  The heading is "Rover.com Insurance
20  Program," Section 8.  It appears to start on page 4
21  and continues quite a ways, to page 6.  Do you see
22  that?
23       A.  Yeah.  Do you want me to read through that
24  and then tell you when I've read it?
25       Q.  I don't think there's a need to -- to

Page 98

1  reread this document.  Let me just ask you
2  generally, is it your understanding -- do you have
3  any reason to think that the terms of service do not
4  accurately describe whatever insurance is provided?
5      A.  There's nothing that I'm aware of that
6  would indicate that the terms of service here
7  reflect what the insurance program was at the time.
8      Q.  I'm going to provide another exhibit.  This
9  is marked for identification purposes as Exhibit 6.
10         (Deposition Exhibit 6 was marked for
11  identification.)
12 BY MR. TIDRICK:
13     Q.  Exhibit 6 for identification purposes is a
14  seven-page document, produced with Bates numbers
15  ROVER_000018 through 24.
16         After you have a chance to look at this, my
17  first question will be what this document is.
18     A.  This is like that -- it's a seven-page
19  document that's sideways?
20     Q.  Yes.
21     A.  Okay.  I've looked at this.
22     Q.  What is the Exhibit 6 document?
23     A.  It looks like it's information from our
24  back-end system.  On the top it says "Django
25  administration," and Django is our -- a back-end

Page 99

1  system that we have.
2      Q.  Does that back-end system keep track of pet
3  care providers' work history?
4         MR. LeCRONE:  Objection; vague and
5  ambiguous, calls for speculation, may ask for a
6  legal conclusion.
7         THE WITNESS:  This information is -- looks
8  like conversations that Melanie Sportsman would have
9  had on the various days that she had when she was a
10  provider in the Rover marketplace.
11 BY MR. TIDRICK:
12     Q.  So this document is just tracking
13  conversations?
14     A.  I believe this document is a -- is the
15  information of the stay she had and then
16  conversations that were related to them.
17     Q.  So, for example, an entry that says, under
18  "Service Type," "Dog Boarding," would that entry
19  reflect that Melanie Sportsman performed a dog
20  boarding service on the dates listed in that row?
21     A.  I don't know whether or not it would
22  actually reflect if somebody -- if Melanie Sportsman
23  had actually done the service versus there
24  potentially being somebody who was asking for it and
25  whether or not that was actually performed or not.

Page 100

1      Q.  Does the Django system keep track of
2  services provided by the pet care providers?
3         MR. LeCRONE:  Objection; vague and
4  ambiguous.
5         THE WITNESS:  The Django system has
6  information about our sitters and the stays and also
7  conversations and I believe whether it was a stay or
8  whether or not it was a request that -- even if it
9  didn't result in a booking.
10 BY MR. TIDRICK:
11     Q.  Let me ask it this way:  Does the Django
12  system allow someone to identify dates when a pet
13  care provider provided services?
14         MR. LeCRONE:  Mr. Reporter, can you read
15  that back, please.
16         (The record was read by the reporter.)
17         MR. LeCRONE:  Okay.  Overbroad, vague and
18  ambiguous as to the term or the word "someone."
19         THE WITNESS:  In Django, the information
20  that is in this, some -- in this case Melanie
21  Sportsman, the information on -- I think you've said
22  if they perform services, would be in this, amongst
23  this information.
24 BY MR. TIDRICK:
25     Q.  Is it fair to say that every time that

Page 101

1  Sportsman provided services through the Rover
2  platform, Rover has a record of that?  Correct?
3      A.  When -- if she had provided services, there
4  would be a record of it.  I think it's in here, but
5  I don't know if it's all here or somewhere else.
6      Q.  Is there another system besides Django that
7  tracks that information?
8      A.  We have another system.  I wouldn't call it
9  a tracking system.  It's -- it's a CRM system, that
10  is kind of like a front-end system, if I can
11  describe it that way.  So those are kind of the two
12  main systems where information would be.
13     Q.  Understood.  So whether you call it
14  tracking or -- it's more accurately called storing,
15  perhaps.  Is that -- is that fair?  It's a --
16     A.  Yeah.
17     Q.  It stores that information?
18     A.  Yeah.
19     Q.  And what is the name of that system?
20     A.  Zendesk.
21     Q.  So is it fair to say that between Zendesk
22  and Django, Rover does maintain information on each
23  service that a pet care provider performs that was
24  arranged through the Rover platform?
25     A.  Yeah, between Zendesk and Django, any

Page 102

1   information about a provider around their stays
2   would be -- would be stored in one of those two.
3       Q.   Now, it may be too obvious, but do you have
4   some understanding, why does Rover keep that
5   information?
6           MR. LeCRONE:  May call for a legal
7   conclusion, lacks foundation, goes beyond the scope,
8   but -- again, of this PMK deposition.
9           THE WITNESS:  Yeah, I -- I don't know
10  overtly why, although it would seem to make sense to
11  have that information stored somewhere.
12  BY MR. TIDRICK:
13      Q.   Are the Django and Zendesk systems designed
14  to keep track of that information accurately?
15          MR. LeCRONE:  Lacks foundation,
16  argumentative, calls for speculation, may call for a
17  legal conclusion.
18          THE WITNESS:  I would characterize it as
19  they're not designed to misrepresent information, so
20  to that extent, yeah, they're designed to store
21  information accurately.
22  BY MR. TIDRICK:
23      Q.   That's fair.  I mean, another way to put
24  it, you don't have any reason to think that the
25  information in those systems is inaccurate, correct?

Page 103

1       A.   That's right.
2       Q.   Do you have any understanding where
3   Sportsman provided pet care services?
4           MR. LeCRONE:  In connection with bookings
5   on Rover or otherwise?
6   BY MR. TIDRICK:
7       Q.   Yes, through the Rover platform.
8       A.   I don't.  You know how we originally talked
9   about broad estimations, like I think her profile
10  was set up in Fresno, I think.  And so I suspect in
11  Fresno.
12      Q.   Would Rover have information in the Zendesk
13  or Django system identifying the names of the pet
14  owners for whom Sportsman provided services on the
15  platform?
16          MR. LeCRONE:  Again, calls for speculation,
17  lacks foundation.
18          THE WITNESS:  Yeah, one of those two
19  systems, I think, would have the -- who was on the
20  other side of that transaction.
21  BY MR. TIDRICK:
22      Q.   Would one of those systems have the
23  addresses of the pet owners?
24      A.   I don't know if it would or not.
25      Q.   Is it your understanding that Sportsman

Page 104

1   provided services on the Rover platform from 2017
2   through 2019?
3       A.   Yeah, that approximately.  I don't know the
4   exact dates, but, yes, that's my understanding.
5       Q.   Do you have any understanding of how much
6   money Sportsman earned through services she provided
7   on the Rover platform?
8           MR. LeCRONE:  Vague and ambiguous with
9   respect to the term "earned," lacks foundation,
10  calls for speculation.
11          THE WITNESS:  I do not know -- I do not
12  know how much money Melanie Sportsman charged her
13  clients on the Rover platform over that period of
14  time.
15  BY MR. TIDRICK:
16      Q.   Would that information be in either the
17  Zendesk or Django platform?
18          MR. LeCRONE:  Vague and ambiguous.
19          THE WITNESS:  I don't know.  Probably, but
20  I'm not sure.
21  BY MR. TIDRICK:
22      Q.   Do you have any understanding how much
23  money Sportsman earned through services provided on
24  the Rover platform for any period of time?
25          MR. LeCRONE:  Same objections.

Page 105

1           THE WITNESS:  No, I don't have any
2   information on it.
3   BY MR. TIDRICK:
4       Q.   I'll present another exhibit.
5           (Deposition Exhibit 7 was marked for
6   identification.)
7   BY MR. TIDRICK:
8       Q.   Exhibit 7 for identification purposes.
9       A.   I have it open.
10      Q.   Exhibit 7 for identification purposes is a
11  five-page document.  I'll represent that this is a
12  true and correct copy of a printout from Rover's
13  website on December 2nd, 2020.  You can see along
14  the top it says, "How do I review my payments from
15  my Rover bookings," dash, "Help Center."  Do you see
16  that?
17      A.   Yes.
18          MR. LeCRONE:  And, Counsel, for the record,
19  this is something you just printed out on the 2nd of
20  December, not something we produced to you?  Is that
21  right?
22          MR. TIDRICK:  I know that this copy was
23  generated from the website, printed from the website
24  electronically on December 2nd, 2020.  I can't tell
25  you off the top of my head right now whether --

Page 106

1          MR. LeCRONE: Okay.
2          MR. TIDRICK: -- you produced this in some
3   fashion or whether we had.
4      Q.  Mr. Chang, do you recognize the Exhibit 7
5   document as being something you're familiar with on
6   the Rover website?
7      A.  I'm not familiar with this.  You know, it
8   looks like it's from our help center, but I'm not
9   familiar with it.
10     Q.  Where is the help center operationally in
11  Rover's organization?
12     A.  Can you be more specific about that,
13  please?
14     Q.  Well, is the help center a group of people,
15  or is that something else?
16     A.  The help center is like a library of
17  information, and it's on our website.
18     Q.  Do you have any understanding who in the
19  organization has responsibility for maintaining the
20  materials that are in the help center on the
21  website?
22     A.  Yeah, my team has writers that create
23  articles for the help center.  I don't -- I think
24  other teams also do, but I know we do for sure.
25     Q.  Are you able to tell me whether this is a

Page 107

1   document generated by your team or someone else's
2   team?
3      A.  I am not.
4          MR. LeCRONE: Call for speculation, lacks
5   foundation.
6          THE WITNESS: I am not able to.
7   BY MR. TIDRICK:
8      Q.  Is there some process that exists to ensure
9   that materials that are put on Rover's website are
10  accurate?
11         MR. LeCRONE: Vague and ambiguous.
12         THE WITNESS: There's no process that I can
13  think of to do that.  We rely and trust on the
14  people that are creating content.
15  BY MR. TIDRICK:
16     Q.  Do you have any reason to think that any
17  material in the help center is inaccurate?
18     A.  No.
19         MR. LeCRONE: By "help" -- by "help
20  center," you mean Exhibit 7, Counsel?
21  BY MR. TIDRICK:
22     Q.  Well, now I'm speaking about the help
23  center generally.
24     A.  I --
25         MR. LeCRONE: Objection.

Page 108

1          THE WITNESS: I would say --
2          MR. LeCRONE: May call for speculation.
3          THE WITNESS: I would say that there's a
4   lot of articles on there.  So is there a possibility
5   that there might be something inaccurate?  Like
6   yeah.
7   BY MR. TIDRICK:
8      Q.  The company makes every effort for the
9   material in there to be accurate, right?
10     A.  Yeah.
11     Q.  Let me ask you about this document in
12  particular.  So Exhibit 7, there's a statement on
13  the first page of this that says, "Keeping track of
14  your payments through Rover is easy.  You can get
15  payment details on every stay or walk you've booked,
16  all through your Payment History."
17     A.  I see that.
18     Q.  Is that an accurate statement?
19     A.  I don't know.  I don't have a reason to
20  believe that it's not, but I've never read this, nor
21  tried to verify it.
22     Q.  Do you have any understanding of what pet
23  care providers are able to do to get payment details
24  on services they perform through the platform?
25     A.  Can you say the first part of that question

Page 109

1   again, please?
2          MR. TIDRICK: Could you read it back,
3   please.
4          (The record was read by the reporter.)
5          THE WITNESS: I'm not familiar with how
6   they would go about getting that information.
7   BY MR. TIDRICK:
8      Q.  Do you have any understanding how pet care
9   providers get information on payments that they've
10  received?
11         MR. LeCRONE: I will reiterate ongoing
12  objections that this goes beyond the scope of the
13  topics in the PMK notice, vague and ambiguous, calls
14  for speculation.
15         THE WITNESS: I would put that in the -- I
16  feel like that's the same as what you just asked me.
17  But to the extent it's not, I would group it in that
18  same thing of like, no, I'm not familiar with that.
19  BY MR. TIDRICK:
20     Q.  Let's turn to page 3 of Exhibit 7.  Near
21  the top of the page, there's a box that says in
22  large print near the top left corner, "Payment
23  History," and then there's various information
24  beneath that.
25     A.  Yep.

Page 110

1    Q. Does that -- does that look like something
2 that you're familiar with?
3    A. I'm not familiar with this content or
4 information.
5    Q. Do you have any knowledge about what
6 information, if any, is routinely provided to pet
7 care providers about payments?
8        MR. LeCRONE: Vague and ambiguous.
9        THE WITNESS: I -- I don't know the details
10 of what they can access and see. We're -- I'll say
11 we're an online marketplace, and we want it to be
12 easy for people to use our Rover platform, so it
13 wouldn't surprise me if they could see this
14 information. But I don't know, because I'm not --
15 I've never personally looked at it, seen it, or even
16 thought about it.
17 BY MR. TIDRICK:
18    Q. Do pet care providers receive wage
19 statements from Rover?
20        MR. LeCRONE: Objection; calls for a legal
21 conclusion, vague and ambiguous, lacks foundation.
22        THE WITNESS: Not that I'm aware of.
23 BY MR. TIDRICK:
24    Q. Do you have any --
25    A. Can I -- can I -- can I clarify one thing

Page 111

1 on that? The --
2    Q. Sure.
3    A. The money or wages that a service provider
4 would earn would come from an owner, not from Rover.
5 So to the extent that question was about whether or
6 not we're paying them and providing some statement,
7 no, because that just isn't how the marketplace
8 works. But I am not aware of any wage statements in
9 general.
10    Q. All right. And I appreciate that
11 clarification. You, Rover, wouldn't know what kind
12 of wage statements, if any, a pet owner might be
13 providing a pet care provider, right?
14    A. Correct.
15    Q. That's not something that you would know
16 about.
17        Let's talk about what you would know about.
18 It is fair to say Rover does not issue wage
19 statements to the pet care providers, correct?
20        MR. LeCRONE: Same objections.
21        THE WITNESS: Not -- correct, not that I'm
22 aware of do we issue any kind of wage statements.
23 BY MR. TIDRICK:
24    Q. Does Rover have a department -- well, let
25 me -- let me phrase it a different way.

Page 112

1        Does Rover have a department that has
2 responsibility for classification of workers as
3 either employees or independent contractors?
4        MR. LeCRONE: Again, calls for a legal
5 conclusion, vague and ambiguous, lacks foundation.
6        THE WITNESS: Can you read that back again
7 for me, please.
8        MR. TIDRICK: Court reporter?
9        (The record was read by the reporter.)
10        THE WITNESS: And can you say that again,
11 that first part of that sentence again one more
12 time, please. I'm sorry.
13        MR. TIDRICK: Could you read it back,
14 please.
15        (The record was read by the reporter.)
16        THE WITNESS: No, we don't have a
17 department dedicated towards that.
18 BY MR. TIDRICK:
19    Q. Do you have familiarity with the terms
20 "independent contractor" and "employee"?
21    A. To the extent I've heard the term, yes.
22    Q. Rover classified Sportsman as an
23 independent contractor, correct?
24    A. I don't believe that's true. She -- she
25 would have been a user of our website, not a

Page 113

1 contractor.
2    Q. Did Rover classify Sportsman as an
3 employee?
4        MR. LeCRONE: Again, calls for a legal
5 conclusion, lacks foundation, calls for speculation,
6 vague an ambiguous.
7        THE WITNESS: As I mentioned earlier, she
8 would have been a user of our website.
9 BY MR. TIDRICK:
10    Q. Rover has numerous workers that it
11 classifies as employees, correct?
12        MR. LeCRONE: Vague and ambiguous; again,
13 lacks foundation, calls for speculation, and
14 certainly is outside the scope of the topics in this
15 PMK deposition.
16        THE WITNESS: Are you asking me does Rover
17 generally have employees?
18 BY MR. TIDRICK:
19    Q. Yes.
20    A. Yes, Rover has employees.
21    Q. For example, the agents that you were
22 describing earlier who conduct the reviews of
23 information provided by the prospective pet care
24 providers, those individuals are employees of Rover,
25 correct?

Page 114

1   A.   Yeah.   We have operations agents who are
2   employees.
3   Q.   Do you have any understanding who in the
4   organization made the decision that those
5   individuals were employees, as opposed to
6   independent contractors?
7   MR. LeCRONE:   Again, vague and ambiguous,
8   lacks foundation, calls for speculation, calls for a
9   legal conclusion.
10   THE WITNESS:   I don't know whether or not
11   there was any overt decision on that in the first
12   place.   And I do not know -- if that were the case,
13   I do not know who that would be.   But -- I don't
14   even know if that was -- that is something that is
15   decided or thought.
16   BY MR. TIDRICK:
17   Q.   Do you have responsibility for hiring
18   people who work under you in the organization?
19   A.   Yes.
20   Q.   Are you given discretion by the company
21   whether someone who is working under you is an
22   independent contractor or an employee?
23   MR. LeCRONE:   Calls for a legal conclusion,
24   vague and ambiguous, lacks foundation.
25   THE WITNESS:   The people that I hire are

Page 115

1   employees.   I'm not sure if that answers your
2   question.   But I -- people we hire as Rover
3   employees are Rover employees.
4   BY MR. TIDRICK:
5   Q.   What I'm getting at is, when you,
6   Mr. Chang, make a decision, "All right, this is
7   somebody I want to hire," does the organization give
8   you discretion whether this new hire is going to be
9   a 1099 contractor or a W-2 employee?   Is that a
10   choice that you make or is that a choice that
11   someone else has made in the organization?
12   A.   It's not a choice -- it's not a choice
13   that's made.   Yeah.
14   Q.   Are you saying that's not a choice that you
15   make or that's not a choice that anyone makes?
16   A.   It's both.   It's -- when I hire somebody, I
17   fire somebody, I'm not making any decision point
18   there.   And same elsewhere.   I -- I'm not sure I
19   fully understand your question.   But I'm -- all I
20   can really say is, like, when we hire somebody that
21   works at Rover, then they're an employee.   There's
22   no discussion or decision around that.   They're just
23   hired as a person who works at Rover.
24   Q.   Does Rover issue 1099s to anyone?
25   MR. LeCRONE:   Calls for speculation, lacks

Page 116

1   foundation, vague and ambiguous, may call for a
2   legal conclusion.
3   THE WITNESS:   I don't know if we issue
4   1099s.
5   BY MR. TIDRICK:
6   Q.   Did Rover ever issue a 1099 to Sportsman?
7   MR. LeCRONE:   Same objections.
8   THE WITNESS:   I don't know if we ever
9   issued her a -- a 1099.   If -- if a 1099 is
10   affiliated with a contractor, then probably not,
11   because she's a user in our community.
12   BY MR. TIDRICK:
13   Q.   Does Rover issue 1099s to any pet care
14   providers?
15   MR. LeCRONE:   Lacks foundation, calls for
16   speculation.
17   THE WITNESS:   Not that I'm aware of, no.
18   BY MR. TIDRICK:
19   Q.   Does Rover communicate to pet owners that
20   they have responsibility for tax compliance?
21   A.   Who do you mean by "they"?
22   MR. TIDRICK:   Could you read back the
23   question, please.
24   (The record was read by the reporter.)
25   MR. LeCRONE:   Again, this calls for a legal

Page 117

1   conclusion.   It goes well outside the scope of
2   this -- the topics in this deposition notice, this
3   PMK deposition, calls for speculation, lacks
4   foundation.
5   THE WITNESS:   I'm not aware of any
6   communication to owners about tax -- I can't
7   remember the term you used, but any tax information.
8   BY MR. TIDRICK:
9   Q.   Has there ever been an investigation by a
10   state agency relating to the classification of pet
11   care providers?
12   MR. LeCRONE:   I'm going to object on the
13   grounds this goes well outside the scope of this
14   deposition -- this PMK deposition notice and the
15   topics contained therein.   It's vague.   It's
16   ambiguous.   It lacks foundation.   I'm going to
17   instruct the witness not to answer this question.
18   I've given a lot of leeway in going outside
19   the scope of these topics, but that is where it is
20   going to stop, Counsel.
21   MR. TIDRICK:   I've been giving you leeway
22   to make your objections for the record.   I would be
23   happy to identify where it is in the topics.
24   So you are instructing the witness not to
25   answer; is that right?

## Page 118

1          MR. LeCRONE:  I am.
2          MR. TIDRICK:  All right.  Could the court
3   reporter mark that question in the transcript,
4   please.
5          Are you willing to let the witness answer
6   any questions about investigations by any
7   governmental authorities?
8          MR. LeCRONE:  It's not within the scope of
9   this -- this -- either his employment with the --
10  with Rover or the -- as I read, the deposition
11  notice on the topics, so I would not allow him to
12  answer those questions.  If you want to mark them,
13  we can take it up with Judge Orrick.
14         MR. TIDRICK:  I'll ask a -- I'll ask a
15  narrower question.  And I'll tell you, I believe
16  that this question is very clearly within topic 12,
17  defendants' classification of Melanie Sportsman as
18  an independent contractor.  And here's the question.
19     Q.  Have there ever been any investigations by
20  any governmental authorities that would encompass
21  Rover's classification of Melanie Sportsman --
22         MR. LeCRONE:  Again, this calls for --
23  BY MR. TIDRICK:
24     Q.  -- as an independent contractor?
25         MR. LeCRONE:  Same objections.  It calls

## Page 119

1   for a legal conclusion, lacks foundation as to this
2   witness's understanding and knowledge.  And I
3   disagree that it falls within the scope of this
4   deposition.  So I'll instruct him not to answer.
5          MR. TIDRICK:  Just in the interest of
6   minimizing issues for the Court to decide, are you
7   willing to let him answer a yes-or-no question as to
8   whether he has any knowledge or would have any
9   knowledge about that subject?
10         MR. LeCRONE:  Well, it depends on what
11  "that subject" is, Counsel.  It's been a little bit
12  vague as you've phrased it.
13  BY MR. TIDRICK:
14     Q.  So -- so let me ask this.  Mr. Chang, yes
15  or no.  Do you have any knowledge about any
16  investigations by any governmental authorities
17  relating to the classification of Melanie Sportsman
18  as an independent contractor?
19         MR. LeCRONE:  Same objections.  I'll allow
20  him to answer this question if he has that
21  knowledge.
22         THE WITNESS:  Court reporter, can you read
23  that back again, please?
24         (The record was read by the reporter.)
25         THE WITNESS:  No, I do not.

## Page 120

1   BY MR. TIDRICK:
2      Q.  Has anyone other than Sportsman ever
3   complained that classification of pet care providers
4   as independent contractors is improper?
5          MR. LeCRONE:  That misstates his prior
6   testimony about the classification of independent
7   contractors, vague and ambiguous, lacks foundation,
8   and goes outside the scope of this case and
9   Ms. Sportsman's claims.
10         If you understand -- I'll let you answer
11  this question, Mr. -- Mr. Chang, if you understand
12  it.
13         THE WITNESS:  I'm not sure I understand it.
14         Court reporter, do you want to read that
15  back to me, just so I can try again.
16         (The record was read by the reporter.)
17         MR. LeCRONE:  I'm assuming you're leaving
18  Ms. Miller out of this, or she's not included in
19  your question?
20  BY MR. TIDRICK:
21     Q.  Sure, other than Miller or Sportsman.
22     A.  I don't know.
23     Q.  All right.  Let's talk about advertising
24  campaigns instead.  Are you familiar with a
25  advertising campaign known as the "Meet the Dog

## Page 121

1   People" advertising campaign?
2      A.  I am familiar with that phrase.  I don't
3   know all the pieces in it.  But yeah.
4      Q.  That was a advertising campaign by Rover,
5   correct?
6      A.  Yes.
7      Q.  Do you know approximately when the "Meet
8   the Dog People" advertising campaign was airing?
9      A.  I do not know that.
10     Q.  Even approximately?
11     A.  No.  I'd be guessing.
12     Q.  Do you have any understanding approximately
13  how much money was spent on the "Meet the Dog
14  People" advertising campaign?
15     A.  No.
16     Q.  Do you have any understanding what the
17  process was by which the videos for that advertising
18  campaign were created?
19         MR. LeCRONE:  Vague and ambiguous as to the
20  term "process."
21         THE WITNESS:  Can you explain more about
22  what you're referring to in "process"?
23  BY MR. TIDRICK:
24     Q.  Sure.  Were those videos made in-house?
25     A.  Oh.  Actually, I don't know.

Page 122

1    Q.   Do you have any understanding whether
2  anyone at the company reviewed them before they were
3  shown to the public?
4         MR. LeCRONE:   And I'm sorry, Counsel.
5  Reviewed what?
6         MR. TIDRICK:   The videos.
7         MR. LeCRONE:   Vague and ambiguous.
8         THE WITNESS:   I do not know whether or not
9  somebody reviewed the videos you're referring to.
10 It would be common for somebody to do that.  But I
11 don't know whether or not that was true in this
12 case.
13 BY MR. TIDRICK:
14    Q.   I'm not asking you to speculate, but is
15 there some department or unit at Rover that,
16 according to your understanding, would have
17 responsibility for reviewing advertisements before
18 they're distributed to the public?
19    A.   Yeah, our marketing department would
20 typically do that.
21    Q.   Is that Susan Johnston's department, PR
22 director?
23    A.   No.
24    Q.   So who is the marketing director?
25    A.   I don't --

Page 123

1    Q.   Oh, did you -- did you identify a CMO,
2  Bill --
3    A.   Yeah.
4    Q.   Bill -- is it Bill Kong?
5    A.   Yeah, Bill Kong would be the -- like the
6  chief marketing officer, and then there's people in
7  his team.  So I don't know who the director is.
8    Q.   Is it your understanding that -- that Bill
9  Kong's department at Rover is the department
10 responsible for advertising?
11    A.   Yes.
12        MR. LeCRONE:   Counsel, would it be possible
13 to take a short restroom break?
14        MR. TIDRICK:   Sure.  Yeah.  You going to
15 make it ten minutes?
16        MR. LeCRONE:   Yeah, that would be fine.
17        MR. TIDRICK:   Okay.
18        THE VIDEOGRAPHER:   Please stand by.  The
19 time is 5:00 p.m. Eastern, and we're going off the
20 record.
21        (Recess taken.)
22        THE VIDEOGRAPHER:   The time is 5:16 p.m.
23 Eastern, and we're back on record.
24 BY MR. TIDRICK:
25    Q.   Mr. Chang, with respect to the "Meet the

Page 124

1  Dog People" advertising campaign, did Rover approve
2  the contents of each ad before it aired?
3    A.   I don't personally know, but I would expect
4  that we would have.
5    Q.   That would be the company's practice,
6  right?
7    A.   Yes.
8    Q.   Do you have any understanding what the
9  Rover guarantee is?
10   A.   Yes, I do.
11   Q.   What is the Rover guarantee?
12   A.   It is -- it offers pet care for any pets
13 that might get injured, and it offers coverage for
14 any owner property damage or for any third-party
15 damages that might have occurred related to a stay.
16   Q.   Why does Rover have the Rover guarantee?
17        MR. LeCRONE:   Objection; calls for a legal
18 conclusion, lacks foundation, calls for speculation.
19        THE WITNESS:   It's -- it's something that I
20 haven't gone down and asked somebody why exactly,
21 but in general it's something that -- I mentioned
22 earlier about how we're an online marketplace and we
23 have owners and sitters who are using it, and we
24 want the marketplace to be a place where people have
25 peace of mind and can come and where sitters can

Page 125

1  provide their pet services with as little worry as
2  possible, and same thing from the owners' side.  And
3  so that is designed to try and do that.  It's like
4  a -- like a feature, or something, that we provide
5  as a service so that people want to use our
6  marketplace.
7  BY MR. TIDRICK:
8    Q.   Is the Rover guarantee a guarantee to pet
9  owners only or also to pet care providers?
10        MR. LeCRONE:   Calls for a legal conclusion,
11 lacks foundation, calls for speculation.
12        THE WITNESS:   When you say guarantee to
13 owners, is there a specific part that you mean about
14 that?
15 BY MR. TIDRICK:
16   Q.   Well, I was just, frankly, a little
17 confused with your last answer.  I'm trying to
18 understand better what the Rover guarantee is.  When
19 I read the Rover guarantee, it -- to me it read like
20 something that was being presented to pet owners.
21 Is the Rover guarantee a guarantee to pet owners?
22        MR. LeCRONE:   Same objections.
23        THE WITNESS:   It's -- and feel free to,
24 like, ask and clarify this, but, like, it's --
25 there's the different pieces that I mentioned.  So

Page 126

1   it is for the pets of owners or sitters who may have
2   gotten -- that might need vet care during -- as a
3   result of a stay or any third-party people that
4   might have damages during a stay or owner damage to
5   their property.   It depends on which part you're
6   talking about.
7   BY MR. TIDRICK:
8        Q.   So for identification purposes, I'll
9   present another document as Exhibit 8.
10            (Deposition Exhibit 8 was marked for
11   identification.)
12   BY MR. TIDRICK:
13       Q.   For identification purposes, Exhibit 8 is a
14   three-page document produced with the Bates numbers
15   ROVER_000525 through ROVER_000527.
16       A.   Yep.  I have that here.
17       Q.   Is Exhibit 8 the Rover guarantee?
18       A.   Can you give me a sec to read through this?
19       Q.   Certainly.
20       A.   Okay.  I've read through this.
21       Q.   Is Exhibit 8 the Rover guarantee?
22       A.   Yes, this is the Rover guarantee.
23       Q.   New topic, Rover Cards.  Are Rover Cards
24   something that you're familiar with?
25       A.   Yes.

Page 127

1        Q.   What are Rover Cards?
2        A.   It's a feature that's available so that if
3   somebody takes a dog for a walk and wants to send
4   the owner a little map of where they went and where
5   their dog peed and pooped, they can do that and send
6   that to them as a thing to feature for both our
7   sitters and owners.  Our owners like to be able to
8   see that, and it's something that our sitters
9   sometimes do.
10       Q.   Is that why Rover created the Rover Cards,
11   because it's something that the pet owners like?
12            MR. LeCRONE:  Calls for speculation, lacks
13   foundation, vague and ambiguous.
14            THE WITNESS:  I don't know the exact
15   origins of it, but that would not surprise me.
16   BY MR. TIDRICK:
17       Q.   Have Rover Cards been around throughout the
18   time that you've been with Rover?
19       A.   Yes, they have.
20       Q.   And just switching back for a sec to the
21   Rover guarantee, the Rover guarantee has been around
22   at least throughout the time that you've been with
23   the company, correct?
24       A.   That's right.
25       Q.   Switching back again to Rover Cards, I'm

Page 128

1   going to send another exhibit.
2            (Deposition Exhibit 9 was marked for
3   identification.)
4   BY MR. TIDRICK:
5        Q.   Exhibit 9 for identification purposes.
6   Exhibit 9 is a seven-page document produced with
7   Bates numbers ROVER_000528 through 534.
8        A.   I have this.
9        Q.   Is Exhibit 9 a document that you're
10   familiar with?
11       A.   Just give me a second.  I'll scan it here.
12            I'm not familiar with this document.
13       Q.   Let me just ask you about a few things in
14   the document to verify whether they're accurate.
15            So at the second page, Bates number 529,
16   the second full paragraph, starting with the word
17   "Similar," there's the statement "when you complete
18   a stay, you also complete what's called a Rover
19   Card."
20       A.   I see that.
21       Q.   Is -- does Rover expect the pet care
22   providers to provide the pet owners with Rover
23   Cards?
24       A.   No, the -- it's the sitter's decision on
25   whether or not they want to use that feature and

Page 129

1   give that to the owners.
2        Q.   From Rover's standpoint and from Rover's
3   perspective, it's always optional?
4            MR. LeCRONE:  Calls for speculation, lacks
5   foundation, vague and ambiguous.
6            THE WITNESS:  To -- to my knowledge, yes.
7   It's something that's optional for -- for the
8   sitters.
9   BY MR. TIDRICK:
10       Q.   Are there any circumstances you're aware of
11   where Rover requires that pet care providers provide
12   the pet owners with Rover Cards?
13       A.   Not -- no.
14       Q.   Also in Exhibit 9, that second full
15   paragraph on page ROVER_000529, I'm excerpting from
16   that paragraph.  There's a sentence that says, "As
17   you may already be familiar with, Rover Cards
18   include a number of pieces of information:  how many
19   times the dog has peed and pooped, food and water
20   activity, a map, photos, and a stay summary, written
21   by you specifically for your clients!"
22            Is that a fair description of what Rover
23   Cards are designed to provide by way of information?
24            MR. LeCRONE:  Vague and ambiguous.
25            THE WITNESS:  That sentence is -- that

Page 130

1  sentence is representative of what a Rover Card
2  could add on it or include in it.
3  BY MR. TIDRICK:
4     Q.  Do Rover Cards have sections for each of
5  those topics?
6     A.  I do not know.
7     Q.  Who at the company would know that?
8     A.  I don't know, actually, off the top of my
9  head.
10    Q.  Did you do anything to prepare to testify
11 on the topic of Rover Cards?
12    A.  No, I didn't do anything specifically about
13 Rover Cards.
14    Q.  Do you have any understanding what a Rover
15 Card form looks like?
16    A.  Can you explain what "form" is?
17    Q.  Well, that's -- that's a great question.
18 Is there a Rover Card form?
19    A.  I don't know.
20    Q.  And even if you're not specific with regard
21 to a particular person who would know, is there a
22 department or unit at Rover that has responsibility
23 for Rover Cards generally?
24    A.  I don't know which department, if there is
25 one, that oversees Rover Cards.  I haven't thought

Page 131

1  about it.  It's just been something that's been part
2  of our service offering since I've been here.
3     Q.  So if you were to try to find out whether
4  there is a Rover Card form, who would you go to in
5  the company?
6     A.  I'm not sure, because I'd, like, kind of
7  want to know what you mean by "form."  If I was just
8  in general going to ask somebody about Rover Card, I
9  don't know; I'd just ask anybody until I could find
10 somebody.  I don't know.
11    Q.  Anybody you would start with?
12    A.  I don't know.  Maybe -- maybe Bill.
13    Q.  Bill Kong?
14    A.  Yeah.
15    Q.  In marketing?
16    A.  Yeah.
17    Q.  I'll show you another exhibit.
18        Exhibit 10.
19        (Deposition Exhibit 10 was marked for
20 identification.)
21 BY MR. TIDRICK:
22    Q.  For identification purposes, Exhibit 10 is
23 a three-page document printed from the Rover website
24 yesterday, December 17th, 2020.  It's a three-page
25 document.  At the top it has yesterday's date,

