**EXHIBIT A**

CERTIFIED COPY

# IN THE UNITED STATES DISTRICT COURT
## THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| ERIKA MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. |
| | ) | 3:19-cv-03053-WHO |
| A PLACE FOR ROVER, INC., | ) | |
| d/b/a ROVER; JANICE MALONEY; | ) | |
| and DOES 1-20,000,000, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**VIDEOTAPED REMOTE DEPOSITION OF ERIKA MILLER**

**Tuesday, April 28, 2020**



**Court Reporting • Video • Trial Presentation**

310.230.9700 • els@elitigationservices.com • www.elitigationservices.com

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 16

1          A.    Zum Childcare Transportation Company.

2          Q.    Is that the transportation company that is

3     used by Urban Sitter for school transport and so

4     forth that you pointed out to us a few minutes ago?

5               MR. YOUNG:  John, just one second.  We're      01:23

6     trying to -- I know you provided that as an exhibit.

7     We're just trying to find it here.

8               MR. LECRONE:  Well, here.  I'm sorry.  I

9     thought you had -- it's exhibit -- it's titled

10    Exhibit G.  And if you want to pull that up, I'm just   01:23

11    reading from page 1.

12              MR. YOUNG:  The documents that were sent to

13    us don't have -- the cover page does not have an

14    exhibit on it.  It just has the word "exhibit."

15              MR. LECRONE:  Okay.                            01:23

16              MR. YOUNG:  It doesn't have a -- it doesn't

17    have a letter.  So one second one while we -- one

18    second while we find it.

19              MR. LECRONE:  I can ask either Collette or

20    Nikki, the court reporter, to put up on the screen     01:23

21    for Ms. Miller and Joel, her counsel, Exhibit G.

22              MR. YOUNG:  We have it hopefully.

23              MR. LECRONE:  Yes.

24              MR. YOUNG:  I'm just --

25              THE VIDEOGRAPHER:  Should be -- it should be  01:23

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 17

1    on the screen.

2              MR. LECRONE:  Guys, I hate the to ask this.

3    Could we go off the record for a minute because

4    everything for me has shut down and I don't know why.

5    I happen to be at the office.  I'm going to have one          01:24

6    of our IT guys come in, take a quick look to see what

7    went wrong, figure out -- could just go off the

8    record for one second.

9              THE VIDEOGRAPHER:  Off the record at

10   1:24 p.m.                                                      01:24

11             MR. LECRONE:  Is that okay?

12             THE VIDEOGRAPHER:  Yes, off the record.

13             MR. LECRONE:  Okay.  Thank you.  Hold on.

14   Hold tight.

15             (Recess held 1:24 p.m. to 1:26 p.m.)              01:26

16             THE VIDEOGRAPHER:  We are back on the

17   record.  The time is 1:26 p.m.

18   BY MR. LECRONE:

19        Q.   Okay.  Ms. Miller, I was just reading from

20   this exhibit what we are -- I will introduce this as         01:26

21   Exhibit G to this record.

22             (The document referred to was marked

23             by the CSR as Deposition Exhibit G for

24             identification and attached to the

25             deposition transcript hereto.)                     01:26

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 18

1    BY MR. LECRONE:

2        Q.   You've seen this.  This is your LinkedIn

3    page, correct?

4        A.   Yes, that's correct.

5        Q.   Okay.  I was reading from this, the Zum is a   01:26

6    driving job that you have?

7        A.   It's, yes, driving for children.  So it's a

8    childcare job that involves transportation of

9    children from various schools.

10       Q.   Is in that your own vehicle or did they       01:27

11   provide that?

12       A.   My own vehicle.

13       Q.   And how do they pay you?

14       A.   Direct deposit.

15       Q.   Okay.  Are you self-employed with them or     01:27

16   are you an employee of Zum or were you?

17       A.   I'm not sure.

18       Q.   You don't know one way or the other?  You

19   don't know one way or the other?

20       A.   Yeah, I don't work for them -- I don't work   01:27

21   for them anymore, but I'm not sure just, you know,

22   direct deposit.

23       Q.   Urban Sitter, that's the most recent job you

24   identified for us a few minutes ago?

25       A.   Yes, that's correct.                          01:27

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 19

1        Q.   Are you -- is that transporting children

2   from school to home and things of that nature?

3        A.   Childcare and driving, pick up, drop off.

4        Q.   Do you use your own vehicle for that

5   purpose?                                          01:28

6        A.   Yes, that's correct.

7        Q.   And are you an employee of them or are you

8   self-employed providing services for them, if you

9   know?

10        A.   Self-employed providing services for them.   01:28

11        Q.   So you're self-employed, correct?

12        A.   I'm sorry?

13        Q.   I'm sorry.

14        A.   For Zum, yes.

15        Q.   Okay.  You also list Fog City Dog Walking.   01:28

16   What is that, can you tell me?

17        A.   Oh, it's just a name that I put down the

18   LinkedIn resume.

19        Q.   It isn't a real --

20        A.   Actually, it doesn't have any -- it doesn't   01:28

21   have any merit.  I just put it down for kicks.

22        Q.   It says "Dog walker Fog City Dog Walking."

23   You just put that on there?

24        A.   Yes, that's correct.  It's not an actual

25   business.                                          01:29

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 20

1          Q.   It's a fake name so to speak?

2          A.   Yes, that's correct.

3          Q.   Is there anything else on your LinkedIn

4     profile that you posted that's not a real business?

5               MR. YOUNG:  Objection; vague.                01:29

6     BY MR. LECRONE:

7          Q.   Can you see on that page?

8          A.   I'm looking.

9               Yes.  Everything else is accurate.  It's

10    just except for the Fog City Dog Walking.             01:29

11         Q.   Okay.  All right.

12              Is anything missing in terms of your work

13    experience in the last, say, five years from this

14    list on Exhibit G?

15         A.   No, there's nothing missing.                01:30

16         Q.   Have you updated your LinkedIn profile since

17    the time this was created I think back in 2019?

18         A.   No.  Like I said before, I never used

19    LinkedIn.  It's just another social media platform.

20    I opened the account, but I don't use it.             01:30

21         Q.   Okay.  You use Facebook instead?

22         A.   Yes, I use Facebook and InstaGram.

23         Q.   And do you use Facebook to market your

24    services as a dog walker to people who are on

25    Facebook?                                             01:30

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 21

```
 1          A.   No, absolutely not.  It's just social media.
 2      It's just social media.
 3          Q.   You don't use it at all for anything
 4      work-related; is that correct?
 5          A.   No, never.                              01:30
 6          Q.   How about --
 7          A.   It's a personal account for social media.
 8          Q.   Okay.  And how about InstaGram?  Do you use
 9      that to market your services or try to find clients
10      for yourself in the dog walking and dog sitting area?  01:31
11          A.   No, never.  Strictly social media.
12          Q.   All right.  You -- back in 2017 I believe
13      you were -- you posted an account or created an
14      account with Rover.com; is that right?
15          A.   Yes, that's correct.                    01:31
16          Q.   And that was an account that you -- let me
17      ask you this.  How did you come to find or know of
18      Rover.com?
19          A.   Online.
20          Q.   Okay.  Any other basis under which you     01:31
21      learned of them, someone talking about it or
22      otherwise?
23          A.   An ad on Facebook.
24          Q.   Okay.  You created an account for yourself
25      on Rover; is that right?                         01:32
```

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 22

1      A.   That's correct.  I opened up an account with
2   them.
3      Q.   And the information you created on that
4   account was all information that came from you; is
5   that right?                                            01:32
6      A.   That's correct.
7      Q.   Was it truthful information?
8      A.   Yes.
9      Q.   Was there anything fake about the
10  information that you may have put on your Rover        01:32
11  account profile or other information with Rover.com?
12     A.   No, nothing fake.
13     Q.   Anything untruthful in what you put on
14  Rover.com?
15     A.   No.                                            01:32
16     Q.   My understanding, Ms. Miller, is you
17  provided pet services to owners that you met on the
18  on the Rover platform for either two or three
19  occasions.  Is that your recollection?
20     A.   Yes, that is correct.                          01:33
21     Q.   One of them was in December of 2018, Shayla
22  I think was the pet name.  Do you recall that?
23     A.   Yeah, Shayla, that's correct.
24     Q.   May of 2018 was Lando; is that right?
25     A.   Yes.  Lando, Antonio, two dogs.               01:33

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 23

1       Q.   Okay.  And December of 2017 was Renshi?

2       A.   Yes, Renshi.

3       Q.   Okay.  So other than those three occasions,

4 did you have any other occasions to provide or market

5 your services to the Rover.com platform?       01:33

6       A.   No.

7       Q.   Those are the only three occasions you

8 provided services to Rover; is that right?

9       A.   Yes.  Yes, that's correct.

10       Q.   And you've done nothing in terms of       01:34

11 providing pet care services using the Rover platform

12 since December of 2018; is that right?

13       A.   That's correct.

14       Q.   Did you cancel your account?

15       A.   No, I changed my profile.       01:34

16       MR. LECRONE:  Let me just say, Counsel, I

17 want to make sure you're not coaching the witness as

18 we're moving forward.  I think, you know, we can see

19 a little bit here.  And I'm trusting that you're not

20 coaching her in her answers.  If you want to take a       01:34

21 break to speak with your client, I'm happy to do

22 that.

23       MR. YOUNG:  There's absolutely no coaching

24 going on here.

25       ///

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 24

1    BY MR. LECRONE:

2        Q.   Okay.  Let me just add that this is all new

3    for all of us, so I'm trying my best to get through

4    this in a very expeditious way.

5            Do you still have a profile posted on the          01:34

6    Rover platform?

7        A.   I'm sorry.  What?

8        Q.   Do you still have a profile posted on the

9    Rover platform?

10       A.   I still have the app, but I don't use it.          01:35

11   The profile is hidden, which means people cannot

12   contact me.  So unless the calendar is updated, then

13   nobody can contact me for any services.

14       Q.   So since, again the date that I just point

15   out, December 2018, you've had no one -- no pet           01:35

16   owners who found your name or otherwise contacted you

17   for pet sitting services, correct?

18       A.   No.  Shayla was the last -- was the last

19   person to contact me.

20       Q.   Do you -- I know for the time being you          01:35

21   testified a few moments ago that you're not working

22   as we sit here today, but since 2007 -- I'm sorry --

23   2018, have you marketed pet sitting services on any

24   other online platforms other than --

25       A.   No.                                              01:36

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 25

1     Q.    -- Rover?

2     A.    No.

3     Q.    Have you provided pet services to pet owners

4  without utilizing or marketing on an online platform?

5     A.    No.                                              01:36

6     Q.    We're going to get through some of these

7  documents in a few minutes, but my understanding is,

8  Ms. Miller, you have a lot of clients for whom you've

9  provided pet services that you met outside of any

10 online platforms; is that right?                          01:36

11    A.    They're not clients.  They're just friends.

12    Q.    Well, are they paying you to watch their dog

13 or to walk their dog or to babysit for their dog?

14    A.    We have an agreement.  So I walk their dog

15 and then they return the favor and do something for     01:37

16 me in return.

17    Q.    Do they pay you money for that time and

18 effort that you -- that you're using to take care of

19 their pets?

20    A.    Sometimes.                                       01:37

21    Q.    And what do they pay you, how much?

22    A.    It varies.  It depends on the job.

23    Q.    So is it -- is it a fee that you charge per

24 visit or per day?  How does that work?

25    A.    I charge an hourly fee, so it depends how      01:37

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 26

1    many hours.

2         Q.   And these are the individuals you provide

3    these services for that are friends, correct?

