**EXHIBIT B**

CERTIFIED COPY

**IN THE UNITED STATES DISTRICT COURT**
**THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ERIKA MILLER, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | )    **CASE NUMBER** |
| | )    **3:19-cv-03053-WHO** |
| A PLACE FOR ROVER, INC. d/b/a | ) |
| ROVER; JANICE MALONEY; and | ) |
| DOES 1-20,000,000, | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

**VIDEOTAPED DEPOSITION OF MELANIE SPORTSMAN**
**Taken on September 29, 2020**



**Court Reporting • Video • Trial Presentation**
LA 310.230.9700 • SF 415.445.0105
els@elitigationservices.com • www.elitigationservices.com

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 10

1    Q    Is there any reason mentally, emotionally, or
2  physically you cannot give us your best testimony
3  today, Ms. Sportsman?
4    A    No.
5    Q    What did you do to prepare for today's
6  deposition other than -- I don't want you to share
7  with me what you discussed with counsel, but what else
8  did you do?
9    A    I'm sorry, what was the question again?
10   Q    What did you do to prepare for today's
11 deposition?
12   A    Nothing.
13   Q    Did you review any documents?
14   A    No.
15   Q    Did you talk to any individuals other than
16 your attorney?
17   A    No.
18   Q    In terms of documents, Ms. Sportsman, did you
19 provide or send any documents to Rover in order to
20 initiate your account on their electronic platform?
21   A    I submitted documents to -- that was
22 requested.
23   Q    So you sent documents to Rover as you were
24 initiating your account on the platform; is that
25 right?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 11

1      A      I'm not quite understanding the question.

2             MR. YOUNG:  Objection.  I think there may be

3      some confusion here.

4             MR. LeCRONE:  That's why I asked her the

5      question again.

6      Q      Let me rephrase that question, Ms. Sportsman.

7             Did you provide or send any documents to

8      Rover in order to initiate or create your account on

9      its platform?

10     A      I was required by Rover to set up a profile.

11     That's the only thing I did.

12     Q      Did you send to them or communicate with them

13     any particular documents or other information other

14     than just creating the profile?

15     A      No.

16     Q      Did Rover send any documents to you as you

17     created your profile?

18     A      No, not that I recall.

19     Q      Tell us what you currently do for income.

20     A      I am a homemaker.  I don't currently work.

21     Q      When is the last time you performed any work,

22     whether as an employee or an independent contractor or

23     self-employed?

24     A      With Rover.

25     Q      What was the date on which you ended your

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 12

1   services that you were providing to the public through

2   the Rover platform?

3       A    I do not recall the exact date.  But it was

4   beginning of 2019.

5       Q    If I told you that what I have in our file is

6   April 18, 2019, does that sound about right, the last

7   time you would have marketed your services on the

8   website?

9       A    I never marketed any services.

10      Q    Excuse me?  I didn't hear you.

11      A    I've never marketed any services.

12      Q    When is the last time you performed services

13  for any clients through the Rover platform?

14      A    I performed services for Rover -- again, not

15  the exact date, but it was the beginning half of 2019.

16      Q    And from that time to now, the present,

17  you've not worked in any way, shape, or form; is that

18  correct?

19      A    That is correct, yes.

20      Q    And you're a staying-at-home housewife,

21  mother; is that right?

22      A    Yes.

23      Q    Do you have any income at all now?

24      A    Yes.

25      Q    What is your income?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 13

1      A     I don't know how pertains to this case, but
2    it is child support and welfare.  And unemployment.
3      Q     How long have you been receiving child
4    support?
5      A     Off and on for the last 15 years.
6      Q     You also identified welfare.
7            How long have you been receiving some form of
8    welfare subsistence?
9      A     Again, off and on for the last 15 years.
10     Q     How much is that per month?
11     A     How does that pertain to this case?
12     Q     It's directly relevant to your damages.
13   You've filed for damages, Ms. Sportsman, so you can
14   answer the question.
15     A     Depending upon what time period you're
16   talking about, because I find out, but I receive cash
17   aid for my children.  That's approximately 600 a
18   month.
19     Q     And you said that has been coming in the last
20   15 years; is that right?
21     A     Off and on, yes.
22     Q     So $600 per month as welfare, as you call it,
23   the last 15 years; is that right?
24     A     Yes.
25     Q     Has that ever stopped?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 22

1           Do you see that?

2      A     Uh-huh.  Yes, I do.

3      Q     Those dates seem to overlap in some way;

4  correct?

5      A     Definitely.

6      Q     So the question is, did they, in fact -- did

7  you provide and post services through the Rover

8  platform while you were employed by the public

9  authority?

10     A     I did not --

11           MR. YOUNG:  Objection.  Vague.  Objection.

12  Vague.

13  BY MR. LeCRONE:

14     Q     You can answer the question.

15           MR. YOUNG:  Also -- also assumes facts not in

16  evidence.

17           Madam Court Reporter, can you please read

18  back the question.

19           (The record was read by the reporter

20           as follows:

21             "Question:  So the question is, did

22           they, in fact -- did you provide and post

23           services through the Rover platform while

24           you were employed by the public

25           authority?")

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 23

1          THE WITNESS:  I did not post services.  I
2     started with Rover during the time, but I did not
3     start actually any clientele until, I think, around
4     the time that I had ended IHSS.
5     BY MR. LeCRONE:
6          Q    So you had no clientele through the Rover --
7          A    No Rover clientele, correct.
8          Q    -- until after August of 2017; is that right?
9          A    I believe that is correct.
10         Q    You attended Clovis Community College from
11    2017 to 2020; correct?
12         A    Yes.  Well, not 2020 --
13              (Reporter interruption for clarification.)
14              THE WITNESS:  I did not attend Clovis
15    community up to 2020.  That ended approximately about
16    two years ago.
17    BY MR. LeCRONE:
18         Q    So 2015 --
19         A    No, 2019, I would say.  2019, about.  Yeah.
20    I would say about June 2019 is when I stopped going to
21    Clovis Community.
22         Q    Did you receive a degree?
23         A    No, I did not.
24         Q    What were your studies?
25         A    Child education.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 24

1    Q    Did you take classes every day?

2    A    No.

3    Q    How often were you taking classes during the

4    time period from 2017 to 2019?

5    A    I took one -- or two classes, and they were

6    usually twice a week.

7    Q    How many classes did you take in total before

8    you stopped going?

9    A    I believe approximately nine.

10   Q    Okay.  And were you also posting your

11   services on the Rover platform during that time period

12   while you were at school?

13        MR. YOUNG:  Objection.  Vague.  Hold on one

14   second.  Objection.  Vague.  It also calls for -- it

15   assumes facts not in evidence.

16   BY MR. LeCRONE:

17   Q    I'm not sure it's vague at all, but go ahead.

18   You can answer, Mrs. Sportsman.

19   A    I did not advertise any services.

20   Q    I didn't ask that, Ms. Sportsman.

21        I asked whether you were posting your

22   services to clientele using the Rover platform during

23   the period of time you were attending school at Clovis

24   Community College.

25        MR. YOUNG:  Objection --

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 25

 1           THE WITNESS:  No, not --

 2           MR. YOUNG:  -- vague.  It also assumes facts

 3    not in evidence.

 4    BY MR. LeCRONE:

 5       Q    You can answer the question, Ms. Sportsman.

 6       A    No, I did not post any services.

 7       Q    You never posted services to the platform?

 8       A    No, I did not post services through the

 9    platform.

10       Q    If you didn't post services, what did you do,

11    Ms. Sportsman?

12       A    I listed services I was able for.

13       Q    Okay.  You got clients by using the platform,

14    did you not?

15       A    Rover had clients.

16       Q    Well -- you connected with individuals that

17    dog -- needed dog sitting and dog boarding; is that

18    right?

19       A    Rover clients contacted me through the Rover

20    platform that I accepted services for and provided.

21       Q    Aha.  So these are all Rover clients; they

22    are not your clients?

23       A    Yes, they are.  No, they're not my clients.

24    They went to the Rover platform to obtain services.

25       Q    They found your profile, didn't they?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 26

```
 1      A     I was acquired for a profile through Rover.

 2            Rover would have --

 3      Q     Okay.  Well --

 4      A     -- do a -- advertised for my profile; right?

 5            MR. YOUNG:  John, it would be great if you

 6   could let her finish her answer.

 7            MR. LeCRONE:  It's hard to hear at this end.

 8   I apologize.

 9            MR. YOUNG:  Understood.

10   BY MR. LeCRONE:

11      Q     We will get to that in just a moment.

12            But you had a profile on the platform, did

13   you not?

14      A     Yes.  A profile required by Rover to make;

15   yes.

16      Q     Well, I understand your -- your testimony is

17   it was required to have a profile.

18            But that is how dog owners, clients, found

19   you; correct?  Was using -- was finding your

20   platform -- I'm sorry, finding your profile --

21      A     Was finding my profile through Rover's

22   platform.

23            MR. YOUNG:  Objection.  The question is

24   vague.

25            (Reporter interruption for clarification.)
```

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

1          MR. YOUNG:  It assumes facts not in evidence.

2   It also calls for speculation.

3   BY MR. LeCRONE:

4       Q     So, Ms. Sportsman, how did you learn about

5   Rover's online platform for services, pet sitting

6   services?  How did you learn about it?

7       A     I believe they advertised through Facebook.

8       Q     Did you know any other individuals, friends,

9   neighbors, anyone else who had also posted profiles on

10  the platform?

11      A     No, I did not.

12      Q     Do you know Erika Miller?

13      A     No, I don't.

14      Q     You've heard of her, have you not?

15      A     Only through this.  Only through this case.

16  I don't know who she is.  I don't know what she looks

17  like.

18      Q     Have you ever talked to her?

19      A     No, I have not.

20      Q     Do you know any other people who post

21  profiles for dog sitting services on the Rover

22  platform other than yourself?

23      A     No, I don't.  No, I do not.

24      Q     Do you know any individuals who post profiles

25  on other platforms for dog sitting services?  And by

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 28

1    "other platforms," I mean --

2        A      No, I don't.

3        Q      -- other --

4        A      No, I don't know anybody else.  I mean, other

5    services for dog sitting, no.

6        Q      Why were you interested in posting a profile

7    for dog services on Rover?

8               MR. YOUNG:  Objection.  Vague.  Also assumes

9    facts not in evidence.

10   BY MR. LeCRONE:

11       Q      You can answer the question, Ms. Sportsman.

12       A      I was interested in working for Rover as an

13   employee due to the fact that I have always wanted to

14   work with animals since I was little.

