# EXHIBIT K

**SENATE COMMITTEE ON LABOR, PUBLIC EMPLOYMENT AND RETIREMENT**
**Senator Jerry Hill, Chair**
**2019 - 2020 Regular**

| | | | |
|---|---|---|---|
| **Bill No:** | AB 5 | **Hearing Date:** | July 10, 2019 |
| **Author:** | Gonzalez | | |
| **Version:** | May 24, 2019 | | |
| **Urgency:** | No | **Fiscal:** | Yes |
| **Consultant:** | Gideon L. Baum | | |

**SUBJECT:** Worker status: employees and independent contractors

**KEY ISSUE**

Should the Legislature codify the recent *Dynamex* decision, requiring that employers prove that their workers can meet a 3 part (ABC) test in order to be lawfully classified as independent contractors?

Should the Legislature expand the scope of *Dynamex* to include unemployment insurance and other labor law protections?

**ANALYSIS**

**Existing law**:

1) Establishes a comprehensive set of protections for employees, including a time-sure minimum wage, meal and rest periods, workers' compensation coverage in the event of an industrial injury, sick leave, disability insurance (DI) in the event of a non-industrial disability, paid family leave, and unemployment insurance (UI).
(Labor Code §§201, 226.7, 246, 512, 1182.12, & 3600 and UI Code §§1251 & 2601)

2) Creates the Industrial Welfare Commission (IWC), which promulgates industry-specific wage orders that set the wages, hours, and working conditions of employees. The IWC wage orders have the force of regulation and are enforced by the Division of Labor Standards Enforcement (DLSE).
(Labor Code §§70, 1173, 1177, 1195 & 1197)

3) Provides that there is a rebuttable presumption that a worker performing services for which a contractor's license is required, or who is performing such services for a person who is required to obtain such a license, is *an employee rather than an independent contractor*. (Labor Code §2750.5)

4) In order to rebut the presumption described above, an employer must prove the following:

   a) That the individual has the right to control and discretion as to the manner of performance of the contract for services in that the result of the work and not the means by which it is accomplished is the primary factor;
   b) That the individual is customarily engaged in an independently established business.

c) That the individual's independent contractor status is bona fide and not a subterfuge to avoid employee status. A bona fide independent contractor status is evidenced by the presence of cumulative factors, which includes substantial investment other than personal services in the business, holding out to be in business for oneself, and bargaining for a contract to complete a specific project for compensation by project rather than by time.

This test, also known as the ABC test, has been California law since 1979.

(Labor Code §2750.5)

5) Requires that an individual holds a valid contractor's license as a condition of having independent contractor status. (Labor Code §2750.5)

6) Requires, for the purposes of IWC wage orders, that the specific work conditions of a worker must conform with the following three circumstances to be considered an independent contractor:

(A) The worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact;
(B) The worker performs work that is outside the usual course of the hiring entity's business; and
(C) The worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

(*Dynamex Operations West v. Superior Court* (2018) 4 Cal. 5th 903)

**This bill** codifies and expands the recent decision in *Dynamex Operations West v. Superior Court* (2018) 4 Cal. 5th 903. ***Specifically, this bill:***

1) Provides that, for the purposes of the Labor Code and Unemployment Insurance Code and the IWC's wage orders, where a definition for employee is not provided a person *providing labor or services for remuneration must be considered an employee* ***unless*** *the hiring entity demonstrates that all of the following conditions are satisfied:*
   a) *The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.*
   b) *The person performs work that is outside the usual course of the hiring entity's business.*
   c) *The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.*

2) Provides that, for the following occupations, the applicable test for determining if an individual is an employee or an independent contractor is the predecessor test to *Dynamex* developed by the California Supreme Court in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 or relevant statute:
   a) Licensed insurance brokers.
   b) Licensed physicians and surgeons.

c) Registered securities broker-dealers, investment advisors, or their agents and advisors.
d) A direct salesperson, provided that the salesperson's compensation is based on actual sales, rather than wholesale purchases or referrals.
e) A real estate licensee, as provided under existing licensure provisions in the Business and Professions Code.

3) Provides that, for a worker who provides hairstyling and barbering services, the applicable test for determining if an individual is an employee or an independent contractor is *Borello* if the worker is free from direction or control of the contracting entity. This includes, but is not limited to, ***the following***:
a) The worker has a booth rental permit.
b) The worker sets their own rates for services performed.
c) Has their own book of business or clients.

