DocuSign Envelope ID: 90F2BBDB-8410-49A4-91C2-10304C4E872C

1  JOHN P. LECRONE (State Bar No. 115875)
     johnlecrone@dwt.com
2  VANDANA KAPUR (State Bar No. 281773)
     vandanakapur@dwt.com
3  MARISSA FRANCO (State Bar No. 296793)
     marissafranco@dwt.com
4  PAUL RODRIGUEZ (State Bar No. 307139)
     paulrodriguez@dwt.com
5  DAVIS WRIGHT TREMAINE LLP
   865 South Figueroa Street, 24th Floor
6  Los Angeles, California  90017-2566
   Telephone:  (213) 633-6800
7  Fax:  (213) 633-6899

8  STEPHEN M. RUMMAGE (*Admitted Pro Hac Vice*)
     steverummage@dwt.com
9  DAVIS WRIGHT TREMAINE LLP
   920 Fifth Avenue, Suite 3300
10 Seattle, Washington  98104
   Telephone:  (206) 622-3150
11 Fax:  (206) 757-7700

12 Attorneys for Defendant
   A PLACE FOR ROVER, INC. dba
13 ROVER.COM

15                    IN THE UNITED STATES DISTRICT COURT

16                    THE NORTHERN DISTRICT OF CALIFORNIA

17                           SAN FRANCISCO DIVISION

19 | MELANIE SPORTSMAN, | Civil Case No. 3:19-cv-03053-WHO |
|---|---|
| Plaintiff, | **DECLARATION OF JENNA WHITE IN SUPPORT OF DEFENDANT A PLACE FOR ROVER, INC.'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| A PLACE FOR ROVER, INC. d/b/a ROVER *et al*. | Date:  March 31, 2021
Time:  2:00 p.m.
Place: Courtroom 2 – 17th Floor |
| Defendants. | Before the Honorable William H. Orrick |

I, Jenna White, declare:

1. I am currently the Senior Director, Core Product for Defendant A Place for Rover, Inc. d/b/a Rover.com ("Rover"), and have held this position since April 2020. I have held several other positions since I joined Rover in 2015, including Director, Marketplace Operations; Director/Senior Director, Rover Now Operations; and Senior Director, Boarding & Daycare Services. "Core Product" and "Services" as used in this paragraph, refer to the Rover website, mobile applications, and the software features and tools provided to users of the Rover platform.

2. In my current role, as well as in previous roles, I have access to information regarding pet care provider and pet owner profiles and their use of the Rover platform, including statistical data collected by Rover related to the use of its platform, all of which is kept by Rover in the ordinary course of its business.

3. I also am very familiar with Rover's operations and overall online business model. That knowledge extends to Rover's operations and business model before my employment began, as I have access to and have reviewed information regarding Rover's historical operations to better understand the company's history and business practices. I have personal knowledge of the facts in this declaration, therefore, or where necessary, confirmed the facts contained in this declaration through review of relevant business records as they are maintained in the ordinary course of business, and I am competent to testify to them.

**About Rover's Online Marketplace**

4. At all times relevant to this litigation, Rover has operated a digital marketplace that facilitates the ability of pet owners ("Pet Owners") to connect with individuals who offer pet sitting or other pet-related services ("Pet Care Providers") and enter into mutually agreed-to bookings for pet services.

5. To gain access to Rover's online marketplace, a Pet Owner or a Pet Care Provider must first create a free online account and accept Rover's Terms of Service ("TOS"), which governs their use of Rover's platform. A true and correct copy of the most recent TOS, last updated on October 27, 2020, is attached to this Declaration as **Exhibit Y**. Under the TOS, Rover agrees to provide on-going software and related services to its customers – Pet Owners

DAVIS WRIGHT TREMAINE LLP

and Pet Care Providers – in exchange for a fee. Rover's services include providing a desktop web application, mobile applications, and other related tools and online support that enable Pet Care Providers and Pet Owners to find, communicate, and transact business with each other in a secure online environment. *See* Ex. Y, TOS ¶ 2.1; Ex. Z, TOS ¶ 2.1.

