JOHN P. LECRONE (State Bar No. 115875)
  johnlecrone@dwt.com
VANDANA KAPUR (State Bar No. 281773)
  vandanakapur@dwt.com
MARISSA FRANCO (State Bar No. 296793)
  marissafranco@dwt.com
PAUL RODRIGUEZ (State Bar No. 307139)
  paulrodriguez@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Fax:  (213) 633-6899

STEPHEN M. RUMMAGE (*Admitted Pro Hac Vice*)
  steverummage@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington  98104
Telephone:  (206) 622-3150
Fax:  (206) 757-7700

Attorneys for Defendant
A PLACE FOR ROVER, INC. dba
ROVER.COM

## IN THE UNITED STATES DISTRICT COURT

## THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MELANIE SPORTSMAN,<br><br>                              Plaintiff,<br><br>        vs.<br><br>A PLACE FOR ROVER, INC. d/b/a ROVER;<br>JANICE MALONEY; and DOES 1-20,000,000,<br><br>                              Defendants. | Civil Case No. 3:19-cv-03053-WHO<br><br>**DEFENDANT A PLACE FOR ROVER, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT**<br><br>Date:    March 31, 2021<br>Time:   2:00 p.m.<br>Place:  Courtroom 2 – 17th Floor<br><br>Before the Honorable William H.  Orrick<br><br>Complaint Filed: November 20, 2018 |

## **TABLE OF CONTENTS**

I.     BRIEF SUMMARY ........................................................................................................1

II.    THE UNDISPUTED MATERIAL FACTS DEMONSTRATE THAT PET CARE
       PROVIDERS ARE NOT ROVER'S "EMPLOYEES" .......................................................2

       A.    The Only Purpose Of Rover's Online Marketplace Is To Allow Pet Owners and
             Pet Care Providers To Connect With Each Other ..............................................2

       B.    How Rover's Marketplace Works .....................................................................3

             1.    *Pet Care Providers use Rover's platform to market their services*..............3

             2.    *Pet Owners use Rover's marketplace to book services with Pet Care
                   Providers.* .....................................................................................4

             3.    *Rover's platform facilitates payment from Pet Owners to Pet Care
                   Providers.* .....................................................................................4

       C.    Pet Care Providers Control Their Rates And The What, If, When, Where, How,
             And For Whom They Provide Services .............................................................5

             1.    *Pet Care Providers determine their own services.*.............................5

             2.    *Pet Care Providers determine if, when, and how to provide services.* .........6

             3.    *Pet Care Providers determine where to provide services.*...........................6

             4.    *Pet Care Providers determine for whom they provide services.*..................6

             5.    *Pet Care Providers determine how to provide services.* ..............................7

             6.    *Pet Care Providers set their own rates and cancellation policies.*...............7

             7.    *Pet Care Providers can (and do) offer their services outside of Rover.* .......7

       D.    Rover's Administrative Services ........................................................................8

III.   PLAINTIFF SPORTSMAN'S DECLARATION SHOULD BE STRICKEN ....................9

IV.    PET CARE PROVIDERS ARE NOT ROVER EMPLOYEES.......................................10

       A.    Plaintiff's Motion Relies On Disputed "Facts" And Unsubstantiated Inferences...10

       B.    The Referral Agency Exemption—*Conveniently Ignored In Plaintiff's Motion*—
             Applies To Rover ............................................................................................12

             1.    *The referral agency exemption applies to Rover*........................................12

             2.    *Pet Care Providers are free from Rover's "control and direction" in
                   performing work for Pet Owners (criterion 1).*............................................13

             3.    *Pet Care Providers certify they obtained all necessary licenses and permits
                   to offer pet services (criteria 2, 3, 4).* .......................................................16

i

DAVIS WRIGHT TREMAINE LLP

4.   *Pet Care Providers provide services "under the service provider's name," not under Rover's name (criterion 5).*...............................................17

5.   *Pet Care Providers provide their "own tools and supplies to perform services" (criterion 6).*...............................................17

6.   *Pet Care Providers are "customarily engaged, or [were] previously engaged," in a business of the same nature or related to, the work performed for the client (criterion 7).*...............................................17

7.   *Rover does not "restrict the service provider from maintaining a clientele"; Pet Care Providers are free to market elsewhere (criterion 8).*...............................................18

8.   *Pet Care Providers "set their own hours and terms of work" and "negotiate [their] hours and terms of work directly" with Pet Owners (criterion 9).*...............................................19

9.   *"Without deduction" by Rover, Pet Care Providers "set their own rates" and can "negotiate their rates with" Pet Owners (criterion 10).*...............................................19

10.  *Pet Care Providers are "free to accept or reject clients and contracts, without being penalized" by Rover (criterion 11).*...............................................20

C.   Under *Borello*, Pet Care Providers, Like Plaintiff, Are Independent Contractors, Not Employees................................................21

D.   Rover Satisfies The ABC Test................................................22

V.   CONCLUSION...............................................25

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-cv-03053-WHO
4846-7462-8063v.1 0107222-000013

## TABLE OF AUTHORITIES

**Cases**                                                                                     **Page**

*Ali v. U.S.A. Cab Ltd.*,
    176 Cal. App. 4th 1333 (2009) ............................................................................................ 13

*Ayala v. Antelope Valley Newspapers, Inc.*,
    59 Cal. 4th 522 (2014) ........................................................................................................ 21

*Chin v. Namvar*,
    166 Cal. App. 4th 994 (2008) .............................................................................................. 16

*Dynamex Operations West, Inc. v. Superior Court*,
    4 Cal. 5th 903 (2018) ............................................................................................. 23, 24, 25

*Garcia v. Border Transportation Group, LLC*,
    28 Cal. App. 5th 558 (2018) ................................................................................................ 22

*Goehring v. Wright*,
    858 F. Supp. 989 (N.D. Cal. 1994) ..................................................................................... 10

*Gonzales v. San Gabriel Transit, Inc.*,
    40 Cal. App. 5th 1131 (2019) .............................................................................................. 25

*Harris v. Vector Mktg. Corp.*,
    656 F. Supp. 2d 1128 (N.D. Cal. 2009) ............................................................................. 18

*Hennighan v. Insphere Ins. Sols., Inc.*,
    38 F. Supp. 3d 1083 (N.D. Cal. 2014), aff'd, 650 F. App'x 500 (9th Cir. 2016) ....... 10, 14, 18

*Patel v. Nike Retail Servs., Inc.*,
    58 F. Supp. 3d 1032 (N.D. Cal. 2014) ............................................................................... 22

*People v. Uber Tech., Inc.*,
    56 Cal. App. 5th 266 (2020), *as modified on denial of reh'g* (Nov. 20, 2020),
    *rev. denied* (Feb. 10, 2021) ..................................................................................... 23, 24, 25

*Providence Wash. Ins. v. Valley Forge Ins. Co.*,
    42 Cal. App. 4th 1194 (1996) .............................................................................................. 13

*S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*,
    48 Cal. 3d 341 (1989) ................................................................................................ *passim*

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-cv-03053-WHO
4846-7462-8063v.1 0107222-000013

**Statutes**

Cal. Lab. Code
 § 2777 ............................................................................................. 2, 12, 13, 19
 § 2775(b)(1)(B) ................................................................................................ 22
 § 2775(b)(1)(C) ................................................................................................ 22
 § 2775(b)(3) ...................................................................................................... 12
 §§ 2777(a) .................................................................................................... 2, 12
 § 2777(a)(1) ...................................................................................................... 13
 § 2777(a)(2)-(4) ................................................................................................ 16
 § 2777(a)(10) .................................................................................................... 19
 § 2777(b)(1) ...................................................................................................... 13
 § 2777(b)(2)(A) ................................................................................................ 12
 § 2777(b)(2)(B) ................................................................................................ 13
 § 2777(b)(4) ...................................................................................................... 13

Fair Labor Standards Act ........................................................................................ 12

**<u>Rules</u>**

Federal Rule of Civil Procedure 56(c) ...................................................................... 10

Federal Rule of Civil Procedure 56(c)(4) .............................................................. 9, 10

DAVIS WRIGHT TREMAINE LLP

## I.   BRIEF SUMMARY

Rover offers a digital marketplace to facilitate the ability of Pet Care Providers to advertise their pet care services, enable Pet Owners to search for those services, and allow both parties to directly negotiate (and agree to) the terms of a "booking" for pet services.  Contrary to Plaintiff's many factual mischaracterizations, Rover does *not* provide pet care services.  Pet Care Providers are not Rover's "employees," and they neither provide services nor perform work *for Rover*.  Rather, Pet Care Providers are *users* of Rover's online platform who market their pet care services to Pet Owners.  Rover does not assign or send "jobs" to Pet Care Providers, and Rover has *no* control over any details of a pet care booking (including the rates Pet Care Providers decide to charge) or the services the Pet Care Providers perform for Pet Owners.

