UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MELANIE SPORTSMAN,<br><br>Plaintiff,<br><br>v.<br><br>A PLACE FOR ROVER, INC.,<br><br>Defendant. | Case No.  19-cv-03053-WHO<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 65, 66 |

Plaintiff Melanie Sportsman brought this action under the Private Attorneys General Act of 2004, California Labor Code § 2698 et seq. ("PAGA"), on behalf of herself and others who have worked for defendant A Place for Rover, Inc. ("Rover") as pet care providers.  She seeks to recover civil penalties pursuant to PAGA arising from Rover's misclassification of pet care providers as independent contractors.   Before me are cross motions for summary judgment on whether Sportsman has been properly classified as an independent contractor.

Under both the ABC test of *Dynamex Operations W. v. Superior Ct.*, 4 Cal.5th 903 (2018), codified by the California legislature in California Labor Code § 2775, and the factor test of *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341 (1989), the undisputed evidence establishes that Sportsman was an independent contractor and not an employee of Rover.  She had complete control over which pet care services to offer, what rate to charge for each service, where to provide the services, how to provide the services, and if and when to provide the services by setting her own schedule and deciding whether to accept a booking request.  She used her Rover profile to advertise her services and distinguished herself from other service providers, holding herself out as operating an independent business.

The level of control and customization she retained demonstrates that Rover operates very

differently from other gig economy companies. Rover's platform more closely resembles an online marketplace that allows service providers to promote their services and connect with prospective buyers. Sportsman's arguments to the contrary are not convincing and do not raise a genuine dispute of material fact sufficient to prevent summary judgment in Rover's favor. For these reasons, Rover's motion for summary judgment is GRANTED and Sportsman's motion for summary judgment is DENIED.

## BACKGROUND

Through its website and mobile app, Rover offers and sells services that are performed by workers whom it refers to as "service providers," "pet sitters," "sitters," or "dog walkers" (collectively "Pet Care Providers"). *See* Declaration of John P. LeCrone in Support of Defendant A Place For Rover, Inc.'s Motion for Summary Judgment ("LeCrone Decl.") [Dkt. No. 67], Ex. C (Chang 30(b)(6) Dep. at 14:1–5, 18:10–20:4). Purchasers of these services are referred to as "Pet Owners." *Id.* at 15:18–24. The services include: (i) "dog walking" for 30-minute increments; (ii) "doggy day care" in the Pet Care Provider's home; (iii) "dog boarding" in the Pet Care Provider's home; (iv) "house sitting," animal care in the Pet Owner's home on a per day basis; and (v) "drop-in visit," 30-minute check-ins at the Pet Owner's home (collectively, "Pet Care Services"). *See* Declaration of Steven Tidrick in Support of Plaintiff's Motion for Summary Judgment ("Tidrick Decl.") [Dkt. No. 66-2], Ex. 32 (Rover webpage "FAQs from Sitters and Dog Walkers New to Rover" at 1–2).

To use Rover's platform, Pet Owners and Pet Care Providers create their own profiles and agree to Rover's user agreement, the Terms of Service ("TOS"). Declaration of Jenna White in Support of Motion for Summary Judgment ("White Decl.") [Dkt. No. 68] ¶ 5; *see id.*, Ex. Z (January 31, 2017 TOS). In their profiles, Pet Care Providers can select which of the five Pet Care Services they want to offer, the rates to charge for each service, the type of cancellation policy associated with each service (ranging from flexible to strict), the geographic area where they want to provide services, and their availability. *See* LeCrone Decl., Ex. O (Sportsman Rover Profile). Pet Care Providers can also limit the size, weight, breed, type and number of pets for which they will accept a booking. *Id.*; *see also* Tidrick Decl., Ex. 24 (Rover webpage "A Part-Time Job For

2

College Students: Make Money as a Pet Sitter" at 2–3). Pet Owners can view Pet Care Provider profiles on the Rover platform and contact them through the platform to request a booking for services.

Once a Pet Owner and a Pet Care Provider have agreed to a particular arrangement, the booking is made through the Rover platform. White Decl. ¶ 12. The Pet Care Provider can decide whether to accept, decline, ignore, to cancel a booking request. *Id.*; LeCrone Decl., Ex. B (Sportsman Dep. at 38:23–39:4, 46:12–48:17). After building a client list through Rover, a Pet Care Provider can set her account to "Repeat only," limiting requests to existing clients. White Decl. ¶ 10. The Pet Owner is charged at the time both parties confirm the booking. *Id.* ¶ 17. Rover charges the Pet Owner's credit card on file and holds the funds until 24 to 48 hours after the end date of the booking. *Id.* Rover then deducts a service fee (between 15% and 25% depending on the profile approval date) before remitting payment to the Pet Care Provider. *Id.* ¶¶ 17–18; January 31, 2017 TOS at §§ 10.2–10.3; Tidrick Decl., Ex. 37 (Rover webpage "What are the service fees?").

Sportsman's use of the Rover platform is detailed in the discussion below. In sum, she created her account in May 2017 and worked as a Pet Care Provider from August 2017 to April 2019, while taking classes at a community college. Sportsman Dep. at 29:12–31:25, 23:10–24:9. Setting her own schedule, she offered boarding, drop-in visits, doggy day care and dog walking services, and add-on services like dog bathing, in Fresno, California. *Id.* at 35:9–36:21, 37:17–39:4, 52:24–53, 97:2–101:20; Sportsman Rover Profile at 1–2. She fixed her rate for boarding at $35 per night, drop-in visits at $25 per visit, doggy day care at $30 per day, and dog-walking at $20 per walk. *Id.* at 40:7–41:10, 65:13–66:18, 93:7–95:9; Sportsman Rover Profile at 1–3. She would lower her rates "[b]ased on if [she] was having a slow period." Sportsman Depo. at 60:14-61:16. She chose a "strict" cancellation policy for dog boarding and drop-in visits but chose a "flexible" cancellation policy for dog walking and doggy day care. Sportsman Rover Profile at 3. She advertised that she could host dogs between 0–40 pounds, with up to three dogs a day, and could sit cats and dogs of any size in a Pet Owner's home. *Id.* at 2; Sportsman Dep. at 33:17–34:25, 47:11–48:17, 63:4–64:2, 66:24–69:13.

United States District Court
Northern District of California

On February 24, 2021, the parties filed cross motions for summary judgment on whether Sportsman has been properly classified as an independent contractor. *See* Defendant's Motion for Summary Judgment ("Rover MSJ") [Dkt. No. 65]; Plaintiff's Motion for Summary Judgment ("Sportsman MSJ") [Dkt. No. 66]. I heard argument on March 31, 2021.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding the motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

## I.   EVIDENTIARY OBJECTIONS AND REQUESTS FOR JUDICIAL NOTICE

As a preliminary matter, I address the parties' evidentiary objections. I only address the main objections that are relevant to resolution of the motions before me.

