THE TIDRICK LAW FIRM LLP
STEVEN G. TIDRICK, SBN 224760
JOEL B. YOUNG, SBN 236662
1300 Clay Street, Suite 600
Oakland, California 94612
Telephone: (510) 788-5100
Facsimile: (510) 291-3226
E-mail: sgt@tidricklaw.com
E-mail: jby@tidricklaw.com

Attorneys for Individual and Representative
Plaintiff MELANIE SPORTSMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELANIE SPORTSMAN,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>A PLACE FOR ROVER, INC. d/b/a Rover *et al.*,<br><br>　　　　　Defendants. | Case No. 3:19-cv-03053-WHO<br><br>**DECLARATION OF JUSTIN REGUS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |

I, Justin Regus, declare:

1. I reside in El Segundo, California and am over 21 years of age. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

2. I am the founder and President of Agility Economics, LLC. In 1999, I graduated *magna cum laude* from Claremont McKenna College with a Bachelor of the Arts degree in Economics. For the past 22 years I have provided economic and financial analysis for parties involved in litigation, transactions, and other disruptive events. Prior to founding Agility Economics, I performed these analyses while employed at prominent international professional services firms, including Navigant Consulting and, most recently, KPMG. During my career I have developed an expertise in economic valuation and cash flow projections; these projections have been used in support of my testimony and the testimony of other experts and have been accepted by courts and regulatory bodies including the United States Internal Revenue Service. In 2010, I earned the Chartered Financial Analyst ("CFA") designation, which is internationally recognized as the preeminent certification for financial analysts. For the subsequent ten years I taught the Economic Analysis course in the CFA Level 3 exam review program for the CFA Society of Los Angeles. I also regularly analyze databases of time and pay records in the context of employment litigation, on behalf of both employers and groups of employees, to quantify the potential damages and penalties at stake. I have provided economic analysis relevant to civil and criminal litigation, and I have been qualified as an expert and testified at deposition and at trial. Attached hereto as **Exhibit 1** is a true and correct copy of my CV.

3. The Tidrick Law Firm LLP ("Tidrick") has hired me as a consultant in this case on behalf of Plaintiff Melanie Sportsman, who has alleged that A Place for Rover, Inc. d/b/a Rover ("Rover") misclassified her and other pet care providers as independent contractors and has failed to pay the pet care providers all wages owed every pay period, among other allegations. Rover operates a two-sided market or platform that connects pet owners and pet care providers who provide services such as overnight boarding of pets, house

sitting and dog walking.[1] Currently, pet care providers set their rates for the services they offer, and pet owners select from available providers for the desired services.[2] Rover charges a fee equal to 20% of the gross booking value paid by pet owners before remitting the balance to the provider.

4. Tidrick has asked me to: (1) estimate the potential penalties owed by Rover pursuant to the California Labor Code Private Attorneys General Act of 2004, California Labor Code §2698 ("PAGA") , using limited data from Rover and certain assumptions; (2) estimate the potential class action damages and penalties in this case, again using limited data from Rover and certain assumptions; and (3) calculate the monetary value to pet care providers of a modification to the Rover platform so that pet care providers in California would instead collect the full rate for their services and Rover would add its fees or any other charges on top of the rate charged by pet care provider rather than deducting the fees or charges from the rate collected by pet care providers. My analyses and conclusions are detailed below.

***Potential PAGA Penalties***

5. Rover provided the following two data points for the period October 1, 2017 (one year prior to the October 1, 2018 PAGA letter submitted to the California Labor and Workforce Development Agency) through September 15, 2022:

| Number of individuals who performed one or more jobs in California on the Rover platform | 90,571 |
|---|---|
| Number of weeks worked by those individuals (the total number for the entire group) | 1,297,719 |

6. Tidrick asked that I estimate the PAGA penalties using the two data points and the following assumptions:

---

[1] See, for example, www.rover.com.
[2] See, for example, https://www.rover.com/blog/sitter-resources/reminder-to-review-your-pricing-on-rover/.