Page 132

1  12/17/2020, which was the day it was electronically
2  printed from the Rover website, and to the right of
3  that, near the top, "What are Rover Cards and how do
4  I send them," question mark, dash, "Help Center."
5        Mr. Chang, are you familiar with the
6  Exhibit 10 document as being something that's
7  visible on the Rover help center website?
8     A.  I don't know if it is or not, how you
9  describe it as that.  Like it might be.  It wouldn't
10 surprise me.  But I don't know personally whether it
11 is.
12    Q.  Is there a way that you would be able --
13 I'm not asking you to do this right now, but is
14 there some method by which you're able to look into
15 some system at Rover and figure out who was the
16 author of this Exhibit 10 document?
17        MR. LeCRONE:  You want to know who was the
18 author of this document, Counsel?
19        MR. TIDRICK:  Well, that's not exactly what
20 I asked.  I was asking him is there some method by
21 which he would be able to figure out who it was.
22        MR. LeCRONE:  And it's vague and ambiguous,
23 lacks foundation, calls for speculation about the
24 drafting of this document, quite frankly.
25        And, again, Mr. Chang, I don't want you to

Page 133

1  guess.
2        THE WITNESS:  I don't know of any system
3  that exists where I would be able to go and do that.
4  BY MR. TIDRICK:
5     Q.  So there's no way of tracking authorship of
6  documents on the Rover website?
7        MR. LeCRONE:  Vague and ambiguous, calls
8  for speculation, lacks foundation.
9        THE WITNESS:  There might be.  I just am
10 not aware of that.
11 BY MR. TIDRICK:
12    Q.  Which department or unit at Rover creates
13 the documents that are on the help center part of
14 the website?
15    A.  I don't know all of them.  Like my team
16 creates some of the content in the help center, but
17 I believe other groups do, too.
18    Q.  At page 2 of this Exhibit 10 document,
19 about a halfway down the page, there's a large
20 heading that says, "Additional information about
21 Rover Cards."  And the first bullet point says, "You
22 must use Rover Cards for Recurring Bookings in order
23 to get paid."  Is that statement accurate?
24    A.  I am not familiar with that statement.  I
25 don't have anything to believe that it's not

Page 134

1  accurate.  But I don't know, because I'm not
2  familiar with it.
3      Q.  Are you familiar with the term "reservation
4  protection"?
5      A.  Yes.
6      Q.  What is reservation protection?
7      A.  I explained it earlier.  Do you want me to
8  reexplain it, or did you think about it as a
9  different thing than what we talked about earlier?
10 And I'm happy to explain it.  I just want to make
11 sure you know what it is.
12     Q.  Well, is it different from -- let me put it
13 this way:  So is reservation protection considered
14 to be part of the reservation guarantee, or are
15 those two separate things?
16     A.  Those are separate.
17     Q.  Does Rover have a customer support
18 department?
19     A.  Yes.
20     Q.  Who does that department report to?
21     A.  That department ultimately reports in to
22 me.
23     Q.  And who is the head of the customer support
24 department?
25     A.  There isn't anybody right now directly,

Page 135

1  because that manager has recently left Rover.  So
2  it's actually an open spot.
3      Q.  What's the name of the person who was in
4  that position?
5      A.  Her name was Ciara.  And her last name
6  was -- or is Mielke.
7      Q.  Can you spell that?
8      A.  Yeah.  It's M-I-E-L-K-E.
9      Q.  Was she based in the Seattle area last you
10 knew?
11     A.  She was in Spokane.
12     Q.  How many people work in the customer
13 support department at Rover?
14     A.  I'm just thinking about like -- it's small
15 right now from our kind of manager layer.  There's
16 like open head and then two leads.  So there's like
17 three people.  And then there's agents that -- that
18 are part of that also.
19     Q.  Are those the same agents that you referred
20 to earlier?
21     A.  They are -- are they the same ones?  No,
22 they're different agents.
23     Q.  And just so we're clear, I think I
24 understand what you're saying.  Earlier today you
25 described agents who work under you who are

Page 136

1  responsible for reviewing information from
2  prospective pet care providers.  Those individuals
3  are separate from the approximately three people in
4  the customer support department, correct?
5      A.  Yeah.  They have -- they would be separate
6  people.  And just -- I just want to make sure I'm
7  clear on how it works.  Like we have, you know, the
8  people who we were talking about earlier who process
9  the profiles.  They are separate.  There are some
10 instances where they'll do some customer support
11 work, but that's not their primary role.
12     Q.  The agents who review information from the
13 prospective pet care providers, do those individuals
14 provide any customer support services to pet owners?
15     A.  When you say provide information to pet
16 care providers, you mean like the information that
17 we were talking about earlier?
18     Q.  No.  And I might have misspoken, so let
19 me -- let me try this again.
20         The -- the approximately three people who
21 are in what you describe as the customer support
22 department, do those individuals in that customer
23 support department interact exclusively with pet
24 owners?
25     A.  Our -- we think about our marketplace as,

Page 137

1  you know, we offer support or -- we offer service to
2  both owners and sitters, so we have people that --
3         (Discussion off the record.)
4         (The record was read by the reporter.)
5      THE WITNESS:  Okay.  Start -- pick it up
6  from there, is that what you're saying, Reporter?
7         (Discussion off the record.)
8      THE WITNESS:  We offer service to both
9  owners and sitters, and so we have people that
10 provide support to both owners and sitters, both,
11 not just -- not just one.
12 BY MR. TIDRICK:
13     Q.  How long has Rover had a customer support
14 department?
15     MR. LeCRONE:  Calls for speculation, lacks
16 foundation.
17     THE WITNESS:  I don't know.  We've had one
18 as long as I've been at Rover, and before me, but I
19 don't know how long it's been in place.
20 BY MR. TIDRICK:
21     Q.  Rover offers refunds to pet owners when
22 services are substandard; is that correct?
23     MR. LeCRONE:  Vague and ambiguous, calls
24 for speculation.
25     THE WITNESS:  We don't offer refunds to

Page 138

1  people if -- when you're talking about when -- I
2  think you said care is substandard.  That is
3  where -- because it is between the service provided
4  by the sitters for owners that the owners go to the
5  sitters if there is a dispute about that.
6  BY MR. TIDRICK:
7      Q.  Could you open up the Exhibit 5 document,
8  please.  This is the terms of service again.  And
9  specifically if you could turn to page 12 -- sorry,
10  page 7 of that.  It's the page that has the Bates
11  number 509 at the bottom.
12      A.  Yeah.
13      Q.  So in section 10.5 of the Exhibit 5 terms
14  of service, four bullet points down is a paragraph
15  headed "Refunds for Substandard Services."  It says,
16  "If we determine in our reasonable discretion that a
17  Service Provider has failed to provide Pet Care
18  Services in accordance with our guidelines and
19  policies on the Site or these terms then we may, in
20  our reasonable discretion, cancel a Booking and
21  issue a full or partial refund to a Pet Owner."
22          My question for you is, is that statement
23  an accurate description of Rover's practices?
24      A.  I don't know if I would describe that as
25  accurate or not.  I'll explain that.  In the

Page 139

1  instance that you described where somebody may say
2  that services were substandard, because we're a
3  marketplace we always want the two parties to talk
4  about it and try and resolve it.  If there is a
5  unresolved issue that escalates, then they'll --
6  there may be a -- there may be -- there may be an
7  instance where we would what we call issue a -- a --
8  a gesture.  So that's the mechanism that we would do
9  that.
10      Q.  What is the gesture?  When you say "we
11  might offer a gesture," what is that?
12      A.  It's where we would offer a credit to
13  that -- to the owner if that was the person that was
14  dissatisfied.  We just really in general think about
15  it as -- we just call it gestures, or it could be
16  dollars, or it could be called redeemable credits,
17  where they could use it towards a future service.
18      Q.  In the terms here that we just read, it
19  calls it a refund.  Is it not a refund?
20      A.  I don't know.  I don't know if it's
21  technically categorized as that.  I'm just
22  describing to you the kind of process and the
23  mechanism that I know.  You know, I don't know if
24  it's technically considered a -- a refund or not or
25  how that's portrayed to the -- to the owner.

Page 140

1      Q.  Is there a department at Rover that has
2  responsibility for determining if services were
3  substandard or not?
4      MR. LeCRONE:  Can you -- before you answer,
5  can you read that question back for me, please.
6          (The record was read by the reporter.)
7      MR. LeCRONE:  Again, vague and ambiguous as
8  to the terms "services" and "substandard."
9      THE WITNESS:  Yeah, there's not a
10  department that is dedicated towards that.
11  BY MR. TIDRICK:
12      Q.  So where the terms say, "If we determine in
13  our reasonable discretion," and it goes on, who is
14  it at Rover that's exercising that discretion?
15      A.  It may vary.  It could be an agent or it
16  could be a supervisor.
17      Q.  In which department?
18      A.  It could be in a variety of departments.
19      Q.  Which departments?
20      A.  It could be in -- in customer experience,
21  or CX.  It could be -- if that situation came up in
22  that -- that case came up with one of our other
23  departments, like our trust and safety team, that
24  could also be determined there.
25      Q.  Do you have any understanding why Rover

Page 141

1  includes this statement in its terms?
2      MR. LeCRONE:  Again, lacks foundation,
3  calls for speculation, vague and ambiguous.
4      THE WITNESS:  Yeah, again, I'm not a
5  lawyer.  I'm not sure why this is here.
6  BY MR. TIDRICK:
7      Q.  In your experience, have you ever heard
8  about a pet owner contacting Rover and asking for a
9  refund?
10      A.  I can't think of a particular instance
11  specifically around that.  But that's not, like, a
12  scenario that I would expect would not have -- that
13  would never have occurred.  Like I could totally see
14  somebody calling us and saying, "I want a refund."
15      Q.  I'm just surprised that in the terms
16  there's actually a section that's called "Refunds
17  for Substandard Services," and it talks about
18  issuing a full or partial refund, but it sounds like
19  that's not something that you in fact offer.  You
20  don't offer refunds.  You offer credits.  Is that
21  right?
22      MR. LeCRONE:  Misstates the witness's
23  testimony, argumentative.
24      THE WITNESS:  What I said was, in that
25  particular scenario that you mention, where somebody

Page 142

1 might say that something was substandard, we would
2 refer them to the -- so if an owner, in that
3 example, called us and said, "I want a refund," we
4 would refer them to the sitter, because that's who
5 their services are that they've arranged with, and
6 have them work it out, and if they weren't able to
7 and -- as part of our service, to try to support our
8 owners and sitters, quite honestly, we would -- we
9 may -- and that's where I'd said like maybe an --
10 one of the agents or supes may decide that they want
11 to issue a gesture, a different word than refund.
12 Whether it's technically the same or not, I'm not
13 sure, but I'm just telling that's how it works.
14 BY MR. TIDRICK:
15    Q.  Are you aware of any handbook or documents
16 that the customer service agents have access to that
17 tells them what to do or gives them guidance for
18 what to do if someone calls in asking for a refund?
19    A.  I don't know if there's a specific guide or
20 handbook.  But I do know it's generally accepted
21 practice to go and do what I just said.
22    Q.  With respect to the reservation protection,
23 the Rover guarantee, this statement in the terms
24 about "Refunds for Substandard Services," is it fair
25 to say that Rover provides these services to provide

Page 143

1 and create loyalty among the pet owners to come back
2 to Rover for future services?
3        MR. LeCRONE:  Vague and ambiguous,
4 compound.
5        THE WITNESS:  Could you repeat the
6 question, court reporter?  I just want to make sure
7 I got those elements right that he mentioned.
8        (The record was read by the reporter.)
9        THE WITNESS:  I -- I would describe it --
10 you know, with respect to those elements that were
11 in the question, I would describe it as we're trying
12 to create a good experience within our marketplace,
13 and we want -- we want both owners to have great
14 experience, service, and support; we want our
15 sitters to provide great service, experience, and
16 support.  And just an example of that is the one we
17 talked about earlier around reservation protection.
18 That's good for sitters, and that's good for owners.
19 And just broadly, that's kind of what we're trying
20 to achieve.
21 BY MR. TIDRICK:
22    Q.  Let me show you another --
23    A.  Can I ask you one thing, too?  Not now, but
24 maybe in the next logical break could we take a
25 break also, just so I can go to the bathroom,

Page 144

1 just -- I don't -- just need like five minutes.
2    Q.  Yeah.  We can do that now.
3    A.  You want to do it now or wait?
4    Q.  Now is fine.
5    A.  Okay.  Thanks.
6        THE VIDEOGRAPHER:  Please stand by.  The
7 time is 5:54 p.m. Eastern, and we're going off the
8 record.
9        (Recess taken.)
10        THE VIDEOGRAPHER:  The time is 5:58 p.m.
11 Eastern, and we're back on record.
12 BY MR. TIDRICK:
13    Q.  I'm going to show you another document,
14 Exhibit 11.
15        (Deposition Exhibit 11 was marked for
16 identification.)
17 BY MR. TIDRICK:
18    Q.  Exhibit 11 is a one-page document Bates
19 numbered MILLER 158.
20        Mr. Chang, is this a document you're
21 familiar with?
22    A.  I am not familiar with this document.
23    Q.  Do you have any understanding about the
24 custom business cards for pet care providers that
25 Rover makes available?

Page 145

1    A.  Yeah, I'm aware of them.
2    Q.  Does the image on Exhibit 11 accurately
3 reflect what the form of the Rover custom business
4 card for dog care providers looks like?
5    A.  I'm actually not sure, because I haven't
6 seen it, so it's hard for me to kind of verify that.
7 It doesn't look like -- based on what I know, it
8 doesn't look like it's not true, but I -- I don't
9 know.  I couldn't verify that.
10    Q.  Did you do anything to prepare to testify
11 about Rover business cards?
12    A.  No.
13    Q.  Have the Rover business cards been around
14 throughout the time that you've been with Rover?
15    A.  I don't know if they have or not.  I think
16 so.  I think they were around when I started, but
17 I'm not sure.
18    Q.  And you understand I'm talking about cards
19 for the pet care providers.  You understand that,
20 right?
21    A.  Yeah, these cards that you're referring to
22 right here, these physical cards.
23    Q.  Right.
24        Do you have any understanding at what point
25 a pet care provider is able to get a Rover.com

Page 146

1  business card?
2      A.  I don't know the point at which they can do
3  it.  I think it's once they have a profile, but I'm
4  not sure.
5      Q.  Do you have any understanding why Rover
6  makes these business cards available for pet care
7  providers?
8      A.  We would have made these so that -- it
9  would be as a service for any pet care provider so
10  it could be easy for them to send prospective owners
11  of their services to their particular profile on --
12  in the Rover marketplace, so that they could direct
13  them there if somebody want to book services with
14  them in the future.
15      Q.  I see in the image of the business cards on
16  Exhibit 11 that there's a place where it says "First
17  Name Last Name," and then lower down it says "My
18  profile," and it has a URL at the Rover website.  Is
19  that URL the URL for the Rover profile of the pet
20  care provider?
21      A.  Yeah, I believe that's the -- the link to
22  how somebody would get to the -- the sitter's
23  profile in the Rover marketplace.
24      Q.  Do you know how the promo code for $20 off
25  works?

Page 147

1      A.  Not specifically.
2      Q.  Do you know who covers the $20 off?
3          MR. LeCRONE:  Vague and ambiguous as -- as
4  to the word "covers."
5  BY MR. TIDRICK:
6      Q.  Let me be clearer.  The $20 off, is that an
7  amount that's deducted from payment that Rover would
8  otherwise receive?
9          MR. LeCRONE:  Misstates prior testimony.
10          THE WITNESS:  Rover gets paid a fee from
11  the sitters.  I'm not sure whether the $20 is a part
12  of that or not.
13  BY MR. TIDRICK:
14      Q.  Is the promo code required to be part of
15  the card?
16      A.  I do not know that.
17      Q.  Does the pet care provider have the option
18  of having their own website domain name printed on
19  the card?
20      A.  I do not know.
21      Q.  Does the pet care provider have the option
22  of listing some website other than the Rover.com
23  URL?
24      A.  I do not know if that's true or not,
25  although that would surprise me, given this is meant

Page 148

1  to try to send people to the Rover sitter in the
2  Rover market -- to the Rover sitter in the Rover
3  marketplace.
4      Q.  Is a pet care provider allowed to list
5  their own business name on the card, such as a dba
6  or a corporate name?
7          MR. LeCRONE:  Calls for a legal conclusion,
8  vague and ambiguous.
9          THE WITNESS:  I don't know if they are or
10  not.  If they wanted a card that had that, they
11  could easily print those and give those out
12  themselves.
13  BY MR. TIDRICK:
14      Q.  You mean outside of Rover.  I mean, you're
15  just saying somebody could go and have their own --
16      A.  Green card, yeah.
17      Q.  -- business card printed?
18      A.  Yeah.
19      Q.  But you understand what I'm asking.  You
20  know, my question is, look, so the Rover.com
21  business card displayed on Exhibit 11, there's a
22  place where it says "First Name Last Name."  Instead
23  of having the pet care provider's personal name, do
24  they have the option of listing the name of their
25  business there?

Page 149

1      A.  I don't know if that's true or not.
2  Probably not if they're trying to send them to the
3  name for a name on the profile.  But I don't know
4  for sure.
5      Q.  Do you know if the pet care provider has
6  the option of having their personal phone number
7  printed on the card?
8      A.  I do not -- I do not know for sure.  I
9  don't think so, because as part of making sure our
10  online marketplace is safe, we create, I don't know
11  what the term is, but a phone number that isn't
12  their phone number so that they can use that as a
13  way for them to communicate without having to give
14  out their personal information.
15      Q.  And the phone number you're referring to is
16  a phone number that rings at Rover's offices,
17  correct?
18      A.  No, it would be a number that I think it --
19  I don't know the details, though I think it goes
20  through the app, and it's how they're able to
21  message through.  I don't know if it's a voice or
22  whether it's only messaging.  But that's how they
23  communicate.
24      Q.  I'm going to send another document.
25          (Deposition Exhibit 12 was marked for

## Page 150

1 identification.)
2        MR. LeCRONE:  Steve, you're teaching me how
3 to do all this on Zoom group chat.
4        MR. TIDRICK:  Well, I'll take that as a
5 compliment.
6        MR. LeCRONE:  It is, isn't it?  I think I
7 said earlier on, I just did a -- it was a two-week
8 trial, and this isn't how we did it.  So I learned
9 something new today.  It was all Zoom, but it wasn't
10 like this.
11       MR. TIDRICK:  Wow.
12       Q.   Hopefully this Exhibit 12 document has
13 popped up.
14       A.   Yeah, I got it.
15       Q.   For identification purposes, Exhibit 12 is
16 a one-page document Bates numbered ROVER_000499.
17       Mr. Chang, is Exhibit 12 a document that
18 you're familiar with?
19       A.   Yes, I have seen this.
20       Q.   What is this document?
21       A.   I think this is a document that is part of
22 information that is set -- that is sent to sitters
23 who are new to the -- to the community and to the
24 marketplace to help explain to them how things work.
25 I think it might be referred to as welcome series,

## Page 151

1 maybe.
2        Q.   Fair to say it's designed to orient people
3 who are new to the platform, new pet care providers,
4 information about how the Rover platform works?
5        A.   Yeah.
6        Q.   Is the information in the Exhibit 12
7 document accurate?
8        A.   Just give me one second.  I'll -- I'll look
9 at this.
10       Yeah, I believe this to be accurate.
11 There's nothing that would lead me to believe not.
12 I'm not intimately familiar with details and all the
13 link-throughs, but, yeah, I think this is accurate,
14 or it would have been accurate at -- whenever this
15 got pulled.
16       Q.   Do you know generally how Rover's search
17 ranking system works?
18       A.   I don't know -- I know generally.  I don't
19 know all the specifics on -- on it.
20       Q.   Do you know why Rover has a search ranking
21 system?
22       MR. LeCRONE:  This was asked and answered.
23       (Discussion off the record.)
24       MR. LeCRONE:  I was going to say, I think
25 this has been asked and answered.  I'll allow the

## Page 152

1 witness to answer.
2        THE WITNESS:  Court reporter, can you read
3 that back again, please.  Sorry.
4        (The record was read by the reporter.)
5        THE WITNESS:  I don't know all the specific
6 details behind it, but I understand why we would
7 have one, just -- as I talked about earlier around
8 how we have a -- a marketplace where owners can find
9 sitters that may -- that are the best fit for them.
10 BY MR. TIDRICK:
11       Q.   Do I understand correctly that the pet
12 owner first identifies one of the services that's
13 listed on the Rover website or app, and then after
14 the pet owner chooses that, the algorithm will
15 produce this listing of pet care providers?  Is that
16 right?
17       A.   I am not sure of all of the exact specific
18 chronology, but in general, yes, that's part of the
19 information that -- that would go into that.
20       Q.   And that's because if a pet owner is
21 looking for someone to provide a sitting service,
22 Rover wants to be able to identify people who are
23 willing to provide that service, right?
24       A.   That's correct.
25       MR. LeCRONE:  Lacks foundation, calls for

## Page 153

1 speculation.
2 BY MR. TIDRICK:
3        Q.   In order to match people appropriately,
4 right?
5        MR. LeCRONE:  Same.
6        (Discussion off the record.)
7        THE WITNESS:  Yes.
8 BY MR. TIDRICK:
9        Q.   So the pet owner doesn't see the profiles
10 until they first identify what service they're
11 looking for, correct?
12       A.   As I said earlier, I'm not sure whether or
13 not you can go in and just browse through or whether
14 or not you have to pick one of those services before
15 you can see the profiles.  I'm not totally sure.  I
16 think that's true, but I'm not sure.
17       Q.   The search algorithm is set up by Rover; is
18 that right?
19       MR. LeCRONE:  Calls for speculation, lacks
20 foundation, goes outside the scope of this witness's
21 PMK deposition.
22       THE WITNESS:  The algorithm is -- is
23 something that Rover -- I don't know what the right
24 word is.  What was -- can you repeat your question
25 so I can figure the word you were trying to say?

30(b)(6) - Derek Chang - December 18, 2020

Page 154

1  BY MR. TIDRICK:
2      Q.  Oh, Rover -- Rover sets it up, or it
3  controls it.  It -- it establishes the parameters of
4  the algorithm?
5      A.  Yes.
6      Q.  Is it fair to say a primary goal of the
7  profile search algorithm is to match pet owners with
8  pet care providers that are more likely to accept
9  the service request?
10     MR. LeCRONE:  Vague and ambiguous, calls
11  for speculation, lacks foundation.
12     THE WITNESS:  I'm not sure whether or not
13  the primary goal of the algorithm is to match to
14  somebody who would accept.  That is, I believe, one
15  of the components of it, or the reason that we
16  talked about earlier around when people can use a
17  site and get somebody to ultimately have a booking
18  with them with as little effort as possible, and
19  that's a good thing.  But I don't know if I would
20  call it the primary reason, and I'm not sure whether
21  or not it's the primary factor in the algorithm.
22  BY MR. TIDRICK:
23     Q.  Understood.  It's one goal; it's one
24  component of the algorithm, right?
25     A.  Yeah, I would agree with that.

Page 155

1      Q.  Is a pet care provider able to pay Rover to
2  improve his or her search ranking?
3      MR. LeCRONE:  I think that has been asked
4  and answered in a slightly different way.  It's also
5  vague and ambiguous, calls for speculation.
6      THE WITNESS:  Yeah, Rover, there's no -- a
7  pet provider is not able to pay us to be able to
8  change their ranking.
9  BY MR. TIDRICK:
10     Q.  You're familiar with the Rover booking
11  score, correct?
12     A.  Yes, I am.
13     Q.  What is the Rover booking score?
14     A.  I should say I'm familiar with it.  I don't
15  know all the pieces underneath it.  But there's some
16  score that's generated based upon information from a
17  sitter related to the bookings.  But I don't know
18  the calculations or nuances underneath it.
19     Q.  Do you have any understanding how Rover
20  uses the booking score?
21     MR. LeCRONE:  Vague and ambiguous.
22     THE WITNESS:  I don't know specifically how
23  that's used, aside from generalities around kind of
24  what we're talking about right now.
25  BY MR. TIDRICK:

Page 156

1      Q.  Do you have any knowledge what Melanie
2  Sportsman's booking score was?
3      A.  No, I don't know what her booking score
4  was.
5      Q.  Is that a score that a pet care provider is
6  able to see?
7      A.  I don't recall if that is something they
8  can see or not.
9      Q.  Is the pet care provider's booking score
10  something that the public can see?
11     A.  I'm not sure if they can see it.  I don't
12  think so, but I'm not sure.
13     Q.  And I think you understood it this way, but
14  let me just be clear.  Is the Rover booking score
15  something that pet owners are able to see?
16     A.  Correct.  Yeah, I under -- sorry.  Thank
17  you for clarifying.  That's where I'm not sure.  I
18  don't think so, but I'm not totally sure if a pet
19  owner can see that at some point.
20     Q.  Are pet care providers able to opt out of
21  being scored in that manner with a booking score?
22     MR. LeCRONE:  I believe that has been asked
23  and answered; vague and ambiguous.
24     THE WITNESS:  I don't know whether or not
25  they can opt out of that piece.

Page 157

1  BY MR. TIDRICK:
2      Q.  You're familiar with Rover's repeat score?
3      A.  I'm not familiar with the "repeat score"
4  term, but I'm familiar with the idea of people
5  having repeat business.
6      Q.  Rover collects data on pet care providers'
7  repeat business, correct?
8      A.  Rover would have stored information kind of
9  like what we talked about or looked at earlier where
10  people could see what bookings they had, and so it
11  would be able to see where somebody had had repeat
12  business with a particular owner.  I don't know
13  whether or not that's exactly the same as repeat
14  score, or a piece of it.  But that's kind of what I
15  know about that.
16     Q.  I'm going to present another document,
17  marked for identification purposes as Exhibit 13.
18     (Deposition Exhibit 13 was marked for
19  identification.)
20  BY MR. TIDRICK:
21     Q.  It's a five-page document Bates numbered
22  MILLER 198 through 202.  Near the top of the page,
23  you can see there's a date, August 22nd, 2018, and
24  it says, "How to Improve Your Performance Scores and
25  Succeed on ROVER | The Dog People by Rover.com."  Do

30(b)(6) — Derek Chang — December 18, 2020

Page 158

1  you see that?
2      A.   I see that.
3      Q.   Is this Exhibit 13 document a document
4  you're familiar with?
5      A.   I'm not familiar with this.
6      Q.   So I'd like to ask you whether the
7  following statement in the document is accurate.  On
8  page 1 of Exhibit 13, near the bottom, there's the
9  statement, "We reward dog walkers and sitters who
10 treat their clients' dogs like family — including
11 surfacing their profiles higher in search results.
12 To help you keep track of your search rank and the
13 overall health of your business, we created the
14 booking score and the repeat score.  If your booking
15 and (audio dropout) are high, you're more likely to
16 show up front and center in search results, get
17 better reviews, and earn loyal clients."  And it
18 goes on.  But at least that part that I just read,
19 has that been accurate throughout the time that
20 you've been with Rover?
21     A.   I don't know if it is or not, because I'm
22 not sure how all the pieces of the algorithm work.
23 So I don't know if all of those specific details are
24 true, or how it works, I should say.
25     Q.   Let's look specifically at two different

Page 159

1  elements of this and — and talk about them
2  separately.
3          So with respect to repeat scores, is it
4  true that if a pet care provider has a higher repeat
5  score, that provider will be more likely to show up
6  higher in the search results?
7      A.   Can you repeat that again, please?
8      MR. TIDRICK:   Court reporter?
9      (The record was read by the reporter.)
10     THE WITNESS:  I don't know.  Based upon
11 this paragraph that you read, it possibly could be
12 true.  But I would also guess that it would also
13 depend on what's happening on the booking score
14 also.
15 BY MR. TIDRICK:
16     Q.   Well, let's talk about the booking score.
17 Is it true throughout the time that you've been with
18 the company that if a pet care provider has a higher
19 booking score, the pet care provider will be more
20 likely to show up higher in search results?
21     A.   I don't know if that's true or not.  And
22 it's only because I'm not familiar with the details,
23 and the kind of paragraph that you read has two
24 pieces to it, and so there's booking score and
25 there's the other score, the repeat score.  So it

Page 160

1  would depend on what the other half of that score
2  was doing, based upon that paragraph.
3      Q.   If I understand correctly, you're
4  suggesting that an individual's repeat score and
5  booking score have to both be high in order for a
6  pet care provider to show up higher on search
7  results?  Is that what you're — or guessing?
8      A.   Yeah, I'm — I'm saying I'm not familiar
9  with the details and the elements of the algorithm
10 and how these two pieces play in.  But based on that
11 paragraph you read, just because somebody's booking
12 score is higher doesn't mean they'll necessarily
13 show up higher, because that's, according to this
14 paragraph, one piece of it.
15     Q.   Do you have any understanding who in the
16 company would have created this Exhibit 13 document?
17     A.   No, I don't know who created this.
18     Q.   Do you generally have confidence that if
19 this document was on the Rover website, that it's
20 accurate?
21     A.   Yeah.  I would — if there's — if the
22 information is on our website, is there a chance
23 that there might be some errors?  Yes.  But in
24 general it's probably accurate.
25     Q.   Is it true that if a pet care provider

Page 161

1  rejects a service request, that that tends to put
2  the pet care provider lower in future search
3  results?
4      A.   At a high level, I think that is probably
5  true.  We are trying to — you know, we have to list
6  people's — we have to — you know, when people come
7  to the site, we want to list sitters who can
8  potentially provide services, and we have to put
9  that list in some order.  So, you know, people who
10 might get asked but then reject I think in general
11 might be ranked lower.  But that's probably all
12 things else being equal, and I don't know if that's
13 always true.
14     Q.   Understood.  It's one piece of the
15 algorithm, right?
16     A.   Yeah.
17     Q.   Is that correct?
18     A.   Yes.  To the extent that I know — well, I
19 should say I don't know for sure, because I don't
20 know the details of the algorithm, but that would —
21 would be a factor I would guess to be part of how
22 our — what — an input to our algorithm.
23     Q.   Do you know what away mode is?
24     A.   Yeah, I'm generally aware of that.  We — I
25 think we talked about that earlier.  I don't know —

Page 162

1        MR. LeCRONE:  Yeah, this has been asked and
2    answered, Counsel.
3    BY MR. TIDRICK:
4        Q.  I think what I haven't asked yet is, does
5    being in away mode factor into that algorithm?
6        MR. LeCRONE:  Well, again, I think you
7    have.  I'll let the witness answer again.
8        THE WITNESS:  I have some general awareness
9    of away mode.  And my understanding on that is if,
10   you know, a service provider -- actually, can --
11   what was your question on that?
12   BY MR. TIDRICK:
13       Q.  Is that a factor in the algorithm that
14   determines where a pet care provider shows up in
15   search rankings?
16       A.  Got it.
17       MR. LeCRONE:  It lacks foundation, may call
18   for speculation.
19       THE WITNESS:  I believe it would be a
20   factor in where somebody shows up to the extent
21   where if a sitter who's offering services on the
22   platform decides they want to take a break from
23   their business or do something else, that they could
24   do that, and then they wouldn't have -- and I'm not
25   sure how it works, but they wouldn't have -- as you

Page 163

1    mentioned earlier, like requests that were rejected
2    would be fewer and not -- not impact their ranking.
3    BY MR. TIDRICK:
4        Q.  Are you familiar with Rover performance
5    scores?
6        A.  I'm familiar with the term.  I'm not
7    familiar with the workings underneath it.
8        Q.  Do you have any understanding whether pet
9    care providers can opt out of being given
10   performance scores?
11       A.  I do not.
12       Q.  For each service provided by a pet care
13   provider, the pet owner pays a service fee to Rover;
14   is that correct?
15       A.  Say that again, please.
16       MR. TIDRICK:  Court reporter?
17       (The record was read by the reporter.)
18       MR. LeCRONE:  That misstates prior
19   testimony.
20       THE WITNESS:  No, that's not true.  The
21   owner pays the sitter for the services.
22   BY MR. TIDRICK:
23       Q.  What is the amount that Rover receives for
24   a service provided by a pet care provider on the
25   platform?

Page 164

1        MR. LeCRONE:  Again -- again, this has been
2    asked and answered several times, I think.
3        THE WITNESS:  The -- Rover is paid a fee
4    from the sitters of 20 percent.
5    BY MR. TIDRICK:
6        Q.  The 20 percent fee that Rover receives,
7    that's paid by the pet owner or the pet care
8    provider?
9        A.  That's paid by -- by the sitter, or the pet
10   care provider.
11       Q.  Do you have any knowledge of how much total
12   Sportsman paid to Rover in service fees?
13       MR. LeCRONE:  Again, that was asked and
14   answered, Counsel.  We're going back over questions,
15   I believe, you've asked earlier today.
16       THE WITNESS:  I do not know.
17   BY MR. TIDRICK:
18       Q.  The service fees that pet care providers
19   pay Rover, those are necessary expenditures that the
20   pet care providers must pay to Rover in order to
21   provide services on the platform, correct?
22       MR. LeCRONE:  Again, vague and ambiguous,
23   asked and answered.
24       THE WITNESS:  Our -- our pet care providers
25   provide service to the owners.  When they do that,

Page 165

1    they pay a fee to Rover of 20 percent.  And I'm not
2    sure -- I'm not clear about your question, or
3    there's a bit of complexity I'm not sure I'm
4    understanding.  So that's kind of how it works, if
5    that make sense or if that answers your question.
6    BY MR. TIDRICK:
7        Q.  Well, that 20 percent must be paid to Rover
8    in order for the pet care provider to work on the
9    platform, correct?
10       A.  I just -- I just want to be super clear.
11   And I think you got this.  It's like the platform is
12   where they -- where owners and sitters -- it's a
13   marketplace where they are able to connect, and then
14   the work is done at a -- in the home or walking,
15   so -- so it's not done on the site.  And that fee is
16   paid when there is a service provided.
17       Q.  And that fee must be paid whenever service
18   is provided on the Rover.com platform, correct?
19       MR. LeCRONE:  Again, misstates prior
20   testimony, vague and ambiguous.
21       THE WITNESS:  As I just stated earlier,
22   it's -- the service isn't performed on the platform;
23   it's performed wherever the stay happens.  And when
24   that stay happens, that's when that fee is paid to
25   Rover.

Page 166

1  BY MR. TIDRICK:
2      Q.   And that fee must be paid for Rover any
3  time that a service has been arranged through the
4  Rover.com platform, correct?
5      A.   Yes, for each transaction that's a fee
6  that's paid to us.
7      Q.   Does Rover ever terminate its relationships
8  with pet care providers?
9          MR. LeCRONE:  Again, I think this was asked
10  a few hours ago.  Asked and answered.
11          THE WITNESS:  Yes, we have deactivated
12  sitters' –– sitters' profiles.
13  BY MR. TIDRICK:
14      Q.   Are there criteria that Rover applies in
15  determining whether to do that with a particular pet
16  care provider?
17          MR. LeCRONE:  Asked and answered.
18          THE WITNESS:  There are no specific
19  criteria associated with any particular sitter.  Our
20  main goal is just to make sure that our community
21  and marketplace is as safe as possible.  And so if
22  that means that a –– we have to deactivate a
23  sitter's profile, we'll do that.  If it means we
24  have to deactivate an owner's profile, we'll do
25  that.