4         A.   Yes, friends and neighbors.

5         Q.   Okay.  Are you doing that as we sit here        01:37

6    today or has that stopped since everything has been

7    shutdown in the Bay Area?

8         A.   No, that stopped in March because my clients

9    aren't working or my neighbors, the people that I

10   walk dogs for, they're not working.                      01:38

11        Q.   In March of this --

12        A.   They're working from home, so...

13        Q.   So this all stopped as of March of this

14   year?

15        A.   That's correct.                                01:38

16        Q.   How many were you providing such services

17   for?  How many friends, as you call them, were you

18   doing this for in March before it stopped?

19        A.   Around three -- two to three.

20        Q.   So two or three friends and two or three       01:38

21   different dogs I would imagine; is that right?

22        A.   One of them had five dogs.  The other one

23   has two dogs.

24        Q.   Do you set your rate depending on how many

25   dogs you are asked to babysit for or walk?               01:39

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 27

1           A.   No, it's just an hourly rate --

2           Q.   And how much do you --

3           A.   -- depending on how long I --

4           Q.   And how much -- what was your hourly rate

5    for these various friends that you were providing       01:39

6    services to as of March of this year before it all

7    stopped?

8           A.   It was 28 for the hour for a 50-minute, a

9    60-minute walk.

10          Q.   $28 for a 15-walk or 28 per hour?           01:39

11          A.   60, 60, 60-minute walk.

12          Q.   Oh, 60-minute walk?

13          A.   Yeah, one hour.

14          Q.   And would you also babysit at friends' homes

15   as of March of 2020, babysit these pets?               01:39

16          A.   The pet sitting I only do during holidays.

17          Q.   Aha.  And --

18          A.   So that is not year-round.

19          Q.   And were you doing pet sitting for friends

20   this past holiday season from, say, Thanksgiving to     01:40

21   New Year's Eve?

22          A.   Yes.

23          Q.   How many pet sitting jobs did you -- did you

24   have with friends during that period of time?

25          A.   Two.                                        01:40

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 28

1       Q.   And how did you bill for your time?   Same
2   as what --
3       A.   Venmo or PayPal.
4            THE DEPOSITION OFFICER:  I'm sorry.  I
5   couldn't hear that.
6   BY MR. LECRONE:
7       Q.   And was there --
8            THE DEPOSITON OFFICER:  I'm sorry.  I
9   couldn't hear that answer.
10  BY MR. LECRONE:
11      Q.   So is the payment was done through Venmo or
12  PayPal, but was it at the rate of $28 for 60 minutes
13  or was it different when you were providing services
14  at their homes?
15      A.   No, it's a different rate.                01:41
16      Q.   How much were you charging?
17      A.   Overnight rate.
18      Q.   How much was your overnight rate?
19      A.   55 to 65.
20           MR. YOUNG:  Is it possible to take Exhibit G 01:41
21  down so we can see the screen?
22           MR. LECRONE:  Yes, that's fine.
23  BY MR. LECRONE:
24      Q.   I just have one last question about Fog
25  City, Ms. Miller, and I don't think you need to see   01:41

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 29

1     it on the screen.

2              Is that a business that you created or is

3     that just a name you created for your LinkedIn post?

4         A.   No, it's just strictly a name I created for

5     the LinkedIn profile.  It's not an actual business.    01:41

6              MR. LECRONE:  Okay.  I'd like to pull up and

7     have the reporter put the next exhibit up on the

8     screen.  It has been titled Exhibit E.  It appears to

9     be your Rover profile.

10             (The document referred to was marked         01:42

11              by the CSR as Deposition Exhibit E for

12              identification and attached to the

13              deposition transcript hereto.)

14             MR. YOUNG:  One second while we gather it.

15             MR. LECRONE:  It is seven pages, and we will 01:42

16    mark this for the record as Miller Exhibit -- we'll

17    just stick with these letters as it is a bit unusual

18    this is Miller Exhibit E.

19             MR. YOUNG:  And we have the -- we have the

20    actual document in front of us, so I don't know if     01:43

21    you need to put it on the screen well.

22             MR. LECRONE:  Well, we might as well have it

23    on the screen just so we all can see it in case

24    there's a confusion here.

25    BY MR. LECRONE:                                        01:43

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 30

1      Q.   You're familiar with this document.  You've
2    seen it before Ms. Miller; is that right?
3      A.   Yes.
4      Q.   This is your profile that you posted on
5    Rover.com?                                        01:43
6      A.   Yes, it's the profile I created.
7      Q.   You created this all on your own, did you
8    not?
9      A.   Yes, I created it on my own.
10      Q.   Did anyone from Rover tell you what to say   01:43
11    or put or do with regards to this profile?
12      A.   No.
13      Q.   These are all in your words; is that right?
14      A.   Yes, that's correct.
15      Q.   Okay.  As we started on this first page it   01:43
16    has (reading):
17              "Services:  House sitting and
18              drop-in visits $65 and $25."
19           Do you see those entries in the middle of
20    the page?                                          01:44
21      A.   Yes, I do.
22      Q.   Are those are the rates that you posted on
23    your profile for --
24      A.   Yes.
25      Q.   -- services for dog walking, dog sitting    01:44

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 31

1    services that you were posting on Rover.com?

2         A.   Yes, that's correct.

3         Q.   You set those two rates, did you not?

4         A.   I did set the rates.

5         Q.   No one told you what those rates should be    01:44

6    or should not be?

7         A.   No.

8         Q.   Is it true that the pet sitters who post on

9    Rover, everyone sets their own rates; is that right?

10        A.   Yes, that's correct.                           01:44

11        Q.   No one told you how much to bill.  You could

12   just make that up or you could make -- you could just

13   create whatever billing rates you thought was

14   appropriate for your services.  Do I have that right?

15        A.   Yes, that's correct.                           01:45

16        Q.   Down a little bit below on that same page it

17   says "Traveling Preferences."  What does that mean?

18   Are these the dogs -- or the dog breeds -- are they

19   types of dogs that you were willing to either walk or

20   to babysit?                                              01:45

21        A.   I'm not sure.  This profile was created a

22   long time ago so --

23        Q.   Okay.  Well, could --

24        A.   I'm not exactly sure why.  I believe the

25   breed or the dog on here are based by weight, so it's   01:45

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 32

1    at the discretion of what type of dog, small, medium,

2    large, extra large.  I think something got cut off.

3    That's why it -- yeah, that doesn't have anything to

4    do with the dog.  That's --

5         Q.   With the breed itself?                        01:45

6         A.   Yeah, something is missing.

7         Q.   All right.  Fair enough.

8              Were you willing to --

9         A.   It's reference to traveling preferences,

10   meaning how far are you willing to travel to take       01:46

11   care of the dog.  Like they go from your house to

12   where the radius is of the person with the dog, so

13   five miles, ten miles, fifteen miles.

14        Q.   Is it true that you stated within this

15   profile, Ms. Miller, the types of breeds of dogs that   01:46

16   you would be willing to provide services for?

17        A.   No, just the sizes of the dog.  So small,

18   medium, large, extra large, not the breed of dog.

19        Q.   I can see that.  Unfortunately I would

20   probably be in the extra large category.               01:46

21             Were you willing to do or provide services

22   to any one of those dog categories of sizes?

23        A.   Yes.

24        Q.   That was a decision you made all on your

25   own, correct?                                          01:47

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 33

1        A.   Yes, that's correct.

2        Q.   And you posted it all on your own on your

3   profile so that pet owners would see this and note

4   this in terms of possibly contacting you for pet

5   services?                                          01:47

6        A.   Yes, that's correct.

7        Q.   All right.  Did anyone from Rover tell you

8   what size of dogs you could or couldn't provide

9   services for?

10       A.   No.                                       01:47

11       Q.   All right.  Moving on to page 2, Ms. Miller,

12   it has a calendar.  You -- in posting this profile on

13   Rover you were able to set your own schedule, were

14   you not?

15       A.   Yes, that's correct.                       01:47

16       Q.   So you could say you were going to work

17   Monday through Friday or seven days a week or two

18   hours a day, whatever the case may be, you as a

19   person providing these pet services, you could decide

20   what your schedule was going to be for those          01:48

21   services?

22       A.   Yes, that's correct.

23       Q.   Did anyone from Rover tell you how to set

24   that schedule or when you could work or not work?

25       A.   No.                                        01:48

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 34

1      Q.   Was there any time or date or week that you
2   were not able to provide services during the time you
3   were providing them or posting your profile on Rover?
4      A.   No, I only filled in the calendar to the
5   days that I was available.                              01:48
6      Q.   Okay.  And you were not directed by anyone
7   at Rover in any way with regard to your schedule or
8   when you would work or not work?
9      A.   That's correct.
10     Q.   You also set where you would be willing to   01:49
11  provide these services, did you not?
12     A.   That's correct, the traveling distance.
13     Q.   And I think if we go -- jumping a little
14  bit, but if we go to the final -- the last page of
15  this document, it has a map in it.                      01:49
16          There we go.
17          Was that the geographical location of what
18  you posted on your profile for how you would -- where
19  you would be willing to work?
20     A.   Yes, that's correct.                           01:49
21     Q.   And you put that in there, correct?
22     A.   Yes.
23     Q.   All right.  If we go back one page -- I'm
24  sorry to have made this a little confusing, but if we
25  go back one page it has some Erika's rates on it.       01:49

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 35

1          Do you recall filling this out Ms. Miller?

2     A.   Yes, that's correct.

3     Q.   You did this all on your own, did you not?

4          MR. YOUNG:  Hey, John, can you slow down a

5     little bit so we can -- so she can turn the page to    01:50

6     the correct page?

7          MR. LECRONE:  Sure.  Sure.  Joel, I just --

8     maybe --

9          THE WITNESS:  I got it.

10    BY MR. LECRONE:                                         01:50

11    Q.   Yeah.  I'm seeing it on the screen.

12    A.   I got it.

13         MR. YOUNG:  Keep in mind the screen that

14    we're using is an iPad, so it's incredibly small.

15    Just FYI.                                               01:50

16         MR. LECRONE:  Okay.  All right.

17         THE WITNESS:  I have it here.

18    BY MR. LECRONE:

19    Q.   Okay.  Very good.  These are all -- this is

20    all information and rates that you put in when you     01:50

21    created your Rover -- I'm sorry -- your Rover pet --

22    I'm messing these words -- your Rover profile,

23    correct?

24    A.   Profile, yes, that's correct.

25    Q.   And so in terms of additional dogs you add       01:50

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 36

1     an additional rate of $15.  Do I have that right?

2          A.   Yes, that's correct.

3          Q.   You had a holiday rate which would appear

4     you gave them a little bit of a discount?

5          A.   Yes, I brought that down.                    01:51

6          Q.   And I won't go through all of them, but all

7     the numbers on here, cat care, puppy rate, and so

8     forth, all of those were rates that you posted in

9     this --

10              MR. YOUNG:  One second, John, I think her   01:51

11    phone line just dropped or we're having a battery

12    issue, I think.

13              MR. LECRONE:  Let's go off the record while

14    we figure this out, please.

15              THE VIDEOGRAPHER:  Off the record.  The time 01:51

16    is 1:51 p.m.

17              (Recess held 1:51 p.m. to 1:53 p.m.)

18              THE VIDEOGRAPHER:  We're on the record.  The

19    time is 1:53 p.m.

20              MR. LECRONE:  All right.  We're back on the  01:53

21    record.