15       Q      You wanted to work as an employee; is that

16   your testimony?

17       A      That is my testimony.

18       Q      There you go.

19              What was it about posting your profile on the

20   Rover platform that interested you?

21              MR. YOUNG:  Objection.  It's vague.  Also

22   assumes facts not in evidence.

23   BY MR. LeCRONE:

24       Q      You can answer the question, Ms. Sportsman.

25       A      It interests me because I wanted to work with

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 29

1    animals.  I wanted to actually become a veterinarian

2    when I was little.

3        Q    And you wanted to be able to make money as

4    well; correct?

5        A    That would only be a bonus.

6        Q    So are you saying that you would be doing

7    this for free?

8        A    I would say that anything outside of a job

9    would be a bonus to care for animals.  Working as an

10   employee with Rover, you could only expect to get

11   paid.

12       Q    So when did you make a decision to create an

13   account, a dog sitter account, on the -- on the Rover

14   platform?  When did you make that decision?

15       A    Obviously, May of 2017, when I made it.

16       Q    At that time, May of 2017, was it important

17   for you to be able to find a way to make money and

18   have a flexible work schedule?

19       A    Yes, because I was going to school.

20       Q    Tell us what you did to establish an account

21   on the Rover platform.

22       A    I had filled out a questionnaire or whatnot

23   through the Rover platform and filled out necessary

24   information required by Rover for that profile.

25       Q    You filled out a questionnaire.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 30

1           What else did you do?

2      A    Provided necessary information required by

3   Rover.

4      Q    And that would be what?

5      A    That would be, like, what dogs I am

6   interested in providing services for, the size, the

7   breeds, et cetera.  Personal information, my name, my

8   address, blah, blah, blah.  So --

9      Q    And that was all information that you

10  utilized for your profile that was posted on the

11  platform; correct?

12     A    Yes, it's all part of the profile.

13     Q    And in your profile you put on this

14  information for dogs -- for clients that you were a

15  dog sitter and dog walker; is that right?

16     A    That -- are services that I'm providing, yes.

17     Q    Those were the services you were providing

18  through your profile; correct?

19     A    On the profile yes.  They're listed.

20     Q    And those services that you were providing to

21  the public using your profile included drop-in visits

22  and dog boarding; correct?

23          MR. YOUNG:  Hold on.

24          Objection.  Assumes facts not in evidence,

25  also vague.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 31

1  BY MR. LeCRONE:

2      Q     You can answer the question, Ms. Sportsman.

3      A     Rover had a list of services that are

4  available.  With those services, I was allowed to

5  select which of them I would be willing to provide.  I

6  selected dog walking, dog drops-in, dog boarding, and

7  dog daycare.

8      Q     And those were selections you made for your

9  profile; correct?

10     A     Yes, with the suggestions that Rover had

11 given.  Those are ones Rover provided.  Of those, I

12 selected the ones I was willing to provide.

13     Q     Those are all things that you were interested

14 in doing for clients; correct?

15     A     For Rover clients, yes.

16     Q     Did you have a preference among those list of

17 four things that you included in your profile that

18 were offered for your services?  Did you have a

19 preference?

20     A     Are you talking about preference of services

21 or preference of the dogs and breeds?

22     Q     The services that you were willing to

23 provide, as you posted to your profile.

24     A     Yes.  As I just said, dog walking, dog

25 drop-ins, dog daycare, and dog sitting or boarding.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 32

1     Q     You had done quite a bit of dog boarding in
2  the past, had you not?
3     A     Yes, I have.  With Rover.
4     Q     Well, prior to Rover, you were doing dog
5  boarding, were you not?
6     A     No.  No, I was not.
7     Q     You had never done dog boarding prior to
8  May of 2017?
9     A     No, I have not.
10    Q     You also included in your profile
11 recommendation from others about your services,
12 recommendations about you, did you not?
13    A     I'm sorry, I'm not understanding the
14 question.
15    Q     When you created your profile for the Rover
16 platform, you included recommendations from others,
17 recommendations about you.
18          Do I have that right?
19    A     Yes.
20    Q     And those recommendations came from clients
21 for whom you had provided dog services, sitting
22 services.
23    A     No, they're not clients.  No, they were not
24 clients.
25    Q     Well, who were they if they weren't clients

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 33

1  then?

2      A    They were my family.

3      Q    Well, are these individuals with whom --

4  family individuals that you had provided pet care

5  services in the past?

6      A    I did them a favor of taking care of their

7  animals while they were gone.

8      Q    And did you continue to provide those

9  services to your family members once you created an

10  online profile with Rover?

11     A    No.

12          MR. YOUNG:  Objection.  Vague.

13  BY MR. LeCRONE:

14     Q    Do you provide those services to your family

15  today?

16     A    No.  They have not needed them.

17     Q    You also put on your profile the sizes of

18  dogs you were willing to provide services for;

19  correct?

20     A    Yes.

21     Q    And you also stated on your profile the types

22  of dogs you'd be willing to provide your pet sitting

23  services for.

24          Do I have that right?

25     A    Yes.  Which I believe was all breeds.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 34

1     Q     Now, Rover did not tell you what breeds you

2     had to provide services for, did they?

3     A     They suggested that you do meet-and-greets to

4     find out which dogs and dog breeds were compatible.

5     Q     I understand.  I understand that.

6           Did anyone at Rover tell you what size dogs

7     you had to provide services for as listed on your

8     profile?

9     A     No.

10    Q     Did anyone from Rover tell you what weight of

11    dog you had to provide services for as listed on your

12    profile?

13    A     No.

14    Q     Did anyone at Rover tell you the breed of

15    dogs to include in your profile that you were willing

16    to provide services for?

17    A     They suggested ones that were compatible.

18    Q     Did they tell you what breeds you had to --

19    A     They did not specify.  They did not specify.

20    It was a very vague suggested* onto what was

21    compatible with my life, my lifestyle, and whatever

22    animals I had in my possession. [Suggestive?*]

23    Q     Did anyone at Rover tell you what to put on

24    your profile one way or the other?

25    A     No.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 35

1     Q     Do you know as you sit here today whether
2  Rover tells other dog sitters and dog walkers what to
3  put on their profiles, Ms. Sportsman?
4     A     I do not know what Rover tells anybody else.
5     Q     You have no information one way or another
6  what Rover tells anyone who has profiles on the online
7  platform; correct?
8     A     I have no idea what Rover tells anybody else.
9     Q     You also put on your platform where in the
10  Fresno area you were offering to provide pet care
11  services; correct?
12     A     Yes.
13     Q     And was that -- that was an area that you
14  selected --
15     A     Yes.
16     Q     -- right?
17           That was an area, a geographical area that
18  you were willing to provide service for pet owners.
19           Do I have that right?
20     A     Again, yes.
21     Q     Was that in the Hoover neighborhood of
22  Fresno?
23     A     Yes.
24     Q     Was it beyond the Hoover neighborhood of
25  Fresno?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 36

1    A    Yes.

2    Q    How much beyond the Hoover neighborhood was

3  it that you put on your profile?

4    A    I believe it was Fresno-Clovis area.

5    Q    All right.

6         Did anyone at Rover tell you the geographical

7  boundaries that you had to include on your profile for

8  where you would be willing to provide your services?

9    A    Not directly.  They suggested an area I was

10  comfortable with and that I was able to get to.

11   Q    Did they tell you what boundaries, what

12  geographical boundaries you had to put on your

13  profile, Ms. Sportsman, other than these suggestions

14  that you've mentioned?

15        MR. YOUNG:  Objection --

16        THE WITNESS:  Again --

17        MR. YOUNG:  John, is it possible -- wait.

18  Melanie, please finish your -- finish your answer.

19        THE WITNESS:  Again, not directly specific,

20  but they suggested that I do an area that I was

21  comfortable with and that I was able to get to.

22  BY MR. LeCRONE:

23   Q    So --

24        MR. YOUNG:  Prior to the next question, is it

25  possible to take down the exhibit?  All I can see on

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 37

1   my screen is the exhibit.

2          MR. LeCRONE:  Yeah, I'm sorry.

3          Hey, you know, one thing I'd like to do -- I

4   know we've been going not all that long, but I'd like

5   to just go off the record for another five minutes and

6   see if I can fix the sound.

7          Would that be okay with you?

8          MR. YOUNG:  Yeah, go for it.  Take your time.

9          MR. LeCRONE:  Okay.  We're going to go off

10  the record, and I'll be back.

11         THE VIDEOGRAPHER:  It is 11:07 a.m.  We are

12  off the record.

13         (A recess was taken.)

14         THE VIDEOGRAPHER:  We're back on the record.

15  It is 11:15 a.m.

16  BY MR. LeCRONE:

17     Q    Prior to the break, Ms. Sportsman, we were

18  talking about the geographic location you posted on

19  your Rover profile for the areas in Fresno that you

20  would be willing to provide pet services.

21         Do you recall that testimony?

22     A    Yes.

23     Q    All right.  And no one at Rover told you the

24  geographic limitations or locations you had to post on

25  your profile, did they?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 38

1    A    They did not specifically tell me what I had

2  area-wise to post.  They suggested a radius of where I

3  was able to get to and am comfortable with.

4    Q    So you made those decisions as you posted

5  your profile and put information onto your profile;

6  correct?

7    A    Based on the suggestions of Rover, I

8  suggested my home area, yes.

9    Q    And, if there was a part of Fresno that was

10  either too far for you or an area of Fresno you were

11  not comfortable going in, you didn't have to include

12  it in your profile, did you?

13    A    Honestly, I do not know if I can exclude a

14  certain area.  I can decline services for Rover

15  clients.

16    Q    But you made clear in your profile, as

17  clients were not only looking to retain your services,

18  the areas of Fresno that you were willing to provide

19  those services.  [Does that make sense?*]

20         Do I have that right?

21    A    It was just the Fresno-Clovis area.  I did

22  not specify certain areas within that area.

23    Q    And if a dog owner wanted you to provide pet

24  services outside of that area that you put on your

25  profile, you could say no?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 39

1        A      I could say no, yes.

2               (Simultaneous speaking.)

3               THE WITNESS:  I said as to any other Rover

4     client within that area, I can decline services too.

5     BY MR. LeCRONE:

6        Q      And, you know, I will just say,

7     Ms. Sportsman, your voice is a tad bit muffled.  I

8     think -- I'm having a hard time hearing it, and I

9     think maybe the court reporter is having a problem

10    too.

11       A      Is this better?

12       Q      That is better.  Thank you.

13       A      Okay.

14       Q      When you posted and created your profile, you

15    set your own price, didn't you?