4) Provides that the *Borello* employment test governs professional contracts if the contracting entity can demonstrate all of the following:

a) The individual maintains a business location, which may include the individual's residence, that is separate from the hiring entity.
b) If work is performed more than six months after the effective date of this section, the individual has a business license, in addition to any required professional licenses or permits for the individual to practice in their profession.
c) The individual has the ability to use their own employees in the completion of the work, where reasonable, and has the authority to hire and fire other persons who assist in providing the services. Nothing in this section requires an individual to hire an employee.
d) The individual has the ability to engage in other contracts for services than with the hiring entity.
e) Both the individual and the hiring entity have the ability to negotiate compensation for the services performed.
f) Outside of project completion dates and reasonable business hours, the individual has the ability to set their own hours.
g) For services that do not reasonably have to be performed at a specific location, the individual can determine where to perform the services under the contract.
h) The individual is customarily engaged in the same type of work performed under the contract with another hiring entity or holds themselves out to other potential customers as available to perform the same type of work.
i) The individual customarily and regularly exercises discretion and independent judgment in the performance of the services.

5) Provides that an individual contracting for professional services can do so as a sole proprietor or other business entity.

6) Defines "professional services" as either:

a) Requiring an active license from the State of California and involve the practice of one of the following recognized professions: law, dentistry, architecture, engineering, or accounting.

b) Requiring possession of an advanced degree that customarily involves a prolonged course of specialized intellectual instruction and study in the field of marketing or the administration of human resources from an accredited university, college, or professional school, as distinguished from a general academic education.

7) Makes findings and declarations on *Dynamex*, the negative consequences of misclassification, and states that this bill is not a change in the law with regard to violations of the Labor Code relating to wage orders of the Industrial Welfare Commission.

**COMMENTS**

**1. Independent Contractors, *Borello*, and *Dynamex*:**

The cornerstone of Labor Law is the employer-employee relationship. Specifically, the employer-employee relationship is a social contract: the employer provides wages and benefits (some legally required) to the employee, in return for the employee's labor, time, and intellectual and/or physical product. The legal roots of this relationship go back to Medieval England, yet are durable enough to shape our current world.

In the past 30 years, this relationship has been put under pressure and strain due to the increasing utilization of independent contractors. For employers who lawfully utilize independent contractors, it allows a business to utilize the services of a skilled individual for specific tasks. The employer trades control over the working conditions for being released from many of the primary obligations of being an employer, including paying overtime, remitting payroll taxes, securing workers' compensation coverage, and ensuring a healthy and safe work environment.

This creates a tremendous incentive for employers to misclassify their employees and illegally avoid paying the cost of benefits. This amounts to a cost-shift from an employer to the employee specifically and, in the case of particularly egregious examples, the people of California generally in the form of increased safety net spending. And it may be a growing issue: according to a 2016 study conducted by Alan Krueger, the number of workers classified as independent contractors rose 30% from 2005 to 2015.

In short, misclassification impacts all Californians, not just the Californians who are misclassified, and may be getting worse, rather than better.

This challenge was further exacerbated because the primary court precedent was less than precise on who was and who was not an independent contractor. Specifically, in *S. G. Borello & Sons, Inc. v Dept. of Industrial Relations* (1989) 48 Cal.3d 341, the California Supreme Court created an 11 point "economic realities" test on whether someone could lawfully be considered an independent contractor. Outside of particularly clear-cut or egregious situations, this made determining who was or was not an independent contractor complicated, expensive, and prone to litigation. This created considerable frustration for both worker and employer stakeholders.

However, this period of considerable confusion appears to be drawing to a close. Earlier this year, the California Supreme Court revisited the independent contractor issue in *Dynamex Operations West v. Superior Court* (2018). Under *Dynamex*, the test for whether a worker is an independent contractor or an employee is a greatly simplified to a three-prong test:

*(A) The worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact;*
*(B) The worker performs work that is outside the usual course of the hiring entity's business; and*
*(C) The worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.*

While a similar ABC Test has been in place for the construction industry for almost 40 years (and predates the *Borello* test by a decade), the *Dynamex* decision has created significant controversy in the employer community. **AB 5 codifies the Dynamex decision,** while also expanding its scope to areas of Labor Law beyond the IWC wage orders. Additionally, AB 5 provides narrow exemptions from Dynamex for specific industries, placing them instead under the broader *Borello* test.