6. Based on my review of Rover's internal management tool known as "django administration," Plaintiff Melanie Sportsman joined Rover's platform as a Pet Care Provider on May 24, 2017 by creating an account with Rover, accepting the version of Rover's TOS that was posted on Rover's platform at such time, and thereafter creating and posting her profile on Rover's online marketplace. A true and correct copy of the TOS acknowledged by Ms. Sportsman, last updated on January 31, 2017, is attached to this Declaration as **Exhibit Z**. A true and correct copy of an excerpt of Rover's django administration records confirming that Ms. Sportsman created her Rover profile on May 24, 2017, is attached to this Declaration as **Exhibit AA**. According to my review of these same records, Ms. Sportsman had 34 bookings between May 24, 2017 and April 2019.

7. Rover does not require Pet Care Providers or Pet Owners to sign any type of agreement in connection with their use of Rover's online marketplace, other than the TOS.

8. In the TOS, Pet Care Providers and Pet Owners make representations concerning their eligibility to enter into transactions using the online marketplace. Among other things, Pet Care Providers certify that they will comply with all applicable laws and ordinances, and that they have all necessary business licenses, permits, and other requirements to legally provide Pet Care Services. Rover relies on these representations in allowing Pet Care Providers to use the online marketplace to conduct their business.

**Pet Care Providers and Pet Owners Are Users of Rover's Marketplace**

9. As stated in the TOS, Rover does not provide pet services and is not a Pet Care Provider. *See* Ex. Y, TOS ¶ 2.2; Ex. Z, TOS ¶ 2.2. Similarly, Rover does not employ, recommend, or endorse Pet Owners or Pet Care Providers. *Id.* Upon joining Rover, Pet Care Providers prepare their own profiles, and while Rover's platform provides a template that includes structured data fields that interact with the platform's software to facilitate online

searching and processing of agreed bookings, Rover does not dictate or control what Pet Care Providers say or put in their profile, other than requiring them to provide a photograph and description of their pet care experience and prohibiting offensive material and statements.

10. Further, as users of Rover's marketplace, Pet Care Providers are free to customize their user experience, such as by having the freedom to set their accounts to the "Away" status to remove their profiles from search results and to let Pet Owners know they are temporarily not accepting booking requests. After building a client list through Rover, Pet Care Providers can also set their accounts to "Repeat only," limiting requests to existing clients.

## How Rover's Online Marketplace Works

11. After registering as users of Rover's platform (including by accepting Rover's TOS), Pet Owners receive access to a database of profiles from self-employed individuals, like Ms. Sportsman, who are interested in providing pet care, enabling them to find Pet Care Providers and book directly with them. A Pet Owner can use Rover's search tools to browse the profiles of Pet Care Providers based on the Pet Owner's preferences and criteria, such as zip code, availability, services provided, and pricing. Pet Owners can read Pet Care Provider profiles and reviews, and can communicate directly with a Pet Care Provider who meets their needs. Rover does not select or pair Pet Care Providers with Pet Owners, assign or send "jobs" to Pet Care Providers, or otherwise involve itself, interfere with, or influence the Pet Owner's or Pet Care Provider's decision-making.

12. If a Pet Owner is interested in using a particular Pet Care Provider, the Pet Owner communicates directly with the Pet Care Provider, either through Rover's application or, if they choose, directly by phone or text. The Pet Care Provider can then address questions regarding the booking, negotiate rates or other material terms of service, or request an in-person meeting with the Pet Owner and the pet at a location of their choosing before deciding whether to move forward with the booking. This process, however, is not instantaneous. Based on my review of user interaction data stored in the data warehouse that supports the Rover platform, the average time between an initial request contact and a booking between a Pet Care Provider and a Pet Owner on Rover's platform in California in 2017 and 2018 was approximately 45 hours.

13. A true and correct copy of messages exchanged between Plaintiff and a Pet Owner between August 16, 2017 and August 21, 2017 on Rover's platform are attached to this Declaration as **Exhibit BB**.

14. A true and correct copy of messages exchanged between Plaintiff and a Pet Owner between January 25, 2018 and February 3, 2018 on Rover's platform are attached to this Declaration as **Exhibit CC**.