Plaintiff's cross-motion for summary judgment ("Motion") ignores those factual realities and instead devotes nearly 18 pages of her brief to a hodgepodge of false assertions that are immaterial to the Court's analysis and unsupported by admissible evidence.  Tellingly, Plaintiff avoids citing her own deposition testimony and that of former Plaintiff Erika Miller ("Miller"), whose admissions establish that Pet Care Providers unilaterally control every material aspect of their work, including what services they choose to offer, how much they charge for each service (their rates), where they want to provide services (geographic area and whether at their home, the Pet Owner's home, or someplace else), to whom they provide those services (they can decline requests for any reason), how they provide those services (what supplies or equipment to use), when they provide those services (availability), and any "extras" they choose to offer.

Plaintiff's Motion takes issue with none of these dispositive facts.  Instead, it focuses on Rover's advertising, which is designed to attract users to its site, including both Pet Owners and Pet Service Providers, and on operational features of the site designed to make users' experience positive and friction-free.  For these reasons alone, this Court should deny Plaintiff's Motion because it lacks undisputed material facts to support a legal ruling in her favor.  Concomitantly, this Court should grant Rover's Motion for Summary Judgment because the undisputed facts establish as a matter of law that Pet Care Providers are not Rover's employees.

But even if the Court were to accept Plaintiff's version of these "facts" as true and

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-cv-03053-WHO
4846-7462-8063v.1 0107222-000013

undisputed (and it should not), Plaintiff ignores a key step in the classification analysis:  Rover is a "referral agency" exempt from the ABC test under California Labor Code section 2777, which expressly includes both "dog walking" and "animal services."  This means, at most, the *Borello* test, not the ABC test, governs the analysis here.  *See* Cal. Lab. Code §§ 2777(a) (referring to multifactor test in *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341 (1989)).  Pet Care Providers are not Rover's employees under *Borello* because (i) Rover does not retain or exert any control over how Pet Care Providers offer or provide their pet services; and (ii) Rover satisfies the secondary *Borello* factors.

The Court's inquiry should end there.  But Plaintiff treats the finish line as the starting point by skipping both the exemption and the *Borello* test altogether.  Even if the Court were to follow Plaintiff's argument and apply the ABC test (it should not), Rover satisfies that test too.

## II.   THE UNDISPUTED MATERIAL FACTS DEMONSTRATE THAT PET CARE PROVIDERS ARE NOT ROVER'S "EMPLOYEES"[1]

The "facts" alleged in support of Plaintiff's Motion are not only disputed, but are replete with unsubstantiated opinion and disputed characterizations that lack any evidentiary basis.

### A.   The Only Purpose Of Rover's Online Marketplace Is To Allow Pet Owners and Pet Care Providers To Connect With Each Other

Rover's online marketplace provides a digital platform that allows Pet Care Providers to advertise their services, enables Pet Owners to search for those services, and allows both parties to negotiate and agree to a booking for pet care.  White Dec. ¶¶ 4, 12, 15-16.  Rover's Terms of Service ("TOS") governs Pet Owners' and Pet Care Providers' *use* of Rover's platform.  *Id.* ¶ 5; LeCrone Dec. ¶ 2, Ex. A at 86:19-88:21; *id.* ¶ 4, Ex. C at 43:12-50:8, 59:7-65:18, 69:1-79:9.[2]

The TOS sets out the terms under which Rover agrees to provide software and certain incidental administrative services to its customers—*both* Pet Care Providers *and* Pet Owners—in

---

[1] Rover's Motion for Summary Judgment on the same legal issue is currently pending.  Because Plaintiff omitted material, undisputed facts and relevant legal arguments, Rover repeats certain of those material facts here and then focuses on Plaintiff's mischaracterization of the Rover marketplace.  *See* Dkt. No. 65 ("Rover MSJ").

[2] Sportsman joined Rover's platform as a Pet Care Provider in May 2017, by creating an account and a profile.  LeCrone Dec. ¶ 3, Ex. B at 29:12-15; *id.* ¶ 4, Ex. C at 20:5-11; *see also* White Dec. ¶ 6.  Former Plaintiff Erika Miller likewise created an account and profile in 2017 and agreed to the TOS.  LeCrone Dec. ¶ 2, Ex. A at 21:12-24:19, 86:19-88:21.

exchange for a fee.[3]  Under the TOS, Rover's services are limited to providing a desktop website and mobile applications, as well as other related digital tools and support that enable Pet Care Providers and Pet Owners to find, communicate, and transact business with each other in a secure online environment.  *See* White Dec. ¶ 6, Ex. AA [¶ 2.1.]  Rover does not provide pet services or employ, recommend, or endorse Pet Owners or Pet Care Providers.  *Id.* at [¶ 2.2].

**B.      How Rover's Marketplace Works**

   **1.      *Pet Care Providers use Rover's platform to market their services***

Pet Care Providers use Rover's platform to create and post personal profiles to attract inquiries from Pet Owners that may lead to an engagement for their services.  LeCrone Dec. ¶ 2, Ex. A at 29:6-33:6; *id.* ¶ 3, Ex. B at 26:12-22; ¶ 4, Ex. C at 43:12-45:20.  They alone determine the information they want to include on their profile about their experience, pet-sitting philosophy, availability, services, and rates charged for those services.  *Id.* ¶ 2, Ex. A at 29:6-33:6; *id.* ¶ 3, Ex. B at 29:20-41:7, 49:20-50:9, 56:18-71:5, 75:16-79:5, 84:7-87:13; *id.* ¶ 14, Ex. O at ROVER_000005-000006; *id.* ¶ 18, Ex. S; *id.* ¶ 16. Ex. Q   Contrary to Plaintiff's mischaracterizations of Rover's 30(b)(6) testimony (Pl. Mtn. 14:22-23), Pet Care Providers can (and do) include their business name on their profile, although most do business as sole proprietors under their own names.  *See* White Dec. ¶ 26, Ex. HH (in the "About" section of their profile, they identify themselves as "Maisy's Mutts.").

Rover does not "create and maintain" or "strictly control" what a Pet Care Provider puts in their profile, despite Plaintiff's claims to the contrary (Pl. Mot. 14:15-18).  *See* LeCrone Dec. ¶ 2, Ex. A at 30:4-14; *id.* ¶ 3, Ex. B at 57:17-60:5, 63:1-65:6.  While Rover's platform offers a template that integrates with Rover's software to facilitate online searching and the processing of agreed-upon bookings, Rover does not dictate or control the content that Pet Care Providers choose to put in their profiles.  Pet Care Providers need only submit a photo of their choosing, create a description of their pet care experience, and avoid offensive and illegal material and statements.  *Id.*; *see id* ¶ 4, Ex. C at 43:12-50:8; *See* White Dec. ¶ 6, Ex. AA [¶ 4.1.]  Although,

---

[3] The TOS attached as Exhibit AA, and referenced throughout this Motion, is the version effective January 31, 2017, which applied to Plaintiff's and Miller's use of the Rover platform. White Dec. ¶ 6, Ex. AA.  Exhibit Z is the most recent version of the TOS.  White Dec. ¶ 5, Ex Y.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-cv-03053-WHO
4846-7462-8063v.1 0107222-000013

for privacy reasons, Rover does not show personal information (such as phone number and email) of Pet Care Providers and Pet Owners on their profiles, Pet Care Providers and Pet Owners can exchange personal information after they make initial contact through the platform. White Dec. ¶ 10.

Pet Care Providers do not fill out job "applications," as Plaintiff claims. Pl. Mot. 10:22-23. Instead, Pet Care Providers simply complete and post an online profile and agree to Rover's TOS in order to use the platform. LeCrone Dec. ¶ 4, Ex. C at 69:1-79:13.