Rover moves to strike Sportsman's declaration submitted in support of her motion for summary judgment on grounds that it contains self-serving assertions, legal arguments, and conclusory statements with no factual support. Defendant's Opposition to Plaintiff's Motion of

United States District Court
Northern District of California

Summary Judgment ("Rover Oppo.") [Dkt. No. 79] 9; *see* Declaration of Melanie Sportsman ("Sportsman Decl.") [Dkt. No. 66-1].  It also moves to strike the declaration she submitted in support of her opposition to Rover's motion for summary judgment for the same reasons. Defendant's Reply in Support of Motion for Summary Judgment ("Rover Reply") [Dkt. No. 87] 4; *see* Supplemental Declaration of Melanie Sportsman ("Suppl. Sportsman Decl.") [Dkt. No. 84-1].

Sportsman responds that Rover cannot deny the authenticity of Exhibit B to her declaration, Rover's webpage entitled "How do I review my payments from my Rover bookings?".  Plaintiff's Reply in Support of Motion for Summary Judgment ("Sportsman Reply") [Dkt. No. 89] 3.  Rover does not object to Exhibit B; it objects to the contents contained in her declaration itself.  I will not strike Sportsman's declarations in full, but I will only consider facts that do not appear to be a blatant attempt to create a dispute of fact and that are not conclusory. For example, self-serving and conclusory statements like "I was employed by [Rover]" and "Rover improperly classified me as an independent contractor" will not be given weight. Sportsman Decl. ¶ 2; *see Hennighan v. Insphere Ins. Sols., Inc.*, 38 F. Supp. 3d 1083, 1096 (N.D. Cal. 2014), *aff'd,* 650 F. App'x 500 (9th Cir. 2016) (declining to strike plaintiff's declaration "*in toto*," but "only consider[ing] facts that do not appear to be a sham or a blatant attempt to create a dispute of fact").

Next, Sportsman contends that Rover's evidence regarding former named plaintiff Erika Miller is irrelevant because Miller was removed from this action and the issue for summary judgment is limited to whether Sportsman was misclassified.  Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Sportsman Oppo.") [Dkt. No. 84] 18.  Rover argues that the issue before me is whether Rover misclassified Pet Care Providers generally and explains that PAGA actions are ultimately representative actions with no individual claims.  Rover Reply 2–4.

Other PAGA actions like this one have been bifurcated in two phases, with "phase one limited to [plaintiff's] individual claims and whether he is an 'aggrieved employee' under PAGA," and "assuming the Court finds he is an aggrieved employee, phase two would resolve the PAGA claim following additional discovery."  *Lawson v. Grubhub, Inc.*, 302 F. Supp. 3d 1071, 1073

United States District Court
Northern District of California

(N.D. Cal. 2018) (finding Lawson was properly classified as an independent contractor under *Borello* and granting summary judgment to Grubhub). In this case, the parties "agree[d] to focus discovery on the dispositive classification issue," but they now disagree on the parameters of that issue. May 12, 2020 Minute Entry [Dkt. No. 57].

I will not consider Rover's evidence about other Pet Care Providers (like "Maisy's Mutts LLC") but evidence about Miller remains relevant. When Miller moved to withdraw as the named plaintiff, I ordered her to meet her outstanding discovery obligation before granting her motion. December 11, 2019 Minute Order [Dkt. No. 48]. While the reason for her withdrawal was irrelevant, I found that she could not avoid her discovery obligation simply by moving to withdraw. She was ordered to produce documents and sit for a deposition limited to the merits of her claim before she withdrew from the case. *Id.* Although I find that I can consider evidence on Miller given that I allowed Rover to obtain it, as further discussed below, that evidence is ultimately not needed because the evidence on Sportsman is sufficient for Rover to prevail on its summary judgment motion.

Both parties have submitted requests for judicial notice. Rover and Sportsman seek judicial notice of several exhibits they rely with respect to the referral agency exemption. Defendant A Place for Rover, Inc.'s Request for Judicial Notice in Support of Motion for Summary Judgment [Dkt. No. 69] 2–4; Defendant A Place for Rover, Inc.'s Request for Judicial Notice in Support of Opposition to Plaintiff's Motion for Summary Judgment [Dkt. No. 82] 5; Plaintiff's Request for Judicial Notice [Dkt. No. 85] 2–4. Given that I need not decide whether Rover qualifies for the referral agency exemption, *see infra*, there is no need for judicial notice of these documents. Rover's request for judicial notice of Exhibits D, and J through N, and Y attached to the LeCrone Declaration is DENIED and Sportsman's request for judicial notice of Exhibits 49 and 51 through 53 attached to the Tidrick Declaration is DENIED.

Sportsman also seeks judicial notice of several webpages on Rover's website and one of Rover's press releases, to which Rover does not object. Sportsman's request for judicial notice of Exhibits 22, 23, 29, and 30 attached to the Tidrick Declaration and Exhibit B attached to the Sportsman Declaration is GRANTED. Rover requests judicial notice of documents related to

another Pet Care Provider named "Maisy's Mutts LLC."  As stated above, I need not rely on that evidence to make a ruling on the motions before me.  Rover's request for judicial notice of Exhibits H, I, and E through G is DENIED.

## II.    MISCLASSIFICATION

In September 2019, the California legislature enacted Assembly Bill No. 5 ("AB 5"), which codified the ABC test from *Dynamex* and expanded its applicability.  Cal. Lab. Code § 2775.[11]  The statute classifies certain workers as employees unless the hiring entity can satisfy all three prongs of the ABC test.  *Id.* § 2775(b)(1)(A)–(C).  It also contains a number of exemptions for businesses that meet certain requirements.  *Id.* §§ 2775–2787.  If an exemption applies, then the *Borello* test controls the classification of workers as employees or independent contractors.  *Id.* §§ 2775(b)(3), 2776(a), 2778(a).

### A.    Referral Agency Exemption

Rover contends that the ABC test does not apply because it qualifies for the referral agency exemption set forth in California Labor Code section 2777.  Rover MSJ 10–18.  Section 2777 provides that "If an individual acting as a sole proprietor, or a business entity formed as a partnership, limited liability company, limited liability partnership, or corporation ('service provider') provides services to clients through a referral agency, the determination of whether the service provider is an employee or independent contractor of the referral agency shall be governed by *Borello*."  Cal. Lab. Code § 2777(a).  The referral agency must also demonstrate that all eleven conditions listed in subsections (a)(1)–(11) are satisfied.[2]

---

[11] AB 5 was originally codified at section 2750.3 of the California Labor Code.  Section 2750.3 was repealed effective September 4, 2020, and the ABC test is currently codified at section 2775 of the California Labor Code.