3

(1) Each of the individuals who performed one or more jobs in California on the Rover platform should have been classified as an employee of Rover;

(2) Pay periods were two weeks, and the number of pay periods worked equaled the number of weeks worked divided by two;

(3) Rover did not timely pay all wages owed and therefore owes penalties under each of California Labor Code §201, §202 and §203 equal to $100 per employee;

(4) Each employee was underpaid wages in each pay period, resulting in penalties under §210(a) of $100 per employee for the first pay period and $200 per employee per pay period thereafter, and penalties under §1197 of $100 per employee for the first pay period and $200 per employee per pay period thereafter;

(5) Each employee had inaccurate pay stubs in each pay period, resulting in penalties under §226(a) of $250 per employee for the first pay period and $1,000 per employee per pay period thereafter;

(6) Each employee had been misclassified as an independent contractor, resulting in penalties under §226.8 of $5,000 per employee;

(7) Ten percent of pay periods had one or more meal or rest period violations, resulting in penalties under §226.7 of $100 per employee for the first pay period with a meal or rest violation and $200 per employee per pay period with a meal or rest violation thereafter;

(8) Ten percent of pay periods had unpaid overtime, resulting in penalties under §510 of $100 per employee for the first pay period with unpaid overtime and $200 per employee per pay period with unpaid overtime thereafter;

(9) Each employee had unreimbursed expenses in each pay period, resulting in penalties under §2802 of $100 per employee for the first pay period and $200 per employee per pay period thereafter; and

4

DECLARATION OF JUSTIN REGUS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT – *Sportsman v. A Place for Rover, Inc. et al.*, Case No. 3:19-cv-03053-WHO

(10) Each employee had inaccurate payroll records, resulting in penalties under §1174 of $500 per employee.

7. Using the data and assumptions listed above, I estimated the following potential PAGA penalties; I did not assume a reduction in PAGA penalties under any statutory authority allowing reductions, which I understand will be discussed in the motion for preliminary approval:

|  | Incidents | Penalty Amount |
|---|---|---|
| PAGA civil penalties under California Labor Code §201 -$100 per employee (timely payment of all wages owed) | 90,571 | $9,057,100 |
| PAGA civil penalties under California Labor Code §202 -$100 per employee (timely payment of all wages owed) | 90,571 | $9,057,100 |
| PAGA civil penalties under California Labor Code §203 -$100 per employee (timely payment of all wages owed) | 90,571 | $9,057,100 |
| PAGA civil penalties under California Labor Code §210(a) -$100/$200 per employee per pay period (timely payment of all wages owed) | 648,860 | $120,714,800 |
| PAGA civil penalties under California Labor Code §1197 -$100/$200 per employee per pay period (minimum wages) | 648,860 | $120,714,800 |
| PAGA civil penalties under California Labor Code §226(a) -$250/$1,000 per employee per pay period (accurate pay stubs) | 648,860 | $580,931,250 |
| PAGA civil penalties under California Labor Code §226.8 -$5,000 per employee (misclassification) | 90,571 | $452,855,000 |
| PAGA civil penalties under California Labor Code §226.7 -$100/$200 per employee per pay period (meal and rest periods) | 64,886 | $12,071,480 |
| PAGA civil penalties under California Labor Code §510 -$100/$200 per employee per pay period (unpaid overtime) | 64,886 | $12,071,480 |
| PAGA civil penalties under California Labor Code §2802 -$100/$200 per employee per pay period (expenses) | 648,860 | $120,714,800 |
| PAGA civil penalties under California Labor Code §1174 -$500 per employee (inaccurate payroll records) | 90,571 | $45,285,500 |
| **TOTAL POTENTIAL PAGA PENALTIES** | | **$1,492,530,410** |