Page 167

1  BY MR. TIDRICK:
2      Q.   If a pet care provider provides poor
3  service, is that a circumstance where Rover would
4  deactivate the pet care provider from the platform?
5          MR. LeCRONE:  Asked and answered.
6          THE WITNESS:  If there is –– if an owner
7  suggests that service was, I think you said subpar
8  or substandard, then we would have the two parties
9  interact with each other to work that out.
10  BY MR. TIDRICK:
11      Q.   And does that ever result in Rover
12  deactivating a pet care provider from the platform?
13          MR. LeCRONE:  Again, asked and answered.
14          THE WITNESS:  Our deactivation is really
15  around how do we make our marketplace as safe as
16  possible.  That's the primary goal of that for both
17  owners and sitters.  So I would say that that's not
18  in that category.
19  BY MR. TIDRICK:
20      Q.   Is violation of the terms of service
21  grounds for deactivating a pet care provider from
22  Rover's platform?
23      A.   It may be, but not always.
24      Q.   Do you have any knowledge how many pet care
25  providers Rover has deactivated from the platform

Page 168

1  since the time that you were with the company?
2          MR. LeCRONE:  Asked and answered.
3          THE WITNESS:  I do not know.
4  BY MR. TIDRICK:
5      Q.   Is there someplace in Rover's computer
6  systems that you would look to be able to identify
7  pet care providers who have been deactivated from
8  the platform?
9      A.   I'm not sure where that information is.  We
10  probably have it.  I just don't know where it would
11  be or how to get it.
12      Q.   If a pet care provider has been deactivated
13  from the platform, is that person able to go ahead
14  and resubmit an application and rejoin the platform?
15          MR. LeCRONE:  Again, that misstates prior
16  testimony about the application.  It's been asked
17  and answered, vague and ambiguous, lacks foundation.
18          THE WITNESS:  If –– if a pet provider has
19  been deactivated from the platform, we do not allow
20  them to create another profile.
21  BY MR. TIDRICK:
22      Q.   I'm going to show you another exhibit.
23          (Deposition Exhibit 14 was marked for
24  identification.)
25  BY MR. TIDRICK:

Page 169

1      Q.   Exhibit 14.  For identification purposes,
2  this is a three-page document Bates numbered
3  MILLER 382 through 384.
4      A.   Yep.
5      Q.   There's a large heading on the first page
6  that says, "What if a client wants to pay me
7  directly, not through the Rover site?"
8      A.   Yep, I got it.
9      Q.   The first full paragraph under that heading
10  says, and I quote, "Paying and communicating through
11  Rover is essential to ensuring a safe and secure
12  experience.  In fact, it's so important to
13  everyone's security that we made it a requirement in
14  our Terms of Service."
15          To your knowledge, is that statement
16  accurate?
17      A.   Yeah, to my knowledge that is accurate.
18      Q.   Below that, there's a statement that says,
19  "Accepting payments outside of Rover could also lead
20  to account suspensions for both the sitter and the
21  owner."  Has that also been accurate throughout the
22  time that you've worked for the company?
23      A.   Yes.
24      Q.   If you could look back to Exhibit 13 for a
25  moment, and specifically page 3 of Exhibit 13.  It's

Page 170

1  the page that has the number MILLER 200 at the
2  bottom.
3       A.  Yeah.
4       Q.  You see the last bullet point on that page
5  says, and I quote, "Never accept cash or checks -
6  always book on Rover.  Booking on Rover is required
7  per Rover's Terms of Service.  We reward sitters and
8  dog walkers who have a great history on the site
9  with a higher search rank - meaning you get more
10 exposure to dog owners near you."
11      Have those statements been true throughout
12 the time that you've been with Rover?
13      A.  Generally, yes.  As I mentioned earlier, I
14 don't know all the parts in a search rank, but,
15 yeah, generally those things are true.
16      Q.  Putting that document aside, I have some
17 questions for you about recruiting.  First, how does
18 Rover recruit potential or prospective pet care
19 providers?
20      MR. LeCRONE:  Vague and ambiguous, calls
21 for speculation.
22      THE WITNESS:  Can you clarify the word
23 "recruit"?
24 BY MR. TIDRICK:
25      Q.  Well, is "recruiting" a term that Rover

Page 171

1  uses?
2       A.  No.
3       Q.  When a customer purchases a service through
4  the Rover website or app, can you explain to me how
5  the payment process works?
6       MR. LeCRONE:  Can I hear that question back
7  again, Mr. Reporter.
8       (The record was read by the reporter.)
9       MR. LeCRONE:  Yeah, I think it misstates
10 the witness's prior testimony about the purchasing
11 Web services.  It's vague and ambiguous.  I think
12 it's been asked and answered.
13      THE WITNESS:  At a high level, when an
14 owner purchases a service from a service provider
15 who is on the Rover marketplace, the payments are
16 made electronically through the Rover site.  That's
17 at a high level how that happens.  I don't know all
18 the intricate details of that.
19 BY MR. TIDRICK:
20      Q.  Does the pet owner pay for the service
21 before or after the service has been performed?
22      MR. LeCRONE:  Asked and answered.
23      THE WITNESS:  I don't know the timing of --
24 exactly of when that happens.  I don't know the
25 timing of when the payment goes through on -- on

Page 172

1  their -- on their card.
2  BY MR. TIDRICK:
3       Q.  And even if you don't know what the exact
4  timing is, are you able to tell me, at least,
5  whether it's before or after the service is
6  performed?
7       MR. LeCRONE:  I believe he testified
8  already about the bookings and when payments are
9  made and how they're processed through the platform,
10 Counsel.
11      But Mr. Chang, if you can answer this
12 question again, please do so.
13      THE WITNESS:  I'm not sure if it's -- you
14 know, if the line is before, after, exactly which
15 side of the line that's on.
16 BY MR. TIDRICK:
17      Q.  Who at the company would know that?
18      A.  I'm not sure who would know that.
19      Q.  When Rover issues a press release, is there
20 some kind of vetting process that it goes through
21 before being issued?
22      MR. LeCRONE:  Again, vague and ambiguous as
23 to "vetting," calls for speculation.
24      THE WITNESS:  Can you be specific around
25 the -- whatever the term is, the descriptor for

Page 173

1  process where you said vetting, please?
2  BY MR. TIDRICK:
3       Q.  Sorry.  Did you just want me to clarify
4  that, or would you like the court reporter to read
5  it back?
6       A.  No, if you could just clarify what you mean
7  by "vetting process."
8       Q.  Let me ask it this way:  Rover understands
9  that press releases potentially are read by
10 investors in Rover, right?
11      MR. LeCRONE:  Again, calls for speculation,
12 vague and ambiguous.
13      THE WITNESS:  Potentially, yeah.
14 BY MR. TIDRICK:
15      Q.  In light of that, does Rover take any steps
16 to ensure that information in press releases is
17 accurate?
18      MR. LeCRONE:  Outside the scope of the
19 topics in the PMK deposition, calls for speculation,
20 lacks foundation as to this witness's knowledge.
21      THE WITNESS:  I don't know whether or not
22 there's a process that is about what you just said.
23 BY MR. TIDRICK:
24      Q.  Would that be under the purview of the
25 chief marketing officer?

30(b)(6) - Derek Chang - December 18, 2020

Page 174

1    A.   I don't think so.
2    Q.   Do you know who at the company has
3 responsibility with respect to issuance of press
4 releases?
5    A.   It is most likely in our PR department.
6    Q.   Susan Johnston?
7    Susan is our director of PR.
8    Q.   Is there anyone at Rover with ultimate
9 responsibility for ensuring that information on the
10 website is accurate?
11    MR. LeCRONE:  Lacks foundation, calls for
12 speculation.
13    THE WITNESS:  No, I don't think there's one
14 person who's responsible for that.
15 BY MR. TIDRICK:
16    Q.   I know we've talked about advertising, but
17 Rover also has videos on its website that you
18 wouldn't necessarily call advertising, correct, like
19 instructional videos?
20    A.   Yeah, we have other videos that might not
21 be considered advertising.
22    Q.   Is there a department at Rover that has
23 responsibility for creating those videos?
24    A.   I don't know.  I believe that the source of
25 those videos can come from a variety of different

Page 175

1 places.
2    Q.   To your knowledge, is there anyone at Rover
3 who takes responsibility for ensuring that
4 information on -- in videos that Rover publishes to
5 the public is accurate?
6    A.   No, there's not one person that I'm aware
7 of that is responsible for that.
8    Q.   I'm going to present another exhibit.
9    (Deposition Exhibit 15 was marked for
10 identification.)
11 BY MR. TIDRICK:
12    Q.   For identification purposes, Exhibit 15 is
13 an eight-page document Bates numbered MILLER 174
14 through MILLER 181.
15    MR. LeCRONE:  I'm sorry, Counsel.  What is
16 the number?
17    MR. TIDRICK:  MILLER 174 through 181.
18    MR. LeCRONE:  I hate to say this, but it's
19 not -- last exhibit on my thread is Exhibit 15.
20    MR. TIDRICK:  Right.  Sorry.  That's what I
21 meant to say.
22    MR. LeCRONE:  You said Exhibit 18.
23    MR. TIDRICK:  I meant to say 15.
24    MR. LeCRONE:  Uh-huh.
25    MR. TIDRICK:  So let me just restate this,

Page 176

1 to be clear.
2    MR. LeCRONE:  Good.  Then I -- it wasn't my
3 error, then.  That -- that makes me feel better.
4 Thank you.
5    MR. TIDRICK:  Well, I don't -- I don't
6 know.
7    MR. LeCRONE:  Whatever it was.  Well, I
8 got --
9    MR. TIDRICK:  Regardless -- regardless, let
10 me restate.
11    Q.   So for identification purposes, I've
12 presented a document, Exhibit 15, which is Bates
13 numbered MILLER 174 through 181.  Mr. Chang, is this
14 a document that you're familiar with?
15    A.   Just let me have a quick look at it here.
16    I don't think I've seen this document
17 before.
18    Are you waiting on me?
19    Q.   No.
20    Let me just ask you, can you flip to the
21 sixth page of this document, that says MILLER 179 at
22 the bottom.
23    A.   Yeah, got it.
24    Q.   So near the top, the first full paragraph,
25 last sentence, says, "Every Rover service you offer

Page 177

1 is covered by 24/7 support, access to veterinary
2 consultation, and the Rover Guarantee."
3    A.   Can you -- sorry.  Did you say -- is it in
4 7 or 5?  5?
5    Q.   So this is page 6 of Exhibit 15.
6    A.   I'm sorry.  It skipped to 5.  That's why I
7 was missing it.  Okay.  So I'm on page 6.  And where
8 exactly, again?  Sorry.
9    Q.   So at the top, it says, "Say 'No Thanks.'"
10    A.   Yeah.
11    Q.   And then below that is a longer paragraph.
12 And I think three sentences into that, there's a
13 statement that says, "Every Rover service you offer
14 is covered by 24/7 support, access to veterinary
15 consultation, and the Rover Guarantee."
16    A.   Yeah, I see that.
17    Q.   During the time that you've been with
18 Rover, has that always been the case?
19    A.   It is technically as long as the booking
20 and payment is on the platform.  The words "every
21 service you offer" I would say doesn't necessarily
22 encompass that, but the spirit of it, yeah.
23    Q.   Have you ever interacted with the CEO?
24    Well, is the CEO of the company still Aaron
25 Easterly?

Page 178

1    A.   Yes.
2    Q.   Have you ever interacted with him?
3    A.   Yes, I have.
4    Q.   You've seen him, talked with him?
5    A.   Yes, I have.
6    Q.   Do you know him to be honest and
7  trustworthy?
8    A.   Yes.
9         (Deposition Exhibit 16 was marked for
10 identification.)
11 BY MR. TIDRICK:
12   Q.   All right.  So the next exhibit is actually
13 a video.  And what I'm going to do, because --
14 unfortunately, one limitation of the Zoom platform
15 is there's a limit on file sizes, so what I'm going
16 to do is -- this is a risky venture, but I'm going
17 to do is actually share my screen.  And I'm going to put
18 this video up.  It's about five minutes long.
19        Do you need to take a break before this, or
20 is -- can you handle a five-minute video?
21   A.   Yeah, I'm good to go.
22   Q.   Okay.
23        All right.  But you'll -- you'll be able to
24 pause on answering questions for about five minutes
25 while this video rolls.

Page 179

1         Okay.  So are you seeing -- well, what are
2  you seeing on the screen?
3    A.   I'm seeing an arrow.  It says "Ex.16.mp4"
4  at the top.
5    Q.   Fantastic.  I -- I managed to do it.
6         All right.  So as you can see, there's --
7  there's a -- I don't know what you call that, but
8  there's something along the bottom that shows you
9  where in the video you are from zero -- time stamp
10 zero to 5 minutes and 37 seconds.  So I'm going to
11 go ahead and play this exhibit now.  This is Exhibit
12 16.
13   A.   Okay.
14        (Exhibit 16 was played.)
15 BY MR. TIDRICK:
16   Q.   So that video was Exhibit 16.  The
17 interviewee in that video was Rover's CEO, Aaron
18 Easterly; is that correct?
19   A.   Yes.
20        MR. LeCRONE:  And I want to put on the
21 record, this is one of the -- I think the exhibits,
22 or exhibit thereof, that you asked us to stipulate
23 to their -- to its authenticity, and we have
24 objected to that and have not authenticated this
25 document.  It is what it is.  It's a video.  It's

Page 180

1  old.  It's been around for a long time.  And it's
2  not within the -- the scope of this deposition,
3  Counsel.  So, I mean, it is what it is.  You can
4  deal with it as you want to deal with it.  I'm not
5  going to have this witness testify to a video that
6  he had nothing to do with preparing.  He wasn't on
7  it.  He wasn't asked questions about it.  It's not
8  within the scope of his job.  And it certainly
9  isn't, based on the objections we've submitted,
10 within the scope of this deposition today.
11 BY MR. TIDRICK:
12   Q.   Mr. Chang, the interviewee looked and
13 sounded like Aaron Easterly, correct?
14   A.   Yes.
15   Q.   It was Rover's CEO, Aaron Easterly,
16 correct?
17        MR. LeCRONE:  Objection.  Again, that's
18 asking him to speculate.  He wasn't there.  I will
19 just throw out that we have seen on social media a
20 whole lot of things that have faked people's voices,
21 people's faces on the political sphere and
22 everything else.  So you're asking this witness to
23 authenticate essentially what this video clip is
24 from CNBC, if I understand it.  It may very well be
25 accurate and true and -- but he -- he's not in the

Page 181

1  position to be able to testify to that.  And you're
2  asking him to speculate.  And I'm going to instruct
3  him not to answer.
4        MR. TIDRICK:  You're instructing him to
5  answer -- to not answer what?
6        MR. LeCRONE:  Well, the question was --
7  the -- I think the question, as I understand it,
8  Steve, was, was that Eric Easterly.  He has already
9  testified that certainly it did look like him.  But
10 beyond that, I'm not sure this witness is qualified
11 and certainly not prepared, to answer this kind of a
12 question.
13        MR. TIDRICK:  It's not Eric Easterly.  The
14 CEO's name is Aaron Easterly.
15        MR. LeCRONE:  I'm sorry.  I misspoke.
16        MR. TIDRICK:  All right.  So do I
17 understand correctly, you're -- you're instructing
18 the witness not to answer whether he believes that
19 is the CEO, Aaron Easterly?  Is that correct?
20        MR. LeCRONE:  I think he already testified
21 it certainly looked like him.  That's fine.  I think
22 that answers that question.
23 BY MR. TIDRICK:
24   Q.   All right.  So as your lawyer pointed out,
25 some of these statements might be fake.  It may be

Page 182

1  that this video is a fake; somebody ginned this up
2  to look like Aaron Easterly but in fact it's not.
3  So I understand your company's position is that this
4  video may be a fake.  I understand that.
5          MR. LeCRONE:  It isn't the --
6  BY MR. TIDRICK:
7      Q.  What I'm asking --
8          MR. LeCRONE:  -- position.  That was the
9  objection, Counsel.  I want that clear for the
10 record.  That isn't our position, but that's the
11 objection.  And we have made that objection both
12 right now and in the objections we served on you
13 prior to today's deposition.
14 BY MR. TIDRICK:
15     Q.  Mr. Chang, you're testifying on behalf of
16 the company.  Do you believe that the video that I
17 just showed, Exhibit 16, is fake?
18     A.  I don't know whether it's fake or not.  All
19 I can say is kind of what I said to you, is that it
20 appears to be Aaron Easterly in the video.
21     Q.  One of the statements in the video is, and
22 I quote, "We only approve something like 20 percent
23 of sitter applicants."  Do you believe that that
24 statement is accurate?
25         MR. LeCRONE:  Again, that's been asked and

Page 183

1  answered of this witness earlier today on two
2  separate occasions.
3          THE WITNESS:  I don't believe that that's
4  accurate.  I believe kind of what we talked about
5  earlier is, again, using the general estimations,
6  that 20 percent of the people who create a profile
7  actually end up completing the process and having it
8  appear in the Rover marketplace.
9  BY MR. TIDRICK:
10     Q.  One of the statements in the video is, and
11 I quote, "Our technology reviews their profiles."
12 Is that statement accurate?
13         MR. LeCRONE:  Again, I'm going to instruct
14 the witness not to answer, Counsel.  You're now
15 going through every statement that was made, however
16 many years ago, on some business channel, CNBC.
17 You're -- I -- this is ridiculous.  I'm not going to
18 put this witness through a line of questions on
19 something that we have objected to in advance prior
20 to this deposition.  We have not authenticated this.
21 You have not authenticated this.  And I'm simply not
22 going to put the witness in a position of having to
23 testify that every statement from the CEO on some
24 news program was entirely accurate.  So I'm
25 instructing him not to answer, and I'm objecting to

Page 184

1  this line of questioning.
2  BY MR. TIDRICK:
3      Q.  All I'm asking right now is the substance
4  of the following statement.  Is the following
5  statement accurate:  "Our technology reviews their
6  profiles"?
7          MR. LeCRONE:  And, again, you've already
8  asked this witness these questions, about
9  technology, about profiles, about reviewing them,
10 and now you're asking him to repeat prior testimony
11 based on something said in some news segment that
12 has no authentication attached to it at all.  I'm
13 not saying I have information to suggest it is
14 inauthentic, but I'm just saying it is not authentic
15 from our position as I'm sitting here right now.
16         So you're reasking questions based on what
17 was interviewed in this news report, and it -- or
18 not news report, this program on CNBC, and it's just
19 an improper line of questioning for this witness.
20 I'm going to instruct him not to answer.
21 BY MR. TIDRICK:
22     Q.  Mr. Chang, do you believe that the CEO,
23 Aaron Easterly, speaks inaccurately in media
24 interviews?
25         MR. LeCRONE:  Asked and answered.

Page 185

1          MR. YOUNG:  We never asked that question.
2          MR. LeCRONE:  Well, Joel, you're not taking
3  this deposition, so I would ask that you just keep
4  quiet.  I'm defending, and your partner, Steve, is
5  taking.  If you want to spend some time, valuable
6  time, to go on and on, you can.  But I'm not going
7  to take directions from you, Joel.  I appreciate you
8  wanting to give those directions, but I'm not going
9  to take them.  I'm just telling you that you ask --
10         MR. YOUNG:  I didn't make directions.  I
11 just made a statement.  We didn't ask the question.
12 I'm just letting you know that.
13         MR. LeCRONE:  And if we were sitting in
14 a -- in a conference room today instead of this
15 visual platform, this virtual platform, you wouldn't
16 be saying anything on this record.  So I would
17 appreciate it if you'd just keep quiet, and the
18 attorneys that are involved in taking and defending
19 this deposition will say what they need to say.  And
20 I'm one of those.
21         So all I'm saying is this is a old video
22 clip.  And, again, I'm not saying it's inaccurate.
23 I'm not saying it's inauthentic.  But there's no --
24 it hasn't been authenticated one way or the other.
25 You can use it for -- for whatever reason you want

Page 186

1  to use it for.  But you're asking this witness —
2  you're putting him in a position of saying are these
3  inauthenticated video clip statements accurate.  And
4  I think it's improper.  You've already gone through
5  this — the substance of these questions with this
6  witness already, and you're reasking these questions
7  based on what you hear in this video clip, and it's
8  improper.  And I'm instructing him not to answer.
9      MR. TIDRICK:  Court reporter, would you
10  please read back my question.
11      (The record was read by the reporter.)
12      MR. LeCRONE:  Calls for speculation, lacks
13  foundation.
14      Mr. Chang, you can — you can answer that
15  to the extent you have ever seen or listened to any
16  news — or this isn't news as much as it is a — a
17  talk show of sorts.  You can — you can answer that
18  question.
19      THE WITNESS:  I am not sure whether or not
20  Aaron Easterly speaks inaccurately during media
21  interviews.  I would — I would say that he intends
22  to speak accurately.  But it doesn't mean that
23  somebody couldn't make a mistake in a potentially
24  high-pressure situation.
25  BY MR. TIDRICK:

Page 187

1      Q.  Is the following statement accurate?
2      "What Rover Cards is, we invented them so
3  an owner would know what's going on.  So when a
4  service is delivered, they get an update.  Did the
5  dog go to the restroom?  Did it drink water?  How
6  far did it walk?  Which route did it take?  When did
7  the person enter and exit the home?  So you actually
8  know the service is being delivered as contracted."
9      MR. LeCRONE:  Again, I'm going to object on
10  the same basis I've already put on this record.  I'm
11  not going to do it over again.  And I'm going to
12  instruct him not to answer.
13      MR. TIDRICK:  I hadn't asked the question
14  yet.
15      MR. LeCRONE:  Well, it —
16  BY MR. TIDRICK:
17      Q.  Is that statement —
18      MR. LeCRONE:  — sounded like you did.
19      Ask the question, then, Steve.  Go ahead,
20  please.  Give it to us.
21      MR. TIDRICK:  I would appreciate it if you
22  would stop interrupting.
23      Q.  Is that statement accurate?
24      MR. LeCRONE:  Again, same objection;
25  instruction — instruction not to answer.

Page 188

1  BY MR. TIDRICK:
2      Q.  Mr. Chang, are you going to follow the
3  instruction not to answer that?
4      A.  Yes.
5      (Deposition Exhibit 17 was marked for
6  identification.)
7  BY MR. TIDRICK:
8      Q.  All right.  I'm going to share my screen
9  again.  I'm going to show a video marked as Exhibit
10  17.
11      Mr. Chang, do you see on your screen — the
12  video isn't playing yet, but near the top it should
13  say "Ex.17.mp4."
14      A.  Yeah, I see it.
15      Q.  All right.  I'm going to play this video.
16      (Exhibit 17 was played.)
17  BY MR. TIDRICK:
18      Q.  Mr. Chang, the interviewee in the Exhibit
19  17 video, that appeared to be Rover's CEO Aaron
20  Easterly, correct?
21      A.  That's correct.
22      Q.  Is the following statement accurate:
23  quote, "Our technology also scores people and
24  predicts how good they're going to be before they
25  even go live, and we have humans review it as well,

Page 189

1  so people that are doing this primary for money and
2  not for the love of pets we tend to turn down?"
3      MR. LeCRONE:  Now, again, I'm — I'm going
4  to set forth the same objections, Counsel, and
5  instruct the witness not to answer.  This is an
6  unauthenticated video clip from a talk show many
7  years ago.  The witness wasn't involved in it,
8  wasn't there.  He wasn't at — these questions are
9  not your questions.  They were the interviewee
10  questions, or interviewer questions.  We don't have
11  any idea how authentic or not these are.  And you're
12  putting this witness in a position of having to
13  authenticate a video clip that he wasn't involved
14  in.
15      So we've objected to this in writing prior
16  to today's deposition.  I'm objecting to it now.
17  It's improper.  I'm not going to have this witness
18  testify about this video clip.  It is what it is.
19  You can use it for whatever you think you want to
20  use it for.  You've already asked questions along
21  these lines to this witness.  He's answered those
22  questions.  I'm going to instruct him not to answer.
23      Let's move on.
24  BY MR. TIDRICK:
25      Q.  I'm going to show you another video, which

Page 190

1  is, I believe, a video that — just a moment.
2          MR. LeCRONE:  I'll add to this record that
3  this — these video clips, to the extent they're in
4  any way accurate, or authentic, I should say, have
5  nothing to do with Ms. Sportsman or the services
6  that she was posting on her profile on Rover.
7  BY MR. TIDRICK:
8          Q.  I'm about to show you another video.  This
9  is going to be Exhibit 18.
10         (Deposition Exhibit 18 was marked for
11  identification.)
12  BY MR. TIDRICK:
13         Q.  All right, Mr. Chang.  On your screen, do
14  you see something that says Ex. 18.mp4?
15         A.  Yes.
16         Q.  All right.  I'm going to play this.  This
17  video is Exhibit 18.  It's a 34-second video.
18         (Exhibit 18 played.)
19  BY MR. TIDRICK:
20         Q.  Mr. Chang, Exhibit 18, do you recognize
21  that to be a video that Rover created?
22         MR. LeCRONE:  I'm going to object.  It
23  calls for speculation, lacks foundation about who
24  may have created it.
25         But you can answer it, Mr. Chang.

Page 191

1          THE WITNESS:  I don't know whether or not
2  that was a video Rover created.  It's not something
3  that I've seen before, either.
4          MR. TIDRICK:  All right.  I'm almost done.
5  Let's take a short break, ten minutes, and we can
6  come back.
7          So it's present — it's presently 4:23.
8  Let's come back at —
9          MR. LeCRONE:  4:30?
10         MR. TIDRICK:  — 4:33.
11         THE VIDEOGRAPHER:  Okay.  Stand by.  The
12  time is 7:23 p.m. Eastern, and we're going off the
13  record.
14         (Recess taken.)
15         THE VIDEOGRAPHER:  The time is 7:35 p.m.
16  Eastern, and we're back on record.
17         (Deposition Exhibit 19 was marked for
18  identification.)
19  BY MR. TIDRICK:
20         Q.  I'm sending you a document that has been or
21  that will be identified as Exhibit 19.
22         Exhibit 19 for identification purposes is a
23  one-page document Bates numbered ROVER_000571.
24         A.  Yep.  I have it.
25         Q.  Mr. Chang — Mr. Chang, please take what

Page 192

1  time you need to familiarize yourself with this.
2  And then my first question will be, what is this
3  document?
4          A.  Okay.  I've looked at this.
5          Q.  What is the Exhibit 19 document?
6          A.  It's a communication to encourage people to
7  be Rover sitters.
8          Q.  Who at Rover — do you know who at Rover,
9  or what department, this would have come out of?
10         A.  I don't know.  Marketing, maybe.  But I
11  don't know for sure.
12         Q.  Do you recognize this to be typical of
13  documents that the marketing department generates to
14  encourage people to become pet care providers?
15         A.  I'm not sure whether or not I'd be able to
16  answer that.  There's two parts in there, which is
17  like typical marketing perspective, I guess, because
18  of the fact it has our brand and logo in there.  I'm
19  not sure whether or not there's a prototype for
20  communications around having sitters creating
21  profiles.
22         Q.  Based on what you're seeing in the
23  document, recognizing also that it's something that
24  Rover produced, do you understand this to be
25  something that Rover created?

Page 193

1          MR. LeCRONE:  Again, it calls for
2  speculation, lacks foundation.
3          THE WITNESS:  I have no reason to believe
4  that it's not, but I don't know for sure that it
5  was.
6  BY MR. TIDRICK:
7          Q.  Looking at the print at the bottom of the
8  page, there's something looks like a field of grass,
9  with the numbers 1, 2, and 3, and then beneath that
10  there's a fairly dense paragraph.  Do you see what
11  I'm referring to?  It starts, "This is a great
12  opportunity."
13         A.  Yes.
14         Q.  And I know you've already looked at this
15  document, but have you read that language at the
16  bottom?
17         A.  Well, let me read it.  I just read up to
18  that line.
19         Okay.
20         Q.  Is that a fair statement of what it means
21  to be a pet care provider on the Rover platform?
22         A.  I don't know if I'd characterize it as a
23  fair statement.  Just what's running through my head
24  is there's so many elements to it, I don't know if
25  this captures everything about it.  So I don't know

## Page 194

1 if it's the definition of a — somebody who has a
2 profile on our platform.
3    Q. Well, all right. Understood. It doesn't
4 necessarily describe everything. I'm not sure
5 there's anything in there that talks about picking
6 up poop after the dog. But for what it is, is there
7 anything — let me ask the question this way: Is
8 there anything inaccurate about it?
9    A. I don't know if there's anything
10 inaccurate. They used the word "could" in there, so
11 it makes any of those things possible but not
12 necessarily factual.
13    Q. You mean where it says, "Rover could be a
14 great fit for you"?
15    A. Yeah, or — yeah, because it's saying if
16 you are one of these things, it could be a great fit
17 for you. Like, yeah, it could be, but it also could
18 not be.
19    Q. Understood. But otherwise, with respect to
20 just what it sets forth about what it means to be a
21 pet care provider on the Rover platform, there's
22 nothing that you're seeing in it that's inaccurate;
23 is that fair?
24    A. My understanding of this is to in general
25 communicate that anybody could be a sitter in the

## Page 195

1 Rover marketplace. And I think that's generally
2 true.
3    Q. And I appreciate what you just said, but
4 just to be clear, there's nothing in it that you see
5 as being inaccurate; is that fair?
6    A. Let me quick — do a quick scan. I don't
7 think so.
8       Yeah, there's nothing in there that I would
9 say is not true.
10    Q. I know earlier I started to ask you about
11 recruitment. And I take it that "recruitment" is
12 not a term that you use at Rover, but — I
13 understand you've said about this document, this is
14 an example of Rover encouraging people to become pet
15 care providers, or something along those lines.
16       Let me ask you the question this way: This
17 document, Exhibit 19, how often does Rover make
18 efforts to encourage people to become pet care
19 providers?
20       MR. LeCRONE: How often? Is that right,
21 Steve?
22       MR. TIDRICK: Yeah.
23       MR. LeCRONE: Okay. Well, vague and
24 ambiguous.
25       But if you can — if you understand and can

## Page 196

1 answer that question, Mr. Chang, go ahead.
2       THE WITNESS: I don't know how often that
3 happens.
4 BY MR. TIDRICK:
5    Q. Well, let me ask the question this way:
6 This Exhibit 19, is this a one-off, or does Rover
7 routinely put out messages to the public to
8 encourage people to become pet care providers?
9       MR. LeCRONE: Again, lacks foundation,
10 vague and ambiguous.
11       THE WITNESS: Technically I don't know
12 whether this is a one-off, but I understand your
13 question around, like, have we put communications
14 out more than once to encourage people to create
15 profiles. And, yes, I know we have done that on
16 more than one occasion. How many times or how often
17 we've done that, I do not know.
18 BY MR. TIDRICK:
19    Q. Is there a department or unit at Rover with
20 responsibility for that?
21    A. I don't know. I would guess kind of what I
22 said earlier, that it would be the same group who,
23 if — marketing, I think I'd said, would be the
24 place that I would suspect that this would have come
25 from, but I don't know for sure.

## Page 197

1    Q. Do you have any understanding which
2 websites Rover uses to put out communications
3 encouraging people to become pet care providers?
4       MR. LeCRONE: Vague and ambiguous as to
5 "websites."
6       THE WITNESS: I don't know all the media
7 placements that these messages are put on.
8 BY MR. TIDRICK:
9    Q. Are you familiar with a website called
10 Indeed.com?
11    A. Yes, I am.
12    Q. Does Rover put out messaging on Indeed.com
13 encouraging people to become pet care providers?
14    A. We have. I don't know if we are or still
15 do, but I know we have.
16    Q. That's happened during the time that you've
17 been working at Rover?
18    A. Yes, it has.
19    Q. And I'm just identifying Indeed as an
20 example of what I mean by a website. And now that
21 I've mentioned Indeed, are there other websites that
22 you're familiar with where Rover has put out
23 messaging encouraging people to become pet care
24 providers?
25    A. I don't know all the sites. I would be

Page 198

1  guessing.  I think there's some pretty obvious ones
2  that might be true.  But I actually don't know.
3       Q.  I don't want you to guess.  Let me ask you
4  this:  Are there -- are there certain websites that
5  you've heard people discussing at the company as --
6  as places for encouraging people to become pet care
7  providers?  In other words, even if you don't know
8  specifically that a specific website was used for
9  putting out a communication like this, can you just
10  tell me the ones that you remember having been
11  discussed as possibilities?
12       A.  I wasn't part of the discussions on which
13  sites that our messages like this would have been
14  on.  So, like I said, I could make a good guess, but
15  it would still be a guess.
16       Q.  All right.  So, again, to be clear, I'm not
17  asking you to guess.  Are there -- are there certain
18  websites where -- I guess let me -- let me ask --
19  ask you the question this way:  Why is it that
20  there -- that you believe that there are certain
21  websites?  Is that knowledge that you've come upon
22  through your work at Rover, or is this just
23  something from experience outside of Rover that
24  makes you think:  Oh, this might be a place we would
25  have placed them?