22    BY MR. LECRONE:

23          Q.   You can hear me now, Ms. Miller, correct?

24          A.   Yes, that's correct.

25          Q.   Very good.                                  01:53

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 37

1          You -- while you were using the Rover

2     platform to market your services for pet sitting --

3               MR. YOUNG:  Objection.  Objection to the

4     extent that you continue using the word "marketing

5     services."  It's unclear.  It's leading.  It's vague.   01:53

6               MR. LECRONE:  Okay.  Objection noted.

7     BY MR. LECRONE:

8          Q.   If I call it posting your services on the

9     Rover platform, then did any -- did Rover prevent you

10    or tell you you could not also post or market your      01:54

11    services in any other way, shape, or form?

12              MR. YOUNG:  Objection to the extent the

13    question is vague.

14    BY MR. LECRONE:

15         Q.   Okay.  You can answer, Ms. Miller.            01:54

16         A.   No.

17         Q.   So you were posting your services or selling

18    your services or marketing your services outside of

19    the Rover platform while you were on that platform,

20    correct?                                                01:54

21         A.   No, that's not correct.

22         Q.   Well, you were doing them for your friends,

23    were you not?

24         A.   Yes, but I wasn't selling services or

25    advertising or marketing.  It was all word of mouth.    01:54

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 38

1      Q.   And no one at Rover told you you couldn't do

2    that, correct?

3      A.   No.

4      Q.   And when you posted the platform on Rover

5    and created the account, nothing indicated to you you    01:55

6    couldn't do that and do that other work; is that

7    right?

8      A.   That's correct.

9      Q.   Have you advertised on things like Craig's

10   List or other platforms, other paper-type platforms      01:55

11   or electronic platforms for your services?

12     A.   No.

13     Q.   Okay.  Let me turn for a moment to the

14   bookings you had on Rover.  Those are the three

15   bookings we've already talked about:  December 2017,      01:55

16   May of 2018 and December of 2018.

17          Do I have that right, Ms. Miller?

18     A.   Yes, that's correct.

19     Q.   Okay.  I will mark and turn your attention

20   to what has been titled Exhibit H.  It's a one-page       01:56

21   document that has "Payment History" to it.

22          MR. YOUNG:  One second while we -- while we

23   grab it.

24          MR. LECRONE:  Sure.  And just for the

25   record, Ms. Court Reporter, we will mark this as          01:56

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 39

```
 1    Miller H.
 2              (The document referred to was marked
 3              by the CSR as Deposition Exhibit H for
 4              identification and attached to the
 5              deposition transcript hereto.)           01:56
 6              MR. YOUNG:  You said it's a one-page
 7    document, correct?
 8              MR. LECRONE:  Correct.  And I know, Joel,
 9    it's hard for you to read sometimes so --
10              THE WITNESS:  I have it here in front of me. 01:56
11    I'm looking at it.
12    BY MR. YOUNG:
13         Q.   Okay.  Have you seen this before,
14    Ms. Miller?
15         A.   I'm sorry?                              01:56
16         Q.   You've seen this before have you not,
17    "Payment History"?
18         A.   Yes.
19         Q.   All right.
20              MR. YOUNG:  And I'm sorry.  We're marking 01:57
21    this as what exhibit?
22              MR. LECRONE:  We're just going to keep with
23    these -- just to keep it simple, we're going to stay
24    with the same letters.  So it will be Miller
25    Exhibit H.                                        01:57
```

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 40

1    BY MR. YOUNG:

2         Q.   So the question again -- I'll just repeat

3    the question.  Ms. Miller, you've seen this before?

4    You know what it is?

5         A.   Yes, that's correct.                        01:57

6         Q.   And it's a payment history for the three

7    bookings that you made to the Rover platform?

8         A.   Yes, that's correct.

9         Q.   And I assume then you would have been paid

10   or received payment for the first -- the first        01:57

11   booking at $278.40, correct?

12        A.   Yes, that's correct.

13        Q.   And you received payment for the May 8, 2018

14   sitting for Lando?  That was $120, you received that

15   payment?                                              01:58

16        A.   Yes, that's correct.

17        Q.   And Shayla or Shayla, you received that

18   payment of $288?

19        A.   Yes, that's correct.

20        Q.   And that was based on the fees that you     01:58

21   posted on your profile less a convenience fee or just

22   a service fee from the Rover platform.  Is that your

23   understanding?

24        A.   Yes.

25        Q.   And they would ensure that you got paid from 01:58

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 41

1     each of these clients?

2          A.   Yes.

3          Q.   Okay.  And you complained about -- you

4     wanted to make sure that they got you paid, did you

5     not?                                              01:58

6          A.   I don't recall.

7          Q.   Okay.  All right.  How would a pet owner, if

8     you know, contact you if they were interested, if

9     they saw your profile on Rover and wanted to see if

10    you were available to provide services to their pets,  01:59

11    how would they contact you?

12         A.   Through the Rover app if the calendar was

13    filled for that particular date that they needed pet

14    care.

15         Q.   And would it -- would you get some sort of a 01:59

16    text message from a pet owner saying "Hi, Ms. Miller.

17    Are you available to watch my dog?  I'm going on

18    vacation."

19              Is that the kind of messaging that you would

20    get from a pet owner?                              01:59

21         A.   No.  I would get a text message through

22    Rover.  It's an automated generated number.  And then

23    after that exchange back and forth, the owner can

24    text me from their personal number if they prefer.

25         Q.   Okay.                                    01:59

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 42

1      A.   But in the beginning it was still a Rover
2 auto-generated number.
3      Q.   Okay.
4      A.   It's a text message, but it's not from the
5 person.  It's a Rover number.                          02:00
6      Q.   Right.  Right.  So it was received by you in
7 the form of a text message?
8      A.   Yes, a text message so that the owner
9 doesn't have to share their real phone number until
10 later.                                                 02:00
11      Q.   Did you provide any form of repeat services
12 for the three Rover dog owners, the three dog owners
13 who found you on Rover's platform?
14      A.   No.  The only repeat services were for
15 Shayla.                                                02:00
16      Q.   And how --
17      A.   So after the Renshi service was completed, I
18 didn't work for that person again.  Lando the same
19 thing.
20      Q.   And when was the repeat for the -- was it   02:00
21 for Shayla?  That was the repeat service appointment?
22      A.   Yes.
23      Q.   When did you repeat this?  Was it some time
24 after December of 2018?
25      A.   Yes, it's not on here.                      02:01

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 43

1         Q.    And it wasn't through Rover, correct?

2         A.    I'm not sure because I don't see it on

3    here..

4         Q.    Would you have just billed them directly for

5    your services, the client, the dog owner?              02:01

6         A.    Yes, that's correct.

7         Q.    All right.   And other than that one

8    repeat -- well, let me ask you this.   How many times

9    did you perform or provide pet services for that --

10   for Shayla?  Was it just one more time or was it more   02:01

11   than that?

12        A.    Through Rover --

13        Q.    No --

14        A.    -- or --

15        Q.    -- not through Rover.                        02:02

16        A.    Three, four times.   It's sporadically

17   throughout the year.   Dog --

18        Q.    That would have been -- that would have been

19   from December of 2018 into 2019 year end?

20        A.    Yes, but not every month; that's correct.    02:02

21        Q.    Was it all house sitting, babysitting, or

22   was it dog walking or both?

23        A.    No, just house sitting, boarding at my house

24   or house sitting at their house.

25        Q.    And when you were doing this directly with   02:02

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 44

1       the dog owner, how much were your rates?

2            A.    The rates were for the overnight.  So that

3       would be 60 to 65 or 55 to 60, depending on how many

4       days --

5            Q.    So --                                          02:03

6            A.    -- I was doing or if it was a holiday.

7            Q.    So the rates were the same that you were

8       charging or posting on your Rover profile, correct?

9            A.    Yes, that's correct.

10           Q.    All right.  Were there clients who found you  02:03

11      through the Rover platform you declined to provide

12      service to do?  That ever happen?

13           A.    Maybe.

14           Q.    You were allowed --

15           A.    If the schedule didn't allow for it, it       02:03

16      wasn't filled.

17           Q.    So if you were busy or had other stuff to

18      do, other work to do, you could say no, correct?

19           A.    That's correct.

20           Q.    And you did in fact do that on a number of    02:03

21      occasions?

22           A.    If I didn't want to take that particular

23      job, I didn't have to.

24           Q.    Why wouldn't -- why wouldn't you want to

25      take a particular job?                                   02:04

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 45

1          A.    The location maybe or the rate.

2          Q.    Okay.  But the rate would be what you posted

3     on Rover, would it not?

4          A.    Not necessarily.

5          Q.    How would it be changed?                    02:04

6          A.    Because dog owners have their own rates as

7     well.

8          Q.    So what would they do with you in terms of

9     getting a different rate?

10         A.    If it was too expensive, they wouldn't use  02:04

11    me.

12         Q.    So with regards to Shayla, did you change

13    your rate or agree to change your rate after you no

14    longer were receiving services through the Rover

15    platform?                                              02:04

16         A.    It depended how many days I was working for

17    her while she's on vacation.

18         Q.    She paid --

19         A.    Would be a sliding scale -- a sliding scale,

20    a discount if it went through a holiday.  It just      02:05

21    depended.

22         Q.    And again, like you did in the Rover rate,

23    we saw in your profile you would just tell the

24    clients, the dog owners, what rate you were willing

25    to do the work for, correct?                           02:05

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 46

1    A.   Yeah.   We could come to a mutual agreement.
2    If it wasn't enough, then we could change things
3    around to fit her needs and my needs.
4         Q.   Are there any other pet owners that would
5    have -- or found you on the Rover platform who you          02:05
6    continued to provide pet sitting services for after
7    December 2018 other than for Shayla's parents?
8         A.   No.   Only for Shayla.   Only for Shayla.
9         Q.   Anyone else?
10        A.   No, not from Rover, no.                           02:05
11        Q.   All right.   Good.   Good.   Good.
12             Did you tell dog owners in your messages to
13        them that you did not like Rover?
14             THE DEPOSITION OFFICER:   I'm sorry.   I
15        couldn't hear.   Did you tell dog owners in something.
16        Question again.
17        BY MR. LECRONE:
18        Q.   Did you ever tell -- you told some dog
19        owners --
20        A.   No.                                               02:06
21        Q.   -- while you were still using the profile --
22        A.   No, not that I recall.   No, not that I
23        recall.
24        Q.   And you told at least one dog owner that you
25        were an independent contractor and had your own       02:06

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 47

1    business, correct?

2         A.   Not that I recall.

3         Q.   Were there dog owners that contacted you

4    through the Rover platform who you simply did not

5    want to work for?                                    02:06

6         A.   Not that I recall.

7         Q.   Because of their dogs or because the

8    location or for any other reason?

9         A.   No.  Possibly the location.

10        Q.   All right.                                  02:07

11        A.   Or the job.

12        Q.   And you could -- you could pick and choose

13   what dogs and the location you wanted to provide

14   services for, correct?

15        A.   Yes.  On Rover you could pick and choose any 02:07

16   job at your discretion.  You don't have to take a job

17   if you don't want to.

18        Q.   And what if you didn't like the dog or the

19   dog owner after providing services, you could refuse

20   any further services to them, correct?               02:07

21        A.   You could hide them on your profile.  So, I

22   mean, I don't have problems with the dogs, but if

23   there's a problem with the dog owner and you don't

24   want to work for them again, you can hide your

25   profile or you can block them, I believe.            02:07

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 48

1      Q.   Okay.  And if one of the dog owners decides

2   they don't like you or the way you performed

3   services, they could do the same thing?