16       A      Based on Rover suggested prices, yes.

17       Q      But you set your price; correct?

18       A      Yes.  Based on suggested prices of Rover.

19       Q      Well, if you wanted -- whatever your pricing

20    was, you could put that price on your profile;

21    correct?

22       A      Yes.  If I wanted to change my pricing, I

23    could.

24       Q      No one at Rover told you what your price had

25    to be, did they?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 40

1       A    They suggested a range of prices.

2       Q    But they didn't tell you what your pricing

3   had to be, did they?

4            MR. YOUNG:  Objection.

5            THE WITNESS:  Did not tell me specifically.

6   BY MR. LeCRONE:

7       Q    You also set your own schedule, didn't you?

8       A    I did set my own schedule.

9       Q    So if you didn't want to work Monday and

10  Wednesday, you could exclude that from your scheduling

11  on your profile; correct?

12      A    Yes.

13      Q    If you wanted to work every day of the week,

14  you could put that on as well.

15           Do I have that right?

16      A    Yes.  Rover gave that ability, yes.

17      Q    And your availability on the days that you

18  would be willing to provide these services to pet

19  owners, that availability, you set that as well.

20           Whether it was morning, noon, nighttime,

21  overnight, you set that availability, didn't you?

22      A    If I was available with a client's needs,

23  yes.

24      Q    You were the one that would decide when to

25  provide these services to pet owners; correct?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 41

1      A      It was in the combination with the Rover

2    client and myself.

3      Q      And you could block chunks of time, days of

4    time, weeks of time?  If you were on vacation or out

5    of town, you could -- you could block that as well;

6    count?

7      A      Rover's platform did allow that.

8      Q      I'm sorry, I didn't -- again, it was a little

9    muffled.  I didn't hear the answer.

10     A      Rover's platform did allow to do that.

11     Q      All right.  And nothing -- Rover did not tell

12   you in any way that you couldn't provide services

13   outside of their online platform; correct?

14     A      Yes, they did.  They told me I was not

15   allowed to perform services for anybody outside of

16   their clientele.

17     Q      Well, who told you that?

18     A      Rover support service.

19     Q      Was that a voice call or something in

20   writing?

21     A      It was through text message, I believe.

22     Q      And you were told what exactly?

23     A      That all dog sitting services had to go

24   through Rover's platform.

25     Q      But you could provide services in any other

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 42

1   way you deemed appropriate, other than the Rover

2   platform; correct?

3       A    I'm not quite understanding your question.

4       Q    You weren't told you couldn't sell your

5   services down at the local park, through other ways of

6   advertising.  You weren't told you couldn't --

7       A    Yes, I was.  Honestly, yes, I was.  I was

8   told I was not allowed to perform any services for dog

9   sitting outside of Rover.

10      Q    And again I ask, when were you -- when was

11  that said to you?

12      A    That was --

13           MR. YOUNG:  Asked and answered.  Objection.

14           THE WITNESS:  Yeah.

15  BY MR. LeCRONE:

16      Q    When was that statement made to you?

17      A    That was made a couple of times with Rover

18  clients wanting to do business outside of Rover.

19  Rover then had sent me a message stating I was not

20  allowed to do that and I could be terminated.

21      Q    Aha.

22           So these are clients for whom you were

23  already providing services through the Rover platform;

24  is that right?

25      A    Yes.  Rover clients I was providing services

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 44

1            And so those two times -- there was actually
2      another one that they wanted to do business outside
3      of, but I told them that I was not able to do it.
4         Q    And these all two or three individuals, these
5      dog owners, they contacted you, they found you by
6      seeing your profile on the Rover website; correct?
7         A    I was already a -- providing services for the
8      Rover client, Carla, when she had mentioned to me that
9      she wanted to stop going through Rover.
10        Q    Okay.
11             Have you provided any such pet services
12      outside of the Rover platform at all?
13        A    No.
14        Q    At any time?
15        A    No.
16        Q    Why did you stop providing pet services?
17        A    Because I was going to school and I had some
18      other medical issues that had come up.
19        Q    And did those medical issues prevent you from
20      working at all?
21        A    I decided it was not as well compatible
22      anymore.  It wouldn't stop me from working, but it was
23      just getting too much on myself that I did not want to
24      degrade my services for Rover because of it.
25        Q    When did that happen?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 45

1      A      That started late 2018.

2      Q      Did you continue to have clients in late 2018

3   into 2019?

4      A      I did.  That's when --

5      Q      Then you stopped providing any services at

6   all April of 2019; correct?

7      A      Correct.

8      Q      Was that because of medical issues or

9   something else?

10      A      It was a combination of things.

11      Q      And you haven't gone back since April of

12   2019?

13      A      No, I have not.

14      Q      Do you recall receiving any kind of welcome

15   emails when you first signed up and posted your

16   profile on Rover's platform?

17      A      I don't recall.

18      Q      Do you recall receiving any kind of email

19   from Rover about providing you with tips and

20   suggestions about how to -- how to market your

21   services?

22           MR. YOUNG:  Objection.

23           THE WITNESS:  I believe that would have been

24   through the Rover app.

25   ///

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 46

1  BY MR. LeCRONE:

2      Q    Excuse me?

3      A    I said I believe that would have been through

4  the Rover app.

5      Q    What did you receive in that regard?

6      A    Just suggestive tips on how to care for pets

7  and what to do in case of issues arising.

8      Q    Such as?

9      A    Such as if a client or a pet was not

10  compatible.  And if you had to find a different Rover

11  client -- Rover employee to take over services.

12      Q    If you weren't compatible with a pet, you

13  could refuse to provide services; correct?

14      A    I would assume so.

15      Q    If a dog owner thought you weren't compatible

16  to their pet, they could refuse to hire you; correct?

17      A    They can decline the services, yes.

18      Q    If they didn't like you, they could refuse to

19  call you, couldn't they?

20      A    I would say yes as to any employee and

21  customer.

22      Q    And if you didn't like one of these clients,

23  you could decline or refuse to provide your services

24  to their pets.

25          Do I have that right?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 47

1    A    Yes.

2    Q    In fact, you did decline a number of clients

3  on the -- through -- that found you through the Rover

4  platform, didn't you?

5    A    I was unavailable for most of it or I was

6  incompatible in some way --

7    Q    And --

8    A    -- not the person itself or the pet.

9    Q    What was the incompatibility?

10   A    It could have been the dates, the time.

11   Q    So if the dates and times that these dog

12  owners wanted your services they wanted to retain your

13  services, if it was incompatible with your schedule,

14  you could decline?

15   A    Or if it was incompatible with the amount --

16  the limit that I was able to have.

17   Q    Limit --

18   A    Like, if I was already -- like, if I was

19  already boarding so many animals, and I've reached my

20  limit, and somebody would call and ask to board their

21  animal and I was already at my limit.

22   Q    What was your limit for boarding animals?

23   A    Three.

24   Q    So you could board -- you were willing to

25  board three animals at one time?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 48

1      A    Yes.

2      Q    And you set that limit, didn't you?

3      A    Yes.  Which I believe was actually over

4   the -- Rover's suggested limit.

5      Q    Aha.  So they suggested fewer than that, but

6   you went above that because that's what you wanted to

7   do; correct?

8      A    Correct.

9      Q    And if your availability -- if you were

10  already providing services for clients on the days and

11  the times that new clients wanted your services, you

12  could decline that as well; correct?

13     A    Yes.

14     Q    You could choose -- pick and choose what dogs

15  you were going to provide services for, couldn't you,

16  as a pet sitter?

17     A    I could choose, yes.

18     Q    And you could negotiate with pet owners about

19  where and when you were going to provide those

20  services for their pets; correct?

21     A    It's a combination of the Rover client and

22  myself compatibility.

23     Q    Were there any clients that you were not

24  compatible with?

25     A    Not the Rover clients themselves.  There was

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 49

1    one Rover pet that did not end up working out.

2         Q    That was a pet that was owned by a pet owner

3    that found your profile on the platform; correct?

4         A    Yes.  They found my profile through Rover's

5    platform.

6         Q    And -- let me rephrase.

7              What was it about that pet that you didn't

8    like?

9         A    It's not that I did not like them; I liked

10   the pets.  The pet had bit my dog.

11        Q    Aha.  And that was during a time that you

12   were providing services for that pet owner?

13        A    Yes.

14        Q    Was that only one time you provided services

15   or more than one?

16        A    That was the first time I ever provided

17   service for that Rover client.  And it was the last

18   time I provided services for that Rover client due to

19   the incompatibility of the issue.

20        Q    Okay.  You have dogs yourself at home, do you

21   not?

22        A    Yes, I do.

23        Q    And you would tell these clients, you'd share

24   that with them that you have a couple of dogs that

25   will be in your apartment or in your homes at the time

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 50

1    you are providing these services; correct?

2        A    Yes.   That was listed on my Rover profile.

3        Q    And if these clients did not like their dogs

4    to be around other dogs, they could refuse your

5    services, couldn't they?

6        A    Yes.

7        Q    If your dog bit one of their dogs, they could

8    also refuse any further services from you; correct?

9        A    Yes.

10       Q    You know what?  Let me just back up a little

11   bit.

12            Did you receive any promo code information

13   from Rover at the time you created an account and

14   posted your profile?

15       A    I believe they did send out some promo codes

16   for something.  I don't recall what it was.

17       Q    You don't recall what a promo code was that

18   was offered to you?

19       A    No, I don't recall what promo code it was,

20   no.

21       Q    Did you use it?

22       A    I do not recall.

23       Q    Let's talk about a meet-and-greet for just a

24   moment.

25            Do you know what I'm talking about, a

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 51

1    meet-and-greet?

2        A    Yes, I do.

3        Q    You were not required to do a meet-and-greet,

4    were you?

5        A    It's suggested by Rover to do one.

6        Q    You were not required to do so, were you?

7             MR. YOUNG:  Objection.  Asked and answered.

8             THE WITNESS:  It was not made mandatory.

9    BY MR. LeCRONE:

10       Q    It was not made mandatory?

11            (Reporter interruption for clarification.)

12            MR. YOUNG:  Asked and answered.

13   BY MR. LeCRONE:

14       Q    So you could do a meet-and-greet if you

15   wanted to, or you could decline a meet-and-greet if

16   you didn't want to?

17       A    Correct.

18       Q    A pet owner could do the same thing.  If we

19   flip it, if they did not want to do a meet-and-greet,

20   they could say no to you, couldn't they?

21       A    Correct.

22       Q    If they wanted to do a meet-and-greet, if

23   that was a requirement for the pet owner, they could

24   request that you do so?