**2. AB 5 and Uncovering the Original Dynamex in *Dynamex*:**

In seminal court decisions like *Dynamex*, it is sometimes easy to lose sight of the facts that led to the decision and go straight to the decision's core holding: the ABC test. This, however, is a mistake. By skipping over the facts of the case, the workers who struggled against the injustice of misclassification are relegated to a legal footnote and obscures why AB 5 is before the Committee today.

As highlighted in the decision, Dynamex is a national on-demand delivery service with several large business clients – including Office Depot and Home Depot. Prior to 2004, all of their delivery drivers were employees. However, starting in 2004, they abruptly re-classified their drivers as independent contractors solely to save money. The drivers had no ability to set rates, were required to use their own vehicles and pay for all transportation expenses, and were expected to pay for Dynamex uniforms with their own money. Moreover, work was assigned solely at the discretion of the Dynamex dispatchers.[1]

In 2005, an aggrieved worker, who alleged employee misclassification, sued Dynamex. In 2011, the Court certified class status. Finally, in 2018, the Court ruled in *Dynamex* that these drivers were misclassified – a 13 year quest for justice. In codifying the ABC Test discussed above, AB 5 ensures that this injustice is not repeated.

**3. Building a Mystery– *Dynamex* and Prong B (Usual Course of Business):**

Despite the clear direction of the Supreme Court's "ABC Test" in *Dynamex*, the ruling did leave several very important questions. For example, when discussing the "usual course of business" in Prong B of the *Dynamex* test, the Court says the following:

---

[1] As noted in the decision, Dynamex drivers could decide the order of how they delivered the packages, had limited control over their schedules, and could (in theory) work for a rival package delivery company.

> "… one principal objective of the suffer or permit to work standard is to bring within the "employee" category all individuals who can reasonably be viewed as working "in the [hiring entity's] business" (*citation ommitted*), that is, all individuals who are reasonably viewed as providing services to the business in a role comparable to that of an employee, rather than in a role comparable to that of a ***traditional independent contractor***….
>
> Thus, on the one hand, when a retail store hires ***an outside plumber*** to repair a leak in a bathroom on its premises or hires an ***outside electrician*** to install a new electrical line, the services of the plumber or electrician ***are not part of the store's usual course of business*** and the store would not reasonably be seen as having suffered or permitted the plumber or electrician to provide services to it as an employee. (*citation omitted*) On the other hand, when a clothing manufacturing company hires work at-home seamstresses to make dresses from cloth and patterns supplied by the company ***that will thereafter be sold by the company*** (*citation omitted*), or when ***a bakery hires cake decorators to work on a regular basis*** on its custom-designed cakes (*citation omitted*), the workers are part of the hiring entity's usual business operation…. In the latter settings, the workers' role within the hiring entity's usual business operations is more like that of an employee than that of an independent contractor.
>
> Treating all workers whose services are provided within the usual course of the hiring entity's business as employees is important to ensure that ***those workers who need and want the fundamental protections afforded by the wage order do not lose those protections***. If the wage order's obligations could be avoided for workers who provide services in a role comparable to employees but who are willing to forgo the wage order's protections, other workers who provide similar services and are ***intended to be protected under the suffer or permit to work standard would frequently find themselves displaced by those willing to decline such coverage***."
>
> (Emphasis added)

There are several pieces worth unpacking here. **First**, the Court is saying that there is a thing known as a traditional (or genuine) independent contractor. The Court uses the example of a plumber or electrician, which is somewhat odd noting that both *are commonly viewed as independent contractors because of* ***statutory provisions***: specifically, the Labor Code provisions discussed above in Labor Code Section 2750.5. Without such a statutory protection, such a common understanding may not be so common.

In another area of the decision, however, the Court does list several other vocations as "unquestionably" independent contractors: "***independent plumbers, electricians, architects, sole practitioner attorneys, and the like — who provide only occasional services unrelated to a company's primary line of business*** and who have traditionally been viewed as working in their own independent business." (*Dynamex*, S222732 at 54) This is likely what the Court means by being outside of the retail store's usual course of business.