15. A true and correct copy of messages exchanged between Plaintiff and a Pet Owner between August 22, 2017 and October 27, 2017 on Rover's platform are attached to this Declaration as **Exhibit DD**.

16. A true and correct copy of messages exchanged between Plaintiff and a Pet Owner on November 24, 2017 on Rover's platform are attached to this Declaration as **Exhibit EE**.

17. Once a Pet Owner has selected a Pet Care Provider (and vice versa), either the Pet Owner or the Pet Care Provider initiates the booking request. *See* Ex. Y, ¶ 2.5. The Pet Owner is charged at the time both parties confirm the booking. The Rover platform holds funds that the Pet Owner has charged to his or her credit card until 48 hours after the end date of the booking, when it releases the Pet Owner's payment to the Pet Care Provider. Rover processes a cancellation if it receives notice that the Pet Care Provider did not provide the booked services. *See* Ex. Z, TOS ¶ 10.5; Ex. TOS Y ¶ 9.6.

18. Through the TOS and the profile creation process, Pet Care Providers acknowledge and agree that the list prices that appear on the Pet Care Provider's profile includes two fees wrapped in one amount: (1) the rate that the Pet Care Provider receives for each booked service; and (2) the 20% service fee that the Pet Care Provider pays to Rover for his/her use of the Rover platform. *See* Ex. Y, TOS ¶ 9.0; Ex. Z, TOS ¶ 10.

19. Pet Care Providers are specifically reminded of their service fee to Rover when they complete their Rover profile and set the list prices for their services (and later, when and if they change any of those prices), as the Rover platform calculates and shows Pet Care Providers the net rate they will receive for their services at their desired list price. A true and correct copy

4

DECLARATION OF JENNA WHITE ISO NOTICE OF MOTION FOR SUMMARY JUDGMENT
Case No. 3:19-cv-03053-WHO
4843-1340-2076v.6 0107222-000013

of the Service and Rates step of the profile completion process, accessed on July 16, 2020, is attached to this Declaration as **Exhibit FF.** Pet Care Providers are free to adjust their list price, up or down, to ensure they obtain the amount they ultimately wish to receive as payment for their services, after netting out the service fee they owe Rover. By way of example, an online search of the Rover platform indicates Pet Care Providers in the San Francisco, California area have listed a wide variety of rates for one night of dog boarding, including rates of $40, $48, $63, $80, $119, $140, and many more.

**Pet Care Providers Are Free to Offer and Advertise Their Services Elsewhere**

20. Rover does not prevent or preclude Pet Care Providers from offering their services through other outlets (like competing marketplaces such as Care.com, or assignment-based services like Wag!) or from obtaining clients through their own independent websites, word of mouth, or on other advertising platforms, like Craigslist and Angie's List.

21. Similarly, Rover does not prevent Pet Care Providers from displaying the names of their businesses, or the names under which they do business, within their Rover Pet Care Provider profiles.

22. To illustrate, in connection with this lawsuit, I am aware that a search within Rover's records was conducted to identify Pet Care Provider profiles in California that provided business names within their profile. As a result of this search, Rover identified the Pet Care Provider profile for Whitney and Manni O. based in Bullard, Fresno, California. A true and correct copy of Whitney and Manni O.'s profile, accessed on Rover's platform on February 23, 2021, is attached to this Declaration as **Exhibit GG**. Within the "About" section of their profile, the Pet Care Providers identify themselves as "Maisy's Mutts."

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on February 23, 2021, in Seattle, Washington.



JENNA WHITE

5
DECLARATION OF JENNA WHITE ISO NOTICE OF MOTION FOR SUMMARY JUDGMENT
Case No. 3:19-cv-03053-WHO
4843-1340-2076v.6 0107222-000013

I hereby attest that I have on file all holographic signatures corresponding to any signatures indicated by a conformed signature within this e-filed document.

Dated: February 23, 2021

                                            */S/ John P. LeCrone*
                                            John P. LeCrone

DECLARATION OF JENNA WHITE ISO NOTICE OF MOTION FOR SUMMARY JUDGMENT
Case No. 3:19-cv-03053-WHO
4843-1340-2076v.6 0107222-000013