### 2. *Pet Owners use Rover's marketplace to book services with Pet Care Providers*.

Pet Owners have access to the online database of self-employed individuals, like Plaintiff, who market pet care services, enabling them to find Pet Care Providers in their area and book pet care services directly with them. White Dec. ¶ 12. A Pet Owner uses Rover's search tools to browse the profiles of Pet Care Providers based on the Pet Owner's preferences and criteria, such as zip code, availability, services provided, and pricing. *Id*. If a Pet Owner is interested in using a particular Pet Care Provider, the Pet Owner communicates directly with the Pet Care Provider, either through the Rover app or, if they choose, by phone or text. LeCrone Dec. ¶ 2, Ex. A at 41:7-42:10, 84:19-86:18; *id.* ¶ 3, Ex. B at 87:14-88:13; *id.* ¶ 4, Ex. C at 149:5-23; White Dec. ¶ 10. The Pet Care Provider can address any questions regarding the booking, negotiate rates or other material terms of service, or request an in-person meeting (a "meet-and-greet") with the Pet Owner before deciding whether to move forward with the booking. *Id.* ¶ 2, Ex. A at 48:11-49:19; ¶ 3, Ex. B at 50:23-52:23, 89:21-90:20, 91:22-95:5, 99:15-101:20; *See* White Dec. ¶ 17, Ex. CC at ROVER_000122; *id.* ¶ 19, Ex. EE.[4]

### 3. *Rover's platform facilitates payment from Pet Owners to Pet Care Providers*.

Once a Pet Owner has selected a Pet Care Provider (and vice versa), either the Pet Owner or the Pet Care Provider initiates a booking request. White Dec. ¶ 21; *see id.* ¶ 6, Ex. AA [¶ 2.5]. As with Pet Owners, Pet Care Providers decide, on a case-by-case basis, whether to agree to a particular booking request. LeCrone Dec. ¶ 3, Ex. B at 46:22-48:22, 89:21-90:20. The

---

[4] This is not an instantaneous process: in California in 2017 and 2018, an average of about 45 hours elapsed between the first requested contact on Rover and a booking between a specific Pet Care Provider and Pet Owner. White Dec. ¶ 16.

transaction reflects an exclusive agreement between the Pet Owner and the Pet Care Provider. *See* White Dec. ¶ 6, Ex. AA [¶¶ 2.4-2.5]; LeCrone Dec. ¶ 4, Ex. C at 36:10-38:2.  Rover does not select or pair specific Pet Care Providers with specific Pet Owners, assign or send "jobs" to Pet Care Providers, or involve itself in (or influence) the Pet Owner's or Pet Care Provider's decision-making.  White Dec. ¶ 15; LeCrone Dec. ¶ 4, Ex. C at 80:7-25.

The Pet Owner does not pay Rover, as Plaintiff claims.  Pl. Mot. 9:1.  Instead, the Pet Owner's credit card is charged at the time the parties confirm the booking and Rover holds funds charged to the Pet Owner's credit card on file until 24 to 48 hours after the end date of the booking, when it releases the agreed-upon portion of the Pet Owner's payment to the Pet Care Provider.  White Dec. ¶ 21; LeCrone Dec. ¶ 3, Ex. B at 55:1-18.

## C.   Pet Care Providers Control Their Rates And The What, If, When, Where, How, And For Whom They Provide Services

Completely omitted from Plaintiff's argument is any discussion about the flexibility and autonomy Pet Care Providers enjoy in providing pet care services.  As Plaintiff and Miller's own testimony makes clear, Pet Care Providers—not Rover—exercise complete control over their work for Pet Owners.

### 1.   *Pet Care Providers determine their own services.*

Pet Care Providers determine what services to offer, including pet walking, boarding, house sitting, drop-in, or day care services.  LeCrone Dec. ¶ 2, Ex. A at 29:6-31:2; *id.* ¶ 3, Ex. B at 29:20-31:25, 52:24-53:11; *id.* ¶ 4, Ex. C at 17:11-20:4, 29:14-31:6; *see id.* ¶ 14, Ex. O at ROVER_000001-000002; *see id.* ¶ 18, Ex. S at p. 1.  Pet Care Providers choose what types of pets to provide these services for (dogs, cats, or other animals), whether to limit their services to certain pet profiles like breed, size, age, or level of training, and whether to limit the number of pets per booking.  *Id.* ¶ 2, Ex. A at 32:14-33:10; *id.* ¶ 3, Ex. B at 33:17-34:25, 47:11-48:17, 63:4-64:2, 66:24-69:13; *id.* ¶ 14, Ex. O; *id.* ¶ 18, Ex. S.

Plaintiff asserts, without any factual support, that Pet Care Providers "do not have the ability to offer other services."  Pl. Mot. 10:7-8.  But the undisputed facts show Pet Care Providers offer additional, add-on service to Pet Owners, whether using Rover or not, such as

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-cv-03053-WHO
4846-7462-8063v.1 0107222-000013

caring for additional dogs, puppy care, pick-up and drop-off, or bathing.  LeCrone Dec. ¶ 2, Ex. A at 29:6-36:9; *id.* ¶ 3, Ex. B at 97:2-101:20; *id.* ¶ 14, Ex. O; *see id.* ¶ 18, Ex. S at p. 7; *see* White Dec. ¶ 18, Ex. DD at ROVER_000429; *see id.* ¶ 19, Ex. EE at ROVER_000140.  Indeed, contrary to Plaintiff's self-serving declaration, her testimony in deposition (and her Rover profile) demonstrates she offered such additional services.  *See* LeCrone Dec. ¶ 3, Ex. B at 97:2-101:20; *Id.* ¶ 14, Ex. O at ROVER_000002 (listing additional services offered); *see* White Dec. ¶ 18, Ex. DD at ROVER_000429 ("Nova had a bath soon after you left"); *see also* White Dec. ¶ 26, Ex. HH at p. 5-7 (other Pet Care Provider listing "training" as an additional services offered).

### 2.   *Pet Care Providers determine if, when, and how to provide services.*

Pet Care Providers set their hours and days of availability, and can work as much (or as little) as they want, whenever they want.  They set and can change their availability (and unavailability) to provide services to Pet Owners at any time and can modify availability in response to a Pet Owner's request.  LeCrone Dec. ¶ 2, Ex. A at 33:11-34:9; *id.* ¶ 3, Ex. B at 40:7-41:10, 65:13-66:18, 93:7-95:9; *id.* ¶ 14, Ex. O; *id.* ¶ 18, Ex. S.  Rover does not require them to be available on particular hours or days, or to work any minimum amount of time.  *Id.*  Pet Care Providers who do not want to appear in search results generated by Pet Owners can choose to remain "unavailable" on their calendar.  *Id.* ¶ 2, Ex. A at 24:8-19; *id.* ¶ 3, Ex. B at 40:7-41:10.

### 3.   *Pet Care Providers determine where to provide services.*

Pet Care Providers determine the geographic area where they are willing to provide services.  LeCrone Dec. ¶ 2, Ex. A at 34:13-22, 47:12-17; *id.* ¶ 3, Ex. B at 35:9-36:21, 37:17-39:4.  Pet Owners and Pet Care Providers also determine where the pet services will be performed—usually in or near either the Pet Owner's or Pet Care Provider's home.  *Id.* ¶ 2, Ex. A at 95:11-14; *Id.* ¶ 3, Ex. B at 48:18-22, 64:3-20.

### 4.   *Pet Care Providers determine for whom they provide services.*

Pet Care Providers control their own clientele and decide whether to accept, decline, or ignore a booking request, for any reason.  Plaintiff and Miller both declined numerous booking requests because of unavailability, incompatibility issues with pets or pet owners, or requests beyond their limitations.  LeCrone Dec. ¶ 2, Ex. A at 44:10-45:11, 69:23-79:4; *id.* ¶ 3, Ex. B at

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-cv-03053-WHO
4846-7462-8063v.1 0107222-000013

38:23-39:4, 46:12-48:17; *see id.* ¶ 19, Ex. T at pp. 2-10.  Pet Care Providers can screen (i.e., "meet-and-greet") as many pets and Pet Owners as they want before accepting a booking.  *Id.* ¶ 3, Ex. B at 50:23-52:23.  After building a client list through Rover, a Pet Care Provider can set their account to "Repeat only," limiting requests to existing clients.  White Dec. ¶ 11.

### 5. *Pet Care Providers determine how to provide services.*

In negotiating bookings with Pet Owners, Pet Care Providers control how they will provide each type of service they offer.  They decide whether and what pet toys to provide; whether and when to take a pet on a walk or a hike; how and where to walk pets; what, when, and how to feed them; and whether and when to provide updates and photos to Pet Owners.  LeCrone Dec. ¶ 2, Ex. A at 49:20-50:23; *id.* ¶ 3, Ex. B at 53:12-54:25; 78:21-79:5; *id.* ¶ 4, Ex. C at 126:23-129:13.  They decide the equipment and supplies they need to perform the pet services, which they buy themselves if the Pet Owners do not provide them.  *Id.* ¶ 3, Ex. B at 53:12-54:25.

### 6. *Pet Care Providers set their own rates and cancellation policies.*

Pet Care Providers decide how much to charge for each service they offer.  LeCrone Dec. ¶ 2, Ex. A at 30:10-31:15; *id.* ¶ 3, Ex. B at 39:14-40:5; 57:17-63:3; *see id.* ¶ 14, Ex. O at ROVER_000001-000002; *see id.* ¶ 18, Ex. S at p. 1.  They can adjust their listing prices at any time and for any reason, with or without negotiations with a Pet Owner.  *Id.* ¶ 2, Ex. A at 35:25-36:5, 45:22-46:3; *id.* ¶ 3, Ex. B at 39:14-40:5, 60:14-61:16, 101:21-104:4; *see* White Dec. ¶ 20, Ex. FF ("I can modify the price and charge my regular rate.").  Pet Care Providers also choose a cancellation policy for Pet Owners who book their services and can set different cancellation policies depending on the different types of services they offer.  LeCrone Dec. ¶ 3, Ex. B at 69:25-71:5; *see id.* ¶ 14, Ex. O at ROVER_000003; *see id.* ¶ 18, Ex. S at p. 2.