[2] *See* Cal. Lab. Code §§ 2777(a)(1)–(11) (conditions include: (1) "The service provider is free from the control and direction of the referral agency in connection with the performance of the work for the client, both as a matter of contract and in fact"; (2–4) the service provider has "a business license or business tax registration", "a state contractor's license" and/or "an applicable professional licensure, permit, certification, or registration" if required by a certain jurisdiction or state rule Business and Professions Code; (5) the service provider "delivers services to the client under the service provider's name, without being required to deliver the services under the name of the referral agency"; (6) the service provider "provides its own tools and supplies to perform the services"; (7) the service provider "is customarily engaged, or was previously engaged, in an independently established business or trade of the same nature as, or related to, the work

7

Sportsman challenges Rover's ability to meet only select criteria out of the eleven— whether she delivers services under her name and not under Rover's name (criterion 5); whether she is "customarily engaged" in or was "previously engaged" in a business of the same nature as, or related to, the work performed for Pet Owners (criterion 7); whether she "set[s] [her] own rates" and can "negotiate [her] rates with" Pet Owners "[w]ithout deduction" by Rover (criterion 10); and whether she is "free to accept or reject clients and contracts, without being penalized" by Rover (criterion 11). *See* Sportsman Oppo. 3–15.

While Rover meets most of the criteria for the referral agency exemption based on the evidence of record, it does not appear to meet criterion 10 because Rover deducts a service fee (20%) from the Pet Owner's payment to Pet Care Providers. The legislative history of AB 5 provides the following example of a permissible service fee that can be charged by a referral agency: "If, for example, a contractor billed her services at $25/hour, it would be permissible for a referral agency to charge the client $35/hour and keep the $10 difference. *It would not be permissible, however, to place the costs of the operation of the referral agency on the shoulders of the contractor.*" LeCrone Decl., Ex. J at 10. It defines a referral agency as an entity that "bill[s] *the client* for the service costs associated with running a referral agency." *Id.* The way Rover has set up payment, the 20% service fee is shouldered by the Pet Care Provider, not the Pet Owner clients. For example, if a Pet Care Provider sets a rate at $33, Rover says $26.40 is "what you'll earn per service." *See* Rover Reply [Dkt. No. 87] at 11. Thus, the 20% fee ($6.60) comes out of what Pet Care Providers earn. Criterion 10 would have been satisfied if, instead, Rover made the Pet Owners client shoulder the 20% fee by charging them an extra $6.60 on top of the $33 set by the Pet Care Provider. Although Rover says that Pet Care Providers can simply increase their

_____

performed for the client"; (8) the referral agency "does not restrict the service provider from maintaining a clientele and the service provider is free to seek work elsewhere, including through a competing referral agency"; (9) the service provider "sets their own hours and terms of work or negotiates their hours and terms of work directly with the client"; (10) "[w]ithout deduction by the referral agency, the service provider sets their own rates, negotiates their rates with the client through the referral agency, negotiates rates directly with the client, or is free to accept or reject rates set by the client"; and (11) the service provider "is free to accept or reject clients and contracts, without being penalized in any form by the referral agency").

1   rates to cover up the service fee, AB 5's legislative history does not support such a reading.

2       That said, I need not decide whether the referral agency exemption applies.  As discussed

3   below, Rover is entitled to summary judgment under both the ABC test and the *Borello* test.[3]

4       **B.      ABC Test**

5       The ABC test establishes a presumption that one who "provid[es] labor or services for

6   remuneration" is an employee.  Cal. Lab. Code § 2775(b)(1).  This presumption may be rebutted if

7   "the hiring entity demonstrates that all of the following conditions are satisfied": "(A) The person

8   is free from the control and direction of the hiring entity in connection with the performance of the

9   work, both under the contract for the performance of the work and in fact; (B) The person

10  performs work that is outside the usual course of the hiring entity's business; (C) The person is

11  customarily engaged in an independently established trade, occupation, or business of the same

12  nature as that involved in the work performed."  *Id.* § 2775(b)(1)(A)–(C); *see Dynamex*, 4 Cal.5th

13  at 950–951.

14          **1.      Prong A**

15      Prong A requires Rover to show that Sportsman "is free from the control and direction of

16  the hiring entity in connection with the performance of the work[.]"  Cal. Lab. Code §

17  2775(b)(1)(A).  "[A]s under *Borello*, . . . depending on the nature of the work and overall

18  arrangement between the parties, a business need not control the precise manner or details of the

19  work in order to be found to have maintained the *necessary control* that an employer ordinarily

20  possesses over its employees, but does not possess over a genuine independent contractor."

21  *Dynamex*,  4 Cal.5th at 958 (emphasis added);  *Garcia v. Border Transportation Grp., LLC*, 28

22  Cal. App. 5th 558, 569 (2018), *as modified on denial of reh'g* (Nov. 13, 2018) ("Part A involves

23  *Borello*'s common law 'control' test[.]").

24      The evidence shows that Sportsman controlled the means by which she performed the Pet

25  Care Services.  Among the five types of services she could offer, she chose to offer the following

26

27  _____

28  [3] Some of the eleven conditions under section 2777 overlap with the *Borello* factors and ABC
    prongs.  For example, criterion 1 is similar to the primary control factor in the *Borello* test and
    Prong A of the ABC test.  *See* Cal. Lab. Code § 2777(a)(1).

United States District Court
Northern District of California

four in Fresno, California: dog boarding, drop-in visits, doggy day care, and dog walking.  *See* Sportsman Rover Profile at 1–3; Sportsman Dep. at 29:12–31:25, 35:9–36:21, 37:17–39:4, 52:24–53.  She opted to offer add-on services, such as pick-up and drop-ff, bathing, and grooming. Sportsman Rover Profile at 2; Sportsman Dep. at 97:2-101:20.  She set her own rates, ranging from $20 and $35 for each service, and chose a strict cancellation policy for some services and a flexible policy for others.  Sportsman Rover Profile at 1–3.  She limited the number and types of pets she can host in her own home (between 0–40 pounds and up to three dogs per day and night) as well as the types of pets she can watch in a Pet Owner's home (cats and dogs of any size).  *Id.* at 2–3.  For services performed in her own home, she specified that dogs would be allowed on her furniture/bed and provided how often the pet will receive a potty break (every 0–2 hours).  *Id.* at 6.

Sportsman also controlled when she worked, setting her availability on the calendar provided in her Rover profile.  *Id.* at 2–3.  Her profile specified that she was "[m]ostly flexible on availability, but will be in school from 8am-1pm on Tues, Wed, & Thurs starting June 20 til July 27."  LeCrone Decl., Ex. Q (copy of Django Administration records showing Sportsman's Rover profile); Sportsman Dep. at 85:9–12 (testifying that "this allowed [her] to not work during those period of times or not provide services during those period of times so [she] could attend class").  She controlled her own clientele and could decide whether to accept, decline, or cancel a booking request, for any reason.  Sportsman Dep. at 38:23–39:4, 46:12–48:17.

None of Sportsman's arguments raise a genuine dispute as to any material fact.  She points to Rover's requirements on how a profile is assembled—that a profile leads with a photograph of Sportsman, followed by her first name and last initial, her location, her "star" rating, her "Response Rate" and her "Response Time."  *See* Sportsman Rover Profile at 1.  That merely shows that Rover arranges the information in a certain way.  It does not show that Rover dictates the content Sportsman put in her profile or the manner and means by which she rendered the services she chose to offer.  *See* Sportsman Dep. at 58:6–13 (confirming that "all the information put into [her] profile is information that [she] put into it" and that she did not have any help in preparing the profile "[o]ther than the suggested Rover prices and services").