***Potential Class Action Damages and Penalties***

8. Rover also provided the following three data points relevant to estimating class

5

action damages and penalties, covering the period October 1, 2018 (approximately four years prior to the October 19, 2022 mediation) through September 15, 2022:

| | |
|---|---|
| Number of individuals who performed one or more jobs in California on the Rover platform | 79,171 |
| Number of weeks worked by those individuals (the total number for the entire group) | 1,060,469 |
| Number of days worked by those individuals (the total number for the entire group) | 4,493,010 |

9. Tidrick asked that I estimate the potential class action damages and penalties using those three data points and the following assumptions:

    (1) Each of the individuals who performed one or more jobs in California on the Rover platform should have been classified as an employee of Rover;

    (2) Pay periods were two weeks, and the number of pay periods worked equaled the number of weeks worked divided by two;

    (3) Each employee's pay rate was $11.62 per hour, representing a weighted average of the minimum wage during the period covered by the data;

    (4) Each employee worked ten minutes of unpaid time per day;

    (5) Ten percent of workdays had a meal or rest period violation, resulting in unpaid meal and rest period premiums;

    (6) Ten percent of workdays had thirty minutes overtime that had been paid as regular time;

    (7) Each employee incurred $10 of unreimbursed business expenses each workday;

    (8) Each pay stub was inaccurate, resulting in statutory penalties under §226(e) of $50 per employee for the first pay period and $100 per employee per pay period thereafter, up to a maximum of $4,000 per employee; and

    (9) Each employee was entitled to thirty days' waiting time penalties under

6

§203(a), calculated at eight hours per day and a wage of $11.62 per hour.

10. Using the class action data and assumptions listed above, I estimated the following potential class action damages and penalties, also assuming that (a) there was in fact off the clock or uncompensated work performed at regular and overtime rates, and (b) there is no good faith defense to Labor Code §203 penalties, both of which I understand will be addressed in the motion for preliminary approval:

| | Incidents | Dollar Value |
|---|---|---|
| Unpaid Time Worked - assumed 10 minutes per workday | 4,493,010 | $8,701,463 |
| Unpaid Meal and Rest Period Premiums | 449,301 | $5,220,878 |
| Unpaid Overtime - assumed paid as regular time | 449,301 | $2,610,439 |
| Unreimbursed Expenses - assumed $10 per workday | 4,493,010 | $44,930,100 |
| Statutory penalties under California Labor Code §226(e) -$50/$100 per employee per pay period, up to $4,000 per employee (accurate pay stubs) | 530,235 | $49,064,900 |
| Statutory penalties under California Labor Code §203(a) - Up to thirty days' wages (waiting time penalties) | 79,171 | $220,792,085 |
| **TOTAL POTENTIAL DAMAGES AND STATUTORY PENALTIES** | | **$331,319,864** |

*Valuation of the Proposed Change in Pricing/Fee Structures*

11. As discussed above, Rover currently deducts a 20% fee from pet care providers for transactions through the Rover platform. To calculate the value to pet care providers of a modification to the Rover platform so that pet care providers in California would instead collect the full rate for their services and Rover would add its fees or any other charges on top of the rate charged by pet care provider, I used the following approach:

(1) Estimate pet care provider earnings in California over the next five years under the current pricing and fee structure;[3]

---

[3] I use five years of calculations because of the relative youth of Rover and the app-based pet care industry; projections beyond five years seem too speculative to be reliable.

7

(2) Estimate pet care provider earnings in California over the next five years under the proposed new pricing and fee structure;

(3) Calculate the present value of the difference between the calculations in steps (1) and (2).

12. I note that my calculation estimates the value of this change to the pet care providers using the Rover platform in California as a whole, rather than to any specific pet care provider or group of pet care providers. Some individuals who have previously provided pet care services through the Rover platform but who are no longer providing services may not receive the benefit of this change. For example, the few data points provided by Rover indicated that 11,400 individuals who performed one or more jobs in California between October 1, 2017 and October 1, 2018 did not continue providing services—the difference between 90,571 individuals in the data for the PAGA time period and 79,171 individuals in the data for the class action time period. Similarly, some individuals who begin providing services under the proposed new pricing and fee structure may enjoy the benefit of the change without having provided services under the current pricing and fee structure. Nonetheless, any individuals who provided services in California through the Rover platform under the current pricing and fee structure would presumably be able to provide services again and therefore enjoy the benefit of the proposed new pricing and fee structure, should they choose to resume providing pet care services through Rover.