Page 199

1       A.  I think it would be the latter, just as
2  a -- you know, just -- it would be the latter, just
3  not through Rover but just in general knowledge of
4  some sites are --
5       Q.  All right.
6       A.  -- big and expansive.
7       Q.  Understood.  Well, I really don't want you
8  to speculate or guess.  All right.
9           Just a moment.  I'm just taking another
10  look at my outline here.
11           Do you have any understanding why Rover
12  puts out messaging such as Exhibit 19 to encourage
13  people to become pet care providers?
14           MR. LeCRONE:  Oh, my goodness.  Lacks
15  foundation, calls for speculation, vague and
16  ambiguous.
17           THE WITNESS:  My understanding on that
18  would be we may have put this out because we wanted
19  to build our marketplace and have lots of sitters in
20  our marketplace so that when an owner came to our
21  site that the network of sitters would be larger
22  than smaller.
23  BY MR. TIDRICK:
24       Q.  Understood.  And to put it another way, is
25  this a way of ensuring that there are enough pet

Page 200

1  care providers to meet the demand on your platform?
2           MR. LeCRONE:  Again, vague and ambiguous,
3  calls for speculation, lacks foundation.
4           THE WITNESS:  I'm not sure if that's the --
5  I think it's more around what I said, which is just
6  as we try and build the community and make sure that
7  there's a big network in there.  I'm not going to --
8  I don't know about the supply and demand part that
9  you mentioned.
10  BY MR. TIDRICK:
11       Q.  So I understand that you'd have to be
12  guessing to identify websites where this happened?
13           MR. LeCRONE:  I'm not going to let him do
14  that, Counsel.  Why don't you identify them
15  yourself.
16           MR. TIDRICK:  Hello?
17           MR. LeCRONE:  I just said, Counsel, he's
18  not going to identify websites for you.  I think
19  that's something you can do yourself.
20           MR. TIDRICK:  Is that an objection?
21           MR. LeCRONE:  It's a comment.
22           MR. TIDRICK:  All right.  That's not
23  necessary.
24           MR. LeCRONE:  Okay.
25  BY MR. TIDRICK:

Page 201

1       Q.  I was starting to say, before counsel
2  interrupted, that I understand that you'd be
3  guessing to identify other websites.  I'm not asking
4  about websites.  What I'm asking you is, are there
5  other tools that Rover uses to encourage people to
6  become pet care providers?
7       A.  I don't know if there's other tools I can
8  think of off the top of my head.  Maybe indirectly
9  some of the -- of our TV ads might encourage it, but
10  I don't know if they directly do that.
11       Q.  Does Rover have a blog on its website
12  designed to encourage people to become pet care
13  providers?
14           MR. LeCRONE:  Lacks foundation, calls for
15  speculation, argumentative.
16           THE WITNESS:  No, we don't have a -- we
17  don't have a blog that's dedicated to that.
18  BY MR. TIDRICK:
19       Q.  Do you have a blog on the website?
20       A.  Yeah, there's a blog there.
21       Q.  Who at Rover controls that?
22       A.  I don't know the person who controls that.
23       Q.  Do you have any understanding what the
24  purposes of the blog is?
25       A.  My understanding is it's an informational

Page 202

1  blog.  But that's all I know.
2      Q.  Does Rover use its website to encourage
3  people to become pet care providers?
4      A.  To the extent that a sitter can create a
5  profile on our site, yes.
6      Q.  Other than creating an opportunity for an
7  individual to create a profile, is there anything
8  else that Rover does on its website, Rover.com, to
9  encourage people to become pet care providers?
10      MR. LeCRONE:  Again, vague and ambiguous.
11      THE WITNESS:  Not that I'm aware of.
12  BY MR. TIDRICK:
13      Q.  The blog on Rover's website, has that been
14  around throughout the time that you've been with the
15  company?
16      A.  Yes, it has.
17      MR. TIDRICK:  All right.  So at this time,
18  I'll suspend the deposition.  There were a couple
19  topics, two or three topics, where I think we may
20  need to have someone come back with knowledge.  But
21  we can meet and confer about that later.
22      MR. LeCRONE:  All right.  It's been fun.
23  Thank you.
24      THE VIDEOGRAPHER:  Okay.  Stand by.  The
25  time is 7:55 p.m. Eastern, and we're going off the

Page 203

1  record.
2      (Whereupon, the deposition session ended at
3  4:55 p.m. PST.)
4      ---o0o---
5      I declare under penalty of perjury that the
6  foregoing is true and correct.  Subscribed at
7  _____, California, this _____ day of
8  _____, 2020.
9
10
11      _____
      Signature of the witness
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 204

1      CERTIFICATE OF REPORTER
2      I, JOHN WISSENBACH, a Certified Shorthand
3  Reporter, hereby certify that the witness in the
4  foregoing deposition was by me duly sworn to tell
5  the truth, the whole truth, and nothing but the
6  truth in the within-entitled cause;
7      That said deposition was taken down in
8  shorthand by me, a disinterested person, at the time
9  and place therein stated, and that the testimony was
10  thereafter reduced to typewriting by computer under
11  my direction and supervision and is a true record of
12  the testimony given by the witness;
13      That before completion of the deposition,
14  review of the transcript [ ] was [X] was not
15  requested.  If requested, any changes made by the
16  deponent (and provided to the reporter) during the
17  period allowed are appended hereto.
18      I further certify that I am not of counsel
19  or attorney for either or any of the parties to the
20  said deposition, nor in any way interested in the
21  event of this cause, and that I am not related to
22  any of the parties thereto.
23      DATED: December 22, 2020
24
    _____
25  JOHN WISSENBACH, CSR No.  6862

Page 205

1      LAWYER'S NOTES
2  PAGE LINE
3  ____ ____  _____
4  ____ ____  _____
5  ____ ____  _____
6  ____ ____  _____
7  ____ ____  _____
8  ____ ____  _____
9  ____ ____  _____
10  ____ ____  _____
11  ____ ____  _____
12  ____ ____  _____
13  ____ ____  _____
14  ____ ____  _____
15  ____ ____  _____
16  ____ ____  _____
17  ____ ____  _____
18  ____ ____  _____
19  ____ ____  _____
20  ____ ____  _____
21  ____ ____  _____
22  ____ ____  _____
23  ____ ____  _____
24  ____ ____  _____
25  ____ ____  _____

Page 206

1    CERTIFICATE OF DEPONENT
2
3        I hereby certify that I have read the
4    foregoing pages of my deposition testimony in
5    this proceeding, and with the exception of
6    changes and/or corrections, if any, find them to
7    be a true and correct transcription thereof.
8
9    _____
10                Deponent
11
12    _____
13                Date
14
15            NOTARY PUBLIC
16        Subscribed and sworn to before me this
17    _____ day of _____, 20___.
18    _____
19            Notary Republic
20    My Commission Expires:_____
21
22
23
24
25

Page 207

1    INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over carefully
4    and make any necessary corrections.  You
5    should state the reason in the appropriate
6    space on the errata sheet for any corrections
7    that are made.
8        After doing so, please sign the errata
9    sheet and date it.
10       You are signing same subject to the changes
11    you have noted on the errata sheet, which
12    will be attached to your deposition.
13       It is imperative that you return the
14    original errata sheet to the deposing
15    attorney within thirty (30) days of
16    receipt of the deposition transcript by
17    you. If you fail to do so, the deposition
18    transcript may be deemed to be accurate
19    and may be used in court.
20
21
22
23
24
25

Page 208

1            ERRATA SHEET
2
3    PAGE -- LINE -- CORRECTION/REASON
4    _____  _____  _____
5    _____  _____  _____
6    _____  _____  _____
7    _____  _____  _____
8    _____  _____  _____
9    _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   _____  _____  _____
25   _____  _____  _____

Page 209

1            ERRATA SHEET
2
3    PAGE -- LINE -- CORRECTION/REASON
4    _____  _____  _____
5    _____  _____  _____
6    _____  _____  _____
7    _____  _____  _____
8    _____  _____  _____
9    _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   _____  _____  _____
25   _____  _____  _____

Exhibit 3







Exhibit 4

  


DEREK CHANG
EXHIBIT 4
12 - 18 - 2020

Rover services may be impacted in your area due to COVID–19. Go here for information on those regulations.



# Melanie S.

Hoover, Fresno, CA

★★★★★ (19)

💬 Response Rate: **100%**

🕐 Response Time: **a few minutes**

## Services

| | |
|---|---|
| **Boarding** in the sitter's home | **$35** per night |
| **Drop–In Visits** visits in your home | **$25** per visit |
| **Doggy Day Care** in the sitter's home | **$30** per day |

Contact Melanie

**Dog Walking**

in your neighborhood

$**20**

per walk

### See Additional Services & Rates

Pick–up & drop–off, bathing / grooming

## Melanie can host



0–15

lbs



16–40

lbs

## Melanie can watch in your home



Cats



0–15

lbs



16–40

lbs



41–100

lbs



101+

lbs

## Availability

| Boarding ▾ |
| --- |

### JUNE 2020

 

| SUN | MON | TUE | WED | THU | FRI | SAT |
| --- | --- | --- | --- | --- | --- | --- |
| 31 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 ♡ |



Contact Melanie

ROVER_000002

| SUN | MON | TUE | WED | THU | FRI | SAT |
|-----|-----|-----|-----|-----|-----|-----|
| 14  | 15  | 16  | 17  | 18  | 19  | 20  |
| 21  | 22  | 23  | 24  | 25  | 26  | 27  |
| 28  | 29  | 30  | 1   | 2   | 3   | 4   |

🟩 Available   ⬛ Unavailable

**Calendar last updated 2 years ago**

Melanie can host up to 3 dogs per night.

Melanie can host up to 3 dogs per day for day care.

Dog Boarding Cancellation Policy: Strict
Drop–In Visits Cancellation Policy: Strict
Doggy Day Care Cancellation Policy: Flexible
Dog Walking Cancellation Policy: Flexible

⊗ Report this profile

## Melanie's Photos

**80%**
of clients received photo updates

Contact Melanie      



Melanie is using the Rover app to track activity and send Rover Cards

## Reviews



| 7 repeat clients | 19 Reviews ⭐⭐⭐⭐⭐ |



**Cindy C.**                                   VERIFIED STAY
Jan 2, 2018

Melanie was amazing with Mason. She sent daily updates and pictures of him. She took especially good care of him when he wasn't feeling very well. You can tell that she truly loves dogs. Thanks Melanie, for all that you did for Mason.

**Ryan M.**                                   VERIFIED STAY
Nov 17, 2017

Melanie was great, and my dog had a great time with her. I will definitely use her again



**Tasha H.**                                   VERIFIED STAY
Nov 3, 2017



Contact Melanie            ♡

ROVER_000004

She was accommodating for a last minute over night stay. Lots of great pictures so we knew our pup was doing great. Overall very happy with Melanie.

Read more reviews

## About Melanie

**35**

years of experience

 

## I'll love & care for your pet well.

I've grown up with dogs since I was a baby (37+ yrs). Growing up, I always put my dogs before homework (mom wasn't happy about that). I would always try to convince my parents we needed to adopt all the dogs in the shelter. I'm use to all size dogs, from Chihuahuas to Great Danes. I took an ROP class in high school that required me to volunteer at a vet clinic/hospital. So I have …

(Read More)

**What Melanie would like to know about your pet**

Gets along with other dogs? Does well with kids? Potty trained? Feeding schedule? Allergies?

**Additional Skills**

- ✓ Oral Medication Administration
- ✓ First Aid/CPR
- ✓ Can provide daily exercise
- ✓ Injected Medication Administration
- ✓ Senior Dog Experience

Contact Melanie

**About Melanie's Home**



ROVER_000005

- ✓ Lives in a House
- ✓ Non–Smoking Household
- ✓ Has 2 Dogs
- ✓ Has a Fenced Yard
- ✓ Has Caged Pets
- ✓ Children 6–12 Years Old

**Melanie's Pets**

### Eevee
Chihuahua
4 years, 1 month old, 8 lbs.

### Maxx
Dachshund
3 years old, 10 lbs.

## When Melanie watches your pet

*Chase *Tug–A–War *Running *Fetch *Walks around Fresno State or surrounding neighborhood *Dog Parks

### In Melanie's Home

- ✓ Dogs Allowed On Bed
- ✓ Potty Breaks Every 0–2 Hours
- ✓ Dogs Allowed On Furniture

Contact Melanie



## Melanie's Neighborhood



 All stays booked on Rover receive our Rover guarantee, 24/7 support, and our reservation protection. Learn More

## More Sitters Near You

 **Brittany H.**
Clovis, CA
★★★★★
10 Reviews

**Whitney and Manni O.**
Bullard, Fresno, CA
★★★★★
56 Reviews

 Contact Melanie





**Nathan B.**

Bullard, Fresno, CA

★★★★★

8 Reviews

Home  /  Fresno, CA Dog Boarding

## Learn More

Read Our Blog                    Rover Guarantee
Rover Q&A                        Safety
Community                        Sit a Dog, Save a Life
Rover Store

## About Rover

About Us                         Partners
Contact Us                       Privacy Statement
Joining Forces                   Cookie Policy
Get the App                      CA – Do Not Sell My Info
Press                            Terms of Service
Careers

## Get cute puppies in your inbox

| Email Address | Submit |

*By providing my e–mail address, I consent to receive marketing communications from Rover.com and its affiliates. Privacy Policy*

**THE DOG PEOPLE**



© 2020 A Place for Rover, Inc. All Rights Reserved.

711 Capitol Way S., Suite 204, Olympia, WA 98501

Contact Melanie          

# Melanie's Reviews



Jan 2, 2018

**VERIFIED STAY**

Melanie was amazing with Mason. She sent daily updates and pictures of him. She took especially good care of him when he wasn't feeling very well. You can tell that she truly loves dogs. Thanks Melanie, for all that you did for Mason.



Melanie S.



Nov 17, 2017

**VERIFIED STAY**

Melanie was great, and my dog had a great time with her. I will definitely use her again



Melanie S.



Nov 3, 2017

**VERIFIED STAY**

She was accommodating for a last minute over night stay. Lots of great pictures so we knew our pup was doing great. Overall very happy with Melanie.



Melanie S.



Oct 29, 2017

**VERIFIED STAY**

I was pleased and felt very comfortable with my fur babies in Melanie's care. She sent pictures with side notes of how they were doing. It gave me comfort being able to leave them in their own familiar surroundings rather than in a cage. Will definitely use Rover for future needs and highly recommend their service.



Melanie S.



Oct 23, 2017

**VERIFIED STAY**

Melanie was wonderful with my pups. She was timely, meticulous and my puppies loved her!



Melanie S.



Oct 16, 2017
VERIFIED STAY

Melanie is amazing! She really goes above and beyond in taking care of Aggie and giving him the quality time he needs. Every walk I receive multiple pictures and a summary of their half hour together. I really appreciate the updates!



Melanie S.



Sep 30, 2017
VERIFIED STAY

Melanie gave photo updates throughout my dogs stay with her! I knew my dog was in good hands- will definitely re-book with Melanie :)



Melanie S.



Sep 27, 2017

My husband and I left our dog with Melanie over the weekend and she did a phenomenal job. We received pictures and updates of our dog during our trip which eased our time away from her. Melanie is a great dog sitter, very welcoming and I instantly felt comfortable leaving my dog with her. At pick up, my dog was so happy and I could tell Melanie spoiled my dog and took great care of ...

(Read More)

My husband and I left our dog with Melanie over the weekend and she did a phenomenal job. We received pictures and updates of our dog during our trip which eased our time away from her. Melanie is a great dog sitter, very welcoming and I instantly felt comfortable leaving my dog with her. At pick up, my dog was so happy and I could tell Melanie spoiled my dog and took great care of her. I will be contacting her in the future for dog sitting.



Melanie S.



Sep 5, 2017

**VERIFIED STAY**

ABSOLUTELY AMAZING! Not only did she care for our dogs like they were her own but she kept our house picked up and sent me pictures of her visits! Honestly I cannot believe how great she was! We were out of town getting married and when we got home

She had left a card and gift on the table for us and congratulated us on our marriage. I'd use her every single time---- AMAZING!!!!



Melanie S.



Aug 22, 2017

**VERIFIED STAY**

Melanie is a natural. Brownie didn't even bark when I dropped her off which was a first. She sent plenty of pictures and I felt real comfortable. I am definitely going to use her again. GOOD JOB



Melanie S.



Aug 21, 2017

**VERIFIED STAY**

Melanie did a stellar job of taking care of my baby girl Nova! She sent me several pictures of her everyday and it really assuaged all of my nervousness! My dog is over 10 years old and she has never spent a night out

of my family's care. Understandably, I was nervous about leaving her in the hands of a stranger. However, I could tell that Nova was in good hands as soon as I ...

(Read More)
Melanie did a stellar job of taking care of my baby girl Nova! She sent me several pictures of her everyday and it really assuaged all of my nervousness! My dog is over 10 years old and she has never spent a night out of my family's care. Understandably, I was nervous about leaving her in the hands of a stranger. However, I could tell that Nova was in good hands as soon as I saw Melanie. She had a big smile on her face and was very warm and inviting. She took Nova on quite a few walks and her children were happy to play with her! She took great care of my dog and I can say that I confidently recommend her services! She was also super flexible with the pickup and drop-off times and she allowed me to extend my dog's stay for an additional night which I really appreciated it!



Melanie S.



Aug 19, 2017
It was wonderful to know that my 3 dogs were taken care of and were given walks while we were away on vacation. Our oldest dog, whom is 14, has many fatty tumors and one became very big and bloody before leaving on vacation. Mel treated it and wrapped it to prevent further licking and infection. When we returned it was clean and smaller than before. Thanks for taking care of our mutts!



Melanie S.

ROVER_000014



Aug 9, 2017

VERIFIED STAY

Mel was so freakin awesome . She took my dog in at short notice and love him as if her own . Her dogs where awesome and so cute I would highly recommend her for any service . She sent me picture of my baby each and every day and videos of him making sure I was aware he was safe . She by far the best sitter we've had . Her daughter was awesome ...

(Read More)

Mel was so freakin awesome . She took my dog in at short notice and love him as if her own . Her dogs where awesome and so cute I would highly recommend her for any service . She sent me picture of my baby each and every day and videos of him making sure I was aware he was safe . She by far the best sitter we've had . Her daughter was awesome as well they gave my Henry so much joy. Cudos to her and her daughter for being so awesome to my Henry I will definitely recommend her ?



Melanie S.



Aug 9, 2017

VERIFIED STAY

Melanie did a great job taking care of my girls. This was my first time using Rover and I was very happy with it. Melanie sent me pictures and videos after each drop in, which I received in Rover report cards. I will book Melanie again next time I need a pet sitter.

ROVER_000015



Melanie S.



May 30, 2017

Melanie has always had a huge heart for all animals, especially dogs. Melanie had grown up with dogs her whole life & even took classes to further educate herself in the care of animals. She puts animals ahead of herself & will go above & beyond to make sure the are taken care of. My wife & I have relied on Melanie many times with the care of our dogs while we go out. Whether ...

(Read More)

Melanie has always had a huge heart for all animals, especially dogs. Melanie had grown up with dogs her whole life & even took classes to further educate herself in the care of animals. She puts animals ahead of herself & will go above & beyond to make sure the are taken care of. My wife & I have relied on Melanie many times with the care of our dogs while we go out. Whether its for a few hours or a week, Melanie has proven to us that she is more than capable & fully worthy of our trust with our dogs. I don't think there is anyone else I would ask to look after & care for our dogs. We have had 2 Labs, 3 Ridgebacks, a Weimaraner, 4 Brittany Spanials, and a Terrier. She currently, on occasion, takes care of a Brittany, Terrier and RB for us.



Melanie S.



May 26, 2017

Melanie has always loved dogs since she was born. We raised our daughters with dogs and to her, they are family. We have had twelve dogs and now Melanie and her two children have their own dog, Evee. We have had Labs, Brittany's, Springers, Rhodesian Ridgebacks,Wimmerimmer and Terrior-Queensland mix. Anytime we go on vacation, day trip or the dogs just need some excercise or some TLC, we can count on Melanie. She is capable and ...

(Read More)
Melanie has always loved dogs since she was born. We raised our daughters with dogs and to her, they are family. We have had twelve dogs and now Melanie and her two children have their own dog, Evee. We have had Labs, Brittany's, Springers, Rhodesian Ridgebacks,Wimmerimmer and Terrior-Queensland mix. Anytime we go on vacation, day trip or the dogs just need some excercise or some TLC, we can count on Melanie. She is capable and compassionate with dogs. I definitely recommend Melanie.

Exhibit 5





(/web/20170222201832/https://www.rover.com/?
ref=header)
Terms of Service

Last updated:  January 31, 2017

1. **Acceptance of Terms; Modifications**.  These Terms of Service (the "**Terms**") are a binding legal agreement between you and A Place for Rover, Inc. ("**Rover.com**," "**we**," "**us**" and "**our**").   The Terms govern your use of our software applications, resources and services for pet owners and pet service providers to find each other, communicate with each other, and arrange for the provision of pet care services (collectively, our "**Rover.com Service**").  The Terms govern all use of the Rover.com Service, whether you access it from our website at https://www.rover.com (https://web.archive.org/web/20170222201832/https://www.rover.com/) (the "**Site**"), our mobile applications and mobile websites, our Facebook application, our online or phone support offerings, or any other access point we make available to you. BY ACCESSING OR USING THE ROVER.COM SERVICE, YOU ACCEPT THESE TERMS.  IF YOU DO NOT AGREE WITH THESE TERMS, YOU SHOULD NOT ACCEPT THEM, IN WHICH CASE YOU DO NOT HAVE THE RIGHT TO USE THE ROVER.COM SERVICE.

You understand and agree that we may change the Terms from time to time, and that any such changes will be effective immediately (except as otherwise described in Section 18.9 below) when we post the modified Terms on the Rover.com Service.  Your continued access and use of the Rover.com Service after we post the modified Terms will constitute your consent to be bound by the modified Terms.

2. **Rover.com Service**.

2.1  Nature of the Rover.com Service.  The Rover.com Service consists of a desktop Web application, mobile applications, and other related tools, support and services that pet owners ("**Pet Owners**") and providers of pet-related services ("**Service Providers**") can use to find, communicate with and interact with each other.   The Rover.com Service includes our emergency support services, educational materials for Service Providers, our RoverGO (https://web.archive.org/web/20170222201832/https://www.rover.com/go/) and Rover Match (https://web.archive.org/web/20170222201832/https://www.rover.com/rover-match/) services, our Rover Protection Package (https://web.archive.org/web/20170222201832/https://www.rover.com/protection-package/), and other related services.   We charge fees for some aspects of the Rover.com Service, as described below in Section 10.

2.2  Rover.com does not provide Pet Care Services.  Rover.com is a neutral venue for Service Providers and Pet Owners.  Rover.com is not a Service Provider and, except for emergency phone support and other resources and support specifically described in the Rover.com Service, does not provide pet care services.   We make no representations or warranties about the quality of boarding, pet sitting, dog walking, house sitting, transportation, or other services provided by Service Providers ("**Pet Care Services**"), or about your interactions and dealings with users. Though we provide general guidance on our Site to Service Providers about safety and pet care and to Pet Owners about selecting and engaging Service Providers, Rover.com does not employ, recommend or endorse Service Providers or Pet Owners, and we will not be responsible or liable for the performance or conduct of Service Providers or Pet Owners, whether online or offline. We conduct an initial review of Service Provider applications and we facilitate background checks on Service Providers conducted by a third party, but do not otherwise screen Service Providers or Pet Owners.   You should exercise caution and use your independent judgment before engaging a Service Provider, providing services, or otherwise interacting with users via the Rover.com Service.  Pet Owners and Service Providers are solely responsible for making decisions that are in the best interests of themselves and their pets.  For example, each user of the Rover.com Service is responsible for keeping current his or her own pet's vaccinations, and we will have no liability for anyone's failure to vaccinate his or her pet.

2.3  Release.  **We hereby expressly disclaim, and you hereby expressly release us from, any and all liability whatsoever for any controversies, claims, suits, injuries, loss, harm and/or damages arising from and/or in any way related to your interactions or dealings with other users and the acts and/or omissions of Service Providers and Pet Owners, whether online or offline.  You acknowledge and agree that YOUR USE AND/OR PROVISION OF PET CARE SERVICES IS AT YOUR SOLE AND EXCLUSIVE RISK.**

ROVER_000503

2.4  Transactions are between Pet Owners and Service Providers.  The Rover.com Service may be used to find and offer Pet Care Services and to facilitate payment, but all transactions conducted via the Rover.com Service are between Pet Owners and Service Providers.   Except for the limited refunds of Rover.com's fees described in Section 10.5 and the "Reservation Guarantee" specified in Section 10.5, you agree that Rover.com has no liability for damages associated with Pet Care Services (which may include bodily injury to, or death of, a pet) or resulting from any other transactions between users of the Rover.com Service.

2.5  Bookings.  Pet Owners and Service Providers transact with each other on the Rover.com Service when they both agree to a "booking" that specifies the fees, time period, cancellation policy, and other terms for provision of Pet Care Services (a "**Booking**").  One you complete a Booking, you agree to honor the price and other terms of that Booking.  For more information about Bookings, please visit *https://support.rover.com/hc/en-us/articles/205980546-How-do-I-book-with-a-sitter-or-dog-walker-* (http://web.archive.org/web/20170222201832/https://support.rover.com/hc/en-us/articles/205980546-How-do-I-book-with-a-sitter-or-dog-walker-).

2.6  Pet Owners are Solely Responsible for Evaluating Service Providers.  Pet Owners are solely responsible for evaluating the suitability of Service Providers for the services they offer to provide.  Please visit https://support.rover.com/hc/en-us/articles/203062300-How-do-I-choose-the-right-sitter- (http://web.archive.org/web/20170222201832/https://support.rover.com/hc/en-us/articles/203062300-How-do-I-choose-the-right-sitter-) for guidance about making informed decisions about engaging Service Providers.  Though Rover.com performs a limited review of applications to become Service Providers and offers Service Providers the opportunity to undergo background checks conducted by a third party, any such screening is limited, and Rover.com does not warrant that any such screen is accurate, complete, conclusive or up-to-date.  Similarly, Rover.com does not endorse reviews of Service Providers by other Pet Owners that may be available via the Rover.com Service, and Rover.com makes no commitments that such reviews are accurate or legitimate.

2.7  Abandoned Pets; Re-homing.  Pet Owners who arrange for Pet Care Services and fail to retrieve their pet within seven (7) days after the service period identified in a Booking (or an earlier period required under applicable animal abandonment or cruelty laws) agree that Rover.com (or the Service Provider) may, in its (or his or her) sole discretion, place the pet in foster care and/or notify animal control authorities. Pet Owner agrees to reimburse Rover.com and/or the Service Provider for all costs and expenses associated with such actions.  Further, Rover.com expressly reserves the right, in its sole discretion, to remove a Pet Owner's pet from a Service Provider's care should Rover.com deem it necessary for the safety of a pet, the Service Provider, or any persons living with the Service Provider. Prior to removing a pet from the care of a Service Provider, Rover.com will use reasonable efforts during Rover.com's normal business hours to contact the Pet Owner and/or the Pet Owner's emergency contact (if provided) to arrange alternative care. Should Rover.com not be able to contact the Pet Owner or the emergency contact, Rover.com will use its best judgment to find alternative care for the pet until the Pet Owner is able to retrieve his/her pet.  Pet Owner is responsible for and agrees to pay all costs and expenses incurred by Rover.com in connection with such transfer, including any additional charges for new Bookings.

2.8  Emergencies.  We recommend that Pet Owners give their Service Providers contact information where they can be reached in the event medical care for a pet becomes necessary. Service Providers agree to immediately contact Pet Owners in the event such care becomes necessary or, if contact information for the Pet Owner is not available, to contact Rover.com by phone at 1-888-727-1140 or at trust@rover.com (http://web.archive.org/web/20170222201832/mailto:trust@rover.com).  If you are a Pet Owner, you hereby authorize your Service Provider and Rover.com to obtain and authorize the provision of veterinary care for your pet if you cannot be reached to authorize care yourself in an emergency situation. Pet Owners are solely responsible for the costs of any such medical treatment for pets and, if you are a Pet Owner, you hereby authorize Rover.com to charge your credit card or other payment method for such costs. In certain circumstances, Pet Owner may be eligible for reimbursement through insurance coverage, as more fully described in Section 8.

2.9  Consultation Services.  Rover.com may offer Pet Owners and Service Providers phone, chat, or email veterinary consultation services from a third party to provide an educational resource for decisions you make about your own pets or pets in your care.  These consultation services are provided by a third party, and are not a part of the Rover.com Service.  If you use these third party consultation services, you should use them only in conjunction with, and not as a substitute for, professional veterinary care.

3.  **Eligibility.**  By accessing and using the Rover.com Service, you certify (1) that you are 18 years of age or older, and (2) that, if you are registering to be a Service Provider, you are legally eligible to work in the jurisdiction where you will provide Pet Care Services, you have complied and will comply with all federal, state, county, municipal and other laws, statutes and ordinances that are applicable to you, and you have obtained all business licenses, permits, and fulfilled any other necessary requirements to legally provide Pet Care Services. You acknowledge that Rover.com is entitled to rely on these commitments, and is not responsible to ensure that all users have met these eligibility conditions.

4.  **Use of the Rover.com Service; Suspension.**

ROVER_000504

4.1  Your Conduct on the Rover.com Service.  When you use the Rover.com Service, you agree:

- To use the Rover.com Service only in a lawful manner and only for its intended purposes.
- Not to submit viruses or other malicious code to or through the Rover.com Service.
- Not to use the Rover.com Service, or engage with other users of the Rover.com Service, for purposes that violate the law.
- Not to use the Rover.com Service to arrange for the provision and purchase of services with another user of the Rover.com Service, then complete a payment transaction for those services offline.
- Not to post reviews about Service Providers that aren't based on your personal experience, that are intentionally inaccurate, or that violate these Terms.
- Not to post content or materials that are pornographic, threatening, harassing, abusive, or defamatory, or that contain nudity or graphic violence, incite violence, violate intellectual property rights, or violate the law or the legal rights (for example, privacy rights) of others.
- Not to post "spam" or other unauthorized commercial communications.
- To use the Rover.com Service only for your own purposes, and not to impersonate any other person.
- Not to transfer or authorize the use of your account for the Rover.com Service by any other person.
- Not to provide false information in your profile on, or registration for, the Rover.com Service.
- Not to interfere with our provision of, or any other user's use of, the Rover.com Service.
- Not to solicit another user's username and password for the Rover.com Service.

4.2  Suspension and Termination.  You understand and agree that we have no obligation to provide the Rover.com Service to you, nor any obligation to continue providing it once we have begun.  If we believe your conduct on the Site or Rover.com Service is inappropriate or violates these terms, and for any other reason (or no reason at all), we reserve the right to suspend or terminate your access to the Rover.com Service in our sole discretion.

5. **Registration; Account Security**.  In order to use some aspects of the Rover.com Service, you will be required to create a username, password, and user profile.  If you elect to use the Rover.com Service, you agree to provide accurate information about yourself and keep this information up-to-date.  You agree not to impersonate anyone else.  You are responsible for maintaining the confidentiality of your username and password for the Rover.com Service, and you agree not to authorize anyone else to use your username and password.  You are responsible for all activity under your account.  You agree to notify us promptly of any unauthorized use of your account.

6. **Privacy**.  Our collection and use of your personal information on the Rover.com Service is described in our Privacy Policy (https://web.archive.org/web/20170222201832/https://www.rover.com/privacy/).

7. **Your Content**.

7.1  Your Content.  We may require or allow you (or someone else on your behalf) to submit or upload text, photographs, images, videos, reviews, information and materials to your profile on the Rover.com Service or otherwise in connection with using the Rover.com Service and/or participating in promotional campaigns we conduct on the Site (collectively, "**Your Content**").  For example, Service Providers are invited to create a profile page with a photograph and other information to allow Pet Owners to find, evaluate and contact them, while Pet Owners have the opportunity to submit reviews of Service Providers.

7.2  License.   Except for the limitations on our use and disclosure of personal information described in our Privacy Policy (https://web.archive.org/web/20170222201832/https://www.rover.com/privacy/), you grant Rover.com an irrevocable, perpetual, non-exclusive, fully paid worldwide license to use, copy, perform, publicly display, reproduce, adapt, modify, transmit, broadcast, prepare derivative works of, and/or distribute Your Content in connection with providing and/or promoting the Rover.com Service, and to sublicense these rights to third parties.

7.3  Release.  If your name, voice, image, persona, likeness, or performance is included in any of Your Content, you hereby waive, and release Rover.com and its users from, any claim or cause of action, whether known or unknown, for defamation, copyright infringement, invasion of the rights of privacy, publicity, or personality, or any similar claim arising out of the use of Your Content in accordance with the license in Section 7.2 and the other provisions of these Terms.

7.4  Your Representations and Warranties about Your Content.  You represent and warrant that (1) you are the owner or licensor of Your Content, and that you have all rights, consents and permissions necessary to grant the license in Section 7.2 and make the release in Section 7.3 with respect to Your Content, (2) that you have any necessary consents and releases from individuals who appear or whose pets appear in Your Content; and (3) Your Content does not violate the law or these Terms.

ROVER_000505

7.5  Right to Remove or Screen Your Content.  Though we are not obligated to do so, we reserve the right to monitor, screen, edit and/or remove Your Content on the Rover.com Service.    Our enforcement of these Terms with respect to Your Content is at our discretion, and failure to enforce the Terms in one instance does not create a waiver of your right to enforce them in another instance.   We have no obligation to retain or provide you with copies of Your Content, nor will we have any liability to you for any deletion, disclosure, loss or modification to Your Content.  It is your sole responsibility to maintain backup copies of Your Content.

7.6  Reviews.  If you are a Service Provider, we have no obligation to provide you with the content of any reviews about you submitted by other users of the Rover.com Service, whether before or after termination of your account for the Rover.com Service.  We will have no liability to you for any deletion, disclosure, loss or modification of these reviews. We reserve the right to screen, edit or remove these reviews from the Rover.com Service at any time.

   8.  **Rover.com Insurance Program**.

8.1  Insurance Program.  For Pet Care Services booked through Rover.com, Rover.com offers the insurance program described in this Section 8 (the "**Insurance Program**").  Except to the extent prohibited by law in your jurisdiction, Rover.com may modify or terminate the Insurance Program at any time in the manner described in Section 1 above, in which case we will (a) notify you of such changes via the email address you have provided, and (b) permit claims that were eligible for coverage prior to termination or modification to continue being processed.  Further, unless and until we refer a claim directly to our third party insurer for processing as described in this Section 8, we may determine in our good faith discretion whether your claim meets the conditions for coverage under the Insurance Program.  Access to the Insurance Program is not available in jurisdictions where prohibited by law.

8.2  Coverage for Pet Veterinary Care.

(a) *Veterinary Care for Pets*.  Subject to the deductibles and coverage limits described in Section 8.2(b), the eligibility conditions in Section 8.2(c), the exclusions from coverage in Section 8.2(d), and the general limitations on the Insurance Program and policy conditions, the Insurance Program includes access to an insurance policy issued by a third party (the "**Third Party Policy**") for reimbursement of verifiable veterinary expenses for (1) injuries to the Pet Owner's pet while in a Service Provider's care or control and (2) injuries to a Service Provider's own resident pets that resulted directly from contact with a Pet Owner's pet in the Service Provider's care or control.

(b) *Deductibles, Coverage Amounts*.  A deductible may apply to covered incidents.  This deductible is payable by the Pet Owner where the claim concerns the Pet Owner's pet, and by the Service Provider where the claim concerns the Service Provider's pet.  Coverage is limited to $25,000 per occurrence.  If you submit a covered claim which is subject to a deductible you agree to reimburse Rover or otherwise contribute if requested. No user will be requested to reimburse or contribute more than $250 for a covered incident. Additionally, Rover may agree to voluntarily reimburse for uncovered events (we love you and your pet). No user will be requested to reimburse or contribute more than $250 for a voluntarily reimbursed incident.