4      A.   That's correct.

5      Q.   Okay.  And if they didn't like the rate, as   02:07

6   you pointed out, they could either not retain your

7   services, the dog owners, or they could, I suppose,

8   negotiate different rates separately outside of the

9   Rover platform with you.  That is what you did?

10      A.   That's correct.                              02:08

11      Q.   Did you require -- before you performed or

12   provided services for pet owners, did you require a

13   meet-and-greet?

14      A.   Yes, that's required for safety reasons.

15      Q.   Right.  To make sure that the location, the   02:08

16   dog, and the owners are all safe and secured?

17      A.   To verify them and for them to get to know

18   me, kind of like a mockup interview, just so we can

19   get to know each other.

20      Q.   And that's something --                       02:08

21      A.   Their dogs as well.

22      Q.   And that's something you thought was

23   important?

24      A.   I'm sorry?

25      Q.   That's something that you thought was         02:08

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 49

1    important to do, correct?

2        A.    It's a requirement for Rover before you

3    could start working for somebody.

4        Q.    And you agreed with that, correct?

5        A.    Yes.  I met with everybody that I worked for   02:09

6    before I accepted the job or before they hired me.

7        Q.    And if a pet owner refused to meet and

8    greet, then you would just move on and not perform

9    services for them, correct?

10       A.    Yes, that's correct.                            02:09

11       Q.    Did you ever have a pet owner do a

12   meet-and-greet with you and then decide not to use

13   your services after the meet-and-greet?

14       A.    No.

15       Q.    Did you have meet-and-greets with anyone      02:09

16   other than the three postings that we saw on, I

17   think, Exhibit H, those three?  Were these the only

18   three meet-and-greets you did?

19       A.    Yes, that's correct.

20       Q.    Okay.  Did Rover or anyone at Rover tell you  02:09

21   how to walk a pet owner's dog?

22       A.    No, that's up to the pet owner.

23       Q.    And the method for you to --

24       A.    No.

25       Q.    -- to do in walking a pet owner's dog?        02:10

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 50

1    A.   No.

2    Q.   Did they ever tell you, Rover or anyone at

3  Rover, tell you how to feed or what to feed a dog if

4  you were performing services for a pet owner?

5    A.   No.                                        02:10

6    Q.   Did they -- anyone at Rover or Rover tell

7  you how to perform house sitting or dog sitting

8  services in any way, shape or form?

9    A.   No.

10   Q.   It was the owners who told you how they      02:10

11  wanted their pets treated, walked, and fed and

12  everything else, correct?

13   A.   That's correct.

14   Q.   And if you didn't like that, you could

15  decline to provide service to them; is that right?  02:11

16   A.   You could in retrospect.

17   Q.   Did that ever happen in the three Rover

18  connections you made through the platform?

19   A.   No, never.

20   Q.   We've been talking back and forth about the  02:11

21  services you've provided in the dog sitting and pet

22  care space.  Do you consider yourself good at it?

23   A.   Yes.

24   Q.   Did you consider yourself good at marketing

25  yourself as a dog sitter, dog walker?            02:11

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 51

1      A.   I've never marketed myself as a dog walker
2  or dog sitter.
3      Q.   So other than the three dog owners you've
4  connected with through the Rover platform, everything
5  else has been by word of mouth or referrals or          02:12
6  friends?
7      A.   That's correct.
8      Q.   And no other methods used by you to find pet
9  owners or find jobs to provide these services; is
10  that right?                                             02:12
11      A.   That's correct.
12      Q.   And during the time you were providing these
13  services to pet owners on the Rover platform, you
14  were still doing it also, the same thing for your
15  friends.  Do I have that right?                         02:12
16      A.   Yes, that's correct.
17      Q.   Okay.  And were you also working as a
18  transportation driver for kids, going to school back
19  and forth at that time?
20      A.   Not while working for Rover.                   02:12
21      Q.   2017 to 2018 were you working -- you told us
22  about being a driver and a nanny, those kind of
23  things, you were doing that back then, were you not?
24      A.   It may have overlapped but not long term.
25      Q.   And in order to get paid through the Rover     02:13

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 52

1    platform you would have submitted some form of

2    invoice after each assignment, after you completed

3    each of the pet sitting assignments?

4        A.   No, that's all generated through Rover.  I

5    don't have anything to do with that.  They take care      02:13

6    of that on their end.

7            MR. LECRONE:  Okay.  Okay.  Let me turn to a

8    couple of the exhibits.  We're making some progress

9    here.

10           I'd like to turn your attention and mark and  02:13

11   introduce Exhibit A.  So this will be -- I will mark

12   this as Miller Exhibit A.  It is a two-page -- what

13   appears to be an e-mail exchange between you and

14   Rover.  It's entitled "Rover Support" at the top.

15           THE WITNESS:  Yes.                               02:14

16           (The document referred to was marked

17            by the CSR as Deposition Exhibit A for

18            identification and attached to the

19            deposition transcript hereto.)

20           MR. YOUNG:  Is that the quick matching         02:14

21   walking one?

22           THE WITNESS:  Yes.

23           MR. LECRONE:  Yes.

24           MR. YOUNG:  That's Exhibit A?

25           MR. LECRONE:  That's Exhibit A.  So I know     02:14

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 53

1    we're flipping back and forth, but I'm just trying

2    to keep this as easy as it can be.

3            MR. YOUNG:  No problem.  I'm just -- we're

4    just -- we have all these documents so we're trying

5    to work through.                                    02:14

6    BY MR. LECRONE:

7        Q.   You've seen this, have you not?

8        A.   Yes, I saw this.

9        Q.   And you recall this exchange between you and

10   someone at Rover?                                   02:14

11       A.   Vaguely, but yes.

12       Q.   The certification process for you as a dog

13   sitter, a quiz, and things like that?

14       A.   This is separate.  This is for a dog walker.

15   This is a separate position that Rover offers.  It's 02:15

16   quick match walking.  So it's just strictly dog

17   walks.

18       Q.   Okay.  In the middle of this page, the part

19   from you dated October 25, 2017 at 12:54 a.m.

20            Do you see that text?                      02:15

21       A.   Yes.

22       Q.   Were you really sending this at 1:00 a.m. or

23   thereabouts?

24       A.   Possibly.

25       Q.   Okay.                                      02:15

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 54

1      A.   This is three years ago, so I don't...

2      Q.   It says here (reading):

3           "I'll just close my account.

4           It's not a big deal to me."

5           Did you make that statement?                02:15

6      A.   I don't recall, but if that's what is on

7  this paper, but I don't recall.

8      Q.   All right.  Any reason to believe this

9  wasn't your statement?

10     A.   No.  I'm just saying I don't recall writing  02:16

11 that.

12     Q.   Did you close your account at any time on or

13 shortly after October 25th of 2017?

14     A.   No, I just didn't do the quick match

15 walking.                                               02:16

16     Q.   So you just dropped this as part of what

17 were providing services for?

18     A.   Yeah.  There was a misunderstanding between

19 what I had completed and what I hadn't.  And on my

20 end I completed everything online that the             02:16

21 application process required.  And they were saying

22 that it didn't come through on their end.  So I never

23 went through and did the quick match walking.  I only

24 took dog sitting jobs.

25     Q.   You go on to say here (reading):             02:16

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 55

1           "This is just a backup job."

2           You see that statement?  Did you make that

3      statement?

4           A.   Yeah.  I mean, I'm reading through the

5      whole -- a lot of it's gibberish, you know.          02:17

6           Q.   This is all your gibberish, is it not?

7           A.   I may have written it, but it doesn't mean

8      that it meant anything.  I had been going back and

9      forth on this for a while on Rover even after I had

10     completed the application process, the testing.      02:17

11          Q.   Well, was it just a backup job as you state?

12          A.   I'm sorry?

13          Q.   Was your providing pet services using the

14     Rover platform, was it just a backup job as you state

15     in this e-mail?                                       02:17

16               MR. YOUNG:  Objection.  Objection; vague.

17               MR. LECRONE:  Okay.  I'm just using her

18     words

19     BY MR. LECRONE:

20          Q.   So you can answer the question, Ms. Miller.  02:17

21               MR. YOUNG:  You can answer the question to

22     the extent that you understand it.

23               MR. LECRONE:  That's fine.

24               THE WITNESS:  It's just a job, a job, not

25     backup or main job or just a job like this -- this    02:18

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 56

1      chat between the support member, it's just, you know,

2      not literal.

3      BY MR. LECRONE:

4           Q.   Well, it's truthful, though, isn't it?

5           A.   I wrote something back to them responding to    02:18

6      them.  But, you know, to say -- it's fair to say that

7      Rover was not a full-time job.

8           Q.   Were you --

9           A.   That's fair to say.

10          Q.   Were you being truthful in making these        02:18

11     statements?

12          A.   I wrote what's there.  It doesn't mean it's

13     truthful or not.  You know, it's just -- it's just a

14     message between somebody in support and myself.  And

15     like I said, this is three years ago.  You know, it's   02:18

16     hard to recall every single detail.

17          Q.   You go on to say in this sentence (reading):

18                    "I already walk several dogs in

19                    my neighborhood and have a real

20                    full-time job at Amazon."               02:19

21               Do you see that statement that you wrote?

22          A.   Yes, I see that.

23          Q.   Were you walking several dogs in your

24     neighborhood as of October 25th, 2017?

25          A.   Yes.  Prior to that, yes.                    02:19

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 57

1      Q.   And were those dogs that you were walking

2  through friends and neighbors outside of the Rover

3  platform?

4      A.   Yes, that's correct.

5      Q.   Did you have a full-time job at Amazon on or   02:19

6  about that date of October 25, 2017?

7      A.   I'm sorry?

8      Q.   Did you have a full-time job at Amazon on

9  that date?

10     A.   No, I did not have a full-time job at        02:19

11 Amazon.

12     Q.   So that's not a truthful statement.  That's

13 another statement like the one we saw earlier about

14 your other job, correct?

15     A.   Yes, that's correct.                          02:20

16          MR. LECRONE:  Okay.  Moving on, I'd like to

17 direct you and the court reporter to what we have

18 titled Exhibit B.  We will mark this as Miller

19 Exhibit B to the transcript.  And for this record it

20 is --                                                  02:20

21          (The document referred to was marked

22          by the CSR as Deposition Exhibit B for

23          identification and attached to the

24          deposition transcript hereto.)

25          MR. YOUNG:  Hey, John, do you mind if we      02:20

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 58

1        take a quick break?

2                MR. LECRONE:  Sure.  Let's just get this --

3        okay.  That's fine.

4                MR. YOUNG:  I was just thinking before you

5        started on this exhibit, that's all.                    02:20

6                MR. LECRONE:  Okay.  That would be okay.

7                MR. YOUNG:  What is the exhibit so I can

8        also get it ready?

9                MR. LECRONE:  It's another e-mail exchange

10       and it's titled "Irrational Owner."                     02:20

11               MR. YOUNG:  Okay.

12               THE VIDEOGRAPHER:  Off the record?

13               MR. YOUNG:  Yeah.  Like five minutes or so.

14               THE VIDEOGRAPHER:  Off the record.  The time

15       is 2:21 p.m.                                            02:21

16               (Recess held 2:21 p.m. to 2:29 p.m.)

17               THE VIDEOGRAPHER:  We're back on the record.

18       The time is 2:29 p.m.

19       BY MR. LECRONE:

20           Q.   All right.  Can you hear me, Ms. Miller?       02:29

21           A.   Yes, I can hear you.

22           Q.   Okay.  You're a tad bit muffled.

23           A.   Can you hear me now?

24           Q.   We need to be able to hear your words and

25       your voice in a way that we can understand what        02:30

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 59

1    you're saying.  Okay?