25       A    Yes.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 52

1     Q     And if you refuse to do so, they could go on

2   and find another dog sitter to perform the services;

3   right?

4     A     Yes.

5     Q     How often did you do meet-and-greets?

6     A     I would say just about every time.

7     Q     It was a good thing, wasn't it?

8     A     Yes.  Rover's suggestion was a good thing.

9     Q     And it allowed to meet the pet and the owner?

10    A     Correct.

11    Q     The owner to meet you?

12    A     Yes.

13    Q     Was there ever a meet-and-greet that did not

14  go well?

15    A     No.

16    Q     Did you ever have a meet-and-greet and say,

17  "You know what?  I don't want to do -- I don't want to

18  provide these services to this dog"?

19    A     No, not me.

20    Q     Did you ever have a meet-and-greet where you

21  just decided you didn't want to provide your services

22  to the dog owner?

23    A     No.

24    Q     Did you provide any additional services other

25  than boarding, walking, and sitting?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 53

1      A      I believe daycare for just a time period

2      during the day.

3      Q      And all those services, you set those.

4              You decided what services you were going to

5      provide or not provide; correct?

6              MR. YOUNG:  Objection.  Asked and answered.

7              THE WITNESS:  Yes.

8      BY MR. LeCRONE:

9      Q      No one at Rover ever limited the number of

10     pet owners you could provide services for, did they?

11     A      Not that I recall.

12     Q      No one at Rover ever told you what kind of

13     equipment you needed to provide these services?

14     A      "Equipment" as in actual, like,

15     leashes and --

16     Q      Yes.  No one at Rover -- no one at Rover told

17     you what equipment was required if there was a dog;

18     correct?

19     A      No.  Usually the owners would have -- that.

20     If not, I would go out and get it myself.

21     Q      So you had the dog owners provide you the

22     things that were needed in caring for their animals;

23     right?

24     A      If they had provided it for me, I could use

25     their equipment or tools or whatnot.  If they didn't,

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 54

1   I bought it myself.

2       Q     And would you charge the client that --

3   having to buy that thing?

4       A     No, I did not.  And I would leave it for the

5   client.

6       Q     Tell me what you bought during your time

7   providing services through the Rover platform.

8       A     Dog brushes.  Dog toys.  Poop bags.  Cleaning

9   equipment.

10      Q     And none of that -- none of that was required

11  for you to do by Rover, was it?

12      A     It was not required directly by Rover, but in

13  order to take care of the Rover clients and the pets,

14  it was necessary to perform my job.

15      Q     What about food?  That came from the owners,

16  didn't it?  The clients?

17      A     Yes.  Aside from dog treats to coax animals

18  back into a cage, if that's what the Rover client had

19  requested.

20      Q     So the Rover client would provide you with

21  the food and the cage and the leash and the collar?

22      A     Yes.

23      Q     Would they provide treats?

24      A     Only the one that required medication

25  provided hot dogs to put the pills in.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 55

1     Q     When you finished a dog-sitting assignment,
2   whether it be a boarding or a walking or a sitting,
3   you would then charge that client your fee from your
4   profile; correct?
5     A     They would pay for the fee up front before
6   services were provided.
7     Q     If they weren't happy with their services,
8   could they pull that back or refuse to pay you?
9     A     With Rover's options, they are able to pull
10  out -- like, refuse services or decline it so many
11  days ahead or whatever for either a full refund or
12  partial refund.
13    Q     But you got paid for the services you
14  provided, didn't you?
15    A     After services were completed.
16    Q     You got paid -- I'm sorry?
17    A     I'm sorry.  I believe it was like a day or
18  two after services were completed did I get paid.
19    Q     That went into your bank account, I assume?
20    A     It went into a PayPal that was set up for
21  Rover platform.
22    Q     And that was a payment the dog owner, the
23  client, made based on the rate that you were charging?
24    A     Yes.  I received payment minus Rover's fee.
25    Q     So there was a service fee for providing the

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 56

1    services to you; correct?

2        A    I basically believe I had to -- not sure if

3    it was like -- there was some sort of Rover fee -- I'm

4    not exactly recalling what it was titled -- that Rover

5    took out of my payment.

6        Q    You don't recall what it was called or how

7    much it was?

8        A    No, I don't recall.  Being part of Rover, you

9    should have that information; correct?

10       Q    I'm asking you -- I'm asking the questions;

11   you're answering them, not me.  Not the other way

12   around.

13       A    I'm not sure why you're asking a question

14   that you should have the answer to.

15       Q    Well, I want to get your answers.  That's why

16   you're under oath and I'm not.

17            Let's move on.

18            If we can put up on the screen the exhibit,

19   what has been marked as Exhibit 3, I will introduce

20   and put that into this record as Sportsman Exhibit 3.

21            (Exhibit 3 marked.)

22   BY MR. LeCRONE:

23       Q    I will try my best here to figure out how to

24   enlarge that, Ms. Sportsman.  If you need me to do

25   that, just let me know.  Okay?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 57

1          For the record, this is -- it says "Rover" at

2    the top and it has a photograph.  It says "Melanie S.,

3    Hoover, Fresno, California."

4       A    Hold on a second.

5       Q    Have you seen this before?

6       A    I'm sorry, hold on.  My screen went to

7    something else.

8       Q    Yeah.  You just disappeared off my screen

9    too.

10      A    Hold on.

11           It's asking me to join the deposition again.

12   Hold on.

13           (A discussion was held off the record.)

14   BY MR. LeCRONE:

15      Q    You're back on, at least on my screen.

16      A    Yeah, okay.

17      Q    Can you see the exhibit we've marked as

18   Exhibit -- Sportsman Exhibit 3 to the deposition

19   transcript?  Can you see that on your screen?

20      A    Yes, I do see it.  I do see it.

21      Q    This is the first page of your profile;

22   correct?

23      A    Yes.

24      Q    You created this profile, didn't you?

25      A    Yes, I created that Rover profile.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 58

1     Q     And since you testified earlier that you

2  signed in to Rover, created an account and a profile

3  back in May of 2017, is that about when you created

4  this profile on the Rover platform?

5     A     Yes.

6     Q     The information -- we'll go through this in

7  some detail, Ms. Sportsman, but all the information

8  put into this profile is information that you put into

9  it; correct?

10    A     Yes.

11    Q     Did you have any help in preparing this?

12    A     Other than the suggested Rover prices and

13 services, no.

14    Q     Okay.  So is that your photo?

15    A     Yes, it is.

16    Q     Did you post that photo?

17    A     Yes, I did.

18    Q     Did anyone tell you what photo to post, or

19 did you make that -- you decide which photo you wanted

20 on your profile?

21    A     I decided what picture to post on the Rover

22 profile.

23    Q     If you wanted to change that photograph at

24 any period of time while you were on the profile,

25 while you had an active profile, you could have done

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 59

1   that too; correct?

2       A    Yes.

3       Q    Do you see below on this page "Services,"

4   "Boarding"?  See that information?

5       A    I'm trying to see it.  Hold on a second.

6       Q    At the bottom of the page?

7       A    I enlarged it but it's not moving on my

8   screen.

9            Here we go.  I'm sorry, now look at what part

10  of it?

11      Q    Can you see it now?  Is that better?

12      A    No.  I had to shrink it on my screen.  But

13  what did you want me to look at on this page?

14      Q    On the bottom half of this document or bottom

15  third, it says "Services."

16           Do you see what's listed there?

17      A    Yes.

18      Q    This is the -- your fees for the services you

19  were providing to the dog owners through the platform;

20  correct?

21      A    Correct.

22      Q    And you see $35 per night for boarding at the

23  sitter's home?

24      A    Yes.

25      Q    You set that fee; right?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 60

1       A     Yes.

2       Q     No one told you it had to be $35 or anything

3    else, did they?

4       A     No.  Rover has a suggested range, and, based

5    on that suggested range, I selected the 35.

6       Q     I'm curious, Ms. Sportsman.  As you were

7    creating this profile, did you look at other profiles

8    on the platform to see what other dog service

9    providers were offering?

10      A     No.

11      Q     Did you want to see how you fit in with

12   everyone else?

13      A     No.

14      Q     Drop-in visits, $25 per visit.

15            That's your fee that you put on your profile;

16   correct?

17      A     Yes.

18      Q     And you could change that at any time; right?

19      A     Yes.

20      Q     Did you?

21      A     I believe I have adjusted each of those.

22      Q     Is this what was on your profile at the very

23   beginning or at the very end of your account time on

24   the Rover platform?

25      A     Probably at the very end.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 61

1      Q     Did you increase it or you decrease it?  I'm
2   curious.
3      A     I have done both.  So --
4      Q     Why?
5      A     Based on if I was having a slow period and I
6   wanted to attract more clientele, I would lower my
7   fees.
8      Q     And no one told you you couldn't do that at
9   any time, did they?
10     A     No.
11     Q     Doggy daycare in the sitter's home, $30.
12           You set that price too; correct?
13     A     Yes.
14     Q     Was that a price that you also adjusted over
15   time?
16     A     Yes.  I believe so.
17     Q     If we could go on to the next page, please.
18           And it's -- for some reason -- can we show
19   the top of that?  It's missing a little bit at the
20   top.
21           THE VIDEOGRAPHER:  To see different parts of
22   the document, you can scroll up on your screen.
23           MR. LeCRONE:  Mine is scrolled up all the
24   way, and it's missing a part.
25           THE VIDEOGRAPHER:  The top of mine says "Dog

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 62

1   Walking."  That's the first --

2              THE WITNESS:  So does mine.

3              MR. LeCRONE:  Hold on.  Okay.

4       Q     Thank you.  I -- I've done this enough times,

5   I should have figured it all out by now, but I'm still

6   figuring it out.

7              All right.  So this is page 2 of your

8   profile, is it not?

9       A     I would assume so.

10      Q     And it begins with "Dog walking in your

11  neighborhood:  $20 per walk."

12             That was the price you set?

13      A     Yes.

14      Q     And you adjusted that here and there,

15  depending on whether you wanted more clients or less

16  clients; is that right?

17      A     Correct.

18      Q     Below that, I think I asked you earlier, if

19  you see "Additional Services and Rates," nothing was

20  listed there.

21             Was that something you decided when you

22  posted this profile -- created this profile, that you

23  were not going to offer any additional services and

24  rates?