**Second**, in looking at the examples of the seamstress and cake decorator, the Court appears to focus on the centrality of the task to the employer's business model: a cake decorator to a cake business and a seamstress to a dress-making company. While this seems straightforward, it is likely that both of these examples would have been prohibited under

*Borello*. For example, in the case of the cake decorator, the workers were prohibited from leaving the job site prior to the work being completed and therefore had to routinely work 50-60 hours per week. That level of control will trigger an employer-employee relationship under the *Borello* test.

**Third**, the Court discusses the need to protect workers to prevent a race to the bottom. Here, the Court takes a sharp turn, adopting a strong normative stance in an arena that traditionally had been heavy on specific factor-based analysis. It appears the Court is arguing that, without protections for workers who are utilized by employers for the employer's usual course of business, then the risk of a race to the bottom is simply too great and will leave certain classes of workers in an unacceptably vulnerable position.

So, in broad brushstrokes, a few things come into focus:

a) There is such a thing as a traditional independent contractor;
b) That person is someone who works occasionally for an employer, but not in their client's normal course of business;
c) That a client's normal course of business can be cleanly distinguished from the client's non-normal course of business; and
d) The independent contractor is in some way, shape, or form less vulnerable (or not vulnerable at all) in a way that an employee is uniquely or particularly vulnerable.

To an outside observer, this would seem simple and straightforward.

**4. *Dynamex* and the False Promise of Simplicity:**

Unfortunately, bright line tests of who is an employee are rarely so bright when subjected to the rigor of reality. For example:

a) What makes a traditional independent contractor an independent contractor? Is it passage of time and tradition? If so, the trucking industry was deregulated in 1980, 1 year after the codification of plumbers and electricians as independent contractors. Are truckers "traditional" independent contractors?
b) What is occasional? At what juncture does a working relationship move from occasionally to regularly? Is there some magical point in time where that extra phone call turns a contractor into an employee?
c) What is a client's normal course of business? And who decides? The Court uses retail as an example, and for large retailers like Target it is unquestionable that cashiers, stockers, and salespeople would qualify as employees (as they would under *Borello* due to control). What about small retailers where individuals who manufacture the goods? Without goods, there is no business – does that make the individual artisan an employee? Is there a scenario where they are not an employee? If so, what?
d) It is unquestionable that a janitor is more vulnerable than an attorney. This is reflected both in law and in conventional wisdom. But why? Why is an attorney on the same level of vulnerability as an electrician, but not a journalist?

There is no intellectual Northwest Passage to developing rules for who is and is not an employee. Even with an ABC test, the test will fade at the margins. There needs to be an intellectual core, a fundamental polestar on who is an independent contractor and what makes them independent, rather than a case-by-case analysis on each and every occupation.

**5. Assembly Bill 5 and the Search for Clarity:**

Therefore, AB 5 faces a herculean task: cutting through 30 years of deferred statutory leadership, codifying a case that is concrete only in the abstract, and identifying and addressing the areas where the *Dynamex* test inappropriately fades in the margins.

It is in the last category that there has been the most attention: the messy tweeners where the *Dynamex* decision simply is not clear enough to determine who is an employee. If the proponents draft special occupational or industrial rules that are too broad, then AB 5 loses its protective power for workers. If the special rules are drafted too narrowly, then AB 5 risks disrupting longstanding independent contractor relationships, including the elusive "traditional" independent contractors discussed in the original *Dynamex* decision.

To thread this needle, AB 5 has focused on occupation-by-occupation rules, placing specific occupations (that in some cases need to meet explicit requirements) under the *Borello* test. Essentially, the bill is saying, "**if** your workers were independent contractors before *Dynamex*, **then** they can continue to be independent contractors under Assembly Bill 5". That said, by retaining the *Borello* test, these occupations remain in the messy muddle of a failed employment test that met the needs of neither employers nor workers. Should Assembly Bill 5 become law, the Legislature will need to revisit the remnants of *Borello* in the future.

Beyond the list of specified occupations, the bill in print before the Committee does not have a general guideline for when a company's "usual course of business" is unclear or prone to misinterpretation. To put it differently, the Court in *Dynamex* talks of "traditional" independent contractors, gives a partial list, and then talks of "others". Who are the others? How will we know them when we see them?