### 7. *Pet Care Providers can (and do) offer their services outside of Rover.*

Rover does not prevent Pet Care Providers from marketing their services through other outlets, such as competing marketplaces like "Care.com" or assignment-based services like "Wag!."  White Dec. ¶ 24.  Nor does Rover prevent Pet Care Providers from obtaining clients through their own independent websites, word of mouth, or other advertising platforms, like Craigslist and Angie's List.  *Id*; *see* LeCrone Dec. ¶¶ 7-8, Exs. E-I; *See* Request for Judicial

7

Notice ("RJN") ¶¶ 1-2.  Indeed, Miller listed her services on Sittercity.com and used word of mouth to offer her pet services to people outside of Rover, including while listed on the Rover platform.  LeCrone Dec. ¶ 2, Ex. A at 37:17-38:12, 51:12-16, 64:24-65:20, 90:16-95:14; *id.* ¶ 22, Ex. W.  Other Pet Care Providers, such as "Maisy's Mutts," have multiple listings through other outlets.  *See* LeCrone Dec. ¶¶ 7-8, Exs. E-I; *See* RJN ¶¶ 1-2; White Dec. ¶ 26, Ex. HH.

**D.      Rover's Administrative Services**

As part of its platform, Rover offers incidental administrative services that facilitate safe and reliable transactions for both Pet Care Providers and Pet Owners—services that also enhance a Pet Care Provider's ability to generate and grow their business.  Among other services, Rover's platform provides:

- Secure cashless payment process. *See, supra*, II.B.3.

- Criminal background checks of prospective Pet Care Providers, which promote a safe marketplace. LeCrone Dec. ¶ 4, Ex. C at 65:9-68:24; White Dec ¶ 8.

- The Rover Guarantee, a service to *both* Pet Care Providers and Pet Owners (contrary to Plaintiff's mischaracterization, *see* Pl. Mtn. 9:14) to protect "users" of the platform (Pet Care Providers and Pet Owners) when certain injuries or damages affect *either* party.  LeCrone Dec. ¶ 4, Ex. C at 124:8-126:22.

- Support services that ensure *both* Pet Care Providers and Pet Owners are satisfied with Rover's online platform.  These include (1) a customer support department (for both Pet Care Providers and Pet Owners) and (2) Reservation Protection, under which, in most circumstances, Rover will issue the Pet Owner a refund when a Pet Care Provider cancels their booking.  LeCrone Dec. ¶ 4, Ex. C at 134:17-137:11.[5]

---

[5] Contrary to Plaintiff's mischaracterization of Rover's platform (*see* Pl. Mtn. 9:7), Rover helps Pet Owners find a replacement sitter or walker only when the Pet Care Provider "*has to cancel at the last minute*."  *See* Tidrick Dec. Ex. 29.  If there is a dispute between a Pet Care Provider and Pet Owner—including over pet services—Rover encourages and prefers that the parties resolve their issue between themselves.  But if an issue remains unresolved, Rover may, in its "reasonable discretion," issue a "gesture" (or credit) to the dissatisfied party.  LeCrone Dec. ¶ 4, Ex. C at 137:21-139:25.  Plaintiff, again, misinterprets Rover's documents by falsely suggesting this means Rover "offers refunds to Pet Owners for 'substandard services.'"  Pl. Mtn. 9:22.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-cv-03053-WHO
4846-7462-8063v.1 0107222-000013

Plaintiff's arguments notwithstanding, she does not, and indeed cannot, proffer any facts to show these administrative services control in any way Pet Care Providers' ability to set their fees charged for pet care services, schedule, availability, type of work, place of work, or customers, among the many decisions they make.  Nor do these administrative services suddenly transform Rover into a business that "offers and sells" pet services, as Plaintiff suggests.  Pl. Mtn. 8:23-10:4.  To the contrary, these services (and others) help Pet Care Providers develop *their* business and help attract Pet Owners to the Rover platform, which *also* helps Pet Care Providers develop their business.

## III.     PLAINTIFF SPORTSMAN'S DECLARATION SHOULD BE STRICKEN

Federal Rule of Civil Procedure 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  The declaration of Melanie Sportsman fails this evidentiary standard.

Plaintiff's declaration is replete with self-serving assertions, legal arguments, and conclusory statements with no factual support to demonstrate personal knowledge or testimonial competence.  *See, e.g.,* Dkt. No. 66, Sportsman Dec., ¶ 2 ("I was *employed* by A Place for Rover, Inc. … Rover *improperly classified* me as an independent contractor.") (emphasis added).  For example, Plaintiff asserts she provided only four types of services as a Pet Care Provider, Sportsman Dec. ¶ 3; in her deposition, however, she testified under oath that she *also* provided other services, such as dog grooming, LeCrone Dec., Ex. B at 98:15-99:6.  Further, Plaintiff asserts the pet care services she performed were "pursuant to Defendant's directions and instructions," Sportsman Dec. ¶ 4; at her deposition, however, she admitted Rover provided her only with suggestions and tips.  LeCrone Dec., Ex. B at 45:18-46:11.

Finally, Plaintiff purports to authenticate documents of which she has no personal knowledge and draws improper legal conclusions concerning those documents without any foundation.  *See, e.g.*, Sportsman Dec. ¶ 9 (attempting to authenticate Exhibit B, a web page on Rover's website, while improperly opining the document is an "example of Defendant deducting a percentage of the Pet Care Provider's earnings").  For these reasons, the Court should strike

9

paragraphs 2-4 and 6-11 of Plaintiff's declaration.  *See* Fed. R. Civ. P. 56(c)(4).

## IV.   PET CARE PROVIDERS ARE NOT ROVER EMPLOYEES

Summary judgment is proper only when the evidence shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.  *Hennighan v. Insphere Ins. Sols., Inc.*, 38 F. Supp. 3d 1083, 1094 (N.D. Cal. 2014), aff'd, 650 F. App'x 500 (9th Cir. 2016).  Here, Plaintiff cannot meet her burden of presenting undisputed material facts showing an employment relationship between her and Rover, and the Court should deny her motion.

**A.    Plaintiff's Motion Relies On Disputed "Facts" And Unsubstantiated Inferences**

Plaintiff's Motion is riddled with disputed and unsubstantiated assertions.  As an example, Plaintiff opens her Motion by claiming Rover characterizes Pet Care Providers as "independent contractors."  Pl. Mot. 1:21-22. This "fact" is nothing more than argument unsupported by the evidence.  *Goehring v. Wright*, 858 F. Supp. 989, 993 n. 4 (N.D. Cal. 1994) ("Unsupported factual assertions made in the parties' briefs" cannot be considered on a summary judgment motion; "[i]t is axiomatic that the arguments of counsel are not evidence.").  Pet Care Providers are *users* of its online platform, not independent contractors, as the TOS governing Pet Care Providers make clear.  *See* White Dec. ¶¶ 5-7, Exs. Z, AA.

Nor does Rover "offer and sell" or provide pet care services, and Pet Care Providers do not perform services for, or on behalf of, Rover.  *See* Pl. Mot. 2:22, 3:3, 8:23-27.  The TOS, to which Plaintiff agreed, makes clear that Rover "does not provide [pet services]," "is a neutral venue for [Pet Care Providers] and Pet Owners," and "is not a service provider."  White Dec. ¶ 6, Ex. AA [¶ 2.2.]  Plaintiff acknowledges "the payments made by Pet Owners are ***for the services provided by Pet Care Providers***," not by Rover.  Pl. Mot. 4:12-13 (emphasis added).  The fee paid to Rover is for the Pet Owner's and Pet Care Provider's use of the platform to find one another and make a booking, not for pet services.  *See* White Dec. ¶ 6, Ex. AA [¶ 10.3] ("We charge service fees for some aspects of the Rover.com Service.").  Indeed, as made clear by Plaintiff's own exhibit, these fees "help [Rover] provide ongoing support, educational

opportunities **and help each individual grow their business**…they help cover benefits for sitters…and ongoing promotion of sitters on Rover."  Sportsman Dec, Ex. A (emphasis added).

The TOS does not, as Plaintiff asserts, dictate the "terms and conditions of work."  Pl. Mtn. 10:19-21.  The TOS is a typical online user agreement that governs the Pet Care Provider's and Pet Owner's use of Rover's platform, not the Pet Care Provider's work or services provided. The transactions for pet services are exclusively "between Pet Owners and [Pet Care] Providers" themselves, who negotiate the terms of their services.  *See* White Dec. ¶ 6, Ex. AA [¶¶ 2.4-2.5]; LeCrone Dec. ¶ 4, Ex. C at 36:10-38:2.