She states that all payment and communication between Pet Care Providers and Pet

United States District Court
Northern District of California

1    Owners are done through the Rover platform, and that Rover has an algorithm for search ranking

2    (the order in which Rover profiles of various Pet Care Providers appear when a Pet Owner is

3    booking a service) and a feature that puts a Pet Care Provider's profile in "away mode" when a Pet

4    Care Provider does not respond to a booking request and has fewer than three completed

5    bookings.  *See* Tidrick Decl., Ex. 35 (Rover webpage "Keep your profile live and out of away

6    mode" at 1–2); *id.*, Ex. 36 (Rover webpage "How Search Rank Works (and How to Work it)").

7    These features go towards how Rover controlled its platform, not how it controlled the manner

8    and means by which Pet Care Providers like Sportsman performed services.  Rover's rule that Pet

9    Care Providers should "[n]ever accept cash or checks—always book on Rover" is similarly

10   incidental to how transactions are administered between Pet Care Providers and Pet Owners, not

11   the manner and means by which services are rendered.  Chang 30(b)(6) Dep. at 170:4–15.

12       Sportsman's reliance on Rover's Terms of Services suffers from the same flaw.  *See*

13   January 31, 2017 TOS at § 2.2 (Rover "conduct[s] an initial review of" a prospective Pet Care

14   Provider's "application" and requires that the worker pass "background checks"); *id.* § 3

15   (requiring Pet Care Providers be "18 years of age or older"); *id.* § 4.1 (Pet Care Providers and Pet

16   Owners are not allowed "to authorize the use of [their] account . . . by any other person" and are

17   prohibited from using the platform "to arrange for the provision and purchase of services with

18   another user of the Rover.com Service, then complete a payment transaction for those services

19   offline"); *id.* § 7.1 (Rover "may require or allow you (or someone else on your behalf) to submit

20   or upload texts, photographs, images, videos, reviews, information and materials to your profile on

21   the Rover.com Service"); *see also* Tidrick Decl., Ex. 33 (Rover webpage "How to Make Your

22   Profile Shine").  These provisions, viewed in the light most favorable to Sportsman, only establish

23   the terms both Pet Care Providers and Pet Owners must abide by to use the platform; they do not

24   dictate the conditions of work.

25       Sportsman separately argues that the flexibility in choosing when to work is not dispositive

26   of employee status.  As the court in *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1152

27   (N.D. Cal. 2015) held, "freedom to choose one's days and hours of work . . . does not in itself

28   preclude a finding of an employment relationship," because "[t]he more relevant inquiry is how

United States District Court
Northern District of California

1  much control Uber has over its drivers *while they are on duty* for Uber." (emphasis in original)

2  (citing *Air Couriers Int'l v. Employment Dev. Dep't.*, 150 Cal. App. 4th 923, 926 (2007) and *JKH*

3  *Enterprises, Inc. v. Dep. of Indus. Relations*, 142 Cal. App. 4th 1046, 1051 (2006)).  As discussed

4  above, the evidence she relies on relates to how Rover set up the platform and how users interact

5  on it.

6        The only other evidence she cites for Rover's control over Pet Care Providers while "on

7  duty" is the "Rover Card" feature.  Sportsman MSJ 15–17.  The Rover Card is an electronic

8  reporting mechanism designed by Rover whereby the Pet Care Provider provides the following to

9  the Pet Owner: (1) "start and stop times"; (2) the exact times when the animal urinated, pooped,

10  ate, and drank water; (3) "at least one photo" of the animal; and (4) an "optional short note."  *See*

11  Tidrick Decl., Ex. 39 (Rover webpage "Rover Cards Are Here!").  For the dog walking service,

12  Rover has "dog walking map" technology that "works with the Rover Card . . . to track and share

13  information about pee, poo, food, and water activity during the walk" and also "tracks the walker's

14  route for the time between when the walk starts and stops."  *Id.*, Ex. Ex. 40 (Rover webpage "How

15  does the dog walking map feature work?").

16        The Rover Cards hardly show that Rover controlled Pet Care Providers while they were on

17  duty.  It is an optional feature through which Pet Owners can receive information about the care

18  provided during a particular service, a feature that Sportsman chose to offer.  *See* Sportsman

19  Rover Profile at 4 ("Melanie is using the Rover app to track activity and send Rover Cards.").  The

20  only circumstance where Pet Care Providers "must use" Rover Cards is "for Recurring Bookings

21  in order to get paid."  Tidrick Decl., Ex. 10 (Rover webpage "Additional information about Rover

22  Cards"). The "Recuring Bookings" tool allows Pet Owners and Pet Care Providers to agree to

23  ongoing repeat services for an indefinite time in the future.  *See* Declaration of Jenna White in

24  Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Suppl. White

25  Decl.") [Dkt. No. 81] ¶ 28.  As part of the recurring billing functionality, Pet Owners agree that

26  Rover can pre-bill their credit cards on a weekly basis, and Pet Care Providers agree to use Rover

27  Cards for each recurring service, which alerts Rover that the Pet Care Provider has completed the

28  service.  *Id.*  Sportsman does not dispute this in her briefing.  *See generally* Sportsman Oppo. and

Sportsman Reply (making no argument with respect to the Rover Cards).

Finally, Sportsman argues that "the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because the power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 532 (2014). She argues that Rover's Terms of Service is evidence that Rover reserves the right to, and in fact does, terminate Pet Care Providers for "any" reason "or no reason at all." January 31, 2017 TOS at § 4.2. Rover responds that Pet Care Providers and Pet Owners can also deactivate their account at any time, and thus the provision amounts to a "mutual termination clause," which is "evidence of an independent-contractor relationship." *Hennighan*, 38 F. Supp. 3d at 1105.

Even if the provision is considered an "at-will termination" clause, such clauses suggest a company's control over a worker only when the worker has made a significant time and financial commitment to the company, such as by buying approved cars and scanners, working full-time, and working exclusively for the company. *Lawson*, 302 F. Supp. 3d 1086–88. Like the worker in *Lawson*, Sportsman did not invest significant time in providing pet services though Rover. She waited several months after creating her Rover profile to begin offering pet services on Rover and only worked part-time while attending community college. Sportsman Dep. at 23:6–9, 29:12–15 (Sportsman created her account in May 2017 and began working in August 2017); White Decl. ¶ 6 (Sportsman episodically made 34 bookings through Rover from May 2017 through April 2019). Nor did she invest a significant amount of money in providing the services. Sportsman Dep. at 53:12–54:25 (testifying that she purchased dog toys, poop bags, dog treats, and other cleaning equipment, and that her clients provided other items like food, a cage, a leash, and a collar). In this circumstance, an "at-will termination" clause is "neutral in the right to control analysis." *Lawson*, 302 F. Supp. 3d at 1088.