13. To estimate pet care provider earnings in California over the next five years, I relied upon Rover's financial statements and earnings releases, transcripts of Rover's earnings calls, pet care industry studies and data from the U.S. Bureau of Economic Analysis and Census Bureau, in addition to my experience and training. I began by projecting the gross booking value ("GBV") of services provided through the Rover platform.[4] From 2014 through 2021, Rover's GBV grew at a compound annual growth rate of 65%.[5] Over the period 2018 through 2022, however, Rover's GBV grew at a compound annual growth rate of

---

[4] GBV represents the amount paid by pet owners for services and is the total amount that is currently divided between pet care providers and Rover.
[5] Source: Rover's Investor Presentation dated November 2022, p. 5.

23.4%.[6] I project that Rover's GBV will continue to grow at a slowing pace to a more sustainable longer-term growth rate, so I estimated GBV using growth rates that decline 2% per year over the next five years, from 23.4% to 13.4%.

14. Next, I estimated the proportion of Rover's GBV that will come from services provided in California over the next five years. Rover has noted that 95% to 97% of its revenue came from its United States operations in recent years but does not provide a further geographic breakdown of its revenue.[7] California represents 11.7% of the US population[8] but 14.1% of US personal income.[9] Because personal income is more reflective of the ability to spend money on pet care services, I estimate that 97% of Rover's GBV will come from United States operations and 14.1% of U.S. GBV will come from services provided in California over the next five years.

15. The table below summarizes my projections of total GBV, California GBV, pet care provider earnings and Rover fees for the next five years, under the current pricing and fee structure.

|  | 2023 | 2024 | 2025 | 2026 | 2027 | Total |
|---|---|---|---|---|---|---|
| **Current Pricing and Fee Structure** | | | | | | |
| Total GBV | 938.7 | 1,121.1 | 1,316.6 | 1,519.7 | 1,723.9 | 6,620.0 |
| California GBV | 128.4 | 153.3 | 180.1 | 207.9 | 235.8 | 905.4 |
| CA Pet care provider earnings | 102.7 | 122.7 | 144.1 | 166.3 | 188.6 | 724.3 |
| CA Rover fees | 25.7 | 30.7 | 36.0 | 41.6 | 47.2 | 181.1 |
| *All figures in millions of dollars* | | | | | | |

16. How pet care provider earnings in California change under the proposed new

---

[6] Using the GBV figures listed on p. 5 of Rover's Nov. 2022 Investor Presentation, I calculated a compound annual growth rate from 2018-2022. I projected the total 2022 GBV by taking the average of the first three quarters and adding the average as a fourth quarter.
[7] Source: Rover Form 10-Q for the quarter ending September 30, 2021.
[8] Source: U.S. Census Bureau (https://www.census.gov/quickfacts/fact/table/CA,US/PST045221).
[9] Source: U.S. Bureau of Economic Analysis (https://apps.bea.gov/itable/?ReqID=70&step=1&acrdn=1#eyJhcHBpZCI6NzAsInN0ZXBzIjpbMSwyNCwyOSwyNSwzMSwyNiwyNywzMF0sImRhdGEiOltbIlRhYmxlSWQiLCI2MDAiXSxbIkNsYXNzaWZpY2F0aW9uIiwiTm9uLUluZHVzdHJ5Il0sWyJNYWpvcl9BcmVhIiwiMCJdLFsiU3RhdGUiLFsiMCJdXSxbIkFyZWEiLFsiMDAwMDAiLCIwNjAwMCJdXSxbIlN0YXRpc3RpYyIsWyItMSJdXSxbIlVuaXRfb2ZfbWVhc3VyZSIsIkxldmVscyJdLFsiWWVhciIsWyIyMDIxIl1dLFsiWWVhckJlZ2luIiwiLTEiXSxbIllYJfRW5kIiwiLTEiXV19).