(c)  *Eligibility Conditions*.  To be eligible for coverage under our Insurance Program, the following conditions must be met:

(i) the injury must have occurred during the scheduled start and end dates of a Booking accepted by the Service Provider and Pet Owner prior to the day of the injury (note that injuries sustained during a pre-Booking "meet & greet" are therefore not eligible for coverage);

(ii) payment for the Booking during which the injury occurred must be completed;

(iii) you must notify Rover.com of your claim via email (trust@rover.com) or telephone (1-888-727-1140) during the Booking (or, if later, within 48 hours following the injury);

(iv) within 14 days following the injury, you must submit written documentation from a board-certified practicing veterinarian that (a) specifies the costs incurred for which reimbursement is sought, (b) confirms that the injury did not result from an illness, breed-specific condition or pre-existing condition, (c) confirms that the injury occurred during the time period of the Booking, and (d) providing any other information we or our insurer reasonably request to evaluate the claim; and

(v) all costs and expenses for which reimbursement is sought must be incurred and paid within 30 days following the date of the injury.

(d)  *Exclusions from Coverage*.  The following are not eligible for coverage:

(i) any costs incurred more than 30 days following the injury, including without limitation long-term care costs that results from the injury; and

(ii) injuries resulting from a pet's contraction of fleas, ticks or parasites during a Booking (or a recurrence of a flea, tick or parasite issue first contracted prior to a Booking);

ROVER_000506

7/17/2020                                                      Terms of Service

(iii) injuries resulting from (or from a recurrence of) a Pre-Existing Condition, Breed-Specific Condition, Chronic Condition, Orthopedic Condition, Undetermined Cause Illness, Preventable Illness or Protopsis (as such terms are defined in Section 8.2(e) below);

(iv) costs or expenses resulting from pregnancy, illness, or recurrence of an illness to a pet;

(v) any costs or expenses other than those resulting from injury to the Pet Owner's or Service Provider's pet, including without limitation those resulting from (a) personal injury to the Service Provider, Pet Owner, or any third party, (b) property damage or liability, (c) injury to any other pet, or (d) loss of wages, canceled travel plans, or any other incidental expenses;

(vi) non-medical expenses of any kind (including professional training); and

(vii) costs associated with the death of a pet.

(viii) Other limitations may apply.

(e)  *Key Definitions.*  Capitalized terms used above in this Section 8 have the following meanings:

(i) "**Pre-Existing Condition**" means any injury, disease or condition, whether diagnosed by a veterinarian or not, that affected a pet prior to a Booking, including without limitation respiratory infections, urinary tract/bladder infections, blood disorders, periodontal/dental disease, and vomiting, diarrhea, and other gastrointestinal disorders.

(ii) "**Breed-Specific Condition**" means any condition that frequently occurs in a particular breed of dog, including without limitation brachycephalic syndrome (common in Pekingese, Bulldogs, French Bulldogs, Pugs, Chow Chows, Boston Terriers and others), hip and/or elbow dysplasia (common in Afghan Hounds, Beagles, Border Collies, Chow Chows, Golden Retrievers, German Shepherds, Great Danes, Labrador Retrievers, and others), Hypothyroidism (common in Bulldogs, Border Collies, Boston Terriers, Poodles, Great Danes, English Setters, and Standard Schnauzers and others, especially large breeds), intervertebral disc disease (IVDD) (common in Beagles, Cocker Spaniels, English Setters, French Bulldogs, Pekingese, Pugs and others), other disc issues (common in Basset Hounds, Bulldogs, Corgis, Dachshunds, Pomeranians, Corgis, Pugs and others), patellar luxation (common in Boston Terriers, Cavalier King Charles, Chihuahuas, Pomeranians, Poodles, Yorkshire Terriers and others, especially small breeds) Gastric dilatation and Volvulus, otherwise known as Bloat (common in Great Danes, German Shepherds, St. Bernard, Labrador Retriever, Irish Wolfhound, Great Pyrenees, Boxer, Weimaraner, Old English Sheepdog, Irish Setter, Collie. Bloodhound, Standard Poodle and others).

(iii) "**Chronic Condition**" means an illness or condition that is persistent or otherwise has long-lasting effects and that generally cannot be prevented by vaccines or cured by medication, including without limitation allergies, hot spots, ear infections, cancer, diabetes, IBD (inflammatory bowel disease), Addison's disease, Cushing's disease, dry eyes (KCS), epilepsy, glaucoma, hypothyroidism or hyperthyroidism, lipomas and skin masses, and urinary or bladder crystals or blockage.

(iv) "**Orthopedic Condition**" means a disorder of the musculoskeletal system and any associated muscles, joints, and ligaments. This includes but is not limited to arthritis, IVDD & cruciate ligament tears, biceptal tenosynovitis, elbow dysplasia, hip dysplasia, fragmented medial coronoid process of the ulna (FMCP), orthopedic illness or injury on the opposite side of a prior injury, osteochondrosis (OCD), osteosarcoma and other orthopedic cancers, patellar luxation, and ununited anconeal process (UAP).

(v) "**Undetermined Cause Illness**" means any condition for which the cause is undetermined or any condition that amounts to a "diagnosis of exclusion," including without limitation autoimmune conditions, Hemorrhagic Gastroenteritis, Pancreatitis, Stress related symptoms, Enteric Coronavirus, Cardiac disease, Bordetellosis ("kennel cough"), Canine parvovirus infection ("parvo"), Distemper, Canine influenza, Gastrointestinal disease, any form of cancer and Immune Mediated Hemolytic Anemia.

(vi) "**Preventable Illness**" means any illness or condition that could have been prevented by vaccination or normal veterinary care, including without limitation Rabies, Canine parvovirus infection ("parvo"), Leptospirosis, Distemper, Adenovirus2, Parainfluenza, Enteric Coronavirus, Canine Influenza, Lyme disease, Bordetellosis ("kennel cough"), Heartworm disease, Intestinal worms, Mange, and Staphylococci.

(vii) "**Proptosis**" means the displacement of an eye out of the eye socket, typically occurring following trauma to the head.

8.3  Liability Insurance.

(a)  *Coverage.*  Subject to the deductible and coverage limits described in Section 8.3(b), the eligibility conditions in Section 8.3(c), the exclusions from coverage in Section 8.3(d) and the general limitation of the Insurance Program in Section 8.4, the Insurance Program provides coverage for damages that the Service Provider becomes legally obligated to pay for (1) bodily injury to anyone other than the

ROVER_000507

Service Provider, the Pet Owner, or someone directly related to (or residing with) the Service Provider or Pet Owner, (2) injury to a pet owned by a third party, or (3) property damage to the Pet Owner's personal property (other than injury or damage to his or her pet) or any third party's personal property. Other limitations may apply.

(b) *Deductibles, Coverage Amounts.* A deductible may apply to covered incidents. If you submit a covered claim which is subject to a deductible you agree to reimburse Rover or otherwise contribute if requested. No user will be requested to reimburse or contribute more than $250 for a covered incident. Additionally, Rover may agree to voluntarily reimburse for uncovered events (we love you and your pet). No user will be requested to reimburse or contribute more than $250 for a voluntarily reimbursed incident. Coverage is limited to $3,000,000 per occurrence and $4,000,000 in the aggregate.

(c) *Eligibility Conditions.* In order to be eligible for coverage under our Insurance Program, the following conditions must be met:

(i) the damages must have occurred during the scheduled start and end dates of a Booking accepted by the Service Provider and Pet Owner through the Rover.com Service prior to the day of the injury;

(ii) if you are a Pet Owner, you must have completed payment for the Booking during which the injury occurred in order to recover under the Insurance Program; and

(iii) you must notify Rover.com of your claim via email or telephone during the Booking (or, if later, within 48 hours following the injury).

(d) *Exclusions from Coverage.* The following are not eligible for coverage: (i) loss due to theft (by the Service Provider or anyone else), (ii) personal injury to the Pet Owner, Service Provider, or anyone related to or living with the Pet Owner or Service Provider, or (iii) property damage to the Pet Owner's own personal property caused by his or her pet. Other limitations may apply.

8.4   General Limitations on Coverage.

(a) If a Service Provider cedes care, custody or control of a pet to another person or party during the service period for a Booking, no coverage is available to that Service Provider under the Insurance Program for injuries to pets or damages that occur during the period in which care, custody or control was ceded. If, during the service period for a Booking, a Pet Owner instructs or otherwise causes a Service Provider to relinquish the Pet Owner's pet to a third party, coverage for injuries or damage during that Booking may be unavailable.

(b) Damages must have occurred during the scheduled start and end dates of a Booking accepted by the Service Provider and Pet Owner through the Rover.com Service prior to the day on which the damages occurred (note that damages sustained during a pre-Booking "meet & greet" are therefore not eligible for coverage).

(c) Personal injury to the Service Provider or anyone related to or living with the Service Provider are not covered by the Insurance Program. Similarly, property damage to property of the Service Provider or anyone related to or living with the Service Provider is not covered.

(d) Other limitations may apply.

8.5   Legal Compliance. Service Providers are solely responsible for carrying insurance sufficient to comply with legal requirements in the jurisdictions where Service Providers provide services. Rover.com makes no commitment that the Insurance Program will suffice for that purpose. Rover.com does not verify whether Service Providers have obtained insurance, and Pet Owners are advised to inquire directly with Service Providers about this subject.

8.6   Termination in the Event of Suit. You acknowledge and agree that all rights and benefits granted to you under the Insurance Program shall immediately terminate in the event you initiate any action, suit or claim against Rover.com, or its officers, directors, employees, contractors, agents, or affiliates, concerning a claim otherwise subject to coverage under the Insurance Program.

9.   **Location Information; Consent to Communications.** The Rover.com Service's mobile applications may implement location features that, if you consent, result in automatic collection of your geolocation information, in which case our mobile application may use such information to allow users to determine which other users are nearby. We may also use this location information to provide information and advertising. IF YOU WANT TO STOP THE AUTOMATIC COLLECTION OF YOUR LOCATION INFORMATION, YOU MAY DO SO BY USING THE PRIVACY SETTINGS IN OUR MOBILE APPLICATION AND/OR ON YOUR DEVICE, OR BY UNINSTALLING OUR MOBILE APPLICATION.

You consent to Rover.com communicating with you about the Rover.com Service by SMS, text message, email and other electronic means. Your carrier's normal, messaging, data and other rates and fees will apply to these communications.

10.   **Fees & Payment**.

ROVER_000508

Terms of Service

10.1 Fees for Pet Owners.  Pet Owners may purchase Pet Care Services from a Service Provider by completing a Booking as described in Section 2.5.  If you are a Pet Owner, you enter into a transaction with the Service Provider when you accept a Booking, and you agree to pay the total fees indicated in the Booking.  Fees for Pet Care Services are determined by Service Providers.  As described in Section 10.3, the total amount Pet Owners are charged for a Booking may also include a service fee payable to Rover.com.  Where required by law, the amount charged may also be inclusive of applicable taxes.  The Service Provider, not Rover.com, is responsible for performing the Pet Care Services.

10.2  Fees for Service Providers.  Service Providers may agree to provide Pet Care Services to a Pet Owner by agreeing to a Booking as described in Section 2.5.  If you are a Service Provider, you must confirm the Booking before it expires or the Pet Care Owner will have no obligation to complete the transaction.  Once the Booking is completed by both parties, you agree to honor the price set forth in your Booking.  The purchase of Pet Care Services is a transaction between the Pet Owner and the Service Provider.  Rover.com's role is to facilitate payments from Pet Owners to Service Providers as an agent for the Service Provider.  We collect payment from the Pet Owner at the time of Booking and (except to the extent of any payment hold pursuant to Section 10.6) remit payment to the Service Provider's account on the Rover.com Service 48 hours after completion of the service period indicated in the Booking.   Service Providers are charged a service fee as described in Section 10.3, which we deduct before remitting payment to Service Providers.

10.3  Service Fees.  We charge service fees for some aspects of the Rover.com Service.   If you are a Service Provider, our service fee is calculated as a percentage of the fees a Pet Owner agrees to pay in a Booking.  We deduct this service fee from the amounts paid by the Pet Owner.  Our service fees are described here (https://web.archive.org/web/20170222201832/https://support.rover.com/hc/en-us/articles/205385304-What-are-the-service-fees-).

10.4  Late Fees and Additional Charges.  If you are a Pet Owner, you acknowledge and agree that, if you fail to retrieve your pet at the end of the service period agreed in a Booking, you will be charged a late pickup fee for each partial late day at the daily rate established in the Booking.  In addition, you agree to indemnify Rover.com from, and agree that we may charge your credit card or other payment method for, any additional costs and expenses we or the Service Provider incur as a result of your failure to retrieve your pet at the end of the service period agreed in a Booking.

10.5  Cancellations and Refunds.

- *Cancellations by Service Provider*.  If a Service Provider cancels a Booking prior to or during the service period identified in the Booking, we will refund the fees paid by the Pet Owner for Pet Care Services not provided, as well as any service charge paid to Rover.com.  Service Provider cancellations are taken seriously.  If you are a Service Provider, you acknowledge that cancellation by you may result in a review of your account and, if we deem it appropriate, suspension or termination of your access to the Rover.com Service.
- *Reservation Guarantee*.  As more fully described on Rover.com's Reservation Guarantee (https://web.archive.org/web/20170222201832/https://www.rover.com/reservation-guarantee/) page, Rover.com uses all reasonable efforts to find replacement Service Providers when Service Providers cancel Bookings near the start date of the service period identified in the Booking.  The availability of the Reservation Guarantee depends on the timing of the cancellation and the type of Pet Care Services provided; consult the Reservation Guarantee (https://web.archive.org/web/20170222201832/https://www.rover.com/reservation-guarantee/) page for details. Generally, if the Reservation Guarantee applies and a Pet Owner accepts a new Booking with a replacement Service Provider, Rover.com will (with the limited exceptions described below) pay the cost difference between the original Booking and the new Booking, up to but not exceeding 25% of the total cost of the original Booking.  However, if a Booking is cancelled by a Service Provider due to the Pet Owner's failure to provide accurate or complete information regarding the pet or due to the pet's aggressive behavior, the Pet Owner is responsible for the full cost of any new reservation.
- *Cancellations by Pet Owner*.  If a Pet Owner cancels a Booking prior to or during the service period specified in a Booking, we will refund fees in accordance with the cancellation policy selected by the Service Provider on the Rover.com Service.  All Service Providers are required to select a cancellation policy prior to completing a Booking so that Pet Owners are aware of the cancellation policy prior to Booking.
- *Refunds for Substandard Services*.  If we determine in our reasonable discretion that a Service Provider has failed to provide Pet Care Services in accordance with our guidelines and policies on the Site or these terms then we may, in our reasonable discretion, cancel a Booking and issue a full or partial refund to a Pet Owner.
- *General Terms for Cancellations*.  If you wish to cancel a Booking, you should use the mechanisms available through the Rover.com Service to do so. For purposes of the policies and terms in this Section 10.5, the date of cancelation is the date a user cancels through the Rover.com Service, regardless of any separate communications between users outside of the Rover.com Service.

ROVER_000509

<span style="float:right">Terms of Service</span>

- *Payment Disputes; Payment Outside of the Rover.com Service.* Rover.com issues payments to Service Providers 48 hours after completion of a Booking. Once these amounts have been disbursed, any further payment dispute are between the Pet Owner and Service Provider, and Rover.com has no obligation to mediate or facilitate any resolution. Further, Rover.com has no responsibility or liability with respect to any tips, bonuses, or other payments made outside of the Rover.com Service.

10.6  Payment Holds.  If you are a Service Provider, we may issue a hold on amounts otherwise payable to you pursuant to Section 10.2 under the circumstances described in our Payment Hold Policy (https://web.archive.org/web/20170222201832/https://support.rover.com/hc/en-us/articles/202838244-How-do-I-get-paid-for-bookings-and-when-).  We may also recommend that third party payment service providers restrict your access to funds in your account under the same circumstances.

10.7  Authorization to Charge.   When you pay for Pet Care Services or for other services on the Rover.com Service, you will be required to provide us with valid, up-to-date credit card or other payment information. You authorize us to charge your credit card or other payment method for fees you incur on the Rover.com Service as they become due and payable. You are responsible for maintaining up-to-date payment information. If we cannot charge you for fees when due because your payment information is no longer valid, or if we do not receive your payment when due, then you understand that neither Rover.com nor the Service Provider will be responsible for any failure to provide services associated with those fees.  Except as expressly provided in these Terms, all fees paid via the Rover.com Service are non-refundable once paid.  Except for our income taxes and gross receipts taxes, you acknowledge that you are responsible to pay any taxes that arise as a result of your purchase, provision, or use of services via the Rover.com Service.

11. **Background Checks**.

Rover.com may provide Service Providers with access to third party consumer reporting agencies that perform, among other things, criminal records checks, sex offender registry checks, motor vehicle records checks and identification verifications (collectively, "**Background Checks**").   We do not provide, and are not responsible or liable in any manner for, the Background Checks, and we do not endorse or make any representations or warranties regarding the reliability of such Background Checks or the accuracy, timeliness or completeness of any information in the Background Checks. We do not independently verify information in the Background Checks.

If you opt via the Rover.com Service to undergo a Background Check, you hereby consent to the collection, use and disclosure of the information in the Background Checks. You understand and agree that Rover.com may, in its sole discretion, review and rely on the information in the Background Checks in deciding whether to suspend or terminate or investigate a complaint about a Service Provider, but also that we are not obligated to do so, and are not responsible or liable in any way in the event that any information in any Background Check is not accurate, timely or complete. If you are the subject of a Background Check, you may contact the applicable third-party consumer reporting agency to dispute the accuracy, timeliness or completeness of such information. Rover.com reserves the right to suspend or terminate your access to the Rover.com Service based on information in the Background Checks or for any other reason, or no reason, in our sole discretion.

**Pet Owners remain fully liable to evaluate and investigate Service Providers.  Be aware of the following limitations in Background Checks: Except as otherwise expressly provided in these Terms or through the Service, Rover.com does not automatically run Background Checks on any Users. Records not available to third-party Background Checking agencies will not be included in the results. Not all arrest logs and records, conviction and correction records, sex offender registries and motor vehicle records are available in all jurisdictions. In many jurisdictions there is a delay before arrest logs and records, conviction and correction records, sex offender registries and motor vehicle records are included in Background Checks. Juvenile records and offenses for minors may not appear in the public record and are therefore not included in the results. Dismissed cases, arrests not resulting in convictions, arrests or convictions from foreign countries and nolle pros will not be reported. Traffic violations are not included unless a jurisdiction reports them as criminal offenses. In the jurisdictions where traffic violations are reported as criminal offenses, such traffic violations may be included in the results as misdemeanors or felonies.**

12. **Copyright Infringement**.

If you believe in good faith that your copyrighted work has been infringed by content posted on the Rover.com Service, please provide our designated copyright agent with a written notice that includes all of the following information:

- A description of the copyrighted work you believe to have been infringed;
- A description of the URL or other location on our Site of the material you believe to be infringing;
- Your name, mailing address, telephone number and email address;
- A statement that you have a good faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law;

ROVER_000510

- A statement by you, which you make under penalty of perjury, that the above information in your notice is accurate, and that you are the copyright owner or authorized to act on the copyright owner's behalf; and
- An electronic or physical signature of the person authorized to act on behalf of the copyright owner.

Our designated agent for notice of copyright infringement can be reached at:

A Place for Rover, Inc.

Attention: Copyright Notice

2101 4th Ave., Suite 400 Seattle, WA 98121

copyright@rover.com (https://web.archive.org/web/20170222201832/mailto:copyright@rover.com)

13. **Third Party Services, Links**.  The Rover.com Service may contain links to third party websites or resources. You acknowledge and agree that we are not responsible or liable for: (i) the availability or accuracy of such websites or resources; or (ii) the content, products, or services on or available from such websites or resources. Links to such websites or resources do not imply any endorsement of such websites or resources, or the content, products, or services available from such websites or resources. You acknowledge sole responsibility for and assume all risk arising from your use of any such websites or resources.

14. **Indemnity**.  YOU AGREE TO DEFEND, INDEMNIFY AND HOLD ROVER.COM HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, LOSSES, EXPENSES, DAMAGES AND/OR LIABILITIES, INCLUDING REASONABLE ATTORNEYS' FEES AND COURT COSTS, THAT ARE IN ANY WAY RELATED TO YOUR: (1) transactions and interactions, online or offline, with other users of the Rover.com Service; (2) breach of these Terms; (3) disputes with other users of the Rover.com Service; (4) your misstatements, misrepresentations, or violation of applicable law; (5) property damage or personal injury to third parties caused by your pet or pets in your care; (6) Your Content; or (7) your use of any Background Check information in violation of the Fair Credit Reporting Act (FCRA).  YOU FURTHER AGREE THAT YOU WILL COOPERATE WITH US IN THE DEFENSE OF SUCH CLAIMS. WE RESERVE THE RIGHT TO ASSUME THE EXCLUSIVE DEFENSE AND CONTROL OF ANY MATTER SUBJECT TO INDEMNIFICATION UNDER THIS SECTION, AND YOU WILL NOT SETTLE ANY SUCH CLAIM OR MATTER WITHOUT OUR ADVANCE WRITTEN CONSENT.

15. **Intellectual Property**. Rover.com and its licensors retain all right, title and interest in and to the Rover.com Service, the technology and software used to provide it, all electronic documentation and content available through the Rover.com Service (other than Your Content), and all intellectual property and proprietary rights in the Rover.com Service and such technology, software, documentation and content.  Except for your rights to access and use the Rover.com Service set forth in these Terms, nothing in these Terms licenses or conveys any of our intellectual property or proprietary rights to anyone, including you.  You agree that we will have a perpetual right to use and incorporate into the Rover.com Service any feedback or suggestions for enhancement that you provide to us concerning the Rover.com Service, without any obligation of compensation.

16. **Warranty Disclaimer for the Rover.com Service**.  The information and materials found on the Rover.com Service, including text, graphics, information, links or other items, are provided "as is" and "as available." Reviews, profiles, advice, opinions, statements, offers, or other information or content made available through the Rover.com Service, but not directly by Rover.com, are those of their respective authors, who are solely responsible for such content. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ROVER.COM DOES NOT: (1) WARRANT THE ACCURACY, ADEQUACY OR COMPLETENESS OF INFORMATION AND MATERIALS ON THE ROVER.COM SERVICE; (2) ADOPT, ENDORSE OR ACCEPT RESPONSIBILITY FOR THE ACCURACY OR RELIABILITY OF ANY OPINION, ADVICE, OR STATEMENT MADE BY ANY PARTY OTHER THAN ROVER.COM; (3) WARRANT THAT YOUR USE OF THE SERVICES WILL BE SECURE, FREE FROM COMPUTER VIRUSES, UNINTERRUPTED, ALWAYS AVAILABLE, ERROR-FREE OR WILL MEET YOUR REQUIREMENTS, OR THAT ANY DEFECTS IN THE ROVER.COM SERVICE WILL BE CORRECTED. TO THE EXTENT PERMITTED BY APPLICABLE LAW, ROVER.COM EXPRESSLY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO THE ROVER.COM SERVICE, AND SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, AND ACCURACY. IN ADDITION AND WITHOUT LIMITING THE FOREGOING, WE MAKE NO REPRESENTATION OR WARRANTY OF ANY KIND, WHETHER EXPRESS OR IMPLIED, REGARDING THE SUITABILITY OF ANY SERVICE PROVIDER THAT OFFERS PET CARE SERVICES VIA THE ROVER.COM SERVICE.

17. **Limitation of Liability**

17.1  Exclusion of Certain Types of Damages**.** In no event will Rover.com be liable to you for any indirect, special, incidental, or consequential damages, losses or expenses that arise out of or relate to the use of or inability to use the Rover.com Service, including without limitation damages related to any information received from the Rover.com Service, removal of your profile information or review (or other content) from the Rover.com Service, any suspension or termination of your access to the Rover.com Service, or any failure error,

ROVER_000511

omission, interruption, defect, delay in operation or transmission of the Rover.com Service, even if we are aware of the possibility of any such damages, losses or expenses. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

17.2  Limit on Our Liability to You.  EXCEPT FOR THE LIMITED REIMBURSEMENT DESCRIBED IN SECTION 8.1 AND THE REFUND AMOUNTS PAYABLE BY ROVER.COM THAT ARE SET FORTH IN SECTION 10, IN NO EVENT WILL ROVER.COM'S AGGREGATE LIABILITY TO YOU OR ANY THIRD PARTY IN ANY MATTER ARISING FROM OR RELATING TO THE ROVER.COM SERVICE OR THESE TERMS EXCEED THE AMOUNTS PAID BY YOU TO ROVER.COM (SPECIFICALLY EXCLUDING AMOUNTS PAID TO SERVICE PROVIDERS VIA THE ROVER.COM SERVICE) DURING THE TWELVE (12) MONTHS PRECEDING THE EVENT THAT GAVE RISE TO LIABLITY OR, IF YOU HAVE NOT PAID ROVER.COM FOR THE USE OF ANY SERVICES, THE AMOUNT OF $100.00.

17.3  No Liability for non-Rover.com Actions. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL ROVER.COM BE LIABLE FOR ANY DAMAGES WHATSOEVER, WHETHER DIRECT, INDIRECT, GENERAL, SPECIAL, COMPENSATORY, AND/OR CONSEQUENTIAL, ARISING OUT OF OR RELATING TO THE CONDUCT OF YOU OR ANYONE ELSE IN CONNECTION WITH THE ROVER.COM SERVICE, INCLUDING WITHOUT LIMITATION, BODILY INJURY, EMOTIONAL DISTRESS, AND/OR ANY OTHER DAMAGES RESULTING FROM RELIANCE ON INFORMATION OR CONTENT POSTED ON OR TRANSMITTED THROUGH THE ROVER.COM SERVICE, OR FOR ANY INTERACTIONS WITH OTHER USERS OF THE ROVER.COM SERVICE, WHETHER ONLINE OR OFFLINE. THIS INCLUDES ANY CLAIMS, LOSSES OR DAMAGES ARISING FROM THE CONDUCT OF USERS WHO ATTEMPT TO DEFRAUD OR HARM YOU.

### 18.  Arbitration Agreement.

18.1 Arbitration Agreement; Claims.   This Section 18 is referred to as the "**Arbitration Agreement**" in these Terms.  Unless you opt out of the Arbitration Agreement in accordance with the procedure described in Section 18.9 below, you agree that any and all disputes or claims that arise between you and Rover.com relating to the Rover.com Service, interactions with others on the Rover.com Service, and/or these Terms (including any alleged breach of these Terms) (all such disputes and claims, "**Claims**") will be resolved exclusively as set forth in this Arbitration Agreement.

18.2  Mandatory Arbitration.  Unless you opt out of the Arbitration Agreement in accordance with the procedure described in Section 18.9 below, you agree that any and all Claims will be resolved exclusively **on an individual basis through final and binding arbitration, rather than in a court,** in accordance with this Arbitration Agreement, except that you may assert individual claims in small claims court if your claims qualify. This means that, unless you have opted out of the Arbitration Agreement in accordance with the procedure described in Section 18.9 or you have asserted a qualifying individual Claim in small claims court, **your rights in connection with all Claims will be determined by a neutral arbitrator, not by a judge or jury.** The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement.

18.3 Prohibition of Class and Representative Actions and Non-Individualized Relief.  **YOU AND ROVER.COM AGREE THAT, UNLESS YOU OPT OUT OF THE ARBITRATION AGREEMENT IN ACCORDANCE WITH SECTION 18.9 BELOW, EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR PROCEEDING. UNLESS BOTH YOU AND ROVER.COM AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN MORE THAN ONE PERSON'S OR PARTY'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR MAY AWARD RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S). ANY RELIEF AWARDED CANNOT AFFECT OTHER ROVER.COM USERS.**

18.4  Pre-Arbitration Dispute Resolution.  Before you commence arbitration, we suggest that you contact us to explain your complaint. Our preference will always be to resolve complaints amicably and efficiently, without the need for arbitration. You may contact us via email at legal@rover.com (https://web.archive.org/web/20170222201832/mailto:legal@rover.com) or by mail at A Place for Rover, Inc., Attn:  Legal, 2101 4th Ave., Suite 400, Seattle, WA 98121.

18.5  Arbitration Procedures.  Arbitration will be conducted by a neutral arbitrator in accordance with the American Arbitration Association's ("AAA") rules and procedures, including the AAA's Supplementary Procedures for Consumer-Related Disputes (collectively, the "AAA Rules"), as modified by this Arbitration Agreement. For information on the AAA, please visit its website, http://www.adr.org (https://web.archive.org/web/20170222201832/http://www.adr.org/). Information about the AAA's Rules and fees for consumer disputes can be found at the AAA's consumer arbitration page: http://www.adr.org/consumer_arbitration (https://web.archive.org/web/20170222201832/http://www.adr.org/consumer_arbitration). If there is any inconsistency between the AAA Rules and this Arbitration Agreement, the terms of this Arbitration Agreement will control unless the arbitrator determines that the

ROVER_000512

application of the inconsistent Arbitration Agreement terms would not result in a fundamentally fair arbitration. The arbitrator must also follow the provisions of these Terms as a court would, including without limitation, the limitation of liability provisions in Section 17. Although arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings, the arbitrator can award the same damages and relief on an individual basis that a court can award to an individual under the Terms and applicable law. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons.

To commence an arbitration against Rover.com, you must complete a short form, submit it to the AAA, and send a copy to Rover.com at A Place for Rover, Inc., Attn: Legal, 2101 4th Ave., Suite 400, Seattle, WA 98121. For more information, see the AAA's claim filing page, http://www.adr.org/fileacase (https://web.archive.org/web/20170222201832/http://www.adr.org/fileacase). You may represent yourself in the arbitration or be represented by an attorney or another representative. Once we receive your arbitration claim, we may assert any counterclaims we may have against you.

The arbitration will be held in the county in which you reside or at another mutually agreed location. If the value of the relief sought is $10,000 or less, you or Rover.com may elect to have the arbitration conducted by telephone or based solely on written submissions, which election will be binding on you and Rover.com subject to the arbitrator's discretion to require an in-person hearing, if the circumstances warrant. Attendance at any in-person hearing may be made by telephone by you and/or Rover.com, unless the arbitrator requires otherwise.

The arbitrator will decide the substance of all claims in accordance with the laws of the State of Washington, including recognized principles of equity, and will honor all claims of privilege recognized by law. The arbitrator will not be bound by rulings in prior arbitrations involving different Rover.com users, but is bound by rulings in prior arbitrations involving the same Rover.com user to the extent required by applicable law.

18.6  Costs of Arbitration.  Payment of all filing, administration, and arbitrator fees (collectively, the "**Arbitration Fees**") will be governed by the AAA's Rules, unless otherwise provided in this Arbitration Agreement. If you demonstrate to the arbitrator that you are economically unable to pay your portion of the Arbitration Fees or if the arbitrator otherwise determines for any reason that you should not be required to pay your portion of the Arbitration Fees, Rover.com will pay your portion of such fees. In addition, if you demonstrate to the arbitrator that the costs of arbitration will be prohibitive as compared to the costs of litigation, Rover.com will pay as much of the Arbitration Fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. Each party will be responsible for all other fees it incurs in connection with the arbitration, including without limitation, all attorney fees. In the event the arbitrator determines the claim(s) you assert in the arbitration to be frivolous, you agree to reimburse Rover.com for all fees associated with the arbitration paid by Rover.com on your behalf that you otherwise would be obligated to pay under the AAA's rules.

18.7  Confidentiality. All aspects of the arbitration proceeding, and any ruling, decision or award by the arbitrator, will be strictly confidential for the benefit of all parties.

18.8  Severability.  If a court decides that any term or provision of this Arbitration Agreement other than Section 18.3 is invalid or unenforceable, the parties agree to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Arbitration Agreement will be enforceable as so modified. If a court decides that any provision of Section 18.3 is invalid or unenforceable, then the entirety of this Arbitration Agreement will be null and void, but the remainder of the Terms will continue to apply.

18.9  Opt-Out Procedure.  You can choose to reject this Arbitration Agreement by mailing us a written opt-out notice ("**Opt-Out Notice**") in accordance with the terms of this Section 18.9. For new Rover.com users, the Opt-Out Notice must be postmarked no later than 30 days after the date you accept these Terms for the first time. If you are already a current Rover.com user and previously accepted the Rover.com Terms, the Opt-Out Notice must be postmarked no later than January 31, 2017. You must mail the Opt-Out Notice to A Place for Rover, Inc., Attn: Legal, 2101 4th Ave., Suite 400, Seattle, WA 98121. The Opt-Out Notice must state that you do not agree to the Arbitration Agreement and must include your name, address, phone number, and the email address(es) used to register for the Rover.com Service to which the opt-out applies. You must sign the Opt-Out Notice for it to be effective. This procedure is the only way you can opt out of the Arbitration Agreement. If you opt out of the Arbitration Agreement, the entire Arbitration Agreement will not apply with respect to you, but the remainder of these Terms will continue to apply. Opting out of this Arbitration Agreement has no effect on any previous, other, or future arbitration agreements that you may have with us.

18.10  Future Changes to this Arbitration Agreement.  Notwithstanding any provision in these Terms to the contrary, you agree that if we make any change to this Arbitration Agreement (other than a change to any notice address or website link provided herein) in the future, that change will not apply to any claim that was filed in a legal proceeding against Rover.com prior to the effective date of the change.

ROVER_000513

Moreover, if we seek to terminate this Arbitration Agreement by removing it from these Terms, such termination will not be effective until 30 days after the version of these Terms not containing the Arbitration Agreement is posted to the Site, and will not be effective as to any claim that was filed in a legal proceeding against Rover.com prior to the effective date of removal.

19. **Governing Law and Jurisdiction.**  These Terms, and any dispute between you and Rover.com, will be governed by the laws of the State of Washington, without regard to principles of conflicts of law, except that the Federal Arbitration Act will govern the interpretation and enforcement of Section 18 (the Arbitration Agreement). Unless you and we agree otherwise, in the event that the Arbitration Agreement is found not to apply to you or to a particular claim or dispute (except for the small-claims court actions anticipated by the Arbitration Agreement), either as a result of your decision to opt out of the Arbitration Agreement under Section 18.9 or as a result of a decision by the arbitrator or a court order, you agree that any claim or dispute that arises between you and Rover.com must be resolved exclusively by a state or federal court located in the State of Washington. You and Rover.com agree to submit to the personal jurisdiction of the courts located within Seattle, Washington for the purpose of litigating all such claims or disputes.

20. **Miscellaneous**.  Nothing in this Agreement will be construed as making either party the partner, joint venturer, agent, legal representative, employer, contractor or employee of the other. Neither party will have, or hold itself out to any third party as having, any authority to make any statements, representations or commitments of any kind, or to take any action, that will be binding on the other, except as provided for herein or authorized in writing by the party to be bound. The invalidity, illegality or unenforceability of any term or provision of these Terms will in no way effect the validity, legality or enforceability of any other term or provision of these Terms. In the event a term or provision is determined to be invalid or unenforceable, the parties agree to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and these Terms will be enforceable as so modified.  This Agreement will be binding on and will inure to the benefit of the legal representatives, successors and assigns of the parties hereto.

If you have any questions about anything in these Terms, please contact us via email at legal@rover.com or by mail at A Place for Rover, Inc., Attn:  Legal, 2101 4th Ave., Suite 400, Seattle, WA 98121.