2         A.   Okay.

3         Q.   All right.  Good.

4              Are you able to proceed and give us your

5    best testimony?                                    02:30

6         A.   Yes.

7         Q.   Have you been able to give us your best

8    testimony thus far?

9         A.   Yes.

10        Q.   Okay.  Good.                              02:30

11             Let me turn to what has -- or what we've

12   already put on the screen.  I believe it is Exhibit B

13   on this record.  We will mark this as Miller

14   Exhibit B.

15             This is another e-mail exchange between you 02:30

16   one of the individuals at Rover, Rover support; is

17   that right?

18        A.   Yes, that's correct.

19        Q.   And this has to do with your dog sitting job

20   with Renshi whose owner found you and connected with  02:31

21   you through the Rover platform; is that right?

22        A.   Yes, that's correct.

23        Q.   And this didn't go so well as I understand

24   it.  You locked the keys in the house and couldn't

25   get back in?                                         02:31

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 60

1      A.   Yes.  She didn't give me a spare key and the
2   door slammed behind me.
3      Q.   So this Exhibit B is four pages.  It begins
4   at the top left "Irrational Owner" and has a date of
5   December 31, 2017.                                    02:31
6           Do you recall this e-mail exchange?
7      A.   Yes.
8      Q.   You wrote this e-mail, this almost a little
9   over two-page e-mail to, I guess, billing and
10  support --                                            02:32
11     A.   To support.
12          (Overtalking.)
13          (Reporter clarification.)
14  BY MR. LECRONE:
15     Q.   Okay.  Let me just say -- let me start over   02:32
16  and just say, you've seen this document, have you
17  not?
18     A.   I have.
19     Q.   And this is an e-mail exchange you had on or
20  about December 31, 2017 with one of the support techs 02:32
21  at Rover.com.  I think his -- the name on this record
22  is Dylan K.
23          Do you recall that?
24     A.   Yeah, the Rover support person.
25     Q.   And you drafted this.  No one told you what   02:32

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 61

1    to say this is all your words?

2         A.   That's correct.

3         Q.   All right.  If we start at page 1, then I

4    just have some questions to ask you as we go through

5    this a little bit.                                      02:33

6              The third paragraph begins (reading):

7              "In 15 years of dog sitting and

8              house sitting I've never had an

9              accident or made a mistake.

10             Do you see that comment?                       02:33

11        A.   Yes, I do.

12        Q.   Is it true that at this time as of

13   December 31, 2017 you had been doing house sitting

14   and dog sitting for 15 years?

15        A.   Yes, that's correct.                           02:33

16        Q.   During all of those 15 years, Ms. Miller,

17   was it all by word of mouth and through friends and

18   neighbors, or were you obtaining clients through

19   other methods?

20        A.   No, always through word of mouth.             02:33

21        Q.   So you were self-employed in that regard,

22   correct?

23        A.   Yes, that's correct.

24        Q.   You go on to say (reading):

25             "I've never had an accident or               02:33

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 62

1              made a mistake."

2              Was that a truthful statement?

3         A.    Yes, that's correct.

4         Q.    All right.  We move on to the second page of

5    the document.                                        02:34

6              Almost halfway down that page, it begins

7    that paragraph (reading):

8                   "So now I'm not getting paid for

9              the seven scheduled days, only six

10             days.  Just walked -- just want sure    02:34

11             I get paid for the days I was here

12             12/27/17 to 1/11/18."

13             Did you make that statement?

14        A.    Yes.

15        Q.    And were you just -- were you concerned   02:34

16   about this owner not wanting to pay your fee because

17   of the locked -- the key situation?

18        A.    That's correct.  She already told that in a

19   text message.

20        Q.    You indeed got paid, did you not?         02:34

21        A.    I did eventually, yes, get paid.

22        Q.    And you were asking Rover support on the

23   platform to help make sure that that payment came

24   through, correct?

25        A.    Yes, because they're in charge of payments.  02:35

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 63

1      Q.   Do these dates, 12/27/17 and 1/1/18

2   accurately reflect the days you were at this pet

3   owner's home?

4      A.   Yes.  It was for seven days.  She came home

5   a day early.                                            02:35

6      Q.   She was unhappy with your services and came

7   home a day early, correct?

8      A.   That's correct.  She was upset about the

9   locksmith.

10      Q.   Okay.  We go down two more paragraphs, the   02:35

11   next paragraph says (reading):

12           "Just please make sure that I get

13           paid."

14           You see that comment, that statement?

15      A.   Yes, I see, yes.                              02:35

16      Q.   Okay.  And that's a statement that you made,

17   correct?

18      A.   Yes, that's correct.

19      Q.   Okay.  It goes on to say (reading):

20           "I work for myself and I have way            02:35

21           better clients that I could be

22           working for."

23           You made that statement, did you not?

24      A.   Yes, that's correct.  That's what I'm

25   reading here.                                          02:36

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 64

1        Q.   Was that a truthful statement at the time
2    you made it?
3        A.   Possibly.  I mean, this is a long time ago,
4    so I don't recall the exact details.
5        Q.   This is only about two, three years ago.    02:36
6    Are you saying it might not be truthful?
7        A.   This is an e-mail.  I mean, you know, it's
8    impossible to remember every single message I've ever
9    written, but it's possible that I was taking care of
10   other dogs, neighbors', friends' at the time.          02:36
11       Q.   But you --
12       A.   It could.
13       Q.   -- you say "I work for myself"?
14       A.   It could be taken out of context.  I'm
15   sorry?                                                 02:37
16       Q.   Well, you've made that statement "I work for
17   myself," did you not?
18       A.   Yes, I wrote it here.  That's what I'm
19   reading I'm reading the same thing you are, so I
20   don't --                                               02:37
21       Q.   Okay.  Good.  And you weren't lying about it
22   at the time you made that, were you?
23       A.   Not that I recall.  I don't believe so.
24       Q.   You go on to say (reading):
25                "My last client I worked for who         02:37

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 65

1         has five dogs finish up on 12-26."

2         I'm assuming that was that same year of

3    2017.  Do you see that statement?

4         A.   Yes, I see it.  That's true.

5         Q.   Is that accurate?  Was that an accurate --   02:37

6         A.   Yes.

7         Q.   Was that an accurate statement at the time

8    you made it?

9         A.   Yes, it's my neighbor.  That's my neighbor

10   with five dogs, yes.                                  02:37

11         (Overtalking.)

12         MR. LECRONE:  Okay.  I'm sorry.  It's a

13   little difficult and I apologize for talking over.

14   Ms. Court Reporter, I hope I'm not -- I'll try better

15   not to do that as we move forward here.               02:38

16   BY MR. LECRONE:

17         Q.   Those five dogs were for a neighbor.  So

18   that was a pet sitting job you undertook outside of

19   the Rover platform, correct?

20         A.   Yes.                                        02:38

21         Q.   And who was that a neighbor?  Can you tell

22   me who it was?

23         A.   Yes.  You want his name?

24         Q.   Is he still a neighbor?

25         A.   Do you want me to spell his name for you?   02:38

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 66

1        Q.   Yeah, please.

2        A.   It's Jeff.  Last name is Byers, B-y-e-r-s.

3        Q.   Okay.  We go on to the next paragraph, you

4    say (reading):

5                 "This has been the worst dog            02:38

6             sitting experience ever.  I'm

7             deleting my account after I get

8             paid."

9             Do you see that statement?

10       A.   Yes, I see it.                              02:38

11       Q.   Did you make that statement and was it

12   accurate at the time you made it?

13       A.   Yes, I made that statement.  It's just

14   words.  It doesn't mean I actually deleted my

15   account.                                             02:39

16       Q.   I may have asked this before, but have you

17   since deleted the account or is it still an active

18   account on the platform?

19       A.   It's inactive, but I have the app.  I just

20   haven't deleted the account, but it's inactive.  I   02:39

21   haven't filled the calendar out in years.

22       Q.   Why have you not deleted it?

23       A.   No reason.

24       Q.   If we --

25       A.   I have reviews on it.  I have reviews on    02:39

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 67

1    there, so if I delete the account and the app, then

2    all my reviews will be deleted as well.  That's the

3    only reason I keep the app on the phone.  I haven't

4    used though it in ages.

5         Q.   Did you ever have any reviews posted on your  02:39

6    Rover profile?

7         A.   Yeah, but it's not in this exhibit.  It's a

8    separate exhibit.

9         Q.   Okay.  We'll get there in a moment.

10        A.   I have four, I believe.                        02:40

11        Q.   And were those from dog owners outside of

12   the Rover platform or outside of who you met through

13   the Rover platform?

14        A.   It's a combination.

15        Q.   So if I go back to your Rover profile that    02:40

16   we looked at earlier -- it was marked as Miller

17   Exhibit E -- we have three --

18        A.   I'm sorry.  Are we -- you're jumping ahead.

19   Are we done with the Janet Maloney, the irrational

20   owner message to Rover support or are we still         02:41

21   working on that because I have that in front of me.

22        Q.   I'm sorry.  We're done with that.

23        A.   Okay.

24        Q.   Sorry for the confusion.  I'm going to --

25        A.   You've got to give me a second to get to the  02:41

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 68

1   page because this is quite a few pages in here.

2        Q.   Sure.

3        A.   Like there's several duplicates.  Some of

4   the copies didn't come out very clearly, so a lot of

5   these are very, very faint, so they're hard to read.   02:41

6   I have to get through.

7             MR. LECRONE:  If we could, Ms. Court

8   Reporter, put back up exhibit that we marked

9   Exhibit E.

10            THE WITNESS:  Are we talking about the page   02:41

11   with the "verified stay"?  Because this is not

12   what --

13   BY MR. LECRONE:

14        Q.   Yes.

15        A.   -- I'm looking at.  Those are my rates.      02:42

16        Q.   No, I'm looking at a page with three names,

17   Sarah P, Laurie H, and Jeff B.

18        A.   Yes.  Sarah Patenda (ph), Laurie Hartenin

19   (ph) and Jeff Byers, that's correct.

20        Q.   Those are the reviews that you posted on     02:42

21   your profile with Rover?

22        A.   Those are their reviews, not mine.

23        Q.   Say that again.  I couldn't hear you.

24        A.   Those are their reviews about me.  They're

25   not mine.                                              02:42

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 69

1        Q.   Oh.  Not you posted, they posted it for you?

2        A.   That's correct.  I did not write these

3   reviews.  These are reviews from people I worked for.

4        Q.   Okay.  So Jeff B, I think you mentioned him,

5   he was the one you had a job for that's a neighbor,    02:42

6   correct?

7        A.   I'm sorry?

8        Q.   Jeff B, that's the name you just give us a

9   neighbor who you worked who you identified as someone

10  you provided pet sitting services for back in 2017?    02:43

11       A.   Yes.

12       Q.   Laurie H, same thing.  You knew Laurie or

13  you provided services for her not through meeting her

14  on the Rover platform, correct?

15       A.   That's correct.                              02:43

16       Q.   How about Sarah P, was this someone who was

17  a dog owner that found you on the Rover platform?

18       A.   This is a verified Rover user.  So that

19  means this is through the Rover app, that property,

20  yes.                                                   02:43

21       Q.   Okay.  So we can put that down and we're

22  done with Exhibit E.