25      A     Yes.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 63

 1     Q     And, again, no one helped you create this
 2  profile; you did this all on your own?
 3     A     No.  They're suggestions through Rover.
 4     Q     So below that it says "Melanie can host."
 5           Do you see that entry?
 6     A     Yes, I do.
 7     Q     And you entered zero to 5 pounds and 16 to
 8  40 pounds.
 9           Was that your selection?
10     A     That was my later suggestion, yes.  That was
11  adjusted.
12     Q     And before this adjustment, as it's reflected
13  on page 2 of Exhibit 3, what did it say before?
14     A     Before, it was basically anything except cats
15  in my home I can host.  That was before my dog had
16  gotten bitten.
17     Q     And you selected the zero to 15 pounds and
18  the 16 to 40 pounds?
19     A     Yes, afterward, yes.
20     Q     And beyond 40 pounds, if I was a client and I
21  found your profile and my dog was 65 pounds, you would
22  decline?
23     A     I was able to decline.
24     Q     Oh.  You're telling these clients that this
25  is what would you do in terms of providing services,

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 64

1    the dogs, size of dog; correct?

2        A    That is what I was comfortable with, yes.

3        Q    Below that, "Melanie can watch in your home."

4            Let me ask, before we go on to that part of

5    this, all of the things we've looked at already, the

6    services, this was all services that you were offering

7    in your home; right?

8        A    No.  This is -- the one below, this is

9    "Melanie can watch in your home," that's in the Rover

10   client's home.

11       Q    I understand that.

12       A    Okay.

13       Q    But everything we've already looked at, the

14   information and the rates that you selected and put on

15   your profile, that was all for things in -- at your

16   home -- boarding and sitting and the like?

17       A    I believe that's what is -- yes.  Well, the

18   dog walking would be in the Rover client's

19   neighborhood.  The drop-ins would be in the Rover

20   client's home.

21       Q    All right.

22           So "Melanie can watch in your home," you list

23   cats and then quite a number of different dogs.

24           Do you see all of those entries?

25       A    Yes, I do.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 65

1    Q    And you put all this in your profile, did you
2    not?
3    A    I did.
4    Q    No one told you what to put in there, in this
5    part of the profile?
6    A    No.
7    Q    And why is this different in terms of dog
8    size than what you have above that when you hosted the
9    dog?
10   A    As I already said, I had changed it after my
11   dog had gotten bitten by a larger dog.
12   Q    I see.
13        Okay.  If we go on, "Availability," you see
14   this calendar, June 2020?  I know we are we well
15   beyond June 2020, but if you could -- this was a
16   calendar where you could identify for potential
17   clients who found your profile on the Rover platform
18   what your availability was?
19   A    Yeah.  It would show my availability on that
20   calendar, yes.
21   Q    And you would pick and choose on that
22   calendar what your availability would be?
23   A    Yes, I was able to do so.
24   Q    How many months would you go out?
25   A    I honestly tended not to do any of the

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 66

1    calendar things.  The only times I had blocked, I

2    believe, anything out was if I was going to actually

3    be out of my home, when I go on vacation or something,

4    and I would block that date off.

5        Q    And so --

6        A    But I would literally be --

7        Q    When you created this profile and used it to

8    post your services, you didn't put anything on the

9    calendar?  You just left that blank?

10       A    Right.  Rover would send me messages asking

11   if I was going to be available during certain periods

12   or whatever and to click "yes" or "no."  Occasionally

13   I would do that just to try to, I guess, keep the

14   Rover profile up to date.  But I tended not to mess

15   with the calendar at all.

16       Q    And that was your decision, to not mess with

17   the calendar; correct?

18       A    Yeah, due to ability to manage.

19       Q    Let's go on to page 3 of this Exhibit 3.

20            Can you see that on your screen,

21   Ms. Sportsman?

22       A    Yes.

23       Q    All right.

24            In the middle of this page, below the

25   calendar, it says (as read):

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 67

1          Melanie can host up to three dogs per
2      night.
3          Is that what you put into your profile?
4    A    Yes.
5    Q    And that was your decision, to put three dogs
6  into your profile; right?
7    A    Yes.  I had changed it.  It used to be, I
8  believe, five at one point, and then Rover suggested
9  that was too many.  So I had made it lowered to three.
10   Q    Did anyone at Rover tell you you had to lower
11  it or change it from five to three?
12   A    It was suggested that it was too many for me,
13  for one person to handle with other dogs.  So I
14  lowered it based on Rover's suggestion.
15   Q    Then it goes on to say (as read):
16          Melanie can host up to three dogs per
17      day for daycare.
18          You put that in your with profile as well,
19  didn't you?
20   A    Yes, again based on again Rover's suggestion
21  that five was too many.
22   Q    And no one told you it had to be three, did
23  they?
24   A    They said three was more compatible.
25   Q    No one told you it had to be three.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 68

1          Do I have that right?

2          MR. YOUNG:  Asked and answered.

3          MR. LeCRONE:  Well, it hasn't been answered.

4    It's been asked.

5          MR. YOUNG:  She just answered it.

6    BY MR. LeCRONE:

7      Q    No one directed you that it had to be three

8    on your profile; correct, Ms. Sportsman?

9          MR. YOUNG:  Objection.  Asked and answered.

10         THE WITNESS:  Right.

11   BY MR. LeCRONE:

12     Q    You can answer the question.  Maybe you did.

13   I didn't hear it.

14     A    It's basically the same answer as the

15   question before that:  It was Rover's suggestion that

16   what I had put was too many and three would be more

17   compatible.

18     Q    If you wanted to put two, you could have done

19   that; correct?

20     A    Yes, I could have put two.  Rover didn't

21   suggest that; they suggested three.

22     Q    You could have put one if you wanted to do

23   that; correct?

24     A    Based on Rover's suggestion, I lowered my

25   five to three.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 69

1    Q    Okay.  No one at Rover told you you had to do
2    that; it's just based on what you were reading as a
3    suggested --
4    A    I answered the question.  Let's move on,
5    please.
6    Q    No, I'm not.  I want an answer to that
7    question.
8         No one at Rover told you --
9    A    I just answered your question.  Rover
10   suggested I lower my five to three; so I did so.
11   Q    Rover told you to lower it to three?
12   A    Rover suggested to lower it by two animals
13   because five was too many for one person to handle.
14   Q    All right.  Well, you don't have to raise
15   your voice, Ms. Sportsman, for a deposition.
16   A    Well, apparently you weren't hearing me when
17   I was already saying it three different times.
18   Q    Well, because you weren't answering the
19   question, Ms. --
20   A    No, I answered it.
21        MR. YOUNG:  I think she was answering the
22   question.  I think your --
23        (Simultaneous speaking.)
24   BY MR. LeCRONE:
25   Q    Below that, it says (as read):

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 70

```
 1              Dog boarding cancellation policy:
 2         Strict.
 3         You put that in there; right?
 4    A    I'm sorry, can you repeat the question?
 5    Q    Below that, below the three dogs per day for
 6  daycare, that was a suggestion, as you called it --
 7    A    Correct.
 8    Q    -- the "Dog boarding cancellation policy:
 9  Strict," you put that in your profile, didn't you?
10    A    Yes, I did.
11    Q    Below that (as read):
12              Drop-in visits cancellation policy:
13         Strict.
14         You put that in there?
15    A    Yes, I did.
16    Q    That was your decision; right?
17    A    Yes.  Rover only allowed for certain
18  different cancellation policies.  And of those, I got
19  to pick what Rover's suggestions were.
20    Q    And --
21    A    So, of the ones that were available, I picked
22  which ones Rover offered on my profile.
23    Q    All right.  So you picked strict for the
24  first two.
25    A    Yes.
```

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 71

```
 1      Q      Immediately below that (as read):

 2             Doggy daycare cancellation policy:

 3             Flexible.

 4             Here you chose flexible; right?

 5      A      Yes.

 6      Q      And below that --

 7      A      Can we -- can you hold on -- excuse me, can

 8  you hold on for a moment?  My battery is getting low

 9  on my laptop and I need to find my charger.

10      Q      Why don't we take -- you want to take a

11  break, go off the record?

12      A      Yes, please.

13             MR. LeCRONE:  Is that okay, Counsel?

14             MR. YOUNG:  Perfect.

15             THE VIDEOGRAPHER:  It is 12:00 p.m.  We are

16  off the record.

17             (A recess was taken.)

18             THE VIDEOGRAPHER:  We are back on the record.

19  It is 12:10 p.m.

20  BY MR. LeCRONE:

21      Q      Okay.  So we were -- are you able to continue

22  to give us your best testimony, Ms. Sportsman?

23      A      Yes.

24      Q      And you understand you're still under oath?

25      A      Yes.
```

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 72

1    Q    All right.

2         We were talking about your profile.  I think

3    we were on page 3 in that profile that's Exhibit 3.

4    If we could pull that back up.  I think it's now still

5    on the record.

6         If we could go to the next page, that would

7    be page -- my page 4.  Another page.  Another two

8    pages, actually.  There we go.  Next page, please.

9    There we go.

10        Again, this is part of your profile.

11        Do you recall this, Ms. Sportsman?

12   A    Yes.

13   Q    The photos that you can see, it says (as

14   read):

15             Melanie is using the Rover app to

16             track activity and send Rover Cards.

17        Do you see the photos at the top?  Are those

18   your dogs or someone else's dogs?

19   A    (Witness reviews exhibit.)

20        Trying to get them all.  I can't see all the

21   photos.

22   Q    Yeah, I don't think the exhibit has all the

23   photos.  It does say "50-plus Photos" on the right.

24        My question is, do you recall these photos?

25   Did you post these on your profile?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 73

1     A    I posted them on the profile, yes.  They were

2  probably of my animals and of others that I have

3  provided services for.

4     Q    Okay.  So those were animals you provided

5  services for, dogs you provided services for prior to

6  creating your account on Rover?

7     A    I wouldn't -- without seeing all of those, I

8  cannot tell you.

9     Q    Well, would there have been some of the

10 photographs -- or not photographs -- photos of dogs at

11 the time you created the profile, would that have

12 included dogs you provided services for prior to

13 opening the account at Rover?

14    A    It could have been part of the

15 recommendations that I had on my profile, included

16 some of the animals that I had cared for in the past.

17    Q    Okay.  If we look down towards the bottom of

18 that page, again it's page 4 of Exhibit 3, we have

19 what appears to be reviews.

20         Do you see these entries?

21    A    Yes.

22    Q    If you could patch down a little bit, there

23 are three of them.

24    A    Yes.

25         MR. LeCRONE:  And, Ms. Court Reporter or

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 74

1    whoever is responsible for the exhibit, could you --

2    oh, maybe do I that?  Maybe I do that; right?  There

3    we go.  Sorry about that.

4            Are these the reviews -- you posted these on

5    your profile; correct?