For example, suppose a business is seeking bids to conduct an advertisement campaign. An ad company that wants the contract for the campaign contracts a copy editor who is particularly experienced with the client's industry. The business loves the campaign concepts, and the ad company wins the contract. As a part of the contract, the copy editor's services are separately billed to the client (copy editor's rates, plus a service markup).

**First**, can the ad company legally contract with the copy editor? **Second**, if the business is paying the contractor's rates, is the business paying/receiving services directly from the contractor? **Finally**, do any of these questions change if the copy editor organizes her sole proprietorship as an S Corporation, and classifies herself as an employee of the S Corporation?

To codify *Dynamex*, it is necessary to also codify the intellectual matrix that the Court used to arrive at the *Dynamex* rule. Otherwise, AB 5 runs the risk of sinking into the same inertia of *Borello* (and the common law test before that).

**6. Searching for the "Others" – Codifying the Intellectual Framework of *Dynamex*:**

As discussed above, the Court in *Dynamex* links independent attorneys, architects, electricians, plumbers, "and others" as independent contractors. What is it that these folks have in common that makes these occupations "unquestionably" open to independent contractor status?

***Market Strength:***

Market strength is a vague concept, and that concept is not assisted by the reality that it can change. But it is somewhat helpfully highlighted by a hypothetical: if someone relayed a story of a group of misclassified attorneys, forced to take sub-minimum wage payments for legal services, that story will be met with skepticism. Why? There are a *finite number* of attorneys, and they average an annual mean salary of $171,550 in California or $82.48 per hour – nearly *7 times* the State Minimum Wage.

Similarly, there are a finite number of electricians (about 16,000 fewer electricians than lawyers) and electricians make an hourly mean wage of $33.33 – about 2.8 times the State Minimum Wage. Similar to attorneys, electricians have strict *educational* and *licensure* requirements. Between the finite number of professionals and strict barriers to entry, attorneys and electricians are able to *control their working conditions free from coercion and intimidation*. Taken together, this places the hypothetical electrician in a different market stratum than the hypothetical janitor.

Logically, it follows that an independent electrician or attorney will make a comparable amount of money (AFTER taxes and expenses) to a similarly situated employee. An attorney who is a sole proprietor, for example, may be comfortable making $86,000 per year if she works 50% less than a comparable employee. On the other hand, an enforcement entity would be well within reason to question a work arrangement where an attorney worked 80 hours per week and only earned $70,000, irrespective of that amount's relation to the State Minimum Wage.

Similarly, in industries where there are *low barriers to entry* **and** there are *significant numbers of employees*, claims of independent contract status *should be met with heightened scrutiny by enforcement entities.*

***Rate Setting:***

Similar to market strength, genuine independent contractors are able to set their own rates for their labor, without interference from another entity. Granted, the act of rate setting occurs in a larger economic context: an electrician who sets an equivalent hourly rate at $50 is more likely to build a successful business than an electrician setting an equivalent hourly rate at $500 due to market demand and competition with other electricians (independent or otherwise). Yet, the ability for a worker to set their own rates for their own labor is a sign of independence, and if a worker is not able to set their own rates, it is difficult to imagine a set of facts where that worker could ever be an independent contractor.

Therefore, if a company does not permit its "independent contractors" to set their own rates, or only permits rate setting in a narrow band, such claims of independent contractor status should be met with skepticism. Alternatively, if a company permits their independent contractors to charge their own rates, and then enforces payment of those rates through contracts with other companies or clients without deduction, then the likelihood that worker is an independent contract is higher than not.

***Relationship between the Contractor and Client:***

At its most elementary level, an independent contractor creates a contract with a client for a specific purpose. Therefore, an independent contractor and the client have a direct relationship, communicate directly to resolve any questions or concerns, and use the structure of the contract to resolve any disputes. Granted, just as attorneys or electricians will refer clients to their fellow associates, or as a client may find an attorney through a referral service, there may be an intermediary. And the intermediary may accrue a simple fee for the referral or advertisement.

For example, CA State Bar Association permits attorneys to pay referral fees, but requires (in part) that the referral fee is explicitly disclosed, the client has agreed to it, and that the referral fee is not "unconscionable". In looking at whether a fee is unconscionable or not, the Bar Association looks at whether the fee is in proportion to the value of services performed.