Plaintiff tries to twist isolated phrases and photos from Rover's advertisements to claim Rover "brands itself as a Pet Service Provider" to the public.  *See* Pl. Mtn. 4-5.  A review of the content makes clear that Rover *actually* brands itself as a marketplace where Pet Owners can *find* Pet Care Providers to provide those services.[6]  Plaintiff's "suggestion" that photos of dog walkers wearing Rover T-shirts in advertisements means that "Pet Care Providers are Rover.com employees," is pure speculation unsupported by any admissible evidence.  *See* Pl. Mtn. 5:20-23. Pet Care Providers are not required to wear any particular uniform or clothing, but (like Pet Owners or any member of the shopping public) can voluntarily buy shirts with Rover's logo on them to, among other things, show their enthusiasm for the Rover community or advertise where their business can be found.  White Dec. ¶ 27.

Plaintiff cherry-picks phrases in Rover marketing materials in hopes of showing that Rover recruits "prospective workers."  In fact, Rover's advertisements on their face demonstrate that Rover reaches out to individuals who are starting or expanding a pet care business, inviting them to use the Rover platform.  For example: "In this work, **you're the boss and you run the business.  Plus, you don't need a business degree to start your own pet sitting business.**" Tidrick Dec. Ex. 24 (emphasis added); *see also* Tidrick Dec. Ex. 19 ("[t]his is a great opportunity

---

[6] *See e.g.,* Tidrick Dec. Ex. 21 (Rover's "goal with this campaign is to show pet parents that *Rover can help them find* true dog people who will care for their dog") (emphasis added); *Id.* Ex. 47 ("Find the perfect walker for your dog."); *Id.* Ex. 42 ("our app makes it simple to find the perfect human fit for your dog"); *Id.* Ex. 44 ("download the app and book today); *Id.* Ex. 44 ("Find the perfect walker for your dog.").

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-cv-03053-WHO
4846-7462-8063v.1 0107222-000013

for current freelance dog care providers, and others in the industry such as vet techs and vet assistants"; "set your own schedule AND price!").

**B.      The Referral Agency Exemption—*Conveniently Ignored In Plaintiff's Motion*— Applies To Rover**

Plaintiff claims this Court should examine the classification of Pet Care Providers according to the ABC test.  She ignores that the Legislature exempted Rover from the ABC test.

### 1.      *The referral agency exemption applies to Rover.*

California Labor Code § 2777 exempts "referral agencies" from the ABC test to protect businesses, like Rover, that serve as intermediaries and help connect independent service providers (including those providing "animal services, [and] dog walking") to their clients.  *Id.* Under the referral agency exemption, the *Borello* test applies "to the relationship between a referral agency and a service provider" if an individual acting as a sole proprietor or other business entity "provides services to clients through a referral agency" and satisfies 11 conditions.  Cal. Lab. Code § 2777(a); *see also* Cal. Lab. Code § 2775(b)(3).[7]

As a threshold matter, Rover is a "referral agency" within the meaning of the exemption. Section 2777 defines a "referral agency" as "a business that provides clients with referrals for service providers to provide services under a contract."  Cal. Lab. Code § 2777(b)(2)(A).  No one can reasonably dispute that Rover operates as a referral agency.[8]  It offers a website and app that create a marketplace for Pet Owners to search for Pet Care Providers in their neighborhoods, negotiate with them for prices and services, and ultimately book an engagement.[9]

During legislative hearings on AB5, State Senator Jerry Hill (Chair of the Labor

---

[7] This Court also has discretion to apply the *Borello* test to determine employment status if it finds the ABC test "cannot be applied to a particular context."  Cal. Lab. Code § 2775(b)(3). With this language, the Legislature recognized that the statutory exemptions are non-exclusive.

[8]  Indeed, an Opinion Letter from the U.S. Department of Labor determined that a company that operates a marketplace nearly identical to Rover's is a referral agency, and that service providers are independent contractors under the Fair Labor Standards Act.  LeCrone Dec. ¶ 24, Ex. Y; *see also* RJN ¶ 4.

[9] In 2020, lawmakers amended AB5 to expand the types of industries and workers who may operate independently, as well as to make clean-up changes.  But lawmakers remained committed to protecting the community of pet lovers and pet caregivers: the referral agency exemption as amended continues to recognize that pet caregivers may remain independent when they possess meaningful freedom and control over their own work.

Committee) explicitly identified Rover and TaskRabbit as companies that should be exempt from the ABC test under the referral agency exemption.  *See* LeCrone Dec. ¶ 13, Ex. N [2:16:18-2:17:06]; *see* RJN ¶ 3.  And when AB5 was enacted on September 18, 2019, the Legislature ensured that the exemption included the services offered on the Rover platform—"animal services" and "dog walking."  Cal. Lab. Code § 2777(b)(2)(B).

Pet Owners meet the definition of "clients" under the exemption, because they "utilize a referral agency [i.e., Rover] to contract for services from a service provider" to receive pet services.  Cal. Lab. Code § 2777(b)(1).  And Pet Care Providers, like Plaintiff, fit the exemption's definition of "service providers," because they are "individual[s] acting as a sole proprietor[10] or business entity that agree[] to the referral agency's contract and use[] the referral agency to connect with clients [i.e., Pet Owners]."  Cal. Lab. Code § 2777(b)(4).  Specifically, they agree to Rover's TOS and use Rover's platform to attract inquiries from Pet Owners, leading to pet services agreements.

Rover satisfies each of the eleven criteria required under Section 2777:

## 2. *Pet Care Providers are free from Rover's "control and direction" in performing work for Pet Owners (criterion 1).*

The first factor of the exemption asks whether the referral agency exercises significant "control and direction" over the service provider "in connection with the performance of the work for the client."  Cal. Lab. Code § 2777(a)(1).[11]  This factor derives from *Borello* and longstanding California law, under which an entity is an employer only if it possesses the "right to control the manner and means of accomplishing the result desired."  *Borello*, 48 Cal.3d at 350; *see also Ali v. U.S.A. Cab Ltd.,* 176 Cal. App. 4th 1333, 1347 (2009).

---

[10] Pet Care Providers generally are sole proprietorships.  *See Providence Wash. Ins. v. Valley Forge Ins. Co.*, 42 Cal. App. 4th 1194, 1199 (1996) ("sole proprietorship is not a legal entity itself … [but] a natural person who directly owns the business"); *See* LeCrone Dec. ¶ 5, Ex. D at p. 3 (California "formation documents [do not need to be] filed with the California Secretary of State's office"); *see also* RJN ¶ 1.

[11] The legislative history of the exemption makes clear that the "referral agency should not exert significant control over how a contractor does their contracted services.  For example, a contractor should be able to select who they will provide services for prior to any work being performed.  If work was simply directed to a contractor, then the entity directing the work is an employer, not a referral agency."  *See* LeCrone Dec. ¶ 9, Ex. J at p. 10; *see* RJN ¶ 3.

13

In *Lawson v. Grubhub, Inc.*, another judge in this District, applying *Borello*, held a delivery worker was not Grubhub's employee, because Grubhub did not retain significant control over the worker's work.  302 F. Supp. 3d 1071, 1083-1086 (N.D. Cal. 2018).  Similarly, in *Hennighan v. Insphere Ins. Sols., Inc.*, this Court granted summary judgment, holding a sales agent was not defendant's employee where the agent: (1) established his own schedule and determine how much he wanted to work, (2) set his own appointments or choose not to work at all, (3) chose how to interact with clients (i.e., on phone or in person), (4) chose which products to sell, and was not required to sell a minimum number of products, and (5) was not monitored, supervised, or reviewed by defendant.  38 F. Supp. 3d 1083 (N.D. Cal. 2014), *aff'd*, 650 F. App'x 500 (9th Cir. 2016).

The absence of control or direction by Rover as to the services provided by Pet Care Providers is even more evident than in *Lawson* and *Hennighan*.  As Plaintiff's and Miller's deposition testimony makes clear, Pet Care Providers—not Rover—determine when and how much to work (*see, supra,* Section II.C.2); decide what types of services to provide, when they will provide services, where they will provide services, to whom they will provide services, and how they will provide services (*see, supra,* Sections II.C.1-5); make their own arrangements with Pet Owners about the details of services to be provided with a particular booking, without influence by Rover (*see, supra,* Sections II.B-C); decide whether to accept, decline, or ignore a booking request, for any reason whatsoever, without fear of punishment or termination by Rover (*see, supra,* Section II.C.4); set and adjust their rates for each service offered; and unilaterally determine the geographical limitations of their work (*see, supra,* Sections II.C.3 and 6).

Rover does not select or pair specific Pet Care Providers with specific Pet Owners, assign or send "jobs" to Pet Care Providers, or involve itself in the Pet Owner's or Pet Care Provider's decision-making.  *See, supra,* Section II.B.3.  Nor does Rover dictate how Pet Care Providers do the work or what tools or supplies to use (*See, supra,* Section II.C.5), or supervise or review the performance of Pet Care Providers; rather, Pet Owners are solely responsible for evaluating the suitability of Pet Care Providers.  *See* White Dec. ¶ 6, Ex. AA [¶ 2.6]; LeCrone Dec. ¶ 2, Ex. A at 67:5-14, 69:16-20, 80:14-82:23; *id.*¶ 3, Ex. B at 73:17-74:21, 80:14-82:23; *see id.*¶ 14, Ex. O

14

at ROVER_000004-000005; *id.*¶ 15, Ex. P; *see id.*¶ 18, Ex. S at p. 4.