Overall, the undisputed evidence establishes that Rover did not maintain the necessary control that an employer ordinarily possesses over its employees. The control it maintained was primarily limited to how users interact on its platform, not the manner by which Pet Care Providers like Sportsman performed services for Pet Owners. *See Hennighan*, 38 F. Supp. 3d at

United States District Court
Northern District of California

1107 (finding the primary control factor under *Borello* weighed against finding an employer-employee relationship because "[a]ny control Insphere exercised over Hennighan was generally unrelated to the manner and means by which Hennighan accomplished his work and was directed more towards the results."). Other cases where workers were properly classified as independent contractors involved relatively less autonomy than what Sportsman retained here. *See Lawson*, 302 F. Supp. 3d at 1086 (finding food-delivery app Grubhub did not have requisite control over worker even though Grubhub (unlike Rover) controlled rates and geographic boundaries of the wok); *Hennighan*, 38 F. Supp. 3d at 1101 (finding insurance company did not have requisite control over agent even though the company (unlike Rover) required agents to attend trainings and monitored the agent's productivity).

### 2.    Prong B

Prong B requires a showing that "the person performs work that is outside the usual course of the hiring entity's business." Cal. Lab. Code § 2775(b)(1)(B). The Ninth Circuit's recent decision in *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106 (9th Cir. 2021) provides guidance on the Prong B analysis. After the California Supreme Court confirmed that the ABC test applies retroactively, the Ninth Circuit remanded for the district court to consider whether the plaintiffs were employees of Jan-Pro International Franchising, Inc. ("Jan-Pro"), an international janitorial cleaning franchise business. *Id.* at 1122. As "an aid to the court", the Ninth Circuit offered some "observations and guidance," noting that "Prong B may be the most susceptible to summary judgment on the record already developed." *Id.* at 1122, 1125. It instructed the district court to consider the following "formulations" in determining whether "Jan-Pro was Plaintiffs' employer and not merely an indirect licensor of a trademark":

> Analytically, courts have framed the Prong B inquiry in several ways. They have considered whether the work of the employee is necessary to or merely incidental to that of the hiring entity, whether the work of the employee is continuously performed for the hiring entity, and what business the hiring entity proclaims to be in. *See, e.g.*, *Mattatuck Museum–Mattatuck Historical Soc'y v. Adm'r, Unemployment Comp. Act*, 238 Conn. 273, 679 A.2d 347, 351 (1996); *Carey v. Gatehouse Media Mass. I, Inc.*, 92 Mass. App. Ct. 801, 804–10, 94 N.E.3d 420 (2018).

*Id.* at 1125.

United States District Court
Northern District of California

With respect to the first consideration of whether the employee is "necessary" or "incidental" to the hiring entity's business, the Ninth Circuit noted that some cases conduct the inquiry "through a common-sense observation of the nature of business," while others do it in "more economic terms." *Id.* at 1125–26. It found that "[b]oth approaches may inform" the case before it because "Jan-Pro fundamentally depends on a supply of unit franchisees for its business" and "Jan-Pro earns a percentage of the payments that customers pay for cleaning services." *Id.* at 1126.

Here, in "economic terms," Rover generates revenue each time Pet Care Providers book and perform a service through its platform. But a "common-sense observation of the nature of business," shows that Pet Care Providers are not "necessary" to Rover's business in the same way. The pet care services they provide is distinct from Rover's business of providing a marketplace that allows Pet Owners to find and connect with Pet Care Providers.

Because the franchise model at issue in *Vazquez* is not comparable to the circumstances in this case, I turn to other gig economy cases to inform my analysis. The California Court of Appeal in *People v. Uber Techs., Inc.*, 56 Cal. App. 5th 266, 292 (2020), *as modified on denial of reh'g* (Nov. 20, 2020), *review denied* (Feb. 10, 2021) summarized the series of cases that "have considered contentions that ride-sharing companies such as Lyft and Uber are in the business solely of creating technological platforms, not of transporting passengers, and have dismissed them out of hand."[4] Rover's platform and business model is unlike the ride-sharing companies.

In *People v. Uber Techs.,* the People of the State of California brought action alleging that Uber and Lyft are transportation companies in the business of selling rides to customers and that their drivers are employees under the ABC test. *Id.* at 281. The People moved for a preliminary injunction enjoining defendants from continuing this practice and prevailed. *Id.* The California Court of Appeal affirmed, finding that "the trial court properly found—based on prong B alone—

---

[4] *See Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1078 (N.D. Cal. 2015); *Cunningham v. Lyft, Inc.*, No. 1:19-CV-11974-IT, 2020 WL 2616302, at *10 (D. Mass. May 22, 2020); *O'Connor v. Uber Techs.*, Inc., 82 F. Supp. 3d 1133, 1142 (N.D. Cal. 2015); *Crawford v. Uber Techs., Inc.*, No. 17-CV-02664-RS, 2018 WL 1116725, at *4 (N.D. Cal. Mar. 1, 2018); *Namisnak v. Uber Techs., Inc.*, 444 F. Supp. 3d 1136, 1143 (N.D. Cal. 2020).

that there is more than a reasonable probability the People will prevail on the merits at trial." *Id.*
at 301.  The court found "considerable evidence that the ride-share drivers involved here meet this
test, despite the changes in the traditional workplace enabled by modern technology" and that the
following characteristics were as "[m]ost pertinent": "Uber and Lyft both solicit riders"; "They
screen drivers and set standards for vehicles that can be used.  Defendants track and collect
information on drivers when they are using the apps, and they may use negative ratings to
deactivate drivers.  Riders request rides and pay for them through defendants' apps, and the
drivers' portions are then remitted to them, either through a payment processing service or a
dedicated bank account"; "The remuneration here may reasonably be seen as flowing from riders
to defendants, then from defendants to drivers, less any fee associated with the ride";
"[D]efendants' revenues are directly connected to the fees that riders pay for each ride." *Id.* at
294–95 (citations omitted).  The court found that "[t]hese facts amply support[ed] the conclusion
that, whether or not drivers purchase a service from defendants, they perform services for them in
the usual course of defendants' businesses," which "involves the day-to-day task of matching
riders and drivers each time a user requests a ride, arranging for riders' payments to be processed,
and retaining a portion of the proceeds from each ride." *Id.* at 295, 297.

Rover is different.  Uber and Lyft assign a rider to a driver to perform a ride service at a
rate fixed by Uber and Lyft, so drivers (and customers) have only the opportunities the platforms
pick for them. *People v. Uber*, 56 Cal. App. 5th at 315.  By contrast, Rover operates a true
marketplace where Pet Care Providers use their profiles to promote the services offered and their
rates, which can be adjusted at any time without Rover's input.  The Pet Care Providers try to
differentiate themselves in competition with other profiles on the platform by touting their pet care
experience, philosophy, availability, prices, and expectation, accompanied by photographs.  Pet
Owners then choose among the offers on the platform, contact the Pet Care Providers through the
platform, and negotiate the terms of any booking directly with the Pet Care Providers.  Once
service is performed, payment is made through the Rover platform.