9

DECLARATION OF JUSTIN REGUS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT – *Sportsman v. A Place for Rover, Inc. et al.*, Case No. 3:19-cv-03053-WHO

pricing and fee structure depends on the answers to two key questions: (1) Given the opportunity to charge a higher price net of fees, how will pet care providers set their prices in the proposed new pricing and fee structure? and (2) To the extent that Rover's fees are passed through to pet owners in the form of higher prices, how will pet owners' demand for services change? If pet care providers set their prices so that pet owners pay all of the fees that Rover currently collects from providers, and pet owners do not consume fewer services through Rover as a result of the higher prices, then pet care providers' earnings would increase by the full $181.1 million in projected Rover fees in California shown in the table above. If pet care providers recover less than the entire amount of the fees Rover currently collects, and if pet owners consume fewer services through Rover as a result of higher prices, then the increase in pet care providers' earnings would be less than the full $181.1 million figure. I address each of these questions below.

17. The question of how pet care providers will set their prices can be illustrated with a hypothetical example. Under the current pricing and fee structure, if a pet care provider offers a dog walk for $25, the pet owner pays $25, then Rover retains a $5 fee and remits $20 to the pet care provider.[10] Under the proposed new pricing and fee structure, if a pet care provider offers a dog walk for $25, Rover would charge its $5 on top of the $25, resulting in a price to the pet owner of $30.[11] Thus, the question is whether the pet care provider would set a new price of $20 (which is equal to what they currently receive net of fees and would result in a *lower* price to the pet owner of $24, assuming Rover continues charging a 20% fee), continue charging $25 (recovering all of the fees Rover currently collects), or something else altogether.[12]

---

[10] Rover's fee is calculated as 20% x $25 = $5.
[11] I have assumed that Rover would continue to charge a fee equal to 20% of the price set by the pet care provider, but nothing prohibits Rover from charging less and reducing the price effect on pet owners.
[12] I have also assumed that when the new pricing and fee structure is implemented, the prices set by pet care providers initially remain in place, so that a dog walker charging $25 but receiving $20 net of fees would initially continue charging $25 instead of Rover adjusting their price to $20. This is important because it allows pet care providers the opportunity to evaluate how demand from pet owners adjusts to the higher prices without concern for other providers initially undercutting their prices.

10

DECLARATION OF JUSTIN REGUS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT – *Sportsman v. A Place for Rover, Inc. et al.*, Case No. 3:19-cv-03053-WHO

18. Evidence from other two-sided platforms or markets offers insight into the likely long-run behavior of pet care providers. A study of data derived from Airbnb.com on more than 170,000 properties in 61 tax jurisdictions spanning three years found that 76% of a new tax on short-term rental properties was passed through to renters, and only 24% of the new tax was internalized to reduce hosts' income.[13] Similarly, a study of a congestion tax in Chicago on ride-share transactions found that 107% of the tax was passed through to single riders and 82% of the tax was passed through on shared rides.[14] Based on these findings, I estimate that pet care providers would set prices to recover 80% of the fees Rover currently collects. For the hypothetical dog walker, this would mean that instead of charging $25 and having the new price to the pet owner increase by the full $5 Rover fee, the dog walker would charge $24 (recovering 80% of the fee Rover currently collects). If Rover continued charging a 20% fee, that fee would equal $4.80, resulting in a total cost to the pet owner of $28.80. In percentage terms, prices to pet owners would increase by 15.2%.[15]