## Join Our Pack

**Follow Rover on Twitter**                                        🐦 Follow @roverdotcom
(https://web.archive.org/web/20170222201832/https://twitter.com/int
screen_name=roverdotcom)

## Need Help?

Visit Our Help Center (https://web.archive.org/web/20170222201832/https://support.rover.com/hc/en-us?ref=footer)

© 2017 Rover.com. All Rights Reserved.

ROVER_000514

Help Center

✉ Inbox   ❓ Help

# Rover Help Center

Enter your search terms

GO

Popular Topics: Getting started, How taxes work, Payments

Sitters

Owners

Mobile App

8/12/2020
ROVER_000515

## Getting Started

★ Becoming a Sitter: Frequently Asked Questions

Is Rover free?

What are the service fees?

**See all articles**

## Booking and Meet & Greets

★ Make Changes to a Booking

What are the best practices for Meet & Greets?

How do I modify an upcoming booking?

**See all articles**

## Taxes

What's a W-9? Do I need to submit one to Rover?

Will I receive a 1099 from Rover?

Where can I view my total earnings?

**See all articles**

Exhibit 8



DEREK CHANG

EXHIBIT 8

12 - 18 - 2020

# Rover Guarantee

*We support Rover pet parents, sitters, and dog walkers by offering an unmatched level of protection. That's why every booking made on Rover is backed by the Rover Guarantee.*

## What is the Rover Guarantee?

Simply put, the Rover Guarantee is our commitment to you in the rare instance that something goes wrong during a booking. We offer the Guarantee because we believe that being there for our community is a fundamental part of what it means to be The Dog People.

Read on for specifics about the Guarantee, including what's covered, how it works, and frequently asked questions.

## The Details

The Rover Guarantee reimburses members of our community for costs arising from certain injuries or damages that occur during a service booked and paid through Rover. The injuries or damages must result from care provided during a Rover stay or walk, and the Guarantee reimburses in the event the sitter or walker is unwilling or unable to pay those costs. In certain cases, the Guarantee may also be used to reimburse for injuries to resident pets owned by sitters or dog walkers.

*What's covered?*

- Vet care for injuries to a "Rover Dog"—i.e., a pet owner's pet(s) in a sitter's or dog walker's care, custody, and control
- Vet care for injuries to the sitter's or walker's resident pet(s) caused by a Rover Dog (in cases where the pet owner may be otherwise liable)
- Physical damage to a pet owner's personal property caused by the sitter or walker, or the sitter's or walker's resident pet(s)
- Liability for injury to certain third parties caused by a Rover Dog

*What's not covered?*

- Injury or damage that arises during a Meet & Greet or otherwise outside of the service dates of a confirmed Rover booking
- Long-term vet care—i.e., care that extends more than 30 days past injury
- Treatment costs for preventive care, or medical or veterinary bills resulting from an illness or a chronic or pre-existing condition
- Preventable conditions such as fleas, ticks, or parasites
- Damage to a pet owner's property caused by his or her own pets, or damage to the property of a pet care provider or someone related to or residing with the pet care provider
- Injury to the pet care provider or pet owner, or someone related to or residing with the pet care provider or pet owner

*What are the monetary limits?*

- Reimbursement for veterinary care is limited to a total amount of **$25,000** per incident
- Reimbursement for pet owner property damage or third-party injuries is limited to **$1 million** per incident

- All reimbursements are subject to a minimum contribution of **$250** by the claimant—so we reimburse only for costs exceeding $250

*Are there other conditions, exclusions, or limitations?*

Yes. For example, injuries or damage involving automobiles or other vehicles, injury or damage caused by natural disasters or other uncontrollable events, or damage to precious goods such as fine art or family heirlooms, are excluded. For a complete understanding of the Rover Guarantee, including the full list of conditions, exclusions and limitations, we strongly encourage you to read the Rover Guarantee Terms and Conditions, which are part and parcel of Rover's Terms of Service.

*Is the Rover Guarantee an insurance plan?*

No. The Rover Guarantee exists to fill the gap when the responsible party—usually the pet care provider—is unable or unwilling to pay for costs arising from damage or injury attributable to his or her negligence, and when insurance is not available. It is a contractual agreement from Rover to protect its users, enforceable in accordance with the Rover Guarantee Terms and Conditions. Reimbursement under the Rover Guarantee is generally paid out of Rover's own pocket—though we reserve the right to refer a claim to our insurance carriers when necessary or appropriate.

*Before filing a claim for reimbursement:*

In many cases, Rover's Trust & Safety team (888-727-1140) can help users take immediate steps to mitigate the injury or damage caused by an incident, such as connecting you with a board-certified veterinarian by phone or marshaling resources to locate a lost dog. For this reason, we ask both sitters and pet owners to notify us as soon as possible after an incident occurs—and in any event no later than 48 hours after the booking. We can't help what we don't know about, so make us your first call!

When it comes to reimbursement, however, we know from experience that issues are often best resolved by simply reaching out to the other party. Before filing a claim for reimbursement under the Rover Guarantee, try contacting the other party through your Rover inbox. If you're unable to come to an agreement informally, let us know. We may recommend your case as a candidate for our Resolution Center or otherwise attempt to resolve the matter with the other party.

Finally, if you have insurance that may cover some or all costs arising from an injury or damage otherwise falling under the Rover Guarantee, such as pet or homeowner's insurance, you should file a claim under that policy before seeking reimbursement from Rover. In such a case the Rover Guarantee may be leveraged to meet deductibles or cover costs that fall outside your policy.

If you are unable to reach an agreement with the responsible party and don't have insurance to cover costs arising from an injury or damage covered under the Rover Guarantee, you can submit a claim for reimbursement as outlined below.

## Claims FAQs

Have a question about filing a claim? We're here to help.

*How do I know if I'm eligible to file a claim?*

To qualify, the stay or walk related to the reimbursable incident must have been booked and paid on Rover.com, and the injury or damage must have occurred during the booked dates.

*How do I submit a claim for reimbursement?*

Contact our Trust & Safety team at (888-727-1140) or trust@rover.com. We'll guide you through the claims process. Keep in mind we must be notified within 48 hours of the end of the booked stay or walk.

ROVER_000526

Rover Guarantee | Rover.com                                                              Page 3 of 3

All claim-related information will be evaluated to determine if the incident is the result of care provided during a Rover stay or walk. We'll reach out to everyone involved to gather as much information as possible, including a written statement from each party. These documents will play a key role in the review process.

*What do I need to submit with a vet care-related claim?*

Make sure to submit:

- all veterinary treatment notes and invoices from a board-certified practicing veterinarian
- a timeline of expected care if additional treatment is needed
- any photos, additional receipts, and other relevant documents

All documentation must be submitted within seven days of the injury. Once we've received these documents, Rover's claims team will review to determine eligibility. Should we have additional questions, we may follow up with either party.

Please note, we may require you to communicate your concerns to Animal Control.

*What do I need to submit with a property damage claim?*

Please provide all potentially relevant documentation, including:

- photos
- receipts or other proof of ownership or fair market value
- a completed property damage claim form

Please note, we may require you to provide proof of claim submission with your homeowners insurance, or a documented police report to move forward with a claim.

*How long does the reimbursement claims process take?*

The process may vary. We'll work as quickly as possible with hopes of resolving all claims within 14 days of receiving all appropriate documentation.

*If I file a claim, am I eligible for a refund?*

Refunds and reimbursement are considered on a case-by-case basis. Rover requires that owners and sitters attempt to work together with regard to refunds for services before filing a reimbursement claim, try contacting the other party through your Rover inbox as your first step.

*What happens to my account if I file a reimbursement claim?*

We're here for both owners and sitters, and we take concerns from both parties seriously. Safety is our top priority, and results for parties found at fault can range from coaching to removal from the platform. We'll always do our best to come to a fair resolution.

Exhibit 10





DEREK CHANG

EXHIBIT 10

12 - 18 - 2020

exhibitsticker.com

Enter your search terms                                                                    GO

Popular Topics: <u>Getting started</u>, <u>How taxes work</u>, <u>Payments</u>

Help Center  >  Sitters  >  Running My Business

# What are Rover Cards and how do I send them?

Rover Cards allow you to track and share information with your clients from the <u>Rover app</u>. You can send Rover Cards after tracking **walking**, **drop–ins**, and **day care** services in the free Rover app.

Rover Cards allow you to share the following information with your client:

- How many times the dog(s) peed and pooped
- Food and water activity
- At least one photo and an optional short message
- A map of your walk with total distance (if applicable)

## How to start and send a Rover Card

**Note**: In order to send Rover Cards, you need the Rover app. Download the app for free <u>here</u>.

You should start a Rover Card right when the service starts. This could be when the walk begins or when the dog enters your care—whatever you've agreed to with the pet owner.

1. Open the Rover app and tap **Home** at the bottom of your screen.

2. When you're ready to begin a service, tap **Start**.

3. During the service, take a photo and track any events that happen by tapping the icons for pee, poo, food, and water breaks.

*Tip:* You can navigate away from an active Rover Card to use other apps on your phone during the service. The card will continue to run until you tap **Stop**. To reopen an active card, tap **Home** and select **Open.**

4. When you're done, tap **Stop** to stop the clock.

5. Write an optional message, review the Rover Card, and make any edits you need. Then, tap **Send** to send it to your client.

To view past Rover Cards you've sent, tap **More** at the bottom of your screen and then tap **Rover Cards**.

## Additional information about Rover Cards

- You must use Rover Cards for [Recurring Bookings](#) in order to get paid.

- Your clients don't need the app to get Rover Cards, but we highly recommend they [download it](#). The app makes it easy to get updates and book services on–the–go.

- It isn't possible to resend a Rover Card. Your client can view these at any time via Rover Messages or through the app by tapping **More > Rover Cards.**

- **Booked walks and drop–ins are typically 30 minutes.** However, if you and the pet owner want to book a longer service, we recommend booking back–to–back services. Go [here](#) for tips on how to adjust your rates on a per booking basis.

Case 3:19-cv-03053-WHO Document 66-2 Filed 02/24/21 Page 104 of 233

**Related Questions**

What are sitter performance scores?

What is confirmed availability and how does it work?

Why am I receiving text messages about my weekend availability?

Where can I find a receipt for my booking?

How do I troubleshoot the Rover app?

**Recently Viewed**

| View all articles | Log in to contact support |
|---|---|

Visit the Q&A Community

Exhibit 13



DEREK CHANG

**EXHIBIT 13**

12 - 18 - 2020

8/22/2018                     How to Improve Your Performance Scores and Succeed on Rover | The Dog People by Rover.com

# Sitter Resources

Advice and resources for being a successful sitter on Rover

Sitter Resources / New Features ▾

## How to Improve Your Performance Scores and Succeed on Rover



We reward dog walkers and sitters who treat their clients' dogs like family—including surfacing their profiles higher in search results. To help you keep track of your search rank and the overall health of your business, we created the **booking score** and the **repeat score**. If your booking and repeat scores are high, you're more likely to show up front and center in search results, get better reviews, and earn loyal clients. Read on to learn more about how to keep your performance scores high—and your business thriving.

MILLER 198

## Booking Score

*Of the people who contact you for the first time, how many end up booking and leaving you a great review? Score ranges from 50-100.* Note: If a dog owner sends you a request when your calendar says you're unavailable,  your booking score won't change if you don't accept the request. This is also true for requests that are outside of your specified service range or stated dog preferences.

Set yourself up for success by:

- **Accept most requests that come your way.** You don't need to book 100% of your requests to stay ahead of other sitters and increase your booking scores. However, sitters and dog walkers who are more flexible—but also make safety their top priority—tend to book more requests.
- **Set the right expectations about when you're available to get more requests you can accept**. Especially if you're new on the site, making yourself available and keeping your calendar updated will help your booking score. If a dog owner sends you a request when your calendar says you're unavailable, your booking score won't change if you don't accept the request.
- **Make your preferences clear.** Call out the sizes of dogs you'll care for, if you're comfortable taking puppies, and if you'll care for dogs who aren't spayed or neutered.
- **Create an inviting and authentic profile that reflects the care you'll provide.** Read more about how to do that here.
- **Respond quickly to every request you receive, even if you're not able to accept the booking.** Top sitters and dog walkers usually respond within an hour. Download the Rover app to make responding quickly even easier.
- **Provide 5-star service.** After each booking ends, we'll ask your client to leave you a review. Focus on providing a 5-star experience and let your client know you appreciate their feedback.
- **Want to accept repeat clients only, or stop receiving requests altogether?** Change your settings here.

Act with safety in mind. If you don't think it's a good match, don't accept the booking—period. Not only could accepting a bad match earn you a negative review, but it could also put you or the pets you're caring for at risk. At the end of the day, the most important thing is making sure your dog clients are happy and well cared for.

## Repeat Score

*How many of your first-time clients book with you again—and how often? Score ranges from 50-100.*

MILLER 199

Set yourself up for success by:

- **Encourage your clients to book with you again.** A great way to earn repeat clients: send photo and text updates early and often.
- **Be accessible.** Communication is key to delivering great customer service, and it'll help you earn that glowing review too.
- **Always provide a 5-star experience.** If a client ends up booking with you again—congratulations! That's a huge accomplishment. Make sure to always provide repeat clients with the same care and customer service you gave them the first time around. Accept repeat bookings you're comfortable with, and say "no thanks" to ones you're not. You and the pet parent both want what's best for their pet, and it's always a better idea to pass on bookings that aren't a good match.
- **Give your loyal clients a heads-up before busy seasons or vacations.** That way, they can request to book your services before your calendar fills up.
- **Ask clients to book with you again.** Did you enjoy taking care of their dog? Let them know you'd love to book with them again. As long as you booked with someone before, you can initiate a booking request the next time around.
- **Never accept cash or checks—always book on Rover.** Booking on Rover is required per Rover's Terms of Service. We reward sitters and dog walkers who have a great history on the site with a higher search rank—meaning you get more exposure to dog owners near you.

The happier you make your clients and the dogs they love, the better it is for your search rank—and your business as a whole. Explore our Sitter Resources Center to learn more about building a thriving business.

By Rover Staff | July 29, 2016

---

## RELATED ARTICLES



MILLER 200



### Best Communication Practices as an On-demand Dog Walker

August 3, 2018



### 7 Ways to Earn Loyal Clients

August 1, 2018



### A Part-Time Job For College Students: Make Money as a Pet Sitter

MILLER 201

A Part-Time Job For College Students: Make Money as a Pet Sitter

June 26, 2018

## Need Help?

Visit Our Help Center

© 2018 Rover.com. All Rights Reserved.

MILLER 202

Exhibit 14





Enter your search terms                                                    GO

Popular Topics: <u>Getting started</u>, <u>How taxes work</u>, <u>Payments</u>

Help Center  >  Sitters  >  Trust and Safety

# What if a client wants to pay me directly, not through the Rover site?

Paying and communicating through Rover is essential to ensuring a safe and secure experience. In fact, it's so important to everyone's security that we made it a requirement in our <u>Terms of Service</u>.

But beyond being a requirement, when a payment takes place outside of Rover, we won't have a record of it. That means your booking won't be covered by the <u>Rover Guarantee</u> or our 24/7 support team. Accepting payments outside of Rover could also lead to account suspensions for both the sitter and the owner.

So, if someone asks to pay you directly—whether that's via check, cash, wire transfer, or a payment website other than Rover—say no and remind them that paying through Rover keeps everyone's information secure.

**My client insists on paying outside of Rover—what should I do?**

If you're messaging a pet owner and they're insistent about paying you outside of report the conversation. Simply select this button within your conversation:



MILLER 382



This sort of thing doesn't happen often, but it's always a good idea to be prepared. Practicing a few simple safety measures can only do great things for your pet-sitting business.

**Related Questions**

Why should I pay and communicate through Rover?

What if someone makes me feel uncomfortable?

What are the service fees?

What are sitter performance scores?

What are Rover Cards and how do I send them?

**Recently Viewed**

Should I tip my sitter?

Will I receive a 1099 from Rover?

What are the service fees?

What do sitters need to know about the Rover Guarantee?

What are sitter performance scores?



MILLER 383

View All Articles

Contact Support

Visit the Q&A Community

..



MILLER 384

Exhibit 19

DEREK CHANG

**EXHIBIT 19**

12 - 18 - 2020

## Core Services, Overnight Boarding (2018- 2019)

1/1/18-2/1/19

reply below

Posted 2 years ago

**Become a Rover sitter - Make up to $1,000/month watching dogs in your home** (San Francisco)

compensation: **Set your schedule AND price!**

employment type: **part-time**

telecommuting ok



Get paid to play with dogs.

**Flexible schedule.**
You choose your availability, services, and rates.

**Work from home.**
Watch dogs at your home or your client's—you decide.

**Go mobile.**
Manage your business from anywhere with the free Rover app.

**We're here for you.**
Enjoy 24/7 support and insurance for the dogs in your care.

Get started

To join, you must:

- Have a genuine love for dogs
- Be at least 18 years old
- Complete a background check
- Have regular internet access and the free Rover app

How it works:

1. Create your Rover profile.
2. Watch your email—we'll be in touch soon.
3. If your profile is approved, you're open for business!



This is a great opportunity for current freelance dog care providers, and others in the pet care industry such as vet techs and vet assistants. Rover dog sitters come from a variety of backgrounds and industries, including customer service, sales, retail, the restaurant industry (including barista, bartender, server, and waiter/waitress, restaurant host, hostess, bus, bus boy), messenger, bike messenger, delivery driver, finance, marketing, data entry, food runner, account manager, contract worker, cleaner, baby sitter, babysitter, caregiver, teacher, education, and intern. If you work from home or you're a student, recent grad, seasonal worker, contract worker, stay at home mom, stay at home dad--or you're just looking for flexible work, gig work, part-time work, seasonal work, a summer job or work to earn additional money on the side--Rover could be a great fit for you. If you're a nurse, healthcare professional, vet tech, vet assistant, or in any pet care field, you could make a side income with Rover while building your professional skills. Many Rover sitters have also worked at Care.com, Grubhub, Seamless, DoorDash, Eat24, Caviar, Munchery, Saucey, Google Express, AmazonFresh, Instacart, Sprig, Luxe, Zirx, Lyft, Uber, Wag, and Postmates. Rover sitters come from a variety of backgrounds, but successful sitters are dog lovers first.

Exhibit 20

# Rover.com Introduces Mobile App For Dogs (And Owners) On The Go

New App Facilitates Owner/Sitter Communication, Photo Sharing and Verification of Sitter Activity

---

NEWS PROVIDED BY
**Rover.com** ➞
Aug 15, 2012, 12:22 ET

---

SEATTLE, Aug. 15, 2012 /PRNewswire/ -- Dog boarding alternative, Rover.com is introducing its mobile app for the Apple iPhone and iPad today. Rover.com has connected thousands of dog owners with local dog sitters around the country as an affordable, cage-free alternative to traditional kennels.

The new app, which is available free of charge in the App Store and can be found by searching for "Rover.com," provides three main benefits not currently available via traditional texting between owners and sitters. The mobile app:

- Facilitates communication between dog owners and sitters by providing them with a direct forum to share updates while owners and their pups are apart
- Captures photos of the dog's stay and all the fun he or she is having in a central location for immediate and/or future use
- Allows owners who are away to check-in with their sitters to confirm when they came to the house or went to the park

"It turns out that cages can't cuddle. For many dog owners, myself included, traveling away from the home can be stressful. People constantly wonder whether or not their four-legged babies are receiving the love and attention that kennels cannot provide," said Aaron Easterly, CEO at Rover.com. "Our new app makes that knowledge just a tap of a finger away."

The app also provides benefits to dog sitters, especially for those who sit for a number of dog owners. Through the new system, sitters will have easy access to all the information provided through Rover.com messaging and activity logs for easy management and communication. Use of the app's photo feature also automatically updates a sitter's profile. Those photos can be used to enhance a sitter's marketability, giving sitters more time to spend with their four-legged friends and less time uploading photos and managing their listing.

"Dog sitters and owners are canine lovers – but also busy people. This attracts them to Rover.com in the first place," said Easterly. "We're confident this new app will help everyone free up more time and provide the peace of mind everyone here at Rover.com prides themselves on delivering."

The new Rover.com mobile app launch comes on the heels of the company's expansion of its Sit a Dog, Save a Life™ program, which helps raise funds for a growing selection of dog-related charities through participating sitters and their Rover.com transactions.

Rover.com, which has been likened to an Airbnb for dogs, also announced a national roll out earlier this year and has since grown to approximately 50,000 members in over 1,000 cities across the country.

**About Rover.com**
Rover.com is an online alternative to traditional dog boarding that connects dog owners with local dog sitters and hosts, in real homes, in hundreds of cities across the United States. To learn more, please visit www.rover.com.

SOURCE Rover.com

Exhibit 21





# Rover.com Introduces "The Dog People" in First Integrated National Brand Campaign

*Rover partners with creative agency Pereira & O'Dell to launch marquee national campaign featuring digital, radio, out-of-home and television advertising*

5-Star Dog Sitters | Rover.com, The Dog People

April 24, 2017 09:00 AM Eastern Daylight Time

SEATTLE & SAN FRANCISCO--(BUSINESS WIRE)--Rover.com©, the nation's largest network of 5-star pet sitters and dog walkers, today announced it has partnered with award-winning creative agency Pereira & O'Dell to create and launch a new advertising campaign, declaring the brand as The Dog People™. This is the first integrated national advertising campaign for the rapidly growing company. The campaign, which rolls out nationwide today, portrays a collection of moments illustrating why Rover and its community of pet sitters and dog walkers are The Dog People that pet parents prefer for dog care.

"Our goal with this campaign is to show pet parents that Rover can help them find true dog people who will care for their dog the same way they would," said Halle Hutchison, vice president of marketing for Rover. "Pereira & O'Dell shares our passion for dogs and the campaign they created is a natural fit for the Rover brand. We're a community of dog people in every sense, from our sitters, to the pet parents we serve, to the Rover employees, and this campaign is reflective of that."

The objective of the campaign is to increase brand awareness and consideration among pet parents. Research indicates that most dog owners don't like the idea of sending their dog to a kennel or having to call in favors from friends and family to dog sit. A survey of pet parents conducted by Rover found that 43 percent said they had opted not to travel for the holidays because they didn't want to leave their dog at a kennel. Rover provides a welcome alternative. With Rover, pet parents can find and book trusted, highly-rated dog people in their own neighborhoods, who are backed by the security of a nationwide company.

"With 'The Dog People' there's a huge opportunity for Rover to own the fast-growing category of specialized dog care," said Pereira & O'Dell Executive Creative Director Jason Apaliski. "By showcasing their one-of-a-kind expertise along with their unique dog-loving personality, we've created a brand platform to build on for years to come."

Since dogs are the core of everything Rover stands for, the ads feature five dogs as the lead characters. The stars of the campaign include Brigitte, a French Bulldog who loves to sing and dance, and was previously cast as Stella on "Modern Family." Another dog in the commercial, Vegas, is a Jack Russell Terrier mix who was rescued off the streets of Las Vegas. He's an acting vet who's ridden in helicopters, limos and in the arms of A-list celebrities for past roles. A third, Cecil, believes bloodhounds are lap dogs too, and his best tricks are hiding under the bed and drooling all over everything. And finally, Jacie and Jovie are chocolate Labradoodles who were adopted together so they could play the same role when they go to work. Jacie's favorite trick is putting her toys away, and Jovie's favorite hobby is chasing her tail.

Rover has established itself as the largest network of dog sitters in the U.S. with more than 100,000 sitters and more joining daily. And over the past year it has become the largest dog walking service in the country with more than 75,000 active dog walkers covering thousands of cities. Rover recently acquired DogVacay, which will allow the company to pick up engineering velocity, bring new products to market faster and invest even more aggressively in building the best tools for sitters and walkers. This growth and momentum of the business has enabled the company to make a significant investment in marketing this year, including a planned media spend of $4.5 million. This represents the biggest media investment that Rover has made to date, and the largest effort in the emerging category of online-sourced, peer-to-peer dog care.

For more on the campaign, visit Rover's YouTube channel and blog "Daily Treat."

**About Rover**

Rover.com® is The Dog People™, the nation's largest network of 5-star pet sitters and dog walkers. Through Rover, pet parents can discover, book, and manage personalized care for their dogs, including pet sitting, dog walking, in-home dog boarding, and doggy day care. Founded on the belief that everyone should have the opportunity to experience the unconditional love of a dog, Rover improves and simplifies life for pet parents and the dogs they love. By connecting pet parents with dog people in their neighborhood, Rover ensures dogs nationwide are happy and well-cared for even when their owner is away, and empowers pet parents to live fulfilling lives. Services are booked through Rover every minute of every day and over 95% of reviewed bookings have received a perfect 5-star rating. The platform offers premium insurance for all services booked through Rover, secure online payments, world-class customer support, vet consultations, a 24/7 team of trust and safety agents, reports that include walk maps and activity tracking, mobile apps, photo and video sharing, and general background checks for sitters.

**About Pereira & O'Dell**

Pereira & O'Dell (www.pereiraodell.com) is an award-winning advertising agency with offices in San Francisco and New York. The agency combines techniques from traditional advertising, digital, PR and design to create innovative campaigns, programs, and products that are in sync with how consumers behave today. Pereira & O'Dell has been named by Advertising Age as Agency of the Year, and by Fast Company as one of the "10 Most Innovative Companies in Advertising." Among the Pereira & O'Dell client roster are Coca-Cola, eBay, Fifth Third Bank, Timberland, Realtor.com, Adobe and Memorial Sloan Kettering.

**Credits:**

Lead Agency: Pereira & O'Dell
Chief Creative Officer: PJ Pereira
Executive Creative Director: Jason Apaliski
Associate Creative Director: Katie Brinkworth
Art Director: Rachel Ngun
Copywriter: Tracy Silagi
Designer: Carolina Penner
Director of Client Services: Ryan Toland

Management Supervisor: Maura Mattoon
Account Executive: Rachel Majors
Communications Strategy Director: Ashley Wells
Senior Strategic Planner: Beth Windheuser
VP Production: Jeff Ferro
Executive Producer: Monica Wilkins
Senior Producer: Owen Bly
Print Producer: Laura Gill
Associate Director of Project Management: Lindsey Anderson
Agency marketing, PR: Molly Parsley
Business Affairs Director: Russ Nadler
Business Affairs Coordinator: Christina Hadly

# Contacts

Rover.com

Brandie Gonzales, 888-453-7889

pr@rover.com

# Tweets by @RoverDotCom 

 **Rover.com** ✔
@RoverDotCom

While dogs tend to steal the show, many animals have lived in the White House. bit.ly/2HHQwJH



**A Raccoon in the White House? Get to Know Your Presidential Pets**
This election season, it's fitting to bring you a roundup of the most prestigious presiden…
rover.com

                                                      9h

 **Rover.com** ✔
@RoverDotCom

Mushroom ... w.b...



**This Common Mushroom is Deadly for Your Dog**
Nothing beats a walk in the woods with your dog, watching them romp back and...
rover.com

     Oct 27, 2020

🔁 Rover.com Retweeted

**Kyle I'm Here for the 🇺🇸Lacy**
@kyleplacy

My lovely dog just trotted in my office, passed gas and walked out.

See email from @RoverDotCom

Hint: look at subject line



# #Hashtags

#TheDogPeople   #Rover

Exhibit 22

# Rover, the World's Largest Network of Five-Star Pet Sitters and Dog Walkers, Announces Plans to Become a Public Company via a Merger with True Wind Capital's SPAC, Nebula Caravel Acquisition Corp.

- Over 2 million pet parents have booked a service on Rover with more than 500,000 pet care providers across North America and Europe

- Transaction values the combined company at an enterprise value of $1.350 billion and is expected to provide approximately $325 million in gross cash proceeds to the Company that will enable continued investment in growth, market expansion, and product development

- As part of the transaction, additional investors have committed to participate in the transaction through a $50 million private placement of common stock

- Investor call scheduled for February 11, 2021 at 3:00 p.m. ET

---

NEWS PROVIDED BY
**True Wind Capital →**
Feb 11, 2021, 07:55 ET

---

SPORTSMAN 085



(PRNewsfoto/True Wind Capital)



(PRNewsfoto/True Wind Capital)

SEATTLE, Feb. 11, 2021 /PRNewswire/ -- A Place for Rover, Inc. ("Rover") the world's largest network of five-star pet sitters and dog walkers, has entered into a definitive business combination agreement with Nebula Caravel Acquisition Corp. (Nasdaq: NEBC) ("Caravel"). Caravel is a publicly traded special purpose acquisition company sponsored by True Wind Capital. Upon closing of the transaction, Caravel will be renamed Rover Group and remain Nasdaq-listed under the ticker symbol "ROVR".

SPORTSMAN 086

**Rover Highlights**

Rover, the leading online marketplace for pet care, connects pet parents with local, high-quality pet care providers who offer a wide range of services, including boarding, in-home pet sitting, doggy daycare, dog walking, drop-in visits, and grooming. Since its inception through 2020, more than 2 million pet parents have booked services on Rover with more than 500,000 pet care providers across North America and Europe. Rover was created to provide a better pet care alternative for pets and their parents than the existing options of friends and family, neighbors, and kennels. Rover built a simple, easy-to-use platform and mobile app to enable pet parents to discover, book, pay, and review loving pet care providers online. Rover eliminates many of the barriers of pet ownership, enabling Rover's mission to make it possible for everyone to experience the unconditional love of pets.

**Management Commentary**

Co-founder and CEO Aaron Easterly will continue to lead Rover's highly experienced management team. Adam Clammer, CEO of Caravel and Founding Partner of True Wind Capital, will serve as a Director on the combined company's board of directors.

Aaron Easterly stated, "Today's transaction marks a key milestone in Rover's effort to build an enduring business that will fundamentally change the pet care industry. Partnering with the True Wind team represents a unique opportunity to bring the unconditional love of pets to more people. A public listing will provide the capital to accelerate the expansion of core service offerings, support other pet types, and continue to grow our geographic footprint."

Adam Clammer stated, "We look forward to partnering with Aaron and the rest of Rover's management team at this exciting inflection point. We believe that management has built an extraordinary business and we're excited to support them along their public market journey."

**Transaction Overview**

The transaction values Rover at an enterprise value of approximately $1.350 billion. Institutional investors have committed to a private investment of $50 million in Class A common stock of the combined company that will close concurrently with the business combination. It is

SPORTSMAN 087

anticipated that the combined company will have an equity market capitalization at closing of approximately $1.63 billion and have over $300 million of unrestricted cash on the balance sheet, subject to any redemptions by Caravel stockholders.

Rover and Caravel board of directors have unanimously approved the proposed business combination. Completion of the proposed business combination is expected in the first half of 2021. The transaction will be effected pursuant to the terms and conditions of the Business Combination Agreement entered into by Rover and Caravel, which contains customary closing conditions including the registration statement being declared effective by the Securities and Exchange Commission ("SEC"), approval by the stockholders of Rover and Caravel, and certain regulatory approvals.

**Advisors**

Morgan Stanley & Co. LLC is acting as exclusive financial advisor to Rover. Deutsche Bank Securities acted as lead financial advisor, capital markets advisor and private placement agent to Nebula Caravel Acquisition Corp. William Blair & Co., LLC and Stifel Financial Corp., also acted as capital markets advisor and private placement agents to Nebula Caravel Acquisition Corp. Wilson Sonsini Goodrich & Rosati is acting as legal advisor to Rover. Simpson Thacher & Bartlett LLP is acting as legal advisor to Caravel.

**Conference Call and Webcast Information**

Management of Rover and True Wind Capital will host an investor conference call on February 11, 2021 at 3:00 p.m. ET to discuss the proposed transaction and review an investor presentation. For those investors who wish to participate, the conference call can be accessed by visiting https://www.rover.com/blog/press/tab/press-release/.

**Additional Information about the Business Combination and Where to Find It**

This press release relates to the proposed merger involving Nebula Caravel Acquisition Corp. ("Caravel") and A Place for Rover, Inc. ("Rover"). Caravel intends to file a Registration Statement on Form S-4 with the SEC, which will include a proxy statement and prospectus of Caravel and an information statement of Rover, and each party will file other documents with the SEC

regarding the proposed transaction. A definitive proxy statement/prospectus/information statement will also be sent to the stockholders of Caravel and Rover, seeking any required stockholder approvals. Before making any voting or investment decision, investors and securityholders of Caravel and Rover are urged to carefully read the entire registration statement and proxy statement/prospectus/information, when they become available, and any other relevant documents filed with the SEC, as well as any amendments or supplements to these documents, because they will contain important information about the proposed transaction. The documents filed by Caravel with the SEC may be obtained free of charge at the SEC's website at www.sec.gov. Alternatively, these documents, when available, can be obtained free of charge from Caravel upon written request to Nebula Caravel Acquisition Corp., Four Embarcadero Center, Suite 2100, San Francisco, California 94111.

Caravel, Rover and certain of their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from the stockholders of Caravel, in favor of the approval of the merger. Information regarding Caravel's directors and executive officers is contained in the section of Caravel's Form S-1 titled "Management", which was filed with the SEC on November 20, 2020. Additional information regarding the interests of those participants and other persons who may be deemed participants in the transaction may be obtained by reading the registration statement and the proxy statement/prospectus/information statement and other relevant documents filed with the SEC when they become available. Free copies of these documents may be obtained as described in the preceding paragraph.

**About Rover**

Founded in 2011 and based in Seattle, Rover is the world's largest online marketplace for pet care. Rover connects pet parents with caring pet care providers who offer overnight services, including boarding and in-home pet sitting, as well as daytime services, including doggy daycare, dog walking, drop-in visits, and grooming. Millions of pet parents have booked a service on Rover, with more than 500,000 pet care providers across North America and Europe.

**About True Wind Capital**

True Wind Capital is a San Francisco-based private equity firm focused on investing in leading technology companies. True Wind has a broad investing mandate, with deep industry expertise across software, data analytics, tech-enabled services, internet, financial technology, and hardware. Rover will be True Wind's 8th platform investment.

**About Nebula Caravel Acquisition Corp.**

Nebula Caravel Acquisition Corp ("Caravel") is a blank check company sponsored by True Wind and led by Adam H. Clammer and James H. Greene, Jr., who serve as Chief Executive Officer and Chairman, respectively, formed for the purpose of partnering with one high-quality technology business. Caravel follows Nebula Acquisition Corporation's successful merger with Open Lending (NASDAQ: LPRO) in June 2020.