23            Let me turn our attention to -- well, let

24  me -- yeah, let me go back to the exhibit.  We're

25  making some progress I'm happy to report here.         02:43

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 70

1              I'd like to put up and show you what we have
2       marked or titled Exhibit C.  So I will introduce this
3       as Miller Exhibit C to the record.
4              (The document referred to was marked
5              by the CSR as Deposition Exhibit C for          02:44
6              identification and attached to the
7              deposition transcript hereto.)
8              MR. LECRONE:  And this is a one-page
9       document.  It just says "Payment."
10             MR. YOUNG:  One second.  We're finding it       02:44
11      right now.
12             MR. LECRONE:  That's okay.
13             MR. YOUNG:  So I think we have it.
14      BY MR. LECRONE:
15          Q.  Okay?                                          02:44
16          A.  Okay.
17          Q.  Do you recall this email exchange from you
18      to Rover March -- or I'm sorry -- January 4, 2018?
19          A.  Vaguely, yes.  Vaguely.  I think this is
20      regarding the Renshi stay, so I hadn't received       02:44
21      payment yet.  I'm sorry?
22          Q.  That's all.
23          A.  Okay.
24          Q.  It goes on to say (reading):
25              "This is ridiculous and I will               02:45

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 71

1          never use this company again."
2          Did you make that statement?
3     A.   Yes, I did.
4     Q.   And when you -- by saying "this company"
5   using this company, are you referring to Rover.com?     02:45
6     A.   Yes, that's correct.  Yes, that's correct.
7     Q.   You go on to say (reading):
8             "And no reply until 24 hours
9             later.  Horrible customer support."
10         Do you see that statement?                        02:45
11    A.   Yes, I do.
12    Q.   Did you write that?
13    A.   Yes, I did.
14    Q.   And was that a complaint by you that they
15  weren't supporting you as their customer?               02:45
16    A.   Yes, that's correct.
17    Q.   Okay.  Moving on --
18    A.   These are -- I'm sorry.
19    Q.   I'm sorry.  Ms. Miller, did you have
20  something to add?                                        02:46
21    A.   No, no disregard.
22         MR. LECRONE:  All right.  Let's turn to what
23  we have titled Exhibit D, so I would introduce this
24  and mark this as Miller Exhibit D.
25                                                            02:46

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 72

```
1              (The document referred to was marked
2              by the CSR as Deposition Exhibit D for
3              identification and attached to the
4              deposition transcript hereto.)
5          MR. YOUNG:  What exhibit, John?          02:46
6          MR. LECRONE:  Someone is speaking and I
7      can't hear it.
8          THE WITNESS:  Yeah.
9          MR. YOUNG:  Sorry, John, I was on mute.
10         Is it the Exhibit D the Django            02:46
11     administration?
12         THE WITNESS:  Yes.
13         MR. LECRONE:  Django, yes.
14         MR. YOUNG:  Okay.
15 BY MR. LECRONE:                                   02:47
16     Q.   These are what I'm calling -- generically
17 calling conversations.
18         So these were produced to your lawyers, and,
19 Ms. Miller, and I'm assuming you're seen them before?
20     A.   Yes, I saw them when they were delivered to  02:47
21 me three days ago.
22     Q.   And you're familiar with these messages?
23     A.   I am now.
24     Q.   Do you recall sending them -- we'll go
25 through them in just a moment, but do you recall      02:47
```

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 73

1   sending messages to these individuals?

2        A.   Vaguely.   These are when a Rover client

3   contacted me.

4        Q.   Right.   And just for the record, this does

5   say Django, D-j-a-n-g-o Administration?          02:47

6        A.   Yeah, I don't know what that means, but

7   yeah, that's what it says.

8        Q.   I'm not sure I do either, but these are

9   messages and they say "sender" and "recipient."   You

10  see your name in both columns I take it?          02:48

11       A.   Yes, these are text messages between a Rover

12  user and myself.

13       Q.   We'll refer just for the purposes of this

14  deposition as we've redacted the last name of these

15  dog owners just because we didn't think it was      02:48

16  necessary.

17            In looking at this, if we start with page 1,

18  it's Jennifer, is the first name of this dog owner.

19  Does that -- excuse me -- ring a bell?

20       A.   No, but I mean, these messages wouldn't be   02:48

21  in my Rover profile.   They would be in the archive,

22  so unless it's a current survey so --

23       Q.   Okay.   So this is a dog owner whose first

24  name is Jennifer.   Do you recall that?

25       A.   Yes.   Not really but --                 02:49

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 74

1          Q.   Do you recall getting a message from this

2     dog owner by this, as posted here in Exhibit D on

3     November 14, 2017 (reading):

4               "Hi, Erika:  I'm going to be out

5               of town over Thanksgiving.  I need          02:49

6               someone to sit -- to dog sit my crew

7               at my house."

8               Do you see that comment?

9          A.   Yes, I see it.

10         Q.   And you responded to that that same day,    02:49

11    shortly after actually from -- it was posted

12    10:17 p.m., you responded 10:23 p.m. (reading):

13              "Hi, Jennifer.  I got your

14              messaging.  Unfortunately, I'm

15              already house sitting and dog sitting       02:49

16              five dogs for someone for five weeks.

17              Good luck."

18              Did you make that statement in this message?

19         A.   Yes.

20         Q.   Who were you house sitting and dog sitting  02:50

21    five dogs for?  Was that the friend or neighbor --

22         A.   My neighbor.

23         Q.   -- you referred to?  Was that --

24         A.   Yes, Jeff.

25         Q.   And again that was not a -- that was not an  02:50

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 75

1      individual or a dog owner that you connected with

2      through the Rover platform, correct?

3           A.   No, he's not a Rover member, that's correct.

4           Q.   Okay.  In any event, this particular

5      engagement with Jennifer, you turned her down, did      02:50

6      you not?

7           A.   I did.  That's correct.

8           Q.   Because you were already doing other jobs;

9      is that right?

10          A.   That's correct.  I wasn't available.         02:50

11          Q.   Okay.  And this was before you had done --

12     or connected with any pet owners through the Rover

13     platform, I take it?  You hadn't done any?

14          A.   I'm sorry.  I'm not following.

15          Q.   Well, I believe the first service time you    02:51

16     got through the Rover platform was December of 2017,

17     that was --

18          A.   Oh, yes, yes, yes, Janet Maloney, that's

19     correct, yes.

20               (Overtalking.)                                02:51

21     BY MR. LECRONE:

22          Q.   You hadn't done --

23          A.   They overlapped, yeah.

24          Q.   Okay.

25          A.   No, I hadn't.  No, that's correct.            02:51

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 76

1          Q.   All right.  Let's go onto the next page if
2     we could.  This appears to be from a dog or pet owner
3     named Ashley.  The message came through to you
4     December 6, 2017 at 9:43 a.m.
5          A.   Yes, I see it here.  Ashley wrote.  I see      02:51
6     these pages are out of order, but that's okay.
7          Q.   Okay.  Well (reading):
8               "Hi, Erika.  I'm looking for an
9               in-home sitter for my dog Renshi
10              while I'm home for the holidays 12/19      02:52
11              through 12/26.  Would you be
12              available?"
13              Do you recall getting this message?
14         A.   Yes.
15         Q.   And you responded and declined, correct?      02:52
16         A.   Yes, because I wasn't available.
17         Q.   Okay.  Well, you could have declined for any
18    reason you wanted; is that right?
19         A.   That's true.  Location or the area of -- no,
20    I didn't say --                                          02:52
21              (Overtalking.)
22              THE WITNESS:  I wasn't -- I honestly wasn't
23    available.
24    BY MR. LECRONE:
25         Q.   I know.  Okay.  But you could have declined   02:52

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 77

1    for any reason at all?

2         A.   Any reason, but you don't disclose that to

3    people because it's rude to say "I don't want to

4    drive that far" or "I don't want to work in that

5    neighborhood."                                        02:53

6         Q.   I get that.  Okay.  Let's go on to the next

7    page.  This is from a pet owner whose first name is

8    Chris, and it appears to have been a message from him

9    to you, December 16, 2017 at 9:54 a.m.

10             Do you recall --                             02:53

11        A.   Yes.

12        Q.   -- this message?

13        A.   I mean, possibly.

14        Q.   He reads, and I just won't say the whole

15   thing, but (reading):                                 02:53

16             "Diesel is a 60 pounds Boxer-mix

17             type dog and loves to play but

18             doesn't really get along well with

19             dogs."

20             He goes on to say (reading):                 02:53

21             "Could you spend the night at my

22             place?  "

23             Did you see that?

24        A.   I see it.

25        Q.   And again you declined the pet owner's       02:53

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 78

1      request?

2           A.   Yes.

3           Q.   Because of your schedule being full?

4           A.   Yes, and I don't want to overbook.

5           Q.   And you didn't hear from this dog owner      02:54

6      again, I assume?

7           A.    I don't know.  I mean, I have so many

8      messages between Rover members and myself, it's too

9      many to count to go back to three years ago.  No, if

10     it's not here, then it's probably they didn't respond  02:54

11     back after the last message.

12          Q.   Go on to the next page if we could.  This is

13     an exchange between you and a dog owner whose first

14     name is Arif, A-r-i-f.

15          A.   Yes.                                          02:54

16          Q.   The message to you is dated January 30, 2018

17     at 4:55 p.m. (reading):

18               "Hi, Erika.  We are looking for a

19               dog and house sitter for our rescue

20               Javier."                                      02:55

21          A.   It's Javier.

22          Q.   Javier.  It's J-a --

23          A.   Yes.

24          Q.   -- -v-i-e-r.  You recall this message coming

25     in to you from a dog owner who connected with you      02:55

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 79

1      through the Rover platform?

2          A.   No.

3          Q.   You declined this as well, correct?

4          A.   Yes.

5          Q.   You state above (reading):                02:55

6                   "Hi, Arif.  Thanks for your

7               message.  Unfortunately, my new work

8               schedule is Wednesday through Sunday,

9               so I'm not available on the weekend."

10              Did you make that statement?            02:55

11         A.   Yes.

12         Q.   Is that a true statement?

13         A.   Yes, I believe I was working for Zum at the

14     time.

15         Q.   And did you change your pet sitting schedule 02:55

16     at or about --

17         A.   Yes.  I updated the calendar to that to

18     reflect that.

19         Q.   Okay.  Do you recall when you changed your

20     schedule on the calendar?                         02:56

21         A.   No.  That would be impossible.

22         Q.   Did Rover or anyone from Rover ever tell you

23     how to change your schedule or direct you in any way

24     about changing your schedule?

25         A.   No, they just tell us to keep it up to date. 02:56

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 80

1    So we have to keep it up to date so we can either
2    fill it in or leave it blank.
3        Q.   Okay.  Let's go on to the last of these
4    pages.  This appears to be a text thread between you
5    and another pet owner --                              02:56
6        A.   Yes.
7        Q.   -- through the Rover platform?
8        A.   Mahalia Muey (ph).
9        Q.   Yes, although we've redacted or her last
10   name, deleted her last name.  It's Mahalia I think;   02:57
11   is that right?
12       A.   I'm just seeing what I see here.
13       Q.   Okay.
14       A.   Yes.
15       Q.   So this pet owner reached out to you it      02:57
16   would appear March 13 of 2018 and again May 6 of
17   2018, and you declined both times, did you not?
18       A.   Yes, it overlapped with my other dog walking
19   times for my neighbor's dog.
20       Q.   At the top here you say (reading):           02:57
21            "I'm sorry.  I'm already booked
22            with two other Rover dogs."
23            That's not a true statement, was it?
24       A.   No, I don't -- I mean, she doesn't have to
25   know that it's Rover or my neighbor.  That's just     02:57

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 81

1    something I wrote, but no, I wasn't worked with two

2    other Rover clients; that's correct.

3         Q.   Were you --

4         A.   It was a figure of speech.

5              (Overtalking.)                              02:57

6              THE WITNESS:  Yeah, I couldn't hear it

7    either.