6    A    I believe the Rover clients posted those on

7    my profile.

8    Q    You testified earlier today that there were

9    some recommendations you posted on your profile of

10   family members for whom you provided doggy daycare and

11   other sitting services.

12           Do you recall that testimony?

13   A    Yes, I do recall that I have -- that I did

14   take care of family members' pets while they were gone

15   for -- as a favor.

16   Q    Are any one of these three that are listed on

17   this particular version of your profile, are they

18   family members or are these clients for whom you've

19   provided services?

20   A    They're of Rover clients.  Those are Rover

21   clients.

22   Q    At the bottom of this, it says "Contact

23   Melanie"?  Do you see that link?

24   A    Yeah.

25   Q    What was that, if you know?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 75

1      A     I do not know what that is.

2      Q     That was -- these clients, if someone was

3   looking at your profile and really liked what they

4   saw, they could connect with you by clicking on that;

5   correct?

6      A     I do not know.

7            MR. YOUNG:  Objection.  Calls for

8   speculation.

9            THE WITNESS:  I do not know what that is.

10           (Reporter interruption for clarification.)

11   BY MR. LeCRONE:

12      Q     Go on to the next page, please, of the

13   exhibit, page 5.  All right.

14            Actually -- okay.  Boy, I miss the old days,

15   I tell you.

16            Here "About Melanie," this is information you

17   put about yourself; is that right?

18      A     Yes.

19      Q     So you were -- this is part of the

20   information you provided, you put onto your profile at

21   the time you created your account on the Rover

22   platform?

23      A     Yes.

24      Q     It says "35 years of experience."

25            Tell us about that.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 76

1     A    Well, growing up, I was always having

2    animals -- dogs, mainly -- as pets.  And so I had

3    35 years of experience with dogs.

4     Q    And how many of those 35 years did you have

5    experience providing pet walking, pet sitting, and pet

6    boarding?

7     A    Not as an employee or professional, but as

8    just everyday personal life, I had.

9     Q    So for neighbors, friends, and family; is

10   that fair?

11         A    No.  They were my own home life.

12         Q    Below that, it says (as read):

13              I'll love and care for your pet well.

14              Do you see that paragraph?

15         A    I do.

16         Q    Did you write all of the text that's within

17   that paragraph?

18         A    I did.

19         Q    No one told you what to say here, did they?

20         A    No.

21         Q    Did you adjust this or change this at any

22   time during the active period of when your account was

23   active with the Rover platform?

24         A    No, I did not.

25         Q    Below that, it says "Additional Skills," and

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

1    there's a list of about five items with checkmarks.

2           Do you see that?  Actually --

3    A    I do.

4    Q    -- it goes on to the next page, and we will

5    get there in just a moment.

6           You put all of this information into your

7    platform; right?

8    A    Yes.

9    Q    No one told you to include or not include any

10   one of these items?

11   A    No.

12   Q    Let's go on to the next page, please.

13          Here's some more checked items.

14          Again, this came from you; you put this into

15   your profile?  At the top?

16   A    Yeah.

17   Q    No one told you what to say or what to

18   include here, did they?

19   A    (Witness reviews exhibit.)

20   Q    Is that right?

21   A    (Witness reviews exhibit.)

22          That's correct.

23   Q    "Melanie's Pets," I assume, Ms. Sportsman,

24   these are your dogs?

25   A    Yes.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 78

1      Q      How do you pronounce the chihuahua's name?

2      A      Eevee.

3      Q      Eevee.  So we have Eevee and Maxx?  Are these

4   all your pets?

5      A      They were my pets at that time, yes.

6      Q      They're no longer your pets?

7      A      No, they are.  I have one other addition to

8   my family.

9      Q      Okay.  Going on to the bottom of that page,

10  if we could -- I guess I'm the one that is required to

11  do that.  Hold on.

12             It says "When Melanie watches your pet."

13             Do you see this information?

14     A      Yes.

15     Q      You put this all in here, did you not?

16     A      (Witness reviews exhibit.)

17             Yes, I believe so.

18     Q      No one told you what to say or not to say in

19  creating this profile, this part of your profile?

20     A      No.

21     Q      You have some more checked items.  Actually,

22  it's only three:  "Dogs allowed on bed," "Potty breaks

23  every two hours," "Dogs allowed on furniture."

24             These are all items you put into your

25  profile?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 79

1     A     These are just items I selected from the
2  Rover suggested listings.
3     Q     And no one told you one way or another which
4  to include, did they?
5     A     No.
6     Q     Can we go on to the next page of Exhibit 3,
7  please.  I think this is -- it bears the document
8  number of 7, page 7.  Oh, my goodness.
9           This page says "Melanie's Neighborhood."
10          You put this in here, did you not?
11    A     I believe Rover actually put that in there.
12    Q     But you selected the area of your
13  neighborhood where you would provide services.
14          Do I have that right?
15    A     No.  Rover puts my location area on my
16  profile.
17    Q     And did they tell you this had to be your
18  area?  Was that a requirement, or was that something
19  you could choose?
20    A     Well, I would say that's a requirement since
21  the fact of that's where I live.
22    Q     You could do it anywhere you wanted to do,
23  could you not?
24    A     No.  They're showing what area I live in that
25  is my neighborhood.  So, no, I could not put anywhere

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 80

1   else.

2       Q     All right.  Well, if someone wanted you to

3   drive up to Tulare, would -- would you have to say

4   yes?

5       A     I could say yes or no, but that picture that

6   you are referring to is of my neighborhood, my area of

7   my location where I live.  That is what Rover put

8   there because that's where I live.

9       Q     That's your neighborhood?

10      A     That's not saying that's somebody else's

11  neighborhood, a different Rover employee, no.  It's

12  saying it's my location.

13      Q     Fair enough.

14            Let's move on to Exhibit 4, please.

15            For the record, this bears Document Numbers

16  ROVER 9 through ROVER 17.

17      A     Okay.

18      Q     And it starts on the upper left of the first

19  page, "Melanie's Reviews."  And it bears the date

20  January 2, 2018.

21      A     I'm not seeing any exhibit.

22      Q     Exhibit 4, please.

23            (Exhibit 4 marked.)

24  BY MR. LeCRONE:

25      Q     There you go.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 81

1          You've seen those before; correct?

2     A     (Witness reviews exhibit.)

3          In a different format, probably.  But I

4     probably have read them, yes.

5     Q     Are these reviews that you posted on your

6     profile?

7     A     They're reviews Rover clients posted on my

8     profile.

9     Q     Do you recall reviewing these, looking at

10    them, reading them?

11    A     Yes, I do.

12    Q     Were there any of these reviews that were

13    posted on your profile reviews that you disagreed

14    with?

15    A     No.

16    Q     If we could just paginate, please, the next

17    couple pages.

18          I'm assuming, Ms. Sportsman, that these in

19    your --

20          (Reporter interruption for clarification.)

21    BY MR. LeCRONE:

22    Q     -- that these reviews that are listed on

23    Exhibit 4, they were positive reviews?

24    A     (Witness reviews exhibit.)

25          Yes.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 82

1      Q      And you agreed with all of them; correct?

2      A      Yes.

3      Q      And this would -- a positive review would

4   help you in terms of finding -- or in terms of these

5   dog owners to contact you for pet services; right?

6      A      Overall, yes.

7      Q      If they were negative reviews, that you were

8   a horrible dog walker, you were really mean to the

9   dog, that wouldn't help you promote your services,

10  would it?

11            MR. YOUNG:  Objection --

12            THE WITNESS:  No, it wouldn't help anybody.

13            MR. YOUNG:  Objection.  Calls --

14  BY MR. LeCRONE:

15     Q      These clients --

16            MR. YOUNG:  Calls for speculation.

17  BY MR. LeCRONE:

18     Q      The clients, the dog owners who posted these

19  reviews, did you ask them to do this?

20     A      No.

21     Q      Did you ever ask any one of them to post a

22  review after you dog-sat or took care of their dogs?

23     A      No.

24     Q      If we could go -- I'm sorry, on this exhibit

25  we're at page 11.  So could we go to page 13.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 83

1          THE VIDEOGRAPHER:  I see that on page 3.

2          MR. LeCRONE:  Well, if we could go to what is

3     marked -- that's 12, I think.  And one more page.

4     Q     Do you recall these reviews, Ms. Sportsman?

5     A     Yes.

6     Q     Do you recall these dogs?

7     A     Yes.

8     Q     There's a comment throughout at the bottom

9     about you sending pictures of these dogs every day.

10          Is that something you did as a dog sitter?

11    A     Yes.  It was a requirement with Rover for

12    sending Rover Cards to clients of how the job was

13    going.

14    Q     The clients asked you to send pictures, did

15    they not?

16    A     No.  Rover did.

17    Q     But this was a requirement of Rover, that you

18    post pictures of the dogs or send them to the owners?

19    A     Yes.  It was a Rover requirement.

20    Q     Who at Rover told you that, Ms. Sportsman?

21    A     Rover support.  It was suggested tips.

22    Q     So another suggestion that you send the dog

23    owners pictures of their dog?

24    A     Yes.  It was Rover's suggestion of how to do

25    the job and to keep the Rover client updated.  It was

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 84

1   part of their requirement for the Rover Card.

2        Q     What's the Rover Card?

3        A     It's like a -- an update on how the visit or

4   drop-in or boarding or whatever job was going.  It was

5   confirmed with pictures and/or just text updates with

6   the pictures.

7        Q     All right.  Why don't we go on, please, to

8   Exhibit 5, and we will mark this for the record as

9   Sportsman 5.

10            (Exhibit 5 marked.)

11  BY MR. LeCRONE:

12       Q     All right.  If we could go to page 2 of this

13  document.

14            And, for the record, this bears Document

15  Numbers ROVER 26 through ROVER 35.

16            Have you seen this document before?

17       A     (Witness reviews exhibit.)

18            I believe only while creating the Rover

19  profile.

20       Q     So this is what you would have put into your

21  profile?  I think we saw it on another exhibit, but

22  this is what you typed into the profile account;

23  correct?

24       A     Correct.

25       Q     And you put in there that you are (as read):

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 85

1           Mostly flexible on availability but

2           will be in school from 8:00 p.m. to

3           1:00 p.m. on Tuesday, Wednesday,

4           Thursday, starting June 20 to July 27.

5           Put that in there too?

6      A    Yes.

7      Q    Is that Clovis Community College?

8      A    Yes, it was.

9      Q    So this allowed you to not work during those

10  period of times or not provide services during those

11  period of times so you could attend class?