Similarly, when looking at fees charged by brokers or intermediaries, ensuring that these intermediary's fees are in proportion to the value provided to the contractor is incredibly important. Does intermediary ensure that the worker is paid in a timely manner and has the maximum amount of work requested? Does the intermediary improve payment times? Does the intermediary maximize rate setting and market position? Does the intermediary assist the worker in disputes? Does the intermediary improve contractor earnings compared to other contractors or employees?

If not, what is the function of the intermediary, beyond skirting employer responsibilities?

***Technological Neutrality:***

Finally, it is worth mentioning that, while there has been significant media discussion on disruption, digital applications, and the "gig economy", this serves more to confuse than clarify. On one hand, if a client secures the services of a contractor through an intermediary, it is unclear how the People of California are well served if the law makes a distinction between the intermediary being contacted through the Yellow Pages or the internet. This is particularly true as the distinction becomes increasing academic: a phone can be used to call someone as well as access an internet application. The core question is if the intermediary is, to use the legal world as a model, deriving disproportionate benefits from the relationship. The rest is detail.

On the other hand, an internet application, no matter how clever, cannot turn lead to gold. Misclassification is misclassification. A company that utilizes the independent contractor model to undercut the employer-based model to cut costs and achieve profitability or scale is a company that misclassifies its workers. The historical reality of the capitalist marketplace and the State's need to protect workers are not repealed by a clever branding initiative, "killer" application, or product placement in a Netflix special. Lead cannot be gold.

**7. Dynamex and Retroactivity:**

Shortly after the *Dynamex* ruling, some stakeholders questioned if the impact of the ruling was retroactive. Since then, the courts have applied the *Dynamex* ruling retroactively in wage and hour disputes, noting that the Supreme Court did not limit its ruling to prospective questions. As such, the issues in AB 5 are not simply prospective.

This is already having impacts on California businesses. One small business owner recently reached out to the Committee, noting that she hired a yoga instructor in 2015 for a photo shoot. It was a one-day shoot, and they paid the instructor's agent $500. They had no further interaction with the yoga instructor.

Four years later, the small business is facing a *Dynamex* lawsuit for $72,000. The small business is currently facing bankruptcy, and is unclear how she found herself here, as she was following the law as of 2015, and was unaware that there was an issue until the lawsuit was filed.

While it is appropriate for the Court and the Legislature to require that companies that unlawfully misclassified their employees repay their employees for the wages that they stole, with penalties, we also need to ensure that blameless parties are not swept up in the push for justice. One potential place to start would be limiting retroactive penalties in cases where the worker's contract was for less than 40 hours in total.

**8. Proponent Arguments:**

State Building and Construction Trades Council, writing in support, argues the following:

"Last April, the California Supreme Court by a unanimous ruling in *Dynamex Operations v. Supreme Court* established a stronger protection for workers by making it more difficult to misclassify them as independent contractors. Workers classified as employees have access to the Labor Code's economic security protections such as minimum wage, unemployment insurance benefits, workers' compensation, and a jobsite free from discrimination and harassment.

The Supreme Court's Dynamex decision specifically mentions that wage and hour laws are "clearly intended for the benefit of those law-abiding businesses that comply with the obligations imposed by the wage orders, ensuring that responsible companies are not hurt by unfair competition from competitor businesses that utilize substandard employment practices." There is no doubt that all employers (old, new, large, mid-size or small) that follow the state's labor laws are severely disadvantaged when their competitors misclassify employees as independent contractors.

Construction has two sides, one that promotes rewarding careers with fair wages and benefits and another that is heavily burdened by the underground economy which depresses wages, denies basic benefits, undercuts good employers, neglects training, and incentivizes unsafe working conditions. Regrettably, construction employers routinely misclassify workers as independent contractors to save money, increase profits and to benefit from an unfair competitive advantage over contractors with employees.

Most recently, the State of California brought forward the largest wage-theft case against any employer citing a framing and drywall subcontractor for cheating over 1,000 workers of the minimum wage, overtime and rest breaks on construction projects throughout the Los Angeles region. The state ordered that over $11.94 million in back wages and penalties for violations between 2014-2017 was owed by RDV Construction to its employees.
In another case brought by the state's labor commissioner, Calcrete Construction was sued separately for $6.3 million for cheating 249 construction workers out of their properly owed

wages on one of the same projects involving RDV Construction. The Division of Labor Standards and Enforcement (DLSE) also found Calcrete Construction guilty of misclassifying 175 construction workers as independent contractors. In fact, these workers were threatened with termination of employment if they resisted signing contracts that falsely stated their independent contractor status.