Plaintiff's bald assertion that Rover "exerts significant control over the Pet Care Providers' work" (Pl. Mtn. 10-17) is untrue. Rover does not limit or choose the services a Pet Care Provider offers (*see, supra*, Section II.C.1.) or set the terms and conditions of services (*see, supra*, Section IV.A). Rover does provide Pet Care Providers with certain metrics, electronic "scores," to give them a sense of how their services compare to other Pet Care Providers who use the marketplace. These are not *reviews* by Rover of Pet Care Providers, but rather electronically calculated metrics that give Pet Care Providers an idea of how many of their clients are returning and how often, and their booking rate and reviews for potential first time clients. White Dec. ¶ 14. It is also logical for a search ranking algorithm to take these metrics, as well as other factors, into account when displaying Pet Care Provider profiles in ordered results. When a Pet Owner browses for Pet Care Providers based on the Pet Owner's preferences and criteria, the search results for Pet Care Providers have to be returned and displayed in some sort of order. *Id.* ¶ 13. Rover has made the reasonable choice— consistent with its role as a referral agency—to return higher in search results those Pet Care Providers who accept more requests (within their stated availability and preferences), get higher ratings, and have more repeat clients. *Id.*

Moreover, Rover does not require Pet Care Providers to operate their business or provide services exclusively through the Rover platform. *See, supra*, Section II.C.7; *see, infra*, Section IV.B.7. Although Rover charges a 20% service fee, it does not *deduct* anything from the amount the Pet Care Provider sets as their personal rate for a booking. *See, infra*, Section IV.B.9.

Finally, Rover does not require detailed reporting by Pet Care Providers. Contrary to Plaintiff's mischaracterization of Rover documents and deposition testimony, Pet Care Providers are *not* required to use Rover Cards, which provide Pet Care Providers an attractive format in which to send their Pet Owner clients information about the service they provided, including how many potty breaks were taken, food and water activity, a photo, and a map of the walk. LeCrone Dec. ¶ 4, Ex. C at 126:23-129:13; White Dec.¶ 28. Rover Cards are *optional* tools available to Pet Care Providers. LeCrone Dec. ¶ 4, Ex. C at 126:23-129:13; *see* White Dec. ¶ 28. The only circumstance where Pet Care Providers are expected to use Rover Cards is for the

15

*recurring bookings* software tool that allows Pet Owners and Pet Care Providers to agree to ongoing repeat services for an indefinite time in the future.  White Dec. ¶ 28.  As part of the recurring billing functionality, Pet Owners agree that Rover can pre-bill their credit cards on a weekly basis, and Pet Care Providers agree to use Rover Cards for each recurring service, which alerts Rover that the Pet Care Provider has completed the service.  *Id.*  In any event, this software feature was not available to Pet Care Providers in Northern California until September 2019— long after Sportsman stopped using Rover to provide pet care services.  *Id*; *see also id.* ¶ 26.

None of these facts change the end result:  Pet Care Providers' have complete control, without interference from Rover, over their rates, schedule, availability, type of work, place of work, and customers, among other decisions they make when providing pet care services.

### 3.     *Pet Care Providers certify they obtained all necessary licenses and permits to offer pet services (criteria 2, 3, 4).*

The second, third, and fourth factors of the exemption require service providers to certify to the referral agency, if necessary "in order to provide the services," they possess a (1) local business license, (2) state contractor's license, and (3) a state professional license or certification.  Cal. Lab. Code § 2777(a)(2)-(4).  California does not require dog walkers, pet boarders, or pet care providers to obtain any type of state business license, state contractor's license, or other state professional license, making the third and fourth factors irrelevant.

When Pet Care Providers agree to the TOS, as Plaintiff and Miller both did (White Dec. ¶ 6; LeCrone Dec. ¶ 2, Ex. A, 86:19-88:21), they expressly certify to Rover they "have obtained all business licenses, permits, and fulfilled any other necessary requirements to legally provide Pet Care Services" and have complied with all laws and regulations applicable to them in their jurisdiction.  *See* White Dec. ¶ 6, Ex. AA [¶ 3].  Section 2777(a)(2) requires nothing more.

The certification in the TOS recognizes, both as a matter of contract and common sense, that the responsibility to ensure any required licensing rests with the individual performing the services, as Plaintiff acknowledged and agreed.  *See Chin v. Namvar*, 166 Cal. App. 4th 994, 1004 (2008) ("one who misrepresents himself as a licensed contractor is estopped from asserting that his unlicensed status makes him an employee under the statute"); White Dec. ¶ 8.

### 4.    *Pet Care Providers provide services "under the service provider's name," not under Rover's name (criterion 5).*

The exemption's legislative history shows that lawmakers found it particularly important that the "contractor…market themselves as an individual….someone using a referral agency is hiring a specific person for a specific task at a negotiated rate.  They would not, for example, request a service from an agency and find out who would provide the service at a later date." LeCrone Dec. ¶ 9, Ex. J at p. 10; *see* RJN ¶ 3.  When Pet Care Providers join Rover, they create a profile—under their name or business name—and include whatever information they believe will attract Pet Owners' attention, such as their pet-sitting philosophy and photographs.  *See, supra,* Sections II.B.1.  Any resulting bookings are arrangements exclusively between the Pet Owner and the specific Pet Care Provider contracted for that service.  *See, supra,* Section II.B-C*; see also* White Dec. ¶ 6, Ex. AA [¶¶ 2.4-2.5].

### 5.    *Pet Care Providers provide their "own tools and supplies to perform services" (criterion 6).*

Rover does not provide tools, equipment, or supplies to perform pet services.  *See, supra,* Section II.C.5.  Instead, Pet Care Providers decide what "tools and supplies" to use for each service and who (i.e., whether the Pet Owner or the Pet Care Provider) will provide them.  *See id*.  For example, Plaintiff testified she purchased dog toys, poop bags, dog treats, and other cleaning equipment, and that her clients provided other items like food, a cage, a leash, and a collar.  LeCrone Dec. ¶ 3, Ex. B at 53:12-54:25.  Rover plays no role in providing Pet Care Providers tools and supplies to use in their work.  *See id.* ¶ 2, Ex. A at 49:20-50:23.

### 6.    *Pet Care Providers are "customarily engaged, or [were] previously engaged," in a business of the same nature or related to, the work performed for the client (criterion 7).*

Pet Care Providers who use Rover regularly engage in their own independent businesses providing pet services.  Indeed, both Plaintiff and Miller performed pet services before creating a Rover account and continued to provide pet services to clients outside of Rover even after signing up to use the Rover platform.  Contrary to the assertions in her self-serving declaration, Plaintiff testified she provided dog care services before joining Rover, and she marketed herself on Rover as having "35 years of experience."  LeCrone Dec. ¶ 3, Ex. B at 32:10-33:11, 75:12-

17

76:11; *see id.* ¶ 14, Ex. O at ROVER_000005.  Similarly, Miller provided pet services for 15 years using word of mouth.  *Id.* ¶ 2, Ex. A at 37:17-38:12, 50:20-23, 51:3-16, 59:10-61:23, 63:19-64:23; *id.* ¶ 17, Ex. R.  Indeed, Miller held herself out as having a pet service business: her LinkedIn page refers to Miller as a "Professional Nanny & Dog Walker" and says she did business for years under the fictitious business name "Fog City Dog Walking and Pet Sitting Services."  *See id.* ¶ 2, Ex. A at 17:19-20:11, 28:24-29:5; *id.* ¶ 21, Ex. V.  Miller also advertised her pet services on Sittercity.com.  *See id.* ¶ 2, Ex. A at 90:16-95:14; *id.* ¶ 22, Ex. W.  Pet Care Providers can and do incorporate their businesses and advertise under their business name.  *See* LeCrone Dec. ¶ 8, Exs. H-I; *See* RJN ¶ 1; *see* White Dec. ¶ 26, Ex. HH at 5 (Pet Care Providers identifying themselves as "Maisy's Mutts" in the "About" section).

Further, Pet Care Providers who use Rover are free to, and do, use other methods and platforms to offer their pet services, even by word of mouth, Craigslist, or their own websites.  *See* LeCrone Dec. ¶ 7, Exs. E-G; *See* RJN ¶¶ 1-2; White Dec. ¶ 24.  *See Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128, 1138 (N.D. Cal. 2009) (that the plaintiff's relationship "was nonexclusive, and she in fact solicited for other insurance companies during her appointment" supported non-employee status); *Hennighan*, 38 F. Supp. 3d at 1102 ("The fact that [plaintiff] sold insurance on behalf of other companies supports his classification as an independent contractor.").  Miller routinely declined booking requests on Rover because she was providing services outside the Rover platform.  LeCrone Dec. ¶ 2, Ex. A at 56:17-57:4, 73:23-75:25, 82:20-84:1; *see id.* ¶ 19, Ex. T at pp. 2-10 ("I'm not on Rover that much anymore because I have my own dog sitting service.").  Miller continued providing pet services for money outside of Rover after she stopped using the Rover platform.  *Id.* ¶ 2, Ex. A at 24:8-28:19.