Sportsman places much emphasis on the fact that Rover requires all payments by Pet
Owners and all communications between Pet Owners and Pet Care Providers to occur through its

16

United States District Court
Northern District of California

1   platform.  This involvement in the booking and payment process is limited when compared to the

2   "continual coordination between [drivers] and [Uber and Lyft] at every stage of the work

3   performed."  *People v. Uber*, 56 Cal. App. 5th at 295.  The level of involvement at issue here is

4   more akin to the cases the California Court of Appeal found inapplicable to Uber and Lyft—Rover

5   gives Pet Care Providers access to its online marketplace and leaves them "to their own devices to

6   make a profit from it."  *Id.* at 296 (citing *Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp. 3d

7   104, 119 (D. Mass. 2015)).  Pet Care Providers like Sportsman are "incidental" to Rover's

8   business in that way.

9          Turning back to the guidance in *Vazquez*, the Ninth Circuit also considered "what business

10  the hiring entity proclaims to be in," finding "Jan-Pro's website and advertisements [] promote

11  Jan-Pro being in the business of cleaning."  *Vazquez*, 986 F.3d at 1125, 1127.[5]  Sportsman argues

12  that Rover continually advertises itself as "The Dog People," suggesting that it is in the business

13  of providing pet care services.  Tidrick Decl., Ex. 21 (Rover April 24, 2017 press release); *see,*

14  *e.g.*, *id.*, Ex. 41 at 0:16–0:30 ("At Rover.com we're the dog care—second only to you—dog

15  people, ready to walk, love, or just play with your dog.  Download the app and book today.

16  Rover.com.  The dog people."); *id.*, Ex. 44 at 0:01–0:15 ("At Rover.com we're the dog people,

17  ready to be there for your dog, rain or shine.  Download the app and book today.  Rover.com.  The

18  dog people.").

19         Rover points out that the press release made clear that Rover is a marketplace where Pet

20  Owners can *find* Pet Care Providers to provide services, which is also reflected in several other

21  advertisements.  *id.*, Ex. 21 at 1–2 ("[Rover's] goal with this campaign is to show pet parents that

22  Rover *can help them find* true dog people who will care for their dog the same way they would";

23

24  ───────────────

     [5] The Ninth Circuit rejected Jan-Pro's argument that it is in the business of "franchising" because
25  "[f]ranchising is not itself a business, rather a company is in business of selling goods or services
     and uses the franchise model as a means of distributing the goods or services to the final end user
26  without acquiring significant distribution costs."  *Vazquez*, 986 F.3d at 1127 (citing *Awuah v.*
     *Coverall N. Am., Inc.*, 707 F. Supp. 2d 80, 84 (D. Mass. 2010)).  Sportsman argues that I should
27  similarly reject Rover's contention that it is a platform because being a platform is not in itself a
     business, rather it is a model for delivering the services.  She fails to explain why operating an
28  online marketplace is comparable to operating a franchise.  The problems identified by the Ninth
     Circuit in the franchise context do not stretch into the circumstances in this case.

"Rover has established itself as the largest network of dog sitters") (emphasis added); *see, e.g.*, *id.*, Ex. 42 at 0:07–0:12, 0:49–0:53  ("That is why our app makes it simple to find the perfect human fit for you dog"; "For whatever dog thing your dog needs, find their perfect fit on Rover."); *id.*, Ex. 47 at 0:24–0:30 ("Find the perfect walker for your dog.").

Viewing the evidence in the light most favorable to Sportsman, even if the advertisements portray Rover as a pet care services business, the advertisements alone do not "fully reflect the activities a company regularly or continually performs."  *Q.D.-A., Inc. v. Indiana Dep't of Workforce Dev.*, 114 N.E.3d 840, 848 (Ind. 2019); *People v. Uber*, 56 Cal. App. 5th at 296 (citing *Q.D.-A.* as an example where there was no "continual coordination").  Evaluating an analogous Prong B under Indiana law, the Indiana Supreme Court in *Q.D.-A.* found that the trial court unreasonably concluded that drivers performed a service within Q.D.-A.'s usual core business-- connecting drivers with customers who needed too-large-to-tow vehicles driven to them.  *Q.D.-A.*, 114 N.E.3d at 848.  Even if Q.D.-A. marketed itself as providing drive-away services, the court held that "marketing plays little, if any, direct role in analyzing the *activities* Q.D.-A. performs on a regular or continual basis."  *Id.* at 847 (emphasis in original).  While "advertising can reflect services a company offers to its customers," the court declined to "uncritically rely on that advertising to fully reflect the activities a company regularly or continually performs."  *Id.* at 847–48.

The same is true here.  Even if Pet Owners thought that Rover was in the business of providing pet care services, the evidence discussed above shows that Rover's regular activities do not involve providing pet care services.  The nature of the business is set up akin to a marketplace that helps Pet Owners find Pet Care Providers, with minimal involvement and direction on how Pet Care Providers perform services.

The third consideration in *Vazquez* "looked to whether the services of the putative employee are continuously used by the hiring entity."  *Vazquez*, 986 F.3d at 1126.  The Ninth Circuit cited a Connecticut Supreme Court decision which held that "a hiring entity cannot meet its burden under Prong B when it 'performs the [putative employee's] activity on a regular or continuous basis, without regard to the substantiality of the activity in relation to the enterprise's

18

United States District Court
Northern District of California

other business activities.'"  *Id.* at 1126–27 (quoting *Mattatuck Museum-Mattatuck Hist. Soc. v. Adm'r, Unemployment Comp. Act*, 238 Conn. 273, 281 (1996)).  The Ninth Circuit instructed the district court to consider "whether Jan-Pro's business model relies on unit franchisees continuously performing cleaning services."  *Id.* at 1127.

Sportsman devotes all of two lines to the analysis of this point, conclusorily arguing that "[t]here is no reasonable dispute that the Pet Care Providers' services are 'continuously' used by Rover," and that "Pet Care Providers are not like electricians or plumbers who perform incidental services for otherwise unrelated businesses."  Sportsman Reply 12.  She relies on an analogy that the *Dynamex* court used to explain Prong B.  *See Dynamex*, 4 Cal. 5th at 959 ("[W]hen a retail store hires an outside plumber to repair a leak in a bathroom on its premises or hires an outside electrician to install a new electrical line, the services of the plumber or electrician are not part of the store's usual course of business and the store would not reasonably be seen as having suffered or permitted the plumber or electrician to provide services to it as an employee.").  While the services that Pet Care Providers perform are not as obviously "incidental" as a store that hires a plumber or electrician, Rover has met its burden in establishing that it operates an online marketplace where Pet Care Providers can advertise their services and Pet Owners can find Pet Care Providers, leaving the pet care services that Pet Care Providers perform during their bookings "incidental" to the overall operation.

### 3.    Prong C

Under Prong C, Rover must establish that Sportsman "customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed."  Cal. Lab. Code § 2775(b)(1)(C).  The question in Prong C is not whether Rover "prohibited [Sportsman] from engaging in an independently established business"; it is whether Sportsman "fits the common conception of an independent contractor—'an individual who independently has made the decision to go into business for himself or herself' and 'generally takes the usual steps to establish and promote his or her independent business—for example, through incorporation, licensure, advertisements, routine offerings to provide services of the independent business to the public or to a number of potential customers, and the like.'"  *Garcia*,

28 Cal. App. 5th at 573 (quoting *Dynamex*, 4 Cal.4th at 962).  "When a worker has not independently decided to engage in an independently established business but instead is simply designated an independent contractor by the *unilateral action* of a hiring entity, there is a substantial risk that the hiring business is attempting to evade the demands of an applicable wage order through misclassification."  *Dynamex*, 4 Cal.4th at 962 (emphasis added).