19. The second component in projecting pet care provider earnings and Rover fees in California under the proposed new pricing and fee structure is to evaluate how pet owners' demand for services would change given a 15.2% increase in prices. This is a common economic concept called the price elasticity of demand. If a product or service has a price elasticity of 1.0, then a price increase of 1% is expected to cause a decrease of 1% in the quantity consumed.[16] When the price elasticity for a good or service is less than 1, demand is considered to be inelastic—the decrease in quantity is smaller than the increase in price. Gasoline is considered to have inelastic demand, because consumers do not change their consumption of gasoline as much as price changes, so a 1% increase in prices leads to a

---

[13] See, Bibler, A. J., Teltser, K., Tremblay, M. (2021). Inferring Tax Compliance from Pass-through: Evidence from Airbnb Tax Enforcement Agreements. *Review of Economics and Statistics*, 103(4), 636-651.

[14] Leccese, Mario, Asymmetric Taxation, Pass-through and Market Competition: Evidence from Ride-sharing and Taxis (August 12, 2022).

[15] ($28.80 - $25.00) ÷ $25.00 = 15.2%. Also, note that Rover's fees would decrease 4%, from $5 to $4.80.

[16] Price elasticity is generally discussed as an absolute value, thus the value of 1.0. In empirical studies, price elasticity is shown as a negative value because an increase in price results in a decrease in quantity consumed. I am using absolute values in my discussion here, but an increase in prices is assumed to lead to a decrease in quantity consumed.

11

DECLARATION OF JUSTIN REGUS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT – *Sportsman v. A Place for Rover, Inc. et al.*, Case No. 3:19-cv-03053-WHO

decrease in the quantity demanded of less than 1%. On the other hand, if a product has many substitutes or is discretionary, the price elasticity of demand may be greater than 1.0, so that a 1% increase in price leads to a greater than 1% decrease in the quantity consumed.

20. In the pet care market, studies have shown that demand is inelastic. For example, a study by KPMG estimated the price elasticity of demand for veterinary services at 0.43.[17] Another study found the price elasticity of demand was 0.16 for care for cats and 0.10 for care for dogs.[18] Rover has noted in investor presentations that the pet owners who use the Rover platform tend to have higher incomes than other pet owners, and the KPMG study found that price elasticity decreased as pet owners' incomes increased. Based on these metrics, I estimate a price elasticity of demand for Rover's services of 0.4. This means that for every 1% increase in price, the quantity demanded would be expected to decrease by 0.4%.

21. Combining the 15.2% projected increase in price with the price elasticity of 0.4, the quantity of services demanded on Rover would be expected to decrease by 6.08% (15.2% x 0.4). This means that the GBV in California under the proposed new pricing and fee structure would increase by approximately 8.2% and pet care provider earnings in California would increase by 12.7%, as shown in the table below.[19]

---

[17] See, Brown JP, Silverman JD. The current and future market for veterinarians and veterinary medical services in the United States. Journal of the American Veterinary Medical Association. 1999 Jul;215(2):161-183.
[18] Daneshvary, N., & Schwer, R. K. (1993). The Nature Of Demand For Companion Pet Health Care. Journal of Applied Business Research (JABR), 9(4), 24–32.
[19] The 8.2% can be calculated as (1 plus the percentage price increase) times (1 minus the quantity decrease), minus 1. 1.152 x 0.9392 = 1.082. Similarly, Rover's fees in California decrease 9.8% because of the 4% decrease in the hypothetical transaction discussed above and the 6.08% decrease in quantity demanded. 0.96 x 0.9392 = 0.902.