**Forward-Looking Statements**

This press release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 including, but not limited to, Caravel's and Rover's expectations or predictions of future financial or business performance or conditions. Forward-looking statements are inherently subject to risks, uncertainties and assumptions. Generally, statements that are not historical facts, including statements concerning possible or assumed future actions, business strategies, events or results of operations, are forward-looking statements. These statements may be preceded by, followed by or include the words "believes," "estimates," "expects," "projects," "forecasts," "may," "will," "should," "seeks," "plans," "scheduled," "anticipates" or "intends" or similar expressions. Such forward-looking statements involve risks and uncertainties that may cause actual events, results or performance to differ materially from those indicated by such statements. Certain of these risks are identified and discussed in the section of Caravel's Form S-1 titled "Risk Factors" which was filed with the SEC on November 20, 2020. These risk factors will be important to consider in determining future results and should be reviewed in their entirety. These forward-looking statements are based on Caravel's or Rover's management's current expectations and beliefs, as well as a number of assumptions concerning future events. However, there can be no assurance that the events, results or trends identified in these forward-looking statements will occur or be achieved. Forward-looking statements speak only as of the date they are made, and neither Caravel nor Rover is under any obligation, and expressly disclaim any obligation, to update, alter or otherwise revise any

forward-looking statement, whether as a result of new information, future events or otherwise, except as required by law. Readers should carefully review the statements set forth in the reports, which Caravel has filed or will file from time to time with the SEC.

In addition to factors previously disclosed in Caravel's reports filed with the SEC and those identified elsewhere in this press release, the following factors, among others, could cause actual results to differ materially from forward-looking statements or historical performance: risks and uncertainties related to the inability of the parties to successfully or timely consummate the merger, including the risk that any required regulatory approvals or stockholder approvals of Caravel or Rover are not obtained, are delayed or are subject to unanticipated conditions that could adversely affect the combined company or the expected benefits of the merger is not obtained, failure to realize the anticipated benefits of the merger, risks related to Rover's ability to execute on its business strategy, attract and retain users, develop new offerings, enhance existing offerings, compete effectively, and manage growth and costs, the duration and global impact of COVID-19, the number of redemption requests made by Caravel's public stockholders, the ability of the combined company to meet Nasdaq's listing standards (or the standards of any other securities exchange on which securities of the public entity are listed) following the merger, the inability to complete the private placement of common stock of Caravel to certain institutional accredited investors, the risk that the announcement and consummation of the transactions disrupts Rover's current plans and operations, costs related to the transactions, the outcome of any legal proceedings that may be instituted against Caravel, Rover, or any of their respective directors or officers, following the announcement of the transactions, the ability of Caravel's or the combined company to issue equity or equity-linked securities in connection with the proposed business combination or in the future, the failure to realize anticipated pro forma results and underlying assumptions, including with respect to estimated stockholder redemptions and purchase price and other adjustments; and those factors discussed in documents of Caravel filed, or to be filed, with SEC.

Additional factors that could cause actual results to differ materially from those expressed or implied in forward-looking statements can be found in Caravel's most recent reports on Form 8-K, which are available, free of charge, at the SEC's website at www.sec.gov, and will also be provided in the Registration Statement on Form S-4 and Caravel's proxy statement/prospectus/information statement when available. Any financial projections in this press release are forward-looking statements that are based on assumptions that are inherently subject to significant uncertainties and contingencies, many of which are beyond

Caravel's and Rover's control. While all projections are necessarily speculative, Caravel and Rover believe that the preparation of prospective financial information involves increasingly higher levels of uncertainty the further out the projection extends from the date of preparation. The assumptions and estimates underlying the projected results are inherently uncertain and are subject to a wide variety of significant business, economic and competitive risks and uncertainties that could cause actual results to differ materially from those contained in the projections. The inclusion of projections in this press release should not be regarded as an indication that Caravel and Rover, or their representatives, considered or consider the projections to be a reliable prediction of future events.

Annualized, pro forma, projected and estimated numbers are used for illustrative purpose only, are not forecasts and may not reflect actual results.

This press release is not intended to be all-inclusive or to contain all the information that a person may desire in considering an investment in Caravel and is not intended to form the basis of an investment decision in Caravel. All subsequent written and oral forward-looking statements concerning Caravel and Rover, the proposed transaction or other matters and attributable to Caravel and Rover or any person acting on their behalf are expressly qualified in their entirety by the cautionary statements above.

**No Offer or Solicitation**

This press release does not constitute a solicitation of a proxy, consent or authorization with respect to any securities or in respect of the proposed transaction. This press release also does not constitute an offer to sell or the solicitation of an offer to buy any securities or a solicitation of any vote or approval, nor will there be any sale of any securities in any state or jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of such other jurisdiction. No offering of securities will be made except by means of a prospectus meeting the requirements of section 10 of the Securities Act of 1933, as amended, or an exemption therefrom.

**Rover**
**MEDIA**
pr@rover.com
Kristin Sandberg

SPORTSMAN 092

(360) 510-6365

**INVESTORS**

brinlea@blueshirtgroup.com

Brinlea Johnson

(415) 269-2645

**True Wind Capital**

press@truewindcapital.com

Stephanie Portillo

SOURCE True Wind Capital

SPORTSMAN 093

Exhibit 23



Enter your search terms                                                    GO

Popular Topics: <u>Getting started</u>, <u>How taxes work</u>, <u>Payments</u>

Help Center  >  Owners  >  Payments

# When will I be charged for a service?

Your card is charged at the time of booking, similar to reserving a flight. Please note that while your card is debited at the time of booking, Rover holds onto the funds and releases them to the sitter two days after the stay or service is complete.

## Related Questions

<u>Should I tip my sitter?</u>

<u>How do I pay for my dog's stay?</u>

<u>How do I get paid for bookings, and when?</u>

<u>How do taxes work?</u>

<u>How do I use coupons, promo codes, and gift cards?</u>

SPORTSMAN 094

2/20/2021                               When will I be charged for a service? – Help Center

| https://support.rover.com/hc/en-us/articles/205880556-When-will-I-b | Go |

MAY **JUN** AUG

◀ **10** ▶

4 captures                                                                        2015 **2016** **2020**
10 Jun 2016 – 31 Oct 2020                                                                     ▼ About this capture

| View All Articles | | Contact Support |

Visit the Q&A; Community

SPORTSMAN 095

https://support.rover.com/hc/en-us/articles/205880556-When-will-I-b   Go

SEP **OCT** NOV

◀ **31** ▶

**2016** **2020** 2021

▼ About this capture

4 captures
10 Jun 2016 – 31 Oct 2020

**Rover**

Enter your search terms                                                        GO

Popular Topics: <u>Getting started</u>, <u>How taxes work</u>, <u>Payments</u>

Help Center  >  Owners  >  Payments

# When will I be charged for a service?

Your card is charged at the time of booking, similar to reserving a flight. Rover holds onto the funds and releases payment to your sitter or dog walker two days after the service is complete.

If a provider does not accept your request, any processing charges will be dropped from your bank account.

**Important**: Booking and paying on Rover is required, per our <u>Terms of Service</u>. Never pay by cash or check—this could expose you to fraud and makes your stay or walk ineligible for the <u>Rover Guarantee</u> and 24/7 support.

For more information about how to book and pay on Rover, <u>check out this article</u>.

**Related Questions**

<u>Should I tip my sitter?</u>

SPORTSMAN 096

2/21/2021                                When will I be charged for a service? – Help Center

https://support.rover.com/hc/en-us/articles/205880556-When-will-I-b   Go    SEP  **OCT**  NOV

4 captures
10 Jun 2016 – 31 Oct 2020                                             ◀ **31** ▶
                                                                     **2016  2020**  2021    ▾ About this capture

What if my sitter cancels a booking?

How do I add or remove a credit card from my account?

**Recently Viewed**

| View all articles | Log in to contact support |

Visit the Q&A; Community

SPORTSMAN 097

2/20/2021                                When will I be charged for a service? – Help Center



Enter your search terms                                                    GO

Popular Topics: <u>Getting started</u>, <u>How taxes work</u>, <u>Payments</u>

Help Center  >  Owners  >  Payments

# When will I be charged for a service?

Your card is charged at the time of booking, similar to reserving a flight. Rover holds onto the funds and releases payment to your sitter or dog walker two days after the service is complete.

If a provider does not accept your request, any processing charges will be dropped from your bank account.

**Important**: Booking and paying on Rover is required, per our <u>Terms of Service</u>. Never pay by cash or check—this could expose you to fraud and makes your stay or walk ineligible for the <u>Rover Guarantee</u> and 24/7 support.

For more information about how to book and pay on Rover, <u>check out this article</u>.

**Related Questions**

<u>Should I tip my sitter?</u>

<u>How do I cancel a booking and receive a refund?</u>

<u>What if I need to cancel a booking?</u>

SPORTSMAN 098

What if my sitter cancels a booking?

How do I add or remove a credit card from my account?

**Recently Viewed**

How does the dog walking map feature work?

Will I receive a 1099 from Rover?

Should I tip my sitter?

|  |  |
|---|---|
| View all articles | Log in to contact support |

Visit the Q&A Community

SPORTSMAN 099

Exhibit 24

# Sitter Resources

Advice and resources for being a successful sitter on Rover

Sitter Resources / Getting Started ▾

## A Part-Time Job For College Students: Make Money as a Pet Sitter



Whether you're preparing to start college or already in the thick of it, finding a part-time job that fits your student schedule can be a challenge. Pet sitting, however, is flexible, fun, a perfect study break for students. You may already have experience taking care of the family dog or watching your neighbor's cat while she was out of town. Whether you're looking for a summer job or a side gig during the school year, Rover is an excellent choice for a part-time

summer job or a side gig during the school year. Rover is an excellent choice for a part-time job for college students.

Become a Rover sitter now!

Why does pet sitting work so well for students? Two reasons. First, you get to design the job so it fits your schedule and the amount of work that's right for you. Second, you get to take advantage of the pet sitting lifestyle. Yeah, it's a lifestyle.



# Create Your Own Part-Time Job

Being a pet sitter is unlike other typical part-time jobs for college students. In this work, you're the boss and you run the business. Plus, you don't need a business degree to start your own pet sitting business. Rover gives you the tools you need to get started.

- **Set your own work schedule.** You don't always have a choice on when your classes scheduled, but you do have a choice over your pet sitting schedule. As you design your Rover profile, you'll determine the days and times that you're available to work. If you've got daytime classes, pet sit in the evening. If you've got evening classes, walk dogs during

got daytime classes, pet sit in the evening. If you've got evening classes, walk dogs during the day. If you don't have any time during the week, schedule pet sitting on the weekends. You post your availability online, so pet owners can view your schedule and book appointments hassle-free.

- **Choose the pet care services that you'll offer.** Pet sitters can offer a variety of pet care services, and you'll get to decide which services work for your life. If you're living in the dorm, you won't be able to board your dog clients overnight, but you can house sit and care for pets at the owner's home. Check out all of the pet care options: drop-in visits, dog walking, doggie daycare, dog boarding (hosting dogs in your home), and house sitting (pet sitting in the owners home).

- **Determine your rates.** Pet sitters earn up to $1,000 per month or more. Set the rate that you'll charge for each pet care service you provide. To determine fair pricing, check out other pet sitters in your area and learn what pet owners are willing to pay. Payment is automatic and secure on the Rover app.

![Woman kneeling to give a treat to a small white dog in a park]

# Enjoy The Lifestyle 

You're not flipping burgers, filing paperwork, or standing around at the cash register. Pet

sitting is fun, and you're free to take pet clients out and about with you. Sure, you'll need to pick-up some poo, but check out these perks:

- **More Pet Friends!** If you miss your dog at home, pet sitting is a great way to take the edge off. You can count on hours of puppy love or kitty cuddles during your pet sitting appointments. Consider this the best way to take a break from class, homework, and other school stress.

- **Get Outside.** Feeling trapped in the library? Pet care for dogs requires playtime outside! Grab a ball and get some fresh air.  Enjoy playing fetch at the dog park, taking walks around campus, or going for a run. Not only are your dog clients happy when they're tired, pet owners will love you too.

- **Utilize the Rover Community.** Rover is committed to your success and provides resources for you to be effective. Get safety tips, pet care tricks, ideas for promoting your business, and advice on how to be the best dog sitter in town. Learn more on Rover.com.

- **The Rover Guarantee.** As a pet sitter with Rover, you're not on your own if there are accidents or emergencies. You have 24/7 support including vet assistance for the dogs in your care. Go online to learn more about what the Rover Guarantee includes.

- **Take your business with you.** You can be a pet sitter anywhere you live. When you've finished your finals and are headed home for summer, pick up pet clients back at home. When the summer ends and you're traveling back to school, update your profile and let your school-year clients know you're back in town!

# Ready to get paid to play with dogs?

Go online now. Here's how it works:

- **Create your profile.** Sign up is easy. First, create your profile page including your schedule, services, and rates. Share your skills, experience, and why you love pet sitting. Be sure to include photos of yourself and your pets.
- **Pass a Background Check.** Rover reviews every profile that's submitted, so take the time to create a profile that stands out. Once you're approved, you can begin accepting clients immediately.
- **Get Started.** Download the Rover app to accept appointments, communicate with owners, track important details of playdates, and get paid. Encourage pet owners to review you online, so you can attract other pet owners too!

Sign up here for more dog love in your life

By Rover Staff | June 26, 2018

**Tags:**   Rover sitter success

RELATED ARTICLES



Measuring up to Your 2019 Resolutions

January 28, 2019





## Walking (Dogs) in a Winter Wonderland

November 20, 2018



## Interview With A Pet Sitter: Profile Maintenance

November 5, 2018

Help Center

About Us

Joining Forces

Privacy Policy

Terms of Service

©2019 Rover.com. All Rights Reserved.

2101 4th Ave #400 | Seattle, WA | 98121



Exhibit 25

# Sitter Resources

Advice and resources for being a successful sitter on Rover

Sitter Resources / Sitter Stories  ▾

## The Top 5 Jobs for Retirees



Whether you've just blown out the candles on your retirement cake or you're a few years in, retirement offers the perfect time to try something new. Why not make a little extra cash in the process? And while you're at it, why not become your own boss? Read on to learn what kinds of jobs are the best jobs for retirees.



# Retiree job tip #1: Join the gig economy

All the retiree jobs we're suggesting are part of the so-called "gig economy." The basic idea of the

Case 3:19-cv-03053-WHO   Document 66-2   Filed 02/24/21   Page 152 of 233

All the retiree jobs we're suggesting are part of the so-called "gig economy." The basic idea of the gig economy is a flexible environment where temporary positions are hired for short-term engagements or projects.

How do you fit in? Gig economy jobs are flexible because they aren't permanent. Individuals are basically independent contractors that work as much or as little as they desire. Most people sign up with a company that offers a specific service, such as food delivery, driving, or on-demand pet sitting.

The benefits of going with a company rather than going it alone are many. Most companies offer various types of reservation guarantees or insurance, customer support, and free promotion for their contractors—giving you total control and flexibility. Sounds good, right?



# Best part-time jobs for retirees

The gig economy offers lots of choices for part-time jobs for retirees, but which will give you the best return on your time? We've gathered some options:

## Become a dog sitter on Rover

Case 3:19-cv-03053-WHO   Document 66-2   Filed 02/24/21   Page 153 of 233

As a dog sitter on Rover, you can offer overnight dog sitting in your home, in a neighbor's home, or both. Dogs get loving care while their owners are away, and you get paid to play with dogs. On top of that, sitters and dogs are covered by the Rover Guarantee. Need we say more?

You can also apply to be a dog walker in addition to dog sitting. Walkers pick up up a lucky pup, take them on a midday adventure and return them home, exercised and happy. The best part is that there's no limit on what you can do. You can walk dogs all day and have a few sitter dogs at night. If you want, your retired life could be full of dogs without the vet bills or long-term responsibility. Sign us up!

## Become a tasker on TaskRabbit

Perfect for a Jack/Jill of All Trades (or Jack/Jill of a Specific Trade), TaskRabbit allows you to list your services on their website. You can offer everything from house cleaning to bartending, and clients can contact you directly from the site.

## Rent Your Guest Room on Airbnb

Have an empty bedroom? Rent it out to travelers on Airbnb. You can select the dates it's available to rent, and travelers will contact you directly from the site. Of course, if you love to travel, you can rent out your whole place while you're away—that way, your vacation can pay for itself!

## Rent your car on RelayRides

RelayRides allows you to share your car with your neighbors, and you get to decide who gets to drive it and when. In some areas, you can even park your car at the airport to reach an even bigger client base. Your car will get the exercise it needs, and you'll get paid for sharing your car when you're not using it.

## Become a driver on Uber or Lyft

Just because you're ditching the morning commute doesn't mean your car has to sit in the garage. Become a driver with Uber or Lyft—check out their websites and see which company is more in line with your goals.





# Build a community (and your nest-egg)

The gig economy is here to stay, and retirement offers the perfect opportunity to jump right in. The technology that these companies rely on helps connect you with your neighbors, and you may even build lasting friendships with someone who originally just needed a lift from the airport.

In addition, retirement can sometimes feel isolating, with the loss of seeing the same people day in and day out. Taking a part-time job as a retiree, especially in your community, can help you reconnect and keep those social connections alive while supplementing your income.

# Why Rover is a great job for retirees

While all of the above jobs for retirees are great choices, we'd like to think Rover offers something special. Not only are you getting to hang out with dogs all day, but you're helping someone experience the unconditional love of a dog.

With Rover, people who work full time can rest easy knowing someone like you is caring for their best friend. And you get to explore your community, get some exercise and make a little money while you're at it. Wondering how the cash you make with Rover can enhance your retirement? We have some ideas for you:

Rover Sitting Paid for Our Carribean Cruise



Craig and Trace saved for nine months to go on the cruise of their dreams while on a fixed income. They were also able to pay for their plane tickets, stay at the Hilton, and pay for all their

meals with their Rover earnings. And the best part? They were able to save for their vacation doing something they love—taking care of dogs. Learn how they did it.

Don't Call me a Senior! Rover and Keeping Active in Retirement

Victoria Stephens can barely get her parents on the phone. They're too busy watching Rover dogs and taking advantage of Task Rabbit. Learn how they keep busy and earn cash on the side being part of the gig economy.

Not sure if dog walking or sitting is for you? Read what qualities a successful dog walker has.

Ready to take your first steps on the working after retirement path? Join us at Rover!

Join Us as a Dog Walker or Sitter Today!

By Rover Staff | September 4, 2015

**Tags:** Dog sitting

## RELATED ARTICLES



Best Communication Practices as an On-demand Dog Walker

August 3, 2018





## 7 Ways to Earn Loyal Clients

August 1, 2018



## A Part-Time Job For College Students: Make Money as a Pet Sitter

June 26, 2018

---

## Need Help?

### Visit Our Help Center

---

© 2018 Rover.com. All Rights Reserved.

Exhibit 26

# Sitter Resources

Advice and resources for being a successful sitter on Rover

## Best Communication Practices as an On-demand Dog Walker



As an on-demand dog walker, you play an important role in every owner's experience trusting Rover with their beloved pets. Currently, on-demand dog walking is Rover's only service that allows you, as a walker, to accept a request without any prior conversation with the owner. Rather than you having to do the work to build client relationships, the service does it for you!

Because on-demand is the only service owners use where they may not ever meet their sitter face-to-face, we place a great deal of trust in you to create a 5-star experience for every walk, which begins with stellar communication.

First, as a reminder, you should always be sure to thoroughly read through the request details before both accepting the walk and asking the owner any questions they may have already addressed. Often times, owners leave important details in their requests which sometimes

limit the type of walker who should accept them. Below are a few commonly seen special requests that you should be on the lookout for:



## "My dog is reactive around men. Female walkers only, please!" (or vice versa)

These types of notes are particularly important to keep your eye out for. Some dogs, for some reason or another, are highly reactive around a particular gender. Just as many dogs can express anxiety, fear, or aggression around people wearing hats, people with different voices, etc. they can feel less comfortable around a certain gender. The best practice is to always assume "owner knows best." Owners spend every day with their pets and know better than anyone what will upset them. More often than not, the owner is making these types of notes to also look out for you, as their walker. They don't want you to have to go through any trouble getting their dog to warm up to or show any aggression towards you if they can avoid it.

## "Flexible start time of XTIMEX to XTIMEX"

Because our system currently only allows scheduled requests to be made at the half hour or

hour mark, often owners are okay with a flexible start time, or window of hours the walk(s) can take place. If, for example, an owner requests walks that repeat weekly every Monday at noon, but really they're okay with the walk taking place anytime between noon and 2:00 pm, they'll often include this in their request details. If an owner does not have a note like this, please do not request a flexible start time. This is up to the owner, and for all other requests, you should plan on arriving promptly at the requested start time.

## "I need a Meet & Greet beforehand!"

On-demand is the only service where the option for a Meet & Greet isn't provided on the platform. Owners who are new to using the service, or maybe have a dog with very specific care instructions to make for successful walks, may require a meet and greet prior to the walk(s). Owners are welcome to request these in their walk request details. If you see a note like this, only accept the walk if you are willing to arrange a time to meet up with the owner.



# From Pre-Walk to Post-Walk, Communication is Key!

## Pre-Walk – You've Just Booked          

As soon as you book a request, be sure to send the owner a message in your Rover Messages introducing yourself. While this isn't required, it's highly encouraged as it opens up room for

conversation should the owner have anything additional they want to let you know, or you them. It also lets the owner know that you're a responsible, reliable walker they are able to feel confident in.

Here's an example of an easy way to first reach out to an owner: "Hey Jack, my name is Jill and I'll be Max's walker on Friday! I'm looking forward to walking Max!" If you want to go above and beyond to make for a 5-star experience, you might include something that illustrates you really understand their instructions, such as "I notice you mentioned that Max sometimes pulls on the leash a bit, so I'll be sure to keep that in mind!"

## I'm On My Way!

When you are on your way to the walk, let the owner know. This helps give them an idea of an ETA, and assures them you're right on time! When owners don't hear from you that you're on your way, sometimes they wonder where you are or whether you forgot about their walk. When in doubt, letting the owner know where you are is always best! If you get stuck in traffic, let them know your ETA and that you're doing everything you can to get there ASAP. If you run into any trouble along the way (ex: car accident, become ill, have an emergency, etc.), let them know that unfortunately you're unable to do the walk and that you'll reach out to Rover Support to help find them a replacement. The more communicative you are with an owner, the better their experience is.

## I've Arrived!

Whether you're running just a few minutes behind because you had to park a few blocks away, or are about to harness up the dog, give the owner a quick message, "I just arrived! I'll be walking Max shortly." Owners love updates! Let's say you arrive and you can't figure out the entry instructions – whether the owner forgot to include them, their lockbox is a little tricky, or you simply cannot find the key where they said it would be – do as much troubleshooting on your own as you can, and if you're still unable to get in, message the owner right away. If you don't hear back via your Rover Messages within 2-3 minutes, give them a call. It's always best practice to contact the owner by all means possible before contacting Rover Support. If you never hear back from the owner and it's been 10+ minutes, contact Rover Support and they can assist from there!

## Post-Walk – Oops! I forgot to let you know that...

If for any reason you forgot to include anything in your Rover Card that you meant to, go ahead and message the owner. If you forgot to include pee and poop breaks, for examp we're sure the owner will appreciate learning their dog did, in fact, do their business!



By Rover Staff | August 2, 2018

By Rover Staff | August 3, 2018

## RELATED ARTICLES



### Best Communication Practices as an On-demand Dog Walker

August 3, 2018



### 7 Ways to Earn Loyal Clients

August 1, 2018



Case 3:19-cv-03053-WHO Document 66-3 Filed 03/24/21 Page 163 of 233



A Part-Time Job For College Students: Make Money as a Pet Sitter

June 26, 2018

---

## Need Help?

### Visit Our Help Center

© 2018 Rover.com. All Rights Reserved.



Exhibit 27

# Sitter Resources

Advice and resources for being a successful sitter on Rover

Sitter Resources / Sitter Stories ▾

## "Dogs Bring Out the Best in Me:" Meet Rover Sitter Fabiana



Rover sitter Fabiana R. lives a dog lover's dream in San Diego. For her and her "canine campers," as she calls her dog clients, an average day includes balanced meals and treats, a trail hike or beach trip, and plenty of cuddles. Dog sitting keeps Fabi physically active and even helps with her mindfulness practice.

She says simply, "[Dogs] bring out the best in me."



Dogs Bring Out the Best in Their Rover Sitter Fabiana | The Dog People by Rover.com



## "Rover Provides Me with my Biggest Dream"

Fabi considers her client dogs as members of her family, saying, "Rover provides me with my biggest dream: to have more than 86 dogs!"

And it seems dogs love her back, based on her repeat customers and five-star reviews. Fabi remembers one pooch in particular who formed a strong bond while staying in her home. "He was very loyal to me," she recalls, "and when his human came to pick him up, he did not want to leave."

## Her Secret to Success

Fabi credits her success to her philosophy of treating dogs like individuals. "I take every pooch's unique personality into account," Fabi says. "I'm very detailed oriented and love making EVERYONE feel happy."

That includes dogs who are feeling under the weather, like a favorite client who needed supervision while recovering from an insect bite. The dog's human had to work, but didn't want to leave their sick pet home alone. Fabi spent all day hanging out with the dog, tracking his symptoms, and was ready to him to the vet at a moment's notice if it seemed necessary.



# Dogs as Mindfulness Practice

Fabiana is able to stay cool under pressure thanks to her practice of mindfulness and meditation. In fact, she's currently studying to become a mindfulness instructor through the Center for Mindfulness at UMass Medical School. Her ability to remain present and calm is a *huge* asset to dog sitting, when challenges and even emergencies can arise at a moment's notice.

Fabiana's biggest tip for taking care of dogs is to "be yourself." Dogs love you and the moment, no matter what. As Fabiana says, "they practice what I preach. Always in the present moment, no worries about the past or future."

We love her advice.

By Irene Keliher | March 20, 2018

**Tags:** Rover sitter success    True story



Irene Keliher

RELATED ARTICLES



Best Communication Practices as an On-demand Dog Walker

August 3, 2018



7 Ways to Earn Loyal Clients

August 1, 2018





A Part-Time Job For College Students: Make Money as a Pet Sitter

June 26, 2018

## Need Help?

Visit Our Help Center

© 2018 Rover.com. All Rights Reserved.



Exhibit 28





Exhibit 29

2/20/2021                                            Rover's Reservation Guarantee

https://www.rover.com/reservation-guarantee/        Go     JAN **FEB** MAY
4 captures                                                      ◄ **23** ►
23 Feb 2017 – 5 Jul 2019                                      2016 **2017** 2018
                                                                ▼ About this capture

# Rover (/web/20170223143220/https://www.rover.com/?ref=header)

# Rover's Reservation Guarantee

Though it's rare, occasionally a sitter or dog walker has to cancel at the last minute. If that happens to you, we've got your back: Every booking made through Rover is covered by our reservation guarantee. Here's what that means.

## We'll Give You a Refund

If a sitter or dog walker cancels your booking within seven days of your start date, we'll give you a refund. If any day of your booking falls on one of our recognized holiday dates (https://web.archive.org/web/20170223143220/https://support.rover.com/hc/en-us/articles/204999640-What-are-holiday-rates-), that changes to within 14 days of the service start date.

## We'll Help You Find a New Sitter or Dog Walker

We'll get in touch with you ASAP, but you can also reach out to us directly. Call us any time at 888-453-7889—we're here 24/7—or contact us here (https://web.archive.org/web/20170223143220/https://support.rover.com/hc/en-us/requests/new).

Though availability varies widely, we'll do everything we can to help you find a great replacement. If you book with a more expensive sitter or dog walker, we'll cover the cost difference between the original booking and your new booking, up to 25% of the total cost of original booking.

## We're Here for You

We promise we'll do everything we can to make sure you and your dog love your experience, and the reservation guarantee is a huge part of that.

## Join Our Pack

**Follow Rover on Twitter**                          Follow @roverdotcom
                                              (https://web.archive.org/web/20170223143220/https://twitter.com/in
                                              screen_name=roverdotcom)

## Need Help?

Visit Our Help Center (https://web.archive.org/web/20170223143220/https://support.rover.com/hc/en-us?ref=footer)

© 2017 Rover.com. All Rights Reserved.

SPORTSMAN 105

Exhibit 30

https://www.rover.com/terms/reservation-protection/          Go     JUL  AUG  NOV
                                                                          ◀ 11 ▶
3 captures                                                         2018 2019 2020
11 Aug 2019 – 26 Jan 2021                                          ▼ About this capture

# 🐾Rover (/web/20190811164829/https://www.rover.com/?ref=header)

# Rover's Booking Protection

Rover's Booking Protection

Though it's rare, occasionally a sitter or dog walker may need to cancel at the last minute. If that happens to you, we've got your back: every booking made through Rover includes Booking Protection. Here's what that means:

## We'll Give You a Refund

If a sitter or dog walker cancels your booking within seven days of your service start date, we'll give you a refund. If any day of your booking falls on one of our recognized holiday dates, that changes to within 14 days of the service start date. We'll also provide a $20 credit to help cover the cost of the new service.

If the booking is cancelled by the service provider due to a lack of information or cooperation from the pet owner, then the owner will have to cover the full cost of any new reservation.

## We can help you find a new Rover sitter or dog walker

Email (https://web.archive.org/web/20190811164829/mailto:support@rover.com) or call us—we can help you find a great replacement.

### Learn More

Read Our Blog (https://web.archive.org/web/20190811164829/https://www.rover.com/blog/?ref=footer)

Rover Q&A; Community (/web/20190811164829/https://www.rover.com/community/questions/)

Rover Store (https://web.archive.org/web/20190811164829/https://store.rover.com/?ref=footer)

Rover Guarantee (/web/20190811164829/https://www.rover.com/rover-guarantee/)

Safety (/web/20190811164829/https://www.rover.com/safety/)

Sit a Dog, Save a Life (/web/20190811164829/https://www.rover.com/sit-a-dog-save-a-life/?ref=footer)

Help Center (https://web.archive.org/web/20190811164829/https://support.rover.com/hc/en-us/?ref=footer)

### About Rover

About Us (/web/20190811164829/https://www.rover.com/about-us/?ref=footer)

Contact Us (https://web.archive.org/web/20190811164829/https://support.rover.com/hc/en-us/?ref=footer)

Joining Forces (/web/20190811164829/https://www.rover.com/joining-forces/?ref=footer)

Get the App (/web/20190811164829/https://www.rover.com/app/?ref=footer)

Press (https://web.archive.org/web/20190811164829/https://www.rover.com/blog/press/?ref=footer)

Careers (/web/20190811164829/https://www.rover.com/careers/)

Partners (/web/20190811164829/https://www.rover.com/partners/?ref=footer)

Privacy Policy (/web/20190811164829/https://www.rover.com/terms/privacy/?ref=footer)

Cookie Policy (/web/20190811164829/https://www.rover.com/terms/cookies/?ref=footer)

Terms of Service (/web/20190811164829/https://www.rover.com/terms/tos/?ref=footer)

Interest-Based Ads (/web/20190811164829/https://www.rover.com/terms/privacy/?ref=footer#advertising-and-analytics-services)

Rover UK (/web/20190811164829/https://www.rover.com/uk/)

### Top Rover Cities

Atlanta (/web/20190811164829/https://www.rover.com/atlanta--ga--dog-boarding/)

Austin (/web/20190811164829/https://www.rover.com/austin--tx--dog-

Minneapolis (/web/20190811164829/https://www.rover.com/minneapolis--mn--dog-boarding/)

Mississauga (/web/20190811164829/https://www.rover.com/ca/mississauga--

SPORTSMAN 100

Rover's Booking Protection | Rover.com

https://www.rover.com/terms/reservation-protection/   Go   JUL **AUG** NOV

**3 captures**                                                    **11**
11 Aug 2019 – 26 Jan 2021                                  2018 **2019** 2020

boarding/)                                                      boarding/)
Calgary (/web/20190811164829/https://www.rover.com/ca/calgary--ab--dog-    Orlando (/web/20190811164829/https://www.rover.com/orlando--fl--dog-
boarding/)                                                      boarding/)
Charlotte (/web/20190811164829/https://www.rover.com/charlotte--nc--dog-   Ottawa (/web/20190811164829/https://www.rover.com/ca/ottawa--on--dog-
boarding/)                                                      boarding/)
Chicago (/web/20190811164829/https://www.rover.com/chicago--il--dog-       Philadelphia (/web/20190811164829/https://www.rover.com/philadelphia--pa-
boarding/)                                                      -dog-boarding/)
Cincinnati (/web/20190811164829/https://www.rover.com/cincinnati--oh--     Phoenix (/web/20190811164829/https://www.rover.com/phoenix--az--dog-
dog-boarding/)                                                  boarding/)
Cleveland (/web/20190811164829/https://www.rover.com/cleveland--oh--       Portland (/web/20190811164829/https://www.rover.com/portland--or--dog-
dog-boarding/)                                                  boarding/)
Columbus (/web/20190811164829/https://www.rover.com/columbus--oh--         Richmond (/web/20190811164829/https://www.rover.com/richmond--va--
dog-boarding/)                                                  dog-boarding/)
Dallas (/web/20190811164829/https://www.rover.com/dallas--tx--dog-         Sacramento (/web/20190811164829/https://www.rover.com/sacramento--ca--
boarding/)                                                      dog-boarding/)
Denver (/web/20190811164829/https://www.rover.com/denver--co--dog-         Saint Louis (/web/20190811164829/https://www.rover.com/st-louis--mo--dog-
boarding/)                                                      boarding/)
Edmonton (/web/20190811164829/https://www.rover.com/ca/edmonton--ab-       Salt Lake City (/web/20190811164829/https://www.rover.com/salt-lake-city--
-dog-boarding/)                                                 ut--dog-boarding/)
Fort Worth (/web/20190811164829/https://www.rover.com/fort-worth--tx--     San Antonio (/web/20190811164829/https://www.rover.com/san-antonio--tx--
dog-boarding/)                                                  dog-boarding/)
Houston (/web/20190811164829/https://www.rover.com/houston--tx--dog-       San Diego (/web/20190811164829/https://www.rover.com/san-diego--ca--
boarding/)                                                      dog-boarding/)
Indianapolis (/web/20190811164829/https://www.rover.com/indianapolis--in-  San Jose (/web/20190811164829/https://www.rover.com/san-jose--ca--dog-
dog-boarding/)                                                  boarding/)
Jacksonville (/web/20190811164829/https://www.rover.com/jacksonville--fl-- Seattle (/web/20190811164829/https://www.rover.com/seattle--wa--dog-
dog-boarding/)                                                  boarding/)
Kansas City (/web/20190811164829/https://www.rover.com/kansas-city--mo--   Tampa (/web/20190811164829/https://www.rover.com/tampa--fl--dog-
dog-boarding/)                                                  boarding/)
Las Vegas (/web/20190811164829/https://www.rover.com/las-vegas--nv--dog-   Toronto (/web/20190811164829/https://www.rover.com/ca/toronto--on--dog-
boarding/)                                                      boarding/)
Lexington (/web/20190811164829/https://www.rover.com/lexington--ky--dog-   Tucson (/web/20190811164829/https://www.rover.com/tucson--az--dog-
boarding/)                                                      boarding/)
Los Angeles (/web/20190811164829/https://www.rover.com/los-angeles--ca--   Washington, D.C.
dog-boarding/)                                                  (/web/20190811164829/https://www.rover.com/washington--dc--dog-
Madison (/web/20190811164829/https://www.rover.com/madison--al--dog-       boarding/)
boarding/)                                                      Winnipeg (/web/20190811164829/https://www.rover.com/ca/winnipeg--mb--
Miami (/web/20190811164829/https://www.rover.com/miami--fl--dog-           dog-boarding/)
boarding/)                                                      More cities (/web/20190811164829/https://www.rover.com/top-dog-
Milwaukee (/web/20190811164829/https://www.rover.com/milwaukee--wi--       boarding-cities/)
                                                                Neighborhoods (/web/20190811164829/https://www.rover.com/top-dog-
dog-boarding/)                                                  boarding-neighborhoods/)

## Get cute puppies in your inbox

| Email Address |   | Submit |

By providing my e-mail address, I consent to receive marketing
communications from Rover.com and its affiliates.
Privacy Policy (/web/20190811164829/https://www.rover.com/terms/privacy/)

visit our blog
**THE DOG PEOPLE**
(https://web.archive.org/web/20190811164829/https://www.rover.com/blog/?
ref=footer)



2019 Rover.com. All Rights Reserved.

2101 4th Ave #400 | Seattle, WA | 98121

SPORTSMAN 101

2/20/2021                                 Rover's Booking Protection | Rover.com

https://www.rover.com/terms/reservation-protection/                    Go

**3 captures**
11 Aug 2019 – 26 Jan 2021

JUL **AUG** NOV
◄ **11** ►
2018 **2019** **2020**

About this capture

SPORTSMAN 102

Rover services may be impacted in your area due to COVID–19. **Go here for information on those regulations. (https://www.rover.com/blog/dogs–covid19–resource–guide/)**

 **Rover** (/)

# Rover's Booking Protection

Though it's rare, occasionally a sitter or dog walker may need to cancel at the last minute. If that happens to you, we've got your back: every booking made through Rover includes Booking Protection. Here's what that means:

## We'll Give You a Refund

If a sitter or dog walker cancels your booking within seven days of your service start date, we'll give you a refund. If any day of your booking falls on one of our recognized holiday dates, that changes to within 14 days of the service start date. We'll also provide a $20 credit to help cover the cost of the new service.