8    BY MR. LECRONE:

9         Q.   The follow-up question was, these were

10   just -- these were dogs outside of the Rover platform  02:58

11   or were there dogs -- no dogs at all?

12        A.   Those are dogs outside of the Rover

13   platform, yes, that's correct.

14        Q.   Okay.  And you did not hear back from that

15   pet owner at any time, I take it?                     02:58

16        A.   No, not after the last message.  If that's

17   what's here, then...

18        Q.   There's one additional page I'm hoping

19   that's on here.  It's a little -- it may be the last

20   entry or are we on the last entry?  Okay.  There it   02:59

21   is.

22        A.   This is the defense VIN something about

23   defend in.

24        Q.   It reads Reese and Devin?

25        A.   Reese and Devin, yes, that's correct.       02:59

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 82

```
 1        Q.    Okay.  Do you recall --
 2              (Overtalking.)
 3              THE WITNESS:  This is somebody that I worked
 4        for.
 5   BY MR. LECRONE:                                    02:59
 6        Q.    Did you recall --
 7        A.    Yes, this is --
 8              THE DEPOSITION OFFICER:  Hold on.  Hold on.
 9   Off the record.
10              THE WITNESS:  Yes.                       02:59
11              THE DEPOSITION OFFICER:  Off the record.
12              MR. YOUNG:  You've got to allow him to
13   finish the question before you answer.
14              THE VIDEOGRAPHER:  Off the record.  The time
15   is 2:59 p.m.                                        02:59
16              (Recess held 2:59 p.m. to 3:00 p.m.)
17              THE VIDEOGRAPHER:  We're back on the record.
18   The time is 3:00 p.m.
19   BY MR. LECRONE:
20        Q.    So you recall this text exchange between    03:00
21   yourself and Reese and Devin.  I'll leave their last
22   names off here.  This is the dog Lando, I believe?
23        A.    Yes, that's correct.
24        Q.    Do you recall this?
25        A.    Two dogs.  Yes, that's correct.           03:00
```

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 83

1      Q.   Okay.  On that first page towards the bottom
2   May 5th --
3      A.   Uh-huh.
4      Q.   -- of 2018 at 9:49 a.m. you make the
5   following statement (reading):                         03:01
6              "Hi, there.  This is kind of
7           short notice.  Do you want me to --
8           do you want to meet first?  Where do
9           you live other than Glen Park?"
10          Did you make those statements?              03:01
11     A.   Yes.
12     Q.   All right.  And that's all true?
13     A.   Yes, because he wanted me to start working
14   for him before we met.
15     Q.   Okay.  (Reading):                          03:01
16             "I'm not on Rover that much
17          anymore because I have my own dog
18          sitting service."
19          Did you make that statement?
20     A.   Yes, if that's what's written there I wrote 03:01
21   that.
22     Q.   Okay.  Was it truthful?  Were you being
23   truthful?
24     A.   I don't have a dog sitting service.  I just
25   walk dogs.  It's not a service.  It's not an actual  03:01

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 84

1     like business.

2          Q.   Well, is it true that you were not on Rover

3     that much anymore as you state in this text message?

4          A.   No, just sending messages back and forth to

5     those previous users.                                    03:02

6          Q.   Can you --

7          A.   It's a separate program --

8               (Overtalking.)

9               THE DEPOSITION OFFICER:  Sorry.

10              MR. YOUNG:  I know.  I know.  I -- part of   03:02

11    that was me.  I apologize.

12              Can you read -- you can answer the question,

13    Ms. Miller.  I'm sorry.  I think I spoke over you.

14              THE WITNESS:  It's fine.  I was just trying

15    to say that Devin is the second Rover client on the   03:02

16    Rover app that I worked for.  So there's a gap

17    between Janet Maloney and this person.

18    BY MR. LECRONE:

19         Q.   Uh-huh.  Okay.  So in this same text thread

20    that we have just been talking about you say         03:02

21    (reading):

22              "Can you please text me instead

23              by sending your messages -- instead

24              of sending your messages through

25              Rover?"                                       03:02

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 85

1              And you give him a phone number.

2              Do you see that?  Near the bottom of the

3        first page of this document.

4              A.   Oh, yes, I see that, yes.  We were having

5        trouble with the communication because I wasn't          03:03

6        getting notifications from Rover on the app, so I

7        suggested a direct form of communication.

8              Q.   Was that something you did frequently with

9        dog owners rather than using the app?

10             A.   If the communication was going to be          03:03

11       constant, yes, not if it had ceased.

12             THE DEPOSITION OFFICER:  Not -- not what?

13       BY MR. LECRONE:

14             Q.   What is this phone number, 415 --

15             THE DEPOSITION OFFICER:  I'm sorry.  I

16       didn't -- Counsel, can you hear me?

17             The witness said:  If the communication --

18             MR. LECRONE:  Yes, I can hear you.  Sorry.

19             THE DEPOSITION OFFICER:  Sorry.  The witness

20       said:  If the communication was going to be constant,

21       yes, not if --

22             THE WITNESS:  The communication was ceased.

23       So we had several messages going back and forth, and

24       it was long-drawn-out messages and they were getting

25       lost within the app.                                     03:04

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 86

1          So I think we should go back to the top here
2    you'll see he sent me his email address, which is
3    right after I sent him that -- this is kind of cut
4    off because it seems to be that this message is
5    missing.                                        03:04
6    BY MR. LECRONE:
7          Q.   I see.  So what is the phone number
8    415.797.2121?  Is that your cell phone?
9          A.   That's my cell phone, yes.
10         Q.   Is it still your cell phone today?    03:04
11         A.   Yes.
12         Q.   So did you begin to communicate directly
13   with Reese and/or Devin, these dog owners, directly
14   through your cell phone and/or emails rather than
15   through the platform, the Rover platform?        03:05
16         A.   Yes.
17         Q.   Did that continue for some period of time?
18         A.   Yes, until we met in person.
19         Q.   Okay.  When you created your account and
20   posted -- well, let me back that up.             03:05
21         When you created your Rover account and your
22   platform or your -- I keep using the wrong words and
23   I apologize.
24         When you created your account, your Rover
25   account and your profile you also --             03:05

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 87

1      A.   Uh-huh.

2      Q.   -- received what's called a Terms of Service

3   document; is that right?

4      A.   I believe so.  It's on the app.  You have to

5   click it in order to create an account.          03:05

6      Q.   And you were asked to review that Terms of

7   Service?

8      A.   Yes.

9      Q.   And you did indeed review it; is that right?

10      A.   I believe so, yes.                        03:06

11      Q.   And you agreed to it, correct?

12      A.   Yes.

13      Q.   And you signed it electronically at the time

14   you created your account and posted your profile?

15      A.   Yes, I checkmarked it, yes.               03:06

16          MR. LECRONE:  Okay.  Let's just -- that is

17   marked as Exhibit I.  So I would introduce this on

18   the record as Miller Exhibit I.

19              (The document referred to was marked

20              by the CSR as Deposition Exhibit I for   03:06

21              identification and attached to the

22              deposition transcript hereto.)

23          MR. LECRONE:  If you could just put it into

24   this record and show the witness.

25              THE WITNESS:  These are just messages    03:06

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 88

1     from --

2     BY MR. LECRONE:

3         Q.   Well, there you go.  Can you see it on the

4     screen?

5         A.   Yes, I see it.                            03:06

6         Q.   Okay.  Is that the Terms of Service you

7     reviewed and read and agreed to?

8             MR. YOUNG:  And hey, John, we didn't -- we

9     didn't get an Exhibit I or an exhibit for the Terms

10    of Service.                                        03:07

11            MR. LECRONE:  Huh.  Well, I thought that was

12    sent to you.  I apologize if it wasn't.  It's just

13    the Terms of Service document.  I believe it was

14    exchanged.  It bears Miller numbers 298 -- Bates

15    number 298 to 312, so you would have produced this  03:07

16    already.

17            THE WITNESS:  We've got it.

18    BY MR. LECRONE:

19        Q.   These are the Terms of Service you reviewed

20    and signed electronically.  Do I have that right?  03:07

21        A.   Yes.  Checkmark on it to create the account.

22            MR. LECRONE:  Okay.  I have no further

23    questions at this time.

24            Joel, do you have questions?

25            MR. YOUNG:  I will ask a couple.           03:07

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 89

1           MR. LECRONE:  We can't hear you.

2           MR. YOUNG:  I was muted.  Yeah, I just have

3    a couple, like four or five questions.  Let me take

4    like three minutes to get ready real quick.  We've

5    got a bunch of documents and stuff over here we want    03:08

6    to clear out.  Can you guys handle that?

7           MR. LECRONE:  Sure.  We'll go off the

8    record.

9           THE VIDEOGRAPHER:  Off the record.  The time

10   is 3:08 p.m.                                           03:08

11           (Recess held 3:08 p.m. to 3:10 p.m.)

12           THE VIDEOGRAPHER:  We're back on the record.

13   The time is 3:10 p.m.

14

15                     EXAMINATION                          03:10

16   BY MR. YOUNG:

17      Q.   Okay.  Erika, have you ever taken any steps

18   to establish an -- or promote an independent pet

19   sitting or dog walking business?

20      A.   No.                                            03:11

21      Q.   Have you ever incorporated a pet sitting or

22   dog walking business entity?

23      A.   No.

24      Q.   Have you ever paid any business license for

25   pet sitting or dog walking?                            03:11

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 90

1        A.   No.

2        Q.   Have you ever advertised to the general

3    public regarding a pet sitting or dog walking

4    business?

5        A.   No.                                        03:11

6        Q.   Have you ever made any offerings to the

7    general public to provide services as an independent

8    pet sitting or dog walking business?

9             MR. LECRONE:  Objection; vague and

10   ambiguous.                                          03:11

11             THE WITNESS:  No.

12             MR. LECRONE:  Calls for speculation,

13   argumentative.

14             MR. YOUNG:  I have no further questions.

15                                                       03:11

16             MR. LECRONE:  I have one more question and

17   one more exhibit if I could show it to you.

18             This has been titled Exhibit F.  So I will

19   introduce this for the record for the deposition as

20   Miller Exhibit F.                                   03:12

21             (The document referred to was marked

22             by the CSR as Deposition Exhibit F for

23             identification and attached to the

24             deposition transcript hereto.)

25

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 91

```
 1                    EXAMINATION
 2   BY MR. LECRONE:
 3        Q.   This is a two-page document I believe we
 4   received from your lawyers, and it appears to be a
 5   posting you made about being a pet sitter in          03:12
 6   San Francisco.
 7             MR. YOUNG:  We're not seeing -- can you put
 8   it up on the screen.
 9             THE WITNESS:  Yes, it's not here.  Oh, okay.
10             MR. YOUNG:  Ah, thank you.                   03:13
11             THE WITNESS:  Yes.
12             MR. YOUNG:  This is Exhibit F, correct?
13   Sorry, I was muted.  This is Exhibit F, correct?
14             MR. LECRONE:  It has been titled for this
15   record, yes, Exhibit F, you're correct.               03:13
16   BY MR. LECRONE:
17        Q.   Have you seen this before, Ms. Miller?
18        A.   Today I'm looking at it right now.
19        Q.   And I'll let it speak for the record.  It
20   says (reading):                                        03:14
21             "Erika M, pet sitter,
22             San Francisco.  Looking for work as a
23             pet sitter or dog walker.
24             And it appears it was posted on to
25   sittercity.com pet sitting San Francisco.             03:14
```

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 92

1      A.   Yes, but I didn't write that.  That's an
2  auto generated.
3      Q.   What's auto generated?
4      A.   The top line is not my writing.  I didn't
5  write that.                                          03:14
6      Q.   Well, how about if we go down -- go ahead.
7      A.   No.  Go ahead.  I was going to say below
8  that the "About" section, I wrote that.
9      Q.   Okay.  Well, it says (reading):
10         "Erika M, pet setter,                       03:14
11         San Francisco.  I'm looking for work
12         as a pet sitter, dog walker.
13         You posted that, did you not?  That was
14  your -- that's your -- those were your words?
15      A.   Yes, yes.                                  03:15
16      Q.   Okay.  And it says below (reading):
17         "10-plus years of experience."
18         You posted that?
19      A.   Yes, that's correct.
20      Q.   Was that a true statement at the time you  03:15
21  made it?
22      A.   Yes.
23      Q.   "10 to 11 dollars per half hour."  Are
24  those -- did you post those rates?
25      A.   That category, I didn't write that.  That's 03:15

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 93

1    part of the app.