12     A    Correct.

13     Q    Is everything there in that text, "About

14  You," that box, is that -- what you put in accurate?

15     A    If I can get this thing centered.  Hold on,

16  sorry.

17          Yes, everything in there is correct.

18     Q    Okay.  Could we go on to the next page, which

19  is ROVER 28.

20          Have you seen this part of it?  This is part

21  of what you submitted when you created your account

22  and your profile; correct?

23     A    (Witness reviews exhibit.)

24          I believe so.

25     Q    It says -- about a third of the way down on

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 86

1   the page, it says "Slug," S-l-u-g, colon, "Melanie-s-
2   love-care-for-your-pet-well."

3          Did you type that in?

4    A    I do not recall.  I don't even know what the
5   slug means.  I don't know what "slug" means.

6    Q    Do you recall putting that statement into
7   that part of Exhibit 5?

8    A    No.  The only part I recall seeing that "I
9   will care for your pet well" is on the previous
10  exhibit, where it also listed "About Me."

11   Q    Okay.

12   A    It was before I gave a summary about myself.
13  So I don't know where the slug and then that came
14  from.

15   Q    Okay, we'll move on.

16          If we could move to what I think is marked as
17  Exhibit -- or page 33 to 34.

18          Keep going.  I think it's one more page.  All
19  right.

20          So could you take a look at this and tell me
21  if it's familiar to you?  This appears, for the
22  record, to be page 1 of a list of dogs for whom you
23  provided services, and I believe the dog owners' names
24  have been redacted.

25   A    (Witness reviews exhibit.)

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 87

1          MR. YOUNG:  Is there a question?

2   BY MR. LeCRONE:

3      Q    Yeah.  The question was, do you recall these

4   dog-sitting engagements?

5      A    (Witness reviews exhibit.)

6          Yes.

7      Q    If we go into the next page, please,

8   Ms. Court Reporter.

9          Again, this is page 2 of what appears to be

10  your sitting engagements.

11     A    Okay.

12     Q    Do you recall these?

13     A    Yes.  Yes.

14     Q    The phone number on there, is that your cell

15  phone?

16     A    (Witness reviews exhibit.)

17          Which number?  Are you talking about the one

18  to the left of my name?

19     Q    No --

20     A    I don't --

21     Q    -- it's one of the right-hand columns.  It's

22  (559) 550-9932.

23          Is that your cell phone?

24     A    That is my current cell phone, yes.  That is

25  not the cell phone number I had at the time.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 88

1      Q     Is that how dog owners would find you so they

2   could call your cell?

3      A     No.  No.  Rover issues their own number for

4   Rover clients to reach me at.

5      Q     Are you saying under oath that a dog owner

6   never contacted you via your cell phone?  Your mobile

7   phone?

8      A     Not for services with Rover, no.

9      Q     Never?

10     A     Never.  Rover issues a -- their own number

11  for clients -- for their clients to get ahold of me,

12  which went to my cell phone, but it was never my own

13  phone number.

14           MR. LeCRONE:  Okay.

15           Counsel, would it be okay if we take just a

16  brief break -- I know it's 12:40 or thereabouts -- for

17  about 10 minutes?  Is that okay?

18           MR. YOUNG:  Sure.

19           MR. LeCRONE:  Or maybe 15.  Let's do 15 and

20  then we'll come back on the record.  Okay?  Thank you.

21           We'll go off the record.

22           THE VIDEOGRAPHER:  It is 12:39 p.m.  We are

23  off the record.

24           (A recess was taken.)

25           THE VIDEOGRAPHER:  We are back on the record.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 89

1    It is 1:00 p.m.

2    BY MR. LeCRONE:

3         Q     So, Ms. Sportsman, you are still able to give

4    us your best testimony as we move forward?

5         A     Yes.

6         Q     Is there anything you want to change or

7    adjust or modify from what you said to us so far?

8         A     No.

9         Q     And you understand you're still under oath?

10        A     Yes.

11        Q     So I have, according to the information I've

12   reviewed, you had 88 client bookings through Rover

13   from May 2017 to April of 2019.

14              Does that sound about right to you?

15        A     I don't have any knowledge of how many.  I

16   never counted.

17        Q     So you don't know one way or the other

18   whether that's right or wrong?

19        A     I know I had quite a few, but -- I don't know

20   any number.

21        Q     These client pet owners would find you by way

22   of the Rover platform?  They'd find you by way of your

23   profile?

24        A     Yes.

25        Q     And you'd have some form of conversation with

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 90

1    them back and forth about your location, your rates,

2    and what you can and can't do in terms of

3    availability?

4        A    They would send me a message requesting a

5    certain service, a certain day or time, and I would

6    respond if I was interested or if I was able to and

7    whatnot.

8        Q    And if you were not interested, you would not

9    respond?

10       A    No, I did not say that.

11       Q    Well, okay.  You said if you were interested,

12   you would respond.

13            If you were not interested, what would you

14   do?

15       A    I said I would respond -- I said if I was

16   interested or able to, I could respond whether I was

17   able to or not.

18       Q    Okay.  Were there any that you just totally

19   ignored?

20       A    No.

21       Q    All right.  I would like to go back to some

22   exhibits or the exhibits.  And let's turn to Exhibit

23   Number -- it's marked as Exhibit Number 6.  I will

24   introduce that as Sportsman Exhibit 6.  This is a

25   document that bears Document Control Numbers ROVER 119

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 91

1   through 122.

2            THE VIDEOGRAPHER:  Give me a moment.

3            (A discussion was held off the record.)

4            THE VIDEOGRAPHER:  Sorry.  This is taking a

5   little longer.  For some reason it's not letting the

6   exhibit come up.  Let me keep trying.

7            I lost host privileges, so I'm having some

8   trouble here.  I may have to sign out and sign in

9   again.

10           MR. LeCRONE:  Can we go off the record while

11  you do this, please.

12           THE VIDEOGRAPHER:  Yes, of course.

13           It is 1:05 p.m.  We are off the record.

14           (A recess was taken.)

15           (Exhibit 6 marked.)

16           THE VIDEOGRAPHER:  We are back on the record.

17  It is 1:09 p.m.

18  BY MR. LeCRONE:

19     Q    All right.  Ms. Sportsman, are you able to

20  continue and give us your best testimony?

21     A    Yes.

22     Q    Okay.  So we've pulled up what we have marked

23  as Sportsman Exhibit 6 to the transcript.  And I --

24  I'm not sure if I put this on the record already, but

25  I'll do it right now just to be safe.  It bears

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 92

1    Document Numbers ROVER 119 to Rover 122.

2          This appears to be a text exchange between

3    you and a client with a dog named Brownie.

4          Do you recall this exchange?

5     A    I recall Brownie.  I do not recall this at

6    all.

7     Q    You don't recall -- again, we have redacted

8    the images of the dog.

9          But it would appear that you were posting

10   photographs for the dog owner; is that fair?

11    A    (Witness reviews exhibit.)

12          I know I did send her messages on updates,

13   but I do not recall this at all.

14    Q    Does this document, this exhibit, look

15   familiar to you?  Putting aside not recalling this

16   particular sitting, but is this how you communicated

17   with dog owners?

18    A    I communicated with dog owners through the

19   Rover app.

20    Q    Would you see this communication?

21    A    No.

22    Q    Would you see -- how would you have received

23   the communication from the dog owner?

24    A    Through the Rover app.

25    Q    Well, okay.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 93

1          And you would read the communication from the
2    dog owner, the client?
3       A    Yes.  If they would send me a message through
4    the Rover app --
5       Q    Okay.
6       A    -- yes, it would come to my phone.
7       Q    Let's go to page 122, which is the last page
8    of this Exhibit 6.
9          This bears a date, this message, of
10   August 16, 2017, from the client to you.  And it has
11   to do with dates you're available.
12         Do you recall receiving this message from the
13   client?
14      A    I'm trying to even see the document.
15         (Witness reviews exhibit.)
16         What was the question again?
17      Q    The question is, do you recall receiving this
18   text message from a client asking about your services?
19   And your availability?
20      A    She was a repeated customer -- a Rover
21   client, but I do not recall -- sorry -- phone calls.
22      Q    You don't recall this one way or the other?
23      A    No.
24      Q    That same day, two paragraphs up, you have
25   (as read):

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 94

1           I'm happy to welcome Brownie to stay

2           with me.  I have modified the request to

3           accurately show the dates you're

4           requesting.

5           Do you see that comment?

6     A     (Witness reviews exhibit.)

7           Where is my cursor?  Okay.  Any communication

8  would come through the Rover platform through the

9  number they had given me onto my phone.

10    Q     Okay.  Do you recall this message?

11    A     I do not recall it directly, no.  But it

12  seems like something that I would state setting up a

13  meeting.

14    Q     If we go up again two paragraphs above that,

15  it says that you're going to modify the request to

16  accurately reflect the dates.

17          Do you recall modifying the client's requests

18  for your services to accommodate them?

19    A     On this particular date, no, I don't recall.

20  But I have modified several different services over

21  the time.

22    Q     You were in control of modifying your

23  schedule, whatever that may be; correct?

24    A     I can modify to change the dates according

25  to, you know, the Rover client or myself.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 95

1    Q    Right.

2         (Simultaneous speaking.)

3    BY MR. LeCRONE:

4    Q    And you can also decline to modify based on

5    availability or any other reason; correct?

6    A    Right.  Just like any other employee with a

7    job, if they have certain things to do, they can

8    request time off.  Like that.

9    Q    Uh-huh.

10        So if we go up -- can we go one page before

11   this?  It bears Document 121.

12        Here in this thread you make a comment about

13   having classes from 9:00 to 10:15 a.m. at Clovis

14   Community.

15        And below that, at the bottom of the page,

16   you indicate that you're in class right now.

17        I'm assuming you are responding to a message

18   you received from a client about your class schedule

19   and your availability; right?

20   A    That could have been possible, but I do not

21   recall this.

22   Q    You don't recall any of this?

23   A    It's been some time ago.  I don't recall

24   every conversation I've had with a Rover client.

25   Q    Do you remember the client?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 96

1       A      (Witness reviews exhibit.)

2       Q      I think you testified earlier that you had

3   seen this client on more than one occasion; is that

4   right?

5       A      I saw most of mine on more than one occasion.

6       Q      This was a repeat client, as they say?

7       A      (Witness reviews exhibit.)

8              It doesn't exactly show who it is.

9       Q      Do you remember the dog?

10      A      Where does it say the dog's name?

11      Q      This is the Brownie one.  At the very top.

12      A      I recall Brownie.

13      Q      "Brownie is excited to see Mommy."

14      A      I do recall the dog Brownie.

15      Q      Is that a dog you agreed to provide services

16  for?