According to a recent study by the Economic Roundtable titled, "Sinking Underground-The Growing Informal Economy in CA Construction," misclassified construction workers earn $.64 cents of every dollar a formal employee earns. In addition, the Employment Development Department's misclassification audits from 2005-2007 recovered $111,956,556 in pay roll taxes, $18,537,894 in labor citations and $40,348,667 in employment tax fraud. Lastly, DLSE estimates that misclassification costs the state over $7 billion annually.

We strongly support AB 5 because it:
• Reinforces Labor Code protections for misclassified workers by codifying the Dynamex case (or ABC test) into the Labor Code.
• Assists the Labor Agency/DLSE's efforts to fight the underground economy and hold law breaking contractors accountable.
• Restores tax revenue for unemployment insurance, disability insurance, and employer contributions to the workers compensation system by preventing misclassification.
• Protects law-abiding contractors, including signatory contractors, from being at a competitive disadvantage.

There has not been a moment in recent history granting the Legislature with the ability to protect the most disadvantaged workers and address income inequality which continues to cause extreme poverty and suffering while businesses, corporations and Wall Street score record breaking profits. We believe AB 5 provides this opportunity as it will significantly improve the working conditions for those that are currently misclassified and suffering from wage-theft and the other negative consequences of being denied the protections under the state's labor code."

**9. Opponent Arguments:**

The National Federation of Independent Businesses (NFIB), writing in opposition to AB 5, argues the following:

"As you know, prior to *Dynamex* California courts and state agencies had long applied what is known as the *Borello* test for determining whether a worker was an independent contractor for labor and employment purposes. The *Borello* test was a multi-factor approach which looked primarily at whether the hiring entity had a "right to control" the manner in which the worker performed the contracted service, along with eight other "secondary" factors. In *Dynamex*, the California Supreme Court decided to abruptly replace the *Borello* test in April of 2018.

*Dynamex* established a new "ABC" test, which provides that a worker must be treated as an employee unless the hiring entity can prove that the worker is: (A) free from control; (B) providing services ***unrelated*** to the hiring entity's business; and (C) holding him or herself out as an independent business. This rigid formula prevents entrepreneurs from working as an independent contractor if they are providing services integral to another company's

business, regardless of what steps they have taken to establish themselves as a separate, independent business.

Fortunately, many policy leaders including yourself have acknowledged this new "ABC" test under *Dynamex* is unworkable for every single business in a state and economy as diverse as California's. Unfortunately, the amendment process that has followed the introduction of AB 5 has left too many small businesses behind by narrowly carving out specific industries, rather than seeking to craft an exemption based on the nature of the contractual relationship between two entities. In a recent direct balloting of our California small business membership, 78% told us clearly that they wish to see a different approach, one that exempts two established, independent businesses from the "ABC" test, rather than picking and choosing industries.

**Broad exemption from "ABC" test between two verifiably independent businesses:** NFIB small business members feel strongly that if, for example, a service provider has gone through the process of incorporating as an LLC or S-Corp, that business operator should be presumed exempt from the "ABC" test so that he or she may freely provide their services to other companies. Fundamentally, if two contracting entities can verify they operate freely and independently of one another, they should be held to the longstanding multi-factor test under *Borello*. Also known as a "business-to-business" exemption, this broad amendment would address the fundamental encumbrance of the "ABC" test, without picking winners and losers by carving out specific industries.

**Eliminate unfair retroactive application of "ABC" test prior to April of 2018:** The sweeping action taken by the California State Supreme Court with *Dynamex* undoubtedly rewrote decades of California law by supplanting what was known as the *Borello* test with an unprecedented "ABC" test, never seen before in statue or regulation. In May of 2019, the U.S. Court of Appeals for the Ninth Circuit ruled that this unprecedented test could be applied retroactively, even when employers had no possible way of knowing about the "ABC" test. While *Borello* was certainly imperfect, NFIB small business members feel strongly it is unfair to punish employers for following the law of the land at the time, which was *Borello* for nearly three decades.