**7.**    ***Rover does not "restrict the service provider from maintaining a clientele"; Pet Care Providers are free to market elsewhere (criterion 8).***

Rover does not require Pet Care Providers to operate their business or provide services exclusively through the Rover platform.  Pet Care Providers can and do offer services through other outlets, such as through word of mouth, Craigslist, Angie's List, or their own websites.  LeCrone Dec. ¶ 2, Ex. A at 37:17-38:12, 51:12-16, 64:24-65:20 (Miller used word of mouth to

offer pet services to people outside of Rover while on the Rover platform); *see id.* ¶¶ 7-8, Exs. E-I; *See* RJN ¶¶ 1-2; White Dec., ¶¶ 20-22.  They can also choose to provide services through competing pet-sitting and pet-walking platforms, such as Wag!.  White Dec., ¶ 24.  Further, Pet Care Providers can maintain their own clientele and work with the same Pet Owners for repeated, long-term bookings if they choose to do so.  *See* LeCrone Dec. ¶ 3, Ex. B at 96:2-5; *see, supra,* Section II.C.4; *see* White Dec., ¶ 11.  Although Pet Care Providers and Pet Owners agree in the TOS that they will not use Rover's platform to meet each other and then avoid fees by making their arrangements outside of Rover (*see* White Dec. ¶ 6, Ex. AA [¶¶ 4.1.],) this reasonable limitation does not otherwise limit a Pet Care Provider's ability to market their services and build a business outside Rover.

### 8. *Pet Care Providers "set their own hours and terms of work" and "negotiate [their] hours and terms of work directly" with Pet Owners (criterion 9).*

Plaintiff and Miller's testimony makes clear that Pet Care Providers control their own schedules.  They decide whether they will work, when they will work, and what services to provide, and can change their availability anytime.  *See, supra,* Section II.C.2.  They are also free to modify the terms for pet care services in response to a specific Pet Owner's request.  *Id.*

### 9. *"Without deduction" by Rover, Pet Care Providers "set their own rates" and can "negotiate their rates with" Pet Owners (criterion 10).*

Section 2777 requires that "the service provider sets their own rates," without deduction by the referral agency.  Cal. Lab. Code § 2777(a)(10).  Lawmakers found important that a service provider be able to set and adjust their own rate, stating: "genuine independent contractors are able to set their own rates for their labor, without interference from another entity."  *See* LeCrone Dec. ¶ 9, Ex. J at p. 10 ("[w]ithout direct communication and rate setting prior to the provision of the service, the entity is an employer, not a referral agency.".); *see also* RJN ¶ 3. Rover satisfies this factor because Pet Care Providers set and can adjust their rates for each service at any time. *See, supra*, Section II.C.6.

Plaintiff mischaracterizes Rover's 20% service fee as a "deduction."  In fact, Rover does not *deduct* anything from the amount the Pet Care Provider sets as their rate charged for a

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-cv-03053-WHO
4846-7462-8063v.1 0107222-000013

booking.  LeCrone Dec. ¶ 4, Ex. C at 81:25-84:9; White Dec., ¶ 23, Ex. GG.  When Pet Care Providers set their list prices, they are aware of the service fee and clearly see the net rate they will receive at their list price.  White Dec., ¶ 23, Ex. GG.  They acknowledge and agree that the list price for a booking that appears on their profile includes two fees wrapped in one amount: (1) the Pet Care Provider's personal rate for the service; and (2) the 20% service fee the Pet Care Provider pays for use of the Rover platform.  *Id.*; White Dec. ¶¶ 21-22.  Pet Care Providers can then adjust their list price, up or down, to the amount that they ultimately want to receive from Pet Owners as payment for their services, depending on how much they want to earn or believe makes sense based on their experience, seasonal impacts, clientele, neighborhood, or any other considerations.  *Id.* at ¶ 23.[12]

This is the type of service fee the Legislature permits from referral agencies for the administrative services they provide to service providers.  *See* LeCrone Dec. ¶ 9, Ex. J ("If, for example, a contractor billed her services at $25/hour, it would be permissible for a referral agency to charge the client $35/hour and keep the $10 difference."); *see also* RJN ¶ 3.  Rover's transparency and control fundamentally differ from other models in the transportation, delivery, and other industries that use an algorithm to impose a nonnegotiable price or that conceal actual earnings until after the service provider completes the service.

### 10. *Pet Care Providers are "free to accept or reject clients and contracts, without being penalized" by Rover (criterion 11).*

Pet Care Providers are free to accept, decline, or ignore *any* booking request, for *any* reason, without penalty.  *See, supra,* Section II.C.4.  Plaintiff and Miller admitted they declined many booking requests for various reasons—including incompatibility, requests outside their limitations, or unavailability.  *See id.*  For example, Miller declined a booking request because she was already engaged to provide pet services for someone outside the Rover platform.

---

[12] The result of this transparency is that independent pet sitters in San Francisco, for example, can negotiate and offer a wide range of prices for a night of dog boarding, such as $40, $63, $80, $119, or $140.  White Dec., ¶ 23.  Similarly, Pet Care Provider "Maisy's Mutts" set their rate for daycare services at $35.00 outside of Rover (*see* LeCrone Dec. at ¶ 7, Ex. E; RJN ¶ 2), but raise their listed price to $40.00 on Rover to cover Rover's service fee.  *See* White Dec. ¶ 26, Ex. HH.

20

1   LeCrone Dec. ¶ 2, Ex. A at 73:23-75:10; *see id.* ¶ 19, Ex. T at p. 2.  Rover did not discipline or

2   penalize Plaintiff or Miller for declining these bookings.

3          To the extent Plaintiff attempts to avoid this factor by characterizing Rover's search

4   function as a form of a "penalty," that argument goes nowhere.  *See* Pl. Mtn. 11:14-12:12.  As

5   stated above (*see, supra,* Section IV.B.2), when a Pet Owner browses for Pet Care Providers

6   based on the Pet Owner's preferences and criteria, the search results for Pet Care Providers must

7   be displayed and returned in some sort of order.  White Dec. ¶ 13.  Rover's search algorithm

8   considers, among other factors, the availability, preferences, and responsiveness of a Pet Care

9   Provider, so that Pet Care Providers who accept more requests (within their stated availability

10  and preferences), get higher ratings, and have more repeat clients, might appear higher in a

11  specific search's results than other Pet Care Providers who accept bookings less frequently, have

12  lower ratings or have fewer returning clients.  *Id.*  Rover's algorithm takes into account instances

13  when a Pet Care Provider rejects a booking, but only when their calendar indicates they are

14  available and the booking request otherwise falls within their own stated preferences.  *Id.*  It is a

15  reasonable feature of most marketplace apps—and in no way a "penalty"— to, all other factors

16  being equal, list higher in search results those Pet Care Providers who are more likely to respond

17  and make a booking.

18         Rover satisfies all eleven referral agency exemption criteria.

19         **C.      Under *Borello*, Pet Care Providers, Like Plaintiff, Are Independent
                     Contractors, Not Employees.**

20         Because the referral agency exemption applies to Rover (so the ABC test does *not* apply),

21  the *Borello* test governs the determination of Plaintiff's status.  Under *Borello*, "the principal test

22  of an employment relationship revolves around 'control of details,' i.e., whether the principal has

23  the right to control the manner and means by which the worker accomplishes the work."  *Ayala*

24  *v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 531 (2014).  *Borello* also enumerates

25  "secondary indicia" for determining worker classification.  *Borello*, 48 Cal. 3d at 350-351.

26         As explained in Section IV.B.2, Rover satisfies the primary "control" factor because it

27  neither retains nor exerts control over the *manner and means* by which Pet Care Providers

28  provide services.  As set forth in detail in the Rover MSJ, the "secondary indicia" factors also

weigh in Rover's favor.  *See* Rover MSJ at Section IV.B.

### D.   Rover Satisfies The ABC Test.

Finally, even if the Court were to conclude the AB5 "referral agency" exemption does not apply (which it does), Rover satisfies all three prongs of the ABC test.

The first two prongs of the ABC test have been analyzed above and Rover will not repeat that analysis here.  In brief, Prong A of the ABC test—requiring that the worker be free from control and direction—is nearly identical to the "control" factor analyzed for the first factor of the referral agency exemption (*see, supra*, Section IV.B.2; Section IV.C.1).[13]  Rover satisfies Prong A for the reasons established in Sections IV.B.2.  Indeed, Plaintiff does even not address Prong A, much less argue that Rover fails to meet that test.