Sportsman is not simply designated an independent contractor "by the unilateral action" of Rover.  She held herself out that way in in her Rover profile.  She marketed herself as having 35 years of experience, indicating that she provided dog services before joining Rover.  *See* Sportsman Rover Profile at 5.  Under the "About Melanie" section of her profile, titled "I'll love & care for your pet well," she wrote:

> I've grown up with dogs since I was a baby (37+ yrs).  Growing up, I always put my dogs before homework (mom wasn't happy about that).  I would always try to convince my parents we needed to adopt all the dogs in the shelter.  I'm use to all size dogs, from Chihuahuas to Great Danes.  I took an ROP class in high school that required me to volunteer at a vet clinic/hospital.  So I have extensive experience other than just home pet care.  I currently have an Emotional Support Dog for my children (ages 8 & 12).  She's a Reindeer Chihuahua named Eevee.  I also have a hamster, Hammy; a snake, Zed (very gentle & calm & use to dogs, but is always caged); & several fish.  I'm mostly flexible on availability, but will be in school from 8am-1pm on Tues, Wed, & Thurs starting June 20 til July 27.

LeCrone Decl., Ex. Q.  She also listed "Oral Medication Administration, "Injected Medication Administration," "First Aid/CPR, "Can provide daily exercise," and "Senior Dog Experience" as "additional skills" to further promote her services.  Sportsman Rover Profile at 5.

Sportsman argues that the "35 years of experience" does not show that she ever engaged in an "independently established business or trade" providing pet care services.  She contends that she never took any steps to establish or promote an independent pet care services business with formal clientele, and only provided pet care services to family and friends as a "favor".  Sportsman Decl. ¶ 5; Sportsman Dep. at 32:10–33:11, 75:12–76:11.  She also asserts that she "never worked in any kind of animal care capacity either before or after working for [Rover]."  Sportsman Decl. ¶ 12.

Even if Sportsman was not providing pet care services outside of Rover in a formal sense,

20

the evidence shows that she held herself out as operating an independent business. The statements in her profile, which she does not dispute that she wrote, show that she took steps to establish and promote herself as operating an independent business, while competing with other Pet Care Providers on the Rover platform. *See* Sportsman Dep. at 76:12–77:11. This suggests that she is an independent contractor rather than an employee.

Rover does not need to prove that Sportsman "in fact provided services for other entities" in order to satisfy Prong C. *Garcia*, 28 Cal. App. 5th at 575 (citing *Kirby of Norwich v. Adm'r, Unemployment Comp. Act*, 328 Conn. 38, 50 (2018) (finding "a putative employer is not *always* required to present evidence of the performance of services for third parties . . . to prove part C of the ABC test" because "such evidence 'is a single factor that may be considered under the totality of circumstances analysis governing that inquiry'") (emphasis in original and citation omitted)). Rover can present evidence that Sportsman "otherwise established a business 'independent' of [her] relationship with [Rover]." *Id.* That is what it has shown here. That showing is not undermined by the fact that, as Sportsman argued at the hearing, Rover requires Pet Care Providers create a profile in order to use the platform because ultimately the Pet Care Providers customize the content on their profiles to attract customers.

Although the undisputed evidence on Sportsman is sufficient for Rover to prevail on Prong C, the evidence on former named plaintiff Miller provides further confirmation. Miller testified that she provided pet services for 15 years using "word of mouth". LeCrone Decl., Ex. A (Miller Dep. at 37:17–25). She identifies as a "Professional Nanny & Dog Walker" on her LinkedIn page, which also says that she did business for years under the business name "Fog City Dog Walking and Pet Sitting Services." Miller Dep. at 38:1–38:12, 50:20–23, 51:3–16, 59:10–61:23, 63:19–64:23, 17:19–20:11, 28:24–29:5; *see* LeCrone Decl., Ex. V (Miller LinkedIn page). She advertised her pet care services on Sittercity.com and routinely declined booking requests on Rover because she was providing services outside the Rover platform. Miller Dep. at 56:17–57:4, 73:23–75:25, 82:20–84:1, 90:16–95:14; *see* LeCrone Decl., Ex. W (Miller profile on Sittercity.com); *id.*, Ex. T (May 2018 message Miller sent to potential client on Rover, stating "I'm not on Rover that much anymore because I have my own dog sitting service."). She

21

1   continued providing pet services for money outside of Rover after she stopped using the Rover

2   platform.  Miller Dep. at 24:8–28:19.

3        Because Rover has satisfied all three prongs of the ABC test, it is entitled to judgment as a

4   matter of law that Sportsman is an independent contractor.  Sportsman had great latitude in the

5   way she went about her work.  Any control Rover exercised over the booking and payment

6   process was generally unrelated to the manner by which Sportsman accomplished her work.  The

7   pet care services she performed were "incidental" to Rover's overall business of operating an

8   online marketplace where Pet Care Providers can advertise their services and Pet Owners can find

9   Pet Care Providers.  Sportsman used Rover's platform to advertise her services and held herself

10  out as operating an independent business.  She fails to point to any genuine dispute of material fact

11  sufficient to prevent summary judgment in Rover's favor.

12      **C.    *Borello* Test**

13       Rover is also entitled to summary judgment if the *Borello* test applies.  Under *Borello*, the

14  principal test of an employment relationship is "[w]hether the person to whom service is rendered

15  has the right to control the manner and means of accomplishing the result desired."  *Borello*, 48

16  Cal.3d at 350.  In addition to the right of control, the *Borello* test enumerates "secondary indicia"

17  for determining worker classification.  *Id.* at 350–51.

18          **1.    Primary Control Factor**

19       The primary control factor strongly favors Rover for the same reasons stated above with

20  respect to Prong A of the ABC test.  *See supra* section B.1; *Garcia*, 28 Cal. App. 5th at 569 ("Part

21  A involves *Borello*'s common law 'control' test[.]"); *Curry v. Equilon Enterprises*, LLC, 23 Cal.

22  App. 5th 289, 315 (2018), as *modified on denial of reh'g* (May 18, 2018) (finding the *Borello*

23  primary control factor satisfied and for the same reasons "there [was] not a triable issue of fact

24  under the 'A' factor concerning whether Curry was free from Shell's control and direction").

25          **2.    Secondary Factors**

26       While the "control" test is the most significant, the following "secondary factors" must

27  also be considered under the *Borello* test: "(a) whether the one performing services is engaged in a

28  distinct occupation or business; (b) the kind of occupation, with reference to whether, in the

United States District Court
Northern District of California

locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. *Borello*, 48 Cal.3d at 351.

### a.      Distinct Occupation

This factor weighs in Rover's favor for the same reasons stated above with respect to Prong C of the ABC test. *See supra* section B.3; *Borello*, 48 Cal.3d at 351 ("whether the one performing services is engaged in a distinct occupation or business"); Cal. Lab. Code § 2775(b)(1)(C) ("person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed"); *Dynamex*, 4 Cal. 5th at 963.