12

|  | 2023 | 2024 | 2025 | 2026 | 2027 | Total | Change |
|---|---|---|---|---|---|---|---|
| *Current Pricing and Fee Structure* | | | | | | | |
| Total GBV | 938.7 | 1,121.1 | 1,316.6 | 1,519.7 | 1,723.9 | 6,620.0 | |
| California GBV | 128.4 | 153.3 | 180.1 | 207.9 | 235.8 | 905.4 | |
| CA Pet care provider earnings | 102.7 | 122.7 | 144.1 | 166.3 | 188.6 | 724.3 | |
| CA Rover fees | 25.7 | 30.7 | 36.0 | 41.6 | 47.2 | 181.1 | |
| | | | | | | | |
| *Proposed New Pricing and Fee Structure* | | | | | | | |
| California GBV | 138.9 | 165.9 | 194.8 | 224.9 | 255.1 | 979.6 | 8.2% |
| CA Pet care provider earnings | 115.8 | 138.3 | 162.4 | 187.4 | 212.6 | 816.4 | 12.7% |
| CA Rover fees | 23.2 | 27.7 | 32.5 | 37.5 | 42.5 | 163.3 | -9.8% |
| *All figures in millions of dollars, except for percentages* | | | | | | | |

22. The final step in calculating the value to pet care providers in California of the proposed change in the pricing and fee structure on the Rover platform is to calculate the difference in pet care provider earnings between the two scenarios, and discount to present value. The process of discounting to present value reflects the concept that a dollar received in the future is worth less than a dollar received today, and that the riskier the opportunity to receive the dollar in the future, the less it is worth today.[20] I use the build-up method to calculate a discount rate appropriate to Rover, as shown in the table below.

| | | |
|---|---|---|
| Risk-Free Rate | 3.9% | [A] |
| Equity Risk Premium | 7.5% | [B] |
| Size Premium | 2.5% | [C] |
| **Discount Rate** | **13.8%** | [D] = [A] + [B] + [C] |

**Notes and Sources:**
[A]  Equals Current 5-Year Treasury Note Interest Rate, as of January 2023 (Source: TreasuryDirect).
[B]  Equals the long-term arithmetic mean of the stock market total return less the arithmetic mean of the long-term government bond income return (Source: Ibbotson SBBI data).
[C]  Reflects the size premium for the decile of firms with market capitalization similar to Rover's (approximately $700 million).
[D]  Equals sum of [A] + [B] + [C].

23. Applying the 13.8% discount rate to the projected increase in pet care provider earnings, I find the value to pet care providers in California of the proposed change in the

---
[20] See, for example, https://www.investopedia.com/terms/p/presentvalue.asp.

13

DECLARATION OF JUSTIN REGUS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT – *Sportsman v. A Place for Rover, Inc. et al.*, Case No. 3:19-cv-03053-WHO

pricing and fee structure on the Rover platform is approximately $65.1 million, as shown in the table below.

|  | 2023 | 2024 | 2025 | 2026 | 2027 | Total |
|---|---|---|---|---|---|---|
| ***Current Pricing and Fee Structure*** | | | | | | |
| Total GBV | 938.7 | 1,121.1 | 1,316.6 | 1,519.7 | 1,723.9 | 6,620.0 |
| California GBV | 128.4 | 153.3 | 180.1 | 207.9 | 235.8 | 905.4 |
| CA Pet care provider earnings | 102.7 | 122.7 | 144.1 | 166.3 | 188.6 | 724.3 |
| CA Rover fees | 25.7 | 30.7 | 36.0 | 41.6 | 47.2 | 181.1 |
| ***Proposed New Pricing and Fee Structure*** | | | | | | |
| California GBV | 138.9 | 165.9 | 194.8 | 224.9 | 255.1 | 979.6 |
| CA Pet care provider earnings | 115.8 | 138.3 | 162.4 | 187.4 | 212.6 | 816.4 |
| CA Rover fees | 23.2 | 27.7 | 32.5 | 37.5 | 42.5 | 163.3 |
| Change in provider earnings | 13.0 | 15.6 | 18.3 | 21.1 | 24.0 | 92.0 |
| Present value factor | 0.937 | 0.823 | 0.723 | 0.635 | 0.558 | |
| Present value of change | 12.2 | 12.8 | 13.2 | 13.4 | 13.4 | **65.1** |
| *All figures in millions of dollars* | | | | | | |

24. Finally, I prepared two alternative scenarios to reflect a reasonable worst-case scenario and a reasonable high-case scenario. For the worst-case scenario, I assumed that Rover would experience no growth in GBV over the next five years, perhaps due to pet owners experiencing a combination of less available income and more available time. I also changed the pass-through rate of price increases to 0.5, so that pet care providers would only increase prices to recover half of the fees Rover currently collects, and I set price elasticity of demand to 1.0, so that each one percent increase in price would be offset by a one percent decrease in quantity demanded. As shown in the table below, even under those circumstances, the value to pet care providers in California of the proposed change in the pricing and fee structure on the Rover platform is approximately $5.5 million.