If the booking is cancelled by the service provider due to a lack of information or cooperation from the pet owner, then the owner will have to cover the full cost of any new reservation.

## We can help you find a new Rover sitter or dog walker

Email (mailto:support@rover.com) or call us—we can help you find a great replacement.

## Learn More

Read Our Blog (https://www.rover.com/blog/)
Rover Q&A
Community
(/community/questions/)
Rover Store (https://store.rover.com)

Rover Guarantee (/rover–guarantee/)
Safety (https://www.rover.com/blog/safety/)

## About Rover

About Us (/about–us/)
Contact Us (https://support.rover.com/hc/en–us/)
Accessibility (/accessibility–statement/)
Get the App (/app/)
Press (https://www.rover.com/blog/press)
Careers (/careers/)

Privacy Statement (/terms/privacy/)
Cookie Policy (/terms/cookies/)
CA – Do Not Sell My Info (/terms/cookies/#ccpa)
Terms of Service (/terms/tos/)

## Get cute puppies in your inbox

Email Address        | Submit |

SPORTSMAN 103

*By providing my e–mail address, I consent to receive*
*marketing communications from Rover.com and its affiliates.*
*Privacy Policy (/terms/privacy/)*

## THE DOG PEOPLE

  

© 2021 A Place for Rover, Inc. All Rights Reserved.

711 Capitol Way S., Suite 204, Olympia, WA 98501

SPORTSMAN 104

Exhibit 31

# Trust & Safety

Safety is at the heart of what we do.

**Our Commitment to Safety**                    Community Guidelines

We believe we're safer when we work together. On top of offering round–the–clock support, we provide features that facilitate safe, informed, and positive experiences for the people and pets in our community.

## How we support safer pet care experiences

### Background checks

Every sitter and dog walker has passed a third–party background check to offer peace of mind to pet parents.

## Rover Guarantee

This is our commitment to you in the rare instance that something goes wrong during a booking, and includes up to $25,000 in vet care reimbursement. Learn more

## Reservation protection

It doesn't happen often, but if a sitter or walker needs to cancel at the last minute, we'll help you find someone new. Learn more

## 24/7 support

We're here for you—24 hours a day, seven days a week. Sitters also have access to advice from qualified veterinary professionals. Get in touch

Discover pet care you can trust on Rover.com.

## Security and encryption

Your personal and account information is secured. Payments are cashless and all credit card details are encrypted.

# Discover pet care you can trust



### Personalized search

You know your pet better than anyone. Use our advanced search filters to find the exact right care for your pet's unique needs.



### Meet & Greet

Sitters, pets, and pet parents can get to know each other and confirm it's the right fit. Get the Meet & Greet guide



### Ongoing sitter education

We offer sitters and walkers relevant tips and safety information, like advice on managing multiple dogs and tips for securing your home and yard.



### Verified reviews

All reviews on Rover are verified, which means reviewers have completed a booking before sharing their experiences.



### Detailed pet profiles

Detailed profiles help keep pets and people safe by sharing each pet's likes and dislikes, anxieties, and unique care needs.



### GPS walk maps and photo updates

Pet parents can get Rover Cards with GPS maps of walks, photo updates, and more when booking dog walks, drop–in visits, and doggy day care.



## Hi, I'm Brent Turner, Rover's Chief Operating Officer.

I know how important peace of mind is when you entrust others to care for a member of your family, which is why I'm proud to be part of the amazing team at Rover. We don't just build and support the Rover platform—we're part of it too. Many employees are actively involved in the Rover community as pet sitters, dog walkers, and pet parents.

At Rover, our mission is to make sure everyone can experience the love of a pet in their lives. Read on to learn more about our commitment to safety, and please get in touch if you have feedback for us.

Brent Turner
COO

## Why pet parents, sitters, and dog walkers choose Rover



More than **30 million** pet care services have been booked on Rover.



**Over a million** pet parents worldwide trust Rover for pet care.



The average wait time to speak with our Trust & Safety team is **15 seconds**.

# Sitters on Rover have received millions of 5–star reviews

Find the right dog care whenever you need it too.

My sitter was very sweet and attentive! I knew she spent a lot of time with my boys and she stayed in touch like I like. She cleaned my bulldog's eyes and put drops in them and gave them yummy treats. I felt extremely safe having her take care of them. Thank you!

5.0 ★★★★★

# Links & Resources

Help Center

The Dog People

Community Guidelines

Rover Guarantee

Reservation Protection

Sitter Resources

## COVID–19 Resources

Pet Parent Resource Guide

Pet Sitter Resource Guide

Rover Resources & Updates

Exhibit 32

# Sitter Resources

Advice and resources for being a successful sitter on Rover

Sitter Resources / Getting Started ▾

## FAQs from Sitters and Dog Walkers New to Rover



You're excited to start watching and walking dogs, and we're excited for you to join the nation's largest network of pet sitters and dog walkers. We thought we'd take this opportunity to to shed some light on some common questions people have when they're revving up their business.

## What services can I offer?



First things first—here's our full list of services you can offer:

- **Dog boarding:** Your client's dogs come to your home and stay overnight.
- **House sitting:** You go to your client's home and stay overnight, taking care of their dogs and home.
- **Drop-in visits:** You stop by your client's home while they're away a few times a day for 30 minutes each time to feed and play with their dogs.
- **Dog walking:** You pick up your client's dogs at their home and provide a 30-minute walk.
- **Doggy day care:** Your client's dogs come to your home during the day, dropping off around 7–9am, and picking up around 4–6pm.

## What services match my schedule?

This question is a good starting point. Are you:

- A full-time or part-time student?
- A stay-at-home parent?
- Someone who works from home?
- Someone who works full time in a dog-friendly office?

Even if you don't fit into one of the above scenarios, we think you get the picture. Bottom line: Tailor your services to fit your schedule.

## What's my dog-size preference?

You can choose what size dogs you care for. Here at Rover, we divide up dog sizes into four categories:

- small (0-15 lbs)
- medium (16 – 40 lbs)
- large (41 – 100 lbs)
- giant (100+ lbs.).

Consider aspects like:

- *Physical strength:* If Sparky the Great Dane sees a squirrel, can you maintain control of his leash?
- *Services offered:* In-home sitting in your studio apartment might not accommodate dogs over 100 lbs.
- *Dogs/animals in your home:* Does your dog only get along with larger dogs? If so, keep dog-size preferences on the larger side.



## How many dogs can I handle at once?

Case 3:19-cv-03053-WHO Document 66-2 Filed 02/24/21 Page 191 of 233

There are several facets to this question, so we'll divide this up into two separate (but equally likely) situations.

1. *The owner has 2 or more dogs:* In this case, consider their dog sizes and look at your past experience. If you've never watched more than one dog at once, start slow: Try only accepting 1-2 dogs at a time, especially if you already have dogs or other animals in your home.
2. *You have two owners who would like to book during the same days:*

- Openly communicate with the owners so that all sides are aware you'll have several dogs in your care at the same time.
- Schedule a Meet & Greet before you book so you can get a good idea of whether or not the dogs will get along.
- Assess your home, and make sure you have enough space to separate each of the dogs if need be.

## Do I have a preference for neutered/spayed dogs vs. not neutered/not spayed?

At Rover, we don't discriminate when it comes to dogs who are fixed vs. those who aren't. However, consider the list below to see if taking unfixed dogs would be the right choice for you.

- Do you have any dogs in your home that aren't spayed or neutered?

You probably see where we're going with this. If your dog isn't fixed, it's best to only accept dogs who are fixed.

- Are you prepared for an unspayed female in heat?

This would be mean having dog diapers or an enclosed area to keep the dog while she is in heat. Unspayed females experience their menstrual cycle only two times per year, but always ask the owner if their dog will be in heat during the stay or walk just in case.

- Most unneutered dogs mark their territory, especially if that territory has already been marked by another dog. Have you had another dog mark his territory in your home? Are you prepared to keep the dog in an isolated area or provide pee pads just in case?



## Am I prepared to provide puppy care?

Puppies tend to be high-maintenance, but those puppy-dog eyes definitely make up for it. Check

FAQs from Sitters and Dog Walkers New to Rover | The Dog People by Rover.com

out some of our recommendations below to see if you should provide puppy care.

- *Be prepared for frequent potty breaks and occasional accidents.* Ask the owner detailed questions about where their dog is in potty-training so that you can help their puppy move forward with its training—and keep your floors clean (Nature's Miracle is, well…a miracle).
- *Other aspects of training might also be incomplete.* Puppies are excited little creatures, and they may react to new friends with jumping and barking. If you have small children, puppies might not be the best for you.
- *Keep your shoes off the ground.* Puppies could be in their teething phase, which means they will want to chew **everything**. Ask the owner to bring a few good chew toys, and make sure your valuables are out of reach.

## Am I prepared to provide care for special needs or elderly dogs?

Interested in caring for dogs with special needs, or dogs that have seen younger days? Here are a few things to keep in mind:

- *Depending on the breed and how they age, you may be required to administer medication.* This is also applicable to special-needs dogs. You may be asked to administer both pills and injections. Injections may also range in intensity—some dogs require intravenous injections, while others might need a routine insulin shot. As always, be vocal with the owner about your concerns or questions when it comes to any medication.
- *Many older dogs experience incontinence and arthritis.* Depending on the dog, you might have to use dog diapers and/or pee pads, which you can ask the owner to provide. In addition, some dogs experience crippling arthritis that causes legs to give out. Think about how much the dogs weigh, and how much weight you are comfortable lifting.

The more comfortable you are as a sitter or dog walker, the better your services will be. Trust your past experiences, be realistic, and know your personal limits. Whether you want to walk dogs on the weekends or are looking for a full-time gig caring for pets, trust your gut and only offer what you're comfortable providing.

By Victoria Harrell | October 30, 2015

**Tags:**   Dog boarding    Dog health & safety    Dog sitting    Dog walking    Puppies

## RELATED ARTICLES



Best Communication Practices as an On-demand Dog Walker

August 3, 2018



7 Ways to Earn Loyal Clients

August 1, 2018







A Part-Time Job For College Students: Make Money as a Pet Sitter

June 26, 2018

Need Help?

Visit Our Help Center

© 2018 Rover.com. All Rights Reserved.



Exhibit 33

# Sitter Resources

Advice and resources for being a successful sitter on Rover

Sitter Resources / Getting Started ▾

## How to Make Your Profile Shine

You know you love dogs, but how are you going to communicate that to potential clients before they have a chance to speak with you? **These tips will make your Rover profile shine—and stand out from the rest.**

## Choosing the Right Photos

First impressions are important, and **the first thing owners look at on your Rover profile are your pictures**. When choosing photos for your profile, remember to:

- Choose clear and crisp photos. High quality photos make your profile look more professional.
- Give them a sense of the real you. Do you have great photos from a recent hike or walk on the beach? If these are activities that a dog could participate in, the better.
- Bring a furry friend. **Photos with a dog instantly make your profile more attractive to potential clients.**
- Make your cover photo different than your profile photo.
- Smile. Think about all the dogs you're going to meet!





# Describing Yourself

Your biography section is a great place to tell your clients about yourself. They want to get to know you, and a thorough biography can take your profile to the next level. When writing about yourself, be sure to:

- **Write about your dog experience**. Did you grow up with dogs? Have you volunteered at a shelter? Are you a fantastic foster parent? All of these details add up to a great profile.
- **Explain what you'll do with a dog**. Whether it's nonstop frisbee, going on a long walk or sunbathing together in the yard, pet parents want to imagine what their dog's day will be like with you.
- **Be clear about why you're the best choice.** We know it can feel strange to do this, but your profile is a great chance to brag about yourself.
- **Go above and beyond**. Do you make homemade dog treats for your canine clients? Is each stay customized to a dog's every need? What do you do for dogs that other sitters won't?

# Filling in All the Details

Tell pet parents about your dog sitting preferences ahead of time by carefully filling out your profile. **You want potential clients to have the most accurate information about you**, so ensure that:

- Your size preferences are filled out. Do you only sit pocket-sized pups? Or can you watch any dog, from the very small to the extra-large?
- Your calendar is up to date. To make sure that owners are reaching out to you at the

right time, mark off any dates that are unavailable.

- You note whether you can take care of other animals. Sometimes clients have cats or caged pets that may also need care. Be sure to mention other pets you have experience with.

By using these tips, your profile will stand out from the crowd and draw in more clients.

By Arah McManamna  |  June 8, 2016

---

**Tags:**    Dog sitting    Rover sitter success

---

## RELATED ARTICLES



### Best Communication Practices as an On-demand Dog Walker

August 3, 2018





[7 Ways to Earn Loyal Clients](#)

August 1, 2018



[A Part-Time Job For College Students: Make Money as a Pet Sitter](#)

June 26, 2018

## Need Help?

[Visit Our Help Center](#)

© 2018 Rover.com. All Rights Reserved.

Exhibit 34



Enter your search terms                                              GO

Popular Topics: <u>Getting started</u>, <u>How taxes work</u>, <u>Payments</u>

Help Center  >  Sitters  >  Running My Business

# What are sitter performance scores?

Sitter Performance Scores give you a sense of how you're performing compared to other sitters and walkers on the platform, and they influence your profile ranking in search. The higher your score, the better your placement in relevant search results on Rover.

**Important to Know:**

- Your scores are private and can only be viewed by you.

- You'll never be penalized for declining requests that aren't compatible with your listed preferences and calendar availability. For instance, if the client has a Great Dane and your profile states that you only accept small dogs, your scores won't be affected if you decline the request.

<u>Types of Scores</u>

<u>Viewing Performance Scores</u>

<u>Improving Your Booking Score</u>

<u>Improving Your Repeat Score</u>


Get Help

## Types of Scores

Each of the services you offer have two types of scores: a booking score, and a repeat score.

**Booking Score**

This score consists of your overall booking rate, which looks at the number of new clients who contact you for the first time and measures that against how many of them end up booking with you and leaving you a positive review.

**Repeat Score**

Your repeat score tells you how often your first-time clients book with you again. If you haven't booked enough repeat clients to generate a score yet, then it may appear in gray.

## Viewing Performance Scores

You can view these scores from your sitter account on a computer by selecting your name in the upper right corner of the screen and selecting **View Performance Scores**.

If you offer more than one service, you'll have a different score for each one. Toggle between them by selecting the dropdown menu next to **Your Performance Scores**.



**Note**: If you see **N/A** as a score for one of your services, then it might you haven't received or booked enough requests to generate a score yet. As you book more requests and build repeat bookings with clients, you'll eventually receive a score for that service.

## Improving Your Booking Score



Here are some ways to ensure that you receive a high booking score :

- Respond to every request you receive in a timely manner, even if you're unable to accept the request. Being communicative is key to running a successful business. It also ensures that you maintain a high response rate.

- Book as many requests as you can accept. This will help you maintain a high booking rate.

- Encourage clients to leave reviews. Positive reviews not only factor into your performance scores, but they also demonstrate your trustworthiness to new clients.

- Regularly update your calendar to ensure that it reflects your availability. Learn how.
- Create an inviting, authentic, and thorough profile that details your preferences.

## Improving Your Repeat Score

Here are some tips to encourage pet owners to book with you again:

- Send frequent photo and text updates to your clients during bookings. Learn more.

- Be accessible and communicate often with your clients.

- Provide 5-star care, whether it's your first or 10th booking with a client.

- Give loyal clients a heads up about your availability before busy seasons or vacations.

- Ask clients to book with you again next time. Learn more.

- Never accept cash or checks—always book on Rover. Learn more.

For more information on how to improve your scores, check out this post from the Rover Blog.

**Related Questions**


Get Help

Will I receive a 1099 from Rover?

How do I manage my calendar?

How do I send my client photos during a booked stay?

How do I book with an owner or create a repeat booking?

How do I remove client photos from my profile?

**Recently Viewed**

What do sitters need to know about the Rover Guarantee?

Why should I pay and communicate through Rover?

Where can I view my total earnings?

What's a W-9? Do I need to submit one to Rover?

Will I receive a 1099 from Rover?

| View All Articles | Contact Support |

Visit the Q&A Community



Exhibit 35

Case 3:19-cv-03053-WHO Document 66-2 Filed 02/24/21 Page 206 of 233

# Sitter Resources

Advice and resources for being a successful sitter on Rover

Sitter Resources / Getting Started ▾

## Keep your profile live and out of away mode



As a new Rover sitter, it's extra important to take action on your first few requests. Not only will it help you grow your business and your reputation, it will also keep your profile live and out of away mode.

# What is away mode?



Away mode occurs when you have less than three completed bookings and you don't respond to your last booking request. When this happens, your profile is automatically put into away

mode, meaning:

- **You can't get booking requests,** which means no business (or dog love) for you.
- **Your search rank will be lower** even when when you do reactivate, so you'll be less likely to receive requests again.

Away mode is good for letting owners know who's available, but isn't great for sitters trying to grow their pet sitting business.

## How to keep your profile live

Thankfully, keeping your profile live and out of away mode is easier than you think. Follow these tips to keep everything active and your reputation positive.

- **Manage your calendar.** It's your business, so make sure your calendar reflects when you're available. It will not only make things smoother for you, but you'll be able to accept all the requests you get. Update it here.
- **Set yourself to away mode intentionally** if you're unable or unwilling to offer certain services or if you're not available for certain dates. This ensures you won't get requests, so you won't have to worry about responding to them. Access that here.

## I've gotten my first booking request—now what?

Hooray! You've got your first booking request. Make sure you do the following to set yourself up for success:

- **Respond quickly**—the quicker you reply, the better your reputation as sitter will be.
- **Set up a Meet & Greet** to make sure it's a good fit and everyone gets along.
- **Accept the request** and get ready for your first Rover guest!

Unable to accept a request? Make sure you still reply, then archive the conversation so it's no longer an active request.

Follow these tips to keep your profile live and out of away mode. Your business—and clients—will thank you.

By Stephanie Olson | May 25, 2018



## RELATED ARTICLES



### Best Communication Practices as an On-demand Dog Walker

August 3, 2018



### 7 Ways to Earn Loyal Clients

August 1, 2018







## A Part-Time Job For College Students: Make Money as a Pet Sitter

June 26, 2018

---

## Need Help?

### Visit Our Help Center

© 2018 Rover.com. All Rights Reserved.



Exhibit 36

Case 3:19-cv-03058-WHO Document 66-2 Filed 02/24/21 Page 211 of 233

# Sitter Resources

Advice and resources for being a successful sitter on Rover

Sitter Resources / Getting Started ▾

## How Search Rank Works (and How to Work It)



You could be the best pet sitter in the biz, but if pet parents never see your profile, you won't get the stay requests you deserve. So how can you make sure that pet parents who come to Rover see your profile at the top of their search results?

Pet parents who come to Rover can search for a sitter by location, dates, and dog size. Beyond that, the order that sitters show up can seem random—but don't worry, there's a science behind it. We can't give away the recipe to our secret sauce, but there are some things you can do to show up at the top.

# Book Most of Your Requests

Being a sitter or dog walker on Rover is a great opportunity to get to know many different dogs and pet parenting styles—explore it! Of course, always schedule a Meet & Greet with a new client, and never take a dog you're not comfortable with. If you find you're getting a lot of requests you're not comfortable with, see if there's anything you need to clarify on your profile, like if dogs in your care must play nicely with cats. But really, you should accept most stay requests that you get, especially early on.

# Keep Your Calendar Updated

This is the easiest way to get requests you can accept. Got a weekend trip planned? Need some me-time? No problem! Just make sure to update your calendar. Download our app so you can update your calendar when you're on the go. And if you offer multiple services, make sure to update both of your calendars.

# Create a Great Profile

It all starts here. Just like a resume, a profile is a great way to show pet parents who you are before they even contact you. Impress 'em! Here are some ways you can build a strong profile:

- **Get Testimonials and Reviews.** When you're starting as a sitter or dog walker on Rover, you can request testimonials from friends and family. Especially if you don't have a lot of reviews, testimonials can give you some extra credibility. As you build your business, request reviews from your clients. There are lots of folks out there who want to sing your praises—so let 'em sing!

- **Upload Great Pictures.** We can't say this enough. High-quality photos of your face, home, and pets help dog owners get to know you.

- **Set Your Rates.** The rates you set are totally up to you. If you like, you can search for sitters and dog walkers in your area to see what they charge, then set a similar rate.

- **Describe Your Services Accurately.** Make sure that your profile reflects the service you offer, including number of spaces available, who else will help out with care, and dog sizes accepted.

# Respond Quickly and with Enthusiasm

Ideally, you would respond to a stay request within minutes, even if you can't accept the stay.

Here's how you can do that without being attached to your computer:

- We send you a text when you get a new message or stay request (We automatically do this by default, as long as you haven't checked "Do not send me any Text Messages" on your settings page).
- Download our app, and we'll send you a notification when you get a new message or stay request.

Not sure what to say when you get a stay request? We wrote a post about that, but a lot of it boils down to:

- Saying you're excited to watch their dog
- Offering to schedule a Meet & Greet right away

If you don't respond to multiple stay requests for the same dates, we'll assume you're not available for those dates and will stop featuring you in search. To keep receiving requests, you can archive your conversations.

Need a break from new stay requests? No problem.

- If you're only accepting repeat clients, set your calendar to Repeat Only.
- If you're temporarily unavailable to sit dogs or reply quickly to requests, set your calendar to Away.

## Deliver Great Service to Earn Loyal Clients

How do you get clients to turn to you every time they need a loving sitter? Make sure their dog has a great stay, of course! Prepare for a great stay by doing your homework and communicating with the pet parent every step of the way. Make sure to:

- Send at least one photo a day. Here's how to make sure you're sending great photos.
- At the end of the stay, ask to watch their pet the next time they're out of town.
- Ask for a review.

If repeat clients are coming back to you again and again, that tells Rover that you're doing a great job.

## If a Pet Parent Offers to Book Outside the Site, Say "No Thanks"

Explain to the pet parent the benefits of booking through Rover. **Every Rover service you offer is covered by 24/7 support, access to veterinary consultation, and the Rover Guarantee. We've**

got your back with every booking so you can focus on the good stuff: Watching dogs and making money.

Our goal is to create beautiful human-dog-human friendships. We hope that we're sending pet parents your way that are right for you and your growing business. Bottom line: If you follow our tips and continue to show time and time again that you're in it for the long haul, your search stock will only go up.

By Rover Staff | July 24, 2015

---

**Tags:**   Dog boarding      Dog sitting      Dog walking

---

## RELATED ARTICLES



### Best Communication Practices as an On-demand Dog Walker

August 3, 2018





## 7 Ways to Earn Loyal Clients

August 1, 2018



## A Part-Time Job For College Students: Make Money as a Pet Sitter

June 26, 2018

## Need Help?

### Visit Our Help Center

© 2018 Rover.com. All Rights Reserved.

Exhibit 37



Enter your search terms                                    GO

Popular Topics: <u>Getting started</u>, <u>How taxes work</u>, <u>Payments</u>

Help Center  >  Sitters  >  Getting Started

# What are the service fees?

Rover exists to make it easier to have a dog in your life. We do this by providing an innovative and secure platform, offering 24/7 customer support, and building better tools. Service fees allow Rover to operate and continually make improvements based on the needs of our growing community.

<u>Sitters</u>

<u>Owners</u>

## Sitters

Service fees vary depending on when your Rover profile was approved.

| Profile Approval Date | Service Fee Per Booking |
|---|---|
| Before March 1, 2016 | 15% |
| On/After March 1, 2016 | 20% |



Get Help

| Sitters with RoverGO | 25% |
| --- | --- |

Learn more about the benefits of becoming a sitter with RoverGO [here](#).

Pet sitters and dog walkers are the cornerstone of our business. Without their passion, hard work, and devotion to providing amazing pet care, we wouldn't be here. We're here to provide ongoing support, educational opportunities, and to help each individual grow their business—and we're in it for the long haul. These fees help us do that, along with facilitating Rover's customer support, 24/7 trust and safety coverage, and important site maintenance and product improvements. They also help cover benefits for sitters, including the costs of processing payments and ongoing promotion of sitters on Rover.

## Owners

Beginning in September 2015, bookings by new account holders are charged a service fee to support Rover's operating costs, and cover state and local taxes, where applicable.

Services booked through a Rover account created prior to the date the fee was implemented will not be subject to the owner service fee. The fee cannot exceed $25/booking ($35 CAD/booking in Canada). It's refundable should the booking be canceled by either the sitter or the owner, in accordance with your sitter's cancellation policy. If the booking dates change, the fee will be updated accordingly.

**FAQ**

**How do these fees impact my business?**

For pet sitters and dog walkers on Rover, these fees are designed to support you every step of the way, and they're standard in our industry. We use these standard service fees to do things like:

- Continually improve your experience with the Rover website and mobile apps.
- Expand our Trust & Safety team to offer best-in-class 24/7 emergency support. (That means whenever you call, we'll be there to answer.)
- Create original educational content specifically for sitters in our Sitter Resources Center and Help Center.

In short, these fees help us build our business so we can keep on building yours.

 Get Help

**If I left Rover as a sitter prior to March 2016 and then come back, what will my service fee be?**

If your sitter profile was originally created and approved before March 1, 2016, you'll take home 85% of earnings from each booking.

**How are donations through Sit a Dog, Save a Life handled?**

The amount you choose to donate will be deducted from your earnings on each booking you complete. You'll see this come through as part of Rover's take rate. Rover will then make the donation on your behalf.

You won't be taxed for making donations. Your 1099 income will be less the amount you've donated. Donations made through Sit a Dog, Save a Life are not tax deductible because they are not included in your reported income.

**Related Questions**

What is RoverGO?

Will I receive a 1099 from Rover?

Is Rover free?

How do I become a cat sitter on Rover?

What are sitter performance scores?

**Recently Viewed**

Will I receive a 1099 from Rover?

What if a client wants to pay me directly, not through the Rover site?

What do sitters need to know about the Rover Guarantee?

 Get Help

What are sitter performance scores?

Why should I pay and communicate through Rover?

| View All Articles | Contact Support |

Visit the Q&A Community

..


Get Help

Exhibit 38

**Become a Rover sitter**

Fix the following errors:
Hide

First Name

## Enjoy a flexible schedule, easy payments, and the joy of getting paid to play with dogs.

Last Name

Zip Code

Email Address

Earn up to 2x more when you offer dog boarding from your home.

Password

How did you hear about us? (Optional)

Get started

By signing in or signing up, I agree to Rover.com's Terms of Service and Privacy Policy, and confirm that I am 18 years of age or older.

## How it works

Ready to start having doggy sleepovers in your home? Most Rover sitters who offer dog boarding get a request within their first week.



**1. Create your profile.**

Tell us what makes you a standout sitter and include details of your pet sitting experience. Upload high-quality photos of you, your pets, and your home.



**2. Wait for review.**

We'll review your profile and if it's approved, congrats! Your profile is now live, and pet parents can start sending you requests for dog boarding stays.



**3. Open for business.**

Earn up to $1,000 (or more) per month. Enjoy automatic payments on our secure platform and the flexibility to choose your own rates and schedule.



**4. Get ongoing support.**

We're here for you every step of the way with 24/7 support, access to educational opportunities, and a whole team dedicated to your success.



> I absolutely love dogs and got tired of having a job that I didn't even like. What's the point of working if you can't enjoy it a little?
>
> Celia U.

## Frequently Asked Questions

**Why should I become a Rover sitter?**

We believe that everyone should have the opportunity to experience the love of a dog. Overnight dog boarding is a great way to earn money doing something you love—playing with dogs! It's a fun way to earn extra income, and is especially suited to people who already work from home—like stay-at-home parents—and freelance gig workers. Many Rover sitters consider themselves entrepreneurs, since with Rover you can run your own part-time dog boarding business with the support of a nationwide company.

**What are the requirements to offer dog boarding?**

Number one: have a genuine love of dogs! You also need to be at least 18 years old, be able to board dogs in your home, and have the latest Rover app for iOS or Android. Beyond that—sitters come from a variety of backgrounds, from office workers to people with less traditional career paths. Note that your past work experience doesn't matter too much as long as you fit the requirements above. Rover is also great if you work from home or you're a student, recent grad, nanny, babysitter, seasonal worker, entry-level job seeker, retiree, or contract worker. Vet techs, vet assistants, or anyone in pet care or animal care fields can also make money with Rover while building professional skills.

**How much does it cost to become a Rover sitter?**

It's free to create your profile on Rover, and you keep 80% of your earnings. The other 20% helps us cover benefits for sitters, including the costs of processing payments and ongoing promotion of sitters on Rover—as well as Rover Support, 24/7 Trust & Safety coverage, and important site maintenance and product improvements.

Rover by the numbers

**140,000+**

sitters and dog walkers are part of the Rover family

**Every 4 seconds**

an owner books a Rover stay or walk

**11,000**

cities are home to owners who use Rover

© 2018 Rover.com. All Rights Reserved. Privacy Policy

Exhibit 39

# Sitter Resources

Advice and resources for being a successful sitter on Rover

Sitter Resources / New Features ▼

## Rover Cards Are Here!



Amazing news, sitters and dog walkers! Now you have another tool at your disposal to make communicating with your clients easier than ever. You can now send your clients Rover Cards at the end of each drop-in visit, dog walk, and day care stay—straight from the Rover app.

## Use Rover Cards to share important info

Easily track and share info with your clients, including:



- start and stop times

- a map of their dog's walk
- pee, poo, food, and water breaks
- at least one photo
- an optional short note

## Create the perfect Rover Card, every time

Here's how to track and share the details with your client:



1. At the beginning of each walk, day care stay, and drop-in visit, open the "Today" tab. Tap "Start" next to the name of the dog you're getting ready to walk or watch.



2. Tap the appropriate icon each time they pee, poo, eat, or drink. If you're going on a walk, we'll create a map for you. Once you're all set, tap "Stop."



3. Take a photo and write an optional short note, then tap "Send." In seconds, your client will see their dog's beautiful Rover Card pop up on their phone.



## Get the latest app

Now's the perfect time to get your feet wet! You can now send Rover Cards for every dog walk, day care stay, and drop-in visit. Make sure you're ready to go and download the app. If you already have the app, take a moment to make sure your phone's automatic updates are turned on.

　

## Seamless communication, at your fingertips

Each Rover Card you send helps build trust and shows dog owners that you'll treat their dog like family. Bottom line: Sending your clients detailed Rover Cards is a great way to keep them coming back. So go ahead—show off your hard work, keep communication effortless, and delight your clients.

By Rover Staff  |  August 22, 2016

---

RELATED ARTICLES



Best Communication Practices as an On-demand Dog Walker

August 3, 2018





## 7 Ways to Earn Loyal Clients

August 1, 2018



## A Part-Time Job For College Students: Make Money as a Pet Sitter

June 26, 2018

## Need Help?

### Visit Our Help Center



© 2018 Rover.com. All Rights Reserved.

Exhibit 40



Enter your search terms                                          GO

Popular Topics: <u>Getting started</u>, <u>How taxes work</u>, <u>Payments</u>

Help Center  >  Sitters  >  Running My Business

# How does the dog walking map feature work?

The dog walking map works with the <u>Rover Card</u>, a feature that allows dog walkers to track and share information with pet owners about pee, poo, food, and water activity during the walk.  The map feature tracks the walker's route for the time between when the walk starts and stops.

The map includes:

- The route
- Total time
- Distance traveled

Case 3:19-cv-03053-WHO Document 46-2 Filed 02/24/21 Page 232 of 233



# How does it work?

When a dog walker begins a walk, they'll tap **Start** in their Rover app. When they're done, they'll tap **Stop** to end the walk. During that time, their device will track and store their GPS location data, which is sent to Rover once they hit Stop. Rover then uses that info to create a Rover Card that is sent to the pet owner.

# View maps from previous walks

You can find maps of past walks from the Rover app:

1. Tap **More** (or **menu** if you're using an Android device) then select **Rover Cards**.

2. Choose the booking you want to view walk details for.

In addition to the map of the route, you'll see a summary of all other activities that took place during the walk.

# Privacy information:

- The map feature is not a live tracking system. That means no one can actively track your location, including Rover employees, pet owners, or third parties.

- Once the map is added to the Rover Card and sent to the pet owner, only the dog walker, pet owner, and Rover have access to it. This information is not made public.

## Related Questions

What are Rover Cards and how do I send them?

What are sitter performance scores?

How do I contact a client?

How do I troubleshoot the Rover app?

How do I remove client photos from my profile?

## Recently Viewed

What if a client wants to pay me directly, not through the Rover site?

What are sitter performance scores?

What are the service fees?

How do I become a pet sitter or dog walker on Rover?

What are Rover Cards and how do I send them?

| View all articles | Log in to contact support |

Visit the Q&A Community