2         Q.   What is this app?  Tell me.

3         A.   This is Sitter City, but I haven't worked

4    for them in years.

5         Q.   When did you make this posting?              03:15

6         A.   I opened this account I believe in 2011,

7    yeah, I believe sometime in 2011, January or

8    February.

9         Q.   Is this a platform like Rover where you

10   are -- you can connect with dog owners?  Is that what  03:16

11   it is?

12        A.   Yeah, it's a platform like Urban Sitter or

13   care.com.

14             THE DEPOSITION OFFICER:  Or what dot com?

15   BY MR. LECRONE:                                        03:16

16        Q.   How long did you --

17             THE DEPOSITION OFFICER:  I'm sorry.  Urban

18   Sitter or what dot com?

19             THE WITNESS:  I'm sorry.

20             THE DEPOSITION OFFICER:  Care.com.  Thank

21   you.

22   BY MR. LECRONE:

23        Q.   You posted this as you just mentioned

24   February of 2011.  How long did you stay on this

25   platform with this posting?                            03:16

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 94

1        A.   Two years, I guess.

2        Q.   Did you connect with any dog owners during

3    that period of time through this platform?

4        A.   I don't believe so.  Just childcare.  I

5    don't recall working as a pet sitter on this -- for     03:17

6    this app.

7        Q.   And what -- why did you post this?  Were you

8    looking for pet owners to find you and hire you to

9    take care of their pets?  Is that the purpose of this

10   posting?                                                03:17

11       A.   This is a category that they offered, so I

12   initially opened up this account for childcare, but I

13   also filled out the special needs care section and

14   the pet care section as well just so I could have a

15   broader account and more people could find me through  03:17

16   this app.

17       Q.   Is this the -- you used this same profile

18   for being a nanny?

19       A.   They have different categories.  So if you

20   filled out a pet sitter category, people looking for   03:17

21   pet care could find you.

22       Q.   Like Rover, they allow you to set your own

23   rates for pet sitting?

24       A.   Yes, they do.

25       Q.   And like Rover do they have the pet owners    03:18

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 95

1    locate you through their platform and reach out to

2    you for work?

3         A.   Yes, through the app.

4         Q.   And like Rover, pet sitter did tell you --

5    or Sitter City didn't tell you how to -- what to say    03:18

6    in this profile, did it?

7         A.   No.

8         Q.   It didn't tell you what rate to charge, what

9    you could or couldn't charge for your services?

10        A.   No.                                            03:18

11        Q.   It didn't tell you where or when you were to

12   provide your services?  It allowed that -- left that

13   to your discretion like Rover, correct?

14        A.   That's correct.

15        Q.   Okay.  You said as we started looking at      03:18

16   this document when it says "About Erika" you wrote

17   that paragraph.  It's a couple sentences long?

18        A.   Oh, the "About Me" section, yes.

19        Q.   Okay.  (Reading):

20              "Hello, fellow pet parents.  My              03:19

21              name is Erika Miller.  I'm a

22              professional animal lover with big to

23              small.  I love them all."

24              You made that statement?

25        A.   Yes, that's correct.                          03:19

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 96

1       Q.   Is it truthful?

2       A.   Yes, that's correct.

3       Q.   (Reading):

4            "To keep it short and sweet, I

5            have over 21 years of experience with      03:19

6            dogs, cats, birds, reptiles, small

7            animals and horses."

8            Is that a true statement?

9       A.   Yes.

10      Q.   So as of 2011 you had over 21 years of     03:19

11  experience in this animal space, so to speak?

12      A.   Yes, that's correct.

13      Q.   You go to say (reading):

14           "I love spending time and working

15           with animals.  It's my passion.  I         03:19

16           look forward to helping you and your

17           pet."

18           You made that statement too, correct?

19      A.   Yes, that's correct.

20      Q.   All right.  And again, you don't recall any 03:20

21  connections from pet sitters through this posting you

22  made on Sitter City?

23      A.   I'm sorry?

24      Q.   You do not recall connecting with or

25  performing services for any pet owners through this   03:20

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 97

1    app, through this portal, correct?

2         A.   No, I never did pet sitting on Sitter City,

3    only childcare.

4              MR. LECRONE:  Okay.  Okay.  I think, believe

5    it or not, can we just take a quick break?  I think     03:20

6    I'm done with the deposition.  If we could just take

7    a three- or four-minute break, we can conclude.

8              THE VIDEOGRAPHER:  Off the record.  The time

9    is 3:20 p.m.

10             (Recess held 3:20 p.m. to 3:27 p.m.)          03:20

11             THE VIDEOGRAPHER:  We are back on the

12   record.  The time is 3:27 p.m.

13   BY MR. LECRONE:

14             Q.   I want to go back for just a moment.  I

15   missed one of the conversations you had, Ms. Miller.    03:27

16   They would be in Miller Exhibit D, and I want to ask

17   you --

18             MR. YOUNG:  One second while we grab it,

19   John.

20             MR. LECRONE:  Sure.                           03:27

21             MR. YOUNG:  You said D, correct?

22             THE WITNESS:  Yes.

23             MR. LECRONE:  It is titled Exhibit D and

24   we'll just keep it and I'll introduce it for this

25   record as Miller Exhibit D.                             03:27

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 98

1    BY MR. LECRONE:

2         Q.   The name of this dog owner -- I will just

3    say the first name -- is Shanda.  Do you recall this

4    if you look at this thread?

5         A.   Hang on.  It's not in here.  Is it this one? 03:28

6              MR. LECRONE:  Shanda.

7              THE WITNESS:  This one.  Yes, I'm just

8    trying to --

9    BY MR. LECRONE:

10        Q.   You see it?                                  03:28

11        A.   Yeah, I see it.

12        Q.   Do you recall this conversation or text

13   exchange with this pet owner, Shanda?

14        A.   Yes.  Sorry.

15        Q.   I don't believe you ended up taking a job   03:28

16   with her or for her?

17             MR. YOUNG:  John, hold on one second.  John,

18   hold on one second.  The earpiece is running out of

19   batteries.  We're trying to make that adjustment.

20             Do you want to use mine?                     03:29

21             (Off-the-record discussion.)

22             MR. YOUNG:  John, can you hear me?

23             MR. LECRONE:  I can.

24             MR. YOUNG:  Can everyone hear?

25             And Erika, go for it.  Make sure everyone    03:30

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 99

1      can hear you.

2              THE WITNESS:  Can you repeat the question,

3      please?

4              MR. YOUNG:  John, I think we're ready to go.

5      BY MR. LECRONE:                                    03:30

6          Q.   Okay.  Do you have this text thread in front

7      of you?  It's about a little more than one page

8      with -- it's an exchange between you and Shanda?

9              Do you see this?

10         A.   Yes, yes.                                 03:30

11         Q.   Okay.  Halfway through down this first page

12     of the document or this thread it's a message between

13     you and her.  It's from you to her Shanda, May 18,

14     2018 at 12:18 p.m., and the content says (reading):

15             "I don't work FT because I'm an             03:30

16             independent contractor."

17             Did you make that statement?

18         A.   I wrote that.

19         Q.   Well, you made the statement, correct?

20         A.   Yes, I did.  I mean, if it's written, I    03:31

21     wrote that.

22         Q.   Okay.  Was that a truthful statement?

23         A.   Yes, it's true.  Make my own hours.

24         Q.   And FT means full-time?

25         A.   Yes, FT, full-time.                        03:31

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 100

1          Q.   Okay.  (Reading):

2               "I make my own hours, but I may

3               start a five-day-a-week job in June."

4               See that?  Did you make that statement?

5          A.   Yes, that's correct.                    03:31

6          Q.   Is that a truthful statement?

7          A.   Yes.

8          Q.   Did you begin a five-week job in June of

9     2018?

10         A.   No, I did not start a five-day-a-week job.  03:31

11         Q.   That's not a truthful statement?

12         A.   I've written "I may start a five-week job in

13    June for JCC.

14         Q.   Is that true or not?

15         A.   Yes, it's true and I wrote that I may start  03:32

16    a five-day-week job.

17         Q.   And what was that five-day-a-week job for or

18    with?

19         A.   For JCC at their childcare center.

20         Q.   All right.  Okay.  One last question.  Do  03:32

21    you know Melanie Sportsman?

22         A.   Am I supposed to be looking at something on

23    here?

24         Q.   No, no, no.

25         A.   Doesn't ring a bell.                    03:32

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 101

1        Q.   And again, I think I asked you earlier, do

2    you know or are you in communication with in any way

3    any of the other -- any pet sitters that are -- have

4    profiles posted on the Rover platform?

5        A.   No.                                          03:33

6        Q.   Have you talked to any pet sitters or pet

7    walkers who have profiles posted on the Rover

8    platform about how they are paid, how they set their

9    schedules, or anything relating to their provision of

10   pet care services?  Have you talked to any of them --  03:33

11       A.   No.

12       Q.   -- about that?

13       A.   No.

14       Q.   Have you told any of them that you filed a

15   lawsuit?                                              03:33

16       A.   No.

17       Q.   That's never come up?

18       A.   No.

19            MR. LECRONE:   Okay.  I have nothing further.

20   Thank you.                                            03:33

21            MR. YOUNG:   Thank you, John.

22            THE WITNESS:   Thank you.

23            THE VIDEOGRAPHER:   Off the record.  The time

24   is 3:33 p.m.

25

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 103

1              DECLARATION UNDER PENALTY OF PERJURY

2

3

4              I, ERIKA MILLER, do hereby certify:

5

6              That I have read the foregoing deposition;

7              That I have made such changes in form

8     and/or substance to the within deposition as might

9     be necessary to render the same true and correct,

10    but have limited such changes to actual reporting

11    errors or errors in fact, as opposed to editing the

12    content generally;

13             That having made such changes thereon as

14    were required, I hereby subscribe my name to the

15    completed deposition.

16

17             I declare under penalty of perjury that

18    the foregoing is true and correct.

19

20             Executed at this _____ day of

21    _____, 2020, at _____,

22    State of California.

23

24                      _____

25                           ERIKA MILLER

ERIKA MILLER
TUESDAY, APRIL 28, 2020

Page 104

1                            CERTIFICATE

2                                OF

3                    CERTIFIED SHORTHAND REPORTER

4

5          The undersigned Certified Shorthand Reporter of

6     the State of California does hereby certify:

7          That the foregoing deposition was taken before

8     me at the time and place therein set forth, at which

9     time the witness was duly sworn by me;

10         That the testimony of the witness and all

11    objections at the time of the examination were

12    recorded stenographically by me and were thereafter

13    transcribed; said transcript being a true copy of my

14    shorthand notes thereof;

15

16         Executed this 4th day of May 2020 at Prescott,

17    Arizona.

18

19         _____

20

21

22

23

24

25