17      A      Yes.  It's for the client pet that I had

18  seen --

19      Q      Let's go on to --

20             (Reporter interruption for clarification.)

21             THE WITNESS:  Okay.  Do you want me to repeat

22  anything?

23             I said yes, I have seen the client Brownie on

24  several occasions.

25  ///

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 97

1   BY MR. LeCRONE:

2        Q     So let's move on to the next exhibit, 7.  We

3   will mark that as Sportsman 7.  For the record, it's

4   another thread of text messages, and it bears Document

5   Numbers ROVER 428 through 431.

6              (Exhibit 7 marked.)

7   BY MR. LeCRONE:

8        Q     This has dates in February 2018 and

9   January 2018.

10             Ms. Sportsman, do you recall this booking?

11  This client?

12       A     (Witness reviews exhibit.)

13             I do not recall this conversation.

14       Q     This appears to be a dog named Nova.

15             That ring a bell?

16       A     I do recall Nova.  I do recall Nova, but I do

17  not recall this conversation.

18       Q     If we go down on the first page, February 3,

19  2018, at 2:46 p.m., you say (as read):

20                  I'm probably going to the library to

21             do some research for a paper.

22             Do you see that comment?

23       A     (Witness reviews exhibit.)

24             Okay.  Yes, I do.

25       Q     Was that during a period of time that you

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 98

1   were at Clovis Community College?

2       A    (Witness reviews exhibit.)

3            No.  Well, I would have been enrolled in

4   school at this time, but not saying that I was

5   currently actually at the location of my school.

6       Q    Okay.  Okay.

7            If we go on to the next page, there are some

8   photographs.  Maybe this will refresh your memory

9   about the dog in question.

10      A    Okay, yes.  Nova.  I recall Nova.

11      Q    Okay, good.  And these are photographs that

12  you would have taken on your cell phone and sent to

13  the client; correct?

14      A    Through the Rover app, yes.

15      Q    It also mentions that you -- that the client

16  asked you to give the dog a bath.

17           Do you recall that?

18      A    Yes, I do.

19      Q    And you agreed to do that?

20      A    Yes.

21      Q    What did you charge for the bath?

22      A    I do not recall what I -- my pricing was.  It

23  was not one that was requested often at all.

24      Q    How much would you charge for a bath?

25      A    That would be on my Rover profile.  Under

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 99

1    "Grooming."

2       Q    Do you recall what that amount was that you

3    set on your profile?

4       A    I already just stated no, I do not recall

5    what I had put on there.  It was not a service that

6    was requested often.

7       Q    Okay.  Can you give me a range of what that

8    fee would typically be?

9       A    Maybe 10 to $20.  I don't -- I don't really

10   recall.

11      Q    That was a fee that you set as a provider;

12   correct?

13      A    And they* thought* a suggestion as a price

14   range from Rover, yes. [And makes up a suggestion?*]

15      Q    Let's go on to Exhibit 8.

16           (Exhibit 8 marked.)

17   BY MR. LeCRONE:

18      Q    Okay.  Can you see this document, this

19   Exhibit 8 that we've marked for the record?

20           I apologize if I've not put the document

21   numbers in there.  It's ROVER 138 through ROVER 140.

22           And this appears to be a dog named Maggie.

23           Does that ring a bell?

24      A    I do recall Maggie.

25      Q    Do you recall the owner?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 100

1      A    Not the name, no.

2      Q    Go to the last page of this document, please.

3    There we go.

4           At the very top here, this is a message from

5    you to the dog owner, Ms. Sportsman.

6           And it says (as read):

7               My rate for a drop-in is $15 for the

8               first dog and $10 for each additional

9               dog.

10          Do you see that comment?

11     A    Yes.

12     Q    Is that the rate that you set, at least at

13   the time, in 2017 August?

14     A    I don't recall.

15     Q    Then you go on to say (as read):

16              So one drop-in visit on October 27

17              for your three dogs would be $35.

18          Do you see that statement?

19     A    Yes.

20     Q    That was your pricing, wasn't it?

21     A    It was based off of Rover suggested rates,

22   yes.

23     Q    You go on to say (as read):

24              Another $35 for the three dogs on

25              October 28.

eLitigation Services, Inc. - els@els-team.com

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 101

1          Do you see that statement?

2     A    Yes.

3     Q    That was pricing you set for your services?

4     A    Again, based off of Rover's suggested rates

5    yes.

6     Q    Okay.  You go on to say (as read):

7              I would gift you a walk for them to

8          avoid you any additional costs since your

9          total cost for the two drop-in visits

10         would be -- would come to $70.

11         Do you see that statement?

12    A    Yes, I do.

13    Q    So you were offering to this client to gift

14   them a walk without charging them; correct?

15    A    That's what it appears to be, yes.

16    Q    Do you recall doing that?

17    A    I do not recall.

18    Q    And no one told you one way or the other that

19   you had to give a gift to a dog owner or client?

20    A    No, not that I recall.

21    Q    Let's move on to Exhibit 9.  We will mark

22   that Sportsman 9.  It bears Document Control Number

23   ROVER 339.

24         (Exhibit 9 marked.)

25   ///

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 102

1  BY MR. LeCRONE:

2      Q     And what is -- this appears to be for a

3  sitting engagement you were hired for a dog named

4  Bear.

5            Can you see this, Ms. Sportsman?

6      A     Yes.

7      Q     Okay.  Do you remember this engagement?

8      A     No, I don't really recall Bear.  I'm not sure

9  if that was really one that was a repeat client of

10  Rover.

11      Q     On November 24, 2017, at 1:55, you receive a

12  message, a text message from the client, saying (as

13  read):

14            Oh, wow, I'm just now seeing the

15            price.  It is listed as cheaper on here.

16            I appreciate it, but I am working on a

17            smaller budget.  I'm sorry for the

18            confusion.

19            Do you recall that message from this client?

20      A     No, I don't recall.

21      Q     Right above that, within five minutes, you

22  responded (as read):

23            That's okay.  Most sitter prices will

24            be more during the time frame because of

25            the holiday pricing.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 103

1           Did you make that statement?

2     A    I do not recall, but I do know that that was

3  typically something that would occur.  Holidays, even

4  with Rover suggested to raise, yes, the pricing

5  because of the demand.

6     Q    Okay.  So you were setting a higher price

7  based on the fact it was asking for time during the

8  holidays; right?

9     A    Rover suggested to raise the pricing for

10  holidays.

11    Q    And you increased your price because of the

12  holidays.

13           Do I have that right?

14    A    Yes.  I went off of Rover's suggestion, and I

15  did that.

16    Q    Two above that, ten minutes later, you say

17  (as read):

18           I can modify the price and change

19           [verbatim] my regular rate.  Instead of

20           650, it would be 455.

21           Did you make that statement?

22    A    Yeah.  I do not recall this conversation, but

23  I can't say if that's what I did or not.

24    Q    But you would modify your rate depending on

25  whether you wanted the business or not; correct?

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 104

1    A    Like I said before, modification was able to

2    be done through Rover platform, yes.

3    Q    You would modify your pricing, would you not?

4    A    I was able to.

5    Q    Let's go to Exhibit 10.  For the record, it's

6    a one-page document bearing -- we'll mark it as

7    Sportsman Exhibit 10.  It bears the number ROVER 393.

8         (Exhibit 10 marked.)

9    BY MR. LeCRONE:

10   Q    Just for the record, this appears to be a

11   text thread between you and a client that bears the

12   date December 16, 2017.

13        If you go to the bottom of this page,

14   Ms. Sportsman, it references taking care of Lincoln

15   and Missy.

16        Does that ring a bell to you?

17   A    I do recall Lincoln and Missy.

18   Q    Do you recall this sitter engagement?

19   A    No, I don't recall this conversation.

20   Q    You say (as read):

21        Normally I charge 20 per drop-in for

22        cat care.

23        Do you see that statement?  At the very

24   bottom?

25   A    Okay.  I do see that here.

MELANIE SPORTSMAN
SEPTEMBER 29, 2020

Page 105

1      Q     You put that in there, did you not?

2      A     I don't recall this conversation.

3      Q     Would you add --

4            (Simultaneous speaking.)

5  BY MR. LeCRONE:

6      Q     Would you add a fee -- would you add a fee to

7  the class of cat care?

8      A     Cats also had a fee, just like dogs had a

9  fee.

10     Q     Okay.  You go on to say (as read):

11           So an additional 140 would be added

12           to the current request of 560, making

13           with the total cost of all animals $700.

14           Is this acceptable to you?

15           Do you recall making that statement?

16     A     I don't recall this conversation, once again.

17     Q     Okay.  So that was pricing that you put onto

18  a message to a client; correct?

19     A     I don't recall this conversation, once again.

20     Q     All right.  All right.  You don't have to

21  raise your voice.  I appreciate --

22     A     Well, I said I would appreciate not having to

23  repeat my answer over and over.

24           (A discussion was held off the record.)

25           THE VIDEOGRAPHER:  It is 1:32 p.m.  We are

```
 1     STATE OF CALIFORNIA     )
                               ) SS.
 2     COUNTY OF LOS ANGELES   )

 3            I, Christianne Lee Fong, CSR Number 7559,
       CCRR, Certified Shorthand Reporter, hereby certify
 4     that:

 5            I am authorized to administer oaths or
       affirmations (Cal. Code of Civ. P. Sec. 2093(b) and
 6     Fed. R. Civ. P. 28(a)).

 7            The foregoing proceedings were taken before
       me at the time and place therein set forth, at which
 8     time the witness was duly sworn by me (Cal. Code Civ.
       Proc. 2025.330(a), 2025.540(a) and Fed. R. Civ. P.
 9     30(f)(1)).

10            The foregoing pages contain a full, true and
       accurate record of all proceedings and testimony (Cal.
11     Code Civ. Proc. 2025.540(a) and Fed. R. Civ. P.
       30(f)(1)).

12
              I am not a relative or employee of the
13     parties, nor financially interested in the action
       (Cal. Code Civ. Proc. 2025.320(a)).
14
              Before completion of the proceedings, review
15     of the transcript [   ] was [ X ] was not requested.
       If requested, any changes made by the witness (and
16     provided to the reporter) during the period allowed,
       are appended hereto (Fed. R. Civ. P. 30(e)).
17
              I declare under penalty of perjury under the
18     laws of California that the foregoing is true and
       correct.
19
              Dated October 16, 2020.
20

21

22            _____
              Christianne Lee Fong
23            CSR Number 7559, CCRR

24

25
                                                      116
```