Independent contractor relationships provide millions of small business owners and entrepreneurs the opportunity to pursue their dreams, yet the rigid "ABC" test established by *Dynamex* and the threat of litigation presented by retroactive application jeopardize these opportunities. NFIB small business members respectfully urge the adoption of the two amendments described above to AB 5 to significantly alleviate these concerns.

**10. Prior Legislation:**

AB 2496 (Gonzalez Fletcher) of 2018 would have created a rebuttable presumption that a worker in the janitorial field is an employee, and therefore is due the same protections and privileges as other employees. Governor Brown vetoed the bill, stating the following in his veto letter:

"I share the Author's concern about protecting the most vulnerable workers as well as the general concern about providing clarity regarding worker classification. The California Supreme Court recently issued a significant decision establishing a new test to determine whether a worker is properly classified as an employee or an independent contractor,

Dynamex Operations West, Inc. v. Superior Court (2018) 4 Cal.5th 903. The Administration and the Legislature are still reviewing this decision and any statutory changes to such tests would be premature."

**SUPPORT**

California Labor Federation (Sponsor)
Amalgamated Transit Union
American Federation of State, County and Municipal Employees
Berkeley City Council
BlueGreen Alliance
California Alliance for Retired Americans
California Association of Health Underwriters
California Conference of Machinists
California Federation of Teachers
California Immigrant Policy Center
California Nevada Conference of Operating Engineers
California Nurses Association
California Partnership for Working Families
California Professional Firefighters
California Rural Legal Assistance Foundation
California School Employees Association
Center on Policy Initiatives, San Diego
Central Coast Alliance United for a Sustainable Economy
Communication Workers of America, District 9
Direct Selling Association
East Bay Alliance for a Sustainable Economy
Employees Rights Center
Engineers and Scientists of California, IFPTE, Local 20
Greater California Livery Association
Independent Insurance Agents and Brokers of California
Labor and Employment Committee of National Lawyers Guild
Legal Aid at Work
Los Angeles Alliance for a New Economy
National Association of Insurance and Financial Advisors of California
National Domestic Workers Alliance
National Employment Law Project
National Union of Healthcare Workers
Orange County Communities Organized for Responsible Development
Professional and Technical Engineers, IFPTE, Local 21
Professional Beauty Federation of California
SEIU CA
SEIU Local 1000
Shaklee Corporation
Sierra Club California
Southern California Coalition for Occupational Safety and Health
State Building and Construction Trades Council
Teamsters Public Affairs Council
The Greenlining Institute

Union of Concerned Scientists
UNITE HERE
United Auto Workers, Local 2865
United Auto Workers, Local 5810
United Domestic Workers, AFSCME Local 3930
United Farm Workers
United Food and Commercial Workers Western States Council
University Professional and Technical Employees, CWA Local 9119
Warehouse Worker Resource Center, Inland Empire
Western Center on Law and Poverty
Western States Council of Sheet Metal, Air, Rail and Transportation
Worksafe
9 to 5

**OPPOSITION**

Anthony Hopkins Investigations
California Aesthetic Alliance
California Association of Winegrape Growers
California Hospital Association
California League of Food Processors
California Podiatric Medical Association
California Society for Respiratory Care
California Trucking Association
Chino Valley Chamber of Commerce
Coalition of DMV Motor Carrier Permit Holders
El Dorado County Joint Chambers Commission
Electrologists' Association of California
Electronic Transactions Association
Elk Grove Chamber of Commerce
Folsom Chamber of Commerce
Fontana Chamber of Commerce
Greater Coachella Valley Chamber of Commerce
Greater Ontario Business Council
Hayward Chamber of Commerce
Hesperia Chamber of Commerce
Indy Hub
Inland Empire Economic Partnership
Insights Association
Lavell Water Truck Service LLC
Moreno Valley Chamber of Commerce
Murrieta/Wildomar Chamber of Commerce
National Federation of Independent Business
Rancho Cordova Chamber of Commerce
Rancho Cucamonga Chamber of Commerce
Recording Industry Association of America
Redlands Chamber of Commerce
Roseville Area Chamber of Commerce
Rover Inc.

Santoro Transportation Inc.
Southern California Contractors Association
TechNet
Victor Valley Chamber of Commerce
Western States Trucking Association
107-individuals

**-- END --**