Similarly, Rover satisfies Prong C, which requires that a worker be customarily engaged in an established trade, occupation, or business of the same nature as the work performed.  Cal. Lab. Code § 2775(b)(1)(C).  Prong C closely resembles the seventh factor of the referral agency exemption.  The undisputed evidence shows that Plaintiff and Miller—as well as other Pet Care Providers—engaged in and promoted an independent business before, during, and after the period in which they offered pet services through Rover.  *See, supra,* Section IV.B.6.  Plaintiff's self-serving declaration—stating that she "never worked in any kind of animal care capacity" and never took steps to start a business including by "making offerings to the general public" (*See* Pl. Mtn. 18:4-8, 24:24-25:1)—contradicts her deposition testimony that she provided dog services before joining Rover, and she marketed herself as having 35 years of experience.  LeCrone Dec. ¶ 3, Ex. B at 32:10-33:11, 75:12-76:11; *see id.* ¶ 14, Ex. O at ROVER_000005.  It is undisputed that Pet Care Providers are permitted to, and do, run their own businesses.[14]

That leaves Prong B: a showing "the person performs work that is outside the usual course of the hiring entity's business."  Cal. Lab. Code § 2775(b)(1)(B).  The California

---

[13] *See Garcia v. Border Transportation Group, LLC,* 28 Cal. App. 5th 558, 569 (2018) ("Part A involves *Borello*'s common law "control" test.").

[14] As the named PAGA representative, Plaintiff must be "similarly situated" to those "aggrieved employees" she is attempting to represent.  *Patel v. Nike Retail Servs., Inc.*, 58 F. Supp. 3d 1032, 1044 (N.D. Cal. 2014).  Plaintiff's individual assertions about her independent business are not relevant to what other Pet Care Providers could, and did, do.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-cv-03053-WHO
4846-7462-8063v.1 0107222-000013

1  Supreme Court explained Prong B as follows:  "Workers whose roles are most clearly

2  comparable to those of employees include individuals whose services are provided within the

3  usual course of the business of the entity for which the work is performed and thus who would

4  ordinarily be viewed by others as working in the hiring entity's business and not as working,

5  instead, in the worker's own independent business."  *Dynamex Operations West, Inc. v. Superior*

6  *Court*, 4 Cal. 5th 903, 959 (2018).

7       Here, Pet Care Providers provide services that fall outside Rover's business, as Rover

8  does not provide or "offer and sell" pet care services, nor does it "brand" itself as a pet service

9  provider.  *See, supra,* IV.A.  Rover does not assign, select, or send jobs to Pet Care Providers.

10  Pet Care Providers control every material aspect of their work, including the prices they list and

11  the rates they receive.  *See, supra,* Section II.C.1-7 and IV.B.2.  Others would ordinarily view

12  Pet Care Providers as working in their "own independent business."  *Dynamex*, 4 Cal. 5th at 959.

13       Rover's users—Pet Owners and Pet Care Providers—are its customers, and Rover is

14  accountable to them.  Rover provides them with its platform and ancillary services, which

15  together provide an environment for Pet Owners and Pet Care Providers to engage in safe and

16  secure transactions for the pet care services offered in the marketplace.  In return, Rover charges

17  an agreed-upon fee for their bookings, dictated by the rate set by the Pet Care Provider.  Like any

18  marketplace, Rover's users are integral to its platform—just as a grocery store's customers are

19  integral to the profitability of that marketplace.  But this does not turn Rover into a provider of

20  pet services or transform its marketplace into a pet services business, despite Plaintiff's

21  unsupported allegations.  If it did, most marketplaces that financially depend on their users—like

22  Ebay, Etsy, TaskRabbit, and AirBnb—would be turned into the employer of the user.

23       Plaintiff relies on *People v. Uber Tech., Inc.*, 56 Cal. App. 5th 266 (2020), *as modified on*

24  *denial of reh'g* (Nov. 20, 2020), *rev. denied* (Feb. 10, 2021), and a number of other cases

25  involving ridesharing transportation platforms like Uber and Lyft, finding those companies likely

26  cannot satisfy Prong B.  Plaintiff's attempt to conflate Uber and Lyft with Rover is misplaced;

27  Rover's business differs in fundamental ways from those transportation platforms.  Indeed, the

28  preliminary injunction ruling against Uber and Lyft rested on facts materially distinct from here:

23

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-cv-03053-WHO
4846-7462-8063v.1 0107222-000013

*First*, the court found Uber and Lyft operate platforms that *assign* a rider to a driver who provides the service without any negotiation between those parties, i.e., riders "are matched with nearby drivers who are available to give them a ride." *Uber*, 56 Cal. App. 5th at 278.  Thus, the "usual course of business" for Uber and Lyft "involves the day-to-day task of matching riders and drivers," so drivers have only the opportunities the platforms choose to offer.  *Id*. at 315.  By contrast, Rover operates a true marketplace where Pet Care Providers promote their services, Pet Owners choose among the offers, and those parties negotiate the terms of any booking.[15]  A Pet Care Provider offering services on Rover's platform would thus "be viewed by others as working ... in the worker's own independent business." *Dynamex*, 4 Cal. 5th at 959.

*Second*, nothing in *Uber* suggested drivers engage in marketing an independent business. Given that those platforms send driving jobs to drivers, drivers have no incentive to entice riders by offering a description of their driving style, experience, or compatibility.  In stark contrast, Pet Care Providers can (and do) use their profile on Rover's marketplace to tout their pet care experience, philosophy, availability, services offered, prices, and expectations, accompanied by photographs.  *Id.* ¶ 2, Ex. A at 29:6-33:6; *id.* ¶ 3, Ex. B at 29:20-41:7, 49:20-50:9, 56:18-71:5, 75:16-79:4, 84:7-87:13; *id.* ¶ 14. Ex. O; *id.* ¶ 18. Ex. S; *id.* ¶ 16. Ex. Q.  They also can include recommendations from pre-existing clients.  *See id.* ¶ 3, Ex. B at 32:15-33:7; 73:17-74:21; *id.* ¶ 3, Ex. B at 32:15-33:7.  This conduct promotes Pet Care Providers' "own independent business" to get a leg up on the competition with other providers on the marketplace.  *Dynamex*, 4 Cal. 5th at 959.

*Third*, "Uber and Lyft set the base fare rates and time and distance rates," *Uber*, 6 Cal. App. 5th at 280, and drivers "had no input" into the amount of the fare, *id*. at 293 (citation omitted).  Because business owners typically set their own prices and location of services, the inability to do so indicated drivers were not really working in their own independent business. Rover's marketplace could not be more different: Pet Care Providers decide what services to

---

[15] Rover's business more closely resembles other online marketplaces—like Airbnb, Etsy, Ebay, and TaskRabbit—that allow sellers of goods or services to connect with prospective buyers.  In the hearings on AB5, Senator Hannah-Beth Jackson observed that these platforms operate as modern versions of the YellowPages.  *See* LeCrone Dec. ¶ 13, Ex. N [2:32:50-2:33:23]; RJN ¶ 3.

provide and how much to charge for their services and, like any business owner, can adjust rates at any time and for any reason, including for specific bookings, specific pet services, or after negotiations with the Pet Owner.  *See, supra*, Section II.C.1 and 6; *see also Gonzales v. San Gabriel Transit, Inc.*, 40 Cal. App. 5th 1131, 1161 (2019) (noting that *Dynamex* found the company at issue could not satisfy Prong B because "its entire business was to provide delivery services, and the company obtained the customers, set the delivery rates charged, told drivers where to pick up and deliver packages, and required its drivers to use its tracking and recordkeeping systems.").

*Fourth*, the record in *Uber* disclosed "continual coordination between [drivers] and company at every stage of the work performed."  *Uber*, 56 Cal. App. 5th at 295.  This case manifests no such "coordination."  Rover provides Pet Care Providers the software and booking platform on which to run their businesses—but then Pet Care Providers coordinate bookings with Pet Owners, their customers, engaging in meet-and-greets and negotiating the rates, terms, and conditions.  Their success or failure using the platform depends on their own talent, initiative, business sense, and management skills.  The circumstances here thus resemble the facts in cases cited in *Uber*, where an entity "merely give[s] the plaintiffs a license or a product and leave[s] the plaintiffs to their own devices to make a profit from it."  *Uber*, 56 Cal. App. 5th at 295-296.  As in those cases, Rover gives Pet Care Providers access to Rover's marketplace and leaves them "to their own devices to make a profit from it."

For these reasons, Rover satisfies each prong of the ABC test.

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion and enter summary judgment in Rover's favor.

DATED: March 10, 2021                    DAVIS WRIGHT TREMAINE LLP

                                        By: */s/John P. LeCrone*
                                              John P. LeCrone

                                        Attorneys for Defendant
                                        A PLACE FOR ROVER, INC. dba
                                        ROVER.COM

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-cv-03053-WHO
4846-7462-8063v.1 0107222-000013