### b.      Supervision

"If the type of work performed is usually done under an employer's direction, it suggests an employer-employee relationship; if the work is usually done by a specialist without supervision, it suggests an independent contractor relationship." *Hennighan*, 38 F. Supp. 3d at 1103 (citation omitted). Where a plaintiff can "determin[e] her own day-to-day hours, including her vacations" and "on most days, fix[] the time for her arrival and departure at her office and elsewhere, including lunch and breaks," that suggests an independent-contractor status. *Id.* (citation omitted). Courts find this factor "largely duplicative of the control factor." *Id.*; *Lawson*, 302 F. Supp. 3d at 1089.

 As discussed above, Sportsman retained control over the main aspects of her job. Rover did not monitor or supervise her work. Sportsman contends that Pet Care Providers with lower performance scores are "penalized" by Rover with a lower search rank, but Pet Owners, not Rover, review the performance of Pet Care Providers. *See* January 31, 2017 TOS at § 2.6 ("Pet Owners are solely responsible for evaluating the suitability of Service Providers for the services

United States District Court
Northern District of California

23

they offer to provide"); Sportsman Rover Profile at 4–5 (reviews left by Sportsman's customers).

That Rover uses the Pet Care Provider's overall performance score as one of the factors in its

search algorithm (*i.e.*, those with higher performance ratings, might appear higher in a specific

search result than other Pet Care Providers who have lower ratings) does not, without more,

amount to "supervision" of Pet Care Providers.  *See* White Decl. ¶ 13.  This factor favors Rover.

### c.    Skill Required

"Where no special skill is required of a worker, that fact supports a conclusion that the

worker is an employee instead of an independent contractor."  *Hennighan*, 38 F. Supp. 3d at 1103

(citation omitted).  In her Rover profile, Sportsman claimed to have "extensive experience other

than just home pet care," and indicated that she previously volunteered at a veterinary hospital and

had additional, specialized skills in providing pet services, including first aid/CPR to animals and

experience with senior dogs.  *See* Sportsman Rover Profile at 5; LeCrone Decl., Ex. Q.  That

Sportsman had those skills does not mean that they were *required* for the job.  Rover

acknowledges that Pet Care Providers do not need any special skills.  *See* Tidrick Decl., Ex. 38

(Rover webpage "Frequently Asked Questions" stating "What are the requirements to offer dog

boarding?  Number one: have a genuine love of dogs!  You also need to be at least 18 years old, be

able to board dogs in your home, and have the latest Rover app for iOS or Android.  Beyond

that—sitters come from a variety of backgrounds, from office workers to people with less

traditional career paths.  Note that your past work experience doesn't matter too much as long as

you fit the requirements above.").  This factor weighs in Sportsman's favor.

### d.    Instrumentalities

Where the defendant "did not furnish the majority of the tools and instrumentalities" nor "a

place to work," this fact weighs in favor of finding an independent-contractor relationship.

*Hennighan*, 38 F. Supp. 3d at 1103 (citation omitted).  Sportsman testified that she purchased dog

toys, poop bags, dog treats, and other cleaning equipment, and that her clients provided other

items like food, a cage, a leash, and a collar.  Sportsman Dep. at 53:12–54:25.  But she concedes

that Rover played no role in providing her tools and supplies to use in her work.  *Id.*  She decided

the equipment and supplies she needed to perform the pet services, which she bought herself if the

Pet Owners do not provide them.  This factor favors Rover.

### e.     Length of Time

Where a worker is employed for a lengthy period of time, the relationship with the employer looks more like an employer-employee relationship.  *See Hennighan*, 38 F. Supp. 3d at 1104.  Sportsman created her account in May 2017 and had 34 episodic bookings in the twenty months between August 2017 and April 2019.  Sportsman Decl. ¶ 2; Sportsman Dep. at 11:25-12:15, 23:6-9, 45:5-13.  This factor is, at best for Sportsman, neutral.  *See Hennighan*, 38 F. Supp. 3d at 1104 (finding factor neutral where the relationship between the parties "lasted only two years" and "[t]heir contract was terminable at will by either side").

### f.     Method of Payment

"Where the worker is paid by the hour, it typically suggests an employment relationship; where the worker is paid by the job, it points toward independent contractor."  *Hennighan*, 38 F. Supp. 3d at 1104 (citation omitted).  Sportsman, like other Pet Care Providers, was paid on a per-job basis, at her chosen rate, for each complete booking.  White Decl. ¶ 17; Sportsman Rover Profile at 1–2.  This factor weighs in Rover's favor.

### g.     Part of the Regular Business

As discussed above under Prong B of the ABC test, the undisputed evidence supports Rover's contention that it operates an online marketplace and that the pet care services performed by Sportsman is not part of Rover's regular business.  *See supra* section B.2; *see Borello*, 48 Cal.3d at 351 ("whether or not the work is part of the regular business of the principal"); Cal. Lab. Code § 2775(b)(1)(B) ("the person performs work that is outside the usual course of the hiring entity's business.");  *Dynamex*, 4 Cal.5th at 961.  This factor weighs in Rover's favor.

### h.     Parties' Belief

Lastly, courts consider "whether or not the parties believe they are creating a relationship of employer-employee."  *Borello*, 48 Cal.3d at 351, 358.  The parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship.  *Id.* at 349.  However, "a lawful agreement between the parties expressly stating that the relationship created is that of independent contractor should not be lightly disregarded[.]"  *Missions Ins. Co. v. Workers' Comp.*

*Appeals Bd.*, 123 Cal. App. 3d 211, 226 (1981).

Sportsman testifies that she "intended to be an employee of [Rover]," but the Terms of Services that she agreed to clearly states that Rover "does not employ" Pet Care Providers. *See* January 31, 2017 TOS at § 2.2; Sportsman Suppl. Decl. ¶ 2. There is also undisputed evidence that Miller believed she was an independent contractor. *See* Miller Dep. at 99:11–100:19; LeCrone Decl., Ex. T at 9 (messages Miller sent to potential client on Rover, stating "I don't work [full-time] because I'm an independent contractor."). This factor favors Rover.

Altogether, the *Borello* factors, including the primary control factor, strongly weigh in favor of finding that Sportsman was properly classified as an independent contractor. One secondary factor favors Sportsman (the work was low-skilled). "Even if one or two of the individual factors might suggest an employment relationship, summary judgment is nevertheless proper" because "all the factors weighed and considered as a whole establish that [Sportsman] was an independent contractor and not an employee." *Hennighan*, 38 F. Supp. 3d at 1098–99 (quoting *Arnold v. Mut. of Omaha Ins. Co.*, 202 Cal. App. 4th 580, 590 (2011)).

## CONCLUSION

Because there is no genuine dispute of material fact and the evidence shows that Sportsman is an independent contractor as a matter of law, Rover's motion for summary judgment is GRANTED and Sportsman's motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

Dated: May 6, 2021

William H. Orrick
United States District Judge

United States District Court
Northern District of California