14

| Low Scenario | 2023 | 2024 | 2025 | 2026 | 2027 | Total |
|---|---|---|---|---|---|---|
| *Current Pricing and Fee Structure* | | | | | | |
| Total GBV | 773.0 | 773.0 | 773.0 | 773.0 | 773.0 | 3,865.0 |
| California GBV | 105.7 | 105.7 | 105.7 | 105.7 | 105.7 | 528.6 |
| CA Pet care provider earnings | 84.6 | 84.6 | 84.6 | 84.6 | 84.6 | 422.9 |
| CA Rover fees | 21.1 | 21.1 | 21.1 | 21.1 | 21.1 | 105.7 |
| *Proposed New Pricing and Fee Structure* | | | | | | |
| California GBV | 103.3 | 103.3 | 103.3 | 103.3 | 103.3 | 516.4 |
| CA Pet care provider earnings | 86.1 | 86.1 | 86.1 | 86.1 | 86.1 | 430.3 |
| CA Rover fees | 17.2 | 17.2 | 17.2 | 17.2 | 17.2 | 86.1 |
| Change in provider earnings | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 7.4 |
| Present value factor | 0.937 | 0.823 | 0.723 | 0.635 | 0.558 | |
| Present value of change | 1.4 | 1.2 | 1.1 | 0.9 | 0.8 | **5.5** |
| *All figures in millions of dollars* | | | | | | |

25. In the high scenario, Rover achieves the ongoing 25% compound annual GBV growth that it projects in its investor presentation, the pass-through rate is back to 0.8 as in the base scenario, and price elasticity of demand is 0.2 instead of 0.4. As shown below, in those circumstances the value to pet care providers in California of the proposed change in the pricing and fee structure on the Rover platform is $98.6 million.

| High Scenario | 2023 | 2024 | 2025 | 2026 | 2027 | Total |
|---|---|---|---|---|---|---|
| *Current Pricing and Fee Structure* | | | | | | |
| Total GBV | 966.3 | 1,207.8 | 1,509.8 | 1,887.2 | 2,359.0 | 7,930.0 |
| California GBV | 132.2 | 165.2 | 206.5 | 258.1 | 322.6 | 1,084.6 |
| CA Pet care provider earnings | 105.7 | 132.2 | 165.2 | 206.5 | 258.1 | 867.7 |
| CA Rover fees | 26.4 | 33.0 | 41.3 | 51.6 | 64.5 | 216.9 |
| *Proposed New Pricing and Fee Structure* | | | | | | |
| California GBV | 147.6 | 184.5 | 230.6 | 288.3 | 360.4 | 1,211.5 |
| CA Pet care provider earnings | 123.0 | 153.8 | 192.2 | 240.3 | 300.3 | 1,009.6 |
| CA Rover fees | 24.6 | 30.8 | 38.4 | 48.1 | 60.1 | 201.9 |
| Change in provider earnings | 17.3 | 21.6 | 27.0 | 33.8 | 42.2 | 141.9 |
| Present value factor | 0.937 | 0.823 | 0.723 | 0.635 | 0.558 | |
| Present value of change | 16.2 | 17.8 | 19.5 | 21.5 | 23.6 | **98.6** |
| *All figures in millions of dollars* | | | | | | |

I declare under penalty of perjury that the foregoing is true and correct. Executed on  Feb. 7 , 2023.

_____
JUSTIN REGUS